LESTER J. MARSTON
California State Bar No. 081030
THE LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA OF ME-WUK INDIANS, and PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS<br><br>Plaintiffs,<br>v.<br><br>KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, and DOES 1-20,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONEY DAMAGES**<br><br>**[25 U.S.C. § 2710(d)(7)(A)(i); 18 U.S.C. § 1964]**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.     This is an action brought by three (3) federally recognized Indian Tribes, the Blue Lake Rancheria, the Chicken Ranch Rancheria of Me-Wuk Indians, and the Picayune Rancheria of the Chukchansi Indians (collectively, the "Tribes"), seeking a preliminary and permanent injunction against the defendants to prevent them from engaging in illegal sports gambling on the Tribes' respective reservations

in direct violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), the Tribes' Tribal-State Gaming Compacts ("Compacts") with the State of California ("State") entered into pursuant to the IGRA, Secretarial Procedures ("Procedures") issued by the Secretary pursuant to the IGRA, the Tribes' Gaming Ordinances ("Ordinances") approved by the Chairman of the National Indian Gaming Commission pursuant to the IGRA, and the respective Tribal Gaming Commissions' regulations adopted pursuant to the Tribes' federally approved Ordinances and Compacts, all of which prohibit sports gambling on the Tribes' reservations or "Indian Lands" ("Reservations"), as defined by the IGRA.

2.      By way of background, for the majority of this Country's history, gambling on sports has been illegal under federal law and the laws of most states for both moral reasons and to ensure that sporting events are fair and free from gambling-related corruption. In 1992, Congress enacted the Professional and Amateur Sports Protection Act, 28 U.S. Code § 3701 *et seq.*, which purported to bar the States (other than Nevada and New Jersey) from authorizing sports betting. In 2018, however, the Supreme Court struck down that Act, recognizing that "Americans have never been of one mind about gambling[,]" and holding that Congress could not lawfully impose such a barrier on state lawmakers. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Since then, most states have legalized sports gambling thorough licensing and registration regimes that generate much needed tax dollars for states and, typically, require bettors to be 21 years old to place sports bets. Indian tribes, too, have begun to offer sports gambling on their reservations in those states where, consistent with the IGRA, the state permits such gambling under state law.

3.      In 2025, the gaming industry shifted significantly. Currently, 18 year old high school students across the United States—including some that are located on Indian reservations—are on their phones placing bets on the outcome of virtually every sporting event occurring across the globe, without any regulation of that

betting by states or Indian tribes and the protective measures related to corruption and problem gambling imbedded in such regulatory schemes, in contravention of federal, state, and tribal law. And they are placing those illegal bets using defendants Kalshi Inc. and KalshiEX LLC, ("Kalshi"), and Robinhood Markets, Inc. and Robinhood Derivatives LLC ("Robinhood").

4.      Kalshi will claim that it is not offering sports gambling. Kalshi will tell the Court that it is a Designated Contract Market, regulated exclusively by the Commodities Futures Trading Commission ("CFTC"), and is merely operating a "prediction market" that permits the buying and selling of "commodities contracts," or swaps on sporting events. While masquerading as novel commodities and futures products, these event contracts are, substantively, nothing more than illegal, unregulated wagers on the outcomes of sporting events:



5.      Contrary to Kalshi's assertions, Kalshi is engaging in sport gambling as defined by the IGRA and the Tribes' Compacts, Procedures, and Ordinances. Therefore, the Tribes seek an order from the Court enjoining Kalshi from conducting its illegal sports gambling operation.

6.      In addition, the Tribes seek a permanent injunction enjoining Kalshi's illegal gambling on Indian lands because such gaming is currently unregulated, violates the State's Constitution and penal code provisions, and directly interferes with the ability of the Tribes to govern themselves under their own laws on their Reservations—land owned by the United States of America in trust for the Tribes.

///

**JURISDICTION**

7.   This Court's jurisdiction over the Tribes' claims is based upon the following:

(a)   28 U.S.C. § 1331, in that this action arises under the Constitution and laws of the United States, specifically, the IGRA, 25 U.S.C. at § 2710(d)(7)(A)(ii), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the federal common law;

(b)   28 U.S.C. § 1362, in that the district courts have original jurisdiction of all civil actions brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior ("Secretary"), wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States;

(c)   25 U.S.C. § 2710(d)(7)(A)(ii), in that this is an action initiated by federally recognized Indian tribes to enjoin a class III gaming activity located on Indian lands and conducted in violation of Tribal-State compacts and secretarial procedures that are in effect;

(d)   18 U.S.C. § 1964(c), in that this is an action initiated by the Tribes for injuries to their business caused by defendants' violation of the Racketeer Influenced and Corrupt Organizations Act through a pattern of racketeering activity; and

(e)   15 U.S.C. § 1125(a)(1)(B), in that this action seeks to redress false and misleading statements of fact made in commercial advertising or promotion that misrepresent the nature, characteristics, or qualities of defendant Kalshi's activities.

**VENUE**

8.   Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, in that:

(a)   The defendants conduct business within this District;

(b)    A substantial part of the events or omissions giving rise to the Tribes' claims occurred in this District; and

(c)    Defendants maintain corporate offices within this District.

**PARTIES**

9.    Plaintiff Blue Lake Rancheria ("Blue Lake") is a federally recognized Indian tribe, organized under the provisions of the Indian Reorganization Act, 25 U.S.C. § 476, under a written Constitution, which has been approved by the Secretary and which designates the Blue Lake Business Council as the governing body of Blue Lake. Blue Lake is the beneficial owner of the Blue Lake Rancheria ("Blue Lake Reservation"), which consists of approximately 26 acres of trust and fee lands located within the exterior boundaries of the Blue Lake Reservation in Humboldt County, California. Blue Lake conducts class-III gaming on its Blue Lake Rancheria pursuant to the IGRA, its Secretarial Procedures, and its Gaming Ordinance.

10.    Plaintiff Chicken Ranch Rancheria of Me-Wuk Indians ("Chicken Ranch") is a federally recognized Indian tribe organized under a written Constitution, which designates the Chicken Ranch Tribal Council as the governing body of Chicken Ranch. Chicken Ranch is the beneficial owner of the Chicken Ranch Rancheria or reservation ("Chicken Ranch Rancheria"), which consists of approximately 40 acres of trust and fee lands located within the exterior boundaries of the Rancheria in Tuolumne County, California. Chicken Ranch conducts class-III gaming on its Chicken Ranch Rancheria pursuant to the IGRA, its Secretarial Procedures, and its Gaming Ordinance.

11.    Plaintiff Picayune Rancheria of Chukchansi Indians ("Picayune Rancheria") is a federally recognized Indian tribe, organized under a written Constitution, which designates the Picayune Rancheria Tribal Council as the governing body of the Tribe. The Tribe is the beneficial owner of the Picayune Rancheria ("Picayune Reservation"), which is located in Madera County, California.

Picayune conducts class-III gaming on its Picayune Reservation pursuant to the IGRA, its Compact, and its Gaming Ordinance.

12.    Defendant Kalshi Inc. is a Delaware corporation headquartered at 594 Broadway, Rm 407, New York City, New York 10012. Plaintiffs are informed and believe, and on that basis allege, that Defendant Kalshi Inc. is the parent company of all other Kalshi entities.

13.    Defendant KalshiEX LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. Plaintiffs are informed and believe, and on that basis allege, that Defendant KalshiEX LLC is a wholly owned subsidiary of Kalshi Inc. that operates as a commodities exchange.

14.    Defendant Robinhood Markets, Inc. is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. Plaintiffs are informed and believe, and on that basis allege, that Defendant Robinhood Markets, Inc. is the parent company of all other Robinhood entities. Robinhood is an investment platform that permits trading on stocks, Exchanged Traded Funds ('ETFs"), and other commodities. As relevant here, Robinhood has partnered with Kalshi to open—on the Robinhood investment platform—a prediction market hub, allowing persons located both on and off the Tribes' respective Reservations to place illegal, unregulated sports book wagers on the outcome of sporting events, in the form of "event contracts."

15.    Defendant Robinhood Derivatives LLC is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. Plaintiffs are informed and believe, and on that basis allege, that Defendant Robinhood Derivatives LLC is a wholly owned subsidiary of Robinhood Markets, Inc. It is a futures commission merchant and provides options on futures trading. As relevant here, it is the division of Robinhood that has partnered with Kalshi to offer a prediction market hub that allows persons to engage in illegal sports gambling by placing illegal, unregulated wagers on the outcome of sporting events in the form of

event contracts on the Tribes' Reservations.

16.    The above-named Defendants are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 20, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiffs will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

## GAMING ON INDIAN LANDS PURSUANT TO THE INDIAN GAMING REGULATORY ACT

17.    Courts have long recognized that Congress has "exclusive authority" over Indian affairs. *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 788-90 (2014). This exclusive authority is rooted in the Indian Commerce Clause (art. I, § 8, cl. 3) and the Supremacy Clause (art. VI, cl. 2) of the Constitution, which gives Congress "the exclusive and absolute power to regulate commerce with the Indian tribes, — a power as broad and as free from restrictions as that to regulate commerce with foreign nations." *United States v. Forty-Three Gallons of Whiskey,* 93 U.S. 188, 194 (1876); *Worcester v. Georgia* 31 U.S. 515, 551-57, 558–60 (1832); *Seminole Tribe v. Fla.,* 517 U.S. 44, 62 (1996).

18.    The Indian Commerce Clause authorizes Congress "[t]o regulate Commerce . . . with the Indian Tribes." Art. I, §8, cl. 3. The United States Supreme Court has interpreted the Indian Commerce Clause to reach not only trade, but certain "Indian affairs," as well. *Cotton Petroleum Corp. v. New Mexico*, 490 U. S. 163, 192 (1989).

19.    The Supreme Court does not treat the Indian Commerce Clause as interchangeable with the Interstate Commerce Clause. *Id.* Unlike the Interstate Commerce Clause, where States retain "some authority" over trade, the Supreme Court has ruled that "virtually all authority over Indian commerce and Indian tribes"

1    lies with the Federal Government. *Seminole Tribe of Fla.*, 517 U. S. at 62.

2        20.    From this exclusive authority the Supreme Court has held that there

3    arises and exists a trust relationship between the United States and the Indian tribes

4    that informs and restrains the Congressional exercise of legislative power. *United*

5    *States v. Mitchell*, 463 U. S. 206, 225-226 (1983). Pursuant to this trust relationship,

6    the Federal Government has "'charged itself with moral obligations of the highest

7    responsibility and trust'" toward Indian tribes. *United States v. Jicarilla Apache*

8    *Nation*, 564 U.S. 162, 176 (2011), *quoting Seminole Nation v. United States*, 316

9    U.S. 286, 296-297 (1942).

10       21.    Based upon the trust responsibility owed to tribes by the United States,

11   courts presume that when Congress legislates on Indian affairs, its intent towards the

12   tribes is benevolent and federal statutes that arguably would abrogate or abridge

13   tribal rights to self-government are narrowly construed in favor of the tribes retaining

14   them. *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985).

15       22.    For this reason, the Supreme Court has adhered to "the general rules

16   that statutes passed for the benefit of the dependent Indian tribes . . . are to be

17   liberally construed, doubtful expressions being resolved in favor of the Indians." *Id.*

18       23.    Applying these canons of statutory construction, the Supreme Court in

19   *California v. Cabazon Band of Indians*, 480 U.S. 202 (1987) ("*Cabazon*"), held that

20   California had no authority to enforce its gambling laws against Indian tribes on their

21   Indian lands. *Cabazon*, 480 U.S. at 221-222.

22       24.    In response to the *Cabazon* decision, Congress enacted the Indian

23   Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, to create a framework for Indian

24   tribes, states, and the federal government to exclusively and comprehensively

25   regulate tribal gaming on "Indian lands."

26       25.    The purpose of IGRA, set forth in 25 U.S.C. § 2702, is:

27       (1)    to provide a statutory basis for the operation of gaming by Indian

28              tribes as a means of promoting tribal economic development, self-

8
COMPLAINT

sufficiency, and strong tribal governments;

(2)    to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3)    to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

26.    Under the IGRA, if the gaming activity is not specifically prohibited by Federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity: (1) Indian tribes and the National Indian Gaming Commission ("NIGC") have the **exclusive** right to regulate class II gaming on Indian lands; and (2) the Indian tribes and the states, pursuant to a compact, have the **exclusive** right to regulate class III gaming on Indian lands. 25 U.S.C. § 2701(5) (emphasis added).

27.    IGRA defines "Indian lands" as "all lands within the limits of any Indian reservation"; and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual Indian or held by any Indian tribe or individual subject to a restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. §§ 2703(4)(A)-(B).

28.    IGRA established a statutory framework for the regulation of Indian gaming, which "expressly pre-empts the field of governance of gaming activities on Indian lands." *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1289 (D.N.M. 1996) (quoting S. REP. No. 100-446 at 6); *Gaming Corporation v. Dorsey & Whitney*, 88 F. 3d 536 (8th Cir. 1996).

29.    IGRA divides Indian gaming into three classes, with different regulatory requirements for each class. Class I gaming consists of traditional tribal games for prizes of minimal value connected with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive regulatory jurisdiction of the tribes. Class II gaming consists of bingo, "whether or not electronic, computer, or other technological aids are used in connection therewith," including "pull tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. § 2703(7)(A)(i). Also included in class II gaming are non-banked card games either explicitly authorized by state law or not prohibited by state law and played in conformity with state regulations regarding hours of play and limits on wagers and pot sizes. 25 U.S.C. § 2703(7)(A)(i)-(ii) and (7)(B). Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming," 25 U.S.C. § 2703(8), which includes sports gambling.

30.    Class III gaming can be the most lucrative form of gaming. It includes the games played in a typical casino in Las Vegas, such as slot machines, craps, roulette, and house banked and percentage card games, like blackjack (21).

31.    The federal regulations adopted by the NIGC, which implement IGRA, specifically state that class III gaming includes "[a]ny sports betting and pari-mutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4 (c).

32.    While federal regulations define class III gaming as including all house banked games, 25 C.F.R. § 502.4 (a), the regulations separately state that sports betting constitutes class III gaming without reference to whether the wagering is house banked. 25 C.F.R. § 502.4 (c).

33.    Thus, sports betting constitutes a class III gaming activity regardless of whether the wager is made against the house or against other bettors.

34.    Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the tribe must have adopted a tribal ordinance that authorizes the playing

of the class III games and the ordinance must have been approved by the Chairman of the NIGC (the federal regulatory agency created under IGRA); (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

35.    In order to go into effect, a tribal-state class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by operation of law, 25 U.S.C. § 2710(d)(8)(C), and notice of approval must be published in the Federal Register, 25 U.S.C. § 2710(d)(3)(B).

36.    Gaming conducted by any person or entity on Indian lands that is not authorized by a tribal-state class III gaming compact violates IGRA and federal and state criminal law. *See* 25 U.S.C. §1166 (applying "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions" to Indian country). *See also Coeur D'Alene Tribe v. State*, 842 F. Supp. 1268, 1282 (D. Idaho 1994)("Accordingly, the court finds that in the absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity … may conduct Class III gaming on the reservation.").

37.    Any class II or class III gaming conducted by a third party management company on Indian lands on behalf of a tribe with a compact must meet the strict requirements of IGRA, 25 U.S.C. § 2710(d)(9) and 25 U.S.C. § 2711, in order to conduct that gaming. Further, any contract authorizing a third party management company to conduct gaming on Indian lands on behalf of a tribe must be approved by the Chairman of the NIGC. *Id*. *See also* 25 C.F.R. § 533.

38.    IGRA provides tribes an enforcement mechanism to prevent gaming from being conducted on Indian lands that is not authorized by a tribal-state compact. "The United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on

1  Indian lands and conducted in violation of any Tribal-State compact entered into

2  under [IGRA] that is in effect . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii).

3  **THE TRIBES' COMPREHENSIVE REGULATION OF GAMING**

4  **A.    The Tribes' Regulation of Gaming Under Their Compacts.**

5     39.    Each of the plaintiff Tribes conducts class III gaming on their respective

6  Reservations. The Blue Lake Rancheria and Chicken Ranch Rancheria conduct their

7  gaming pursuant to Secretarial Procedures issued by the Department of the Interior

8  on January 31, 2024. The Picayune Rancheria conducts its gaming pursuant to a

9  class-III gaming compact. Picayune entered into its Compact with the State in 1999,

10  which has been subsequently extended four times.

11     40.    The Procedures and Compacts afford the Tribes primary responsibility

12  for the regulation of their gaming facilities and activities to ensure the fairness of the

13  playing of the class III games, to shield the games from criminal activity, to ensure

14  that the Tribes are the primary beneficiaries of the gaming activities, and to promote

15  tribal economic development and self-sufficiency. To achieve these objectives, the

16  Procedures and Compacts promote ethical practices in conjunction with class III

17  gaming through the licensing and control of persons and entities employed in, or

18  providing goods and services to, the tribal gaming operations, protect against the

19  presence or participation of persons whose criminal backgrounds, reputations,

20  character, or associations make them unsuitable for participation in gaming, thereby

21  maintaining a high level of integrity in tribal governmental gaming, and protect the

22  patrons and employees of their gaming facilities.

23     41.    The Procedures and Compacts thus regulate class III gaming on the

24  Tribes' Reservations to ensure compliance with IGRA, tribal Gaming Ordinances,

25  and the NIGC and Tribal Gaming Commissions' minimum internal control

26  standards. Through that regulated class III gaming, the procedures and compact

27  enable the Tribes to develop self-sufficiency, promote tribal economic development,

28  and create jobs and generate revenues to support the Tribes' governments and their

governmental services and programs. Relevant to the Tribes, tribal governmental gaming is the primary source of revenue funding the Tribes' governments and their governmental services and programs.

42.    Under their Procedures and Compacts, the Tribes are authorized to operate slot machines, lottery games, and banked and percentage card games at their casinos. However, because California has not specifically authorized and affirmatively prohibits betting on the outcome of sporting events (other than pari-mutuel wagering on horse racing) the State consistently has refused to negotiate the inclusion of sports betting in Tribal-State compacts and, as a result, no Indian tribe in California, including the Plaintiff Tribes, offer sports betting on their Indian lands, and betting on the outcome of sporting events would constitute a violation of the Tribes' Compacts and Procedures.

43.    By making its sports wagering contracts available on the Tribes' Reservations, and offering for play to the general public the class III game of sports betting, Kalshi violates the Tribes' Compacts and Procedures, Gaming Ordinances, and Gaming Commissions regulations, and directly interferes with and impairs the Tribes' sovereign right to regulate gaming on their Reservations.

**B.    The Tribes Regulation Of Gaming Under their Gaming Ordinances.**

44.    Pursuant to the IGRA and the Tribes' own inherent sovereign authority, each of the Tribes have enacted gaming Ordinances, that have been approved by the Secretary, comprehensively regulating gaming activities on the Tribes' Reservations.

45.    Each Ordinance establishes a Tribal Gaming Commission ("TGC") with the authority to adopt and enforce regulations that establish comprehensive minimum internal control standards for the playing of all games conducted on the Reservations, including but not limited to the rules for the playing of the games and approval and testing of the equipment used in the playing of the games.

46.    In addition, each Ordinance requires every person, organization, and entity  involved in gaming activities on the Reservation to go through detailed criminal history and background check and obtain gaming licenses issued by the TGC verifying that the licensee is not involved in or associated with any criminal activity.

47.    Finally, each Ordinance and the Tribes' TGC regulations specify what games can be played on the Tribes' Reservations and prohibit the playing of any class III game, including sports gambling, that is not expressly authorized by the Tribes' Compacts, Procedures, or Ordinances.

## KALSHI'S ILLEGAL SPORTS GAMBLING ON THE TRIBES' RESERVATIONS

48.    Kalshi is engaging in illegal sports gambling on the Tribes' Reservations disguised as event contracts that allow people to speculate on the outcome of a sporting event. Event contracts usually pose a binary, yes-or-no question as to whether the underlying event will happen. Events contracts are governed by the Commodities Exchange Act, 7 U.S.C. 1, et. seq. ("CEA").

49.    Under the CEA, event contracts are a subset of futures contracts, which are derivatives contracts for the sale and purchase of a specified asset or basket of assets, including event contracts, at a specified price on a specified future date.

50.    A derivative is a financial instrument or contract whose price is directly dependent upon (i.e., derived from) the value of one or more underlying assets — for example, commodities (like corn and wheat), securities, or debt instruments. Derivatives take many forms, including futures, options, and swaps. Derivatives allow the purchaser to take on exposure to an underlying asset without actually requiring a direct investment in the asset.

51.    Simply put, futures contracts are agreements to buy or sell a specific commodity or asset at a predetermined price at a predetermined date. U.S. law defines "commodity" broadly to include physical goods (agricultural products,

metals, energy, etc.) as well as broad categories of intangibles (services, rights, and interests in which futures contracts are traded). 7 U.S.C. § 1a(9).

52.    In 2000, Congress passed the Commodity Futures Modernization Act ("CFMA"), which amended the CEA and introduced new legal categories of commodities: *excluded commodities* and *exempt commodities*. An "excluded commodity" was defined to include various financial indices and, importantly, occurrences or contingencies beyond the control of the contracting parties that are associated with financial or economic consequences. 7 U.S.C. §§ 1a(19)–(20)

53.    In effect, 7 U.S.C. § 1a(19) brought certain event-based phenomena, such as weather events or other contingencies, into the fold of regulated derivatives, classifying them as commodities on which futures or swaps could be based.

54.    In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Dodd-Frank § 745(b) expanded the CEA to add Section 5c(c)(5)(C), sometimes called the "special rule for event contracts." *See* Brian Quintenz, *Any Given Sunday*, Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts (March 25, 2021) ("Quintenz Statement").[1]

55.    This provision expressly empowered the CFTC, an independent federal agency created by Congress in 1974 under the "The Commodity Futures Trading Commission Act", 7 U.S.C. § 4, to regulate financial derivative markets in accordance with the CEA, 7 U.S.C. § 1 *et seq.*; 17 C.F.R. § 1 *et seq.*, and authorized the CFTC to prohibit certain types of derivatives contracts if it finds them "contrary to the public interest," specifically naming certain specific categories. *See* 7 U.S.C. § 7a-2(c)(5)(C).

56.    Pursuant to this authority, in 2011, the CFTC promulgated Regulation 17 C.F.R. § 40.11, titled *"Review of event contracts based upon certain excluded commodities,"* which formalized the review process for event contracts. Regulation

---

[1] https://www.cftc.gov/PressRoom/SpeechesTestimony/quintenzstatement032521

40.11 mirrored the substance of the statutory language and set out the procedure for the Commission to block an event contract. Subsection (a)(1) of Regulation 40.11 establishes a clear prohibition: "*A registered entity shall not list for trading or accept for clearing*" any contract "based upon an excluded commodity, as defined in [the CEA], that involves, relates to, or references terrorism, assassination, war, **gaming**, or an activity that is unlawful under any State or Federal law." *Id.* (emphasis added). Any event contract that falls into one of those sensitive categories is thus *per se* barred from being listed by a registered entity.

57.    Consistent with the findings and purpose of the CEA, the CFTC promulgated regulations that allow registered entities to self-certify event contracts through 17 C.F.R. § 40.2 and where self-certified products or contracts present compliance issues, the self-certifying registered entity must provide a "concise explanation and analysis that is complete" concerning "the underlying commodity, and the [contract's] compliance with applicable provisions of the [CEA], including core principles, and the [CFTC] regulations thereunder." 17 C.F.R. § 40.2(a)(3)(v).

58.    17 C.F.R. § 40.11(c) established a 90-day review process: if an exchange, like Kalshi, self-certifies a new event contract that may violate Regulation 40.11(a), the Commission can stay the listing for up to 90 days while it evaluates the contract and then issue an order approving or disapproving it. *Id*.

59.    Thus, by 2011, the regulatory structure was in place to address the rise of event contracts, which previously fell into a gray area between regulated futures and mere wagers.

60.    Until recently, the CFTC's consistent stance has been to prohibit contracts that it views as "gaming" or betting-type events, while permitting other event-based contracts.

61.    At bottom, the purchase or sale of a "true" futures contract on an exchange is motivated by two economic purposes — (1) the opportunity to make a profit or (2) to minimize the risk of loss from a change in the market price or the

happening of an event.

62.    Thus, "true" futures contracts, and the purposes for which they are traded, "serve[] legitimate hedging and price discovery functions, thereby facilitating production of the underlying commodity." *Bd. of Trade v. SEC*, 677 F.2d 1137, 1151 (7th Cir. 1982). "Indeed, one basic justification for a futures market is that futures trading in a central location performs a 'price discovery' function for the underlying commodity, thereby furnishing producers and users a reference point for their pricing on the cash market." *Id*. at 1173 n.15.

63.    This is, ultimately, what differentiates "true" commodities futures contracts from gambling on a sporting event. While gambling *via* an event contract on next year's rainfall measures allows a wheat farmer to hedge against the risk of a low production year in the event of a lack of rain, betting on whether the 49ers will win the Super Bowl serves no hedging or other economic purpose. Nor does it perform any price discovery function on an underlying commodity. It is simply gambling on sports. And it is offered, unabashedly, by Kalshi, to the public, as such, even within states and Indian reservations that strictly prohibit sports betting.

64.    In resorting to this legal fiction, Kalshi seeks to blur the distinction between careful minimization and allocation of market risk and what, in reality, amounts to unregulated sports gambling, to such an extent that the preexisting regulatory regime that distinguishes futures from off-exchange betting cannot restrict their business.

65.    Such a result runs directly contrary to Congress's intent in enacting the 2010 amendments to the CEA to specifically give the CFTC the authority to prohibit sports wagering contracts, which — categorically — do not fulfill the economic purposes for which "true" futures contracts are permitted, but regulated:

> Mrs. FEINSTEIN. I am glad the Senator is restoring this authority to the CFTC. I hope it was the Senator's intent, as the author of this provision, to define "public interest" broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used predominantly by speculators or participants not having a

commercial or hedging interest. Will CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use?

Mrs. LINCOLN. That is our intent. The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. **These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.**

156 Cong. Rec. S5906-07, (daily ed. July 15, 2010)(emphasis added).

66.    Kalshi's operations quite clearly "construct an 'event contract' around sporting events such as the Super Bowl" and, therefore, serve no real commercial purpose. Rather, they are used solely for gambling, in direct violation of the CEA and its implementing regulations and as shown above the IGRA, and the Tribes' Procedures, Compacts, Ordinances and TGC's regulations.

67.    Because Kalshi's contracts are not futures contracts but instead simply gambling on sports, as defined by the Tribes' Compacts, Procedures, Ordinances and state law, which does not "permit" any entity within the State, to offer for play within the State sports betting, Kalshi's offering of the contracts to the general public for play on the Tribes' Reservations violates the IGRA.

68.    By making its sports wagering contracts available on the Tribes' Reservations, and offering for play to the general public the game of sports betting, Kalshi not only violates each of the Tribes' Procedures, Compacts, Ordinances, and TGC regulations, but it also directly interferes with and impairs the Tribes' sovereign right to regulate gaming on their Reservations.

69.    Furthermore, by illegally offering its sports wagering contracts to persons located both on and off of the Reservations in California, Kalshi draws business away from the Tribes' casinos by allowing patrons to participate in class III gaming from their homes. Loss of revenue has a direct impact on tribal governmental functions and has a tangible effect on the services and programs the tribal

governments provide to their members and all persons who live, work, and visit the Reservations.

70.    On information and belief, Kalshi has offered and continues to offer its sports event contracts to consumers on the Reservations with the knowledge that its sports event contracts undercut tribal class III gaming markets, in violation of IGRA, over which Congress, the federal, state and tribal governments exercise **exclusive** regulatory jurisdiction.

## KALSHI'S EVASION OF CFTC REGULATION

71.    In 2020, as stated above, the CFTC authorized Kalshi to list event contracts for public trading as a DCM. *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *4.

72.    On June 12, 2023, Kalshi filed a self-certification to trade congressional control contracts, which allowed buyers to predict which political party will control the U.S. House of Representatives or Senate on a specific, future date, and took the form of a binary, "yes/no" event contract that posed the question: "Will <chamber of Congress> be controlled by <party> for <term>?" *KalshiEX LLC*, 2024 WL 4164694, at *4.

73.    On June 23, 2023, the CFTC sent a letter to Kalshi representing that it had exercised its authority to initiate a 90-day review of Kalshi's self-certified submission because it determined that the contracts "may involve, relate to, or reference an activity enumerated" in the CEA and applicable regulations. *KalshiEX LLC*, 2024 WL 4164694, at *4; Notification of 90-day Review (June 23, 2023)[2]; Release Number 8728-23, *CFTC Announces Review of Kalshi Congressional Control Contracts and Public Comment Period* (June 23, 2023).[3]

74.    On September 22, 2023, at the conclusion of the 90-day review period, the CFTC issued an order prohibiting Kalshi from listing its congressional control

---

[2] https://www.cftc.gov/sites/default/files/filings/ptc/23/06/ptc0623230001.pdf.
[3] https://www.cftc.gov/PressRoom/PressReleases/8728-23.

contracts for trading pursuant to 17 C.F.R. § 40.11, consistent with 7 U.S.C. § 7a-2(c)(5)(C). *KalshiEX LLC*, 2024 WL 4164694, at *5. In its order the CFTC determined that Kalshi's congressional control contracts involve two activities enumerated in the special rule: gaming and unlawful activity. *KalshiEX LLC*, 2024 WL 4164694, at *5. As a result, the CFTC found that Kalshi's congressional control contracts were contrary to the public interest. *KalshiEX LLC*, 2024 WL 4164694, at *6; CFTC Order (September 22, 2023)[4]; Release Number 8780-23, *CFTC Disapproves KalshiEX LLC's Congressional Control Contracts* (September 22, 2023).[5]

75.    On November 1, 2023, Kalshi initiated litigation against the CFTC, challenging the CFTC determination, *inter alia*, that Kalshi's congressional control contracts were contrary to the public interest because the contracts involve gaming.

76.    In the *KalshiEX LLC* litigation, Kalshi argued its election contracts do not involve gaming because an event contract involves gaming "if it is contingent on a game or game-related event" such as "the Kentucky Derby, Super Bowl, or Masters golf tournament."

77.    In the *KalshiEX LLC* litigation, the Court acknowledged the potential application of the IGRA in supplying a definition of "gaming" as codified in, but not defined by, the CEA and implementing regulations. *KalshiEX LLC*, 2024 WL 4164694, at *9 ("And while the CFTC's order also considered and pulled definitions from a federal statute, it did not look to the only one that the Court is aware actually uses the term 'gaming'—the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701.").

78.    June 10, 2024, the CFTC proposed rule-amendments to 17 C.F.R. Part 40, to "specify types of event contracts that fall within the scope of CEA section 5c(c)(5)(C) and are contrary to the public interest." Event Contracts, 89 Fed. Reg.

---

[4] https://www.cftc.gov/sites/default/files/filings/documents/2023/orgkexkalshiordersig230922.pdf.
[5] https://www.cftc.gov/PressRoom/PressReleases/8780-23.

48968-01, *48969. The proposed rule-amendments repeatedly acknowledge the CFTC's limited resources. "From a resource allocation perspective, this [rule-amendment] will be of significant benefit to the Commission and its staff, since, in the Commission's experience, a single § 40.11(c) review is resource-intensive and consumes hundreds of hours of staff time." *Id.* The rule-amendments were never finalized.

79.     On January 7, 2025, CFTC Chairman, Rostin Behnam, announced that he would step down from the position of Chairman on January 20, 2025, and that Benham's last day at the Commission would be February 7, 2025. Public Statements & Remarks, *Chairman Rostin Behnam Announces Departure from CFTC* (January 7, 2025).[6]

80.     On January 13, 2025, Donald Trump, Jr. announced that he was joining Kalshi as a strategic adviser. Brett Samuels, *Trump Jr. joins betting market Kalshi as adviser* (January 13, 2025).[7]

81.     On January 22, 2025, Kalshi filed a self-certification to trade sports event contracts, which allowed buyers to predict the winner of a sport event title related to American sports leagues, and took the form of a binary, "yes/no" event contract that posed the question: "Will <team> win <title>?" The self-certification does not mention the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) or that, as a registered entity, Kalshi is prohibited from listing contracts that involve gaming pursuant to 17 C.F.R. § 40.11. The self-certification merely states that it is CEA compliant. Kalshi Notification Regarding the Initial Listing (January 22, 2025).[8]

82.     On February 5, 2025, the CTFC announced its intent to hold a public roundtable related to sports-related event contracts. The purpose of the roundtable was to "establish a holistic regulatory framework that will both foster thriving

---

[6] https://www.cftc.gov/PressRoom/SpeechesTestimony/behnamstatement010725.
[7] https://thehill.com/business/5082357-trump-jr-joins-kalshi-prediction-market/.
[8] https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf.

prediction markets and protect retail customers from binary options fraud such as deceptive and abusive marketing and sales practices."[9] The roundtable was to include topics such as: "CFTC-registered entities' legal arguments in court that event contracts based on games or sports contests or sporting events constitute 'gaming' and are therefore prohibited under the Commodity Exchange Act," as well as "other issues including but not limited to Constitutional questions such as the Commerce Clause, States' rights and State regulatory schemes, Federalism, Federal preemption doctrines, and Tribal sovereignty as well as other federal laws applicable to sports betting." Release Number 9046-25, CFTC Announces Prediction Markets Roundtable (February 5, 2025).[10] The roundtable was then subsequently cancelled without explanation. Dustin Gouker, *News: CFTC Cancels Prediction Markets Roundtable*, Event Horizon (April 24, 2025).[11]

83.    On February 7, 2025,[12] Kalshi filed a self-certification to trade sports event contracts, which allowed buyers to predict the winner of a sport event title related to American sports leagues, and took the form of a binary, "yes/no" event contract that posed the question: "Will <team> win <event>?" The self-certification does not mention the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) or that, as a registered entity, Kalshi is prohibited from listing contracts that involve gaming pursuant to 17 C.F.R. § 40.11. The self-certification merely states that it is CEA compliant. Kalshi Notification Regarding the Initial Listing (February 7, 2025).[13]

84.    On February 11, 2025, President Donald Trump nominated Brian Quintenz, a Kalshi Board Member, to replace Rostin Behnam as the Chairman of the CFTC. Quintenz, in a statement concerning the CFTC's review of ErisX futures contracts involving NFL football games on March 25, 2021, asserted that the CEA

---

[9] https://www.cftc.gov/PressRoom/PressReleases/9046-25
[10] https://www.cftc.gov/PressRoom/PressReleases/9046-25.
[11] https://nexteventhorizon.substack.com/p/news-cftc-cancels-prediction-markets.
[12] This is the same day former Chairman Behnam exited the CFTC.
[13] https://www.cftc.gov/sites/default/files/filings/ptc/25/02/ptc02072514957.pdf.

"special rule," 7 U.S.C. § 7a-2(c)(5)(C), is unconstitutional, that the CFTC regulation, 17 C.F.R. § 40.11 is invalid, that the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) and 17 C.F.R. § 40.11 are not, in fact, prohibited and that "the Commission is not a moral arbiter. It is not expert [sic] in determining what the [sic] is in the public's interest, and it is certainly not equipped to tell the public what its interest *should* be." Quintenz Statement, *supra*.

85.    Quintenz also stated: "Interestingly, the statute also does not require the Commission to make any determinations on these contracts at all. It is completely up to the Commission to decide whether and when to review an enumerated event contract or set of contracts for a public interest determination. If the Commission made no public interest determinations pursuant to this statutory section, it would nonetheless be following the law." Quintenz Statement, *supra*.

86.    On March 7, 2025, the Major League Baseball ("MLB") wrote a letter to the CFTC expressing concerns about sports event contracts. The MLB stated: "As the resemblance between sports event contracts and traditional sports betting markets continues to grow, so too does the need to replicate the integrity and consumer protections that exist at the state level. Currently, those protections are lacking."[14]

87.    On March 17, 2025, Robinhood announced that it partnered with Kalshi to offer March Madness sports event contracts. Kalshi's CEO, Tarek Mansour stated: "[we] couldn't ask for a better partner in Robinhood to bring our vision to every American." Tom Nightingale, *Robinhood launches Kalshi-powered sports markets, starting with March Madness*, SBC Americas (March 17, 2025).[15]

88.    On May 16, 2025, interim Chairman of the CFTC, Caroline Pham signaled her intent to leave the CFTC once Quintenz is confirmed to the appointment of the CFTC Chairman, leaving only Quintenz and commissioner Kristin Johnson

---

[14] https://www.cftc.gov/media/11941/MLB030725/download (last visited June 24, 2025).
[15] https://sbcamericas.com/2025/03/17/robinhood-kalshi-sports-event-contracts/.

on the Commission. Jesse Hamilton, *CFTC's Pham Said to Plot Exit, Agency May Be Left Without a Party Majority*, Coin Desk (May 16, 2025).[16]

89.    On May 21, 2025, Quintenz submitted an ethics statement to the CFTC, confirming that Quintenz was employed by Kalshi and held stock and unvested stock options in Kalshi. Brian Quintenz, Ethics Statement to CFTC at 2 (May 21, 2025).[17]

90.    On May 28, 2025, CFTC Commissioner Kristin Johnson signaled her intent to leave the CFTC "later this year," leaving Quintenz as the sole commissioner.  Julia Shapero, *CFTC leaders exit as Trump pick prepares to take helm*, The Hill (May 28, 2025).[18]

91.    On information and belief, Kalshi has been prolific in offering sports event contracts with the knowledge that the legality of their sports event contracts is highly questionable and widely criticized as an impermissible form of sports gaming or gambling, at a time when power in the CFTC is being consolidated in one commissioner, Quintenz, a Kalshi board member, with the knowledge that the CFTC is understaffed and lacks the resources to adequately review and regulate Kalshi's self-certified contracts to ensure compliance with the CEA.

92.    As a direct results of these events, Kalshi has been able to avoid regulation of its sport gambling activities by the CFTC.

## KALSHI'S FALSE AND MISLEADING ADVERTISING

93.    Kalshi actively promotes its products, including its sports event contracts, across major social media platforms such as TikTok, Instagram, X.com, and YouTube.

94.    On its Instagram account, @kalshi_official, Kalshi, as shown in Exhibit A, has published advertisements asserting itself as "The First Nationwide Legal

---

[16]    https://www.coindesk.com/policy/2025/05/14/cftc-s-pham-said-to-plot-exit-agency-may-be-left-without-a-party-majority.
[17] https://extapps2.oge.gov/201/Presiden.nsf/PAS+Index/009D247776338CD385258C95002C929F/$FILE/Quintenz%2C%20Brian%20D.%20%20finalEA.pdf.
[18]    https://thehill.com/newsletters/technology/5322818-cftc-leaders-exit-as-trump-pick-prepares-to-take-helm/.

Sports Betting Platform" and that its customers can engage in "Sports Betting Legal in all 50 States on Kalshi" (Exhibit A).

95.    Kalshi's Instagram account includes a post, dated January 23, 2025, stating in the caption post: "Legal sports markets, accessible to Americans in all 50 states." The post remains accessible on Kalshi's Instagram (Exhibit B).

96.    Kalshi's Instagram account also includes a post, dated February 3, 2025, containing a screenshot of an article from Front Office Sports stating "Robinhood to Offer Super Bowl Betting via Kalshi." The post remains accessible on Kalshi's Instagram (Exhibit C).

97.    On June 11, 2025, Kalshi posted an artificial intelligence ("AI") generated video advertisement to its Instagram account. Kalshi has also posted this video on other platforms such as TikTok. The advertisement contains depictions of people exclaiming "I'm all in on OKC" and "Indiana got that dog in them." The advertisement further contains a depiction of a shirtless man exclaiming, "Kalshi lets you legally trade on anything, anywhere in the U.S."

98.    On July 19th, 2025, Kalshi sponsored a TikTok video where a man explains to viewers, in response to questions by a woman asking about the legality of Kalshi's contracts, in the video that Kalshi is "totally [legal] … in all 50 states, even California" (Exhibit C).

99.    As part of its widespread promotional strategy, Kalshi has posted on its TikTok a video where Kalshi describes its platform as a place for placing "live bets" in various promotional materials including billboard signs, out-of-home advertising on bus stops, on trucks, and the sides of buildings, in various locations including New York City, Los Angeles, Miami, and Dallas.

100.    Social media users have raised questions about the legality of Kalshi's products, with specific comments expressing confusion, such as; "Is this app legit?" Users have also raised concerns regarding their own legal liability for using Kalshi. On Reddit page r/Kalshi, one user stated: "I just wanted to confirm before using

Kalshi. Washington state has strict 'gambling' laws in place and I know Kalshi is a trading app for contracts. Is there a guarantee I will not get into any legal trouble for using there [sic] app in the state?"[19]

101.    Social media users have expressed concern regarding these products, stating: "Kalshi is dangerous. Sports betting should not be okay for under 21 let alone in all 50 states" ( Exhibit D).

102.    On one of Kalshi's promotional TikTok posts added to the site on July 18, 2025, various TikTok users commented: "This shouldn't be legal"; "Betting culture is crazzyyy"; "Didn't Enron do the exact same thing?"; "Enron is back baby!"; "Betting on the weather is insane"; "Predatory marketing"; "Calling it a trading app is crazy"; "I 'traded' it all on black and now im by the wendy's dumpster if anybody wants service for a $5"; "Addiction type beat"; "1-800-GAMBLER"; "'Trading'"; "'Trade' ima buy $15 that it's sunny tomorrow. Yea that's a trade alright"; "As a meteorologist would this be insider trading?"; "Holy addiction"; "'I traded that I'd be…' dawg that's called betting. You gambled."; "This is literal distopia. Please don't do this." (Exhibit E).

103.    Kalshi's promotional materials frequently utilize the term "odds" in its advertisements. Kalshi even sells merchandise, including hats that say "What are the odds" (Exhibit F).

104.    Kalshi's deceptive promotional materials also pre-date its push into the sports gambling market. For instance, in close proximity to its advertisements of sports event contracts on various social media platforms, Kalshi marketed its platform as a betting app during the 2024 U.S. Presidential election. In one video posted on October 17, 2024, which remains available on Kalshi's Tiktok page, an interviewer is seen pulling a number of voters aside who are going to the polls to vote and asking "How much money would you bet on Trump winning the election?"

105.    On October 15, 2024, Kalshi posted a TikTok video on its official

---

[19] https://www.reddit.com/r/Kalshi/comments/1m0c3da/legality_behind_kalshi/

account, which remains available to users on its page, where its CEO and Co-founder, Tarek Masour, explains in response to the question "Hey my man, what do you do for a living", that "I'm the founder of Kalshi […] its an app and website where you can bet on anything." In the video, the man then asks, "anything?" and Tarek Mansour replies, "Anything. [...] We are the first platform that legalized betting on the U.S. election. Now, Americans can actually bet on whose going to win, Trump versus Kamala. You can bet on the weather tomorrow. You can bet on inflation. You can bet on whether Eric Adams is gonna get fired. Or when he's gonna get fired."

106.  Additionally, on October 17, 2024, Kalshi posted a TikTok video on its official account, which remains available to users on its page, where its CEO and Co-founder, Tarek Masour, explains that "I wanted to see our Billboard. So, these are live trades, live bets, of people actually betting on the exchange as we speak… If you bet on Kalshi right now, you're gonna get streamed on this billboard."

107.  Likewise, a TikTok post on Kalshi's page from October 19, 2024, states: "For the first time in 100 years, you can legally bet on U.S. elections." The post interviews different individuals, including one person who says, "If I could mortgage my house to bet on Trump, I would."

## **KALSHI'S AND ROBINHOOD'S ILLEGAL RACKETEERING**

108.  Kalshi, as Designated Contract Market ("DCM"), operates as a federally regulated exchange where users can trade event contracts based on the outcome of future events. This means individuals can buy and sell contracts, essentially betting "yes" or "no" on whether a specific event will occur. These events include economic indicators (e.g., GDP, inflation, unemployment rates), company performance (e.g., earnings releases), and weather outcomes (e.g., temperature, rainfall). The price of a contract reflects the market's perceived probability, and correct predictions lead to a predetermined payout. *See How are prices determined*,

Kalshi.com (Accessed: 18 April 2025).[20]

109.    Kalshi's platform ensures liquidity through a partnership with Susquehanna International Group, LLP ("Susquehanna"). Susquehanna provides liquidity by consistently taking the opposite side of trades, thereby ensuring there are always buyers and sellers available. In effect, Susquehanna acts as Kalshi's "house," facilitating the continuous and smooth execution of these event contracts, which function as wagers.

110.    Kalshi's Privacy Policy states that Kalshi collects personal information when a user interacts with its services, such as signing up, registering for Membership, requesting a transaction, or communicating with Kalshi. Kalshi Privacy Policy (Effective Date: December 20, 2023).[21]

111.    Certain information, like Location Data, Device Data, and Usage, is collected automatically through tracking technologies. Kalshi's Privacy Policy specifically states the company collects location data, including current and past geographic spot, GPS location, transaction locations, and the IP address of the device used. *Id*.

112.    Kalshi also gathers information automatically whenever a user visits its site, uses services, opens emails, or otherwise interacts with the company, utilizing various tracking technologies such as cookies, web beacons, and embedded scripts. Kalshi explicitly mentions collecting device details like IP address, browser type, Internet Service Provider, platform type, device type, operating system, date and time stamps, and a unique ID for identification. *Id*. at p. 2.

113.    Kalshi's Privacy Policy states that this collected information is used to comply with applicable laws and regulatory obligations for a DCM. *Id*. at p. 3.

114.    Robinhood's financial services operate through distinct subsidiaries, forming a comprehensive brokerage system that serves over 25 million-plus

---

[20] https://help.kalshi.com/markets/markets-101/how-are-prices-determined
[21] https://kalshi.com/docs/kalshi-privacy-policy.pdf

accounts.

115.  Robinhood's ecosystem includes Robinhood Derivatives, LLC. This wholly owned subsidiary, based in Chicago, Illinois, was acquired on January 3, 2024, from Marex Group plc (formerly Marex North America LLC).

116.  Robinhood Derivatives, LLC operates as a Futures Commission Merchant ("FCM"), soliciting orders for futures or options contracts and accepting customer assets to support such orders. It enables users to trade futures, options contracts, and cleared swaps.

117.  17 C.F.R. § 166.3 applies to FCMs and requires that "Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant."

118.  For regulatory purposes, Robinhood Derivatives, LLC operates as a distinct entity, yet it integrates tightly into Robinhood's existing brokerage platform; a user cannot open an account with Robinhood Derivatives without an active Robinhood brokerage account.

119.  Throughout its litigation with the CFTC, Kalshi has repeatedly discussed gaming within the context of sports. In *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024), dismissed, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025), Kalshi has stated:

   a.  "An event contract thus involves 'gaming' if it is contingent on a game or a game-related event. . . . The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." Appellee's Brief, at 41.

b. "Evidently, Congress sought to prevent exchanges from facilitating casino-style or sports gambling. . . . On a policy level, that makes some sense: The basic purpose of Designated Contract Markets is to allow 'hedging' of economic risk. . . . Contracts that 'serve[] no commercial purpose at all' may therefore not deserve to be traded on a regulated exchange. . . . And, at least in general, contracts relating to *games*—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Appellee's Brief, at 45.

c. "[T]he word 'gaming' on its face – and in accord with its legislative history – is concerned with casino gambling and sports, not the premise of the entire derivatives market. As Justice Holmes put it, the 'proposition that the dealings which give its character to the great market for future sales in this country are to be regarded as mere wagers' is 'extraordinary and unlikely.'" Appellee's Brief, at 50.

d. "The legislative history is exclusively about sports when it talks about 'gaming'. So, I think there is a reason to believe that Congress was particularly concerned at the time it enacted this statute about sports betting and that was probably what they were getting at with the word 'gaming.'" Oral Argument, Jan. 17, 2025, at 50:22-50:40.

120. Kalshi has made the following statements in *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024):

a. "The 'gaming' category reaches contracts contingent on *games*—for example, whether someone will win the Powerball lottery by a certain date, or whether a certain team will win the Super Bowl. It thus functions as a check on attempts to launder casino-style or sports gambling through the derivatives markets." Pl.'s Mem. of Law in Supp. of Pl.'s Mot. Summ. J., Dkt. No. 17, at p. 16.

b. "The only relevant legislative history, moreover, confirms that contracts on "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" were *precisely* what Congress had in mind as "gaming" contracts. 156 Cong. Rec. S5907 (daily ed. July 15, 2010)." Pl.'s Mem., Dkt. No. 17, at p. 23.

c. Arguing that the statutory term 'gaming' [as used in 7 U.S.C. § 7a-2(c)(5)(C)(i)] "on its face—and based on its legislative history—appears to be concerned with casinos and sports, not with the premise of the entire industry. Statutory context thus forecloses the Commission's overbroad approach to "gaming." Giving the term its ordinary meaning—betting on *games*—avoids all of those pitfalls." Pl.'s Mem., Dkt. No. 17, at p. 27-28.

d. "Football, horseracing and golf. They're all games. . . . It's something that has no inherent economic significance. It's something that is done for amusement. It may be done for sport. It may be done purely to facilitate

the betting itself, right, for its own sake." Oral Arg. on Mots. for Summ. J., Dkt. No. 40, at p. 15.

e. "So I think it makes sense for Congress to have thought about that category. Contacts that involve games are probably not the type of contracts that we want to be listed on an exchange, because they don't have any real economic value to them. But, again, what's tying that together is the existence of the game because the game is the thing that doesn't have intrinsic economic significance." Oral Arg., Dkt. No. 40, at p. 15.

121. Additionally, on August 8, 2024, JB Mackenzie of Robinhood Derivatives, through its General Counsel, Lucas Moskowitz, submitted a comment letter to the CFTC regarding CFTC Proposed Rule on Event Contracts. JB Mackenzie, Comment 74488 on Notice of Filing of Proposed Amendments to CFTC Regulation Section 40.11 (August 8, 2024) ("Mackenzie Comment").[22] In this letter, Robinhood Derivatives stated that the CFTC's definitions of "gaming" were "overly broad and ambiguous" and recommended that the CFTC "focus on prohibiting single sporting events or contests." Mackenzie Comment, *supra* 30:19–30:21, at 1, 7. The letter referenced 156 Cong. Rec. S5906-07, (daily ed. July 15, 2010), and stated that "[t]o the extent this discussion on the floor of the Senate represents Congressional intent, it focused on a comparison of gambling related to the results of *single* sporting events." *Id*. at 3.

122. Beginning in October 2024, Robinhood announced its intention to allow trading on the outcome of the U.S. presidential election. This announcement followed Kalshi's favorable ruling against the CFTC, which allowed Kalshi to list its election contracts. Robinhood's shares spiked 4% after this announcement, despite the event contracts being rolled out to a limited number of U.S. citizen users.

123. Robinhood does not independently offer event contracts; instead, users must access Kalshi's third-party services directly through the Robinhood platform.

---

[22] https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=74488&SearchText=Robinhood.

Robinhood began offering access to Kalshi's event contracts around October 28, 2024, initially focusing on political events like the 2024 U.S. presidential election. This arrangement deviates from Robinhood's typical third-party partnerships, where it facilitates all trades and earns revenue through payment for order flow.

124.    In contrast, Robinhood's partnership with Kalshi involves a direct revenue-sharing model, with Robinhood earning a $0.01 commission per contract traded . *Robinhood event contracts* (accessed July 1, 2025).[23] Robinhood's ability to offer event contracts is entirely reliant on Kalshi, as Robinhood itself is not a CFTC-designated contract market. Unlike its equities, options, or crypto offerings, where it does not co-brand with market makers (like Citadel Securities, Virtu, Wintermute, or B2C2), Robinhood Derivatives notably co-brands with Kalshi, an exchange, and does not coordinate with a market maker to connect users to Kalshi's event contracts.

125.    Robinhood has incorporated Kalshi's foundational and regulatory documents into its platform. These documents specifically include: (1) KalshiEX LLC's Rulebook (Version 1.15) (January 17, 2025);[24] (2) a link to Appendix B of the January 22, 2025, self-certification Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <team> win <title>?"Contract;[25] and (3) a Robinhood Event Contracts Risk Disclosure with a link to KalshiEx's Risk Disclosure.[26]

126.    Robinhood users access and trade Kalshi's event contracts directly within a dedicated "prediction markets hub" in the Robinhood application's native interface. This integration leverages Robinhood's existing user account and wallet infrastructure.

127.    Kalshi expanded its offerings to include sports event contracts, which it began self-certifying on January 22, 2025. Through the CFTC's self-certification

---

[23] https://robinhood.com/us/en/support/articles/robinhood-event-contracts/
[24] https://cdn.robinhood.com/assets/robinhood/legal/KalshiEX_LLC_Rulebook.pdf
[25] https://newsroom.aboutrobinhood.com/robinhood-prediction-markets-hub/
[26] https://cdn.robinhood.com/assets/robinhood/legal/Event_Contracts_Risk_Disclosure.pdf

process under 17 C.F.R. § 40.2, Kalshi notified the Commission of its intent, asserting compliance with the CEA and CFTC regulations. Initial examples included questions such as "Will <team> win <title>?" for major sports championships, including the Super Bowl.

128.   The self-certification states it is CEA compliant but does not mention prohibited contracts under 7 U.S.C. § 7a-2(c)(5)(C) or the prohibition against listing contracts involving gaming pursuant to 17 C.F.R. § 40.11. *See* Kalshi Notification Regarding the Initial Listing (January 22, 2025).[27]

129.   On February 3rd, 2025, Robinhood announced its intention to offer event contracts for Super Bowl LIX using Kalshi's services. *Robinhood Pauses Super Bowl Betting Contracts After Regulator Pushback* (February 5, 2025).[28] Robinhood noted these contracts would be limited to roughly 1% of its users. *Robinhood Receives Formal Request from the CFTC to Roll Back the Pro Football Championship Market* (February 4, 2025).[29]

130.   In response to Robinhood's and Kalshi's partnership for Super Bowl sports event contracts, the CFTC formally requested Robinhood to cease offering them. On February 4, 2025, Robinhood announced it was rolling back the event contracts, halting bets on the Super Bowl result just one day after launch. *Id*.

131.   In Nevada, the Nevada Gaming Control Board ("NGCB") issued a cease-and-desist letter to Kalshi on March 4, 2025, stating that its sports and election outcome contracts were unlawful without state approval. Nevada Gaming Control Board, Nevada Gaming Control Board Issues Cease and Desist Order to Company Engaged in Unlawful Gaming (March 4, 2025).[30]

---

[27] https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf.
[28] https://esportsinsider.com/2025/02/robinhood-pauses-super-bowl-betting-contracts-after-regulators-pushback
[29] https://newsroom.aboutrobinhood.com/robinhood-receives-formal-request-from-the-cftc-to-roll-back-the-pro-football-championship-market/
[30] https://gaming.nv.gov/uploadedFiles/gamingnvgov/content/about/press-release/NGCB%20-%20News%20Release%20-%20KalshiEX%20Cease%20and%20Desist%20Order%20(3-4-2025).pdf

132.   Only a month after pausing its sports event contracts related to Super Bowl LIX, pursuant to the CFTC's requests, Robinhood announced its renewed partnership with Kalshi to offer these contracts again on March 17, 2025. *Robinhood Pauses Super Bowl Betting Contracts After Regulator Pushback* (February 5, 2025).[31] During the 2025 March Madness tournaments, Kalshi reportedly facilitated a trading volume of around $500 million, specifically on tournament-related markets. These trades took place in all 50 states and were widely available on Robinhood.

133.   Robinhood's March 17, 2025, announcement of the launch of its "Prediction Markets Hub" occurred via a blog post titled "Robinhood Launches Prediction Markets Hub." *Robinhood Launches Prediction Markets Hub* (March 17, 2025).[32] The blog post stated that this new hub would allow customers to "trade on the outcomes of some of the world's biggest events." *Id.* It specified initial contract offerings, including those related to the upper bound of the target Fed funds rate in May and the upcoming men's and women's College Basketball Tournaments. The post quoted JB Mackenzie, Robinhood's Vice President and General Manager of Futures and International, as identified in this post, regarding the company's view on prediction markets. *Id.* Furthermore, it contained a direct link to "Appendix B" from Kalshi's self-certified contract, which had been submitted to the CFTC on January 22, 2025. *Id.*

134.   The March 17, 2025, blog post contained a standard forward-looking statement disclaimer:

> This blog post contains forward-looking statements regarding Robinhood's expectations, beliefs, plans, and projections about its business, regulatory environment, and product offerings. These statements are based on current assumptions and subject to risks and uncertainties that could cause actual results to differ materially from

---

[31] https://esportsinsider.com/2025/02/robinhood-pauses-super-bowl-betting-contracts-after-regulators-pushback

[32] https://newsroom.aboutrobinhood.com/robinhood-prediction-markets-hub/

1
2
3
4

those anticipated. Such risks include, but are not limited to, regulatory developments, market demand, legal challenges, technological changes, and economic conditions. Robinhood undertakes no obligation to update any forward-looking statements after the date of this communication, except as required by law.

5

*Robinhood Launches Prediction Markets Hub* (March 17, 2025).[33]

6

135.   In response to the offering of sports event contracts, particularly those

7

related to the March Madness tournament, state gaming regulators took actions to

8

assert that these contracts constituted unlicensed sports wagering in violation of their

9

respective state laws.

10

136.   On March 27, 2025, the New Jersey Division of Gaming Enforcement

11

issued cease-and-desist letters to both Kalshi and Robinhood, accusing them of

12

unlawfully offering sports wagering in the state and demanding the voiding of placed

13

wagers. Letter from Mary Jo Flaherty, Interim Director, New Jersey Division of

14

Gaming Enforcement, to Tarek Mansour, CEO, Kalshi (March 27, 2025).[34] In

15

immediate response, Robinhood promptly ceased allowing New Jersey customers to

16

open new positions on March Madness event contracts and implemented geofencing

17

to restrict access in other states raising similar concerns.

18

137.   Similarly, the Maryland Lottery and Gaming Control Agency issued a

19

cease-and-desist letter to Kalshi on April 7, 2025, asserting that Kalshi's sports-

20

event contracts constituted illegal sports wagering under Maryland law. Letter from

21

John A. Martin, Secretary, Maryland Lottery and Gaming Control Commission, to

22

Legal Counsel, Kalshi (April 7, 2025).[35]

23

138.   Kalshi responded to the Nevada Gaming Control Board's cease-and-

24

desist by filing a lawsuit in the U.S. District Court for Nevada on March 28, 2025,

25

seeking a temporary restraining order and preliminary injunction to continue its

26
27
28

---

[33] https://newsroom.aboutrobinhood.com/robinhood-prediction-markets-hub/.
[34] https://www.nj.gov/oag/ge/docs/EmergencyOrders/Kalshi2025.pdf
[35] https://www.mdgaming.com/wp-content/uploads/2025/04/Kalshi-4-7-25.pdf

operations. On April 8, 2025, the Nevada court granted Kalshi a temporary restraining order against the NGCB.

139.    Despite initially pursuing the appeal in *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024), dismissed, No. 24-5205 (D.C. Cir. May 7, 2025), the CFTC later moved to voluntarily dismiss its case against Kalshi on May 7, 2025. This action ended its legal challenge to the validity of election-based event contracts on public policy concerns.

140.    Kalshi continues to maintain that it is regulated by federal law under the CFTC and, therefore, state gambling laws are preempted concerning their sports event contracts.

141.    In addition to New Jersey, Maryland, and Nevada, other states that have issued cease-and-desist letters to Kalshi or its partners include Illinois, Ohio, Montana, and Arizona. The litigation in Maryland against the Maryland Lottery and Gaming Control Commission is ongoing, and the court has notably questioned Kalshi's inconsistent legal positions regarding the "economic consequence" of sports outcomes, given its differing arguments in the separate CFTC litigation over political event contracts.

142.    These acts by Kalshi show a pattern and practice through their enterprises of racketeering activity in violation of RICO.

## FIRST CAUSE OF ACTION

**(Violation of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721)**

143.    The Tribes reallege each of the allegations set forth in Paragraphs 1 through 142 above and by this reference incorporate each allegation as if set forth herein in full.

144.    Gambling in Indian country is criminally prohibited by federal statute, except gaming conducted by a federally recognized Indian tribe in accordance with the IGRA. 18 U.S.C. §1166.

145.   IGRA established a statutory framework for the regulation of Indian gaming that expressly pre-empts the field of governance of gaming activities on Indian lands. *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 543–44 (8th Cir. 1996).

146.   Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the tribe must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chairman of the National Indian Gaming Commission ("NIGC"), a federal regulatory agency created under IGRA; (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

147.   In order to go into effect, a tribal-state class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by operation of law, 25 U.S.C. § 2710(d)(8)(C), and notice of approval must be published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B).

148.   Federal regulations that implement IGRA define "gaming activity" or "gaming activities" as "the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward." 25 C.F.R. § 293.2(d).

149.   Federal regulations that implement IGRA state that class III gaming includes "[a]ny sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4(c).

150.   Kalshi and Robinhood are not federally-recognized Indian tribes conducting class III gaming activity pursuant to a Tribal-State Compact, 25 U.S.C. §§ 2710(d)(1)–(2), or Secretarial Procedures. 25 U.S.C. § 2710(d)(7)(B)(vii).

151.   Through self-regulation, Kalshi has offered sports event contracts that are explicitly prohibited under 17 C.F.R. § 40.11(a)(1), and Kalshi has admitted that

the subject matter of those contracts constitutes gaming.

152.   Kalshi's self-certifications of its sports event contracts, pursuant to 17 C.F.R. § 40.2, are defective because the submissions fail to adequately address CEA compliance issues and establish that the prohibited contracts are nevertheless CEA compliant and are, therefore, not contrary to the public interest.

153.   Kalshi has an adequate, available remedy for explicit CFTC approval under 17 C.F.R. § 40.3, but has chosen not to avail itself of CFTC approval.

154.   Kalshi's contracts fall outside the permissible scope of the CEA and, therefore, constitute unlawful gambling in Indian country under 18 U.S.C. § 1166, because the Kalshi app may currently be accessed for the purpose of staking something of value (consideration), on a sports event involving the element of chance, for the purposes of receiving a reward based on the outcome of the event, consistent with the definition of class III gaming activity in 25 C.F.R. § 293.2(d), from locations in Indian country, as defined by IGRA, 25 U.S.C. §§ 2703(4)(A)-(B).

155.   As a result, any person over the age of eighteen with a cell phone, tablet, or computer can access the Kalshi app and engage in unlawful gambling on Indian lands.

156.   Kalshi has not implemented any mechanism, such as geo-location and geo-fencing, that would prevent any person or entity from engaging in sports betting using the Kalshi app on the Tribes' Indian lands.

157.   IGRA establishes a right of action by an "Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact [or Secretarial Procedures] entered into . . . that is in effect," over which the "United States district courts shall have jurisdiction . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii).

158.   An actual case or controversy exists between the Tribes and Kalshi, in that the Tribes assert that Kalshi is conducting class III gaming on the Tribes' Indian lands and such conduct violates the Tribes' tribal state class III gaming compacts

and federal and state law, while Kalshi contends that its activities do not constitute gaming and, therefore, do not violate IGRA.

WHEREFORE, the Tribes pray as hereinafter set forth below.

## SECOND CAUSE OF ACTION

### (Violation of the Tribes Gaming Ordinances)

159.    The Tribes reallege each of the allegations set forth in Paragraphs 1 through 158 above and by this reference incorporate each allegation as if set forth herein in full.

160.    The Tribes are sovereign governmental entities that exercise inherent powers of self-government with the jurisdiction and authority to enact their own laws and enforce those laws against both Indians and non-Indians engaging in activities on their Reservations. *United States v. Wheeler*, 435 U.S. 313, 323 (1978); *Water Wheel v. LaRance*, 642 F. 3d 802 (9th Cir. 2011).

161.    In enacting the IGRA, Congress expressly granted Indian tribes the right to regulate gaming activities on their respective Reservations through the enactment of tribal gaming Ordinances that would become effective upon the approval of those Ordinances by the Chairman of the NIGC. 25 U.S.C. § 2710(b) and § 2710(d).

162.    Pursuant to the IGRA and their inherent sovereign authority, each of the Tribes have enacted gaming Ordinances comprehensively regulating all gaming activities on their Reservations. The enactment of the gaming Ordinances was not only an exercise of the Tribes' own inherent sovereign authority but also an exercise of Congressionally delegated authority granted to the Tribes by Congress with the enactment of the IGRA. *United States v. Mazurie*, 419 U.S. 544 (1975).

163.    As such, the Tribes' gaming Ordinances preempt the field of conduct that the Tribes define as gaming in their Ordinances, including any other federal or state law that conflicts with the express provisions of the Ordinances authorized by the IGRA and which also conflicts with the provisions of the CEA. *Fisher v. District*

*Court*, 424 U.S. 383 (1976).

164.    Under the Ordinances, Kalshi's sports gambling activities meet the definition of gaming that is strictly prohibited under the Ordinances. Pursuant to the Tribes' inherent sovereign authority and congressionally-delegated authority granted to the Tribes by IGRA, the Tribes have jurisdiction to enforce the provisions of their Ordinances against Kalshi, including prohibiting Kalshi from engaging sports betting on their respective Reservation by offering future event contracts.

WHEREFORE, the Tribes pray as hereinafter set forth below.

## THIRD CAUSE OF ACTION
### (Civil RICO, 18 U.S.C. § 1962(c))

165.    The Tribes reallege each of the allegations set forth in Paragraphs 1 through 164 above and by this reference incorporate each allegation as if set forth herein in full.

166.    18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Thus, a *prima facie* RICO case requires that a plaintiff show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-97 (1985).

167.    Kalshi and Robinhood violated 18 U.S.C. § 1962(c) by engaging in the acts described in the paragraphs below. At all relevant times, Defendants Kalshi and Robinhood and other individuals and entities named herein are "persons" within the meaning of 18 U.S.C. § 1961(3).

168.    At all relevant times, Kalshi was associated with an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). This Enterprise (the "Gaming Racket") is an "association-in-fact" consisting of Kalshi, Robinhood, and various

1    individual officers, directors, agents, and/or employees of these entities who
2    knowingly participated in the Gaming Racket's affairs.

3        169.    An association-in-fact enterprise must have at least three structural
4    features: a purpose, relationships among those associated with the enterprise, and
5    longevity sufficient to permit these associates to pursue the enterprise's purpose.
6    *Boyle v. United States*, 556 U.S. 938, 946 (2009). Such a group need not have a
7    hierarchical structure or a "chain of command" and decisions may be made on an ad
8    hoc basis and by any number of methods—by majority vote, consensus, a show of
9    strength, etc. *Id.* at 948. Members of the group need not have fixed roles; different
10   members may perform different roles at different times. *Id.* The group need not have
11   a name, regular meetings, dues, established rules and regulations, disciplinary
12   procedures, or induction or initiation ceremonies. *Id.*

13       170.    This Gaming Racket was formed and functions with a common
14   purpose: to design, market, distribute, and widely disseminate event contracts based
15   on sports outcomes ("gaming contracts"), all the while consciously disregarding or
16   actively circumventing prior regulatory concerns and even their own prior stated
17   positions that such contracts constituted prohibited "gaming." The decision by both
18   Kalshi and Robinhood to jointly enter and aggressively expand the market for
19   gaming contracts was made with a mutual awareness of the ongoing regulatory
20   scrutiny surrounding such products, resulting in shared liability and operational
21   interdependence for this specific venture.

22       171.    The introduction of this product category represents a new venture for
23   the Defendants, which distinguishes this Gaming Racket from their prior business
24   operations.

25       172.    Prior to this venture, Kalshi's contract offerings primarily focused on
26   more conventional event types, such as those tied to economic data releases (e.g.,
27   inflation rates, unemployment figures), general political outcomes (e.g., election
28   results), or other verifiable, non-sporting events.

173.    Kalshi self-certified its first sports event contract via the CFTC Portal on January 22, 2025. This offering of event contracts on sports outcomes to the general public, particularly through a mass-market retail platform like Robinhood, involved a significant and deliberate expansion into a product category from its previous contract types.

174.    Robinhood's integration with Kalshi allows users to access Kalshi's event contracts directly within the Robinhood app. This constitutes a marked departure from Robinhood's traditional, federally regulated brokerage services, which include commission-free trading of stocks, exchange-traded funds, options, and cryptocurrency. Robinhood has additionally noted the novelty of these gaming contracts in its March 17, 2025, blog post standard forward-looking statement disclaimer. See *supra* ¶ 134.

175.    Robinhood's departure from its normal business to offer products solely dependent on Kalshi's specific self-certification is also evident in its inclusion in its March 17, 2025, blog post of a direct link to Appendix B from Kalshi's January 22, 2025, self-certification, which had taken place only weeks prior.

176.    The coordinated nature of this venture extends to its financial structure, as Kalshi and Robinhood engage in revenue sharing on the gaming contracts offered through the Robinhood platform. This arrangement demonstrates a shared financial interest in the success and widespread dissemination of these gaming contracts, directly serving the Gaming Racket's common purpose to design, market, distribute, and widely disseminate these contracts based on sports outcomes.

177.    The Gaming Racket functions as a continuing unit with ongoing relationships and a discernible structure, where the actions undertaken are on behalf of the enterprise's joint interests, not merely the individual capacities of Kalshi and Robinhood.

178.    The operational design of the Gaming Racket ensures a seamless user experience, with Robinhood users accessing and trading Kalshi's event contracts

directly within a dedicated "prediction markets hub" in the Robinhood application's native interface. This leverages Robinhood's existing user account and wallet infrastructure. This technical integration, requiring dedicated resources from Robinhood for development and ongoing maintenance, demonstrates a specific, shared, and continuous investment in the functional operability and success of this new venture.

179.    Robinhood's arrangement here differs from its typical third-party partnerships, where it facilitates all trades and earns revenue through payment for order flow by routing orders to market makers. In contrast, Robinhood's partnership with Kalshi involves a direct revenue-sharing model where Robinhood earns a $0.01 commission per contract traded. This further establishes Robinhood's financial stake in facilitating an ongoing relationship with Kalshi.

180.    Evidencing a continuous structure, Robinhood has incorporated Kalshi's foundational and regulatory documents into its platform, demonstrating operational and regulatory integration. This indicates direct inter-company involvement and shared responsibility for the Gaming Racket's products and compliance framework, moving beyond standard commercial dealings. See *supra* ¶ 125.

181.    The Gaming Racket's current shared legal exposure additionally reinforces its continuous structure. This shared legal burden necessitates a unified defense strategy, compelling ongoing collaboration between the two entities and reinforcing their commitment to the Gaming Racket's objectives despite external challenges.

182.    This shared legal challenge reveals a coordinated, albeit differentiated, strategic response by the Gaming Racket that underscores its continuity and lack of Robinhood's disengagement from the enterprise. In several instances where state authorities issued cease and desist orders or declared gaming contracts illegal, Robinhood, functioning in its operational capacity for the enterprise, implemented

geofencing technology in states such as New Jersey. This operational measure served to restrict access to the gaming contracts for users within those specified jurisdictions, while crucially continuing to offer these same gaming contracts to users in other states through Kalshi, which also collects geolocation data, thereby demonstrating the Gaming Racket's ongoing commitment and its operation across varied regulatory landscapes.

183.   Concurrently, and as a complementary component of the Gaming Racket's overall strategy, Kalshi, in its capacity as the DCM, elected to directly confront these cease-and-desist letters through legal proceedings. This included initiating lawsuits against state regulators to assert federal preemption or challenge the legality of state actions. This distinct legal posture by Kalshi, while Robinhood managed operational access, demonstrates a deliberate division of labor within the enterprise.

184.   These differing, yet congruent, responses underscore a unified strategic commitment by the Gaming Racket to ensure the widespread dissemination of gaming contracts while addressing specific legal impediments. The deployment of operational restrictions by one member and direct legal challenges by another illustrates the adaptability and concerted efforts of the Gaming Racket to overcome obstacles to its common purpose, with Robinhood maintaining its integral role in the venture rather than disengaging from the enterprise.

185.   The longevity of the Gaming Racket is evidenced by its persistent and adaptive efforts to establish and expand the offering of these new, controversial gaming contracts despite recurring regulatory challenges, indicating a sustained commitment to its common purpose. The strategic actions by Kalshi regarding self-certification and the subsequent strategic reengagement and March relaunch, indicate that the Gaming Racket adapted and continued its pursuit of its objective for this product line.

186.   A "pattern" of racketeering activity requires proof of "at least two

[predicate] acts of racketeering activity" within ten years of each other. See 18 U.S.C. § 1961(5). Racketeering activity consists of the commission of a predicate act, as defined in 18 U.S.C. § 1961(1). *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985).

187.    Through this Gaming Racket, Defendants Kalshi and Robinhood directly and indirectly conducted and engaged in the enterprise's activities through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1). Specifically, the Gaming Racket has: (1) engaged in wire fraud as prohibited by 18 U.S.C. § 1343, (2) transmitted wagering information as prohibited by 18 U.S.C. § 1084, (3) and operated an illegal gambling business as prohibited by 18 U.S.C. § 1955.

188.    18 U.S.C. § 1343 requires proof of: (1) a scheme to defraud; (2) the use of interstate wire communications in furtherance of the scheme; and (3) that the defendants acted with the specific intent to deceive or defraud. *United States v. Bonallo*, 858 F.2d 1427, 1433 (9th Cir. 1988). Specific intent to defraud may be established by circumstantial evidence and by inferences drawn from the scheme itself, particularly if the scheme was reasonably calculated to deceive. *Manta v. Chertoff*, 518 F.3d 1134, 1142 (9th Cir. 2008).

189.    A scheme to defraud by false representations may be accomplished by making patently false statements or statements with a reckless indifference as to their truth or falsity, and deceitful concealment of material facts may constitute actual fraud. *Gusow v. United States*, 347 F.2d 755, 756 (10th Cir. 1965). "Even though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations." *United States v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997).

190.    The scheme to defraud involved the systematic misrepresentation of unlawful gaming contracts as legitimate commodity contracts tradable on a CFTC-regulated exchange, in direct conflict with the CEA and CFTC regulations thereunder, particularly the explicit prohibition against transactions that involve

"gaming." *See* 7 U.S.C. § 7a-2(c)(5)(C); 17 C.F.R. § 40.11.

191.   Beginning in February 2025, the Gaming Racket (through Robinhood's platform and its integrated payment systems) has continuously used interstate wire communications to electronically collect deposits from users, process orders for gaming contracts, facilitate trades, and manage withdrawals of funds. Each such instance of financial transfer has been conducted under the false pretense that it relates to legitimate commodity transactions stemming from valid self-certifications, rather than unlawful gaming contracts that violate the CEA (specifically 7 U.S.C. § 7a-2(c)(5)(C) prohibiting "gaming") and CFTC Regulations (including 17 C.F.R. § 40.11 prohibiting contracts involving "gaming," and in contravention of the requirements of 17 C.F.R. § 40.2 regarding proper self-certification).

192.   Kalshi's 17 C.F.R. § 40.2 self-certification presented these gaming contracts as CEA-compliant, despite a demonstrable insufficiency in establishing compliance with the CEA's provisions against gaming, specifically 7 U.S.C. § 7a-2(c)(5)(C) and 17 C.F.R. § 40.11. This assertion of compliance for contracts tied directly to sports outcomes, coupled with the lack of detailed analysis and supporting documentation explicitly required by 17 C.F.R. § 40.2, indicates a disregard for relevant facts and applicable CFTC regulations. This position stands in stark contrast to Kalshi's own prior statements, which previously suggested or acknowledged that such "sports events" contracts fall within the definition of "gaming" under 17 C.F.R. § 40.11, thereby being subject to prohibition under Section 40.11(a)(1).

193.   Kalshi notably self-certified the January 22, 2025, contract within a week of stating that similar sports events contracts constituted gaming, representing a rapid and contradictory shift in its compliance posture without apparent new legal justification.

194.   As a key act in furtherance of this scheme, in its March 17, 2025, press release, Robinhood included a link to Kalshi's January 22, 2025, self-certification filing with the CFTC and specifically directed users to Appendix B of that filing on

its website. By directly disseminating Kalshi's insufficient compliance justification, Robinhood actively facilitated the widespread rollout of these mischaracterized contracts to its extensive user base.

195.    Defendant Robinhood Derivatives, as an FCM and a "Commission registrant" under 17 CFR § 166.3, was statutorily obligated to diligently supervise the activities of its partners, officers, employees, and agents in relation to the legitimacy and regulatory compliance of the products it makes available to its customers. Robinhood's actions indicate an understanding, or a disregard of readily available information, that Kalshi's 17 C.F.R. § 40.2 self-certification for its gaming contracts was insufficient to establish its compliance with the CEA's prohibition on unlawful gaming.

196.    Robinhood's own prior internal actions (e.g., its decision to pull specific sports-related contracts from its platform, such as those related to the Super Bowl or NCAA March Madness, in certain jurisdictions due to regulatory concerns) and documented external communications or internal analyses previously acknowledging the regulatory conflicts or the "gaming" nature of such contracts, further illustrate its awareness of the regulatory conflicts under the CEA and CFTC rules. By permitting its partners, officers, employees, and agents to promote and facilitate trading in these contracts, Robinhood's conduct indicates an intention to present these impermissible contracts as legitimate commodity interests, leading to investor engagement based on a fundamental mischaracterization that generated profits for Robinhood.

197.    18 U.S.C. §1084(a) states that whoever: engages in the business of betting or wagering and knowingly uses a wire communication in interstate or foreign commerce to transmit bets, wagers, or information assisting in placing bets or wagers "shall be fined under this title or imprisoned not more than two years, or both."

198.    18 U.S.C. §1084(b), as an exception to Part (a), states:

Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal.

199.  Defendants, by and through the Gaming Racket described herein, have knowingly used a wire communication facility for the transmission in interstate and foreign commerce of bets or wagers, or information assisting in the placing of bets or wagers, on sporting events or contests, or for the transmission of money or credits in connection therewith, in violation of 18 U.S.C. § 1084.

200.  The sports gaming contracts designed, marketed, and widely disseminated by the Gaming Racket constitute "bets or wagers" within the meaning of 18 U.S.C. § 1084. These contracts offer binary choices tied to the outcome of sporting contests such as the Super Bowl and NCAA March Madness tournaments. Customers buy "Yes" or "No" positions, with a fixed payout of $1 (minus fees) for a correct prediction and expiration at $0 for an incorrect one, aligning with the characteristics of a wager.

201.  The Gaming Racket, through its operation of the "prediction markets hub" within the Robinhood mobile application and web platform, knowingly utilizes wire communication facilities. These platforms serve as the primary means by which users interact with and place positions on the gaming contracts. The transmissions occur in "interstate commerce" due to Robinhood's nationwide reach and the fact that users in various states access and engage with the prediction markets hub and associated contracts. Robinhood's mobile application and web platform are employed to transmit:

    a.  bets or wagers, by facilitating the placing of orders for "Yes" or "No" positions on gaming contracts.

    b.  information assisting in the placing of bets or wagers, including real-time pricing and probability information for these contracts, and marketing and promotional materials for gaming contracts to users across state lines. These transmissions explicitly concern "sporting events or contests,"

including but not limited to the Super Bowl and NCAA March Madness tournaments, as explicitly marketed and offered by the Defendants.

c. money or credits in connection therewith, by processing the transmission of funds related to the funding of accounts for these contracts and the distribution of payouts upon resolution.

d. direct communication channels for users to monitor the status and outcomes of their sports-related positions.

202. In California, sports betting is not legal. Its prohibition is established by California Penal Code § 337a, which criminalizes various forms of bookmaking and wagering. Therefore, 18 U.S.C. §1084(b) is inapplicable.

203. Under 18 U.S.C. § 1955(a), whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business can be held liable for violating this section. Section 1955(b)(4) establishes a non-exclusive and broad list of what qualifies as "gambling."

204. An "illegal gambling business" under Section 1955(b)(1) qualifies as a business which: (1) violates state or local law; (2) involves five or more people who conduct, finance, manage, supervise, direct, or own all or part of the business; and (3) has been or remains in substantially continuous operation for more than 30 days or had a gross revenue of $2,000 in any single day.

205. Defendants, by and through the Gaming Racket described herein, have knowingly conducted, financed, managed, supervised, directed, or owned all or part of an illegal gambling business, as defined by 18 U.S.C. § 1955, that violates California Penal Code § 337a, which prohibits various forms of bookmaking and wagering including sportsbook.

206. The following constitute relevant offenses under California Penal Code § 337a:

a. Pool selling or bookmaking, with or without writing, at any time or place. Cal. Penal Code § 337a(1).

b. Whether for gain, hire, reward, or gratuitously, or otherwise, keeps or occupies, for any period of time whatsoever, any room, shed, tenement, tent, booth, building, float, vessel, place, stand or enclosure, of any kind,

or any part thereof, with a book or books, paper or papers, apparatus, device or paraphernalia, for the purpose of recording or registering any bet or bets, any purported bet or bets, wager or wagers, any purported wager or wagers, selling pools, or purported pools, upon the result, or purported result, of any trial, purported trial, contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever. Cal. Penal Code § 337a(2).

c.  Whether for gain, hire, reward, or gratuitously, or otherwise, receives, holds, or forwards, or purports or pretends to receive, hold, or forward, in any manner whatsoever, any money, thing or consideration of value, or the equivalent or memorandum thereof, staked, pledged, bet or wagered, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever. Cal. Penal Code § 337a(3).

207.  The Gaming Racket designs, markets, and distributes these gaming contracts. In doing so, the Gaming Racket engages in pool selling and bookmaking as identified in Cal. Penal Code § 337a(1). Bookmaking, at its core, involves the business of receiving, recording, and accepting bets on the outcome of a contest. The "Yes" or "No" positions offered by the Gaming Racket on sports events function as direct wagers on specific outcomes. The Gaming Racket acts as a central party in facilitating these wagers, accepting funds from participants, and distributing payout based on the result of the sports event. Additionally, the collection of funds from participants creates a pool of money that is then redistributed based on the event's outcome, which is characteristic of illegal pool selling. These activities are precisely the type of wagers or bets that the statute aims to prohibit, irrespective of any purported "market" or "exchange" framing.

208.  The Gaming Racket, through the operation of Robinhood's platform,

keeps or occupies a "place" for the purpose of recording, registering, and otherwise facilitating these unlawful wagers, in contravention of Cal. Penal Code § 337a(2). Kalshi and Robinhood's digital interfaces, accessible by users in California, including on Indian reservations, serves as the virtual device where bets on the results of contests involving of "skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus" are continuously processed and managed.

209.    The Gaming Racket receives, holds, and forwards monies staked or wagered on the results of these sporting events in violation of Cal. Penal Code § 337a(3). Users deposit funds with Kalshi and Robinhood for the express purpose of purchasing these gaming contracts, which relate to contests of "skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus." These funds are then held and managed by the Gaming Racket. The fees charged on these transactions further align with the "for gain" language within Cal. Penal Code § 337a(3).

210.    The Gaming Racket involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business. These persons include, but are not limited to, Kalshi and Robinhood, their respective executives, officers, and employees responsible for the development, self-certification, marketing, platform integration, and financial operations of the "prediction markets hub" and the gaming contracts.

211.    The illegal gambling business has been and remains in substantially continuous operation for a period in excess of 30 days, and/or has a gross revenue of $2,000 in any single day. The substantial volume of trades generating direct, shared revenue for the Gaming Racket through transaction fees on an ongoing basis since at least February 2025 demonstrates both a substantially continuous operation and daily gross revenues far exceeding the statutory threshold.

212.   As Federally recognized Indian Tribes holding the exclusive right to conduct Class III gaming within the State of California, the Tribes have suffered direct and substantial injury to their business by reason of Defendants' violations of 18 U.S.C. § 1962(c). The Gaming Racket's systematic engagement in a pattern of racketeering activity, encompassing wire fraud (18 U.S.C. § 1343), the transmission of wagering information (18 U.S.C. § 1084), and the operation of an illegal gambling business (18 U.S.C. § 1955) encroaches upon and usurps the Tribes' exclusive market. By conducting these unlawful activities, Defendants have impermissibly diverted revenue that, by law and compact, belongs exclusively to the Plaintiffs. This direct competition from the Gaming Racket, enabled and sustained by these prohibited racketeering acts, has caused the Tribes to suffer concrete and quantifiable injuries in the form of significant lost profits and diminished market share to their established and legally protected businesses.

213.   An actual case or controversy exists between the Tribes, Kalshi, and Robinhood, in that the Tribes assert that Kalshi and Robinhood have engaged in a coordinated and systematic pattern of gaming racketeering activity under RICO, while Kalshi and Robinhood contend that their coordinated activities comply with the CEA and, therefore, do not violate RICO, 18 U.S.C. § 1962(c).

WHEREFORE, the Tribes pray as hereinafter set forth below.

## FOURTH CAUSE OF ACTION

### (Infringement of the Tribes' Sovereignty and Interference with Tribal Self-Governance)

214.   The Tribes reallege each of the allegations set forth in Paragraphs 1 through 213 above and by this reference incorporate each allegation as if set forth herein in full.

215.   Kalshi's sports gambling activities are being conducted in direct violation of the Tribes' duly enacted gaming Ordinances, which prohibit sports gambling on their Reservations.

216.    By engaging in illegal sports gambling in violation of the Tribes' Ordinances, Kalshi is interfering with and will continue to interfere with the Tribes' ability to govern themselves, their members, and all persons who work, live, and visit their respective Reservations by preventing the Tribes from determining to what extent and under what conditions, if any, persons, organizations, and entities can engage in class III gaming on their Reservations.

217.    An actual controversy exists between the Tribes and Kalshi, in that the Tribes contend they have the authority to enforce their Ordinances against Kalshi and prohibit it from engaging in sports gambling on their Reservations, while Kalshi asserts that the Tribes have no such authority.

218.    Kalshi's past and future actions of violating the Tribes' Ordinances by engaging in sports gambling on the Tribes' Reservations impermissibly interferes with the ability of the Tribes to govern themselves on their Reservations under their own laws. *Williams v. Lee*, 358 U.S. 217 (1959).

219.    The Tribes has been irreparably injured by Kalshi's unlawful sports gambling on their Reservations and unless Kalshi is provisionally and permanently restrained and enjoined from engaging in such illegal gambling the Tribes will be prevented from governing themselves on their Reservations under their own Tribal laws, causing severe and irreparable injury for which the Tribes have no plain, speedy, or adequate remedy at law.

WHEREFORE, the Tribes pray as hereinafter set forth below.

## FIFTH CAUSE OF ACTION

## (False Advertising – Lanham Act, 15 U.S.C. § 1125(a)(1)(B))

220.    The Tribes reallege each of the allegations set forth in Paragraphs 1 through 219 above and by this reference incorporate each allegation as if set forth herein in full.

221.    The following five elements must be established by a plaintiff in order to make out a claim for false or deceptive advertising on the part of a defendant: (1)

a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Servs., Inc.,* 911 F.2d 242, 244 (9th Cir. 1990).

222.    Kalshi has made multiple false and misleading statements of fact concerning the legality and nature of its sports event contracts. These include statements to consumers that Kalshi's sports events contracts are fully legal and accessible nationwide despite the defectiveness of these contracts under 17 C.F.R. 40.2. Kalshi also repeatedly referred to its sports events contracts as "betting." This includes statements that Kalshi is "The First Nationwide Legal Sports Betting Platform" and offers "Sports Betting Legal in all 50 States on Kalshi." *See supra* ¶ 94.

223.    Kalshi knew, or should have known, that its advertising was false, misleading, and deceptive, as numerous online users have expressed concern regarding the legality of these contracts. *See supra* ¶ 100. Kalshi has also continued to keep advertisement posts on its social media platforms that refer to these contracts as betting.

224.    Each of these false or misleading statements was made in the context of a commercial advertisement or promotion, including Instagram advertisement posts and Reels, TikTok video product promotions, TV commercials, YouTube videos, X.com posts, and Kalshi's own websites, distributed across the Internet and designed to promote purchasing of Kalshi's sports event contracts to consumers nationwide.

225.   Statements made in these advertisements have deceived, and are still likely to deceive, consumers into believing that Kalshi was associated with or created as a gambling platform affirmatively endorsed by the federal government. Currently, on its social media platforms, Kalshi's advertisements for sports event contracts are in close proximity to political events advertisements that use the terms "bet" and "betting." *See supra* ¶ 104. And in fact, Internet comments indicate that consumers were actively deceived on this point. Defendants' false and misleading statements have caused harm to the public and, unless restrained, will further damage the public.

226.   This deception is also material, as it is likely to cause a consumer to purchase Kalshi's sports event contracts, believing its products were universally compliant and that Kalshi was a legally compliant sports betting platform.

227.   As a result of Kalshi's false and misleading statements, the Tribes have suffered damages through lost sales and lost profits of their Class III businesses, as well as continuing damage to the Tribes' business, goodwill, and reputation. The Tribes have suffered and continue to suffer immediate and irreparable injury for which there is no adequate remedy at law. The Tribes are entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a). Furthermore, under 15 U.S.C. § 1117(a), the Tribes are entitled to recover Kalshi's profits on its sports event contracts in addition to any damages sustained and the costs of the action, ensuring that Kalshi does not benefit from its unlawful conduct.

228.   An actual case or controversy exists between the Tribes and Kalshi, in that the Tribes assert that Kalshi has made false statements of fact in advertisements distributed in interstate commerce in violation of 15 U.S.C. § 1125(a)(1)(B), while Kalshi contends that its advertisements are accurate and comply with 15 U.S.C. § 1125(a)(1)(B).

WHEREFORE, the Tribes pray as hereinafter set forth below.

/ / /

1

## **PRAYER FOR RELIEF**

2          Pursuant to their claims and causes of action alleged herein, the Tribes pray

3     as follows:

4          1.      That the Court declare Kalshi's sports event contracts to be outside the

5     permissible scope of the CEA as self-certified contracts that involve, relate to, or

6     reference gaming in contravention of the prohibition in 17 C.F.R. § 40.11(a)(1) and,

7     therefore, Kalshi's contracts constitute illegal class III gaming activity in violation

8     of 18 U.S.C. § 1166 and IGRA;

9          2.      That the Court declare that Kalshi and Robinhood's conduct is unlawful

10    class III gaming activity in violation of 18 U.S.C. § 1166 and, therefore, subject to

11    injunctive relief under IGRA, 25 U.S.C. § 2710(d)(7)(A)(ii);

12         3.      That the Court declare that Kalshi, as a self-certifying registered entity,

13    self-regulating the products offered on its DCM, is impermissibly regulating an area

14    of Indian commerce, within the field of class III gaming activity in Indian country,

15    outside the permissible scope of the CEA, where IGRA occupies the field of

16    regulation and grants Tribes the exclusive right to regulate class III gaming activity

17    on Indian lands;

18         4.      That the Court declare that Kalshi's gambling activities on the Tribes'

19    Reservations violates the Tribes' Gaming Ordinances and constitutes an

20    impermissible interference with the ability of the Tribes to govern themselves on

21    their Reservations under their own laws;

22         5.      That the Court preliminarily and permanently enjoin Kalshi and

23    Robinhood from offering sports events contracts on the Tribes' Indian lands;

24         6.      That the Court declare that Kalshi and Robinhood's joint conduct

25    demonstrate systematic engagement in a pattern of racketeering activity in violation

26    of RICO, 18 U.S.C. § 1962(c);

27         7.      That the Tribes be awarded treble damages, costs, and attorneys' fees

28    pursuant to 18 U.S.C. § 1962(c) and the Tribes' own attorney fee ordinances; and

COMPLAINT

8.    That the Court order injunctive relief as permitted by 15 U.S.C. § 1116(a), and award damages, including disgorgement of ill-gotten gains, lost profits, costs, and attorneys' fees, as permitted by 15 U.S.C. § 1117(a); and

9.    That the Court grants such other and further relief as may be deemed appropriate.

Respectfully Submitted,

DATED: July 22, 2025                    RAPPORT AND MARSTON

By:    /s/ *Lester J. Marston*

LESTER J. MARSTON, Attorney for the Blue Lake Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians, and the Picayune Rancheria of Chukchansi Indians

# EXHIBIT A

**Exhibit A**



# EXHIBIT B

**Exhibit B**



# EXHIBIT C

## Exhibit C



# EXHIBIT D

**Exhibit D**



# EXHIBIT E

**Exhibit E**







# EXHIBIT F

**Exhibit F**



Promo available

## WATO Hat

**$25.00**

Free shipping for orders over $100.00 for everyone. Promotion auto-applied on checkout.

| 1 | Add to Cart |

More details                                        +

Size & Fit                                          +

Quality Guarantee & Returns                         +