LESTER J. MARSTON
California State Bar No. 081030
LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA OF ME-WUK INDIANS, and PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS<br><br>                    Plaintiffs,<br><br>v.<br><br>KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, and DOES 1-20,<br><br>                    Defendants. | Case No.:  25-cv-06162-JSC<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: October 9, 2025<br>Time: 10:00am<br>Courtroom.: 8<br>Judge: Jacqueline Scott Corley<br><br>**Oral Argument Requested** |

**PLEASE TAKE NOTICE** that on October 9, 2025, at 10:00 a.m., before the Honorable Jacqueline Scott Corley, District Court Judge in Courtroom 8, located at the 19th Floor, Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, the Plaintiffs, the Blue Lake Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians, and Picayune Rancheria of the Chukchansi Indians (collectively, Plaintiffs) will and hereby do move this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 7-2 for a preliminary injunction against Kalshi Inc. and KalshiEX LLC, (collectively, Kalshi).

Plaintiffs respectfully move the Court to enter a preliminary injunction enjoining Kalshi from offering on the Tribes' Indian lands any sports contracts, including, but not limited to,

contracts that facially involve, relate to, or reference the sports of baseball, tennis, pickleball, soccer, basketball, football, golf, chess, esports, hockey, motorsports, the Ultimate Fighting Championship ("UFC"), and any other sports events. The Tribes further request that the Court enjoin Kalshi from offering on the Tribes' Indian lands contracts that take the form of a binary "yes/no" event contract that pose the following questions:

1.    "Will <team> win <title>?"

2.    "Will <team> win <event>?"

and any subsequent permutation, alteration, or variation of such contracts that facially involve, relate to, or reference sports, constitute or mimic sports betting, or any other potential class III gaming activity.

The Tribes further respectfully request that Court enjoin Kalshi from marketing its sports contracts as "legal in all 50 states" or any variation of that phrase or similar representation regarding the nationwide legality of these gaming contracts.

This motion is based on this notice, the Complaint for Declaratory and Injunctive Relief (ECF No. 1); the accompanying Memorandum of Points and Authorities; the supporting declarations filed herewith; the request for judicial notice filed herewith; all pleadings already on file with the Court in this case; and any matters properly before the Court.

DATED: September 4, 2025                Respectfully Submitted,

                                        RAPPORT AND MARSTON

                                        By:     /s/ Lester J. Marston
                                                LESTER J. MARSTON,
                                                Attorney for Plaintiffs

LESTER J. MARSTON
California State Bar No. 081030
LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA OF ME-WUK INDIANS, and PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS<br><br>      Plaintiffs,<br><br>v.<br><br>KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, and DOES 1-20,<br>      Defendants. | Case No.: 25-cv-06162-JSC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: October 9, 2025<br>Time: 10:00am<br>Courtroom.: 8<br>Judge: Jacqueline Scott Corley<br><br>**Oral Argument Requested** |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. LEGAL BACKGROUND ........................................................................................3

III. STANDARD FOR GRANTING A PRELIMINARY INJUNCTION .......................................8

     a.     Likelihood of Success on the Merits......................................................... 9

     b.     Irreparable Harm ................................................................................. 14

     c.     The Balance of the Equities Favors the Tribes ....................................... 17

     d.     Public Interest ..................................................................................... 20

     e.     Request for Relief ................................................................................ 23

IV. CONCLUSION....................................................................................................24

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.:  25-cv-06162-JSC]

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*AECOM Energy & Constr., Inc. v. Ripley*,
   No. 2:17-cv-05398-RSWL-SS, 2017 U.S. Dist. LEXIS 160180
   (C.D. Cal. Sep. 27, 2017) ........................................................................ 22

*Alliance For The Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ................................................................... 9

*Amoco Prod. Co. v. Vill. Of Gambell, AK*,
   480 U.S. 531 (1987) ............................................................................ 8, 17

*Arcsoft, Inc. v. Cyberlink Corp.*,
   153 F. Supp. 3d 1057 (N.D. Cal. 2015) .................................................. 14

*Artichoke Joe's v. Norton*,
   216 F. Supp. 2d 1084 (E.D. Cal. 2002) .................................................... 6

*Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*,
   584 F.2d 308 (9th Cir. 1978) ..................................................................... 9

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
   547 F.3d 115 (2d Cir. 2008) .................................................................... 15

*Choctaw Nation of Oklahoma v. State of Oklahoma*,
   724 F. Supp. 2d 1182 (W.D. Okla. 2010) ............................................... 15

*City & Cty. of S.F. v. Trump*,
   No. 25-cv-01350-WHO, 2025 U.S. Dist. LEXIS 78603
   (N.D. Cal. Apr. 24, 2025) .......................................................................... 8

*Cmty. Legal Servs. In E. Palo Alto v. United States Dep't of
   Health & Hum. Servs.*,
   2025 WL 973318 (N.D. Cal. Apr. 1, 2025) ............................................. 17

*Coca-Cola Co. v. Tropicana Prods., Inc.*,
   690 F.2d 312 (2d Cir. 1982) .................................................................... 12

*Comanche Nation v. United States*,
   393 F. Supp. 2d 1196 (W.D. Okla. 2005) ............................................... 14

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ................................................................... 8

*EEOC v. Karuk Tribe Hous. Auth.*,
   260 F.3d 1071 (9th Cir. 2001) ................................................................. 15

*Fraihat v. United States Immigration & Customs Enf't*,
   16 F.4th 613 (9th Cir. 2021) ...................................................................... 8

*Gaming Corp. of Am. V. Dorsey & Whitney*,
   88 F.3d 536 (8th Cir. 1996) ....................................................................... 6

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.:  25-cv-06162-JSC]

*In re Indian Gaming Related Cases*,
    331 F.3d 1094 (9th Cir. 2003) ........................................................ 6, 15

*KalshiEX LLC v. CFTC*,
    No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) ..................... 1

*KalshiEX LLC v. Commodity Futures Trading Comm'n*,
    2024 WL 4164694 (D.D.C. Sept. 12, 2024) ........................................ 3

*KalshiEX LLC v. Martin*,
    No. 25-cv-1283-ABA, 2025 U.S. Dist. LEXIS 147815
    (D. Md. Aug. 1, 2025) .............................................................. 5, 10

*Kos Pharms., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004) ........................................................ 22

*Lacassagne v. Chapuis*,
    144 U.S. 119 (1892) ................................................................. 8

*Lopez v. Heckler*,
    725 F.2d 1489 (9th Cir.) ......................................................... 8-9

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014) ................................................................. 6

*Morton v. Mancari*,
    417 U.S. 535 (1974) ................................................................. 10

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................. 8

*Phong Thanh Nguyen v. Scott*,
    No. 2:25-cv-01398, 2025 U.S. Dist. LEXIS 142875, at *6
    (W.D. Wash. July 25, 2025) ........................................................ 8

*Pom Wonderful Ltd. Liab. Co. v. Purely Juice, Inc.*,
    No. CV-07-02633 CAS (JWJx), 2008 U.S. Dist. LEXIS 55426
    (C.D. Cal. July 17, 2008) .......................................................... 20

*Posadas v. Nat'l City Bank of New York*,
    296 U.S. 497 (1936) ................................................................. 10

*Prairie Band of Potawatomi Indians v. Pierce*,
    253 F.3d 1234 (10th Cir. 2001) ................................................... 15

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976) ................................................................. 10

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ...................................................... 14

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ...................................................... 14

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) ...................................................... 8

vi

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ............................................................ 11, 14

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) .................................................................................. 20

*Stewart v. City & Cnty. Of San Francisco*,
  No. 22-16018, 2023 WL 2064162 (9th Cir. Feb. 17, 2023) ................... 9

*Sun Microsystems, Inc. v. Microsoft Corp.*,
  87 F. Supp. 2d 992 (N.D. Cal. 2000) ...................................................... 20

*Suzie's Brewery Co. v. Anheuser-Busch Companies, LLC*,
  519 F. Supp. 3d 839 (D. Or. 2021) ...................................................Passim

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007)......................................................... 12, 13, 17

*Tohono O'Odham Nation v. Schwartz*,
  837 F. Supp. 1024 (D. Ariz. 1993) .......................................................... 14

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011) ................................................................ 7, 22

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
  522 F. Supp. 1238 (D. Ariz. 1981) .......................................................... 22

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
  681 F.2d 1159 (9th Cir. 1982) .............................................................. 7, 22

*United States v. Borden Co.*,
  308 U.S. 188 (1939) .................................................................................. 10

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981) .................................................................................... 9

*U.S. Philips Corp. v. KBC Bank N.V.*,
  590 F.3d 1091 (9th Cir. 2010) ................................................................... 9

*Ute Indian Tribe of the Uintah & Ouray Rsrv. V. Utah*,
  790 F.3d 1000 (10th Cir. 2015) ............................................................... 14

*Virginian Ry. Co. v. Sys. Fed'n No. 40*,
  300 U.S. 515 (1937)................................................................................... 20

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008)........................................................................... 8, 17, 20

**Statutes**

7 U.S.C. § 1 .............................................................................................. 1, 3

7 U.S.C. § 1a(6) ........................................................................................... 4

7 U.S.C. § 1a(19) ......................................................................................... 4

7 U.S.C. §§ 1a(37) and (51) ........................................................................ 4

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.: 25-cv-06162-JSC]

7 U.S.C. § 2 .................................................................................................. 3

7 U.S.C. § 7a-2(c)(5)(C) ............................................................................... 4

7 U.S.C. § 7a-2(c)(5)(C)(ii) ......................................................................... 21

15 U.S.C. § 1116(a) ............................................................................... 12, 17

15 U.S.C. § 1125 .......................................................................................... 7

15 U.S.C. § 1125(a)(1)(B) ............................................................................ 7

15 U.S.C. § 1127 .......................................................................................... 7

18 U.S.C. § 1084 .................................................................................... 12, 22

18 U.S.C. § 1955 ........................................................................................ 22

25 U.S.C. § 2701(4) .................................................................................... 21

25 U.S.C. § 2701(5) .................................................................................... 10

25 U.S.C. § 2702 ..................................................................................... 2, 6

25 U.S.C. § 2702(1) .................................................................................... 21

25 U.S.C. § 2702(2) .................................................................................... 21

25 U.S.C. § 2703(4) ...................................................................................... 1

25 U.S.C. § 2710 (d)(1) ............................................................................... 11

25 U.S.C. § 2710(d)(7)(A)(ii) ................................................................ 2, 7, 9

25 U.S.C. §§ 2701-2721 ............................................................................ 2, 6

25 U.S.C. §§ 2703(4)(A)-(B) ........................................................................ 1

25 U.S.C. §§ 2710(d)(9) ............................................................................. 15

25 U.S.C. §§ 2711 ...................................................................................... 15

29 U.S.C. § 151 .......................................................................................... 20

31 U.S.C. § 5362(1)(E) ............................................................................... 10

31 U.S.C. §§ 5361–5367 ............................................................................... 6

31 U.S.C. §§ 5362(1)(E)(ii)–(iv) .................................................................. 6

Cal. Const. Art. IV. § 19 (f) ........................................................................ 15

Cal. Bus. & Prof. Code § 19801 (d) ............................................................ 21

Cal. Penal Code § 337a(1) .................................................................... 12, 22

**Regulations**

17 C.F.R. § 1 ................................................................................................. 3

17 C.F.R. § 1.3 .............................................................................................. 4

17 C.F.R. § 40.11(a) ...................................................................................... 4

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.:  25-cv-06162-JSC]

17 C.F.R. § 40.11(a)(1) ......................................................................................... 21

17 C.F.R. § 40.11(a)(2) ......................................................................................... 21

17 C.F.R. § 40.11(c)(1) ......................................................................................... 18

17 C.F.R. § 40.2(a)(3)(v) ......................................................................................... 5

17 C.F.R. § 40.3 .......................................................................................... 4, 5, 18

17 C.F.R. § 40.3(a) ................................................................................................. 4

17 C.F.R. §§ 40.11, 40.2, 40.3 ............................................................................... 2

25 C.F.R. § 502.15 ............................................................................................... 15

25 C.F.R. § 502.4 ................................................................................................... 6

25 C.F.R. § 502.4(c) ......................................................................................... 9, 11

25 C.F.R. § 533.7 ................................................................................................. 15

Events Contracts, 89 Fed. Reg. 48968-01 (June 10, 2024) ...................................... 4

**Other Authorities**

STATES' BIG GAMBLE ON SPORTS BETTING,
    12 UNLV Gaming L.J. 53 ................................................................................... 4

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.:  25-cv-06162-JSC]

## I.    INTRODUCTION

Defendants Kalshi Inc. and KalshiEX LLC ("Kalshi") are engaging in sports betting, which is class III gaming as defined in the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"). Kalshi initially made a name for itself by offering controversial contracts allowing consumers to bet on the outcome of the 2024 Presidential election, which Kalshi claimed was distinct from gaming. In a matter of months, however, Kalshi expanded from betting on election results to single game bets on the outcomes of the Super Bowl and the March Madness college basketball tournament, and has now expanded to prop bets on player performance, point spread, and over/unders.[1] And as of September 2, 2025, Kalshi has self-certified a contract that would allow for parlays on sporting events.[2]

Kalshi has admitted[3] that its sports event contracts constitute gaming under the Commodities Exchange Act, 7 U.S.C. § 1, et seq. ("CEA") and the Commodities Futures Trading Commission's ("CFTC") regulations, and has advertised its contracts as sports betting to target a consumer demographic interested in sports betting. Kalshi is intentionally entering the field of class III gaming, which subjects Kalshi to regulation under IGRA when its app-based gaming reaches consumers on Plaintiff Tribes' "Indian lands." 25 U.S.C. §§ 2703(4)(A)-(B).[4]

Kalshi claims that its activities are commodities contracts or swaps ("gaming contracts" or "contracts") regulated by the CFTC pursuant to the CEA and, because the CFTC has not chosen to review its gaming contracts, Kalshi's contracts comply with the CEA and the CFTC regulations.

---

[1] Dustin Gouker, *News: Kalshi Can Now Offer Point Spreads, Totals And TD Props For Football Games*, Event Horizon (Aug. 18, 2025), https://nexteventhorizon.substack.com/p/news-kalshi-can-now-offer-point-spreads-totals-football.

[2] *KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <outcomes> occur in <events>?" Contract,* Commodity Futures Trading Commission (Sep. 2, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/09/ptc09022529868.pdf.

[3] Appellee's Br. at 17, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024); Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj., Doc. 26 at 20, 27, *KalshiEX, LLC v. John A. Martin, et al.*, 1:25-cv-01283-ABA (D. Md. May 9, 2025).

[4] IGRA defines Indian lands as "all lands within the limits of any Indian reservation; and . . .  any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4).

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.:  25-cv-06162-JSC]

Kalshi is wrong. Kalshi's contracts are not CEA compliant because Kalshi did not meet its obligations under the CEA and CFTC regulations with respect to the self-certification process. Specifically, Kalshi's contracts facially involve sports gaming, prohibited by the CEA and CFTC regulations, and Kalshi's self-certifications do not address compliance issues, let alone rebut the regulatory presumption that its contracts are contrary to the public interest. *See* 17 C.F.R. §§ 40.11, 40.2, 40.3. Kalshi, as a Designated Contract Market ("DCM") and the regulator of that marketplace, is offering prohibited gaming contracts in all fifty states, including on Indian lands within the boundaries of each state.

Class III gaming on Indian lands must be conducted in accordance with the IGRA and is regulated exclusively by Indian tribes and states and subject to federal regulatory oversight. 25 U.S.C. §§ 2701–2721. IGRA comprehensively regulates the field of Indian gaming and assigns specific regulatory roles for tribes, states, and federal agencies. *See*, *e.g.*, 25 U.S.C. § 2702. IGRA preempts the field of regulation of Indian gaming and conveys to the Tribes a right to enjoin unlawful class III gaming on their Indian lands. 25 U.S.C. § 2710(d)(7)(A)(ii). Because Kalshi is intentionally targeting the sports betting consumer and engaging in sports betting in a manner that allows persons and entities to engage in class III sports betting on Indian lands, Kalshi's activities violate IGRA, the Tribal-State Compact entered into by the Picayune Rancheria of Chukchansi Indians ("Picayune"), the Secretarial Procedures issued to the Blue Lake Rancheria ("Blue Lake") and the Chicken Ranch Rancheria of Me-Wuk Indians ("Chicken Ranch"), and the Tribal Gaming Ordinances enacted by the Plaintiff Tribes in accordance with IGRA to regulate class III gaming activity on their Indian lands.

The Tribes, therefore, request that the court issue an order enjoining Kalshi from offering any future gaming contracts within the Plaintiff Tribes' Indian lands. The Tribes also request that the court issue an order enjoining Kalshi from deploying false and misleading advertisements

related to their gaming contracts such as advertisements that indicate that these contracts are "legal in all 50 states."[5]

Below, the Tribes will demonstrate that the Tribes satisfy each of the factors necessary to entitle them to preliminary injunctive relief consistent with the statutory relief prescribed by IGRA and the Lanham Act because: (1) Kalshi's gaming contracts are presumptively contrary to the public interest and, because Kalshi failed to rebut such presumption through the self-certification process, Kalshi's contracts are unlawful; (2) as the primary regulator of its DCM, Kalshi is placing unlawful class III gaming contracts in the stream of commerce that reach consumers on Indian lands; (3) IGRA comprehensively regulates the field of class III gaming on Indian lands and establishes a tribal right to enjoin unlawful class III gaming activity on such Indian lands; and (4) Kalshi's marketing strategy deploys false and misleading advertisements to promote its "sports betting."

## II.    LEGAL BACKGROUND

The CFTC is an independent federal agency that regulates financial derivative markets in accordance with the CEA. 7 U.S.C. § 1 *et seq.*; 17 C.F.R. § 1 *et seq.*; *see generally KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694, at *2–3 (D.D.C. Sept. 12, 2024), *dismissed,* No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025) (reviewing the evolution of the CEA and the implementing CFTC regulations). The CFTC is responsible for administering and enforcing the CEA, and the statute vests the CFTC with jurisdiction to regulate various types of commodities, futures, and swaps on regulated exchanges, as well as the authority to promulgate implementing regulations. *See generally* 7 U.S.C. § 2 (establishing CFTC jurisdiction to regulate agreements and transactions involving swaps or

---

[5] Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (Apr. 3, 2025), https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could.

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.:  25-cv-06162-JSC]

contracts of sale of a commodity for future delivery, traded or executed on a Designated Contract Market).[6]

The CFTC is vested with the authority to evaluate contracts that pertain to excluded commodities, defined in 7 U.S.C. § 1a(19), and determine whether those contracts are contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C).[7] Consistent with its vested authority to evaluate whether contracts are contrary to the public interest, the CFTC promulgated regulations prohibiting registered entities from listing contracts pertaining to excluded commodities and similar activities. 17 C.F.R. § 40.11(a) ("A registered entity **shall not list** for trading or accept for clearing on or through the registered entity [a contract] that involves, relates to, or references terrorism, assassination, war, **gaming**, or an activity that is unlawful under any State or Federal law [or] an activity that is similar to an activity enumerated [herein]") (emphasis added). As a result, the CFTC regulations prohibit a registered entity, such as Kalshi, from offering contracts that involve excluded commodities, such as gaming. Neither the CEA nor the CFTC regulations define "gaming." *KalshiEX LLC*, 2024 WL 4164694, at *4, *8; *see generally* Proposed rules for Events Contracts, 89 Fed. Reg. 48968-01, *48974–*48977 (June 10, 2024) (discussing lack of definition of "gaming" in the CEA/CFTC regulations and proposing a definition).

Registered entities, such as Kalshi, seeking approval to list contracts pertaining to enumerated excluded commodities can voluntarily submit prospective contracts to the CFTC for a determination that the contracts comply with the CEA and are not contrary to the public interest. 17 C.F.R. § 40.3. Section 40.3 specifies that this mechanism is for seeking approval of "a new product," or "if a product was initially submitted under § 40.2 . . . ." 17 C.F.R. § 40.3(a). Kalshi has chosen not to avail itself of CFTC approval prior to offering its gaming contracts on its DCM.

---

[6] A DCM, defined in 17 C.F.R. § 1.3 and also known as a "futures exchange," is a "board of trade" designated as a contract market by the CFTC. A "board of trade," is defined in 7 U.S.C. § 1a(6) as an "organized exchange or other trading facility." Those terms, in turn, are defined in 7 U.S.C. §§1a(37) and (51).

[7] Note that "[t]he reference to '1a(2)(i)' [in 7 U.S.C. § 7a-2(c)(5)(C)] is nonsensical because neither CEA § 1a(2)(i) nor CEA § 1a(2) appear in the definition of 'appropriate Federal banking agency.' The authors [of the article] believe that Congress instead meant to refer to CEA § 1a(19)(i), a reading consistent with CEA [§ 7a-2(c)(5)(C)]'s focus on excluded commodities." ARTICLE: STATES' BIG GAMBLE ON SPORTS BETTING, 12 UNLV Gaming L.J. 53, 67.

1   *See KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA, 2025 U.S. Dist. LEXIS 147815, at *10 (D.

2   Md. Aug. 1, 2025) ("Although Kalshi could have requested pre-approval from the Commission

3   regarding whether Kalshi could lawfully conduct sports betting on its platform, *id*. § 7a-2(c)(4)(A),

4   instead on January 24, 2025, Kalshi self-certified and began listing sports-event contracts on its

5   exchange, allowing users to place positions on which teams will advance in certain rounds of the

6   NCAA College Basketball Championship or who will win the U.S. Open Golf Championship.")

7   (internal citations omitted).

8       The CFTC has promulgated regulations that allow registered entities to self-certify event

9   contracts through 17 C.F.R. § 40.2. Where self-certified products or contracts present compliance

10  issues, the self-certifying registered entity must provide a "concise explanation and analysis that

11  is complete" concerning "the underlying commodity, and the [contract's] compliance with

12  applicable provisions of the [CEA], including core principles, and the [CFTC] regulations

13  thereunder." 17 C.F.R. § 40.2(a)(3)(v). Kalshi's self-certifying documents fail to address

14  compliance concerns arising from contracts that facially involve gaming, let alone rebut the

15  presumption that such contracts are prohibited as contrary to the public interest. Pls.' Req. for

16  Judicial Notice ¶¶ 1-5, Ex. 1-5. Kalshi's gaming contracts, therefore, are presumptively prohibited

17  and therefore presumptively unlawful.

18      Lack of CFTC regulation and review under 17 C.F.R. § 40.11 does not constitute

19  compliance with the CEA and the CFTC regulations. 17 C.F.R. § 40.3 is the only regulatory

20  mechanism that compels CFTC contract review. The CEA and CFTC regulations do not require

21  that the CFTC review every proposed contract or swap, and the CFTC staff lacks the resources to

22  review Kalshi's expanding gaming contract market. Event Contracts, *supra*, 89 FR 48968-01 at

23  *48969 ("From a resource allocation perspective . . . a single § 40.11(c) review is resource-

24  intensive and consumes hundreds of hours of staff time."). Primary responsibility for the regulation

25  of Kalshi's DCM and the evaluation of whether Kalshi's products comply with the CEA and the

26  CFTC regulations rests with Kalshi. Kalshi is, thus, a de facto regulator, primarily responsible for

27  regulating its DCM. Since Kalshi is targeting the sports betting market in all fifty states, which

28

5

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.:  25-cv-06162-JSC]

necessarily includes the Indian lands located in each state, Kalshi is offering class III gaming contracts, in conflict with the CEA, that interfere with the regulation of class III Indian gaming in accordance with IGRA.

It is well-settled that IGRA comprehensively regulates the field of Indian gaming and establishes that the Tribes and states, under federal oversight, have the exclusive right to regulate gaming on Indian lands. *See*, *e.g.*, 25 U.S.C. § 2702; *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1096 (9th Cir. 2003) ("IGRA is an example of 'cooperative federalism' in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." (quoting *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002), *aff'd sub nom. Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712 (9th Cir. 2003)); *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) ("Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else."); *Gaming Corp. of Am. V. Dorsey & Whitney*, 88 F.3d 536, 546–47 (8th Cir. 1996). IGRA was enacted in accordance with the unique trust relationship between the federal government and Indian tribes, and Congress enacted IGRA to alleviate burdens on federal resources and promote tribal sovereignty, tribal self-government, and tribal self-determination through tribal economic self-sufficiency, namely, through tribal gaming. *See generally* 1 Cohen's Handbook of Federal Indian Law § 6.04[3] (2025) (discussing the history and context of the trust relationship between tribes and the federal government); 25 U.S.C. §§ 2701–2702. In contrast to other federal gambling laws, IGRA does not carve out an exception for contracts offered in accordance with the CEA. *Contrast* IGRA, 25 U.S.C. §§ 2701–2721 (establishing that IGRA occupies the field of class III Indian gaming), *with* the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361–5367, specifically 31 U.S.C. §§ 5362(1)(E)(ii)–(iv) (establishing exemptions for transactions under the CEA and excluding such transactions from the definition of "bet" or "wager").

Regulations promulgated in accordance with IGRA establish that sports betting constitutes class III gaming activity. 25 C.F.R. § 502.4 ("Class III gaming means all forms of gaming that are

not class I gaming or class II gaming, including but not limited to . . . sports betting and pari-mutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai . . . .”). IGRA also establishes the Tribes' right to enjoin unlawful gaming activity on Indian lands. 25 U.S.C. § 2710(d)(7)(A)(ii) (“The United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under [IGRA] that is in effect . . . .”). Not only are the Tribes entitled to permanent injunctive relief under IGRA but, as set forth below, the Tribes satisfy each of the factors necessary to demonstrate that preliminary injunctive relief is appropriate. Without preliminary injunctive relief, the impermissible interference with tribal self-government will persist and frustrate the purposes for which IGRA was enacted – to promote tribal sovereignty, self-determination, and economic self-sufficiency of tribal governments. 25 U.S.C. §§ 2701–2702.

Additionally, the Lanham Act, specifically 15 U.S.C. § 1125, forbids any false or misleading description of fact, or false or misleading representation of fact, “which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of his or her . . . goods, services, or commercial activities.” 15 U.S.C. § 1125(a)(1)(B). The Lanham Act was intended to make “actionable the deceptive and misleading use of marks,” and “to protect persons engaged in . . . commerce against unfair competition.” 15 U.S.C. § 1127. The Lanham Act creates a cause of action for unfair competition through misleading advertising or labeling. However, “the Lanham Act is at heart a consumer protection statute.” *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011) (citing *U-Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1162 (9th Cir. 1982)).

Kalshi's myriad false and misleading statements about its platform, products, and services violate 15 U.S.C. § 1125(a)(1)(B). Their commercial advertising deliberately confuses consumers as part of a broader marketing strategy to attract a large consumer base. *See* Declaration of Skyler Kretz in Support of Plaintiffs' Motion for a Preliminary Injunction (“Kretz Decl.”) ¶¶ 13, Ex. 13; 15, Ex. 15; 16, Ex. 16; 28-31, Ex. 28-31. Granting an injunction is necessary to protect consumers

1  from confusion resulting from Kalshi's false and misleading marketing practices. Granting an

2  injunction here is also necessary to protect the Tribes' ability to regulate class III gaming activity

3  on the Tribes' Indian lands, and consequently tribal sovereignty and economic self-sufficiency.

### III. STANDARD FOR GRANTING A PRELIMINARY INJUNCTION

5  To establish entitlement to preliminary injunctive relief, the moving party "[1] must

6  establish that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm

7  in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that

8  an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). In cases such

9  as this one, where governments—the Tribes—are seeking an injunction, "these last two factors

10  merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). *See also Roman v.

11  Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020) ("Where the government is a party to a case in which

12  a preliminary injunction is sought, the balance of the equities and public interest factors merge.");

13  *Fraihat v. United States Immigration & Customs Enf't*, 16 F.4th 613, 657 (9th Cir. 2021) ("When

14  the government is a party, the balance of equities factor merges with the public interest

15  consideration."); *City & Cty. of S.F. v. Trump*, No. 25-cv-01350-WHO, 2025 U.S. Dist. LEXIS

16  78603, at *10 (N.D. Cal. Apr. 24, 2025) ("As government entities are parties to this case, the final

17  two factors merge."); *Phong Thanh Nguyen v. Scott*, No. 2:25-cv-01398, 2025 U.S. Dist. LEXIS

18  142875, at *6 (W.D. Wash. July 25, 2025) ("The final two *Winter* factors, which involve balancing

19  the equities and considering the public interest, merge when the Government is a party to a case.").

20  "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter

21  v. NRDC, Inc.*, 555 U.S. at 24 (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). "In each

22  case, courts 'must balance the competing claims of injury and must consider the effect on each

23  party of the granting or withholding of the requested relief.'" *Id*. (quoting *Amoco Prod. Co. v. Vill.

24  of Gambell, AK*, 480 U.S. 531, 542 (1987)). "The function of an injunction is to afford preventive

25  relief, not to redress alleged wrongs which have been committed already." *Lacassagne v. Chapuis*,

26  144 U.S. 119, 124 (1892). Stated differently, the general purpose of a preliminary injunction is to

27  protect the rights of the parties pending final determination of the action after a full hearing. *Lopez*

28

1   *v. Heckler*, 725 F.2d 1489, 1509 (9th Cir.), *cert. granted, judgment vacated on other grounds,* 469

2   U.S. 1082 (1984); *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

3       Additionally, the Ninth Circuit "has adopted and applied a version of [a] sliding scale

4   approach" in which "the elements of the preliminary injunction test are balanced, so that a stronger

5   showing of one element may offset a weaker showing of another. For example, a stronger showing

6   of irreparable harm to a plaintiff might offset a lesser showing of likelihood of success on the

7   merits." *Alliance For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–1132 (9th Cir. 2011).

8                    **a.       Likelihood of Success on the Merits**

9       "To establish a likelihood of success, plaintiffs need not conclusively prove their case or

10  show that they are 'more likely than not' to prevail." *Stewart v. City & Cnty. of San Francisco,*

11  *California*, 608 F. Supp. 3d 902, 911 (N.D. Cal. 2022), *aff'd sub nom. Stewart v. City & Cnty. of*

12  *San Francisco*, No. 22-16018, 2023 WL 2064162 (9th Cir. Feb. 17, 2023) (citing *Univ. of Texas*

13  *v. Camenisch*, 451 U.S. 390, 395 (1981)). "Rather, a 'fair chance' of success is the standard for

14  granting preliminary injunctive relief." *Id.* (quoting *Benda v. Grand Lodge of Int'l Ass'n of*

15  *Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978)).

16      IGRA establishes the Tribes' right to permanently enjoin class III gaming in violation of

17  their respective Compacts or Secretarial Procedures. 25 U.S.C. § 2710(d)(7)(A)(ii). As articulated

18  above, Kalshi's contracts are presumptively contrary to the public interest and are, therefore,

19  prohibited from being listed under the CEA and CFTC Regulations. As the licensed operator of its

20  DCM, Kalshi has taken substantial steps toward attracting consumers interested in engaging in

21  sports betting activity, which is class III gaming activity. *See* Kretz Decl. 16, Ex. 16; 28-31, Ex.

22  28-31; *see also* 25 C.F.R. § 502.4(c). The defects in Kalshi's self-certifications and lack of CEA

23  compliance arising therefrom, coupled with Kalshi's targeting of the class III gaming market,

24  compel the conclusion that Kalshi's contracts constitute class III gaming which, on Indian lands,

25  is expressly precluded by IGRA.

26      Because IGRA precludes such unauthorized class III gaming, there is a substantial

27  likelihood that the Tribes will prevail on the merits of their IGRA claim. Therefore, the relief

28

requested by the Tribes is the appropriate, statutorily imposed relief, and the Court should grant the Tribes' Motion for Preliminary Injunction.

Even if the Court accepts the proposition that Kalshi's contracts comport with the CEA and CFTC regulations, which they do not, IGRA must control gaming activity on Indian lands if the CEA and CFTC regulations permit some commodities contracts that involve gaming. Kalshi would then be compelled to advocate for an interpretation of the CEA that permits gaming contracts on Indian lands, creating a conflict between the CEA and IGRA. IGRA is clear, when tribal gaming activity is conducted in accordance with IGRA, "Indian tribes have the exclusive right to regulate gaming activity on Indian lands . . . ." 25 U.S.C. § 2701(5). Thus, "Kalshi's proposed statutory interpretation would necessarily entail at least a partial implied repeal of the IGRA . . . ." *KalshiEX LLC v. Martin*, 1:25-cv-01283-ABA, Doc. 70 at *23 (D. Md. Aug. 1, 2025) (denying Kalshi's motion for injunctive relief for failure to establish likelihood of success on merits).

"The cardinal rule is that repeals by implication are not favored." *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936). "When there are two [federal] acts upon the same subject, the rule is to give effect to both if possible." *Morton v. Mancari*, 417 U.S. 535, 551 (1974) (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)). "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Id.* at 550–551. "It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976).

IGRA comprehensively regulates one subject: gaming on Indian lands, without exception. *See* 31 U.S.C. § 5362(1)(E) (creating an exemption for commodities contracts under UIGEA). Interpreting the CEA to permit gaming contracts that constitute sports betting—or activity that otherwise falls within the scope of gaming activity under IGRA—on Indian lands would be tantamount to an implied repeal of IGRA. Even if it is theoretically possible for a commodities

---

10

contract involving gaming to comport with the public interest and, thereby, be lawful under the CEA and CFTC regulations, if such contracts constitute gaming activity that falls within the scope of IGRA and those contracts are offered on Indian lands, the contracts must comply with IGRA, its implementing regulations, the applicable compact or secretarial procedures, and the applicable tribal gaming ordinance. ("class III gaming activities shall be lawful on Indian lands **only** if such activities are- (A) authorized by an ordinance…that- (i) is adopted by the gaming body of the Indian tribe…") (emphasis added). 25 U.S.C. § 2710 (d)(1). Kalshi's contracts unequivocally do not comply with IGRA. Thus, even if the Court were to determine that Kalshi's self-certifications comply with the CEA and CFTC regulations, Kalshi's activity would still constitute class III gaming activity located on Indian lands and conducted in violation of the Tribes' Compact, Secretarial Procedures, and Gaming Ordinance. *See* 25 C.F.R. § 502.4(c). Therefore, the Tribes are likely to succeed on the merits of their IGRA claim.

Additionally, the Tribes can demonstrate that the Defendants are liable for false advertising. The elements of a false advertising claim under section 1125(a)(1)(B) of the Lanham Act are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). A plaintiff may establish the "falsity" of the advertisement in one of two ways—by "show[ing] that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Id*; *Suzie's Brewery Co. v. Anheuser-Busch Companies, LLC*, 519 F. Supp. 3d 839, 846 (D. Or. 2021) ("*Suzie's Brewery*").

"When an advertisement is shown to be literally or facially false, consumer deception is presumed, and 'the court may grant relief without reference to the advertisement's [actual] impact

on the buying public.'" *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007) (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)); *Suzie's Brewery*, 519 F. Supp. 3d at 846; *see* 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction . . . ."). "Only an unambiguous message, however, can be literally false." *Suzie's Brewery*, 519 F. Supp. 3d at 846 (citing *Time Warner*, 497 F.3d at 158). "Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Id*.

Kalshi published an advertisement on January 23, 2025, with the headline that asserted: "Sports Betting Legal in all 50 States on Kalshi," which included the statement: "Breaking News: You can now bet on sports in all 50 states with Kalshi." Gouker article, *supra* page 2. These statements are not susceptible to more than one reasonable interpretation; the only reasonable interpretation is that Kalshi offers "sports betting" and that sports betting is "legal in all 50 states." These statements are literally false. First, states either criminally prohibit or strictly regulate sports betting activity. *See e.g.*, Cal. Penal Code § 337a(1). Thus, on its face, sports betting is not legal in all fifty states and is not legal in California. Second, at the federal level, IGRA and the Wire Act, 18 U.S.C. § 1084, prevent such conduct. Kalshi's assertion that its "sports betting" is "legal in all 50 states" relies on the presumed preemptive force of the CEA, a caveat that cannot be reasonably ascertained from the plain language of the advertisement. Significantly, Kalshi's contracts are not legal in all fifty states because, as shown above, Kalshi's contracts do not comply with the CEA, as they are presumptively contrary to the public interest and, pursuant to 17 C.F.R. § 40.11, Kalshi was prohibited from offering its gaming contracts to consumers.

Even if Kalshi's advertisements were not facially false, they are false by necessary implication. Under "the false-by-necessary-implication doctrine, '[i]f the words or images, considered in context, necessarily imply a false message, the advertisement is literally false[,] and no extrinsic evidence of consumer confusion is required.'" *Suzie's Brewery*, 519 F. Supp. 3d at

846 (citing *Time Warner*, 497 F.3d at 158). On March 20, 2025, Kalshi advertised "Bet[ting] on March Madness in all 50 states," which advertisement depicted a classroom with a computer and four phones displaying multiple basketball games, and asserted: "Really hope kids in high school still do this." Kretz Decl. ¶ 31, Ex. 31. Considered in context, the text and images in Kalshi's advertisement not only necessarily implies that betting on March Madness basketball games is legal in all fifty states, but implies that "kids in high school" can bet on March Madness basketball games. Kids in high school are typically under eighteen years old, and the plaintiff Tribes are unaware of any state or federal law that authorizes children under the age of eighteen to gamble on sports.

Kalshi's advertisements promoting "legal" sports betting in all fifty states are, therefore, either facially false or false by necessary implication in light of the configuration of text and images and the mode of presentation in which Kalshi's advertisements are communicated to consumers.

Even if the Court concludes that Kalshi's advertisements are not literally false, these advertisements are still likely to mislead or confuse consumers, as social media users have expressed confusion and doubt regarding the legality of these contracts. *See* Kretz Decl. ¶¶ 7, Ex. 6; 9-11, Ex. 8-11; 18-21, Ex. 18-21; 40, Ex. 41; 41, Ex. 42-44; 46, Ex. 62. Kalshi's advertisements on its social media accounts use the terms "betting" and "trading" in close proximity to one another, and sometimes within the same advertisement. Kretz Decl. ¶ 47, Ex. 63. The concern and confusion of the public is evident in social media users' comments on Kalshi's on-line advertising: "Betting culture is crazzyyy"; "Didn't Enron do the exact same thing?"; "I bet not traded"; "Enron is back baby!"; "Calling it a 'trading app' is crazy."; and "1-800-GAMBLER". Kretz Decl. ¶¶ 18, Ex. 18; 20-22, Ex. 20-22.

In sum, Kalshi is aggressively promoting contracts that do not comply with the CEA and conflict with IGRA and state gambling laws by communicating to consumers that Kalshi's contracts and the consumers' conduct is legal when such conduct is unlawful and, thus, likely criminal. Kalshi's advertisements are likely to deceive a substantial segment of its audience in a manner that is likely to influence the purchasing decision of consumers and gamblers, and divert

1  business from the Tribes' casinos to Kalshi. Declaration of Jason Ramos in Support of Plaintiffs'

2  Motion for a Preliminary Injunction ("Ramos Decl.") ¶¶ 40, 41; *see also Southland Sod Farms*,

3  108 F.3d at 1139 ("the deception is material, in that it is likely to influence the purchasing

4  decision [and] the plaintiff has been or is likely to be injured as a result of the false statement. .

5  . by direct diversion of sales from itself to defendant . . . ."). Because Kalshi's advertisements are

6  facially false, false by necessary implication, and mislead consumers, the Tribes are likely to

7  prevail on the merits of their Lanham Act claim.

8                                    **b.    Irreparable Harm**

9              "In every case in which the plaintiff wants a preliminary injunction he must show that he

10  has 'no adequate remedy at law,' and . . . that he will suffer 'irreparable harm' if the preliminary

11  injunction is not granted." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.

12  1984). "Only if he will suffer irreparable harm in the interim—that is, harm that cannot be

13  prevented or fully rectified by the final judgment after trial—can he get a preliminary injunction."

14  *Id.* "[E]conomic injury alone does not support a finding of irreparable harm, because such injury

15  can be remedied by a damage award." *Arcsoft, Inc. v. Cyberlink Corp.*, 153 F. Supp. 3d 1057, 1071

16  (N.D. Cal. 2015) (quoting *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944

17  F.2d 597, 603 (9th Cir. 1991)).

18              It is well-settled that impermissible interference with tribal self-government and,

19  necessarily, tribal sovereignty, constitutes irreparable harm. Indian tribes are irreparably harmed

20  by unlawful deprivations of their jurisdictional authority. *Ute Indian Tribe of the Uintah & Ouray*

21  *Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) (the Tenth Circuit has "repeatedly stated that

22  such an invasion of tribal sovereignty [enforcing state law on Indian land] can constitute

23  irreparable injury"); *Tohono O'Odham Nation v. Schwartz*, 837 F. Supp. 1024, 1034 (D. Ariz.

24  1993) ("The harm to the Nation's sovereignty cannot be remedied by any other relief other than

25  an injunction precluding the . . . action from proceeding."); *Comanche Nation v. United States*,

26  393 F. Supp. 2d 1196, 1205–1206, 1210–1211 (W.D. Okla. 2005). Encroachments on tribal

27  sovereignty constitute an irreparable injury because the harm to tribal self-government is "not

28

easily subject to valuation." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001); *see also EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1077 (9th Cir. 2001) ("Assuming that the Tribe is correct in its analysis with respect to jurisdiction, the prejudice of subjecting the Tribe to a subpoena for which the agency does not have jurisdiction results in irreparable injury vis-a-vis the Tribe's sovereignty."); *Choctaw Nation of Oklahoma v. State of Oklahoma*, 724 F. Supp. 2d 1182, 1187 (W.D. Okla. 2010) (holding remedies at law are inadequate to remedy unlawful assertions of state jurisdiction in Indian Country).

While the court decisions addressing the irreparable injury arising from encroachment on tribal sovereignty have usually involved attempts by states to extend their jurisdictional reach to activities on Indian lands, the reasoning of those decisions applies equally well to Kalshi conducting class III gaming on Indian lands in violation of IGRA and the Tribes' laws.

Tribes have the exclusive authority[8] to conduct, or to authorize a third-party entity to conduct,[9] gaming pursuant to a compact or procedures on their Indian lands, in accordance with IGRA and its implementing regulations. Kalshi's conducting of class III gaming on Indian lands without authorization from a tribe pursuant to a compact, secretarial procedures, or a management contract impermissibly encroaches upon and interferes with the right and ability of the Tribes to regulate that gaming and, thereby, to govern themselves. Ramos Decl. ¶¶ 38-40; Declaration of Joseph Mathiesen-Powell in Support of Plaintiffs' Motion for a Preliminary Injunction ("Mathiesen-Powell Decl.") ¶ 27; Declaration of Ian DeVries in Support of Plaintiffs' Motion for a Preliminary Injunction ("DeVries Decl.") ¶¶ 3-7; Declaration of Steve Carrillo in Support of Plaintiffs' Motion for a Preliminary Injunction ("Carrillo Decl.") ¶¶ 12-17.

---

[8] Cal. Const. Art. IV. § 19 (f)(giving California Indian Tribes the exclusive right to utilize slot machines and play house banked and percentage card games), see also, *In re Indian Gaming Related Cases*, 331 7. 3d 1094 (9th Circ. 2003)

[9] *See* 25 U.S.C. §§ 2710(d)(9) and 2711; 25 C.F.R. § 502.15 (establishing a regulatory mechanism by which tribes can enter into a contract that "provides for the management of all or part of a gaming operation."); 25 C.F.R. § 533.7 (establishing by regulation that unapproved management contracts are void ab initio); *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 120 (2d Cir. 2008).

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.: 25-cv-06162-JSC]

Injunctive relief is the only remedy that can restore the Tribes' inherent governmental right to police and regulate the activity occurring within their lands and prevent further harm to tribal sovereignty. Therefore, the Court should grant the Tribes' request for injunctive relief to prevent the ongoing threat to tribal sovereignty, the impermissible interference with tribal self-government, and the regulation of class III gaming activity on the Tribes' Indian lands.

The Tribes' monopoly on class III gaming activity in California is the result of substantial time, effort, and money, painstaking negotiations with the State of California, decades of litigation and lobbying for favorable legislation, and a political campaign that resulted in an amendment to the California Constitution. Ramos Decl. ¶¶ 12-27; Mathiesen-Powell Decl. ¶¶ 11-25, 27; Declaration of Tracey Hopkins in Support of Plaintiffs' Motion for a Preliminary Injunction ("Hopkins Decl.") ¶¶ 9-16. The Tribes spent decades establishing and securing the class III gaming market, and Kalshi has destabilized the Tribes' market in a matter of months. Ramos Decl. ¶¶ 12-27; Mathiesen-Powell Decl. ¶¶ 11-25, 27; Hopkins Decl. ¶¶ 9-16. Importantly, Kalshi offers sports betting, which the Tribes cannot legally offer pursuant to Picayune's Compact[10], and Blue Lake's[11] and Chicken Ranch's[12] Secretarial Procedures. The Court should therefore grant the Tribes' request for preliminary injunctive relief to prevent ongoing harm to tribal sovereignty and the Tribes' class III gaming markets.

Additionally, Kalshi's false and deceptive advertising, which includes claims of "legal sports betting" and that its gaming contracts are "legal in all 50 states," is causing specific, concrete

---

[10] *Tribal-State Compact Between the State of California and the Chukchansi Indians*, Bureau of Indian Affairs (May 16, 2000), https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_2000.05.16_picayune_rancheria_tribal_state_gaming_compact_1.pdf; *Third Amendment to the Tribal-State Compact to Extend the Compact Term*, Bureau of Indian Affairs (Feb. 20, 2025), https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_2025.02.20_picayune_rancheria_of_chukchansi_indians_tribal_state_gaming_compact_third_amendment%29.pdf.

[11] *Class III Gaming Secretarial Procedures for The Blue Lake Rancheria*, *California*, Bureau of Indian Affairs (Jan. 31, 2024), https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_2024.01.31_blue_lake_rancheria_secretarial_procedures.pdf.

[12] *Class III Gaming Secretarial Procedures for The Chicken Ranch Rancheria of Me-Wuk Indians of California*, Bureau of Indian Affairs (Jan. 31, 2024), https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_2024.01.31_chicken_ranch_rancheria_secretarial_procedures.pdf.

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES
[Case No.: 25-cv-06162-JSC]

harm that cannot be fully compensated. Crucially, having demonstrated that Kalshi's advertisements are facially false or false by necessary implication above, the Tribes are entitled to a presumption of irreparable harm under the Lanham Act. 15 U.S.C. § 1116(a); *see Time Warner*, 497 F.3d at 153; *Suzie's Brewery*, 519 F. Supp. 3d at 846.

The Tribes have invested significant resources in establishing a strictly regulated Class III gaming market, and Kalshi's false advertising interferes with the Tribes' authority and ability to regulate this market. Ramos Decl. ¶¶ 33-41. By falsely and misleadingly representing their unregulated activities as lawful and likening them to sports betting, Kalshi confuses the public and undermines the Tribes' carefully developed and regulated Class III gaming market. *See* Kretz Decl. ¶¶ 7, Ex. 6; 9, Ex. 8; 11, Ex. 11; Ramos Decl. ¶¶ 40, 41. The Tribes' gaming authority is contingent on maintaining a clear distinction between legal and illegal operations. Kalshi's advertisements erode this distinction, forcing the Tribes to compete with an unregulated entity, which harms their market positions and the integrity of their regulated businesses.

### c.    The Balance of the Equities Favors the Tribes

In assessing whether to grant a request for injunctive relief, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). The *Winter* factors may be evaluated on a sliding scale, such that preliminary relief may be issued when the moving party demonstrates "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, No. 25-CV-02847-AMO, 2025 WL 973318, at *3 (N.D. Cal. Apr. 1, 2025), *appeal dismissed,* No. 25-2358, 2025 WL 1189827 (9th Cir. Apr. 18, 2025) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)).

Here, the balance of the equities tips sharply in favor of the Tribes. With respect to IGRA, if Kalshi is enjoined from offering its contracts on the Tribes' Indian lands, Kalshi may lose profits

and incur costs. But injury to the Tribes' sovereignty and their right to govern themselves far outweighs those costs.

Additionally, the potential economic harm to Kalshi arising from injunctive relief granted to the Tribes is far less than if the CFTC initiated regulatory review under 17 C.F.R. § 40.11(c), during which the CFTC "shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity . . . ." 17 C.F.R. § 40.11(c)(1). The Tribes seek only to enjoin Kalshi from offering its contracts involving sports within the boundaries of the Tribes' respective Indian lands prospectively. CFTC review, on the other hand, would require Kalshi to cease offering all contracts under review. Since Kalshi has failed to avail itself of CFTC review pursuant to 17 C.F.R. § 40.3, and since the CFTC, under the current administration, has demonstrated an inability[13] or unwillingness[14] to review and regulate Kalshi's unlawful gaming contracts, the only remedy available to the Tribes is injunctive relief granted by this Court, pursuant to the statutory remedy prescribed by IGRA.

In contrast to the minor harm Kalshi may suffer upon issuance of a preliminary injunction, the Tribes will suffer ongoing interference of core governmental functions. Shown above, IGRA establishes a comprehensive framework for regulating gaming activity on Indian lands, assigning specific roles to the federal government (the Department of the Interior and the National Indian Gaming Commission), state governments through the compacting process, and tribal governments through the compacting process and the enactment of tribal gaming ordinances. Kalshi's activity not only interferes with the Tribes' right to regulate gaming on their Indian lands, but also interferes with the rights and obligations of the State of California, as a party to the Picayune Rancheria of Chukchansi Indian's Compact, for the regulation of class III gaming, and interferes with the federal government's broad regulatory oversight of class III gaming.

---

[13] 89 FR 48968-01, *48969 ("From a resource allocation perspective . . . a single § 40.11(c) review is resource-intensive and consumes hundreds of hours of staff time.")
[14] Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts, *Any Given Sunday* (March 25, 2021), Pls.' Req. for Judicial Notice ¶ 6, Ex. 6 (expressing unwillingness to evaluate whether commodities contracts are in the public interest: "[T]he Commission is not a moral arbiter. It is not an expert in determining what is in the public's interest, and it is certainly not equipped to tell the public what its interest *should* be.").

Additionally, Kalshi is or, in the future, will be thereby diverting profits from the Tribes and affecting tribal gaming revenues, which are either the sole or the primary source of income for the Tribes. Ramos Decl. ¶¶ 40-42; Mathiesen-Powell Decl. ¶¶ 25-27. Those revenues fund their tribal governments and the programs and services provided to members of the Tribes and non-members living on the Tribes' reservations. Ramos Decl. ¶¶ 42-52. Importantly, among those programs, the Tribes offer programs to combat the harm of compulsive gambling. Ramos Decl. ¶ 36. Neither the CEA, nor the CFTC regulations, nor Kalshi's self-certifications, provide any preventative or remedial protections for compulsive behavior by consumers of app-based sports betting.

Crucially, any potential economic or reputational harm to Kalshi arising from injunctive relief granted to the Tribes is a consequence of Kalshi's own actions. Kalshi is conducting patently unlawful, unregulated class III gaming in the form of sports betting, an activity that is subject to stringent regulation to protect the public from the potential consequences of unregulated gambling[15]. Because they have failed to fulfill the requirements for self-certification and have failed to subject their products to an evaluation of the public interest by the CFTC, Kalshi cannot assert that enjoining presumptively prohibited contracts from being offered on Indian lands, while the Court evaluates whether Kalshi's contracts are CEA compliant and comport with the public interest, constitutes a significant equitable consideration. Kalshi's choice to self-certify instead of seeking affirmative approval of its gaming contracts evidences a calculated risk that either the CFTC or a court would find its activities impermissible. On balance, disruptions of tribal sovereignty and core governmental functions of the Tribal governments significantly outweigh any potential harm to Kalshi, particularly since any harm to Kalshi is largely a product of its own conduct and decision-making.

---

[15] The bets placed by DeVries and Carrillo contain the elements of consideration (the bet or wager), chance (the random outcome of the sporting event), and prize (the paying of money to winners and collecting of money from losers) and constitutes gaming as defined by the NIGC's regulations and the Tribe's Gaming Ordinance. In other words what Kalshi is doing is just plain old fashion sports gambling.

1    Concerning Kalshi's advertising practices, Kalshi will not suffer any legitimate hardship

2    from the issuance of a preliminary injunction halting its false and misleading advertisements.

3    "Indeed, there is no harm to a defendant from an injunction which prevents continuing

4    dissemination of false statements." *Pom Wonderful Ltd. Liab. Co. v. Purely Juice, Inc.*, No. CV-

5    07-02633 CAS (JWJx), 2008 U.S. Dist. LEXIS 55426, at *42 (C.D. Cal. July 17, 2008). Requiring

6    a defendant to refrain from using false statements "... poses little, if any, harm to [the defendant]."

7    *Id*. (internal citations omitted) (quoting *Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d

8    992, 998 (N.D. Cal. 2000)).

9    Kalshi has knowingly made false statements to consumers through numerous advertising

10    campaigns. The inconvenience arising from a court order directing Kalshi to cease false

11    advertising pales in in comparison to the harm incurred by the constitutional infringement of tribal

12    sovereignty and diversion of essential gaming revenue, which the Tribes rely upon to provide

13    essential services. The balance of hardships, therefore, weighs decidedly in favor of granting a

14    preliminary injunction.

### d.    Public Interest

16    In deciding what issues affect the "public interest," courts have given considerable weight

17    to the carrying out of executive functions of the government as well as the intent of Congress. *See*

18    *Winter,* 555 U.S. at 24 ("In this case, the District Court and the Ninth Circuit significantly

19    understated the burden the preliminary injunction would impose on the Navy's ability to conduct

20    realistic training exercises, and the injunction's consequent adverse impact on the public interest

21    in national defense."); *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 362 (2024) ("When

22    addressing the public interest, courts must defer to Congress's articulation of that interest in the

23    [Act] itself." (citing 29 U.S.C. § 151 ("It is . . . the policy of the United States to . . . encourag[e] .

24    . . collective bargaining and . . . protec[t] the exercise by workers of full freedom of association,

25    self-organization, and designation of representatives of their own choosing . . . .").); *Virginian Ry.*

26    *Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) ("The fact that Congress has indicated its

27

28

purpose . . . is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief.").

Here, the CFTC regulations establish that contracts involving excluded commodities, such as gaming, are presumed to be contrary to the public interest. 17 C.F.R. § 40.11; *see also* 7 U.S.C. § 7a-2(c)(5)(C)(ii). The CFTC regulations also apply this presumption to "activity that is similar to" gaming, broadening the scope of the presumption that gaming activity is contrary to the public interest. 17 C.F.R. § 40.11(a)(2). As a result, the CFTC regulations prohibit a registered entity, such as Kalshi, from offering contracts that involve excluded commodities, such as gaming. 17 C.F.R. § 40.11(a)(1). Kalshi has nevertheless proceeded to offer its gaming contracts and, in so doing, failed to rebut the presumption that its gaming contracts are contrary to the public interest through the self-certification process.

In contrast, IGRA recognizes that "a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government . . . ." 25 U.S.C. § 2701(4); *see* 25 U.S.C. § 2702(1). IGRA comports with the public interest by establishing "a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences . . . and to assure that gaming is conducted fairly and honestly by both the operator and players . . . ." 25 U.S.C. § 2702(2).[16]

Kalshi's app-based platform combines one of the most addictive activities, sports betting, with one of the most addictive devices, smart phones, without any preventative measures for compulsive behavior or remedial treatment for addiction. The fact that the CEA and CFTC regulations lack such preventative and remedial measures demonstrates that commodities contracts are not supposed to constitute or mimic gaming activities. By extension, the lack of such preventative and remedial measures demonstrates that Kalshi is operating outside the scope of the CEA in offering gaming contracts on the Tribes' Indian lands.

---

[16] State law, furthermore, specifically codifies that "[u]nregulated gambling enterprises are inimical to the public health, safety, welfare, and good order." Cal. Bus. & Prof. Code § 19801 (d).

1       Enjoining Kalshi's unregulated sports betting on Indian lands is manifestly in the public

2 interest. Gambling has always been a subject of concern in the United States. In every other

3 context, gambling has been either prohibited as a public nuisance or strictly regulated because of

4 the potential harms associated with unregulated gaming. *See* Cal. Penal Code § 337a(1); 18 U.S.C.

5 § 1084; 18 U.S.C. § 1955. The Court should grant the Tribes' request for injunctive relief because

6 Kalshi's contracts are patently contrary to the public interest under the CEA and CFTC regulations

7 and because Kalshi's gaming activity presents a danger to the public and individual consumers on

8 the Tribes' Indian lands.

9       Concerning Kalshi's advertisements, enjoining Kalshi from making further false and

10 misleading statements promotes the public interest. The "Lanham Act is at heart a consumer

11 protection statute." *TrafficSchool.com,* 653 F.3d at 827. "[T]he most basic public interest at stake

12 in all Lanham Act cases [is] the interest in prevention of confusion, particularly as it affects the

13 public interest in truth and accuracy." *AECOM Energy & Constr., Inc. v. Ripley*, No. 2:17-cv-

14 05398-RSWL-SS, 2017 U.S. Dist. LEXIS 160180, at *23 (C.D. Cal. Sep. 27, 2017) (citing *Kos*

15 *Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 730 (3d Cir. 2004). The "Lanham Act is itself a public

16 interest statute intended to protect the consuming public and competitors from false and deceiving

17 statements which a company chooses to utilize in advertising its goods or services." *Suzie's*

18 *Brewery*, 519 F. Supp. 3d at 856 ((internal citations omitted) (quoting *U-Haul Int'l, Inc. v. Jartran,*

19 *Inc.*, 522 F. Supp. 1238, 1242 (D. Ariz. 1981), *aff'd*, 681 F.2d 1159 (9th Cir. 1982)). As discussed

20 above, Kalshi's advertisements are literally false or, at the very least, likely to confuse and mislead

21 consumers. *See* Kretz Decl. ¶¶ 18, Ex. 18; 20, Ex. 20; 47, Ex. 63. Granting a preliminary injunction

22 sharply tips in the Tribes' favor because preventing consumer confusion serves the public interest.

23      By targeting consumers in the sports gaming market with advertisements that claim "sports

24 betting" is "legal in all 50 states," Kalshi has—explicitly or implicitly—conveyed that "sports

25 betting" is regulated by Kalshi and such regulation provides measures to protect consumers from

26 the potential risks involved in high-stakes betting and addictive, compulsive consumer behavior.

27

28

IGRA, IGRA's implementing regulations, and the Tribal Gaming Ordinances, on the other hand, establish a comprehensive framework that address situations related to machine malfunction, consumer solvency in high-stakes gambling, and compulsive consumer conduct, and provide preventative and remedial protocols to ensure public safety and mitigate the risks inherent in gambling. Thus, for the forgoing reasons, the Court should grant the Tribes' request for injunctive relief because commodities contracts masquerading as "sports betting" that is "legal in all 50 states" is contrary to the public interest—under the CFTC's own regulations—and presents a danger to the public and the consumers targeted by Kalshi's advertisements.

### e.    Request for Relief

In light of the foregoing analysis, and in consideration of the declarations submitted herewith, the Tribes respectfully request that the Court grant the Motion for Preliminary Injunction and enjoin Kalshi from offering on the Tribes' Indian lands[17] any sports contracts, including, but not limited to, contracts that facially involve, relate to, or reference the sports of baseball, tennis, soccer, basketball, football, golf, chess, esports, hockey, motorsports, UFC, and any other boxing, pickleball, wrestling, or martial arts event. The Tribes further request that the Court enjoin Kalshi from offering on the Tribes' Indian lands contracts that take the form of a binary "yes/no" event contract that pose the following questions:

1.   "Will <team> win <title>?"

2.   "Will <team> win <event>?"

and any subsequent permutation, alteration, or variation of such contracts that facially involve, relate to, or reference sports, constitute or mimic sports betting, or any other potential class III gaming activity.

---

[17] The vast majority of the Tribe's gaming market consists of persons who reside within a sixty-mile radius or less from the Tribes' casino. While the Tribes only seek a preliminary injunction at this time enjoining Klashi's sports betting on their respective reservations, the Tribes intend to offer expert testimony demonstrating that Kalshi's illegal gaming is diluting the Tribes' existing markets thereby reducing revenues at their respective casinos.

The Tribes further respectfully request that Court enjoin Kalshi from marketing its sports contracts as "legal in all 50 states" or any variation of that phrase or similar representation regarding the nationwide legality of these gaming contracts.

## IV.    CONCLUSION

For all the foregoing reasons, this Motion and the declarations and points and authorities in support thereof have established that injunctive relief is appropriate to prevent further harm to the Tribes, tribal sovereignty, and consumers of Kalshi's gaming contracts, and that such relief comports with the public interest with minimal harm to Kalshi.

DATED: September 4, 2025                Respectfully Submitted,

RAPPORT AND MARSTON

By:    */s/ Lester J. Marston*
LESTER J. MARSTON,
Attorney for Plaintiffs

1

## CERTIFICATE OF SERVICE

2     I am employed in the County of Mendocino, State of California. I am over the

3  age of 18 years and not a party to the within action; my business address is that of

4  Rapport & Marston, 405 West Perkins Street, Ukiah, California 95482.

5     I hereby certify that I electronically filed the foregoing document with the

6  Clerk of the United States District Court for the Northern District of California by

7  using the CM/ECF system on September 4, 2025, which generated and transmitted

8  a notice of electronic filing to CM/ECF registrants.

9     I declare under penalty of perjury under the laws of the State of California that

10 the foregoing is true and correct; executed on September 4, 2025, at Ukiah,

11 California.

12

13                                 */s/ Anita Salmeron*
                                   ANITA SALMERON

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28