LESTER J. MARSTON
California State Bar No. 081030
THE LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA OF ME-WUK INDIANS, and PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS<br><br>Plaintiffs,<br><br>v.<br><br>KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, and DOES 1-20,<br><br>Defendants. | Case No.:  25-cv-06162-JSC<br><br>**DECLARATION OF JASON RAMOS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

I, JASON RAMOS, declare:

1.      I am an enrolled member of the Blue Lake Rancheria ("Tribe") and Chairperson of the Blue Lake Rancheria Business Council ("Business Council"). I served as chair of the Tribe's Gaming Commission ("Gaming Commission") from 2001 until December 31, 2020. I am submitting this declaration in support of the Motion for a Preliminary Injunction filed by the Plaintiffs in the above-entitled action. The information contained in this declaration is of my own personal

1

knowledge and, if called as a witness in these proceedings, I could and would competently testify thereto.

2.    The Tribe is a federally recognized Indian tribe organized under the provisions of the Indian Reorganization Act, pursuant to a written constitution ("Constitution"), which has been approved by the Secretary of the Interior, and which designates the Blue Lake Rancheria Business Council as the governing body of the Tribe.

3.    Through its Constitution, the Tribe has delegated to the Business Council certain enumerated powers, subject only to the limitations imposed by the Tribe's Constitution or applicable federal law, to operate the Tribe's government and to conduct governmental relations with the United States, the states, and local governments.

4.    I have served as a member of the Business Council since December 29, 2018, and as Chairperson of the Business Council since January 7, 2025. As such, along with the other elected Business Council members, I govern all the Tribe's members, resources, land and water reserved to the Tribe in accordance with the Tribe's Constitution and applicable federal law. In addition to my role on the Business Council, I am responsible for the day-to-day operations of the Tribe's government, including, but not limited to, drafting, preparing, approving, and overseeing implementation of the Tribe's governmental and business enterprise budgets.

5.    Since time immemorial, the ancestors of the Tribe have occupied the lands that currently comprise the Blue Lake Rancheria ("Reservation") in Humboldt County, California.

6.    The Tribe's Reservation was purchased by the United States in 1908. When established, the Reservation consisted of just under 31 acres of land in northwestern California, five miles inland from the Pacific Coast, along California Highway 299 adjacent to the City of Blue Lake.

RAMOS DECLARATION IN SUPPORT
[Case No. 25-cv-06162-JSC]

7.    The status of the Tribe as a federally recognized Indian tribe, and the Reservation was illegally terminated by the United States pursuant to the California Rancheria Act, Public Law 85-671, August 18, 1958 (the "Rancheria Act").

8.    The termination of the Tribe and the Reservation extinguished the existence of the Tribe, ended the rights of the tribal members to receive special federal services as Indians, terminated the trust status of the Tribe's lands, and subjected the Tribe's lands to state and county laws, regulation and taxation.

9.    After termination, Humboldt County officials issued citations to tribal members because their homes and parcels failed to meet state and county zoning and subdivision requirements and uniform building code standards.

10.    Within weeks of termination, many tribal members were prohibited from inhabiting their homes. Since few tribal members had the financial resources to bring their homes up to the applicable zoning and building code standards, many tribal members were forced to sell their property on the Reservation.

11.    By the late 1960's, only 4.31 acres of the Tribe's land was still owned by tribal members within the boundaries of the terminated Reservation. Ownership of all of the other tribal members' land within the terminated Reservation passed into non-Indian ownership as a result of the illegal termination of the Reservation.

12.    In 1979, members of the Tribe participated in a class action lawsuit against the United States seeking to reestablish the Tribe and the Reservation on the grounds that certain federal officials violated the Rancheria Act when the federal government purported to terminate the Tribe and the Reservation. That case was *Hardwick v. United States*, United States District Court, Northern District of California, Case No. C-79-1710-SW ("*Hardwick*").

13.    In 1983, the *Hardwick* court approved a "Stipulation for Entry of Judgment" and entered an "Order Approving Entry of Final Judgment in Action" in *Hardwick* ("Judgment"). The Judgment provided for the reinstatement of the tribes' members' status as Indians and their eligibility for federal benefits and services

3

provided to Indians by the United States, the reinstatement of the recognition of the tribes' status as federally recognized Indian tribes, the application to the tribes' members of all federal statutes that affect Indians because of their status as Indians, the right of the members of the tribes to restore to trust status any reservation land that was not owned by non-Indians, the reestablishment of the boundaries of the tribes' reservations, and the restoring of all of the lands within the boundaries to "Indian country" status as defined by 18 U.S.C. § 1151.

14.     After the Judgment restored the Tribe to federal recognition, the Tribe reconstituted its tribal government by adopting the Constitution and reacquired a land base by purchasing, over a period of time, land within and adjacent to the boundaries of the Reservation. Today, the Reservation consists of approximately 340 acres of land owned by the United States in trust for the Tribe, spanning the Mad River, and adjacent to California Highway 299 and the City of Blue Lake.

15.     In 1987, the United States Supreme Court issued a decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), in which the Supreme Court held that California lacked the federal statutory authority required to regulate bingo halls on tribal lands. Prior to the decision in *Cabazon*, many Tribes, including Blue Lake, sought to engage in bingo and other forms of Indian gaming to promote tribal self-determination and economic self-sufficiency.

16.     In 1988, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et. seq.* ("IGRA"), in response to the *Cabazon* decision. Between 1988 and 1998, California Tribes, including Blue Lake, fought the State of California ("State") and, in particular, Governor Pete Wilson for the right to engage in class III gaming in accordance with IGRA.

17.     In 1998, with the assistance of the California Nations Indian Gaming Association ("CNIGA") and Governor-elect Gray Davis, California Tribes placed an initiative measure on the ballot, which the voters of the State of California passed, called Proposition 5 ("Prop. 5"), which among other things, mandated the Governor

4

RAMOS DECLARATION IN SUPPORT
[Case No. 25-cv-06162-JSC]

of California to negotiate IGRA, class III gaming compacts with Tribes.

18. Pursuant to the IGRA, on September 10, 1999, the Tribe executed the 1999 Model Tribal-State Class III Gaming Compact ("1999 Compact") with the State.

19. In 1999, the California Supreme Court issued a decision in *Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, which held that the Prop. 5 initiative statute was invalid as inconsistent with provisions of the California State Constitution that prohibited Nevada and New Jersey style casinos. As a result, the 1999 Compacts negotiated between Tribes and Governor Davis were precluded from being executed and ratified by the California State Legislature.

20. In 2000, the citizens of California approved Proposition 1A ("Prop. 1A"), which amended the California Constitution and expressly authorized class III gaming, generally, and, in particular, authorized the operation of slot machines, lottery games, and banking and percentage card games, identified in the 1999 Compacts. Prop 1A authorized the Governor to execute, and the Legislature to ratify, the 1999 Compacts entered into as a result of Prop. 5.

21. The Tribe's 1999 Compact was ratified by the State legislature by statute, Cal. Gov. Code § 12012.25(a)(6).

22. By letter dated May 5, 2000, the Tribe's 1999 Compact was approved by Assistant-Secretary for Indian Affairs, Kevin Gover.

23. Pursuant to its Constitution, the Tribe, as the beneficial owner of the Reservation, and acting through its Business Council, adopted a Tribal Gaming Ordinance ("Gaming Ordinance"), which authorizes and provides for the regulation of class I, II, and III gaming on the Reservation.

24. The National Indian Gaming Commission ("NIGC") approved the Gaming Ordinance, and its subsequent amendments, pursuant to the authority granted to it under the IGRA.

25. The 1999 Compact was set to expire on December 31, 2020, and in

RAMOS DECLARATION IN SUPPORT
[Case No. 25-cv-06162-JSC]

May 2014, the Tribe sought to negotiate a new compact with the State. The negotiations were unsuccessful, and the Tribe was one of five Tribes that initiated bad faith litigation against the State, pursuant to the IGRA. That case was *Chicken Ranch Rancheria of Me-Wuk Indians v. Newsom.*

26.    On July 28, 2022, the United States Court of Appeals for the Ninth Circuit issued a decision in *Chicken Ranch Rancheria of Me-Wuk Indians v. Newsom*, 427 F.4th 1022 (9th Cir. 2022). The Court concluded that the State of California failed to negotiate a new compact with the plaintiff tribes in good faith and ordered the implementation of IGRA's remedial scheme. On January 31, 2024, consistent with the remedy supplied by IGRA, the Secretary of the Interior, United States Department of the Interior, issued Secretarial Procedures for the regulation of the Tribe's class III gaming.

27.    The Tribe has operated the Blue Lake Casino and later (2006) its small slot machine-only gaming facility within its fuel station convenience store (collectively, the "Casino") pursuant to the IGRA, its 1999 Compact, its Secretarial Procedures, and its Gaming Ordinance since Assistant-Secretary Gover approved its 1999 Compact.

28.    Pursuant to the 1999 Compact, the Secretarial Procedures, and the Tribe's Gaming Ordinance, the Business Council has established and appointed the Blue Lake Rancheria Tribal Gaming Commission ("Gaming Commission"), which comprehensively regulates every aspect of the playing of class I, II, and III gaming on the Reservation.

29.    The Gaming Commission has the power and duty to inspect, examine, and monitor gaming activities, including the power to demand access to and inspect, examine, photocopy, and audit all papers, books, and records respecting such gaming activities; to the extent required, comply with any reporting requirements established under a tribal-state compact or secretarial procedures to which the Tribe is a party and other applicable law, including IGRA; promulgate and issue such

6

regulations as it deems appropriate in order to implement and enforce the provisions of the Gaming Ordinance; promulgate regulations establishing minimum internal control standards for the operation of any gaming activities conducted on the Reservation including, but not limited to, auditing, internal fiscal controls, technical standards for electronic gaming, and describing and establishing rules for each class I, II or III game authorized to be conducted on the Reservation; to issue employee, and vendor gaming licenses pursuant to the Gaming Ordinance; and to carry out such other duties with respect to all gaming activities on the Reservation as the Business Council shall direct from time to time by amendment to the Gaming Ordinance or by the adoption of a written policy or resolution.

30.    As a current member of the Business Council and former member of the Gaming Commission, I am familiar with the operation of the Tribe's government and business enterprise and, specifically, the Tribe's gaming facility, and how gaming revenues affect the Tribe's governmental budgets and finances.

31.    Gaming provided the Tribe with its first source of adequate, consistent, and predictable revenue with which to develop a minimum level of government operations, programs, and services. That remains true today.

32.    The Gaming Commission has implemented all provisions of the Tribe's gaming ordinance first adopted by the Tribe by Resolution 95-01, dated August 14, 1993, approved by the NIGC on March 30, 1995, and later amended and then approved by NIGC on January 4, 2002. It regulates class I, II, and III gaming on all tribal lands.

33.    Although the Tribe operates a relatively small casino, it expends considerable resources fulfilling the Gaming Commission's regulatory mission with a staff of over 60 people across all divisions including security, surveillance, backgrounds and licensing, gaming resource compliance, public safety/EMT, internal audit, and Title 31 compliance. The Gaming Commission has complied with 31 CFR Chapter X - Financial Crimes Enforcement Network ("FinCEN") of the

7

Bank Secrecy Act. The Gaming Commission has a full-time Title 31 officer who conducts three Title 31 trainings per month and is active in reporting Currency Transaction Reports ("CTR") and Suspicious Activity Reports for Casinos ("SARC"). The Gaming Commission reports on average 228 CTRs, 120 SARCs, and 52 watchlist SARCs each year. The Gaming Commission conducts 24 Internal Controls audits each year (e.g., key control, cash handling and gaming operations, surveillance, Title 31, Erasable Programmable Read Only Memory ("EPROM") control, back-of-house accounting and marketing).

34.    On behalf of the Gaming Commission, in my capacity as a member of the Gaming Commission, I coordinated the yearly NIGC audit on backgrounds, licensing and surveillance standards with the regional NIGC Sacramento office. On behalf of the Gaming Commission, I dedicated full-time Gaming Commission compliance staff to audit and test class III gaming devices randomly on a monthly basis to ensure that EPROM chips that drive the random and fair game play of class III gaming devices were accounted for, locked in the devices and separately keyed to prevent tampering, properly disposed of, and remained solely in the control of the Gaming Commission, all in an effort to ensure public confidence and establish principles of fair play.

35.    The Gaming Commission also ensures that other gaming resources, such as playing cards and bingo balls, were locked in a secure room under 24-hour surveillance with daily audit and dual access controls, and that those resources were regularly disposed of and new resources were put into play in an effort to assure the Tribe and the public that gaming was conducted fairly. The Gaming Commission further ensures that casino operations are free from organized crime and other corrupting influences, the Tribe is the primary beneficiary of the gaming operation, and gaming is conducted fairly and honestly by both the operator and players. The Gaming Commission ensures that the revenues from the gaming operation undergo a yearly financial audit and that the audit reports are forwarded to the NIGC. The

8

Gaming Commission also ensures that the revenues from the gaming are used to fund tribal government operations or programs, provide for the general welfare of the Tribe and its members, to promote tribal economic development, to donate to charitable organizations, and to fund operations of local government agencies. The Gaming Commission ensures that all contracts for supplies, services, or concessions for a contract amount in excess of $25,000 annually (except contracts for professional legal or accounting services) relating to gaming are subject to independent audits. The Gaming Commission ensures that construction and maintenance of the gaming facility and the operation of gaming is conducted in a manner which adequately protects the environment and public health and safety. The Gaming Commission has institutionalized a comprehensive system for background investigations conducted on primary management officials and key employees of the gaming enterprise, and oversight of such officials and their management is conducted on an ongoing basis, including tribal gaming licensing for primary management officials and key employees of the gaming enterprises.

36.    As part of the regulation of gaming on its Indian lands, the Tribe has instituted its own responsible gaming program, which mirrors National Council on Problem Gambling programs. Training in responsible gaming is mandatory for all casino employees. For some classes of employees, the training must be repeated two times per year. The casino uses RG24seven, a virtual training program, which requires that each employee pass an exam at the end of the training. The Casino's Human Resources officials track the exam results to ensure that each employee has completed the training.

37.    The Tribe's Gaming Commission has an exceptional record of compliance, and its policies and processes have been used as models by other gaming tribes. Between 2011 and 2020 the State conducted onsite compact compliance audits. California Department of Justice ("DOJ") Agents collected documents, tribal internal control standards ("TICS") promulgated by the Gaming

9

Commission that were generated using best industry standards for gaming regulation and NIGC minimum internal control standards ("MICS") as guides, and casino policies and procedures written to implement those TICS. The DOJ compact compliance reports reviewed 70 sections with zero documented findings or recommendations for that time period. Agents with the California Bureau of Gambling Control have stated to Gaming Commission staff that they began their annual series of Compact Compliance Reviews with the Tribe's Gaming Commission, as it was the high standard to which they held other tribal gaming regulatory agencies.

38.    In my capacity as a Gaming Commissioner and Chairman of the Business Council, based on my understanding of the IGRA, the implementing regulations, the Tribe's Secretarial Procedures, and the Tribe's Gaming Ordinance, Kalshi's activity falls within the category of class III gaming because it is a form of sports betting, which is not permitted on the Tribe's Indian lands pursuant to the Tribe's Secretarial Procedures. That gaming is being conducted without any oversight by any governmental regulatory body and in violation of the Secretarial Procedures issued by the United States Department of the Interior for the authorization and regulation of class III gaming on the Tribe's Indian lands. If Kalshi's class III gaming activities on the Tribe's Indian lands are not enjoined, the Tribe's authority to regulate activities on the Tribe's Indian lands will be undermined and the Tribe's regulation of gaming by the Gaming Commission will be impaired.

39.    Currently, Kalshi's class III gaming activities on the Tribe's Indian lands are not being conducted under the regulatory oversight of the Gaming Commission or in compliance with the Tribe's Procedures laws, regulations, and standards, and, therefore, the Tribe's members and the general public are losing the benefits of the Tribe's regulatory scheme that ensures the gaming is conducted fairly and honestly by both the operator and players, is shielded from organized crime and

other corrupting influences, and that the Indian tribe is the primary beneficiary of the gaming operation.

40.    Casino staff has observed casino patrons betting on the Kalshi app while in the casino. Kalshi is, thus, engaging in sports wagering on the Tribe's Reservation and is thereby interfering with the Tribe's exclusive right to regulate class II and class III gaming on the Tribe's Indian lands for which the Tribes spent years negotiating, engaging in campaigns to convince California voters to support changes in California law necessary to authorize tribal gaming, and litigating to prevent the State of California from infringing on the Tribe's right to regulate gaming on its Indian lands.

41.    Kalshi's activities also have the potential to damage the Tribe and its members in ways that go beyond the regulation of the gaming. As a result of Kalshi's engaging in class III gaming on the Tribe's Indian lands, Kalshi is directly competing for the same gaming market, patrons, and gaming dollars that would have been spent in the Tribe's facility.

42.    The Tribe devotes the lion's share of its governmental resources, primarily revenues from its gaming activities, to an array of social, environmental, economic, and infrastructure services. If those gaming revenues are reduced as a result of Kalshi's class III activities, that will negatively impact the Tribe's government operations by reducing the Tribe's revenue from gaming.

43.    If Kalshi continues to conduct class III gaming through its app-based sports betting and thereby divert potential casino patrons from gaming at the Tribe's casino, the Tribe will lose gaming market predictability and the ability to generate the revenues necessary to fund essential governmental services that it is presently providing on its Indian lands and for the larger region, including, but not limited to, police protection, tribal court, wildland and structure fire protection, tribal utility authority, energy efficiency measures, solar and battery storage microgrids and other electrical systems construction and maintenance, natural gas infrastructure

11

RAMOS DECLARATION IN SUPPORT
[Case No. 25-cv-06162-JSC]

maintenance, water and wastewater infrastructure construction, maintenance, and conservation, telecommunications infrastructure construction and maintenance, liquid fuels supply and manufacturing, tribal education agency and associated programs, road maintenance, the local region's only public transit program, electrified transportation infrastructure maintenance, food sovereignty program including food production (community garden), distribution, storage, and meals preparation and delivery (over 60,000 meals a year) across a 1,450 square mile service area, environmental programs management (e.g., air quality and water quality monitoring, recycling programs, wetland, fish passage, and river restoration activities) thereby preventing the Tribe from effectively operating its tribal government.

44.    Though the Tribe is one of the smallest in terms of land base and population of the Nation's over 574 federally recognized Native American governments, it is one of the largest employers and service providers in its rural region, serving tribal and non-tribal constituencies alike.

45.    The vast majority of the Tribe's over 400 employees are California citizens and taxpayers, and as a result of Kalshi's conducting and potentially expanding its class III gaming on the Tribe's Indian lands, Reservation jobs in gaming and in other government operations are in jeopardy, which would impact the associated tribal (and state) revenue streams that result.

46.    The Tribe has invested a portion of its gaming revenues over the last decade into energy efficiency and clean energy resilience projects, which have created co-benefits for tribal members and the broader region. In August and September of 2020, the Tribe coordinated electric power demand response actions to help California with "once in 35 year" electric grid stress events which happened twice in two weeks, caused by a historic heat dome over the entire western United States. By using its clean energy microgrids to island from the regional grid and provide reliable power onsite, the Tribe helped reduce the demand on California's

RAMOS DECLARATION IN SUPPORT
[Case No. 25-cv-06162-JSC]

electrical grid to avoid grid collapse, and maintained operations of critical infrastructure, which in turn enabled tribal staff and others to deliver social and emergency services (e.g., food, water, shelter, tele-health and remote/distance education supports, internet and cellular connectivity, electric vehicle charging facilities, fuel for emergency vehicles and backup generators for clinics and other local governmental needs), and, during the COVID pandemic, maintaining PPE and EPG inventories and distribution.

47.    Tribal government revenue uncertainty arising from Kalshi's activities could prevent hiring and contracting for adequate capacity to manage new funding and projects such as broadband and clean energy expansions, jobs programs and workforce training, and overall climate mitigation and adaptation strategies. There are large projects in motion at the Reservation and in the surrounding rural, geographically isolated, and underserved region (e.g., Echo subsea broadband cable, Digital 299 broadband cable, offshore wind energy development), and without confidence in, and security of its primary source of revenue, the Tribe will not be able to participate, coordinate, collaborate, or keep pace with these critical infrastructure build-outs, which will mean significant and irrecoverable opportunity costs as federal funding passes by and is not captured, and as infrastructure is built which does not include the Tribe.

48.    Reduction in the Tribe's gaming revenue could also jeopardize a specific current project, the construction of the Toma Resilience Campus ("Toma"). The Toma is a state-of-the-art multipurpose facility designed to support regional rural resilience, clean energy and smart technologies, training and workforce development programs, hands-on maker-space science, technology, engineering, arts, and math education, emergency preparedness, retail, a teaching kitchen, café, and business incubator focused on climate-smart solutions. The Toma is partially funded by a $7.8 million U.S. Economic Development Administration grant but requires funding from the Tribe to complete construction and to launch its programs,

13

which include workforce development and professional trainings, trades education and certifications, a tribal college in partnership with other tribal nations, Humboldt State University and College of the Redwoods.

49.     Reduction in tribal gaming revenue would jeopardize the continuation of the Tribe's public transit system, the only public transit serving the Reservation, City of Blue Lake, and other off-reservation areas in the surrounding communities. With its gaming revenues, the Tribe augments limited grant funding to ensure the region has access to reliable transportation. A reduction in gaming revenue would place at risk public ridership of over 47,000 trips per year, primarily low-income students and families, including, but not limited to, over 360 low-income healthy family passes that enable transport to schools, jobs and work, medical appointments, and grocery shopping.

50.     Reduction in tribal gaming revenue would jeopardize the continuation of the Tribe's green fuels program, which includes biodiesel manufactured by using waste oil from the Tribe's commercial kitchen and used to fuel the Tribe's public transit buses. Discontinuation of this program will increase the cost of public transit by $5,000 per year and increase greenhouse gas emissions ("GHG") by many tons per year.

51.     Reduction in gaming revenue would threaten the investments that the Tribe makes using its gaming revenues in climate-smart innovations. Notable examples are advancements in clean energy, highly efficient electrified buildings, electrified transportation, smart water grids, and other green projects that assist California in meeting its GHG reductions and resilience goals as well.

52.     Reduction in gaming revenue would also jeopardize the Tribe's plans to build, operate, and maintain an adjacent rail-to-trail project that will be the northern terminus of the 300-mile "Great Redwood Trail." Without confidence in its government economic enterprises, the Tribe will not proceed with construction of the trail, nor will it have enough funds to conduct vegetation management for

wildfire risk reduction, or water transport improvements and wetland management to prevent flooding on the Reservation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: August 27, 2025.

*/s/ Jason Ramos*
JASON RAMOS, Declarant

RAMOS DECLARATION IN SUPPORT
[Case No. 25-cv-06162-JSC]

## CERTIFICATE OF SERVICE

I am employed in the County of Mendocino, State of California. I am over the age of 18 years and not a party to the within action; my business address is that of Rapport & Marston, 405 West Perkins Street, Ukiah, California 95482.

I hereby certify that I electronically filed the foregoing document with the Clerk of the United States District Court for the Northern District of California by using the CM/ECF system on September 4, 2025, which generated and transmitted a notice of electronic filing to CM/ECF registrants.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct; executed on September 4, 2025, at Ukiah, California.

/s/ Anita Salmeron
ANITA SALMERON

RAMOS DECLARATION IN SUPPORT
[Case No. 25-cv-06162-JSC]