Christopher C. Wheeler (SBN 224872)
cwheeler@fbm.com
Dylan M. Silva (SBN 306363)
dmsilva@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Olivia S. Choe (pro hac vice)
ochoe@milbank.com
Joshua B. Sterling (pro hac vice)
jsterling@milbank.com
MILBANK LLP
1101 New York Avenue, NW
Washington D.C. 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586

Grant R. Mainland (pro hac vice)
gmainland@milbank.com
Karen Wong (pro hac vice)
kwong3@milbank.com
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Attorneys for Defendants Kalshi Inc. and
KalshiEX LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA OF ME-WUK INDIANS, and PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS, <br><br> Plaintiffs, <br><br> vs. <br><br> KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, and DOES 1-20, <br><br> Defendants. | Case No. 3:25-cv-06162 <br><br> **KALSHI DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge: Jacqueline Scott Corley <br> Hearing Date: October 23, 2025 <br> Hearing Time: 10:00 a.m. <br> Courtroom: 8 |

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

# **TABLE OF CONTENTS**

I. Statement of the Issues ................................................................................................. 1

II. Introduction ................................................................................................................... 1

III. Relevant Legal and Factual Background ..................................................................... 4

    A. Legal Background ................................................................................................. 4

        1. Congress passes the Commodity Exchange Act to bring federal regulation to the derivatives market. ................................................................... 4

        2. Congress passes the Indian Gaming Regulatory Act to regulate federal, state, and tribal relations relating to gaming "on Indian lands." .................. 5

        3. Congress passes the Unlawful Internet Gambling Enforcement Act to address state and tribal regulation of gaming in the internet era. ................. 6

        4. Congress further amends the Commodity Exchange Act through Dodd-Frank and addresses regulation of event contracts. ................................... 8

    B. Factual Background ............................................................................................... 9

IV. Argument ..................................................................................................................... 10

    A. Legal Standard ................................................................................................... 10

    B. Plaintiffs are not likely to succeed on the merits. ............................................. 11

        1. Plaintiffs are not likely to succeed on the merits of the IGRA claim. ......... 11

            a. The Court lacks jurisdiction over the IGRA claim ........................... 11

            b. IGRA does not apply because the alleged "class III gaming" activity does not occur "on Indian lands." ................................... 13

            c. UIGEA directly addresses internet gaming and carves out derivatives transactions subject to the CEA. ................................... 14

            d. Kalshi's event contracts are compliant with the CEA, and the CFTC has not determined otherwise. ....................................... 16

        2. Plaintiffs are not likely to succeed on the Lanham Act claim. .................... 17

            a. Plaintiffs lack standing to bring a Lanham Act claim. .................... 18

            b. Plaintiffs have not shown a false statement of fact. ....................... 19

            c. Plaintiffs have not shown a likelihood of deception or injury. ....... 20

    C. Plaintiffs will not suffer irreparable harm absent a preliminary injunction. ........... 20

    D. The balance of equities does not favor a preliminary injunction. ........................... 22

    E. A preliminary injunction would not be in the public interest. ............................... 24

V. Conclusion .................................................................................................................... 25

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

ii

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Acosta v. Gonzales*,
439 F.3d 550 (9th Cir. 2006)...................................................................................15

*Alfasigma USA, Inc. v. First Databank, Inc.*,
2022 WL 899848 (N.D. Cal. 2022)..........................................................................19

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011).................................................................................10

*Am. Agric. Movement, Inc. v. Bd. of Trade*,
977 F.2d 1147 (7th Cir. 1992)...................................................................................2

*Amoco Prod. Co. v. Gambell*,
480 U.S. 531 (1987).................................................................................................22

*Arcsoft, Inc. v. Cyberlink Corp.*,
153 F. Supp. 3d 1057 (N.D. Cal. 2015) ..................................................................21

*Artichoke Joe's v. Norton*,
216 F. Supp. 2d. 1084 (E.D. Cal. 2002)...................................................................12

*BNI Enters., Inc. v. Referral Leaders Int'l, LLC*,
2015 WL 12644984 (C.D. Cal. Jan. 9, 2015)..........................................................20

*California v. Cabazon Band of Mission Indians*,
480 U.S. 202 (1987)...................................................................................................5

*California v. Iipay Nation of Santa Ysabel*,
2016 WL 10650810 (S.D. Cal. Dec. 12, 2016)..........................................................2

*California v. Iipay Nation of Santa Ysabel*,
898 F.3d 960 (9th Cir. 2018) ...................................................................................14

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ...................................................................................................2

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017)....................................................................................24

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
92 F.3d 1486 (9th Cir.1996).....................................................................................22

*Florida v. Seminole Tribe of Florida*,
181 F.3d 1237 (1999) ...............................................................................................12

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

*Freelancer Int'l Pty Ltd. v. Upwork Global, Inc.*,
    851 Fed. Appx. 40 (9th Cir. 2021) ................................................................... 22

*FTC v. Qualcomm, Inc.*,
    935 F.3d 752 (9th Cir. 2019)........................................................................... 23

*Garrett v. City of Escondido*,
    465 F. Supp. 2d 1043 (S.D. Cal. 2006) ............................................................ 23

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013).......................................................................... 24

*HomeLight, Inc. v. Shkipin*,
    694 F. Supp. 3d 1242 (N.D. Cal. 2023) ........................................................... 19

*Hornell Brewing Co. v. Rosebud Sioux Tribal Court*,
    133 F.3d 1087 (8th Cir. 1998).......................................................................... 14

*Imperial Granite Co. v. Pala Band of Mission Indians*,
    940 F.2d 1269 (9th Cir. 1991).......................................................................... 23

*KalshiEX LLC v. CFTC*,
    2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) ................................................... 19

*KalshiEX LLC v. CFTC*,
    2024 WL 4164694 (D.D.C. Sept. 12, 2024) ..................................................... 10

*KalshiEX LLC v. Flaherty*,
    2025 WL 1218313 (D.N.J. Apr. 28, 2025) ........................................... 4, 10, 20

*KalshiEX LLC v. Hendrick*,
    2025 WL 1073495 (D. Nev. Apr. 9, 2025) ................................................ *passim*

*KalshiEX LLC v. Martin*,
    2025 WL 2194908 (D. Md. Aug. 1, 2025)............................................... 4, 19

*Keezio Grp. v. Mommy&Me LLC*,
    2024 WL 3432001 (N.D. Cal. Jul. 16, 2024) ...................................... 18, 19, 22

*Lackey v. Stinnie*,
    604 U.S. 192 (2025) ........................................................................................ 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ................................................................................... 18, 19

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009)...................................................................... 10, 21

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) .......................................................................................... 4

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014) ............................................................................... 5, 13

*Momeni v. Chertoff*,
    521 F.3d 1094 (9th Cir. 2008) ..................................................................... 15

*Munaf v. Geren*,
    553 U.S. 674 (2008) ..................................................................................... 10

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................... 22

*Poretti v. Dzurenda*,
    11 F.4th 1037 (9th Cir. 2021) ...................................................................... 22

*Quidel Corp. v. Siemens Med. Sols. USA, Inc.*,
    2021 WL 4622504 (9th Cir. 2021) ............................................................... 18

*Rent-a-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ........................................................................ 24

*S. Fork Bank Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
    588 F.3d 718 (9th Cir. 2009) ........................................................................ 22

*Sammartano v. First Jud. Dist. Ct.*,
    303 F.3d 959 (9th Cir. 2002) ........................................................................ 25

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999) ........................................................................ 21

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) .................................................................. 11, 13

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ...................................................................... 24

*Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*,
    240 F.3d 832 (9th Cir. 2001) ........................................................................ 24

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
    316 F.2d 804 (9th Cir. 1963) ........................................................................ 21

*ThermoLife Int'l, LLC v. BPI Sports, LLC*,
    2022 WL 612669 (9th Cir. Mar. 2, 2022) .................................................... 18

*ThermoLife Int'l, LLC v. Gaspar Nutrition Inc.*,
    648 F. App'x 609 (9th Cir. 2016) .............................................................. 4, 20

*Timbisha Shoshone Tribe v. Kennedy*,
    687 F. Supp. 2d 1171 (E.D. Cal. 2009) ........................................................ 22

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011)...........................................................18, 20

*Traynor v. Turnage*,
    485 U.S. 535 (1988) ...............................................................................15

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................10, 22, 25

*Wood v. United States*,
    41 U.S. (16 Pet.) 342 (1842) ....................................................................2

**Statutes**

7 U.S.C. § 1a ....................................................................................7, 8, 9

7 U.S.C. § 2 .............................................................................................*passim*

7 U.S.C. § 5 ................................................................................................5

7 U.S.C. § 6c ..............................................................................................4

7 U.S.C. § 7 ................................................................................................9

7 U.S.C. § 7a-2 ..................................................................................3, 9, 16

7 U.S.C. § 8 ..........................................................................................9, 25

7 U.S.C. § 12c ............................................................................................9

7 U.S.C. § 13 ..............................................................................................9

15 U.S.C. § 1116 ......................................................................................22

25 U.S.C. § 2701 ........................................................................................5

25 U.S.C. § 2702 ........................................................................................5

25 U.S.C. § 2703 .....................................................................................5, 6

25 U.S.C. § 2706 ......................................................................................13

25 U.S.C. § 2710 .................................................................................*passim*

25 U.S.C. § 2719 ......................................................................................13

31 U.S.C. § 5361 ........................................................................................7

31 U.S.C. § 5362 .................................................................................*passim*

31 U.S.C. § 5363 ..................................................................................7, 14

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

31 U.S.C. § 5365 ................................................................................................................ 8, 14

**Other Authorities**

17 C.F.R. Pt. 38 (2012) ..................................................................................................... 9

17 C.F.R. § 38.100 (2012) ................................................................................................. 9

17 C.F.R. § 38.150 (2012) ............................................................................................... 24

17 C.F.R. § 38.151 (2012) ............................................................................................... 24

17 C.F.R. § 38.255 (2012) ............................................................................................... 24

17 C.F.R. § 40.2 (2024) ...................................................................................... 9, 16, 17

17 C.F.R. § 40.11 (2011) ........................................................................................ 8, 17

*Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 848 (1974) ................................ 5

Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming
    L.J. 53 (2021) ............................................................................................................. 15

H.R. Conf. Rep. No. 93-1383 (1974) ................................................................................. 5

Kevin Jon Heller, *In Defense of Pure Sovereignty in Cyberspace*, 97 Int'l L. Stud.
    1432 (2021) ................................................................................................................. 22

Pub. L. 111–203, 124 Stat. 1376, 1666 (July 21, 2010) ..................................................... 8

*Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1973) ................................................ 5

S. Rep. No. 93-1131 (1974) ............................................................................................. 5

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

vii

Defendants Kalshi Inc. and KalshiEX LLC (together, "Kalshi") respectfully submit this memorandum of law in opposition to Plaintiffs' motion for preliminary injunction (Dkt. No. 35, the "Motion" or "Mot.").

## I. Statement of the Issues

1. Whether Plaintiffs are likely to succeed on the merits of their claim that Kalshi, a federally regulated designated contract market ("DCM") falling under the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC"), has violated the Indian Gaming Regulatory Act ("IGRA") by offering sports event contracts lawfully certified with the CFTC pursuant to the Commodity Exchange Act ("CEA") and CFTC regulations.

2. Whether Plaintiffs are likely to succeed on the merits of their claim that Kalshi's advertisements violate the Lanham Act because they say that Kalshi's CFTC-regulated event contracts are legal nationwide.

3. Whether Plaintiffs will suffer imminent irreparable harm during the pendency of this proceeding should the Court not enter a mandatory injunction prohibiting Kalshi from engaging in business authorized by and regulated under federal law.

4. Whether the balance of the equities and the public interest weigh against entering an order that would disrupt the status quo, cause irreparable reputational and financial harm to Kalshi, and undermine the comprehensive regulatory scheme Congress has established for the nation's derivatives markets.

## II. Introduction

By this Motion, Plaintiffs seek what they admit is an "extraordinary remedy": to enjoin Kalshi, a nationwide, federally regulated derivatives exchange located in New York City, from offering sports event contracts "on Indian lands" even though the company has not so much as stepped foot on a tribal reservation. Kalshi does not maintain an office on Indian lands. Kalshi does not house servers on Indian lands. Kalshi does not employ personnel on Indian lands. Kalshi conducts no business whatsoever on Indian lands.

Plaintiffs effectively acknowledge this. The Complaint does not allege that Kalshi has

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

opened an unlicensed casino on a tribal reservation. Rather, Plaintiffs' theory is that, although Kalshi operates its exchange thousands of miles away in New York, it is conducting gaming activity on Plaintiffs' tribal reservations in California because persons with an internet connection can access the exchange there. As a result, Plaintiffs argue, Kalshi is subject to IGRA.

But Congress provided otherwise in the Unlawful Internet Gambling Enforcement Act ("UIGEA")—a federal statute that the Complaint ignores, and the Motion mentions only in passing. In UIGEA, Congress addressed Plaintiffs' theory of the case—that allegedly unlawful internet gaming should be deemed to occur wherever it can be accessed. As a general matter, Congress agreed, rendering unlawful any "bet or wager" that is "initiated" within a state or reservation where such gaming is unlawful. 31 U.S.C. § 5362(10); *see also California v. Iipay Nation of Santa Ysabel*, 2016 WL 10650810, at *1 (S.D. Cal. Dec. 12, 2016), *aff'd*, 898 F.3d 960 (9th Cir. 2018). But Congress did not stop there. Rather, it excluded transactions conducted on a registered exchange pursuant to the CEA. *See* 31 U.S.C. § 5362(1)(E)(ii). That exemption makes sense, as Congress had worked for the better part of a century to bring derivatives markets "under a uniform set of regulations." *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992). And the centerpiece of that effort was the CEA's dictate that derivatives markets would fall under the "exclusive jurisdiction" of the CFTC. *Id.* at 1155.

Plaintiffs labor to create a conflict between IGRA and the CEA such that one must yield to the other. But "so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) (quoting *Wood v. United States*, 41 U.S. (16 Pet.) 342, 363 (1842)). Here, the Court can give effect to all *three* federal statutes that touch this issue. IGRA regulates the conduct of gaming activity "on Indian lands"—that is, gaming operations physically conducted on a tribal reservation. UIGEA regulates gaming activity that can be accessed via the internet in a state or reservation where it is unlawful, *unless* such activity constitutes derivatives trading subject to the CEA. And the CEA regulates such derivatives trading, subjecting it to a uniform regulatory framework under the "exclusive" oversight of a single federal regulator, rather than the patchwork advocated by Plaintiffs. Far from threatening "implied repeal" of IGRA (Mot. at 10), this reading harmonizes the concerns animating all three statutes: tribal self-

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

2

government "on Indian lands" (IGRA), state and tribal regulation of gaming in the Internet era (UIGEA), and the need for a national, uniform derivatives market and regulatory scheme (the CEA).

Plaintiffs ask the Court to disrupt this legislative balance and enter a preliminary injunction that would, in effect, require Kalshi to "geofence" its nationwide offerings from a handful of small, geographically irregular tribal reservations. Setting aside whether this kind of pinprick geofencing is feasible, Plaintiffs do not and cannot satisfy the standards for the novel relief they seek.

**The IGRA Claim (Count One).** Plaintiffs are not likely to succeed on the merits of their IGRA claim. As a threshold matter, the Court lacks jurisdiction to hear the claim because Plaintiffs either lack the requisite state-tribal compacts, or cannot show a violation of such a compact. *See* 25 U.S.C. § 2710(d)(7)(A)(ii). And even if the Court did have jurisdiction, IGRA does not apply because the alleged "class III gaming activit[y]" does not occur "on Indian lands." 25 U.S.C. § 2710(d)(1). In an effort to remove Kalshi's event contracts from the ambit of the CEA, Plaintiffs argue that the event contracts are non-compliant with the CEA and CFTC regulations. But Plaintiffs' CEA analysis is wildly off-base. Congress provided for self-certification of event contracts, 7 U.S.C. § 7a-2(c)(1), and such contracts are lawful until the CFTC finds otherwise. *KalshiEX LLC v. Hendrick*, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025) (Gordon, C.J.) ("I will preserve the status quo, which is that [Kalshi's] contracts are legal under federal law."). Congress also created a "Special Rule" for event contracts, providing that the CFTC "may" determine that certain contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). That discretionary determination rests exclusively with the CFTC, which is not required to and has not made such a determination with respect to Kalshi's event contracts.

**The Lanham Act Claim (Count Five).** Plaintiffs are also unlikely to succeed on the merits of their Lanham Act claim. Plaintiffs lack standing under the Lanham Act because they cannot show any commercial injury arising from Kalshi's advertisements. Even if they had, Kalshi's statements regarding the legality of its products are statements of opinion, which are "generally inactionable." *ThermoLife Int'l, LLC v. Gaspar Nutrition Inc.*, 648 F. App'x 609, 614-15 (9th Cir. 2016). The claim that Kalshi did not genuinely hold these opinions is counter-intuitive at best in light of Kalshi's good standing with its federal regulator and success in court. Nor have Plaintiffs

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

3

shown that any customer was deceived and as a result withheld business from Plaintiffs' casinos.

**Irreparable Harm.** Plaintiffs also cannot show irreparable harm. The alleged harm to Plaintiffs' casinos is clearly monetary in nature, precluding equitable relief. The Motion therefore highlights the supposed affront to Plaintiffs' sovereignty caused by Kalshi. But Plaintiffs' cases involve clashes between *actual sovereigns*—typically, state and tribal governments—not the operations of a private business. And the only "interference" with tribal self-governance they can identify is the fact that Kalshi is not complying with Plaintiffs' ordinances. Even if those ordinances were not preempted by the CEA,[1] Kalshi is aware of no case in which a government was found to have suffered irreparable harm because a defendant was not following its laws.

**Balance of the Equities and Public Interest.** It is Kalshi that will suffer irreparable harm if the Court enters the requested injunction. To comply, Kalshi would likely need to cease all trading of sports event contracts while it determined the feasibility of preventing individuals located on Plaintiffs' lands from trading. The reputational and financial harm to Kalshi would be enormous, and the resulting disruption would damage Kalshi's customers and business partners, and the markets more generally. Finally, Kalshi would also be put in the untenable position of violating its obligation under CFTC rules to provide "impartial access" to market participants.

## III.    Relevant Legal and Factual Background

### A.    Legal Background

#### 1.    Congress passes the Commodity Exchange Act to bring federal regulation to the derivatives market.

Congress passed the CEA in 1936 to bring a measure of federal regulation to the derivatives markets. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362 (1982). Congress initially stopped short of a comprehensive federal scheme, preserving parallel state authority over "transactions" subject to the CEA. 7 U.S.C. § 6c. A patchwork of regulations

---

[1] *Hendrick*, 2025 WL 1073495, at *6 ("[B]ecause Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted."); *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("at the very least field preemption applies" to prevent states from regulating trading on DCMs; *but see KalshiEX LLC v. Martin*, 2025 WL 2194908, at *13 (D. Md. Aug. 1, 2025), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025).

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO                    4
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

resulted, leading to calls for a regulatory framework that was "uniform throughout the United States" and not "subject to the vagaries of" different obligations in "different jurisdictions." *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1973).

In 1974, Congress heeded these calls by amending the CEA to "[b]ring all futures trading under federal regulation." *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 848 (1974). In furtherance of that effort, Congress took two essential steps. First, it created the CFTC to oversee trading on federally designated "contract market[s]." 7 U.S.C. § 2(a)(1)(A). Second, it vested the CFTC with "exclusive jurisdiction" over trading on those federal exchanges. *Id.* Although House drafters introduced a state-law savings clause, the Senate added language clarifying that the clause applied "except as hereinabove provided" by the statute's grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The Senate also "struck" the existing provision that preserved state laws applicable to derivatives "transactions." H.R. Conf. Rep. No. 93-1383, at 35 (1974). The conference report explained that the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.*

### 2. Congress passes the Indian Gaming Regulatory Act to regulate federal, state, and tribal relations relating to gaming "on Indian lands."

In 1988, Congress passed IGRA in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, which held that states could not regulate gaming on Indian lands. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014) (citing *Cabazon Band*, 480 U.S. 202, 221-22 (1987)). Congress recognized that tribes were engaged in "gaming activities on Indian lands as a means of generating tribal governmental revenue," but then-existing federal law did not provide "clear standards" governing such gaming. 25 U.S.C. § 2701(1), (3). Congress therefore sought to "provide a statutory basis for the operation of gaming by Indian tribes." *Id.* § 2702(1). It did so through a unique blend of federal, state, and tribal oversight. It also created the National Indian Gaming Commission ("NIGC") to lead the effort on the federal level.

The phrase "on Indian lands" permeates IGRA; the statute uses that phrase 22 times. It defines "Indian lands" to mean "all lands within the limits of any Indian reservation" or lands held in trust by the United States for the benefit of tribes. *Id.* § 2703(4). It also focuses on gaming

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

5

activity "conducted" on Indian lands—that is, the operation of gaming businesses on Indian lands. *E.g.*, *id.* § 2710(b)(1)(B) (requiring separate licenses for "each place, facility, or location on Indian lands" where class II gaming "is conducted"); *id.* § 2710(b)(4)(A) (restricting access to a "tribal license to own a class II gaming activity conducted on Indian lands").

The statute affords tribes exclusive jurisdiction over class I gaming "on Indian lands," *id.* § 2710(a)(1), defined to mean "social games solely for prizes of minimal value," *id.* § 2703(6). With respect to class II and class III gaming, however, the statute provides for concurrent jurisdiction of federal, state, and tribal authorities. For instance, IGRA requires that a tribe issue a separate license "for each place, facility, or location on Indian lands at which class II gaming is conducted." *Id.* § 2710(b). It authorizes "[c]lass III gaming activities on Indian lands . . . only if such activities are," among other things, "located in a State that permits such gaming" and "conducted in conformance with a Tribal-State compact." *Id.* § 2710(d)(1)(B)-(C). It requires that "any Indian tribe" wishing to engage in class III gaming activity "on Indian lands of the Indian tribe" (or to authorize someone else to do so) adopt a tribal ordinance and enter into a "Tribal-State compact" with the state in which the class III gaming activities would be "located," to be approved by either the Chairman of the NIGC or Secretary of the Interior. *Id.* § 2710(d)(1)-(3). If a compact with the state cannot be achieved, the Secretary of the Interior is to promulgate "procedures" guiding the regulation of gaming activity. *Id.* § 2710(d)(7)(B)(vii). Finally, IGRA provides the United States district courts with jurisdiction over lawsuits by (1) a state or tribe "to enjoin a class III gaming activity located on Indian lands" conducted in violation of a tribal-state compact; and (2) the Secretary to enforce procedures established in the absence of a compact. *Id.* § 2710(d)(7)(A)(ii), (iii). In this manner, Congress established in IGRA a delicate balance of federal, state, and tribal regulation of gaming activities "conducted" by a tribe or authorized licensee "on Indian lands." *Id.* Nowhere does IGRA convey any intent to regulate the derivatives markets that had been brought under the exclusive jurisdiction of the federal government years earlier.

### 3. Congress passes the Unlawful Internet Gambling Enforcement Act to address state and tribal regulation of gaming in the internet era.

In 2006, Congress returned to gaming-related legislation, this time to address the advent of

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

the internet and the challenges it posed to enforcement of state and tribal regulation. The result was UIGEA, which was passed out of a need for "[n]ew mechanisms for enforcing gambling laws on the Internet." 31 U.S.C. § 5361(a)(4). Notably, Congress was aware that it was legislating against the backdrop of IGRA, providing that UIGEA should not be construed as "altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." *Id.* § 5361(b). Rather, the purpose of UIGEA was to ensure that any such laws or compacts would not be undermined by the diffuse nature of internet technology. *Id.* § 5361(a)(4).

Congress did so by addressing head-on the issue presented here: if a business operates an internet gaming platform in, say, New York (where such conduct is legal), and a person engages in gaming activity over the internet while located in, for example, Utah (where such conduct is illegal), where is the conduct deemed to have occurred for purposes of application of state law—New York or Utah? Under UIGEA, the answer is Utah. UIGEA accomplished this result in the following way. First, the statute prohibits a person "engaged in the business of betting or wagering" from accepting funds in connection with "unlawful Internet gambling." 31 U.S.C. § 5363. Second, the statute defines "unlawful Internet gambling" to mean:

> [T]o place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

*Id.* § 5362(10)(A). Thus, if the bettor located in Utah "place[s] . . . a bet or wager by . . . means . . . of the Internet," he has done so "where such bet or wager is unlawful," resulting in a statutory violation. *Id.*

Crucially, however, Congress carved out derivatives trading activity—such as the event contracts offered by Kalshi—from the reach of UIGEA. It did so through the statute's definition of "bet or wager," which has a number of exclusions. As relevant here, the definition excludes "any transaction conducted on or subject to the rules of a registered entity . . . under the Commodity Exchange Act." *Id.* § 5362(1)(E)(ii); *see also* 7 U.S.C. § 1a(40)(A) (defining "registered entity" to include "a board of trade designated as a contract market" by the CFTC). Thus, UIGEA's

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

prohibitions on certain bets or wagers placed over the internet does not extend to "transaction[s] conducted on" a DCM such as Kalshi—a "registered entity . . . under the Commodity Exchange Act." *Id.* This exclusion ensured that UIGEA could not be used to undermine the uniform federal regulatory scheme established decades earlier.

Congress also created enforcement mechanisms that contemplated the possibility of "unlawful Internet gambling" on Indian lands. 31 U.S.C. § 5365(b)(3). UIGEA provides that, where a violative transaction is "initiated, received, or otherwise made on Indian lands," the United States and enforcement authorities under state-tribal compacts will have concurrent authority. *Id.* By contrast, IGRA contains no such language relating to gaming activity "initiated . . . on Indian lands" (*i.e.*, the kind of activity that Plaintiffs allege is happening here). Rather, IGRA focuses on gaming activity "located" or "conducted" on Indian lands. *See supra* at 5-6.

### 4. Congress further amends the Commodity Exchange Act through Dodd-Frank and addresses regulation of event contracts.

Four years after UIGEA's passage, Congress further amended the CEA through the Dodd-Frank Act of 2010 ("Dodd-Frank"). Two amendments are relevant here. First, Congress added "swaps" to the CFTC's exclusive jurisdiction. *See* Pub. L. 111–203, 124 Stat. 1376, 1666 (July 21, 2010). Section 2(a) now provides that the CFTC "shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). And Congress defined "swap" to encompass, among other things, event contracts— that is, contracts "dependent on the occurrence . . . of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

Second, Congress created a "Special Rule" that authorizes the CFTC to review and prohibit certain event contracts it determines to be "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i). The CEA provides that the CFTC "may"—but need not—deem event contracts contrary to the public interest if they "involve" certain categories, including "gaming." *Id.*; *see also* 17 C.F.R. §§ 40.11 (2011). The decision to prohibit an event contract that falls within one of the enumerated categories is subject to the CFTC's evaluation of the "public interest."

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

8

Today, the CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market, known as a "DCM." 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100 (2012). Once the CFTC designates an entity as a DCM, the CFTC has "exclusive jurisdiction" over swaps and futures contracts traded on the exchange, including "event" contracts. 7 U.S.C. §§ 1a(47)(A), 2(a)(1)(A). Exchanges under the CFTC's jurisdiction are subject to an extensive federal regulatory framework, including 23 "core principles" identified in the CEA. *See id.* § 7(d); 17 C.F.R. Pt. 38 (2012). If an exchange violates the CEA or CFTC regulations, the CFTC has recourse to a comprehensive array of enforcement mechanisms all committed to the agency's discretion, including penalties, suspension or revocation of the exchange's designation, and referral to the Department of Justice for criminal enforcement. *See, e.g.*, 7 U.S.C. §§ 8(b), 12c, 13.

The CEA also provides that a DCM may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a) (2024). The contracts are immediately effective unless and until the CFTC initiates review of any contract. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).

## B. Factual Background

Plaintiffs are federally recognized Indian tribes located in California and are the beneficial owners of their respective reservations. Compl. ¶¶ 9-11. Plaintiffs conduct class III gaming activity in casinos on their reservations. *Id.*; *see also* Hopkins Decl. ¶ 20 (offering 2,020 slot machines and 40 table games); Mathiesen-Powell Decl. ¶ 3 (offering 1200 slot machines and 22 table games). Plaintiffs claim to have secured a "monopoly" on gaming activity in California through lobbying, political campaigning, and litigation. Mot. at 16. Although California prohibits and Plaintiffs thus cannot offer the kind of "sports betting" that Plaintiffs accuse Kalshi of offering, Compl. ¶ 42, Plaintiffs assert that Kalshi's sports event contracts threaten their monopoly. Mot. at 16.

Kalshi is a federally regulated exchange and prediction market where people can trade on the outcome of real-world events. Sottile Decl. ¶¶ 3, 7. Kalshi was founded in 2018 and is based in New York City. In 2020, the CFTC unanimously certified Kalshi as a DCM, affirming that its platform complied with the CEA and the CFTC regulations promulgated thereunder, and subjecting

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

9

it to ongoing regulation by the CFTC. Wong Decl., Ex. A. In July 2021, Kalshi began offering event contracts for trading on its DCM. Kalshi soon began offering contracts that referenced the outcome of political elections. The CFTC issued an order blocking such offerings as contrary to the public interest, but a federal court invalidated the order as exceeding the CFTC's statutory authority. *See KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *2 (D.D.C. Sept. 12, 2024). On January 24, 2025, Kalshi self-certified, pursuant to Section 7a-2(c)(1) of the CEA, the first of a number of sports event contracts that are now available on its exchange. Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review. *See, e.g.*, Dkt. No. 36-1, at 2 (referencing confidential appendices).

Kalshi's sports event contracts have attracted attention from various state regulators around the country, who have issued (or threatened to issue) cease-and-desist orders alleging that the contracts violate state law and demanding that the offerings be suspended. Kalshi has sought a preliminary injunction against such orders in three cases, and obtained injunctions in two of them on federal preemption grounds. *KalshiEX LLC v. Hendrick*, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025) ("[B]ecause Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted."); *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi).

## IV. Argument

### A. Legal Standard

A "preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008), which is "never awarded as of right," *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A preliminary injunction can be prohibitory (maintaining the status quo) or mandatory (requiring action beyond the status quo). *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH &*

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

10

1   *Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009).  By seeking a court order requiring Kalshi to "geofence"

2   or otherwise ensure that its national, CFTC-regulated exchange is unavailable to persons located on

3   Plaintiffs' reservations, Plaintiffs seek a mandatory injunction, which "is particularly disfavored"

4   and "not granted unless extreme or very serious damage will result and [is] not issued in doubtful

5   cases." *Id.* (citation omitted); *see also Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)

6   ("When a mandatory preliminary injunction is requested, the district court should deny such relief

7   'unless the facts and law clearly favor the moving party.'") (citation omitted).

8          **B.        Plaintiffs are not likely to succeed on the merits.**

9          The Motion is premised on two claims:  the IGRA claim (Count One) and Lanham Act claim

10  (Count Five).[2]  Plaintiffs are unlikely to succeed on the merits of either.

11                 *1.        Plaintiffs are not likely to succeed on the merits of the IGRA claim.*

12         Plaintiffs' IGRA claim is doomed for at least four reasons.  First, the Court lacks jurisdiction

13  to hear Plaintiffs' claim.  Second, IGRA does not apply because the conduct in question does not

14  occur "on Indian lands."  Third, UIGEA *does* apply to internet gaming made accessible to persons

15  located in states or reservations that prohibit it, but UIGEA carves out CFTC-regulated derivatives

16  activity such as Kalshi's event contracts.  Fourth, Kalshi's event contracts are fully CEA-compliant,

17  and even if they were not, it is the CFTC's exclusive responsibility to regulate them.

18                 *a.        The Court lacks jurisdiction over the IGRA claim.*

19         The IGRA claim fails at the threshold because the Court lacks subject matter jurisdiction to

20  hear it.  Plaintiffs assert jurisdiction lies under 25 U.S.C. § 2710(d)(7)(A)(ii). Compl. ¶¶ 7(a), (c),

21  157; Mot. at 7, 9.  That provision gives federal courts jurisdiction over "any cause of action initiated

22  by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands *and conducted

23  in violation of any Tribal-State compact*."  25 U.S.C. § 2710(d)(7)(A)(ii) (emphasis added).

24         Setting aside whether the activity here is "class III gaming activity located on Indian lands"

25  (it is not), the statute's plain terms do not provide the Court with jurisdiction over the claims of two

26  of the three tribes that have sued Kalshi.  Those tribes (Chicken Ranch and Blue Lake Rancherias)

27  _____

28  [2] The Motion does not seek an injunction based on Counts Two and Four (violations of ordinances)
    or Count Three (civil RICO conspiracy).  Plaintiffs cannot succeed on these claims either.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO                    11
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

do not have a tribal-state compact, but rather secretarial procedures issued by the Secretary of the Interior under the process governing situations where tribes and states cannot agree to a compact. 25 U.S.C. § 2710(d)(7)(B); Mathiesen-Powell Decl. ¶ 23; Ramos Decl. ¶ 26.

Ignoring the statutory text, Plaintiffs assert that the statute provides jurisdiction over tribal actions to enjoin class III gaming activity "conducted in violation of Tribal-State compacts *and secretarial procedures*." Compl. ¶ 7(c) (emphasis added); *id.* ¶ 157. But that is not what the statute says, and it is not what Congress intended. Instead, Congress expressly provided that courts have jurisdiction to hear claims brought by *the Secretary* (not states or tribes) to "enforce" secretarial procedures governing class III gaming activity. 25 U.S.C. § 2710(d)(7)(A)(iii) (jurisdiction over actions "initiated by the Secretary to enforce procedures prescribed under subparagraph (B)(vii)"); *id.* § 2710(d)(7)(B)(vii) (establishing process for Secretary to "prescribe . . . procedures . . . under which class III gaming may be conducted"); *Artichoke Joe's v. Norton*, 216 F. Supp. 2d. 1084, 1113 (E.D. Cal. 2002) (noting IGRA "contemplates a multitude of specific causes of action that may be brought by specified entities or persons," including "suit by [the] Secretary of [the] Interior to enforce procedures for conducting class III gaming" under § 2710(d)(7)(A)(ii)) (citing *Florida v. Seminole Tribe of Florida*, 181 F.3d 1237, 1248 (1999)).

As for the third plaintiff (Picayune Rancheria), it does have a tribal-state compact, but Plaintiffs do not and cannot point to any evidence that Kalshi is "in violation of" any particular provision of that compact. They say that Section 2710(d)(7)(A)(ii) gives tribes "an enforcement mechanism to prevent gaming … that is *not authorized* by a tribal-state compact," Compl. ¶ 38 (emphasis added), but again, that is not what the statute says. The statute provides a cause of action to enjoin activity "conducted in violation of" a compact. And as Plaintiffs concede, gaming activity that is "not authorized" by a compact does not violate that compact, but rather "violates IGRA and federal and state criminal law." *Id.* ¶ 36. The closest Plaintiffs come to alleging a violation of the compact is the Carrillo Declaration, which states that Section 4.1(c) of the compact "specifically prohibits internet gaming activities such as those being conducted by Kalshi." Carrillo Decl. ¶ 13. But Section 4.1(c) limits the activity *of the tribe*, not of Kalshi or any other third party. Wong Decl., Ex. B. Kalshi's conduct cannot and does not violate that provision.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

12

### b. IGRA does not apply because the alleged "class III gaming" activity does not occur "on Indian lands."

The Complaint alleges repeatedly that Kalshi is engaged in illegal conduct on Plaintiffs' territory. Amazingly, however, neither the Complaint nor the Motion makes any attempt to explain why running a derivatives exchange from New York City amounts to conduct "on Indian lands." Plaintiffs' failure to engage on this gating issue should alone defeat its request for extraordinary relief. *Stanley*, 13 F.3d at 1326 (movant's burden of demonstrating likelihood of success on the merits as the "irreducible minimum for obtaining a preliminary injunction").

In any event, the analysis begins, as it must, with the text. *See, e.g.*, *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025). IGRA uses the phase "on Indian lands" in virtually every section of the statute, emphasizing Congress's geographic focus. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) ("Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, *and nowhere else*.") (emphasis added). Other indicia of IGRA's territorial focus abound: its requirement that tribes issue a separate license "for each place, facility, or location on Indian lands at which class II gaming is conducted," 25 U.S.C. § 2710(b); its authorization of "[c]lass III gaming activities on Indian lands only if such activities are . . . located in a State that permits such gaming," *id.* § 2710(d)(1)(B); and its direction that the NIGC monitor gaming "conducted on Indian lands" and "inspect and examine all premises located on Indian lands on which . . . gaming is conducted," *id.* § 2706(b)(1)-(2). Indeed, IGRA identifies specific parcels that are *not* Indian lands, such as "approximately 25 contiguous acres of land, more or less . . . located within one mile of the intersection of State Road Numbered 27 . . . and the Tamiami Trail." *Id.* § 2719(b)(2)(B).

The text of the statute also tells us what it was "on Indian lands" that Congress sought to address through IGRA: the "conduct" of "gaming activity." The term "conduct" also appears throughout the statute, referring to the operation of a gaming business. *E.g.*, *id.* § 2710(b)(2)(A) (referring to "proprietary interest and responsibility for the conduct of any gaming activity"); *id.* § 2710(b)(3) (referring to revenues from gaming "conducted or licensed by any Indian tribe"). All of this underscores that Congress's concern in IGRA was with the operation of gaming businesses

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

13

occurring on tribes' physical territory—casinos, bingo halls, and such—not gaming that could be accessed from afar through an electronic medium that had not even been introduced to the public when the statute was passed. *See California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 964 n.6 (9th Cir. 2018) ("We note that Congress passed IGRA in 1988—a few years before the internet became publicly available. . . . [T]he statute nowhere referenced the internet, or other networking capabilities that reach beyond Indian lands.").[3]

### c. UIGEA directly addresses internet gaming and carves out derivatives transactions subject to the CEA.

Later, the advent of the internet raised new questions about the location of "gaming activity" accessed online. Congress decisively answered those questions in UIGEA. Unlike IGRA, UIGEA expressly addresses gaming activity on the internet that can be accessed in places where it is unlawful, including on Indian lands. UIGEA provides that internet gaming is unlawful if and to the extent that a bet or wager is unlawful "in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10); *see also id.* § 5363. It gives enforcement authority not only to the United States, but also to tribal authorities pursuant to whatever state/tribal compact might govern. *Id.* § 5365(b)(3). And it creates that authority with respect to violative transactions that are "*initiated, received, or otherwise made* on Indian lands," *id.* § 5365(b)(3)(A) (emphasis added), not with respect to gaming activity conducted "on Indian lands" (as in IGRA). In other words, UIGEA is on point; IGRA is not.

The problem for Plaintiffs is that Congress specifically exempted DCMs from UIGEA's reach. UIGEA unambiguously carves out derivatives trading by excluding from the definition of "bet or wager" transactions "conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act." *Id.* § 5362(1)(E)(ii). Kalshi's event contracts are just that, as Plaintiffs concede. Compl. ¶ 71 ("In 2020, . . . the CFTC authorized Kalshi to list

---

[3] Kalshi has uncovered no cases addressing the issue presented under IGRA—whether internet gaming activity should be deemed to occur "on Indian lands" merely because a person located there can access it. Indeed, courts addressing similar issues have found the opposite. *See, e.g.*, *Hornell Brewing Co. v. Rosebud Sioux Tribal Court*, 133 F.3d 1087, 1093 (8th Cir. 1998) (online advertising outside of tribal lands "cannot be said to constitute non-Indian use of Indian land").

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

event contracts for public trading as a DCM.").  And UIGEA's carve-out for derivatives transactions is understandable—without it, the statute had the potential to reintroduce the very patchwork of state derivatives regulation that Congress stamped out in 1974.  *See* Dave Aron & Matt Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 57 (2021); *see also* 7 U.S.C. § 2(a)(1)(A).

Plaintiffs are clearly aware of UIGEA, but make no effort to grapple with it.  Their Complaint does not refer to it at all, and their Motion mentions it only twice in passing.  Yet it courses through the main assertion in Plaintiffs' case: that Kalshi's event contracts should be deemed to be gaming "on Indian lands" because persons located there can initiate a trade via their cell phone or computer.  Plaintiffs note that IGRA does not provide the same carve-out that UIGEA does, Mot. at 6, but that works against, not for, Plaintiffs.  Congress has amended IGRA many times, and it would have been easy for Congress to amend IGRA when it passed UIGEA if it thought that IGRA raised a similar potential conflict with the CEA.  It did not.  To credit Plaintiffs' argument, the Court would need to accept that Congress exempted derivatives trading from UIGEA (the statute that actually deals with internet gaming) while regulating such trading through IGRA.  This not a reasonable interpretation, much less one that is likely to succeed on the merits.

It is a well-settled principle of statutory interpretation that, "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  *Traynor v. Turnage*, 485 U.S. 535, 548 (1988) (quotation omitted); *see also Momeni v. Chertoff*, 521 F.3d 1094, 1097 (9th Cir. 2008) (where a court can "construe two statutes so that they conflict, or so that they can be reconciled and both can be applied, it is obliged to reconcile them").  Plaintiffs' reading asks the Court to do the opposite—to find that Congress used IGRA to unwind the uniform national regulatory scheme laid down by the 1974 amendments to the CEA.  Moreover, even if the statutes were not capable of harmonization (they are), it is equally well-settled that a "later enacted, more specific statute" should govern an "earlier, more general statute."  *Acosta v. Gonzales*, 439 F.3d 550, 555 (9th Cir. 2006), *overruled on other grounds by Garfias-Rodriguez v. Holder*, 702 F.3d 504 (9th Cir. 2012).  Here, there are *two* later-enacted statutes that govern the subject matter and guide the analysis:  UIGEA's 2006 provision that internet gaming is unlawful if it is unlawful where it can be accessed, 31 U.S.C. § 5362(10)(A),

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

15

unless it falls into an exemption such as the one for transactions on a CFTC-registered exchange, *id.* § 5362(1)(E)(ii); and Dodd-Frank's 2010 provision that the CFTC has exclusive jurisdiction over trading of swaps on DCMs, 7 U.S.C. § 2(a)(1)(A).

### d. Kalshi's event contracts are compliant with the CEA, and the CFTC has not determined otherwise.

Instead of grappling with Congress's carefully crafted statutory scheme, Plaintiffs instead baldly assert that IGRA governs Kalshi's event contracts because Kalshi has failed to comply with the CEA. *See, e.g.*, Compl. ¶ 154; Mot. at 9. Notably, this assertion concedes that the CEA governs Kalshi's conduct; were it otherwise, Kalshi's compliance or noncompliance with that statute would be irrelevant. It also makes no sense as an argument in favor of IGRA's applicability. There is no basis in law or logic to say that a statute ceases to apply once a person violates it. Here, if Kalshi's contracts do not comply with the CEA or CFTC regulations, the CFTC (the regulator with exclusive jurisdiction over trading on DCMs) can take action.

In any event, Plaintiffs' claims of non-compliance fall wide of the mark. The gravamen of Plaintiffs' non-compliance argument is that Kalshi is required, under the CEA's "Special Rule," to "rebut the regulatory presumption that its contracts are contrary to the public interest" because they allegedly fall within one of the categories enumerated in the Special Rule. Mot. at 2; *see also id.* at 3, 5, 21. Plaintiffs contend that Kalshi's submissions to the CFTC fail to rebut this supposed presumption. Plaintiffs' theory reflects fundamental misunderstandings of the CEA itself and regulatory practice before the CFTC.

First, the supposed "regulatory presumption" that Plaintiffs invoke is made up out of whole cloth. The Special Rule provides that the CFTC "may"—not "must" or "shall"—determine that event contracts falling into certain enumerated categories (among them "gaming") are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Nothing in the text or structure of the Special Rule imposes any "presumption," much less an obligation that a DCM must "rebut" such a presumption by means of its self-certifications under 17 C.F.R. § 40.2. The Special Rule simply grants

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

16

1   discretionary authority to the CFTC to conduct a public interest review in certain specified areas.[4]

2   Second, there is nothing "defective" about Kalshi's submissions to the CFTC, as Plaintiffs

3   allege. Compl. ¶ 152. Plaintiffs are wrong in stating that "[t]he CFTC has promulgated regulations

4   that allow registered entities to self-certify event contracts through 17 C.F.R. § 40.2." Mot. at 5. It

5   was Congress, not the CFTC, who provided for the self-certification process in the CEA. 7 U.S.C.

6   § 7a-2(c)(1). The regulation Plaintiffs cite merely prescribes the categories of information a DCM

7   must include when self-certifying. 17 C.F.R. § 40.2. Kalshi's submissions have complied with

8   those requirements, including in confidential appendices that are not available to the public so as to

9   protect Kalshi's confidential and proprietary business information. Plaintiffs' only concrete

10  "critique" of Kalshi's submissions is that they supposedly "do not address compliance issues" with

11  core principles. Mot. at 2. But the confidential appendices contain pages of analysis discussing the

12  product's compliance with the CEA's Core Principles.[5]

13  Third, whatever dissatisfaction Plaintiffs may have with the CFTC's administration of the

14  CEA is not a basis for them to step in. Plaintiffs may think that Kalshi's event contracts are contrary

15  to the public interest, but it is the CFTC—and only the CFTC—whom Congress has charged with

16  making that determination. *Hendrick*, 2025 WL 1073495, at *6 ("But even if Kalshi's sports

17  contracts involve 'gaming,' that would not subject Kalshi to state gaming laws. Rather, it would

18  subject Kalshi to the special rule that allows the CFTC to conduct a public interest review.").

19                    **2.      Plaintiffs are not likely to succeed on the Lanham Act claim.**

20  Plaintiffs claim that Kalshi has violated the Lanham Act through false advertisements and

21  seek to enjoin Kalshi from marketing its sports event contracts as "legal in all 50 states." Mot. at 12,

22  24. They assert that these ads have harmed their businesses, but as proof offer only that an expert

23

24  [4] Plaintiffs elsewhere claim that the CFTC has banned all event contracts in the enumerated areas altogether. Mot. at 4. But this argument cannot be squared with Plaintiffs' repeated contention that

25  the Special Rule and associated regulation create a "regulatory presumption" that DCMs can rebut. And Plaintiffs appear to concede that the CFTC has *not* determined that Kalshi's event contracts are

26  contrary to the public interest. *Id.* at 5 ("Lack of CFTC regulation and review under 17 C.F.R. § 40.11 does not constitute compliance with the CEA and the CFTC regulations.").

27
    [5] Kalshi can provide *in camera* review of the confidential appendices to its self-certifications should
28  the Court desire.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO                    17
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

will provide evidence sometime in the future and a hearsay reference to seeing customers looking at the Kalshi app while patronizing their casinos. This Act claim fails. First, Plaintiffs lack standing to bring a false advertising claim. Second, the advertisements at issue are neither "false" nor "statements of fact." And finally, Plaintiffs have not shown that customers were or are likely to be diverted from their casinos because they were deceived by Kalshi's advertisements.

### a. Plaintiffs lack standing to bring a Lanham Act claim.

To have standing under the Lanham Act, Plaintiffs must show (1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is competitive in nature. *Keezio Grp. v. Mommy&Me LLC*, 2024 WL 3432001, at *2 (N.D. Cal. Jul. 16, 2024) (Corley, J.). The commercial injury must "flow[] directly from the deception [allegedly] wrought by [Kalshi's] advertising," and causes consumers "to withhold trade from the plaintiff[s]." *ThermoLife Int'l, LLC v. BPI Sports, LLC*, 2022 WL 612669, at *2 (9th Cir. Mar. 2, 2022) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)).

First, Plaintiffs have not shown any injury to their "commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131-32. Plaintiffs claim that Kalshi's advertisements will influence consumer decisions and divert business from Plaintiffs' casinos to Kalshi. Mot. at 13-14; Ramos Decl. ¶¶ 40-41. But they have not offered any evidence of actual or likely lost business. Vague promises of future, Mot. at 23 n.17, cannot support the drastic remedy they seek.[6]

Plaintiffs also offer a hearsay observation that casino staff have observed some unspecified number of patrons trading on Kalshi while inside a casino. Ramos Decl. ¶¶ 40-41. This anecdotal evidence comes nowhere close to demonstrating that Kalshi's advertisements diverted patrons. Nor are Plaintiffs entitled to any presumption of injury here: Kashi and the tribes do not offer the same product and thus are not direct competitors, *TrafficSchool.com*, 653 F.3d at 827; and Kalshi's advertising "does not directly compare defendant's and plaintiff's products," *Quidel Corp. v.*

---

[6] Plaintiffs also assert that "Kalshi has destabilized the Tribes' market in a matter of months," but the evidence they offer says nothing about destabilizing their casino businesses. Mot. at 16; Ramos Decl. ¶¶ 12-27 (describing history of establishment of Blue Lake Casino); Hopkins Decl. ¶¶ 9-16 (same); Mathiesen-Powell Decl. ¶¶ 11-25, 27 (same and broadly speculating about a "*potential* loss of infrastructure, programs, and services" (emphasis added)).

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

*Siemens Med. Sols. USA, Inc.*, 2021 WL 4622504, at *2 (9th Cir. 2021). Plaintiffs also have not shown any reputational harm, as "none of the statements are alleged to disparage or even refer to [Plaintiffs]." *HomeLight, Inc. v. Shkipin*, 694 F. Supp. 3d 1242, 1255 (N.D. Cal. 2023).

Nor have Plaintiffs shown that Kalshi's advertisements proximately caused their injury. Plaintiffs operate casinos that do not offer sports betting. Compl. ¶ 42; Mot. at 16. Nothing in the record indicates that advertisements promoting Kalshi's sports event contracts cause injury to those casinos. Even if Plaintiffs were able to show lost business, "determining the actual relationship" between Kalshi's advertisements (which say nothing about Plaintiffs' casinos) and that lost business "would require precisely the 'speculative . . . proceedings or intricate, uncertain inquiries' that the Supreme Court [has] cautioned against." *Alfasigma USA, Inc. v. First Databank, Inc.*, 2022 WL 899848, at *9 (N.D. Cal. 2022) (quoting *Lexmark*, 572 U.S. at 140).

### b. Plaintiffs have not shown a false statement of fact.

Plaintiffs also cannot prove, as they must, that Kalshi made a false statement of fact. *Keezio Grp.*, 2024 WL 3432001 at *2. An advertisement stating that "sports betting" on Kalshi is "legal" is not an actionable statement of fact. *ThermoLife Int'l, LLC v. Gaspar Nutrition Inc.*, 648 F. App'x 609, 614-15 (9th Cir. 2016) (statements that a product is "legal" are "generally inactionable opinion because they 'purport to interpret the meaning of a statute or regulation'"). Here, two federal district courts in Nevada and New Jersey have agreed with Kalshi and entered preliminary injunctions that block state efforts to prohibit or regulate Kalshi's event contracts because state laws are preempted by the CEA. *Hendrick*, 2025 WL 1073495, at *8; *Flaherty*, 2025 WL 1218313, at *7.[7] And the CFTC itself—Kalshi's exclusive regulator—has agreed that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. at *27, *KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024).

Nor can Plaintiffs establish falsity. They argue that the ads are false because "sports betting is not legal in all fifty states and is not legal in California." Mot. at 12. But Kalshi's ads do not simply state that sports betting is legal in all 50 states. The very ad that Plaintiffs point to says that

---

[7] *Cf. Martin*, 2025 WL 2194908 (declining to grant a preliminary injunction on the record before the court).

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

19

"Sports Betting [is] Legal in all 50 States **on Kalshi**," and "You can now bet on sports in all 50 states **with Kalshi**" (emphasis added).[8]  *Id.*  The Court must analyze an advertisement "in its full context."  *BNI Enters., Inc. v. Referral Leaders Int'l, LLC*, 2015 WL 12644984, at *3 (C.D. Cal. Jan. 9, 2015).  And here, the "full context" makes clear that the ads are limited to describing Kalshi's product offerings.[9]

### c.    Plaintiffs have not shown a likelihood of deception or injury.

Plaintiffs also cannot show that they are likely to succeed in proving that Kalshi's advertisements "actually" deceive or have the "tendency to deceive" a "substantial segment of its audience," or that they are "likely to influence purchasing decisions" and that Plaintiffs have been or are likely to be injured as a result.  *TrafficSchool.com*, 653 F.3d at 828.  Plaintiffs point to a variety of social media reactions to Kalshi's posts, Mot. at 13, without providing any of the actual posts to which these comments respond.  *See, e.g.*, Kretz Decl. ¶¶ 7-14 (attaching screenshots of comments on posts, but not the posts themselves).  A selection of anonymous comments—reacting to different, unspecified posts—does not establish that a "substantial segment" of the audience was deceived by any particular Kalshi advertisements.  And as explained above, Plaintiffs have not shown they are likely to succeed in establishing injury, as they have offered no evidence to support their assertion that Kalshi's advertisements have "influence[d] the purchasing decisions of consumers and gamblers" or "divert[ed] business from the Tribes' casinos to Kalshi."  Mot. at 13-14.

### C.    Plaintiffs will not suffer irreparable harm absent a preliminary injunction.

Plaintiffs concede that they seek an "extraordinary remedy."  Mot. at 8.  But they have not shown that they will suffer the kind of immediate and irreparable harm that would support a

---

[8] Other statements attached to the Kretz Declaration, to the extent that they refer to sports betting and legality (most do not), similarly make clear that they refer to trading **on Kalshi**, rather than sports betting generally.  *See, e.g.*, Kretz Ex. 17 ("Trade all college basketball games **on Kalshi**."); Exs. 28, 29, 30 ("kalshisports: Bet on it **here** in all 50 states" (emphasis added)).

[9] The other social media post Plaintiffs complain about—which allegedly shows "kids in high school" watching basketball on multiple screens—makes no statement about legality whatsoever. Mot. at 13; Kretz Decl. ¶ 31.  In any event, persons under 18 are ineligible to trade on Kalshi.  *See* Kalshi, *Signing Up as an Individual*, help.kalshi.com/account/signing-up/signing-up-as-an-individual (last visited Sept. 25, 2025).  Nor can Plaintiffs show that "kids in high school" have been diverted from Plaintiffs' casinos.

1  mandatory preliminary injunction that would change, rather than preserve, the status quo. *Tanner*

2  *Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 805 (9th Cir. 1963).

3      First, Plaintiffs complain that Kalshi's operations have "destabilized" the "class III gaming

4  market," and that an injunction is necessary to protect against "ongoing harm" to "the Tribes' class

5  III gaming markets." Mot. at 16. They assert that Kalshi "divert[s] profits from the Tribes and

6  affect[s] tribal gaming revenues," but provide no concrete proof, promising only to submit evidence

7  sometime in the future. Mot. at 19, 23 n.17. And they suggest, again without offering any evidence,

8  that reduced revenues will impact tribal operations. *See* Mathiesen-Powell Decl. ¶ 26; Carrillo Decl.

9  ¶ 15; Ramos Decl. ¶ 39. This is ultimately a claim of economic injury, which Plaintiffs themselves

10 concede "does not support a finding of irreparable harm." Mot. at 14 (citing *Arcsoft, Inc. v.*

11 *Cyberlink Corp.*, 153 F. Supp. 3d 1057, 1071 (N.D. Cal. 2015)). Any loss of revenue, even if

12 proven, would be compensable with money damages at the conclusion of these proceedings and

13 thus is not irreparable. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873,

14 879 (9th Cir. 2009) (citations and quotations omitted); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716,

15 725-26 (9th Cir. 1999) (preliminary injunction properly denied where plaintiff's injury is reparable).

16     Second, presumably aware of the legal remedy available to them for any actionable loss of

17 revenue, Plaintiffs claim that Kalshi's sports event contracts result in "ongoing harm to tribal

18 sovereignty and the Tribes' class III gaming markets." Mot. at 16. But they offer no support for

19 the notion that a private business like Kalshi can infringe on tribal sovereignty.[10] *See* Kevin Jon

20 Heller, *In Defense of Pure Sovereignty in Cyberspace*, 97 Int'l L. Stud. 1432, 1438 (2021)

21 ("Territorial sovereignty refers to a State's right to exercise supreme authority over all persons and

22 things within its territory without any form of interference *by other States*.") (emphasis added,

23 internal quotations omitted). Plaintiffs concede that the cases they cite concern "attempts *by states*

24 to extend their jurisdictional reach to activities on Indian lands." Mot. at 15 (emphasis added).

25     Third, Plaintiffs argue that the tribes are entitled to a presumption of irreparable harm under

26

27 _____

[10] Plaintiffs' suggestion that Kalshi is exercising sovereignty as a "de facto regulator" of itself is
absurd. Mot. at 5. That the CEA authorizes self-certification of products on DCMs does not change

28 the fact that DCMs are subject to an extensive regulatory scheme overseen by the CFTC.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO          21
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

the Lanham Act, 15 U.S.C. § 1116(a), and that Kalshi's advertising causes specific and concrete harm that "cannot be fully compensated." Mot. at 16–17. They assert, without any evidentiary support, that Kalshi "confuses the public," which in turn damages Plaintiffs' "market positions and the integrity of their regulated businesses." *Id.* On each point, Plaintiffs are wrong. The Lanham Act's presumption of irreparable harm applies only where Plaintiffs have shown they are likely to succeed on the merits. 15 U.S.C. § 1116(a); *see also Keezio Grp.*, 2024 WL 3432001 at *4 (declining to address irreparable harm factor where plaintiff had not demonstrated a likelihood of success on its Lanham Act claim). Nor have they shown consumer confusion. Anonymous comments on social media, hearsay references to casino patrons looking at Kalshi's app while gambling at Plaintiffs' establishments, and a footnote mentioning anticipated "expert testimony" are insufficient to tie Kalshi's ads to the kind of "substantial and immediate irreparable injury" required to support a mandatory preliminary injunction. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495 (9th Cir. 1996); *Freelancer Int'l Pty Ltd. v. Upwork Global, Inc.*, 851 Fed. Appx. 40, 42 (9th Cir. 2021) (irreparable harm "cannot be based on 'unsupported and conclusory statements regarding harm'—it must be based on 'factual findings'").

### D. The balance of equities does not favor a preliminary injunction.

"A plaintiff seeking a preliminary injunction must establish . . . that the balance of equities tips in his favor." *See Winter*, 555 U.S. at 20.[11] The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987). As set forth above, Plaintiffs have not shown that they would suffer any injury if the Court declined to enter an injunction. But the damage to Kalshi were the Court to grant Plaintiffs' request would be immediate and devastating.

Kalshi is a nationwide exchange, and its event contracts are available to trade across the

---

[11] Plaintiffs assert that the balance of the equities factor merges with the public interest because they are a governmental party. Mot. at 8. None of the cases they cite involves an Indian tribe. And those factors merge only when the government is the party *opposing* the preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Poretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Courts regularly consider all four preliminary injunction factors in litigation involving tribes. *See, e.g., S. Fork Bank Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 721 (9th Cir. 2009); *Timbisha Shoshone Tribe v. Kennedy*, 687 F. Supp. 2d 1171 (E.D. Cal. 2009).

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

22

country. It sets no geographic limits in the United States on its products and has no practical mechanism for implementing such restrictions. Sottile Decl. ¶ 15. To stop offering event contracts on Plaintiffs' tribal lands and those lands alone, Kalshi would be required to try and geofence around small, irregularly shaped parcels of land. Wong Decl., Exs. C-E (maps of Plaintiffs' tribal lands); Mathiesen-Powell Decl. ¶ 5 (40 acres, approximately 0.06 square miles); Hopkins Decl. ¶ 6 (80 acres, approximately 0.125 square miles); Ramos Decl. ¶ 14 (340 acres, approximately 0.5 square miles). Setting aside whether it is even feasible to do so, to comply with the requested injunction, Kalshi would likely need to pause all trading of sports event contracts on its exchange while it determined whether it could develop a geofencing solution and then, were it possible, to obtain and implement it—a process that would take months and cost tens of millions of dollars. Sottile Decl. ¶¶ 15, 22, 24. That step alone would result in enormous and irreversible financial and reputational damage. *Hendrick*, 2025 WL 1073495, at *7 ("Kalshi presents credible evidence that even if it could implement geofencing [as to Nevada] at great expense, it could not do so immediately as the defendants demanded."). And the costs would be non-recoverable from Plaintiffs due to limits imposed by sovereign immunity. *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1271 (9th Cir. 1991) (tribes are shielded from suits for money damages).

Kalshi would also be required to try to identify and immediately unwind any live sports event contracts where one of the parties entered tribal lands or to pause trading on these contracts pending the outcome of litigation that could take months or years. Traders on Kalshi's markets can hold open positions in event contracts until the event occurs, and a trader might be on Indian lands when entering, holding, or exiting a position. Kalshi would be faced with the likely impossible task of trying to identify and unwind contracts whenever any party to the contract crossed onto tribal lands, even if only briefly. Sottile Decl. ¶¶ 21, 38, 39, 47. These steps would be extraordinarily disruptive, impairing existing contractual obligations amongst traders and potentially exposing Kalshi to additional liability. *Id.* at ¶¶ 38, 39, 44, 48; *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1051–52 (S.D. Cal. 2006) (party required to choose between complying with an ordinance and impairing existing contractual obligations that would subject party to litigation established an "imminent irreparable harm"); *FTC v. Qualcomm, Inc.*, 935 F.3d 752, 756 (9th Cir. 2019)

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

23

(irreparable harm where defendant was required "renegotiate existing [contracts] on a large scale").

If forced to take these steps, the loss of confidence Kalshi would suffer among its current and prospective customers and the damage to its goodwill would be tremendous. This alone tips the equities in Kalshi's favor. *Stuhlbarg Intern. Sales Co. v. John D. Brush and Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (loss of goodwill not readily remedied with damages); *Rent-a-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries" to "advertising efforts and goodwill" would be "difficult to valuate" and could cause irreparable harm).

An injunction would also subject Kalshi to regulatory risk. If Kalshi stopped offering its products in specific locales, it would risk violation of the CFTC Core Principles, including its obligation to "provide . . . impartial access to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b) (2012); and to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and market disruptions." 17 C.F.R. § 38.255 (2012). Kalshi is unaware of any CFTC-designated exchange closing its business to members of a certain Indian tribe or even to residents of a particular state; doing so would create enormous regulatory risk and uncertainty for the exchange. Should the CFTC conclude that Kalshi had, by complying with Plaintiffs' requested injunction, violated federal law, it could respond by seeking to revoke Kalshi's designation, resulting in further and immense reputational and economic harm. 7 U.S.C. § 8(b).

### E.     A preliminary injunction would not be in the public interest.

Finally, the mandatory injunction that Plaintiffs request would be contrary to the public interest, disrupting the comprehensive regulatory scheme governing the nation's derivatives markets; ignoring UIGEA's effort to harmonize that scheme with regulation of online gaming activity and the existing federal framework for gaming on Indian lands; and reaching "beyond the parties" and thus "carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

24

For years, Kalshi has been subject to comprehensive regulation of "trading facilities, clearing systems, market participants and market professionals," expressly established by the CEA "to serve the public interests." 7 U.S.C. § 5(b). The event contracts at issue here have been properly self-certified with the CFTC. A court order selectively prohibiting Kalshi from offering its products while in full compliance with that scheme would destabilize Congress's regulatory framework; undermine the delicate balance that Congress carefully established in IGRA, UIGEA, and the CEA; sow confusion in the derivatives markets; and thereby harm the public interest.

A preliminary injunction would also harm non-parties, including both Kalshi's customers and its third-party business partners, such as co-Defendant Robinhood, another entity duly registered with the CFTC. *Sammartano v. First Jud. Dist. Ct.,* 303 F.3d 959, 974 (9th Cir. 2002), *overruled on other grounds by Winter*, 555 U.S. at 22 ("The public interest inquiry primarily addresses impact on non-parties rather than parties."). Requiring Kalshi to pause trading and unwind contracts would be unprecedented and damaging to all parties involved in the trade. *Hendrick*, 2025 WL 1073495, at *8 ("Additionally, third parties' contracts and investment expectations would be disrupted if Kalshi were forced to terminate its existing contracts for Nevada-based users. And that may impact counterparties to those contracts who are neither based in Nevada nor signed the event contracts while in Nevada."). The unwinding of positions would have ripple effects, impairing the ability of other traders to act in reliance on Kalshi's markets. Sottile Decl. ¶ 39. Harm to third parties and harm to market integrity would damage the public interest. The Court should avoid taking this path.

V.    **Conclusion**

Kalshi respectfully requests that the Court deny the Motion.

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO          25
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

Dated: September 25, 2025                    Respectfully submitted,

_____

Christopher C. Wheeler (SBN 224872)
cwheeler@fbm.com
Dylan M. Silva (SBN 306363)
dmsilva@fbm.com
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Olivia S. Choe (pro hac vice)
ochoe@milbank.com
Joshua B. Sterling (pro hac vice)
jsterling@milbank.com
MILBANK LLP
1101 New York Avenue, NW
Washington D.C. 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586

Grant R. Mainland (pro hac vice)
gmainland@milbank.com
Karen Wong (pro hac vice)
kwong3@milbank.com
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

*Attorneys for Defendants Kalshi Inc.*
*and KalshiEX LLC*

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO          26
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2025, I electronically filed the foregoing Kalshi Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF electronic filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

Christopher C. Wheeler

Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
(415) 954-4400

KALSHI DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION
- Case No. 3:25-cv-06162

27