# Exhibit F

UNITED STATES OF AMERICA

Before the

COMMODITY FUTURES TRADING COMMISSION

_____

In the Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives

_____

# ORDER

## BACKGROUND

By a submission dated June 12, 2023 (the "Submission"), KalshiEX LLC ("Kalshi"), a designated contract market ("DCM"), filed a certification of congressional control political event contracts (the "Congressional Control Contracts"), pursuant to section 5c(c)(1) of the Commodity Exchange Act ("CEA") and Commodity Futures Trading Commission ("CFTC" or "Commission") Regulation 40.2. On June 23, 2023, the Commission commenced review of the Submission pursuant to Commission Regulation 40.11(c), because the Commission determined that the Submission comprised contracts that may involve, relate to, or reference an activity enumerated in Commission Regulation 40.11(a)(1) and CEA section 5c(c)(5)(C)(i). By letter dated June 23, 2023, the Commission informed Kalshi of its determination to commence review of the Congressional Control Contracts pursuant to Commission Regulation 40.11(c), and requested that Kalshi suspend the listing and trading of the Congressional Control Contracts during the pendency of the review period. In addition, on June 23, 2023, the Commission

1

opened a comment period to request public comments to assist the Commission's evaluation of the Submission.  The public comment period ended on July 24, 2023.[1]

The Congressional Control Contracts are cash-settled, binary (yes/no) contracts based on the question: "Will <chamber of Congress> be controlled by <party> for <term>?"  Kalshi describes the Congressional Control Contracts as event contracts.  The settlement values of the Congressional Control Contracts are determined by the party affiliation of the leader of the identified chamber of the United States Congress on the expiration date.  In the case of the House of Representatives, the leader is the Speaker of the House ("Speaker"), and in the case of the Senate, the leader is the President Pro Tempore ("Pres Pro Temp").  Upon settlement, an absolute amount is paid to the holder of one side of the contract, and no payment is made to the counterparty.  All contracts trading on Kalshi are fully-collateralized.

The Congressional Control Contracts have a notional value of one dollar with a minimum price fluctuation of $0.01, and must be purchased in multiples of 5,000 contracts per order.  The Congressional Control Contracts have tiered position limits, depending on the category of market participant and whether that market participant has "demonstrated established economic hedging need," which may be demonstrated to Kalshi according to means and methods established by Kalshi.

The  terms of the Congressional Control Contracts prohibit certain individuals and entities from trading the contracts, namely: 1) candidates for federal or statewide public office; 2) paid campaign staffers on Congressional campaigns; 3) paid employees of Democratic and Republican Party organizations; 4) paid employees of political action committees ("PACs") and

---

[1] The Commission received 1,378 comments, including four comments that were received after the close of the public comment period but were added to the comment file.  *See* https://comments.cftc.gov/PublicComments/CommentList.aspx?id=7394.

"Super PACs" (independent expenditure only political committees); 5) paid employees of major polling organizations; 6) existing members of Congress; 7) existing paid staffers of members of Congress; 8) household members and immediate family members of any of the above; and 9) "any of the above listed institutions themselves."

## LEGAL STANDARD

Under CEA section 5c(c)(5)(C)(i), the Commission may determine that contracts in certain excluded commodities, as defined in CEA section 1a(19), are contrary to the public interest if the contracts involve: (1) activity that is unlawful under any Federal or State law; (2) terrorism; (3) assassination; (4) war; (5) gaming; or (6) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.[2]

CEA section 5c(c)(5)(C)(ii) provides that "[n]o . . . contract . . . determined by the Commission to be contrary to the public interest under [CEA section 5c(c)(5)(C)(i)] may be listed or made available for clearing or trading on or through a registered entity[,]" including a DCM (such as Kalshi).[3]

Commission Regulation 40.11(a)(l) provides that registered entities, including DCMs, "shall not list for trading or accept for clearing" any contract based upon an excluded commodity, as defined in CEA section 1a(19)(iv), that "involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law. . ."[4]  Commission Regulation 40.11(a)(2) further provides that registered entities, including DCMs, "shall not list for trading or accept for clearing" any contract based upon an excluded

---

[2] CEA section 5c(c)(5)(C)(i); 7 U.S.C. § 7a-2(c)(5)(C)(i).
[3] CEA section 5c(c)(5)(C)(ii); 7 U.S.C. § 7a-2(c)(5)(C)(ii).
[4] 17 C.F.R. §§ 40.11(a)-(a)(1).

commodity, as defined in CEA section 1a(19)(iv), that "involves, relates to, or references an activity that is similar to an activity enumerated in [Commission Regulation] 40.11(a)(1) … and that the Commission determines, by rule or regulation, to be contrary to the public interest."[5]

Under Commission Regulation 40.11(c), when a contract that is submitted to the Commission by a registered entity, pursuant to Commission Regulation 40.2 or Commission Regulation 40.3, is based upon an excluded commodity, as defined in CEA section 1a(19)(iv), "which may involve, relate to, or reference" an activity enumerated in Commission Regulation 40.11(a)(1) or Commission Regulation 40.11(a)(2), the Commission is authorized to commence a 90-day review of the contract.[6] Commission Regulation 40.11(c)(1) requires the Commission to request that the registered entity suspend the listing or trading of such contract during the 90-day review period.[7] The Commission must ultimately issue an order approving or disapproving such contract by the end of its review or at the end of any extended period agreed to or requested by the registered entity.[8]

---

[5] 17 C.F.R. §§ 40.11(a)-(a)(2).

[6] 17 C.F.R. § 40.11(c).

[7] 17 C.F.R. § 40.11(c)(1).

[8] 17 C.F.R. § 40.11(c)(2).

## FINDINGS

Having reviewed the complete record in this matter, including the Submission and the public comments received, the Commission makes the following findings and determinations pursuant to CEA section 5c(c)(5)(C) and Commission Regulation 40.11:

### The Congressional Control Contracts Involve Enumerated Activities

**WHEREAS,** the Commission has evaluated whether the Congressional Control Contracts involve an activity enumerated in CEA section 5c(c)(5)(C)(i) and Commission Regulation 40.11(a)(1).

**WHEREAS,** the term "involve" is not defined for purposes of CEA section 5c(c)(5)(C)(i).

**WHEREAS,** an undefined term in a statute is generally given its ordinary meaning.[9] To determine the ordinary meaning of undefined statutory terms, courts typically look to dictionary definitions for guidance.[10]

**WHEREAS,** definitions of the word "involve" include "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence."[11]

---

[9] *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788 (1995); *See also*, *Morrisette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240 (1952) (holding that undefined statutory words that are not terms of art are given their ordinary meanings, frequently derived from the dictionary).

[10] *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000).

[11] *See Involve Definition,* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/involve (last visited September 7, 2023); Random House College Dictionary 703 (Revised ed. 1979); Riverside University Dictionary 645 (1983); *see also* Roget's International Thesaurus 1040 (7th ed. 2010) (giving as synonyms "entail" and "relate to").

**WHEREAS,** the Commission has considered assertions by Kalshi and some commenters that, under CEA section 5c(c)(5)(C)(i), contracts "involve" an enumerated activity only if that activity is the contract's underlying.

**WHEREAS,** when the CEA refers to a contract's underlying, it uses the word "underlying,"[12] or it refers to what the contract is "based on"[13] or "based upon."[14]

**WHEREAS,** CEA section 5c(c)(5)(C)(i) itself uses "based upon" to refer to the underlying: it applies with respect to "contracts … in [certain] excluded commodities that are *based upon* the occurrence, extent of an occurrence, or contingency" (emphasis added).[15]  The underlying must therefore be a kind of excluded commodity, but that is all that CEA section 5c(c)(5)(C)(i) says about the underlying.

**WHEREAS,** in CEA section 5c(c)(5)(C)(i), the requirement that the contract "involve" an enumerated activity is separate:

> In connection with the listing of … ***contracts … in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency*** … the Commission may determine that ***such … contracts*** … are contrary to the public interest ***if the*** … ***contracts … involve*** [an enumerated activity] (emphasis added).[16]

**WHEREAS,** in context, "based upon" and "involve" have different meanings for purposes of CEA section 5c(c)(5)(C)(i): "based upon" refers to the contract's underlying (as it does elsewhere in the CEA), and "involve" refers to the enumerated activities and retains its broader ordinary meaning.  In other words, the contract must be "based upon" a type of excluded

---

[12] *E.g.*, 7 U.S.C. §§ 6c(d)(2)(A)(i), 20(e), 25(a)(1)(D)(ii).
[13] *E.g.*, 7 U.S.C. §§ 2(a)(1)(C)(i)(I), 2(a)(1)(C)(iv), 6b(e).
[14] *E.g.*, 7 U.S.C. § 2(a)(1)(C)(ii).
[15] CEA section 5c(c)(5)(C)(i); 7 U.S.C. § 7a-2(c)(5)(C)(i)
[16] *Id.*

commodity, and the contract must "involve" an enumerated activity. But the contract need not be "based upon" an enumerated activity.

**WHEREAS,** Congress's choice of the broader term "involve" means that CEA section 5c(c)(5)(C)(i) can capture both contracts whose underlying *is* one of the enumerated activities, and contracts with a different connection to one of the enumerated activities because, for example, they "relate closely" to, "entail," or "have as an essential feature or consequence" one of the enumerated activities.[17]

**WHEREAS,** the legislative history of CEA section 5c(c)(5)(C) supports the plain meaning of the term "involve,"[18] and indicates that the question for the Commission in determining whether a contract "involves" one of the activities enumerated in CEA section 5c(c)(5)(C)(i) is whether the contract, considered as a whole, involves one of those activities.[19]

---

[17] The types of activities enumerated in CEA section 5c(c)(5)(C)(i) – including terrorism, war, and activities that are unlawful under federal or state law – of themselves support a broad reading of the term "involve," to ensure that the Commission has the authority that Congress intended to prevent trading on Commission-regulated markets that is contrary to the public interest. *See* footnotes 29 and 31, *infra*

[18] In a colloquy with Senator Diane Feinstein on the Senate floor regarding the proposed Dodd-Frank Act provision that ultimately was enacted as CEA section 5c(c)(5)(C), Senator Blanche Lincoln, then-Chair of the Senate Committee on Agriculture, Nutrition and Forestry, stated that, among other things, the provision was intended to "prevent gambling through futures markets" and to restrict exchanges from "construct[ing] an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament." *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), *available at* https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf. None of the Super Bowl, the Kentucky Derby, or the Masters Golf Tournament are, of themselves, "gaming." Rather, the statement of Senator Lincoln, who is identified in the colloquy as one of the authors of CEA section 5c(c)(5)(C), focuses on the overall characteristics of the contract. It does not base the evaluation of whether the contract involves an enumerated activity – here, "gaming" – on the underlying alone. Indeed, it is difficult to conceive of a contract whose underlying event, itself, is "gaming." If "involve" were to refer only to a contract's underlying, contracts based on the outcome of sporting events such as horse races and football games would not qualify, because sports typically are not understood to be "gaming" – they are understood to be "games." In effect, if "involve" were to refer only to a contract's underlying, the scope of certain prongs of CEA section 5c(c)(5)(C)(i) could effectively be limited to a null set of event contracts, which could not have been Congress's intent.

[19] For example, giving the term its ordinary meaning, a contract "involves" one of the activities enumerated in CEA section 5c(c)(5)(C)(i) if trading in the contract amounts to the enumerated activity.

<u>Gaming</u>

**WHEREAS,** the term "gaming" is not defined in the CEA or Commission regulations.

**WHEREAS,** as discussed above, an undefined term in a statute is generally given its ordinary meaning, and to determine the ordinary meaning of undefined statutory terms, courts typically look to dictionary definitions for guidance.  In addition, courts consider the construction of similar terms in other statutes, as well as the purpose of the statute being interpreted.[20]

**WHEREAS**, the term "gaming" includes betting or wagering on elections, as demonstrated by the following:

A.    Dictionaries define the term "gaming" to mean "gambling."[21]

B.    Under most state laws, "gambling" involves a person staking something of value upon the outcome of a game, contest, or contingent event.[22]

---

[20] *See, e.g., Sanders v. Jackson*, 209 F.3d 998, 1000-02 (7th Cir. 2000).

[21] *See, e.g., Gaming Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/gaming (defining the noun "gaming" as "the practice or activity of playing games for stakes: gambling") (last visited March 14, 2023); *Gaming Definition*, DICTIONARY.COM, https://www.dictionary.com/browse/gaming (defining "gaming" as "gambling") (last visited Sept. 7, 2023); *Gaming Definition*, Black's Law Dictionary, https://thelawdictionary.org/gaming/ (last visited September 10, 2023) (refers to gambling as gaming and cross-refers the definition to gambling).

[22] *See, e.g.*, GA. CODE ANN. § 16-12-21(a)(1) (West 2020) (". . . A person commits the offense of gambling when he . . .[m]akes a bet upon the partial or final result of any game or contest or upon the performance of any participant in such game or contest . . . ."); KY. REV. STAT. ANN. § 528.010(6)(a) (West 2023) ("'Gambling' means staking or risking something of value upon the outcome of a contest, game, gaming scheme, or gaming device which is based upon an element of chance, in accord with an agreement or understanding that someone will receive something of value in the event of a certain outcome."); MICH. COMP. LAWS § 750.301 (2023) ("Any person or his or her agent or employee who, directly or indirectly, takes, receives, or accepts from any person any money or valuable thing with the agreement, understanding or allegation that any money or valuable thing will be paid or delivered to any person where the payment or delivery is alleged to be or will be contingent upon the result of any race, contest, or game or upon the happening of any event not known by the parties to be certain . . . ."); N.Y. PENAL LAW § 225.00(2) (McKinney 2015) ("A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."); TEX. PENAL CODE ANN. § 47.02(a) (West 2019) ( "A person commits an offense [of gambling] if he: (1) makes a bet on the partial or final result of a game or contest or on the performance of a participant in a game or contest . . . ."); VA. CODE ANN. § 18.2-325(1) (West 2022) ("'Illegal gambling' means the making, placing, or receipt of any bet

C.      The Unlawful Internet Gambling Enforcement Act ("UIGEA"), a federal statute, defines the term "bet or wager" as "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome . . . ."[23]

D.      To bet or wager on elections is to stake something of value upon the outcome of contests of others, namely, contests between electoral candidates.

E.      Several state statutes, on their face, link the terms "gaming" or "gambling" to betting or wagering on elections.[24]

_____

or wager . . . of money or other consideration or thing of value, made in exchange for a chance to win a prize, stake, or other consideration or thing of value, dependent upon the result of any game, contest, or any other event the outcome of which is uncertain or a matter of chance . . .").

[23] 31 U.S.C. § 5362(1)(A).  The UIGEA, 31 U.S.C. §§ 5361-5367 (2006), prohibits gambling businesses from knowingly accepting payments in connection with the participation of another person in a bet or wager that involves the use of the Internet and that is unlawful under any federal or state law.  Unlike the Wire Act, 28 U.S.C. § 1084 (1961), the UIGEA defines a "bet or wager", but it criminalizes it only if it is connected with unlawful Internet gambling that violates any federal or state law.  *See* 31 U.S.C. § 5362.  The UIGEA does not alter the definitions in other federal and state laws and expressly excludes any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the CEA from the definition of "bet or wager."  *See id*. at § 5362 (1)(E).

[24] *See*, *e.g.*, 720 ILL. COMP. STAT. ANN. 5/28-1 (West 2011) ("A person commits gambling when he . . . [m]akes a wager upon the result of any game, contest, or any political nomination, appointment or election . . . ."); NEB. REV. STAT. § 28-1101(4) (2011) ("A person engages in gambling if he or she bets something of value . . . upon the outcome of a game, contest, or election . . . ."); N.M. STAT. ANN. § 44-5-10 (1978) ("Bets and wagers authorized by the constitution and laws of the United States, or by the laws of this state, are gaming within the meaning of this chapter."); N.D. CENT. CODE. ANN. § 12.1-28-01 (West 2011) ("Gambling means risking any money . . . upon . . . the happening or outcome of an event, including an election . . . over which the person taking the risk has no control.").  *See also* GA. CODE. ANN. § 16-12-21(a)(2) (West 2011) ("A person commits the offense of gambling when he . . . [m]akes a bet upon the result of any political nomination, appointment, or election . . . ."); MISS. CODE ANN. § 97-33-1 (West 2011) ("If any person . . . shall wager or bet . . . upon the result of any election . . . he shall be fined in a sum not more than Five Hundred Dollars . . . ."); S.C. CODE ANN. § 16-19-90 (2011) ("Any person who shall make any bet or wager of money . . . upon any election in this State shall be guilty of a misdemeanor . . . ."); TEX. PENAL CODE ANN. § 47.02(a)(2) (West 2011) ("A person commits an offense if he . . . makes a bet on the result of any political nomination, appointment, or election . . . .").

**WHEREAS**, the Congressional Control Contracts involve "gaming," pursuant to CEA section 5c(c)(5)(C)(i) and Commission Regulation 40.11(a)(1), because taking a position in the Congressional Control Contracts would be staking something of value upon the outcome of a contest of others. The Congressional Control Contracts are premised on the outcome of Congressional election contests, which ultimately determine the party affiliation of the Speaker and the Pres Pro Temp.[25]

---

[25] Kalshi argues that elections are not "contests" even if they are at base competitions, and that, if the Congressional Control Contracts constitute gaming, all event contracts are also arguably gaming. Certain commenters agreed, with one arguing that the Congressional Control Contracts are no more like gaming than anything else trading in traditional financial markets, and another arguing that recognizing the Congressional Control Contracts as gaming would imply that all futures contracts are gaming. The Commission disagrees, and notes, first, that it is common parlance to refer to elections as contests. *See, e.g.*, *A Frozen Needle in GOP Contest*, The Washington Post (Sept. 3, 2023); *Biden: Dems revitalizing manufacturing*, Houston Chronicle (Sept. 10, 2022) (discussing the "contest to control Congress"). One commenter similarly stated that elections fall squarely within the definition of a "contest," citing the following definition in the Cambridge English Dictionary: "a competition to do better than other people, esp. to win a prize or achieve a position of leadership or power: 'In the last election, he survived a close contest against a political newcomer.'" Moreover, the Commission reiterates that many state statutes, on their face, specifically link the terms gaming and gambling to betting or wagering on elections. As such, unlike all futures contracts (or all financial instruments), the Congressional Control Contracts fall squarely within statutory definitions of gaming. More generally, the Commission notes that a common thread throughout the large majority of definitions of "gaming" and "gambling" is the act of staking something of value on the outcome of a contest of others. To take a position in the Congressional Control Contracts would be to stake something of value upon the outcome of a contest of others, since the Congressional Control Contracts are premised on the outcome of contests between electoral candidates (which ultimately determine the party affiliation of the Speaker and the Pres Pro Temp). By contrast, futures contracts traditionally have not been premised on the outcome of a contest of others. As discussed *infra*, futures contracts traditionally have served hedging and risk management functions, and have therefore been designed to correlate to direct and quantifiable changes in the price of commodities or other financial assets or instruments. As also discussed *infra*, the economic impacts of the outcome of contests for Congressional control are too diffuse and unpredictable to serve the hedging and risk management functions that futures contracts have traditionally been intended to serve.

<u>Activity That Is Unlawful Under State Law</u>

**WHEREAS,** in many states, betting or wagering on elections is prohibited by statute[26] or

common law.[27]

---

[26] ARIZ. REV. STAT. ANN. § 16-1015 ("A person who, before or during an election provided by law, knowingly makes, offers or accepts a bet or wager . . . upon any contingency whatever arising out of [an] election, is guilty of a class 2 misdemeanor."); ARK. CODE ANN. § 7-1-103 (20) (West) ("No person shall make any bet or wager upon the result of any election . . . ."); COLO REV. STAT. ANN. § 31-10-1531 (West) ("It is unlawful for any person, including any candidate for public office, before or during any municipal election, to make any bet or wager with a qualified elector or take a share or interest in, or in any manner become a party to, any such bet or wager or provide or agree to provide any money to be used by another in making such bet or wager upon any event or contingency whatever arising out of such election."); GA. CODE. ANN. § 16-12-21(a)(2) (West 2011) ("A person commits the offense of gambling when he . . . [m]akes a bet upon the result of any political nomination, appointment, or election . . . ."); IDAHO CODE ANN. § 18-2314 (West) ("Every person who makes, offers, or accepts any bet or wager upon the result of any election . . . is guilty of a misdemeanor."); 720 ILL. COMP. STAT. ANN. 5/28-1 (West 2011) ("A person commits gambling when he . . . [m]akes a wager upon the result of any game, contest, or any political nomination, appointment or election . . . ."); MD CODE, ELECTION LAW § 16-902 ("A person may not make a bet or wager on the outcome of an election held under this article."); MICH COMP. LAWS ANN. § 168.931 (I) (West) ("A person shall not keep a room or building for the purpose, in whole or in part, of recording or registering bets or wagers, or of selling pools upon the result of a political nomination, appointment, or election."); MISS. CODE. ANN. § 97-33-1 (West 2011) ("If any person . . . shall wager or bet . . . upon the result of any election . . . he shall be fined in a sum not more than Five Hundred Dollars . . . ."); NEB. REV. STAT. § 28-1101(4) (2011) ("A person engages in gambling if he or she bets something of value . . . upon the outcome of a game, contest, or election . . . ."); NEV. REV. STAT. ANN. § 293.830 (West) ("Any person who makes, offers or accepts any bet or wager upon the result of any election . . . is guilty of a gross misdemeanor."); N.J. STAT. ANN. § 19:34-24 (West)("No person shall make, lay or deposit any bet, wager or stake, to be decided by the result of any election . . . or by any contingency connected with or growing out of any election."); N.C. GEN. STAT. ANN. § 163-274 ("It shall be unlawful . . . [f]or any person to bet or wager any money or other thing of value on any election."); N.D. CENT. CODE. ANN. § 12.1-28-01 (West 2011) ("Gambling' means risking any money . . . upon . . . the happening or outcome of an event, including an election . . . ."); OKLA STAT. ANN. TIT. 21, § 181 (West) ("Every person who makes, offers or accepts any bet or wager upon the result of any election . . . is guilty of a misdemeanor."); OR. REV. STAT. ANN. § 260.635 (West) ("No candidate shall make or become party to a bet of anything of pecuniary value on any event or contingency relating to a pending election" and "[n]o person, to influence the result of any election, shall make a bet of anything of pecuniary value on the result of a pending election, or on any event relating to it."); 18 PA. STAT. § 5514 (West) ("A person is guilty of a misdemeanor of the first degree if he . . . receives, records, registers, forwards, or purports or pretends to forward, to another, any bet or wager upon the result of any political nomination, appointment or election . . . ."); S.C. CODE ANN. § 16-19-90 (2011) ("Any person who shall make any bet or wager of money . . . upon any election in this State shall be guilty of a misdemeanor . . . ."); TENN. CODE ANN. § 2-19-129 (West) ("A person commits a Class C misdemeanor if such person makes any bet or wager of money or other valuable thing upon any election."); TEX. PENAL CODE ANN. § 47.02(a)(2) (West 2011) ("A person commits an offense if he . . . makes a bet on the result of any political nomination, appointment, or election . . ."); W. VA. CODE ANN. § 3-9-22 (West) ("It shall be unlawful to bet or wager money or other thing of value on any election held in this state"). A number of states also have more limited statutes in place. See, e.g., S.D. CODIFIED LAWS § 12-26-19 ("Any person who shall directly or indirectly make a bet with a voter depending upon the result of any election, with the intent thereby to procure the challenge of such voter or to prevent his voting at an election, is guilty of a Class 2 misdemeanor."); WIS. STAT. ANN. § 6.03 (West) ("No person shall be allowed to vote in any election in which the person has made or become interested, directly or indirectly, in any bet or wager depending upon the result of the election.").

**WHEREAS,** the Congressional Control Contracts involve "activity that is unlawful under … State law," pursuant to CEA section 5c(c)(5)(C)(i) and Commission Regulation 40.11(a)(1), because taking a position in the Congressional Control Contracts would be staking something of value upon the outcome of contests between electoral candidates (which ultimately

---

[27] Alabama, *White v. Yarbrough*, 16 Ala. 109, 110 (1849) ("A wager on an election is void as against public policy"); Arkansas, *Williams v. Kagy*, 3 S.W.2d 332, 333-34, 176 Ark. 484, 3 (1928) ("Even before the passage of the statute quoted, this court ruled . . . that wagers upon elections then pending are calculated to endanger the peace and harmony of society and have a corrupting influence upon the morals and are contrary to sound policy"); Colorado, *Maher v. Van Horn*, 60 P. 949, 17-18 (Colo. 1900) ("[W]ager contracts on the result of elections are contrary to public policy and void and will not be enforced by the courts"); Delaware, *Gardner v. Nolen*, 3 Del. 420, 420 (Del. Super. Ct. 1842) ("As within the policy of prohibiting betting on elections, an election wager cannot be recovered though laid after the closing of the polls"); Georgia, *McLennan v. Whidon*, 48 S.E. 201, 202-03, 120 Ga. 666 (1904), quoting *Leverett v. Stegal*, 23 Ga. 259 (1857) (finding that all gambling contracts are illegal but noting that "If there be any class of gambling contracts which should be frowned upon more than another it is bets on elections. They strike at the foundations of popular institutions, corrupt the ballot box, or, what is tantamount to it, interfere with the freedom and purity of elections"); Indiana, *Worthington v. Black*, 13 Ind. 344, 344-345 (1859) ("It has been often decided that wagers upon the result of an election are against the principles of sound policy, and consequently illegal . . ."); Iowa, *David v. Ransom*, 1 Greene 383, 383-85 (Iowa 1848) ("A wager or bet made between parties on the result of an election is void.  If the wager is made before an election, illegal votes are often secured, and others induced, contrary to the better judgment of the voter; or if made after an election, the parties interested might be led to exert a corrupt influence upon the canvassing, and returns of the votes"); Kansas, *Reynolds v. McKinney*, 4 Kan. 94, 101 (1866) ("[A bet] involving an inquiry into the validity of the election of a public officer. … was therefore, illegal and void on principles of public policy"); Massachusetts, *Ball v. Gilbert*, 53 Mass. 397, 400-02 (1847) (a wager upon the event of an election to a public office - at the federal, state, or local level -  is illegal and void on numerous public policy grounds); Missouri, *Hickerson v. Benson*, 8 Mo. 8 (1843) (wagers on the result of public elections and collateral matters are "clearly" against public policy and "sound morality" and consequently illegal and void at common law); Nebraska, *Specht v. Beindorf*, 56 Neb. 553, 76 N.W. 1059 (1898) (promissory note premised on the election of a public official is a wager on the result of an election and void on grounds of public policy); New York, *Rust v. Gott*, 1828 WL 1964 (N.Y. Sup. Ct. 1828) (wager on the event of an election is illegal and void, even where made after the poll of election is closed but before the canvass is complete); North Carolina, *Bettis v. Reynolds*, 34 N.C. 344, 345-48 (1851) ("the practice of betting on elections has a direct tendency to cause undue influence[,]" and even where neither party was a voter, a wager on the result of a Presidential election void as against public policy); Oregon, *Willis v. Hoover*, 9 Or. 418, 419-20 (1881) (wagers on the result of public elections are illegal and void upon grounds of public policy); Rhode Island, *Stoddard v. Martin*, 1 R.I. 1, 1 (1828) (all wagers on elections and judicial decisions "are of immoral tendency, against sound policy," and therefore void); Tennessee, *Russell v. Pyland*, 21 Tenn. 131, 133 (1840) (a note premised on the outcome of an election is illegal and void under common law principles); Texas, *Thompson v. Harrison*, 1842 WL 3625, at *1 (Tex. 1842) (wagers on the result of public elections are "contrary to good morals" and void on grounds of public policy); Wisconsin, *Murdock v. Kilbourn*, 6 Wis. 468, 470-71 (1857) (wager upon the event of a public election is contrary to public policy, illegal, and void).

determine the party affiliation of the Speaker and the Pres Pro Temp), and in many states such conduct is illegal.[28]

### The Congressional Control Contracts Are Contrary to the Public Interest

**WHEREAS,** the Commission has evaluated whether the Congressional Control Contracts are contrary to the public interest.

**WHEREAS**, the legislative history of CEA section 5c(c)(5)(C) indicates Congressional intent for the Commission to consider, among other things, in its evaluation of whether a contract is contrary to the public interest for purposes of that provision, a form of the "economic purpose test" that was applied to determine whether a contract was contrary to the public interest under former CEA section 5(g) prior to its deletion by the Commodity Futures Modernization Act of 2000 ("CFMA").[29]

---

[28] Kalshi argues that many state gaming laws carve out exceptions for Commission-regulated products and, relatedly, that the Commission's jurisdiction over futures and swaps preempts any state gaming laws as to those products. Seen in this context, Kalshi argues, the state laws that prohibit betting or wagering on elections do not and cannot refer to Commission-regulated event contracts, and the Congressional Control Contracts are therefore not unlawful under state law. This misses the point. CEA section 2(a)(1) grants the Commission "exclusive jurisdiction" over futures and swaps traded on a DCM. 7 U.S.C. § 2(a)(1). This "preempts the application of state law," *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), so transacting these products on a DCM cannot, in and of itself, be an "activity that is unlawful under any … State law." On the other hand, these products may still "involve … activity" that is unlawful under a state law, in the sense, for example, that transactions in the products may "relate closely" to, "entail," or "have as an essential feature or consequence" an activity that violates state law. *See* Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/involve (last visited Oct. 12, 2022); Random House College Dictionary 703 (Revised ed. 1979); Riverside University Dictionary 645 (1983). Here, state laws (that are not preempted by the CEA) prohibit wagering on elections. Taking a position in the Congressional Control Contracts would be staking something of value on the outcome of contests between electoral candidates, such that wagering on elections is "an essential feature or consequence" of the contracts. Thus, while transactions in the Congressional Control Contracts on a DCM do not violate, for example, state bucket-shop laws, they nevertheless involve an activity that is unlawful in a number of states—wagering on elections. To permit such transactions on a DCM would undermine important state interests expressed in statutes separate and apart from those applicable to trading on a DCM.

[29] 7 U.S.C. § 7(g), *as amended* by the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 8 Stat. 1389 (1974). In the colloquy between Senator Feinstein and Senator Lincoln on the Senate floor regarding the proposed Dodd-Frank Act provision that ultimately was enacted as CEA section 5c(c)(5)(C), Senator Feinstein referenced the Commission's pre-CFMA authority "to prevent trading that is contrary to the public interest," and asked Senator Lincoln whether, with respect to CEA section 5c(c)(5)(C), the intent was to "define 'public interest' broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used

**WHEREAS,** the general "Findings and Purpose" provision of the CEA, at CEA section 3, states that "[t]he transactions subject to [the CEA] . . . are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair, and secure financial facilities,"[30] and thus recognizes hedging – and, in particular, price hedging (the "managing [of] price risks") – as a public interest that transactions subject to the CEA are intended to serve.

**WHEREAS,** the Commission has the discretion to consider other factors in its evaluation of whether a contract is contrary to the public interest for purposes of CEA section 5c(c)(5)(C), and the legislative history of CEA section 5c(c)(5)(C) supports consideration of whether a contract may threaten the public good.[31]

---

predominantly by speculators or participants not having a commercial or hedging interest." Senator Feinstein asked whether the Commission would "have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use[,]" and Senator Lincoln replied, "That is our intent." *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), *available at* https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf. Pre-CFMA Commission guidelines articulated the economic purpose test as an evaluation of "whether [a] contract reasonably can be expected to be, or has been, used for hedging and/or price basing on more than an occasional basis." 17 C.F.R. § 5, Appendix A- Guideline No. l (repealed 2001). The colloquy between Senators Feinstein and Lincoln suggests a modification of the "on more than an occasional basis" standard; it suggests that the Commission should consider whether a contract is used predominantly by speculators or market participants not having a commercial or hedging interest.

[30] CEA section 3(a); 7 U.S.C. § 5(a). Section 3 further states that it is the purpose of the CEA to serve such public interests "through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission." CEA section 3(b); 7 U.S.C. § 5(b).

[31] In the colloquy on the Senate floor, Senator Lincoln further confirmed for Senator Feinstein that CEA section 5c(c)(5)(C) would empower the Commission to prevent trading in contracts "that may serve a limited commercial function but threaten the public good by allowing some to profit from events that threaten our national security." Senator Lincoln cited terrorist attacks, war and hijacking as examples of events that "pose a real commercial risk to many businesses in America," but stated that "a futures contract that allowed people to hedge that risk would also involve betting on the likelihood of events that threaten our national security. That would be contrary to the public interest." Senator Feinstein thanked Senator Lincoln for this confirmation, concluding that, "[a] futures market is for hedging." *See* 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), available at https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf.

**WHEREAS,** in light of the foregoing, in evaluating whether the Congressional Control Contracts are contrary to the public interest, the Commission has considered the contracts' hedging utility and price-basing utility.[32]  Additionally, the Commission has considered the potential impact that trading in the Congressional Control Contracts may have on election integrity, or the perception of election integrity – as well as the extent to which permitting trading in the Congressional Control Contracts could require the Commission to assume a role in overseeing the electoral process.[33]

<u>Hedging and Price Basing Utility</u>

**WHEREAS,** control of a chamber of Congress does not, in and of itself, have sufficiently direct, predictable, or quantifiable economic consequences for the Congressional Control Contracts to serve an effective hedging function.

**WHEREAS,** the Commission has considered comments from Kalshi and others that state that Congressional control impacts a wide variety of assets and cash flows, for a variety of

---

[32] *See* footnote 29, *supra*.

[33] In making findings regarding whether the Congressional Control Contracts are contrary to the public interest, the Commission distinguishes two staff no-action positions referenced by some commenters that have been issued by the Commission's Division of Market Oversight ("Division") to two academic institutions.  Subject to specified terms, these no-action positions state that the Division will not recommend enforcement action against the academic institutions for operating, without registration as a DCM, SEF, or foreign board of trade, small-scale not-for-profit markets that offer trading in political and economic indicator event contracts for academic purposes. CFTC Staff Letter No. 93-66 (June 18, 1993), issued to the University of Iowa, *available at* https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf; CFTC Staff Letter No. 14-130 (Oct. 29, 2014), issued to Victoria University of Wellington, New Zealand, *available at* https://www.cftc.gov/csl/14-130/download.  The terms of these staff no-action positions contemplate that each market will be operated by the relevant academic institution for academic purposes and without compensation. The terms of the no-action positions also contemplate limitations on, among other things, the number of market participants and the number of contracts that each market participant may hold.  In issuing the no-action positions, the Division did not recognize the political event contracts that would be offered by the markets as having hedging or price-basing utility.  In issuing each of the no-action positions, the Division explicitly noted that it was not rendering an opinion on the legality of the academic institutions' activities under state law.  Kalshi has not submitted that the Congressional Control Contracts would be subject to analogous limitations to those contemplated under the Division's no-action positions, including limitations providing for the market for the Congressional Control Contracts to be operated on a small-scale, not-for-profit basis for academic purposes.

entities, and that market participants already engage in behavior aimed at hedging risks related to Congressional control. Kalshi notes that Congress has extensive powers to influence the economy and that shifts in political power often portend changes in policy.

**WHEREAS,** the Commission has considered detailed examples provided by Kalshi of statements from private research firms attempting to predict broad-ranging economic impacts of various political outcomes, and academic research indicating that the marketplace generally considers political risks in its operation (citing, for example, links between changes in the price of equities and other assets, and expected changes in Congressional control).

**WHEREAS,** the Commission has also considered similar assertions from commenters that the effect of Congressional control on the economy is sufficiently predicable and measurable for the Congressional Control Contracts to have a hedging purpose.

**WHEREAS,** conversely, several commenters expressed the view that the economic effects of Congressional control are too attenuated and unpredictable for the Congressional Control Contracts to serve as an effective hedging tool.

**WHEREAS,** the Commission finds that while control of a chamber of Congress may ultimately have economic effects, those eventual economic effects are both diffuse and unpredictable. While the likelihood of adoption of a given policy may increase or decrease based on the composition of Congress, many intervening events and variables exist between control of a chamber of Congress and the actual implementation of such a policy.[34]  Furthermore,

---

[34] There are several steps required to enact legislation. Proposed legislation must be approved by both chambers of Congress and by signature of the president or a Congressional override of a presidential veto. During that process, the nature of proposed legislation can change in dramatic ways. Beyond that, legislation requires implementation and is subject to judicial review. All of these dynamics make it difficult to predict the nature, magnitude, and timing of policy outcomes resulting from a given party's control of a chamber of Congress.

the likelihood of implementation is not dependent on control of a chamber of Congress alone; it also depends upon many other things, including, for example, whether a party controls one or both chambers of Congress, the size of its majority, votes by individual party members, and the political affiliation of the president.

   **WHEREAS,** control of a chamber of Congress could, following a number of independent intervening events, generally affect a wide variety of personal liabilities and economic factors, but that does not establish that the Congressional Control Contracts can be used for specific, identifiable hedging purposes and thus does not establish the hedging utility of the Congressional Control Contracts.  Rather, it further indicates that control of a chamber of Congress does not have a direct, predictable, or quantifiable impact on any commodity or other financial asset. [35]

   **WHEREAS,** the Congressional Control Contracts result, upon settlement, in a payout of either $1 or $0, depending on the party in control of the relevant chamber of Congress, with settlement and payout occurring only once every two years, to coincide with the election cycle.

---

[35] Kalshi implies that the Congressional Control Contracts should be permitted to trade because certain other contracts currently trading on Commission-regulated exchanges involve a degree of removal from the actual risk that is intended to be hedged.  As a preliminary matter, the Commission notes that an exchange's certification of a product for trading pursuant to CEA section 5c(c)(1) and Commission Regulation 40.2 does not entail or amount to Commission approval of that product.  Further, while Kalshi does not cite to specific contracts in most of the examples it provides, the contracts that Kalshi appears to be referring to for comparison generally have more specific and targeted hedging utility than the Congressional Control Contracts and are otherwise materially different from such contracts. For example, Heating and Cooling Degree Day futures contracts that Kalshi appears to reference do not settle based on an overarching nationwide heating degree day/cooling degree day calculation – they settle based on a calculation at a very specific location.  Similarly, real estate index contracts that Kalshi appears to reference settle based on the value of the index in a specific metropolitan area, with the index itself based on real estate price values. In contrast, the Congressional Control Contracts are based on which political party will control the relevant chamber of Congress – they are not based on or tied to any actual price or related values. Furthermore, certain of the event contracts that Kalshi appears to reference do not fall within the scope of CEA section 5c(c)(5)(C) and Commission Regulation 40.11 – which apply with respect to contracts in certain types of excluded commodities – and most of the contracts that Kalshi appears to reference are not event contracts at all.

**WHEREAS,** the payout for the Congressional Control Contracts is not tied in any way to actual or estimated losses incurred elsewhere, and a loss on the Congressional Control Contracts is not offset by a related gain elsewhere, as is the case for contracts with hedging and risk management capabilities.

**WHEREAS,** the binary payout of the Congressional Control Contracts further limits their utility as a vehicle for hedging any eventual economic effects resulting from which party controls a chamber of Congress, as does their frequency of settlement.

**WHEREAS,** price-basing occurs when producers, processors, merchants, or consumers of a commodity establish commercial transaction prices based on the futures price for that or a related commodity.[36]

**WHEREAS**, the Commission has considered comments from Kalshi and others that the outcome of Congressional elections could affect the pricing of a number of diverse commercial transactions because the outcome could impact the pricing of various commodities underlying those transactions.

**WHEREAS,** other commenters stated that the Congressional Control Contracts cannot have price-basing utility for the same reason that they do not have hedging utility – namely, that the economic ramifications of an election are indirect and unpredictable, and therefore cannot help determine the price of a commodity or financial asset in a predictable manner.

**WHEREAS,** even if some level of political risk may be embedded in the pricing of many commercial transactions, that does not, in itself, support a finding that the Congressional Control Contracts serve a price-basing function.

---

[36] *See* CFTC Futures Glossary, *available at*
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#P.

**WHEREAS**, since the economic effects of control of a chamber of Congress are diffuse and unpredictable, the price of the Congressional Control Contracts is not directly correlated to the price of any commodity, and so the price of the Congressional Control Contracts could not predictably be used to establish commercial transaction prices.

**WHEREAS,** in light of the foregoing, the Commission finds that it has not been demonstrated that the Congressional Control Contracts could reasonably be expected to be used for hedging and/or price basing on more than an occasional basis or that the Congressional Control Contracts could reasonably be expected to be used predominantly by market participants having a commercial or hedging interest.

<u>Election Integrity and the Commission's Role in the Electoral Process</u>

**WHEREAS,** more than 600 commenters – a significant proportion of the public commenters on the Submission – expressed concerns about the effect that the Congressional Control Contracts could have on election integrity, including concerns that the Congressional Control Contracts are inconsistent with ideals of democracy and the sanctity of the electoral process.

**WHEREAS,** these commenters included members of Congress, who expressed concern about the potential impact of the Congressional Control Contracts on the electoral process.  A comment letter from six United States Senators stated that "[e]stablishing a large-scale, for-profit political event betting market in the United States … would profoundly undermine the sanctity and democratic value of elections … There is no doubt that mass commodification of our

democratic process would raise widespread concerns about the integrity of our electoral process."[37]

  **WHEREAS**, the Congressional Control Contracts could potentially be used in ways that would have an adverse effect on the integrity of elections, or the perception of integrity of elections – for example, by creating monetary incentives to vote for particular candidates, even when such votes may be contrary to a voter's (or an organized group of voters') political preferences or views of such candidates.

  **WHEREAS**, the Congressional Control Contracts raise concerns that conduct designed to artificially affect the electoral process could also, intentionally or otherwise, manipulate the market in the Congressional Control Contracts, or that the market in the Congressional Control Contracts could be manipulated to influence elections or electoral perceptions.  In particular, several commenters (including members of Congress) stated that the Congressional Control Contracts could incentivize the spread of misinformation by individuals or groups seeking to influence perceptions of a political party or a party candidate's success.

  **WHEREAS**, the public interest in guarding against such misinformation is all the more pressing in the context of contracts rooted in the outcome of United States federal elections.[38]

---

[37] The signatories to the letter are Senators Jeffrey Merkley, Sheldon Whitehouse, Edward Markey, Elizabeth Warren, Chris Van Hollen, and Diane Feinstein (the "Six Senators").  Senator Amy Klobuchar filed a separate comment letter expressing "concern" with the Submission.  The comment letter from the Six Senators underscores differences between a potential market for the Congressional Control Contracts and the markets for political event contracts in respect of which the Division has previously issued staff no-action positions. Kalshi is a for-profit entity seeking to offer a broad-based market in the Congressional Control Contracts.  Kalshi has not submitted that the Congressional Control Contracts would be subject to analogous limitations to those contemplated under the Division's no-action positions.  In particular, Kalshi has not submitted that the markets for the Congressional Control Contracts would be operated on a small-scale, not-for-profit basis for academic purposes.

[38] Kalshi cites to a paper on the history of election betting in the United States for the premise that such betting did not negatively affect the political process.  *See* Paul Rhode and Coleman Strumpf, "Historical Presidential Betting Markets," Journal of Economic Perspectives, Vol. 18, No. 2 (Spring 2004).  The Commission notes that the markets examined in that study existed in a very different historical context – before 1940 – and that the study nonetheless

**WHEREAS**, the Congressional Control Contracts have no underlying cash market with bona fide economic transactions to provide directly correlated price forming information. Rather, price forming information for the Congressional Control Contracts is driven in large measure by polling, voter surveys, and other informational sources that are unregulated, frequently have opaque underlying processes and procedures, and may not follow scientifically reliable methodologies.  This differs from the informational sources (*e.g.*, government issued crop forecasts, weather forecasts, federal government economic data, market-derived supply and demand metrics for commodities, market-based interest rate curves, etc.) used for pricing the vast majority of commodities underlying Commission-regulated derivatives contracts.

**WHEREAS,** the opaque and unregulated sources of price forming information for the Congressional Control Contracts may increase the risk of manipulative activity relating to the trading and pricing of the contracts, while decreasing Kalshi's and the Commission's ability to detect such activity.

**WHEREAS**, the Commission has considered assertions by Kalshi and other commenters that the Congressional Control Contracts would serve as a check on misinformation and inaccurate polling, stating that market-based alternatives tend to be more accurate than polling or other methods of predicting election outcomes.

---

acknowledges both attempts to manipulate the odds and concerns that the betting markets provided a potential means of influencing elections.  Several other commenters noted specific examples of manipulation or attempted manipulation incidents on election markets, while others downplayed these incidents.

**WHEREAS,** there is also research suggesting that election markets may incentivize the creation of "fake" or unreliable information in the interest of moving the market, and a number of commenters also raised this concern.[39]

**WHEREAS,** the Congressional Control Contracts prohibit certain individuals and entities likely to have a stake in the outcome of elections from trading in the contracts – including paid employees of political campaigns and major polling organizations. However, these trading prohibitions would not prevent such individuals and entities from engaging in other activity – intended to create the impression of likely electoral success or failure on the part of a particular political candidate or candidates – that could artificially move the market in the Congressional Control Contracts.

**WHEREAS,** the trading prohibitions for the Congressional Control Contracts also do not exclude all individuals or entities who could have a motivation to create the impression of likely electoral success or failure on the part of a political candidate or candidates.[40]

**WHEREAS,** if trading in the Congressional Control Contracts were to be permitted, the Commission, as regulator of the markets in those contracts, would be required to investigate suspected manipulation in those markets. By extension, the Commission could find itself investigating election-related activities – potentially including the outcome of an election itself. Several commenters stated that this was not a role for which the Commission is equipped or

---

[39] *See* Yeargain, Tyler, "Fake Polls, Real Consequences: The Rise of Fake Polls and the Case for Criminal Liability," Missouri Law Review, Volume 85, Issue 1 (Winter 2020) *citing* Enten, Harry, "Fake Polls are a Real Problem," *available at* https://fivethirtyeight.com/features/fake-polls-are-a-real-problem/ (Aug. 22, 2017) (noting how a seemingly false or unreliable poll caused significant movement on an event contract market and suggesting that such poll could have been, or at least could be, created to cause such market movement; further arguing that such false polls can have a real and detrimental effect on elections).

[40] Such individuals and entities could include, for example, Congressional campaign volunteers, consultants to Congressional campaigns, or donors or other supporters of political parties or individual Congressional candidates.

well-suited, with two members of the House of Representative stating in a joint comment letter that "because the CFTC is not equipped or authorized to enforce election laws, the prospect of the Commission assuming the role of an 'election cop' raises very serious concerns about the misalignment of such a role with the CFTC's historic mission and mandate as established by Congress."[41]

  **Therefore**, the Commission FINDS that:

  Pursuant to section 5c(c)(5)(C)(i) of the Commodity Exchange Act and Commission Regulation 40.11, the Congressional Control Contracts: (1) involve gaming and activity that is unlawful under State law; and (2) are contrary to the public interest.

  **Accordingly, IT IS HEREBY ORDERED THAT:**

  Pursuant to CEA section 5c(c)(5)(C)(ii) and Commission Regulation 40.11(a)(1), the Congressional Control Contracts are prohibited and shall not be listed or made available for clearing or trading on or through Kalshi.

**The provisions of this Order shall be effective as of this date.**


By the Commission.

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission


Date:  September 22, 2023

---

[41] Comment Letter of Reps. Sarbanes and Raskin at 3.