# Exhibit H

submit such information to the Council as the Council may require for the sole purpose of assessing whether the financial market utility is systemically important.

(b) *Prerequisites to information collection.* Before requiring any financial market utility to submit information to the Council under paragraph (a) of this section, the Council shall—

(1) Determine that it has reasonable cause to believe that the financial market utility is, or is likely to become, systemically important, considering the standards set out in § 1320.10; or

(2) Determine that it has reasonable cause to believe that the designated financial market utility is no longer, or is no longer likely to become, systemically important, considering the standards set out in § 1320.10; and

(3) Coordinate with the Supervisory Agency for the financial market utility to determine if the information is available from, or may be obtained by, the Supervisory Agency in the form, format, or detail required by the Council.

(c) *Timing of response from the appropriate Supervisory Agency.* If the information, reports, records, or data requested by the Council under paragraph (b)(3) of this section are not provided in full by the Supervisory Agency in less than 15 calendar days after the date on which the material is requested, the Council may request the information directly from the financial market utility with notice to the Supervisory Agency.

(d) *Notice to financial market utility of information collection requirement.* In requiring a financial market utility to submit information to the Council, the Council shall provide to the financial market utility the following—

(1) Written notice that the Council is considering whether to make a proposed determination under § 1320.12; and

(2) A description of the basis for the Council's belief under paragraphs (b)(1) or (b)(2) of this section.

Dated: July 20, 2011.

**Alastair Fitzpayne,**

*Deputy Chief of Staff and Executive Secretary, Department of the Treasury.*

[FR Doc. 2011–18948 Filed 7–26–11; 8:45 am]

**BILLING CODE 4810–25–P–P**

## COMMODITY FUTURES TRADING COMMISSION

### 17 CFR Part 40

**RIN 3038–AD07**

## Provisions Common to Registered Entities

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Final Rule.

**SUMMARY:** The Commodity Futures Trading Commission ("Commission") is adopting regulations to implement certain statutory provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"). The Commission also is amending its existing regulations governing the submission of new products, rules, and rule amendments. The final regulations establish the Commission's procedural framework for the submission of new products, rules, and rule amendments by designated contract markets ("DCMs"), derivatives clearing organizations ("DCOs"), swap execution facilities ("SEFs"), and swap data repositories ("SDRs"). In addition, the final regulations prohibit event contracts involving certain excluded commodities, establish special submission procedures for certain rules proposed by systemically important derivatives clearing organizations ("SIDCOs"), and stay the certifications and the approval review periods of novel derivative products pending jurisdictional determinations.

**DATES:** Effective date: September 26, 2011.

**FOR FURTHER INFORMATION CONTACT:** Bella Rozenberg, Assistant Deputy Director, Division of Market Oversight ("DMO"), at 202–418–5119 or *brozenberg@cftc.gov,* Riva Spear Adriance, Associate Director, DMO at 202–418–5494 or *radriance@cftc.gov,* Phyllis Dietz, Associate Director, Division of Clearing and Intermediary Oversight at 202–418–5449 or *pdietz@cftc.gov,* and Joseph R. Cisewski, Attorney Advisor, DMO at 202–418–5718 or *jcisewski@cftc.gov,* in each case, at the Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW., Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Background
II. Amendments to Part 40 of the Commission's Regulations
    a. Definitions (§ 40.1)
    b. Listing Products for Trading by Certification (§ 40.2)
    c. Voluntary Submission of New Products for Commission Review and Approval (§ 40.3)
    d. Amendments to Terms or Conditions of Enumerated Agricultural Contracts (§ 40.4)
    e. Voluntary Submission of Rules for Commission Review and Approval (§ 40.5)
    f. Self-Certification of Rules (§ 40.6)
    g. Delegations (§ 40.7)
    h. Availability of Public Information (§ 40.8)
    i. Special Certification Procedures for Submission of Rules by Systemically Important Derivatives Clearing Organizations (§ 40.10)
    j. Review of Event Contracts Based Upon Certain Excluded Commodities (§ 40.11)
    k. Staying of Certification and Tolling of Review Period Pending Jurisdictional Determination (§ 40.12)
III. Cost Benefit Considerations
IV. Related Matters
    a. Regulatory Flexibility Act
    b. Paperwork Reduction Act

### I. Background

On November 2, 2010, the Commission published proposed regulations to implement certain statutory provisions of the Dodd-Frank Act and to amend existing regulations governing the submission of new products, rules, and rule amendments.[1] The Commission is hereby adopting final regulations 40.1 through 40.8, as amended below, and new regulations 40.10 through 40.12 to implement certain provisions of the Dodd-Frank Act, to clarify submission-related regulatory obligations of registered entities, and to enhance the Commission's administration of the Commodity Exchange Act ("Act").

The Commission's final regulations implement, among other provisions, Section 745 of the Dodd-Frank Act, which, effective July 16, 2011, amended Section 5c of the Act to provide new procedures for the submission of rules and rule amendments by DCMs, SEFs, DCOs, and SDRs.[2] The final regulations also amend existing requirements for the submission of new products and prohibit the listing and clearing of products based upon certain excluded commodities, if such products involve statutorily-specified activities or similar activities determined, by rule or regulation, to be contrary to the public interest. In addition, the Commission is adopting special submission procedures for certain risk-related rules proposed

---

[1] 17 CFR part 40 Provisions Common to Registered Entities, 75 FR 67282 (Nov. 2, 2010).

[2] Sections 728 and 733 of the Dodd-Frank Act created two new categories of registered entities, SEFs and SDRs. Provisions related to the regulation of these entities will be promulgated in other Commission rulemakings.

by SIDCOs.[3] The SIDCO regulations implement Section 806(e)(1) of the Dodd-Frank Act by requiring, among other things, 60-days advance notice of proposed rules that may materially affect the nature or level of risk presented by the SIDCO. Finally, the Commission is adopting previously proposed regulations to stay certifications and toll approval review periods for novel derivative products subject to jurisdictional determinations by the Commission or the Securities and Exchange Commission ("SEC").

Part 40 of the Commission's regulations, as amended herein, will become effective sixty days after publication in the **Federal Register**.

## II. Amendments to Part 40 of the Commission's Regulations

The Commission received nine comment letters during the 60-day public comment period following the publication of its notice of proposed rulemaking. Seven of these comment letters were submitted by registered entities subject to the proposed regulations. Five comments were submitted on behalf of DCMs—the CME Group, Inc. ("CME"), ICE Futures U.S., Inc. ("ICE"), the Kansas City Board of Trade ("KCBOT"), the Minneapolis Grain Exchange, Inc. ("MGEX"), and OneChicago LLC Futures Exchange ("OCX")—and two comments were submitted on behalf of registered DCOs—the Options Clearing Corporation ("OCC") and LCH.Clearnet Ltd ("LCH").[4] The Commission also received comments from the Futures Industry Association ("FIA"), an organization representing futures commission merchants, and the American Benefits Council ("ABC"), an organization representing pension funds and other buy-side swaps users.

Many of the comments received by the Commission offered specific recommendations for clarification or modification of proposed regulations; other comments generally objected to certain aspects of the proposal. The Commission, in consideration of these comments and as detailed below, is modifying its proposed rules to clarify

regulatory obligations under certain provisions of part 40. The Commission has otherwise determined to implement its regulations as originally published on November 2, 2010.

### a. Definitions (§ 40.1)

Three registered entities submitted comments concerning the proposed definitions of "rule" and "terms and conditions" in § 40.1 of the Commission's regulations. The Commission has determined to revise both definitions to address these comments. In addition, the Commission is adopting revised language in the definition of "terms and conditions" to provide specific examples of terms and conditions frequently included in swaps.

The FIA asked the Commission to consider whether an amendment to the § 40.1 definition of "rule" might be appropriate to ensure that the Commission's regulations captured advisories, interpretations, and less formal means of communicating policies to market participants. The FIA noted that registered entities, including DCMs, may be able to circumvent regulatory obligations by issuing communications under a category not enumerated in the proposed definition of "rule." The Commission notes that "interpretations" and "stated policies" are explicitly included in the present definition of "rule" and that the non-exclusive categories enumerated in that definition are merely examples of the types of actions that are subject to Commission review. The Commission's position has always been that the definition of "rule" turns more on substance than form; that is, a registered entity cannot avoid regulatory obligations by adopting what is in substance a policy or interpretation by formally issuing the communication under a category that is not enumerated in the definition of "rule."

The Commission nevertheless has determined to add the term "advisory" to the list of categories constituting "rules" under § 40.1, which should ensure that registered entities issue advisories in compliance with all regulations applicable to "rules." In consideration of the FIA's comments, the Commission also has determined to move the phrase "in whatever form adopted" to ensure that an addition or deletion to a communication constitutes a "rule" under § 40.1, without regard to the particular form in which a registered entity adopts such an amendment. In this regard, the Commission is clarifying that the language "in whatever form adopted" applies to all non-exclusive categories of "rules" enumerated in

§ 40.1 and that the enumeration of particular examples of "rules" does not imply the exclusion of others.

MGEX commented on the proposed definition of "rule" as well. In its comments, MGEX suggested that the Commission may be exceeding its authority by requiring DCMs to submit market maker and trading incentive programs as "rules" subject to the provisions of part 40. MGEX also commented that the terms and conditions of such programs should not be submitted to the Commission for approval, because, as a policy matter, the Commission should not substitute its judgment for "the business judgment of the registered entities." Moreover, in MGEX's view, the publication of program terms and conditions could inhibit negotiations with market participants. The Commission disagrees with MGEX and, for the reasons discussed below, has determined to continue requiring registered entities to submit the complete terms and conditions of market maker and trading incentive programs to the Commission, with an appropriate request for confidential treatment.[5]

A DCM's rules implementing market maker and trading incentive programs fall within the Commission's oversight authority. Indeed, a number of core principles touch upon trading issues that may be implicated by the design of such programs. Core Principle 9, for example, establishes the Commission's framework for regulating the execution of transactions, requiring DCMs, like MGEX, to provide a competitive, open, and efficient market and mechanism for execution. The newly-amended Core Principle 12 also requires DCMs to establish and enforce rules to protect markets and market participants from abusive practices and to promote fair and equitable trading on designated contract markets. In addition, market maker and trading incentive programs frequently touch upon Core Principle 19, which requires that DCMs avoid adopting any rules or taking any actions that result in unreasonable restraints of trade.

It is not always clear in the first instance whether the rules implementing market maker and trading incentive programs have implications for a DCM's compliance with these core principles. Consequently, for many years, the Commission has required registered entities to submit the terms and conditions of all market maker and

---

[3] A SIDCO is a DCO that has been designated as a systematically important financial market utility by the Financial Stability Oversight Council pursuant to Section 804 of the Dodd-Frank Act and for which the Commission is the Supervisory Agency. *See* below section II.i. (discussing § 40.10).

[4] CME also submitted a comment on the Commission's cost-benefit analysis subsequent to the close of the public comment period for the proposed rulemaking. The Commission has addressed CME's comments in its cost-benefit analysis, below. CME, KCBOT, and MGEX are also registered DCOs and they commented on clearing-related issues.

[5] Pursuant to § 145.9 of the Commission's regulation, registered entities requesting confidential treatment for program terms and conditions must, among other things, file a written justification for the confidential treatment request.

trading incentive programs to ensure that, among other things, they do not incentivize manipulative activities, unreasonably restrain competition on or between exchanges, or otherwise interfere with the fair and efficient functioning of the marketplace. Reviewing program rules for compliance with applicable law is not tantamount to substituting the Commission's judgment for the business judgment of the registered entity.

The Commission continues to view such programs as "agreements * * * corresponding" to a "trading protocol" within the § 40.1 definition of "rule" and, as such, all market maker and trading incentive programs must be submitted to the Commission in accordance with procedures established in part 40. In addition, to further clarify submission obligations, the Commission intends to continue reminding each newly-designated contract market, in its designation letter, that such programs are considered "rules" under § 40.1. The Commission would like to emphasize, however, that such programs need not be submitted to the Commission for approval, as suggested in MGEX's comment. Market maker and trading incentive programs may be submitted for approval under § 40.5, but they also may be certified and submitted in accordance with the provisions of § 40.6, which has been the favored process for submission of market maker and trading incentive programs to date.

In a similar comment concerning the Commission's authority to amend rules relating to margin, MGEX stated that "DCMs and DCOs are best qualified to set margins" in light of their "extensive historical record for doing this well." MGEX recommended that the Commission provide DCOs "the broadest latitude possible" to establish appropriate margin rules. The Commission believes that the final definition of "rule," as adopted herein—and which does not restrict the Commission's review of rules relating to margin levels—is not inconsistent with the comment submitted by MGEX. As discussed in the proposed rulemaking, Section 736 of the Dodd-Frank Act amends Section 8a(7) of the Act to permit the Commission to alter or supplement the rules of a registered DCO by issuing rules, regulations or orders regarding margin requirements. To ascertain whether or not and under what conditions to issue such rules, regulations, or orders, the Commission must be able to review rules "relating to the setting of levels of margin" in the first instance, although the Commission is not authorized to "set specific margin amounts" under Section 8a(7)(D)(iii) of

the Act. The Commission's review of such rules is an appropriate exercise of its DCO oversight responsibilities and may not result in the Commission taking action under Section 8(a)(7).

Finally, OCC recommended that the Commission reconsider certain language within the proposed definition of "terms and conditions" in § 40.1(j). Specifically, OCC suggested that the Commission delete language that would have required "proposed swap or contract terms and conditions * * * [to] conform to industry standards or those terms and conditions adopted by comparable contracts." In OCC's view, novel products, by their nature, contain provisions that deviate somewhat from those in comparable contracts. The Commission, as suggested by OCC, intended to prevent registered entities from designing products that are economically identical to existing products but that have "one or more unique features that serve no apparent purpose but to prevent fungibility." Given the potential adverse effect on innovation and other proposed regulatory provisions, the Commission has determined to revise the definition of "terms and conditions" to delete the above-cited language.

To further clarify the definition of "terms and conditions," the Commission is revising § 40.1(j) to differentiate between the "terms and conditions" generally applicable to a contract for the purchase or sale of a commodity for future delivery, or an option on such a contract or an option on a commodity—not including an option on a commodity that falls within the definition of a swap—("commodity futures and options contracts") in paragraph (j)(1) and the "terms and conditions" generally applicable to a swap in paragraph (j)(2). Some of the "terms and conditions" associated with commodity futures and options contracts are different from those associated with swaps and, accordingly, the revised format for identifying particular examples of "terms and conditions" applicable to each product type may clarify certain submission requirements that are dependent on this definition. For example, the Commission has determined to revise the introductory paragraph to the definition of "terms and conditions" to include language that describes a swap's underlying "trading unit" or "commodity" as a "description of the payments to be exchanged under a swap."

The examples of "terms and conditions" generally applicable to commodity futures and options contracts and contained in paragraph

(j)(1) are being adopted as proposed, except that the Commission has determined to amend the definition to include "no cancellation ranges" within subparagraph (vi). However, as discussed above, the Commission also has determined to amend and clarify the definition of "terms and conditions" by separating those terms and conditions generally applicable to commodity futures and options contracts from those generally applicable to swaps.[6] Accordingly, the new and final § 40.1(j)(2) provides examples of "terms and conditions" frequently associated with swaps,[7] which the Commission has determined to clarify and/or renumber as follows:

• Paragraph (j)(2)(i) defines as a "term" or "condition" the "identification of the major group, category, type or class in which the swap falls" and "any further sub-group, category, type or class that further describes the swap."[8] To clarify the meaning of this phrase, a parenthetical lists "interest rate, commodity, credit, or equity" swaps as non-exclusive examples of major swap groups. This is equivalent to a description of the "quality and other standards that define the commodity or instrument underlying the contract" applied to commodity futures and options contracts in § 40.1(j)(1)(i);

• Paragraph (j)(2)(ii) refers to "[n]otional amounts, quantity standards, or other unit size characteristics." This provision, as proposed in paragraph (j)(15)(i), previously referred only to "notional values." The revision clarifies that there may be more than one way to state the size of a swap;

• Paragraphs (j)(2)(iii) (any applicable premiums or discounts for delivery of nonpar products) and (iv) (trading hours and the listing of swaps) are parallel to paragraphs (j)(1)(iii) and (iv), which are applicable to commodity futures and options contracts;

• Paragraph (j)(2)(v) for swaps, like paragraph (j)(1)(v) for commodity

<hr>

[6] The examples of terms and conditions proposed as paragraphs (j)(1)–(14) are being renumbered as paragraphs (j)(1)(i) through (xiv) to reflect the inclusion of paragraph (j)(2) for swaps.

[7] The Commission notes that the definition of "swap" in Section 1a(47)(A)(i) of the Act includes an option ("any agreement, contract or transaction (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value of 1, or more interest or other rates, currencies. * * *"

[8] The terminology used in this provision, *i.e.*, "group, category, type, or class," is used to describe swaps in section 723 of the Dodd-Frank Act, codified in section 2(h)(2) of the Act, regarding the review of swaps for a mandatory clearing determination. *See also* proposed § 39.5 (process for review of swaps for mandatory clearing; 75 FR 67277 (Nov. 2, 2010)).

futures and options contracts, addresses the pricing basis of the instrument. It refers to "pricing basis for establishing the payment obligations under, and mark-to-market value of, the swap including, as applicable, the accrual start dates, termination or maturity dates, and, for each leg of the swap, the initial cash flow components, spreads, and points, and the relevant indexes, prices, rates, coupons, or other price reference measures." This incorporates the provisions of proposed paragraphs (j)(15)(iii) (indexes), (iv) (relevant prices, rates or coupons), (vi) (initial cash flow components), and (x) (spreads and points). The Commission notes that other "price reference measures" could include any factor that might have a bearing on the price of a swap, including pricing curves, reference prices, reference entities or obligations, reference currencies, disruption fallbacks, or, given the variety of existing and potential swap products, any other term or condition that affects the pricing basis of the swap;

• Paragraphs (j)(2)(vi) (any price limits, trading halts, or circuit breaker provisions, and procedures for the establishment of daily settlement prices) and (vii) (position limits, position accountability standards, and position reporting requirements) for swaps are the same as paragraphs (j)(1)(vi) and (vii), respectively, as applied to commodity futures and options contracts;

• Paragraph (j)(2)(viii) refers to "payment and reset frequency, day count conventions, business calendars, and accrual features." It incorporates proposed paragraphs (j)(15)(ii) (relevant dates, tenor and day count conventions), (vii) (payment and reset frequency), (viii) (business calendars), and (ix) (accrual type). Included within this category are such specifications as payment, delivery, pricing and reset dates, day count fractions, holiday calendars, and accrual features such as compounding;

• Paragraph (j)(2)(ix) addresses specifications related to physical delivery, if physical delivery applies. The enumerated features are the same as those listed for commodity futures and options contracts in paragraph (j)(1)(ix);

• Paragraph (j)(2)(x) relates to cash settlement and provides "[i]f cash settled, the definition, composition, calculation and revision of the cash settlement price, and the settlement currency." This is the same as paragraph (j)(1)(x) for commodity futures and options contracts, except that the new paragraph contains an additional reference to settlement

currency that incorporates proposed paragraph (j)(15)(v) (currency);

• Paragraphs (j)(2)(xi), (xii), (xiii) and (xiv), relating to swaps that are options, parallel paragraphs (j)(1)(xi), (xii), (xiii) and (xiv) relating to commodity options contracts;

• Paragraph (j)(2)(xv) lists "[l]ife cycle events" as a term or condition. Originally included in proposed paragraph (j)(15)(vi), this encompasses provisions relating to such attributes as special assignment, novation, exchange or other transfer rights or limitations, special termination events, amendment provisions, rights to extinguish obligations under the swap, and special notice requirements.

The Commission would like to clarify that these "terms and conditions" apply to the submission of products for listing or trading by DCMs and SEFs. The Commission's proposed swap-related examples referenced "swaps cleared by a derivatives clearing organization," which may have suggested that the examples were relevant only in connection with rules submitted by DCOs. The "terms and conditions" of a swap are relevant to rules that may be submitted by DCMs and SEFs, as well as DCOs, and the reference to swaps cleared by DCOs therefore has been removed.

*b. Listing Products for Trading by Certification (§ 40.2)*

The Commission previously proposed to amend § 40.2(a) to require registered entities to accompany their submissions with the documentation relied upon to establish the basis for compliance with the Act and the Commission's regulations. The Commission received a number of comments regarding the proposed documentation requirement in § 40.2(a)(3)(v). Two registered entities, ICE Futures and CME, commented that the Commission may not have the authority to require the submission of documentation with newly-certified products. A number of registered entities also found the proposed provision unclear or overly prescriptive. The Commission, in consideration of these comments, has determined to amend its regulations to clarify the filing obligations of registered entities and to ameliorate the perceived burdens associated with the proposal.

ICE Futures and CME suggested that the Commission may not have the authority to amend the product submission requirements, because the Dodd-Frank Act, while substantially amending statutory provisions relevant to the submission of rules and rule amendments, did not amend the Act's provisions governing the certification

and approval of products. The Commission would like to clarify that its proposed rulemaking concerned not only Dodd-Frank related amendments but also certain amendments that facilitate the Commission's administration of the Act. Thus, although the Dodd-Frank Act did not substantively change the product certification provisions in Section 5c(c) of the Act, the Commission proposed the documentation requirement in § 40.2, as well as other provisions,[9] to expedite the submission review process and to ensure adequate consideration is given to legal and financial issues arising from new product and rule submissions.

In this regard, the Commission continues to view its product submission requirements as a logical adjunct to the certification provisions of Section 5c(c)(1) of the Act. To argue that the Commission's proposal exceeds statutory authority, the product submission provisions of the Act would need to be read strictly to require that registered entities merely make—and not support—certifications of compliance with the Act and regulations thereunder. This interpretation ignores the Commission's product oversight function and its duty to examine support for certifications of compliance with core principles, including certifications that new products are not susceptible to manipulation. The Commission has long recognized "the need to balance the flexibility" that the Act, as amended by the Commodity Futures Modernization Act ("CFMA"), gives "a DCM in being able to [quickly] self-certify new products * * * against the obligations of both the DCM and the Commission to assure themselves that the certification is accurate—*i.e.,* that the product or rule does indeed comply with applicable * * * core principles."[10]

The Commission nevertheless agrees with ICE Futures that it might be "more useful" for staff to have "a written explanation" of the newly-certified product than to receive "pages of reports, data and other records." The Commission therefore has determined to substantially revise § 40.2(a)(3)(v) to require product certifications be supported by a "concise explanation and analysis" of the certified product

---

[9] *See* proposed §§ 40.3, 40.5, 40.6, and 40.10, 17 CFR part 40 Provisions Common to Registered Entities, 75 FR 57282 (Nov. 2, 2010).

[10] See Technical Clarifying Amendments to Rules for Exempt Markets, Derivatives Transaction Execution Facilities and Designated Contract Markets, and Procedural Changes for Derivatives Clearing Organization Registration Applications, 71 FR 1953, 1956 (Jan. 12, 2006).

and its compliance with applicable law. This "explanation and analysis" must either (1) be accompanied by supporting documentation, or (2) incorporate the information contained in such documentation, with appropriate citations to data sources.[11] Thus, under final § 40.2(a)(3)(v), registered entities certifying new products with an appropriately detailed and cited "explanation and analysis" do not have to submit supporting documentation.

The submission of an explanation and analysis is necessary for the Commission's review of a new product certification. The Commission has encountered numerous instances in which registered entities provided only cursory supporting analyses for their product submissions or, in certain cases, failed to document the evidentiary basis for their certifications altogether. The Commission also has experienced undue delays in receiving certain requested information, suggesting that supporting analyses had not been prepared by the registered entities as of the time of request.[12] Without prompt receipt of supporting information, the staff must expend significant resources and time to replicate existing analyses or to otherwise independently establish a product's compliance with applicable law. In addition, the staff frequently has found it necessary to contact registered entities for additional guidance on product submissions. To address these problems, final § 40.2(a)(3)(v) facilitates the staff's review of new products subsequent to certification while discouraging unsupported certification of products in the first instance.[13] The more flexible and substantially revised provision permits registered entities to support product certifications in a manner that may be most effective and least costly under the circumstances.

The Commission notes that the explanation and analysis supporting a product certification requires the incorporation of information that, in many cases, is already collected or reviewed by registered entities. For

example, registered entities complying with the guidance and acceptable practices in the Guideline No. 1 Appendix to part 40 presently must review and, if necessary, develop the evidentiary basis for certain certifications prior to submitting new products for Commission review. Moreover, under existing § 40.2(b), registered entities must, upon receipt of a staff request, submit this or other supporting information to substantiate product submissions. The routine provision of a concise explanation and analysis should be no more burdensome than compliance with existing regulations requiring registered entities to collect supporting information and to further explain and submit such information upon request.

To further address comments concerning the perceived burdens of the product submission requirements, the Commission also has determined to streamline the product certification process for a significant percentage of swap contracts[14] by permitting DCMs and SEFs to certify, within a single submission, one or more swaps without submitting each swap and its supporting information to the Commission. To list a particular swap or a particular number of swaps through the class certification provisions of new § 40.2(d), the DCM or SEF must certify that each of the individual contracts within the certified class complies with certain conditions.

A DCM or SEF may submit a class certification only if each swap within the certified class of swaps complies with the conditions specified in § 40.2(d)(1)(i)–(iv). First, each swap within the certified class of swaps must be based upon an "excluded commodity," as defined in § 40.2(d)(1); these swaps include, for example, interest rate swaps, swaps on widely-held and liquid currencies, and swaps based upon the occurrence or non-occurrence of certain events or contingencies. Second, if more than one swap is included in a single filing under § 40.2(d), each particular swap within the certified class of swaps must be based upon an excluded commodity with an identical pricing source and methodology for calculating reference prices and payment obligations. This ensures that DCMs and SEFs simultaneously certify, for example,

only those interest rate swaps with a common pricing source—such as Thomson Reuters on behalf of the British Bankers' Association ("BBA")—and a common methodology for calculating the reference rates for swaps with varying maturities—such as the contributor averaging methodology used to calculate each of the BBA's fifteen London Interbank Offer Rates ("LIBOR") for a particular currency. Thus, a DCM or SEF may class certify (i.e., include in a single submission under § 40.2) a number of LIBOR-based interest rate swaps for a particular currency notwithstanding the varying underlying maturities or varying tenors of swaps within the certified class.

Third, the regulation limits class certifications to swaps based upon sources and methodologies that the Commission previously reviewed in connection with a certified or approved futures or swap contract. This ensures that the Commission had an opportunity to review the particular pricing source and methodology used in each of the swaps within the certified class of swaps.[15] Fourth and finally, each particular swap within the certified class of swaps must be based upon an excluded commodity involving an identical currency or identical currencies. For example, a swap based upon 3-month LIBOR for U.S. Dollars may not be submitted in the same submission as a swap based upon the 3-month LIBOR rate for any of the other 9 currencies presently included in the BBA survey.

To further streamline the new product submission process, the Commission also has determined to permit DCOs to submit products accepted for clearing under the forthcoming provisions of § 39.5. As proposed, the second provision of § 40.2(a) would have retained the existing requirement that, prior to accepting any over-the-counter product for clearing, a DCO must submit the new product pursuant to the provisions of part 40. Comments submitted in connection with the proposed process for review of swaps for mandatory clearing indicated some confusion about the interplay between the § 40.2 product submission process and the § 39.5 submission process for a mandatory clearing determination. In light of the introduction of procedures for a DCO to submit swap products for a mandatory clearing determination under § 39.5 and the potential for confusion as to the interaction between

---

[11] For example, registered entities could incorporate a summarized record in the product explanation and analysis with reference to a Web site link containing the information relied upon to establish compliance with applicable law.

[12] Staff recently received a number of self-certified submissions containing insufficient information for several products, implicating a number of core principles. Each submission's deficiencies were corrected only after numerous discussions with the Commission's staff, a process that exhausted significant resources and time.

[13] Moreover, the Dodd-Frank Act's elimination of certain exemptions and exclusions relied upon by currently operating exempt entities may encourage these entities to register with the Commission, thereby increasing the number of product certifications subject to staff review.

[14] According to a recently published report by the International Organization of Securities Commissions ("IOSCO"), interest rate swaps comprised approximately 77.5% of the total outstanding notional value of over-the-counter swaps. Foreign exchange swaps accounted for another 9.1%. See Technical Committee of IOSCO, Report on Trading of OTC Derivatives, 1, 6 (Feb. 3, 2011).

[15] Based upon its experience with § 40.2(d), the Commission may consider expanding the classes of commodities eligible for class certification in a future rulemaking.

the two regulatory provisions, the Commission has reconsidered what would have been a dual submission requirement. The Commission therefore is deleting from § 40.2 the provision requiring submission of new products by a DCO.[16] A DCO may submit a single filing in accordance with § 39.5 instead of submitting two filings—one under § 40.2 and one under § 39.5—and the information required for the § 39.5 submission encompasses the information that would otherwise be required under § 40.2. The Commission believes that this revision will facilitate the product submission process without adversely affecting the supervisory purpose of regulations requiring the submission of products for Commission review.

In other comments related to product certification requirements, registered entities stated that the price certification provision in proposed § 40.2(a)(3)(vi) required unclear or vague certifications concerning matters unrelated to the Commission's core regulatory functions. CME commented that registered entities already have sufficient incentives—for example, avoiding possible litigation—to ensure that products meet applicable legal standards. In addition, ICE Futures commented that the Commission's proposal "exceed[ed] the requirements contained in [the] Dodd-Frank [Act]" and "inappropriately inject[ed] the Commission into the commercial and business practices of registered entities." In its view, the Commission should not be the "business and legal sounding board for each registered entity in the area of intellectual property and other legal conditions." Moreover, ICE Futures questioned "whether the Commission would be properly positioned to make * * * complex [intellectual property] determinations" as part of the product review process. The OCC did not object to the price certification requirement but questioned whether it served a "useful purpose." The OCC correctly stated that registered entities are required to abide by the Act and the Commission's regulations, which contemplate appropriate due diligence concerning intellectual property and pricing issues, "whether or not [they] give[] * * * a [special] certification" to that effect.

The Commission, in consideration of these comments, has determined not to adopt proposed § 40.2(a)(3)(vi). The Commission recognizes that registered entities should, and generally are, sensitive to intellectual property issues

that might arise in the course of developing a new product and that the general certification provision in § 40.2(a)(3)(iv) captures the more specific settlement price certification proposed in § 40.2(a)(3)(vi).[17] However, in light of recent experience, the Commission disagrees with the assertion that registered entities, without exception, sufficiently account for intellectual property issues when listing new products for trading. In fact, a DCM was recently involved in a legal dispute concerning the use of certain published third-party prices. Although the DCM had been facilitating trading in contracts referencing these prices, another entity obtained an exclusive license to use the third party's prices and, accordingly, threatened to seek legal action to enjoin the DCM from further referencing those prices to cash settle its products. The DCM ultimately found an alternative means for settlement of its existing contracts but not without some disruption to the market. The episode highlights the relevance and necessity of appropriate due diligence in referencing third-party prices for purposes of cash settlement. Market participants should be able to enter into positions in a newly-certified contract without concerns that the registered entity's use of a particular price may be subject to legal challenge. Legal challenges or disputes can be not only disruptive to the marketplace but also may undermine confidence in the futures and derivatives markets. Moreover, such challenges or disputes can affect the value of positions taken in contracts subject to the controversy.

Thus, although the Commission has determined not to adopt the proposed pricing certification provisions, it notes that the staff, in its discretion and as part of its due diligence reviews of new product submissions, may request information under § 40.2(b) concerning whether a registered entity has obtained the legal rights to use or reference proprietary prices, including third-party index prices, in connection with the listing or trading of a product. Registered entities submitting a product that uses prices published by another market or that references third-party prices should include all information relevant to the cash settlement of the product with its accompanying explanation and analysis. In this regard, a simple statement that the registered entity has the legal rights to use or

reference a particular price could expedite Commission staff review without imposing a material burden on either the Commission or registered entities.

Finally, the Commission notes that registered entities frequently submit product "terms and conditions" with accompanying rules—for example, rules establishing block trade thresholds—that, upon the effective date of these regulations, will be subject to a new rule certification review process. Such "rules" or "rule amendments" submitted in connection with the listing or trading of a product, if not included in the definition of "terms and conditions," will not be effective and cannot be implemented until properly submitted for Commission review under §§ 40.5 or 40.6. The Commission also notes that the "terms and conditions" of a product, as defined in § 40.1(j), must be submitted in connection with the listing or trading of a product and therefore would become effective one full business day after the business day of submission. However, if "terms and conditions" submitted in connection with the listing or trading of a particular contract would amend the existing terms or conditions of a previously certified or approved product, such "terms and conditions" must be certified under § 40.6 or submitted for approval under § 40.5 as well.

*c. Voluntary Submission of New Products for Commission Review and Approval (§ 40.3)*

For the reasons noted in its explanation of amendments to § 40.2, the Commission has determined to revise its documentation provisions in proposed § 40.3(a)(4) and to eliminate the price certification provisions in proposed § 40.3(a)(9). The amendments parallel those adopted with respect to product certifications under § 40.2. Final § 40.3(a)(4) requires that products submitted for Commission approval be accompanied by an explanation and analysis of the product and its compliance with applicable law and either (1) the documentation relied upon to establish the basis for compliance with applicable law, or (2) the information contained within such documentation, with appropriate citations to data sources.

The Commission received a comment concerning its existing regulation governing staff requests for additional information under final § 40.3(a)(10). The OCC commented that the two-day deadline for responses to requests for additional information may be insufficient and impractical in certain circumstances. It reasoned that

---

[16] DCOs voluntarily seeking prior approval to clear a new product under § 40.3 may still submit two filings—one under § 40.3 and one under § 39.5.

[17] Accordingly, implicit in any certification that a product complies with the Act and the Commission's regulations is an assertion that the submitting entity has the rights to use or reference a particular price. Filing a false certification could result in a Commission action under § 40.2(c).

registered entities generally seek to provide "additional materials as soon as possible in order to expedite the staff's review of the new product" and that the regulation's inflexible deadline therefore was unnecessary. The OCC also suggested that the Commission adopt alternative language to permit registered entities to "notify the Commission" that additional time is "reasonably required to provide the requested evidence" and, in such cases, to require the submission of this information no later than ten business days subsequent to the request, or at the completion of a longer period specified by staff.

The Commission has determined that a longer response period is not appropriate for the submission of additional information. The Commission has a limited timeframe for making final determinations under the product approval provisions of § 40.3 and the prompt receipt of requested information frequently is requisite to its determination regarding the submission. In light of the OCC's comment, however, the Commission has determined to amend the final § 40.3(a)(10) to permit, at the discretion of its staff and upon receipt of a written request from the registered entity, an extension of time for the submission of additional information.

*d. Amendments to Terms or Conditions of Enumerated Agricultural Contracts (§ 40.4)*

The Commission has determined to adopt technical amendments to § 40.4(b)(3) to permit registered entities to implement "[c]hanges in no cancellation ranges" for enumerated agricultural contracts without prior approval, provided these rules are properly submitted to the Commission pursuant to § 40.6. Newly-certified products frequently include terms and conditions related to "no cancellation ranges" and the Commission does not believe it appropriate to delay implementation of a no cancellation range for products involving enumerated agricultural commodities, especially when those products may be actively trading through a registered entity.

*e. Voluntary Submission of Rules for Commission Review and Approval (§ 40.5)*

For the reasons noted below, the Commission has determined to eliminate the documentation provision previously proposed in § 40.5(a)(7), to revise existing § 40.5(a)(5) to be similar to final § 40.6(a)(7)(v), and to eliminate proposed § 40.5(a)(10). The Commission

notes that the "explanation and analysis" requirement in final § 40.5(a)(5) does not include the qualifier that the submission be "concise." The Commission requires registered entities to provide a more detailed explanation and analysis of rules voluntarily submitted for Commission approval under the provisions of § 40.5.

*f. Self-Certification of Rules (§ 40.6)*

The Commission received a number of comments concerning the proposed documentation requirement in § 40.6(a)(7)(v) and its application to routine rules and rule amendments. The OCC, for example, commented that it is frequently "obvious" that a routine rule submission complies with applicable statutory and regulatory provisions and that the documentation requirement failed to account for the fact that many rules warrant the submission of minimal, if any, supporting documentation. Similarly, KCBOT commented that many rule submissions need be supported only by a "cursory review of the rule or rule change in relation to Commission regulations," with little or no "significant benefit" to be gained from the collection or provision of supporting documentation. Like comments concerning the submission of documentation in §§ 40.2 and 40.3, a number of comments also stated that the submission of documentation in connection with all new rules and rule amendments would be burdensome and unlikely to yield benefits that outweighed costs.

The Commission has determined, in consideration of these comments, to eliminate its proposed documentation requirement in § 40.6(a)(7)(v) and to insert in its place a requirement that registered entities provide a "concise explanation and analysis" of the "operation, purpose, and effect" of certified rules, consistent with the existing requirement in § 40.5(a)(5). Unlike the certification provisions applicable to new products, the rule certification provisions of the Act provide the staff ten-business days to review new rules and rule amendments and, if necessary, to prevent them from becoming effective until staff receives adequate information from the submitting entity.[18] Registered entities

therefore should have sufficient incentives to provide adequate explanations of new submissions under § 40.6 without the provision of actual documentation.[19]

The "concise explanation and analysis" will facilitate the Commission's review of newly-certified rules and rule amendments. Registered entities recently have submitted rule submissions with only a cursory explanation of the rule change and a conclusory statement concerning the submission's compliance with core principles. As a consequence, the staff frequently has found it necessary to contact registered entities for additional guidance on submissions and the potential implications for compliance with core principles. The Commission's review of the explanation and analysis will be less burdensome—both for the Commission and registered entities— than the current practice of contacting registered entities to request explanations and analyses subsequent to each rule submission.[20] Like the explanation and analysis required for new product submissions, the explanation and analysis of certified rules or rule amendments should be a

---

[18] Pursuant to Section 745 of the Dodd-Frank Act, the Commission has ten-business days to review rule certifications and to determine whether to stay certain submissions—including those submitted with inadequate information—for as many as 90 additional days. Moreover, the Commission's staff may request additional information at any time during the applicable rule review period pursuant to existing § 40.6(a)(8).

[19] CME commented that the extended review period should not be "mandatorily invoked in the event a rule submission [is] stayed due to the provision of inadequate information." In its view, the public comment period associated with stayed rules is designed to solicit external perspectives regarding only "controversial" submissions. The Commission does not, however, have the authority to prevent a stayed submission from being subject to the extended review and public comment requirements. Section 745 of the Dodd-Frank Act provides that the Commission's issuance of a notification "shall stay the certification of the new rule or rule amendment" and that "[t]he Commission shall provide a not less than 30-day public comment period." However, the Commission acknowledges that its authority to issue a notification of stay in the first instance is discretionary rather than mandatory. Under § 40.6(c), the Commission "may stay the certification of a new rule or rule amendment" for the enumerated reasons, but it may also request a revised submission that would render a notice of stay unnecessary. Accordingly, the Commission's regulations permit—but do not require—a stay of any submission that omits information that could "reasonably be deemed important by the Commission," as noted by FIA.

[20] The Commission believes that its final regulations will conserve both Commission and registered entity resources. Subsequent to the effective date of the Dodd-Frank, the Commission anticipates an increase in the number of new and amendatory rule submissions implementing the Dodd-Frank Act and forthcoming regulations, as well as an increase in the number of registered entities submitting such rules. Concise explanations and analyses will assist the Commission's staff in conducting its due diligence within the initial 10-business-day review period, thereby minimizing potential delays for registered entities. Moreover, registered entities presently submit a large number of rules and rule amendments throughout the year; CME, for example, noted that it submitted more than 342 rules in the last calendar year alone.

Federal Register / Vol. 76, No. 144 / Wednesday, July 27, 2011 / Rules and Regulations     44783

clear and informative—but not necessarily lengthy—discussion of the submission, the factors leading to the adoption of the rule or rule amendment, and the expected impact of the rule or rule amendment on the public and market participants.

In another comment concerning proposed § 40.6, the FIA encouraged the Commission to adopt regulations that would maximize the transparency of the rule submission process, as well as account for the expertise of market participants. The Commission, in consideration of the FIA's comment, intends to continue its practice of publishing all incoming submissions on its Web site and will continue developing a Web portal at cftc.gov that, once completed, should expedite both Commission and public review of submissions.[21] The Commission also intends to facilitate public comment by enabling interested parties to submit comments directly from the submissions page on the Commission's Web site. As noted in the notice of proposed rulemaking, the Commission presently is working on enhancements to its Web site and information technology systems that will, among other things, enable the Commission to promptly inform the public of rule submissions and stays of rule submissions. The Commission also intends to continue using its current ability to provide notice through e-mail notifications and RSS feeds to those who choose to sign-up for them.

The Commission would like to note that the "industry filings" tab on the Commission's Web site currently consolidates all filings onto a single Web page and posts them for public review with a brief explanation of the rule or rule amendment. Market participants and the public can click on a link within this Web page and access all rule filings by registered entities. Thus, although the Commission does not intend to publish a "daily rule digest," as suggested by the FIA, all market participants currently have and will continue to have access to submissions in an organized format, which will be complemented by the "concise explanation and analysis" accompanying each submission.

The FIA also commented that, with respect to rules submitted in response to an emergency pursuant to § 40.6(a)(6), the Commission should not limit the ability of registered entities "to respond as may be necessary to the unforeseen circumstances of an emergency situation." The FIA expressed concerns, however, that a registered entity could potentially "cite an emergency event as the grounds for a fundamental recasting" of regulatory responsibilities. The Commission agrees that registered entities must be able to respond flexibly and decisively to emergencies. In addition, the Commission acknowledges the possibility that a registered entity could attempt to immediately implement a rule and bypass the rule certification process by asserting that the rule is in response to an emergency. The final regulations accordingly clarify that registered entities are required to certify any rule implemented in response to an emergency under the procedures set forth in § 40.6. The staff will review such certifications for compliance with applicable law in situations where the rule, by necessity, has been implemented and in situations where the rule is intended for implementation prior to the completion of the 10-business-day review period. In either situation, the staff may permit the registered entity's rule to remain effective or it may determine that the implemented rule should be stayed for an extended review.[22]

The Commission is adopting three revisions to its proposed regulations in § 40.6. First, the price certification in proposed § 40.6(a)(7)(viii) has been eliminated for the reasons discussed in connection with revisions to proposed §§ 40.2(a)(3)(vi), 40.3(a)(9), and 40.5(a)(10). Second, the Commission, in consideration of comments from both CME and OCX, has determined to amend § 40.6(a) to make rules delisting or withdrawing the certification of products effective upon submission to the Commission. The Commission agrees that such submissions should be exempt from the 10-business-day review period in order to avoid complicating the delisting of the product by providing market participants an opportunity to enter into contracts between the time period of submission and the effective date of the rule.[23] Finally, the Commission, in response to a comment from the OCC, is retaining the existing language in § 40.6(d) that permits certain non-substantive rules to take effect without certification to the Commission.

*g. Delegations (§ 40.7)*

The Commission is correcting a typographical error that appeared in proposed § 40.7(a)(1) by replacing the reference to "§ 40.5(c)(1)(B)" with a reference to "§ 40.5(c)(1)(ii)."

*h. Availability of Public Information (§ 40.8)*

The Commission has determined to adopt technical amendments to § 40.8 to reflect possible changes in the designation or registration application procedures for DCMs, SEFs, DCOs and SDRs.[24] Specifically, § 40.8(a) will make public the following: (1) The transmittal letter and first page of the "cover sheet" of applications; (2) the applicant's regulatory "compliance chart;" and (3) the "narrative summary" of the applicant's proposed activities."[25]

*i. Special Certification Procedures for Submission of Rules by Systemically Important Derivatives Clearing Organizations (§ 40.10)*

CME, FIA, LCH, and OCC submitted comments regarding the Commission's proposed regulations to implement Section 806 of the Dodd-Frank Act. Section 806 requires a financial market utility that has been designated by the Financial Stability Oversight Council ("FSOC") to be systemically important to provide its Supervisory Agency with 60 days advance notice of any proposed changes to rules, procedures, or operations that could materially affect the nature or level of risks presented by the financial market utility. Section 40.10 sets forth implementing requirements for SIDCOs.

Proposed § 40.10(a) required that all SIDCOs provide 60 days advance notice to the Commission in accordance with Section 806 of the Dodd-Frank Act. In a separate proposed rulemaking, the Commission proposed to define a "systemically important derivatives clearing organization" to mean a "financial market utility that is a derivatives clearing organization registered under section 5b of the Act (7 U.S.C. 7a–1), which has been designated by the FSOC to be systemically

---

[21] Given the short time period for the Commission's review, the Commission agrees with FIA that immediate Web site notice is "a far superior alternative to waiting several days for **Federal Register** publication of the rule or product filing."

[22] The Commission's staff may stay a rule or rule amendment implemented in response to an emergency for the same reasons that it may stay other rules or rule amendments submitted pursuant to the procedures in part 40. Specifically, the staff may stay the rule for an extended review if the submission insufficiently explains the emergency or the registered entity's response, presents novel or complex issues warranting further consideration, or is potentially inconsistent with the Act or regulations thereunder.

[23] The Commission has the discretion to permit certain rules to become effective prior to the expiration of the 10-business-day rule review period, provided it establishes the effective date of such rules by rule or regulation. See Section 5c(c)(2) of the Act, as amended by Section 745(b) of the Dodd-Frank Act.

[24] See, e.g., 76 FR 3698 (Jan. 20, 2011) (proposing revisions to DCO application procedures).

[25] See id. at 3718 (proposing a parallel public information provision in § 39.3(a)(5)).

important." [26] Under this definition, a DCO could be a SIDCO even if the Commission was not its Supervisory Agency and, as an unintended result, proposed § 40.10 would require such a DCO to provide advance notice to the Commission.

OCC pointed out this issue, noting that the authority for § 40.10(a) is Section 806(e)(1)(A) of the Dodd-Frank Act, which requires a systemically important financial market utility to provide 60 days advance notice to "its Supervisory Agency." Under Section 803(8)(B) of the Dodd-Frank Act, there can be only one Supervisory Agency for a financial market utility designated as systemically important.[27]

The Commission recognizes that some DCOs, like OCC, may be regulated by more than one Federal agency. In the case of OCC, if it were designated as a systemically important financial market utility, it is possible that it would be so designated because of its activities as a securities clearing agency, not because of its activities as a DCO. Accordingly, the SEC, not the Commission, would likely be its Supervisory Agency.

OCC recommended revising the language in § 40.10(a) to clarify that advance notice to the Commission would be required only for DCOs for which the Commission is the Supervisory Agency.[28] Although the Commission is adopting § 40.10(a) as proposed, it intends to act on OCC's suggestion by revising the definition of "systemically important derivatives clearing organization" in a future final rulemaking to clarify that a SIDCO is a financial market utility that has been designated by the FSOC to be systemically important and for which the Commission acts as its Supervisory Agency pursuant to section 803(8) of the Dodd-Frank Act. This clarification will address the issue raised by OCC in connection with § 40.10 and will serve

to clarify the scope of any other regulations relating to SIDCOs.

Proposed § 40.10(a) required a SIDCO to notify the Commission of a change in rules, procedures, or operations that could materially affect the nature or level of risks presented by the SIDCO. OCC and CME commented that a SIDCO would be required to notify the Commission of proposed changes that could *decrease* the nature or level of risk in addition to changes that could *increase* the nature or level of risk. OCC does not believe that a SIDCO should be required to report a change that could materially reduce risk under § 40.10 because the proposed change would be subject to a 60-day "waiting period," and the goal of reducing risk is not served by requiring that such a change be subject to delay.

Similarly, CME expressed the view that the Dodd-Frank Act does not provide the Commission with authority to impose a 60-day advance notice requirement for changes in rules, procedures, or operations that could improve the operations of a SIDCO, and it believes the Commission should exercise its authority over risk-reducing changes under the certification procedures of § 40.6.

OCC and CME proposed that the Commission change § 40.10(a) to cover only a proposed change in rules, procedures, or operations that could have a materially adverse impact on risk. The Commission has determined not to adopt this suggested revision for the reasons discussed below.

As a preliminary matter, the Dodd-Frank Act does not distinguish between a change that could materially increase or decrease the nature or level of risks presented by a SIDCO. Although Congress could reasonably have expected that risk-related changes are almost always intended to reduce risk, it required advance notice of "any" change that could "affect" risk and did not limit Section 806 to only those instances where a change could increase risk. Moreover, the purpose of advance notice is to assist the Commission in monitoring systemic risk and in seeing that SIDCOs effectively manage risk in furtherance of compliance with the core principles. The Commission acknowledges that requiring a SIDCO to notify the Commission under § 40.10 of a change that could materially reduce risk could delay the time when that change becomes effective. However, a proposed change that could materially reduce risk in certain respects also could materially increase risk in other respects, and a SIDCO and the Commission might come to different conclusions when evaluating whether a

particular change could increase or decrease risk, overall. For example, a SIDCO could reduce risk by requiring heightened membership requirements, but this might also reduce the number of clearing members and therefore increase concentration of risk. As a practical matter, even for ostensibly risk-reducing changes, there may be adverse consequences that the Commission should have the opportunity to consider in the time frame set forth in Section 806 of the Dodd-Frank Act.

The Commission notes that, as proposed, § 40.10(g) provides that a SIDCO may implement a change in less than 60 days from the date the Commission receives the notice of proposed change or the date the Commission receives any further information it has requested, if the Commission notifies the SIDCO in writing that it does not object to the proposed change and authorizes implementation of the change on an earlier date, subject to any conditions imposed by the Commission. To further address the concerns expressed by the commenters, the Commission is adding a new paragraph (a)(3) that provides that a SIDCO may request that the Commission expedite the review on the grounds that the change would materially decrease risk. The Commission, in its discretion, may expedite the review and, pursuant to paragraph (g) of this section, notify the SIDCO in less than 60 days.

The concern that § 40.10 prevents a SIDCO from instituting a risk-reducing change in less than 60 days may be overstated. Section 40.10(g) allows a SIDCO to implement a change in less than 60 days if the Commission notifies the SIDCO in writing that it does not object to the change. Moreover, unless an emergency exists, it is unlikely the market would be significantly harmed if implementation of the change were delayed for more than 10 days, which is the basic time period for the Commission's review of certified rules under § 40.6.

Proposed § 40.10(h) required a SIDCO to provide notice to the Commission of an emergency change no later than 24 hours after implementation of the change.[29] Among other things, the proposed rule required the notification to include the information set forth in proposed § 40.10(a). OCC commented that it is not practical to require a SIDCO's emergency filing to conform to the requirements of § 40.10(a) within 24

---

[26] *See* 75 FR 77576, 77586 (Dec. 13, 2010).

[27] Section 803(8)(B) provides as follows: "Multiple Agency Jurisdiction: If a designated financial market is subject to the jurisdictional supervision of more than 1 agency listed in subparagraph (A), then such agencies should agree on 1 agency to act as the Supervisory Agency, and if such agencies cannot agree on which agency has primary jurisdiction, the Council shall decide which agency is the Supervisory Agency for purposes of this title."

[28] OCC suggested revising § 40.10(a) to read, in relevant part: "A registered derivatives clearing organization that has been designated by the Financial Stability Oversight Council as a systemically important derivatives clearing organization and for which the Commission acts as the Supervisory Agency pursuant to Section 803(8) of the Dodd-Frank Wall Street Reform and Consumer Protection Act shall provide notice to the Commission * * *" *See* OCC letter at 7.

[29] This standard is consistent with the 24-hour requirement for emergency rule certifications under § 40.6(a)(6).

hours of implementing the change. OCC proposed a two-stage approach whereby the SIDCO would file an initial notice within 24 hours of the change and would submit a more extensive filing conforming to § 40.10(a) as soon as reasonably practicable thereafter, but in any event not more than 30 days after implementation of the change.

The Commission notes that § 40.10(h)(1) codifies Section 806(e)(2)(B) of the Dodd-Frank Act, which requires that the emergency notice be provided as soon as practicable and no later than 24 hours after implementation of the change. Section 40.10(h)(2) codifies Section 806(e)(2)(C), which requires that the notice contain the information that must be submitted for changes subject to advance notice, plus a description of the nature of the emergency and the reason the change was necessary for the SIDCO to continue to provide its services in a safe and sound manner. These provisions do not provide for partial or late submissions, as suggested by OCC. However, the Commission believes that it can adequately address the concern expressed by OCC.

As proposed, § 40.10(a) required a SIDCO to provide the information required by proposed § 40.6(a)(7) within 24 hours. OCC singled out the documentation requirement in proposed § 40.6(a)(7)(v) as one that would be difficult to satisfy within 24 hours. As discussed above, that provision, as adopted herein, has been revised to significantly reduce the perceived burden of the proposed rule, and the Commission believes that a SIDCO should be able to provide the required "concise explanation and analysis," as well as other required information within 24 hours.

LCH observed that the Commission may require modification or rescission of an emergency change if it finds that the change is not consistent with the Act or the Commission's regulations. According to LCH, this could lead to legal uncertainty regarding activities undertaken while the emergency change is in effect. As a result, LCH proposed that the Commission revise § 40.10(h)(3) by adding a provision to immunize from legal challenge any action taken by a SIDCO pursuant to an emergency change that is later modified or rescinded by the Commission.[30] The

Commission is not taking further action on LCH's suggestion because it believes that the existing enforceability provisions in § 39.6 of the Commission's regulations adequately address the concern expressed by LCH.[31]

In the notice of proposed rulemaking, the Commission solicited comment as to whether there are any changes a SIDCO should be prohibited from adopting on an emergency basis. FIA and CME did not favor imposing any restrictions on a SIDCO's response to an emergency. CME also noted that a DCO does not have unfettered discretion to act in an emergency situation. Rather, a DCO's ability to act is limited by the emergency rules and procedures that have been vetted previously by the Commission.[32] The Commission agrees that there should not be any express limitation on the type of actions that a SIDCO can take in responding to an emergency, primarily because it is difficult to pre-judge the permissibility of an emergency action taken in the context of particular circumstances.

Finally, the Commission is making a technical revision to the proposed § 40.10(a)(2) requirement that concurrent with providing the Commission with the advance notice or any request or other information related to the advance notice, the SIDCO provide the Board of Governors of the Federal Reserve System ("Board") with a copy of the submission. The Commission is adding the instruction that such notice, request or other information must be filed in the same format and manner as the Board requires for those designated financial

market utilities for which it is the Supervisory Agency pursuant to section 803(8) of the Dodd-Frank Act.

*j. Review of Event Contracts Based Upon Certain Excluded Commodities (§ 40.11)*

Pursuant to Section 745(b) of the Dodd-Frank Act, the Commission proposed § 40.11(a)(1) to prohibit the listing of certain contracts involving terrorism, assassination, war, gaming, or activities that are unlawful under any State or Federal law. The CME commented that the term "gaming" should be further defined to ensure that registered entities do not confront difficult legal questions with respect to the applicability of the "gaming" prohibition in § 40.11(a)(1). In this regard, the CME noted that the courts have struggled to arrive at an appropriate legal definition for "gaming" for many years and that the Commission's prohibition on contracts involving "gaming" could introduce uncertainty into the markets.

The Commission agrees that the term "gaming" requires further clarification and that the term is not susceptible to easy definition. Indeed, in its "Concept Release on the Appropriate Regulatory Treatment of Event Contracts," the Commission solicited public comments on the best approach for addressing the "the potential gaming aspects of some event contracts and the potential pre-emption of state laws."[33] The Commission received a number of responses to its concept release, including several comments articulating bases for distinguishing trading in contracts linked to the occurrence (or non-occurrence) of events and participation in traditional "gaming" activities. The Commission continues to consider these comments and may issue a future rulemaking concerning the appropriate regulatory treatment of "event contracts," including those involving "gaming." In the meantime, the Commission has determined to prohibit contracts based upon the activities enumerated in Section 745 of the Dodd-Frank Act and to consider individual product submissions on a case-by-case basis under § 40.2 or § 40.3.

The Commission would like to note that registered entities may receive a definitive resolution of any questions concerning the applicability of § 40.11(a)(1) by submitting a particular product for Commission approval under to § 40.3. If the submitted product is approved, the registered entity may list it for trading or clearing with an

---

[30] LCH proposed that the Commission add the following language adapted from Section 739 of the Dodd-Frank Act (regarding swaps): "* * * However, no modification or rescission shall retroactively affect the enforceability of any power exercised by the SIDCO, nor shall any agreement, contract or transaction entered into by the SIDCO or its counterparty pursuant to the exercise by such

SIDCO of any emergency change, be void, voidable, or unenforceable, and no party to such agreement, contract, or transaction shall be entitled to rescind, or recover, any payment made with respect to, the agreement, contract, or transaction under this section or any other provision of Federal or State law."

[31] Section 39.6 provides as follows:

An agreement, contract or transaction submitted to a derivatives clearing organization for clearance shall not be void, voidable, subject to rescission, or otherwise invalidated or rendered unenforceable as a result of:

(a) A violation by the derivatives clearing organization of the provisions of the Act or of Commission regulations; or

(b) Any Commission proceeding to alter or supplement a rule under section 8a(7) of the Act, to declare an emergency under section 8a(9) of the Act, or any other proceeding the effect of which is to alter, supplement, or require a derivatives clearing organization to adopt a specific rule or procedure, or to take or refrain from taking a specific action. *See also* § 38.6 (comparable enforceability provisions for DCMs); and proposed § 37.6, 76 FR 1214, 1240 (Jan. 7, 2011) (comparable enforceability provisions for SEFs).

[32] Under proposed § 40.6(a)(6), new rules or rule amendments that establish standards for responding to an emergency must be submitted pursuant to § 40.6.

[33] Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 FR 25669, 25670 (May 7, 2008).

assurance that the Commission reviewed and did not object to the submission based on the prohibitions in § 40.11(a). In addition, registered entities may always certify products pursuant to the procedures in § 40.2. If the Commission determines during its review of a product that the submission may violate the prohibitions in § 40.11(a)(1)–(2), the Commission may request that the registered entity suspend the trading or clearing of the contract pending the completion of a 90-day extended review. Upon the completion of that review, the Commission must issue an order, pursuant to Section 745(b) of the Dodd-Frank Act, finding either that the product violates or does not violate the prohibitions in § 40.11(a)(1)–(2).

The Commission's staff also may, at its discretion and upon a request from a registered entity, review a draft product submission or proposal and provide guidance concerning the product's compliance with core principles and § 40.11(a). The Commission would like to note, however, that the staff's guidance concerning drafts and proposals is preliminary and non-binding. The staff formally reviews products only at such time as a compliant submission is provided to the Commission pursuant to § 40.2 or § 40.3.

Finally, the Commission would like to note that its prohibition of certain "gaming" contracts is consistent with Congress's intent to "prevent gambling through the futures markets" [34] and to "protect the public interest from gaming and other events contracts." [35] The Commission may, at some future time, adopt regulations that prohibit products that are based upon activities "similar to" those enumerated in Section 745 of the Dodd-Frank Act. It has determined not to propose such regulations at this time.

*k. Staying of Certification and Tolling of Review Period Pending Jurisdictional Determination (§ 40.12)*

The OCC objected to the Commission's use of the term "derivative" in proposed § 40.12(a)(1), which, the Commission agrees, is an undefined term encompassing products within the jurisdiction of both the SEC and the Commission. The Commission therefore has determined to delete the

word "a derivative" from § 40.12(a)(1) and to insert in its place "a contract for the sale of a commodity for future delivery (or an option on such contract or an option on a commodity)." The final regulation thereby codifies the Dodd-Frank Act's provisions concerning "novel derivative products having elements of both securities and contracts for the sale of a commodity for future delivery (or options on such contracts or options on commodities)." In addition, the Commission has determined to limit the application of § 40.12 to only those novel agreements, transactions, or contracts that are not subject to a separate process for requesting interpretations of the characterization of swaps, security-based swaps, and mixed swaps pursuant to § 1.8 of this chapter. [36]

The Commission also is amending proposed § 40.12(b) to clarify that the receipt of a request for a jurisdictional determination "tolls" both the applicable product certification and the applicable approval review period until the issuance of a final determination. In this regard, the Commission has determined to insert "shall be stayed" after "the product certification," which more appropriately characterizes the Commission's action with respect to certified products and distinguishes that action from the suspension of the approval review period under § 40.3. [37] Similarly, in § 40.12(b)(2), the Commission has determined to clarify that the stay shall be withdrawn and that the submission review period shall resume upon the issuance of a final determination order finding that the Commission has jurisdiction over the submission.

The Commission would like to note that the suspension of a product's certification would permit continued trading for liquidation purposes. That is, the stay of certification under § 40.12 would not prevent market participants from entering into positions that offset others taken while the product certification remained in effect. The Commission will provide to the registered entity a written notice of stay pending issuance of a final determination order by the Commission. [38]

Finally, the Commission notes that Section 718(a)(2) of the Dodd-Frank Act provides the Commission explicit authority to request a jurisdictional determination concerning a novel derivative product having elements of both a security and a contract for the sale of a commodity for future delivery (or an option on such contract or an option on a commodity) at any time subsequent to the effective date of a product containing such elements, provided no notice of a novel derivative product filing has been received from the SEC pursuant to Section 718(a)(1) of the Dodd-Frank Act.

**III. Cost-Benefit Considerations**

Section 15(a) of the Act requires the Commission to "consider the costs and benefits" of its actions before promulgating a regulation. [39] In particular, these costs and benefits must be evaluated in light of five broad areas of market and public concern: (1) Protection of market participants and the public; (2) efficiency, competitiveness, and financial integrity of futures markets; (3) price discovery; (4) sound risk management practices; and (5) other public interest considerations. In conducting its analysis, the Commission may, in its discretion, give greater weight to any one of the five enumerated areas and it may determine that, notwithstanding costs, a particular rule is necessary to protect the public interest or to effectuate any of the provisions or to accomplish any of the purposes of the Act. [40]

Certain of the regulations promulgated in this final rule are mandated by the Act, as amended by the Dodd-Frank Act, and, for those

---

[34] Congressional Record—Senate, S5906 (July 15, 2010).

[35] *Id.* Senator Lincoln, in a colloquy with Senator Feinstein, emphasized that the Commission "needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed event contracts."

[36] *See* Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement;" Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 76 FR 29818 (May 23, 2011).

[37] Section 717(d) of the Dodd-Frank Act amended Section 5c(c)(1) of the Act to "stay the certification of a product pending a determination by the Commission upon a request of the Securities and Exchange Commission * * * that the Commission issue a determination as to whether" a novel derivative product is within the jurisdiction of the Commission. However, Section 745 of the Dodd-Frank Act amended the Act by striking Section 5c in its entirety and inserting language that did not include the stay provision in Section 717(d) of the Dodd-Frank Act. The Commission would like to clarify that the stay provisions adopted in final § 40.12 of its regulations do not give effect to the stay provisions in Section 717(d) of the Dodd-Frank Act, given inconsistent amendments to Section 5c(c). The Commission is adopting its stay provisions pursuant to its Section 8a(5) authority to "make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any purposes of the Act."

[38] A final determination, for purposes of § 40.12(b) of this part, shall be a determination order issued pursuant to Section 718(a)(3) of the Dodd-Frank Act.

[39] 7 U.S.C. 19(a).

[40] *See, e.g., Fisherman's Doc Co-op., Inc* v. *Brown, 75 F.3d 164 (4th Cir. 1996); Center for Auto Safety* v. *Peck,* 751 F.2d 1336 (DC Cir. 1985) (noting that an agency has discretion to weigh factors in undertaking cost-benefit analysis).

provisions, the Commission does not have the authority to consider alternatives to the statute's prescribed procedures. For example, the final regulations implement, among other provisions, Section 745 of the Dodd-Frank Act, which specifies new procedures for the submission of certain rules and rule amendments and new default timelines for the Commission's review of rule submissions. Many of these new procedures—for example, the 30-day public comment period following the stay of a submitted rule—are statutorily mandated and the Commission's final regulations have been drafted to remain within the confines of the enabling language. Similarly, the Commission's SIDCO provisions, in large part, codify the procedures established by Section 806 of the Dodd-Frank Act. For those final regulations not mandated by the Dodd-Frank Act, the Commission has adopted the least-cost alternative consistent with achieving the purposes of the Act.

The Commission invited but did not receive public comments specific to its cost-benefit discussion within the initial comment period following the Commission's proposal. The Commission also invited the public "to submit any data or other information that [it] may have quantifying or qualifying the costs and benefits of the proposal with their comment letters." The Commission received no such data or other information. The Commission did, however, receive general comments on the "burden" associated with the documentation and pricing source certification requirements proposed in §§ 40.2, 40.3, 40.5, and 40.6. Those comments suggested that the new provisions could substantially increase the time and resources required to prepare submissions and could potentially delay the introduction of new products and implementation of rules. However, none of these comments suggested feasible alternatives to the statutory mandate. Nor did such comments show how and to what extent those burdens would be increased by the implementing proposal.

In a comment concerning the Commission's cost-benefit analysis, the CME stated that the CFMA streamlined the product and rule submission process to eliminate the "substantial unnecessary paperwork" previously required to be submitted to the Commission. In the CME's view, the documentation and pricing source certification requirements effectively reinstated the pre-CFMA submission process by mandating that registered entities submit "massive amounts of documentation" for Commission

review. In addition, CME stated that the part 40 proposal's cost-benefit discussion did not "acknowledge that a fully-functional and less costly system of self-certification is already in place" and that the Commission failed to justify what CME characterized as "onerous requirements" with few public benefits. CME also stated that the Commission's proposal did not "address any actual costs" to industry, including "the cost of compiling all documentation relied upon to determine whether a new product, new rule or rule amendment complies with the Core Principles" and the costs of "enabl[ing] foreign competitors" to introduce products that compete with domestic DCM product innovations.

The Commission, after consideration of the public interest factors specified in section 15(a) of the Act, has determined, as set forth below, that the costs associated with its final regulations will not have a material effect on the efficiency, competitiveness, and financial integrity of the futures and swaps markets and should substantially benefit registered entities by facilitating and expediting the Commission's review of product and rule submissions. The Commission has considered the costs and benefits of its regulations throughout the preamble and generally views the related matters section of this final rulemaking to be an extension of that discussion. Estimates pursuant to the Paperwork Reduction Act are a subset of and incorporated into the overall compliance costs associated with final part 40.

The Commission's final regulations address the relevant areas of market and public concern specified in section 15(a) of the Act. Specifically, the Commission's certification and approval procedures ensure that registered entities do not enact rules that, among other things, harm market participants or the public, result in unreasonable restraints of trade or material anticompetitive burdens on trading, or have other effects that are detrimental to the public interest. In addition, the special certification procedures for SIDCOs and certain event contracts implement Sections 806 and 745 of the Dodd-Frank Act, respectively, and ensure that the Commission has adequate time and information to analyze certain risk-related rules and novel products based upon certain excluded commodities. The SIDCO notice requirement is important to the Commission's oversight of sound risk management practices and to its efforts to monitor and mitigate systemic risks. The proposed event contract provisions, consistent with the intent of Congress,

prevent individuals from speculating on activities that are potentially harmful to national security or detrimental to the stability of the futures markets. Finally, the "concise explanation and analysis" required for the submission of new products is a less-costly alternative to the Commission's proposed documentation requirement and will assist the Commission in protecting the price discovery function of the markets.

The final certification and approval procedures are necessary to fulfill the requirements of the Dodd-Frank Act, to protect market participants, to enhance the Commission's administration of the Act, and to ensure the continued competitiveness and financial integrity of the futures and swaps markets. Moreover, in response to public comments and after consultations with market participants and prudential regulators, the proposed rules have been amended to implement, where possible, a less costly alternative that achieves the statutory objectives of the Act, as amended by the Dodd-Frank Act.

With respect to costs, the Commission recognizes that its final regulations may increase compliance costs by requiring the submission of a "concise explanation and analysis" and by requiring registered entities to certify that they posted the complete submission on the registered entity's Web site at the time of filing. The Commission believes that these costs will be *de minimis*. A "concise explanation and analysis" should be a clear and informative—but not necessarily lengthy—description of the product or rule and its implications for compliance with applicable law. Moreover, the explanation and analysis incorporates information that is, in many cases, already required to be reviewed or collected by registered entities. A concise description and examination of the submission should impose minimal costs on registered entities, because it requires the registered entity merely to memorialize its due diligence in certifying compliance with applicable law. Posting this information on the registered entity's Web site should be as simple as providing an electronic copy of the submission to appropriate personnel. All current registered entities maintain a Web site and therefore this new requirement may increase the overall cost, if at all, by only a negligible margin.

In addition, the proposed price certification provisions are not being adopted and the proposed documentation provisions have been revised—and, in some cases, removed from the final regulations—to permit

registered entities more flexibility in complying with the Act and Commission's regulations, to reduce potential administrative and compliance costs, and to adopt, where possible, less burdensome alternatives to the Commission's proposal. For example, under the Commission's final product submission regulations, registered entities, including CME, are not required to submit "massive amounts of documentation" with their new product submissions. Instead, as suggested by ICE Futures, the Commission will allow registered entities to submit an explanation and analysis of the product with the information contained in such documentation and citations to relevant data sources. Moreover, the Commission finds that the submission of an explanation and analysis is necessary for its review of product and rule certifications. Although CME correctly notes that self-certification regime has been retained under the Act, as amended by the Dodd-Frank Act, the Commission has encountered numerous instances in which registered entities provided only cursory supporting analyses for their product submissions or, in certain cases, failed to document the evidentiary basis for their certifications altogether. As discussed in the preamble, the staff must expend significant resources and time to replicate existing analyses or to otherwise independently establish a product's compliance with applicable law when submissions are not adequately explained or supported by registered entities.

With respect to the new SIDCO provisions in § 40.10, the cost of creating the advance notice will not be substantial. A SIDCO should have this information prior to determining whether to implement a change and, consequently, the marginal cost of drafting and submitting the notice will be small. On the other hand, the Commission believes that the benefit of this information is significant because it is necessary to assess the effect that the proposed change would have on the nature or level of risks. The final provisions of § 40.10 parallel the requirements of the Dodd-Frank Act. The Commission's proposal effectively mirrors the enabling provisions of the statute and, accordingly, the Commission's ability to revise the proposed requirements is limited.

As discussed above, advance notice of all changes that materially impact risk—increasing or decreasing risk—is necessary for the Commission to monitor systemic risk and to see that SIDCOs effectively manage risk in furtherance of compliance with the core

principles. The Commission acknowledges that requiring a SIDCO to notify the Commission under § 40.10 of a change that could materially reduce risk could delay the time when that change becomes effective. However, even for ostensibly risk-reducing changes, there may be adverse consequences that the Commission should have the opportunity to consider in the time frame set forth in Section 806 of the Dodd-Frank Act.

Moreover, the Commission and the Board have statutory obligations to review proposed changes to SIDCO rules, procedures and operations that materially impact risks and Section 806 of the Dodd-Frank Act mandates the time period for review. The Commission also notes that, in appropriate cases, the staff may permit a risk-related rule to become effective prior to the expiration of the 60-day notice period.

The costs associated with the emergency notice required in § 40.10(h) are similarly minimal and include the cost of drafting and submitting the notice and any cost associated with the possibility that the Commission could rescind or modify the emergency change. There also may be a cost of requiring notice within 24 hours; however, section 806(e)(2)(B) of the Dodd-Frank Act mandates notices be provided within this timeframe. The substantive requirements of the notice provisions also are outlined by section 806(e)(2)(C) of the Dodd-Frank Act and, as explained above, the Commission believes that the cost of providing the information required for an advance notice will be small. The marginal cost of providing additional information concerning an emergency notice should be similarly small because a SIDCO will already know the nature of the emergency and will have determined that the change was necessary for the SIDCO to continue to provide its services in a safe and sound manner prior to implementing the emergency change. The Commission believes that the information is necessary for it to review an emergency change.

Having considered the costs of its proposal, the Commission is adopting these final regulations, including changes to the proposed regulations as summarized below, to further reduce the information collection burdens on and associated costs for registered entities as follows:

• The Commission is revising the proposed documentation requirements in § 40.2 and § 40.3 to permit the submission of an appropriately detailed and cited explanation and analysis in lieu of documentation;

• The Commission is amending § 40.2 to apply only to DCMs and SEFs and intends to implement new product clearing submission requirements in a new § 39.5 (in a separate rulemaking);

• The Commission is eliminating the documentation requirements in § 40.5 and § 40.6;

• The Commission is providing new provisions for class certifications of certain swaps;

• The Commission is amending § 40.6(a) to make effective upon submission rules delisting or withdrawing the certification of products;

• The Commission is eliminating the proposed certification requirement concerning the use of third-party prices;

• The Commission is eliminating a previously proposed provision requiring "[w]henever possible, all proposed swap or contract terms and conditions [to] conform to industry standards or those terms and conditions adopted by comparable contracts;"

• The Commission is limiting the application of § 40.12 to novel derivative products that are not subject to the forthcoming provisions of § 1.8.

The resulting final rules should impose significantly lower costs on registered entities than the proposed rules. The average annual burden for the 70 anticipated registered entities may be reduced by more than one-third in comparison to the initial proposed requirements—from an estimated 324 hours per year per registered entity to approximately 202 hours per year per registered entity. To the extent that the Commission's final regulations impose any additional costs or burdens on registered entities, these costs or burdens would require a single part-time staff person to handle new requirements related to product and rule submissions to the Commission; the total time cost may be as little as four hours per week per registered entity. Thus, the Commission has determined that these final regulations are necessary to enable the Commission to perform its oversight functions and to carry out its statutory responsibilities under the Act.

## IV. Related Matters

### a. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") [41] requires agencies to consider whether final regulations have a significant economic impact on a substantial number of small entities and, where the regulations do so, to provide a regulatory flexibility analysis concerning the impact of such

---

[41] 5 U.S.C. 601 et seq.

regulations.[42] The final rules require DCOs, DCMs, SEFs, and SDRs to submit to the Commission new products, rules, and rule amendments, before they become effective, with either a request for Commission approval or a certification that the products or rules comply with the Act and Commission regulations. In addition, the Commission's new regulations require product submissions be accompanied by a concise explanation and analysis that incorporates information contained in supporting documents, whereas the new requirements for rule certifications simply require the submission of a concise explanation and analysis of the purpose, operation, and effect of the filing. Accordingly, these product and rule approval and self-certification regulations are not complex and do not impose a significant economic impact on any registered entity.

Moreover, the Commission previously determined that DCMs, DCOs, SEFs, and SDRs are not "small entities" for purposes of the RFA.[43] In determining that these registered entities are not "small entities," the Commission reasoned that it designates a contract market or registers a DCO, SEF, or SDR only if the entity meets a number of specific criteria, including the expenditure of sufficient resources to establish and maintain an adequate self-regulatory program.[44] Because DCMs, DCOs, SEFs and SDRs are required to demonstrate compliance with Core Principles, including principles concerning the maintenance or expenditure of financial resources, the Commission previously determined that SEFs and SDRs, like DCMs and DCOs, are not "small entities" for the purposes of the RFA.

The Chairman, on behalf of the Commission, hereby certifies pursuant to 5 U.S.C. 605(b) that these regulations do not have a significant impact on a substantial number of small entities.

*b. Paperwork Reduction Act*

The Commission may not conduct or sponsor, and a registered entity is not required to respond to, a collection of information unless it displays a currently valid Office of Management and Budget ("OMB") control number. Amendments to §§ 40.2, 40.3, 40.5, 40.6, and 40.10 impose new information

[42] 5 U.S.C. 601 *et seq.*

[43] *See* 17 CFR part 40 Provisions Common to Registered Entities, 75 FR 67282 (November 2, 2010); *see also* 47 FR 18618, 18619 (April 30, 1982) and 66 FR 45604, 45609 (August 29, 2001).

[44] *See, e.g.,* Core Principle 2 applicable to SEFs under Section 733 of the Dodd-Frank Act and Core Principles 1–3 applicable to SDRs under Section 728 of the Dodd-Frank Act.

collection requirements on registered entities within the meaning of the Paperwork Reduction Act.[45] Accordingly, the Commission requested and OMB assigned a control number for the required collections of information. The Commission has submitted this notice of final rulemaking along with supporting documentation for OMB's review in accordance with 44 U.S.C. 3507(d) and 5 CFR 1320.11. The title for this collection of information is "Part 40, Provisions Common to Registered Entities, OMB control number 3038–D07." Many of the responses to this new collection of information are mandatory.

The Commission protects proprietary information according to the Freedom of Information Act and 17 CFR part 145, "Commission Records and Information." In addition, section 8(a)(1) of the Act strictly prohibits the Commission, unless specifically authorized by the Act, from making public "data and information that would separately disclose the business transactions or market positions of any person and trade secrets or names of customers." The Commission also is required to protect certain information contained in a government system of records according to the Privacy Act of 1974, 5 U.S.C. 552a.

1. Information Provided by Reporting Entities/Persons

These rules require DCMs, DCOs, and new registered entities, SEFs and SDRs, to collect and submit to the Commission information concerning new products, rules, and rule amendments pursuant to the procedures outlined in §§ 40.2, 40.3, 40.5, 40.6, and 40.10. The Commission is adopting these information collection requirements in order to give effect to various notice, rule certification, and rule approval provisions of the Dodd-Frank Act, to expedite the staff's review of newly-certified and submitted products, and to improve the Commission's administration of the Act.

The Commission estimated the final information collection burdens on registered entities below. These estimates account for the following: (1) The number of respondents; (2) the number of responses required of each respondent; (3) the average hours required to produce each response; and (4) the aggregate annual reporting burden. The Commission estimates that the effect of final §§ 40.2, 40.3, 40.5, 40.6, 40.10, and 40.12 will be to increase the information collection burden by approximately 202 hours per year per registered entity, resulting mostly from the preparation of the

[45] 44 U.S.C. 3501 *et seq.*

concise explanation and analysis to be filed with the Commission in connection with the listing of products or the certification or approval of rules. The Commission estimates that 70 registered entities will be required to file their new product and rule submissions.

The Commission previously estimated the aggregate number of hours that it expected registered entities to spend complying with part 40. Upon further consideration, the Commission has determined to revise the hours attributable to the new provisions of part 40. The newly-revised and final regulations require each registered entity to spend an estimated and additional 202 hours per year complying with part 40. Due to a calculation error in the proposed rulemaking, the estimated information collection burden in the proposed part 40 rulemaking was quoted as 8,300 hours; the estimated information collection burden should have been 22,664. Based on the 22,664 estimate, the estimated average hours per registered entity would have been 323.771 hours. Thus, under the Commission's current analysis and in light of the regulatory changes below, each registered entity may expect to spend approximately 121 fewer hours per year complying with part 40 than would have been required under the Commission's proposal. The substantial reduction in the estimated annual time that each registered entity may spend complying with part 40 results from revisions to the documentation requirements in §§ 40.2 and 40.3, the elimination of the documentation requirements in §§ 40.5 and 40.6, the elimination of the price certification requirements in §§ 40.2, 40.3, 40.5, and 40.6, and the addition of the class certification provisions for certain swaps in § 40.2(d).

Final §§ 40.2, 40.3, 40.5 and 40.6 require each registered entity to comply with new certification and approval requirements when seeking to implement new products, rules, and rule amendments, including changes to product terms or conditions. However, in consideration of comments concerning proposed §§ 40.2, 40.3, 40.5 and 40.6, the Commission has determined to amend its proposal to reduce the information collection burden on the registered entities. Specifically, the Commission's final § 40.2(d) streamlines the product certification process for a significant percentage of swap contracts by permitting a DCM or SEF to class certify, within a single submission, one

or more swaps with similar, specified characteristics.

In addition, the Commission has determined to amend its proposal to do the following: (1) Substantially revise § 40.2 and § 40.3 to reduce the document collection burden for newly-submitted products, and (2) eliminate the previously proposed documentation provisions in § 40.5 and § 40.6. The Commission has determined to maintain §§ 40.2(a)(3)(vii), 40.3(a)(10), 40.5(a)(6), and 40.6(a)(2) requiring registered entities to state that they posted a copy of the certification or request for approval on the registered entity's Web site at the time of the filing with the Commission.

In light of the amendments to the Commission's final regulations, noted above, the Commission revises these previous estimates as follows:

*Estimated number of respondents:* 70.
*Annual responses by each respondent:* 100.
*Estimated average hours per response:* 2.00.
*Aggregate annual reporting burden hours (for all respondents):* 14,000.

The Commission originally estimated that 45 registered entities would be subject to the information collection requirements in §§ 40.2, 40.3, 40.5 and 40.6. The Commission based this estimate upon the number of registered and exempt entities at the time of proposal. The Commission has determined to increase its previous estimate to account for an increased number of anticipated registered entities, a few of which do not currently operate a registered or exempt entity. The 70 registered entity figure, above, only minimally alters the per registered entity estimate of time that will be required to comply with part 40.

In addition, the Commission initially estimated 120 responses per year from registered entities. In light of the revisions to the documentation requirements and the ability of registered entities to certify certain swap contracts as a class under § 40.2(d), the number of estimated submissions has been reduced. The Commission also reduced the estimated hourly burden in light of revisions to the documentation requirements in §§ 40.2 and 40.3 and the elimination of the documentation requirements in §§ 40.5 and 40.6.

§ 40.10 requires SIDCOs to provide to the Commission 60 days advance notice of proposed changes to rules, procedures or operations that could materially affect the nature or level of risks presented by the SIDCO.

*Estimated number of respondents:* 4.
*Annual responses by each respondent:* 2.

*Estimated average hours per response:* 5.
*Aggregate annual reporting burden hours (for all respondents):* 40.

Finally, § 40.12 permits registered entities to provide notice to the Commission and the Securities and Exchange Commission when certifying, submitting for approval, or otherwise filing a proposal to list a product (other than a product subject to the forthcoming provisions of § 1.8 of this chapter) having elements of both a security and a contract for the sale of a commodity for future delivery (or an option on such contract or an option on a commodity). The Commission has determined to promulgate rules governing jurisdictional disputes over novel swap products in a separate and forthcoming rulemaking. Accordingly, it is adjusting its estimates to reflect that fact that jurisdictional determinations concerning certain novel product submissions will not be subject to the provisions of § 40.12.

*Estimated number of respondents:* 8.
*Annual responses by each respondent:* 4.
*Estimated average hours per response:* 2.52.
*Aggregate annual reporting burden hours (for all respondents):* 80.64.

**List of Subjects in 17 CFR Part 40**

Commodity futures, Contract markets, Designation application, Reporting and recordkeeping requirements, Swap execution facility, Swap data repository, Systemically important derivatives clearing organization, Rule approval, Rule certification, Review of certain event contracts.

In light of the foregoing, and pursuant to authority in the Act, and, in particular, Sections 3, 5, 5c(c) and 8a(5) of the Act, the Commission hereby revises part 40 of Title 17 of the Code of Federal Regulations to read as follows:

**PART 40—PROVISIONS COMMON TO REGISTERED ENTITIES**

Sec.
40.1   Definitions.
40.2   Listing products for trading by certification.
40.3   Voluntary submission of new products for Commission review and approval.
40.4   Amendments to terms or conditions of enumerated agricultural products.
40.5   Voluntary submission of rules for Commission review and approval.
40.6   Self-certification of rules.
40.7   Delegations.
40.8   Availability of public information.
40.9   [Reserved]
40.10   Special certification procedures for submission of rules by systemically

important derivatives clearing organizations.
40.11   Review of event contracts based upon certain excluded commodities.
40.12   Staying of certification and tolling of review period pending jurisdictional determination.

**Appendix A to Part 40—Schedule of Fees**

**Appendix B to Part 40—[Reserved]**

**Appendix C to Part 40—[Reserved]**

**Appendix D to Part 40—Submission Cover Sheet and Instructions**

**Authority:** 7 U.S.C. 1a, 2, 5, 6, 7, 7a, 8 and 12, as amended by Titles VII and VIII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Pub. L. 111–203, 124 Stat. 1376 (2010).

**§ 40.1   Definitions.**

As used in this part:

(a) *Business day* means the intraday period of time starting at the business hour of 8:15 a.m. and ending at the business hour of 4:45 p.m.; *business hour* means any hour between 8:15 a.m. and 4:45 p.m. Business day and business hour are Eastern Standard Time or Eastern Daylight Savings Time, whichever is currently in effect in Washington, DC, on all days except Saturdays, Sundays, and Federal holidays in Washington, DC.

(b) *Dormant contract or dormant product* means:

(1) Any agreement, contract, transaction, instrument, swap or any such commodity futures or option contract with respect to all future or option expiries, listed on a designated contract market, a swap execution facility or cleared by a registered derivatives clearing organization, that has no open interest and in which no trading has occurred for a period of twelve complete calendar months following a certification to, or approval by, the Commission; *provided, however,* that no contract or instrument under this paragraph (b)(1) initially and originally certified to, or approved by, the Commission within the preceding 36 complete calendar months shall be considered to be dormant; or

(2) Any commodity futures or option contract, swap or other agreement, contract, transaction or instrument of a dormant designated contract market, dormant swap execution facility or a dormant derivatives clearing organization; or

(3) Any commodity futures or option contract or other agreement, contract, swap, transaction or instrument not otherwise dormant that a designated contract market, a swap execution facility or a derivatives clearing

organization self-declares through certification to be dormant.

(c) *Dormant designated contract market* means any designated contract market on which no trading has occurred during the period of twelve consecutive calendar months, preceding the first day of the most recent calendar month; *provided, however,* no designated contract market shall be considered to be dormant if its initial and original Commission order of designation was issued within the preceding 36 consecutive calendar months.

(d) *Dormant derivatives clearing organization* means any derivatives clearing organization registered pursuant to Section 5b of the Act that has not accepted for clearing any agreement, contract or transaction that is required or permitted to be cleared by a derivatives clearing organization under Sections 5b(a) and 5b(b) of the Act, respectively, for a period of twelve complete calendar months; *provided, however,* no derivatives clearing organization shall be considered to be dormant if its initial and original Commission order of registration was issued within the preceding 36 complete calendar months.

(e) *Dormant swap data repository* means any registered swap data repository on which no data has resided for a period of twelve consecutive calendar months, preceding the most recent calendar month.

(f) *Dormant swap execution facility* means any swap execution facility on which no trading has occurred for a period of twelve consecutive calendar months, preceding the first day of the most recent calendar month; provided, however, no swap execution facility shall be considered to be dormant if its initial and original Commission order of registration was issued within the preceding 36 consecutive calendar months.

(g) *Dormant rule* means:

(1) Any registered entity rule which remains unimplemented for twelve consecutive calendar months following a certification with, or an approval by, the Commission; or

(2) Any rule or rule amendment of a dormant designated contract market, dormant swap execution facility, dormant swap data repository or dormant derivatives clearing organization.

(h) *Emergency* means any occurrence or circumstance that, in the opinion of the governing board of a registered entity, or a person or persons duly authorized to issue such an opinion on behalf of the governing board of a registered entity under circumstances

and pursuant to procedures that are specified by rule, requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or the liquidation of or delivery pursuant to, any agreements, contracts, swaps or transactions or the timely collection and payment of funds in connection with clearing and settlement by a derivatives clearing organization, including:

(1) Any manipulative or attempted manipulative activity;

(2) Any actual, attempted, or threatened corner, squeeze, congestion, or undue concentration of positions;

(3) Any circumstances which may materially affect the performance of agreements, contracts, swaps or transactions, including failure of the payment system or the bankruptcy or insolvency of any participant;

(4) Any action taken by any governmental body, or any other registered entity, board of trade, market or facility which may have a direct impact on trading or clearing and settlement; and

(5) Any other circumstance which may have a severe, adverse effect upon the functioning of a registered entity.

(i) *Rule* means any constitutional provision, article of incorporation, bylaw, rule, regulation, resolution, interpretation, stated policy, advisory, terms and conditions, trading protocol, agreement or instrument corresponding thereto, including those that authorize a response or establish standards for responding to a specific emergency, and any amendment or addition thereto or repeal thereof, made or issued by a registered entity or by the governing board thereof or any committee thereof, in whatever form adopted.

(j) *Terms and conditions* means any definition of the trading unit or the specific commodity underlying a contract for the future delivery of a commodity or commodity option contract, description of the payments to be exchanged under a swap, specification of cash settlement or delivery standards and procedures, and establishment of buyers' and sellers' rights and obligations under the swap or contract. Terms and conditions include provisions relating to the following:

(1) For a contract for the purchase or sale of a commodity for future delivery or an option on such a contract or an option on a commodity (other than a swap):

(i) Quality and other standards that define the commodity or instrument underlying the contract;

(ii) Quantity standards or other provisions related to contract size;

(iii) Any applicable premiums or discounts for delivery of nonpar products;

(iv) Trading hours, trading months and the listing of contracts;

(v) The pricing basis, minimum price fluctuations, and maximum price fluctuations;

(vi) Any price limits, no cancellation ranges, trading halts, or circuit breaker provisions, and procedures for the establishment of daily settlement prices;

(vii) Position limits, position accountability standards, and position reporting requirements;

(viii) Delivery points and locational price differentials;

(ix) Delivery standards and procedures, including fees related to delivery or the delivery process; alternatives to delivery and applicable penalties or sanctions for failure to perform;

(x) If cash settled; the definition, composition, calculation and revision of the cash settlement price or index;

(xi) Payment or collection of commodity option premiums or margins;

(xii) Option exercise price, if it is constant, and method for calculating the exercise price, if it is variable;

(xiii) Threshold prices for an option contract, the existence of which is contingent upon those prices; and

(xiv) Any restrictions or requirements for exercising an option; and

(2) For a swap:

(i) Identification of the major group, category, type or class in which the swap falls (such as an interest rate, commodity, credit or equity swap) and of any further sub-group, category, type or class that further describes the swap;

(ii) Notional amounts, quantity standards, or other unit size characteristics;

(iii) Any applicable premiums or discounts for delivery of nonpar products;

(iv) Trading hours and the listing of swaps;

(v) Pricing basis for establishing the payment obligations under, and mark-to-market value of, the swap including, as applicable, the accrual start dates, termination or maturity dates, and, for each leg of the swap, the initial cash flow components, spreads, and points, and the relevant indexes, prices, rates, coupons, or other price reference measures;

(vi) Any price limits, trading halts, or circuit breaker provisions, and procedures for the establishment of daily settlement prices;

(vii) Position limits, position accountability standards, and position reporting requirements;

(viii) Payment and reset frequency, day count conventions, business calendars, and accrual features;

(ix) If physical delivery applies, delivery standards and procedures, including fees related to delivery or the delivery process, alternatives to delivery and applicable penalties or sanctions for failure to perform;

(x) If cash settled, the definition, composition, calculation and revision of the cash settlement price, and the settlement currency;

(xi) Payment or collection of option premiums or margins;

(xii) Option exercise price, if it is constant, and method for calculating the exercise price, if it is variable;

(xiii) Threshold prices for an option, the existence of which is contingent upon those prices;

(xiv) Any restrictions or requirements for exercising an option; and

(xv) Life cycle events.

### § 40.2 Listing products for trading by certification.

(a) A designated contract market or a swap execution facility must comply with the submission requirements of this section prior to listing a product for trading that has not been approved under § 40.3 of this part or that remains dormant subsequent to being submitted under this section or approved under § 40.3 of this part. A submission shall comply with the following conditions:

(1) The designated contract market or the swap execution facility has filed its submission electronically, in a format and manner specified by the Secretary of the Commission with the Secretary of the Commission;

(2) The Commission has received the submission by the open of business on the business day preceding the product's listing; and

(3) The submission includes:

(i) A copy of the submission cover sheet in accordance with the instructions in Appendix D to this part;

(ii) A copy of the product's rules, including all rules related to its terms and conditions;

(iii) The intended listing date;

(iv) A certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder;

(v) A concise explanation and analysis of the product and its compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with

applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(vi) A certification that the registered entity posted a notice of pending product certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's Web site. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's Web site but must be republished consistent with any determination made pursuant to § 40.8(c)(4);

(vii) A request for confidential treatment, if appropriate, as permitted under § 40.8.

(b) *Additional information.* If requested by Commission staff, a registered entity shall provide any additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act or the Commission's regulations or policies thereunder.

(c) *Stay.* The Commission may stay the listing of a contract pursuant to paragraph (a) of this section during the pendency of Commission proceedings for filing a false certification or during the pendency of a petition to alter or amend the contract terms and conditions pursuant to Section 8a(7) of the Act. The decision to stay the listing of a contract in such circumstances shall not be delegable to any employee of the Commission.

(d) *Class certification of swaps.* (1) A designated contract market or swap execution facility may list or facilitate trading in any swap or number of swaps based upon an "excluded commodity," as defined in Section 1a(19)(i) of the Act, not including any security, security index, and currency other than the United States Dollar and a "major foreign currency," as defined in § 15.03(a), or an "excluded commodity," as defined in Section 1a(19)(ii)–(iv) of the Act, provided the designated contract market or swap execution facility certifies, under § 40.2(a)(1)–(2), § 40.2(a)(3)(i), § 40.2(a)(3)(iv), and § 40.2(a)(3)(vi), each of the following:

(i) That each particular swap within the certified class of swaps is based upon an excluded commodity specified in § 40.2(d)(1); and

(ii) That each particular swap within the certified class of swaps is based upon an excluded commodity with an identical pricing source, formula, procedure, and methodology for

calculating reference prices and payment obligations; and

(iii) That the pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in each particular swap within the certified class of swaps is identical to a pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in a product previously submitted to the Commission and certified or approved pursuant to § 40.2 or § 40.3;

(iv) That each particular swap within the certified class of swaps is based upon an excluded commodity involving an identical currency or identical currencies.

(2) The Commission may in its discretion require a registered entity to withdraw its certification under § 40.2(d)(1) and to submit each individual swap or certain individual swaps within the submission for Commission review pursuant to § 40.2 or § 40.3

### § 40.3 Voluntary submission of new products for Commission review and approval.

(a) *Request for approval.* Pursuant to Section 5c(c) of the Act, a designated contract market, a swap execution facility, or a derivatives clearing organization may request that the Commission approve a new or dormant product prior to listing the product for trading or accepting the product for clearing, or if a product was initially submitted under § 40.2 of this part or § 39.5 of this chapter, subsequent to listing the product for trading or accepting the product for clearing. A submission requesting approval shall:

(1) Be filed electronically, in a format and manner specified by the Secretary of the Commission with the Secretary of the Commission;

(2) Include a copy of the submission cover sheet in accordance with the instructions in Appendix D to this part;

(3) Include a copy of the rules that set forth the contract's terms and conditions;

(4) Include an explanation and analysis of the product and its compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with the applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(5) Describe any agreements or contracts entered into with other parties that enable the registered entity to carry out its responsibilities;

(6) Include the certifications required in § 41.22 for product approval of a commodity that is a security future or a security futures product as defined in Sections 1a(44) or 1a(45) of the Act, respectively;

(7) Include, if appropriate, a request for confidential treatment as permitted under § 40.8;

(8) Include the filing fee required under Appendix A to this part;

(9) Certify that the registered entity posted a notice of its request for Commission approval of the new product and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's Web site. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's Web site but must be republished consistent with any determination made pursuant to § 40.8(c)(4);

(10) Include, if requested by Commission staff, additional evidence, information or data demonstrating that the contract meets, initially or on a continuing basis, the requirements of the Act, or other requirement for designation or registration under the Act, or the Commission's regulations or policies thereunder. The registered entity shall submit the requested information by the open of business on the date that is two business days from the date of request by Commission staff, or at the conclusion of such extended period agreed to by Commission staff after timely receipt of a written request from the registered entity.

(b) *Standard for review and approval.* The Commission shall approve a new product unless the terms and conditions of the product violate the Act or the Commission's regulations.

(c) *Forty-five day review.* All products submitted for Commission approval under this paragraph shall be deemed approved by the Commission 45 days after receipt by the Commission, or at the conclusion of an extended period as provided under paragraph (d) of this section, unless notified otherwise within the applicable period, if:

(1) The submission complies with the requirements of paragraph (a) of this section; and

(2) The submitting entity does not amend the terms or conditions of the product or supplement the request for approval, except as requested by the Commission or for correction of typographical errors, renumbering or

other non-substantive revisions, during that period. Any voluntary, substantive amendment by the submitting entity will be treated as a new submission under this section.

(d) *Extension of time.* The Commission may extend the 45 day review period in paragraph (c) of this section for:

(1) An additional 45 days, if the product raises novel or complex issues that require additional time to analyze, in which case the Commission shall notify the registered entity within the initial 45 day review period and shall briefly describe the nature of the specific issues for which additional time for review is required; or

(2) Any extended review period to which the registered entity agrees in writing.

(e) *Notice of non-approval.* The Commission at any time during its review under this section may notify the registered entity that it will not, or is unable to, approve the product. This notification will briefly specify the nature of the issues raised and the specific provision of the Act or Commission's regulations, including the form or content requirements of paragraph (a) of this section, that the product violates, appears to violate or potentially violates but which cannot be ascertained from the submission.

(f) *Effect of non-approval.* (1) Notification to a registered entity under paragraph (e) of this section of the Commission's determination not to approve a product does not prejudice the entity from subsequently submitting a revised version of the product for Commission approval or from submitting the product as initially proposed pursuant to a supplemented submission.

(2) Notification to a registered entity under paragraph (e) of this section of the Commission's refusal to approve a product shall be presumptive evidence that the entity may not truthfully certify under § 40.2 that the same, or substantially the same, product does not violate the Act or the Commission's regulations thereunder.

### § 40.4 Amendments to terms or conditions of enumerated agricultural products.

(a) Notwithstanding the provisions of this part, a designated contract market must submit for Commission approval under the procedures of § 40.5, prior to its implementation, any rule or dormant rule that, for a delivery month having open interest, would materially change a term or condition, as defined in § 40.1(j), of a contract for future delivery in an agricultural commodity enumerated in Section 1a(9) of the Act,

or of an option on such a contract or commodity.

(b) The following rules or rule amendments are not material and should not be submitted under this section:

(1) Changes that are enumerated in § 40.6(d)(2) may be implemented without prior approval or certification if implemented pursuant to the notification procedures of § 40.6(d);

(2) Changes that are enumerated in § 40.6(d)(3)(ii) may be implemented without prior approval or certification or notification as permitted pursuant to § 40.6(d)(3);

(3) Changes in no cancellation ranges and trading hours may be implemented without prior approval if implemented pursuant to the procedures of § 40.6(a);

(4) Changes required to comply with a binding order of a court of competent jurisdiction, or a rule, regulation or order of the Commission or of another Federal regulatory authority, may be implemented without prior approval if implemented pursuant to the procedures of § 40.6(a);or

(5) Any other rule:

(i) The text of which has been submitted for review at least ten business days prior to its implementation and that has been labeled "Non-Material Agricultural Rule Change;"

(ii) For which the designated contract market has provided an explanation as to why it considers the rule "non-material," and any other information that may be beneficial to the Commission in analyzing the merits of the entity's claim of non-materiality; and

(iii) With respect to which the Commission has not notified the contract market during the review period that the rule appears to require or does require prior approval under this section, may be implemented without prior approval if implemented under the procedures of § 40.6(a).

### § 40.5 Voluntary submission of rules for Commission review and approval.

(a) *Request for approval of rules.* Pursuant to Section 5c(c) of the Act, a registered entity may request that the Commission approve a new rule, rule amendment or dormant rule prior to implementation of the rule, or if the request was initially submitted under §§ 40.2 or 40.6 of this part, subsequent to implementation of the rule. A request for approval shall:

(1) Be filed electronically in a format and manner specified by the Secretary of the Commission with the Secretary of the Commission;

**44794**    **Federal Register** / Vol. 76, No. 144 / Wednesday, July 27, 2011 / Rules and Regulations

(2) Include a copy of the submission cover sheet in accordance with the instructions in Appendix D to this part;

(3) Set forth the text of the rule or rule amendment (in the case of a rule amendment, deletions and additions must be indicated);

(4) Describe the proposed effective date of the rule or rule amendment and any action taken or anticipated to be taken to adopt the proposed rule by the registered entity or by its governing board or by any committee thereof, and cite the rules of the entity that authorize the adoption of the proposed rule;

(5) Provide an explanation and analysis of the operation, purpose, and effect of the proposed rule or rule amendment and its compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder, including, as applicable, a description of the anticipated benefits to market participants or others, any potential anticompetitive effects on market participants or others, and how the rule fits into the registered entity's framework of self-regulation;

(6) Certify that the registered entity posted a notice of pending rule with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's Web site. Information which the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's Web site but must be republished consistent with any determination made pursuant to § 40.8(c)(4);

(7) Provide additional information which may be beneficial to the Commission in analyzing the new rule or rule amendment. If a proposed rule affects, directly or indirectly, the application of any other rule of the registered entity, the pertinent text of any such rule must be set forth and the anticipated effect described;

(8) Provide a brief explanation of any substantive opposing views expressed to the registered entity by governing board or committee members, members of the entity or market participants that were not incorporated into the rule, or a statement that no such opposing views were expressed;

(9) Identify any Commission regulation that the Commission may need to amend, or sections of the Act or the Commission's regulations that the Commission may need to interpret, in order to approve the new rule or rule amendment. To the extent that such an amendment or interpretation is necessary to accommodate a new rule or rule amendment, the submission should

include a reasoned analysis supporting the amendment to the Commission's regulation or the interpretation;

(10) As appropriate, include a request for confidential treatment as permitted under the procedures of § 40.8.

(b) *Standard for review and approval.* The Commission shall approve a new rule or rule amendment unless the rule or rule amendment is inconsistent with the Act or the Commission's regulations.

(c) *Forty-five day review.* (1) All rules submitted for Commission approval under paragraph (a) of this section shall be deemed approved by the Commission under section 5c(c) of the Act 45 days after receipt by the Commission, or at the conclusion of such extended period as provided under paragraph (d) of this section, unless the registered entity is notified otherwise within the applicable period, if:

(i) The submission complies with the requirements of paragraph (a) of this section;

(ii) The registered entity does not amend the proposed rule or supplement the submission, except as requested by the Commission, during the pendency of the review period other than for correction of typographical errors, renumbering or other non-substantive revisions. Any amendment or supplementation not requested by the Commission will be treated as the submission of a new filing under this section.

(2) The Commission shall commence the review period in paragraph (c) of this section for a compliant submission under § 40.4(b)(5) ten business days after its receipt.

(d) *Commencement and extension of time for review.* The Commission may further extend the review period in paragraph (c) of this section for any approval request for:

(1) An additional 45 days, if the proposed rule raises novel or complex issues that require additional time for review or is of major economic significance, the submission is incomplete or the requestor does not respond completely to Commission questions in a timely manner, in which case the Commission shall notify the submitting registered entity within the initial forty-five day review period and shall briefly describe the nature of the specific issues for which additional time for review shall be required; or

(2) Any period, beyond the additional 45 days provided in § 40.5(d)(1), to which the registered entity agrees in writing.

(e) *Notice of non-approval.* Any time during its review under this section, the Commission may notify the registered entity that it will not, or is unable to,

approve the new rule or rule amendment. This notification will briefly specify the nature of the issues raised and the specific provision of the Act or the Commission's regulations, including the form or content requirements of this section, with which the new rule or rule amendment is inconsistent or appears to be inconsistent with the Act or the Commission's regulations.

(f) *Effect of non-approval.* (1) Notification to a registered entity under paragraph (e) of this section does not prevent the registered entity from subsequently submitting a revised version of the proposed rule or rule amendment for Commission review and approval or from submitting the new rule or rule amendment as initially proposed in a supplemented submission; the revised submission will be reviewed without prejudice.

(2) Notification to a registered entity under paragraph (e) of this section of the Commission's determination not to approve a proposed rule or rule amendment of a registered entity shall be presumptive evidence that the entity may not truthfully certify that the same, or substantially the same, proposed rule or rule amendment under § 40.6(a) of this section.

(g) *Expedited approval.* Notwithstanding the provisions of paragraph (c) of this section, changes to a proposed rule or a rule amendment, including changes to terms and conditions of a product that are consistent with the Act and Commission regulations and with standards approved or established by the Commission may be approved by the Commission at such time and under such conditions as the Commission shall specify in the written notification, provided, however, that the Commission may, at any time, alter or revoke the applicability of such a notice to any particular product or rule amendment.

### § 40.6  Self-certification of rules.

(a) *Required certification.* A registered entity shall comply with the following conditions prior to implementing any rule, other than a rule delisting or withdrawing the certification of a product, that has not obtained Commission approval under § 40.5 of this part, that remains dormant subsequent to being submitted under this section or approved under § 40.5 of this part, or that is submitted under § 40.10 of this part, except as otherwise provided by § 40.10(a):

(1) The registered entity has filed its submission electronically in a format and manner specified by the Secretary

of the Commission with the Secretary of the Commission.

(2) The registered entity has provided a certification that the registered entity posted a notice of pending certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's Web site. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's Web site but it must be republished consistent with any determination made pursuant to § 40.8(c)(4).

(3) The Commission has received the submission not later than the open of business on the business day that is 10 business days prior to the registered entity's implementation of the rule or rule amendment.

(4) The Commission has not stayed the submission pursuant to § 40.6(c).

(5) The rule or rule amendment is not a rule or rule amendment of a designated contract market that materially changes a term or condition of a contract for future delivery of an agricultural commodity enumerated in section 1a(4) of the Act or an option on such a contract or commodity in a delivery month having open interest.

(6) *Emergency rule certifications.* (i) New rules or rule amendments that establish standards for responding to an emergency must be submitted pursuant to § 40.6(a);

(ii) Rules or rule amendments implemented under procedures of the governing board to respond to an emergency as defined in § 40.1, shall, if practicable, be filed with the Commission prior to the implementation or, if not practicable, be filed with the Commission at the earliest possible time after implementation, but in no event more than twenty-four hours after implementation. Such rules shall be subject to the certification and stay provisions of paragraphs (b) and (c) of this section.

(7). The rule submission shall include:

(i) A copy of the submission cover sheet in accordance with the instructions in Appendix D to this part (in the case of a rule or rule amendment that responds to an emergency, "Emergency Rule Certification" should be noted in the Description section of the submission coversheet);

(ii) The text of the rule (in the case of a rule amendment, deletions and additions must be indicated);

(iii) The date of intended implementation;

(iv) A certification by the registered entity that the rule complies with the

Act and the Commission's regulations thereunder;

(v) A concise explanation and analysis of the operation, purpose, and effect of the proposed rule or rule amendment and its compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder;

(vi) A brief explanation of any substantive opposing views expressed to the registered entity by governing board or committee members, members of the entity or market participants, that were not incorporated into the rule, or a statement that no such opposing views were expressed;

(vii) As appropriate, a request for confidential treatment pursuant to the procedures provided in § 40.8; and

(8) The registered entity shall provide, if requested by Commission staff, additional evidence, information or data that may be beneficial to the Commission in conducting a due diligence assessment of the filing and the registered entity's compliance with any of the requirements of the Act or the Commission's regulations or policies thereunder.

(b) *Review by the Commission.* The Commission shall have 10 business days to review the new rule or rule amendment before the new rule or rule amendment is deemed certified and can be made effective, unless the Commission notifies the registered entity during the 10-business day review period that it intends to issue a stay of the certification under paragraph (c) of this section.

(c) *Stay* (1) *Stay of certification of new rule or rule amendment.* The Commission may stay the certification of a new rule or rule amendment submitted pursuant to paragraph (a) of this section by issuing a notification informing the registered entity that the Commission is staying the certification of the rule or rule amendment on the grounds that the rule or rule amendment presents novel or complex issues that require additional time to analyze, the rule or rule amendment is accompanied by an inadequate explanation or the rule or rule amendment is potentially inconsistent with the Act or the Commission's regulations thereunder. The Commission will have an additional 90 days from the date of the notification to conduct the review. The decision to stay the certification of a rule in such circumstances shall be delegable pursuant to § 40.7 of this part.

(2) *Public comment.* The Commission shall provide a 30-day comment period within the 90-day period in which the stay is in effect as described in paragraph (c)(1) of this section. The

Commission shall publish a notice of the 30-day comment period on the Commission Web site. Comments from the public shall be submitted as specified in that notice.

(3) *Expiration of a stay of certification of new rule or rule amendment.* A new rule or rule amendment subject to a stay pursuant to this paragraph shall become effective, pursuant to the certification, at the expiration of the 90-day review period described in paragraph (c)(1) of this section unless the Commission withdraws the stay prior to that time, or the Commission notifies the registered entity during the 90-day time period that it objects to the proposed certification on the grounds that the proposed rule or rule amendment is inconsistent with the Act or the Commission's regulations.

(4) *Stay of effectiveness of rules or rule amendments already implemented.* The Commission may stay the effectiveness of an implemented rule during the pendency of Commission proceedings for filing a false certification or during the pendency of a petition to alter or amend the rule pursuant to section 8a(7) of the Act. The decision to stay the effectiveness of a rule in such circumstances shall not be delegable to any employee of the Commission.

(d) *Notification of rule amendments.* Notwithstanding the rule certification requirement of Section 5c(c)(1) of the Act and paragraph (a) of this section, a registered entity may place the following rules or rule amendments into effect without certification to the Commission if the following conditions are met:

(1) The registered entity provides to the Commission at least weekly a summary notice of all rule amendments made effective pursuant to this paragraph during the preceding week. Such notice must be labeled "Weekly Notification of Rule Amendments" and need not be filed for weeks during which no such actions have been taken. One copy of each such submission shall be furnished electronically in a format and manner specified by the Secretary of the Commission; and

(2) The rule governs:

(i) *Non-substantive revisions.* Corrections of typographical errors, renumbering, periodic routine updates to identifying information about registered entities and other such non-substantive revisions of a product's terms and conditions that have no effect on the economic characteristics of the product;

(ii) *Delivery standards set by third parties.* Changes to grades or standards of commodities deliverable on a product

that are established by an independent third party and that are incorporated by reference as product terms, provided that the grade or standard is not established, selected or calculated solely for use in connection with futures or option trading and which changes do not affect deliverable supplies or the pricing basis for the product;

(iii) *Index products.* Routine changes in the composition, computation, or method of selection of component entities of an index (other than routine changes to securities indexes to the extent that such changes are not described in paragraph (d)(3)(ii)(F) of this section) referenced and defined in the product's terms, that do not affect the pricing basis of the index, which are made by an independent third party whose business relates to the collection or dissemination of price information and which was not formed solely for the purpose of compiling an index for use in connection with a futures or option product;

(iv) *Option contract terms.* Changes to option contract rules, which may qualify for implementation without notice pursuant to paragraph (d)(3)(ii)(G) of this section, relating to the strike price listing procedures, strike price intervals, and the listing of strike prices on a discretionary basis;

(v) *Fees.* Fees or fee changes, other than fees or fee changes associated with market making or trading incentive programs, that:

(A) Total $1.00 or more per contract, and

(B) Are established by an independent third party or are unrelated to delivery, trading, clearing or dispute resolution.

(vi) *Survey lists.* Changes to lists of banks, brokers, dealers, or other entities that provide price or cash market information to an independent third party and that are incorporated by reference as product terms;

(vii) *Approved brands.* Changes in lists of approved brands or markings pursuant to previously certified or Commission approved standards or criteria;

(viii) *Delivery facilities and delivery service providers.* Changes in lists of approved delivery facilities and delivery service providers (including weigh masters, assayers, and inspectors) at a delivery location, pursuant to previously certified or Commission approved standards or criteria;

(ix) *Trading months.* The initial listing of trading months, which may qualify for implementation without notice pursuant to (d)(3)(ii)(H) of this section, within the currently established cycle of trading months; or

(x) *Minimum tick.* Reductions in the minimum price fluctuation (or "tick").

(3) *Notification of rule amendments not required.* Notwithstanding the rule certification requirements of section 5c(c)(1) of the Act and paragraph (a) of this section, a registered entity may place the following rules or rule amendments into effect without certification or notice to the Commission if the following conditions are met:

(i) The registered entity maintains documentation regarding all changes to rules; and

(ii) The rule governs:

(A) *Transfer of membership or ownership.* Procedures and forms for the purchase, sale or transfer of membership or ownership, but not including qualifications for membership or ownership, any right or obligation of membership or ownership or dues or assessments;

(B) *Administrative procedures.* The organization and administrative procedures of a registered entity governing bodies such as a Board of Directors, Officers and Committees, but not voting requirements, Board of Directors or Committee composition requirements or procedures, decision making procedures, use or disclosure of material non-public information gained through the performance of official duties, or requirements relating to conflicts of interest;

(C) *Administration.* The routine, daily administration, direction and control of employees, requirements relating to gratuity and similar funds, but not guaranty, reserves, or similar funds; declaration of holidays, and changes to facilities housing the market, trading floor or trading area;

(D) *Standards of decorum.* Standards of decorum or attire or similar provisions relating to admission to the floor, badges, or visitors, but not the establishment of penalties for violations of such rules; and

(E) *Fees.* Fees or fee changes, other than fees or fee changes associated with market making or trading incentive programs, that:

(*1*) Are less than $1.00; or

(*2*) Relate to matters such as dues, badges, telecommunication services, booth space, real time quotations, historical information, publications, software licenses or other matters that are administrative in nature.

(F) *Securities indexes.* Routine changes to the composition, computation or method of security selection of an index that is referenced and defined in the product's rules, and which is made by an independent third party.

(G) *Option contract terms.* For registered entities that are in compliance with the daily reporting requirements of § 16.01 of this chapter, changes to option contract rules relating to the strike price listing procedures, strike price intervals, and the listing of strike prices on a discretionary basis.

(H) *Trading months.* For registered entities that are in compliance with the daily reporting requirements of § 16.01 of this chapter, the initial listing of trading months which are within the currently established cycle of trading months.

### § 40.7    Delegations.

(a) *Procedural matters.* (1) The Commission hereby delegates, until it orders otherwise, to the Director of the Division of Clearing and Intermediary Oversight and, separately, to the Director of the Division of Market Oversight, to be exercised by either Director, as appropriate, or by such employees of the Commission that either Director may designate from time to time, the following authorities, with the concurrence of the General Counsel or the General Counsel's delegate:

(i) To request, pursuant to § 40.3(c)(2) or § 40.5(c)(1)(ii) of this part, that the registered entity requesting approval amend the proposed product, rule or rule amendment, or supplement the submission to the Commission;

(ii) To notify the registered entity, pursuant to § 40.3(e) or § 40.5(e) of this part, that the Commission is not approving, or is unable to approve, the proposed product, rule or rule amendment;

(iii) To make all determinations reserved to the Commission in § 40.10.

(2) The Commission hereby delegates, until it orders otherwise, to the Director of the Division of Clearing and Intermediary Oversight and, separately, to the Director of the Division of Market Oversight, to be exercised by either Director, as appropriate, or by such employees of the Commission that either Director may designate from time to time, the following authorities, after consultation with the Office of General Counsel or the General Counsel's delegate to notify a registered entity:

(i) Pursuant to § 40.3(d) of this part, that the time for review of the submission has been extended because the product raises novel or complex issues that require additional time for review;

(ii) Pursuant to § 40.5(d) of this part, that the time for review of the submission has been extended because the proposed rule or rule amendment raises novel or complex issues that

require additional time for review or is of major economic significance;

(iii) Pursuant to § 40.6(c) of this part, that the proposed rule or rule amendment has been stayed because there exist novel or complex issues that require additional time to analyze, or there is potential inconsistency with the Act or the Commission's regulations.

(3) The Commission hereby delegates, until it orders otherwise, to the Director of the Division of Clearing and Intermediary Oversight and, separately, to the Director of the Division of Market Oversight, to be exercised by either Director, as appropriate, or by such employees of the Commission that either Director may designate from time to time, the authority to notify a registered entity, pursuant to § 40.3(d) or § 40.5(d) of this part, that the time for review of the submission has been extended, or that a rule certified pursuant to § 40.6(c) has been stayed, because the submission is incomplete or provides an inadequate explanation.

(4) *Emergency rules.* The Commission hereby delegates to the Director of the Division of Market Oversight and, separately, to the Director of the Division of Clearing and Intermediary Oversight, to be exercised by either Director, as appropriate, or by such other employee or employees of the Commission that either Director may designate from time to time, authority to receive notification of emergency rules under § 40.6(a)(6)(ii) of this part.

(5) The Commission hereby delegates to the Director of the Division of Market Oversight, to be exercised by the Director or by such employees of the Commission that the Director may designate from time to time, with the concurrence of the General Counsel or the General Counsel's delegate, the authority to determine whether a rule change submitted by a designated contract market for a materiality determination under § 40.4(b)(5) of this part is not material (in which case it may be reported pursuant to the provisions of § 40.6(d) of this part), or is material, in which case he or she shall notify the registered entity that the rule change must be submitted for the Commission's prior approval.

(b) *Approval authority.* The Commission hereby delegates, until it orders otherwise, to the Director of the Division of Clearing and Intermediary Oversight and, separately, to the Director of the Division of Market Oversight, to be exercised by either Director, as appropriate, or by such employees of the Commission that either Director may designate from time to time, with the concurrence of the General Counsel or the General

Counsel's delegate, the authority to approve, pursuant to section 5c(c)(3) of the Act and § 40.5 of this part, rules or rule amendments of a registered entity that:

(1) Relate to, but do not substantially change, the quantity, quality, or other delivery specifications, procedures, or obligations for delivery, cash settlement, or exercise under an agreement, contract or transaction approved for trading by the Commission; daily settlement prices; clearing position limits; requirements or procedures for governance of a registered entity; procedures for transfer trades; trading hours; minimum price fluctuations; and maximum price limit and trading suspension provisions;

(2) Reflect routine modifications that are required or anticipated by the terms of the rule of a registered entity;

(3) Establish or amend speculative limits or position accountability provisions that are in compliance with the requirements of the Act and the Commission's regulations;

(4) Are in substance the same as a rule of the same or another registered entity which has been approved previously by the Commission pursuant to section 5c(c)(3) of the Act;

(5) Are consistent with a specific, stated policy or interpretation of the Commission; or

(6) Relate to the listing of additional trading months of approved contracts.

(c) Notwithstanding the provisions of this section, the Director of the Division of Clearing and Intermediary Oversight and, separately, the Director of the Division of Market Oversight may submit to the Commission for its consideration any matter that has been delegated pursuant to this section.

(d) Nothing in this section shall be deemed to prohibit the Commission, at its election, from exercising any of the authority delegated pursuant to this section.

§ 40.8    Availability of public information.

(a) The following sections of all applications to become a designated contract market, swap execution facility, derivatives clearing organization, or swap data repository shall be made publicly available: Transmittal letter and first page of the application cover sheet, proposed rules, narrative summary of the applicant's proposed activities and regulatory compliance chart, documents establishing the applicant's legal status, documents setting forth the applicant's corporate and governance structure and any other part of the application not covered by a request for confidential treatment.

(b) The following submissions provided by an electronic trading facility on which significant price discovery contracts are traded or executed will be public: rulebook, the facility's regulatory compliance chart, documents establishing the facility's legal status, documents setting forth the facility's governance structure, and any other parts of the submissions not covered by a request for confidential treatment (§ 40.8(b)) will be removed on July 20, 2012.

(c) A registered entity's filing of new products pursuant to the self-certification procedures of § 40.2 of this part, new products for Commission review and approval pursuant to § 40.3 of this part, new rules and rule amendments for Commission review and approval pursuant to § 40.4 or § 40.5 of this part, and new rules and rule amendments pursuant to the self-certification procedures of § 40.6 and § 40.10 of this part shall be treated as public information unless accompanied by a request for confidential treatment. If a registered entity files a request for confidential treatment, the following procedures shall apply:

(1) A detailed written justification of the confidential treatment request must be filed simultaneously with the request for confidential treatment. The form and content of the detailed written justification shall be governed by § 145.9 of this chapter;

(2) All material for which confidential treatment is requested must be segregated in an Appendix to the submission;

(3) The submission itself must indicate that material has been segregated and, as appropriate, an additional redacted version provided;

(4) Commission staff may make an initial determination with respect to the request for confidential treatment without regard to whether a request for the information has been sought under the Freedom of Information Act;

(5) All requests for confidential treatment shall be subject to the process provided by § 145.9 of this chapter.

(6) A submitter of information under this part may appeal an adverse decision by staff to the Commission's Office of General Counsel. The form and content of such appeal shall be governed by § 145.9(g) of this chapter.

(7) The grant of any part of a request for confidential treatment under this section may be reconsidered if a subsequent request under the Freedom of Information Act is made for the information.

(d) Commission staff will not consider confidential treatment requests for information that is required to be made

public under the Act. The terms and conditions of a product submitted to the Commission pursuant to § 40.2, § 40.3, § 40.5 and § 40.6 of this part shall be made publicly available at the time of submission.

### § 40.9  [Reserved]

### § 40.10  Special certification procedures for submission of rules by systemically important derivatives clearing organizations.

(a) *Advance notice.* A registered derivatives clearing organization that has been designated by the Financial Stability Oversight Council as a systemically important derivatives clearing organization shall provide notice to the Commission not less than 60 days in advance of any proposed change to its rules, procedures, or operations that could materially affect the nature or level of risks presented by the systemically important derivatives clearing organization. A notice submitted under this section shall be subject to the filing requirements of § 40.6(a)(1) and the Web site publication requirements of § 40.6(a)(2).

(1) The notice of a proposed change shall provide the information required to be submitted under § 40.6(a)(7) and shall specifically describe:

(i) The nature of the change and expected effects on risks to the systemically important derivatives clearing organization, its clearing members, or the market; and

(ii) How the systemically important derivatives clearing organization plans to manage any identified risks.

(2) Concurrent with providing the Commission with the advance notice or any request or other information related to the advance notice, the systemically important derivatives clearing organization shall provide the Board of Governors of the Federal Reserve System with a copy of such notice, request or other information in the same format and manner as required by the Board of Governors for those designated financial market utilities for which it is the Supervisory Agency pursuant to section 803(8) of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

(3) The systemically important derivatives clearing organization may request that the Commission expedite the review on the grounds that the change would materially decrease risk. The Commission, in its discretion, may expedite the review and, pursuant to paragraph (g) of this section, notify the systemically important derivatives clearing organization in less than 60 days from the date the Commission receives the notice of proposed change

in writing that it does not object to the proposed change and authorizes implementation of the change on an earlier date.

(b) *Materiality.* The term "materially affect the nature or level of risks presented," when used to qualify determinations on a change to rules, procedures, or operations of a systemically important derivatives clearing organization, means matters as to which there is a reasonable possibility that the change could affect the performance of essential clearing and settlement functions or the overall nature or level of risk presented by the systemically important derivatives clearing organization. Such changes may include, but are not limited to, changes that materially affect financial resources, participant and product eligibility, risk management (including matters relating to margin and stress testing), daily or intraday settlement procedures, default procedures, system safeguards (business continuity and disaster recovery), and governance. If a systemically important derivatives clearing organization determines that a proposed change is not material and therefore does not file an advance notice under this § 40.10, but the Commission determines that the change is material, the Commission may require the systemically important derivatives clearing organization to withdraw the proposed change and provide notice pursuant to this section.

(c) *Further information.* The Commission may require the systemically important derivatives clearing organization to provide any further information necessary to assess the effect the proposed change would have on the nature or level of risks associated with the systemically important derivatives clearing organization's payment, clearing, or settlement activities and the sufficiency of any proposed risk management techniques.

(d) *Notice of objection.* A systemically important derivatives clearing organization shall not implement a change to which the Commission has an objection on the grounds that the proposed change is not consistent with the Act or the Commission's regulations, or the purposes of the Dodd-Frank Act or any applicable rules, orders, or standards prescribed under Section 805(a) of the Dodd-Frank Act. The Commission will notify the systemically important derivatives clearing organization in writing of any objection regarding the proposed change within 60 days from the later of:

(1) The date that the notice of the proposed change was received; or

(2) The date the Commission received any further information it had requested for consideration of the notice.

(e) *Implementation of change absent Commission objection.* A systemically important derivatives clearing organization may implement a change if it has not received an objection to the proposed change within 60 days from the later of:

(1) The date that the Commission received the notice of proposed change; or

(2) The date the Commission received any further information it had requested for consideration of the notice.

(f) *Extended review.* The Commission may, during the 60-day review period, extend the review period if the proposed change raises novel or complex issues. A notification by the Commission pursuant to this paragraph will extend the review for an additional 60 days. Any extension under this paragraph will extend the time periods under paragraphs (d) and (e) of this section for an additional 60 days.

(g) *Change allowed earlier if notified of no objection.* A systemically important derivatives clearing organization may implement a change in less than 60 days from the date the Commission receives the notice of proposed change or the date the Commission receives any further information it has requested, if the Commission notifies the systemically important derivatives clearing organization in writing that it does not object to the proposed change and authorizes implementation of the change on an earlier date, subject to any conditions imposed by the Commission.

(h) *Emergency changes.* A systemically important derivatives clearing organization may implement a change that would otherwise require advance notice under this section if it determines that an emergency exists and immediate implementation of the change is necessary for the systemically important derivatives clearing organization to continue to provide its services in a safe and sound manner.

(1) The systemically important derivatives clearing organization shall provide notice of any such emergency change to the Commission as soon as practicable, which shall be no later than 24 hours after implementation of the change.

(2) The notice of an emergency change shall:

(i) Provide the information required for advance notice as set forth in paragraph (a) of this section;

(ii) Describe the nature of the emergency; and

(iii) Describe the reason the change was necessary for the systemically important derivatives clearing organization to continue to provide its services in a safe and sound manner.

(3) The Commission may require modification or rescission of the emergency change if it finds that the change is not consistent with the Act or the Commission's regulations, or the purposes of the Dodd-Frank Act or any applicable rules, orders, or standards prescribed under Section 805(a) of the Dodd-Frank Act.

### § 40.11   Review of event contracts based upon certain excluded commodities.

(a) *Prohibition.* A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved.]

(c) *90-day review and approval of certain event contracts.* The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day review. The 90-day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period. The Commission shall post on the Web site a notification

of the intent to carry out a 90-day review.

(2) *Final determination.* The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

### § 40.12   Staying of certification and tolling of review period pending jurisdictional determination.

(a) *Notice of novel derivative products.* (1) A registered entity certifying, submitting for approval, or otherwise filing a proposal to list, trade, or clear a novel derivative product (other than a product subject to the provisions of § 1.8 of this chapter) having elements of both a security and a contract for the sale of a commodity for future delivery (or an option on such contract or an option on a commodity) may provide notice of its proposal to the Commission and the Securities and Exchange Commission with a statement that written notice has been provided to both agencies through an appropriate means provided in each Commission's regulations.

(2) If concurrent notice is not provided pursuant to § 40.12(a)(1), the Commission shall notify the Securities and Exchange Commission of the registered entity's submission of a novel derivative product described in § 40.12(a)(1) and accompany such notice with a copy of the submission. The Commission shall determine whether a particular submission is a novel derivative product requiring notice to the Securities and Exchange Commission not later than five business days subsequent to the date that the registered entity submits the product for Commission review.

(b) *Tolling of review period.* Upon receipt of a request for a jurisdictional determination, pursuant to Section 718(a)(2) of the Dodd-Frank Act, by the Commission or the Securities and Exchange Commission, the product certification shall be stayed or the approval review period shall be tolled until a final determination order is issued.

(1) The Commission will provide the registered entity with a written notice of stay pending issuance of a final determination order by the Commission or the Securities and Exchange Commission.

(2) The stay shall be withdrawn or the approval review period shall resume

upon the Commission's or the Securities and Exchange Commission's issuance of a final determination order finding that the Commission has jurisdiction over the submission.

(3) *Determination order.* A final determination, for purposes of § 40.12(b) of this part, shall be a determination order issued by the Commission or the Securities and Exchange Commission pursuant to Section 718(a)(3) of the Dodd-Frank Act.

(c) *Judicial review of determination order.* The filing of a petition by a complaining Commission, pursuant to Section 718(b) of the Dodd-Frank Act, shall operate as a stay of the agency order.

(1) The stay shall remain in effect until the date on which the United States Court of Appeals for the District of Columbia Circuit issues a final determination pursuant to Section 718(b)(4) of the Dodd-Frank Act, or until such date that there is a final disposition of an appeal of that determination.

(2) The submission review period shall resume upon issuance of a final determination, as described in § 40.12(c)(1), that the Commission has jurisdiction over the submission.

### Appendix A to Part 40—Schedule of Fees

(a) *Applications for product approval.* Each application for product approval under § 40.3 must be accompanied by a check or money order made payable to the Commodity Futures Trading Commission in an amount to be determined annually by the Commission and published in the **Federal Register**.

(b) Checks and applications should be sent to the attention of the Office of the Secretariat, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, DC 20581. No checks or money orders may be accepted by personnel other than those in the Office of the Secretariat.

(c) Failure to submit the fee with an application for product approval will result in return of the application. Fees will not be returned after receipt.

### Appendix B to Part 40—[Reserved]

### Appendix C to Part 40—[Reserved]

### Appendix D to Part 40—Submission Cover Sheet and Instructions

(a) A properly completed submission cover sheet shall accompany all rule and product submissions submitted electronically by a registered entity in a format and manner specified by the Secretary of the Commission to the Secretary of the Commission. A properly completed submission cover sheet shall include all of the following:

1. *Identifier Code (optional)*—A registered entity Identifier Code at the top of the cover sheet, if applicable. Such codes are commonly generated by registered entities to

provide an identifier that is unique to each filing (*e.g.*, NYMEX Submission 03–116).

2. *Date*—The date of the filing.

3. *Organization*—The name of the organization filing the submission (*e.g.*, CBOT).

4. *Filing as a*—Check in the appropriate box indicating that the rule or product is being submitted by a designated contract market (DCM), derivatives clearing organization (DCO), swap execution facility (SEF), or swap data repository (SDR), electronic trading facility with a significant price discovery contract (the term will be removed on July 20, 2012).[1]

5. *Type of Filing*—An indication as to whether the filing is a new rule, rule amendment or new product. The registered entity should check the appropriate box to indicate the applicable category under that heading.

6. *Rule Numbers*—For rule filings, the rule number(s) being adopted or modified in the case of rule amendment filings.

7. *Description*—For rule or rule amendment filings, a description of the new rule or rule amendment, including a discussion of its expected impact on the registered entity, market participants, and the overall market. The narrative should describe the substance of the submission with enough specificity to characterize all material aspects of the filing.

(b) *Other Requirements*—A submission shall comply with all applicable filing requirements for proposed rules, rule amendments, or products. The filing of the submission cover sheet does not obviate the registered entity's responsibility to comply with applicable filing requirements (*e.g.*, rules submitted for Commission approval under § 40.5 must be accompanied by an explanation of the purpose and effect of the proposed rule along with a description of any substantive opposing views).

(c) Checking the box marked "confidential treatment requested" on the Submission Cover Sheet does not obviate the submitter's responsibility to comply with all applicable requirements for requesting confidential treatment in § 40.8 and, where appropriate, § 145.9 of this chapter, and will not substitute for notice or full compliance with such requirements.

Issued in Washington, DC, on July 19, 2011, by the Commission.

**David A. Stawick,**

*Secretary of the Commission.*

**Appendices to Provisions Common to Registered Entities—Commission Voting Summary and Statements of Commissioners**

**Note:** The following appendices will not appear in the Code of Federal Regulations.

---

[1] Even though ECM–SPDC was eliminated by the Dodd-Frank Act, the Commission will retain references to this entity in the cover sheet since ECMs may be allowed to operate until July 20, 2012, pursuant to grandfather relief issued by the Commission. *See* 75 FR 56513 (Sept. 16, 2010).

**Appendix 1—Commission Voting Summary**

On this matter, Chairman Gensler and Commissioners Dunn, Sommers, Chilton and O'Malia voted in the affirmative; no Commissioner voted in the negative.

**Appendix 2—Statement of Chairman Gary Gensler**

I support the final rulemaking to establish a process for the certification and approval of new rules and rule amendments for designated contract markets, derivatives clearing organizations, as well as new registrants, swap execution facilities and swap data repositories. The Dodd-Frank Wall Street Reform and Consumer Protection Act establishes enhanced CFTC review and certification of new rules and amendments. Today's final regulations provide important procedural guidance to registered entities on how to comply with Congress's mandate for the Commission's review of new rules and rule amendments.

[FR Doc. 2011–18661 Filed 7–26–11; 8:45 am]

**BILLING CODE 6351–01–P**

---

# DEPARTMENT OF THE TREASURY

## Internal Revenue Service

### 26 CFR Part 1

**[TD 9539]**

**RIN 1545–BI09**

### Election of Reduced Research Credit Under Section 280C(c)(3)

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final regulations.

**SUMMARY:** This document contains final regulations that amend the regulations concerning the election to claim the reduced research credit. The final regulations simplify how taxpayers make the election and affect taxpayers that claim the reduced research credit.

**DATES:** *Effective Date:* These regulations are effective on July 27, 2011.

*Applicability Date:* For dates of applicability, see § 1.280C–4(c).

**FOR FURTHER INFORMATION CONTACT:** David Selig, (202) 622–3040 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### Background

This document contains amendments to the Income Tax Regulations (26 CFR Part 1) relating to the election for claiming the reduced research credit under section 280C(c)(3). On July 16, 2009, a notice of proposed rulemaking (REG–130200–08) was published in the **Federal Register** (74 FR 34523). No public hearing was requested or held.

Written and electronic comments responding to the notice of proposed rulemaking were received. After considering the comments received the proposed regulations are adopted as revised by this Treasury decision.

Section 280C(c)(1) provides that no deduction shall be allowed for that portion of the qualified research expenses (as defined in section 41(b)) or basic research expenses (as defined in section 41(e)(2)) otherwise allowable as a deduction for the taxable year which is equal to the amount of the credit determined for such taxable year under section 41(a).

Similarly, section 280C(c)(2) provides that if the amount of the credit determined for the taxable year under section 41(a)(1) exceeds the amount allowable as a deduction for such taxable year for qualified research expenses or basic research expenses (determined without regard to section 280C(c)(1)), the amount chargeable to capital account for the taxable year for such expenses shall be reduced by the amount of such excess.

Section 280C(c)(3)(A) provides, in general, that in the case of any taxable year for which an election is made under section 280C(c)(3), sections 280C(c)(1) and (c)(2) shall not apply, and the amount of the credit under section 41(a) shall be the amount determined under section 280C(c)(3)(B). Under section 280C(c)(3)(B), the amount of credit for any taxable year shall be the amount equal to the excess of the amount of credit determined under section 41(a) without regard to section 280C(c)(3), over the product of the amount of credit determined under section 280C(c)(3)(B)(i), and the maximum rate of tax under section 11(b)(1).

Section 280C(c)(3)(C) provides that an election under section 280C(c)(3) for any taxable year shall be made not later than the time for filing the return of tax for such year (including extensions), shall be made on such return, and shall be made in such manner as the Secretary may prescribe. Section 1.280C–4(a) provides that the section 280C(c)(3) election to have the provisions of section 280C(c)(1) and (c)(2) not apply shall be made by claiming the reduced credit under section 41(a) determined by the method provided in section 280C(c)(3)(B) on an original return for the taxable year, filed at any time on or before the due date (including extensions) for filing the income tax return for such year. Such an election, once made, shall be irrevocable for that taxable year.

Section 280C(c)(4) provides that section 280C(b)(3) shall apply for