# Exhibit I

**COMMODITY FUTURES TRADING COMMISSION**

**17 CFR Part 40**

**RIN 3038–AF14**

**Event Contracts**

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Commodity Futures Trading Commission (Commission or CFTC) is proposing amendments to its rules concerning event contracts in certain excluded commodities. The Commission is proposing amendments to further specify types of event contracts that fall within the scope of section 5c(c)(5)(C) of the Commodity Exchange Act (CEA or the Act) and are contrary to the public interest, such that they may not be listed for trading or accepted for clearing on or through a CFTC-registered entity. Among other things, the Commission proposes to further specify the types of event contracts that involve "gaming." The Commission also proposes to amend certain language in its event contract rules to further align with statutory text, and to make certain technical changes to its event contract rules in order to enhance clarity and organization.

**DATES:** Comments must be received on or before July 9, 2024.

**ADDRESSES:** You may submit comments, identified by "Event Contracts" and RIN number 3038–AF14, by any of the following methods:

• *CFTC Comments Portal:* https://comments.cftc.gov. Select the "Submit Comments" link for this release and follow the instructions on the Public Comment Form.

• *Mail:* Send to Christopher Kirkpatrick, Secretary of the Commission, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street NW, Washington, DC 20581.

• *Hand Delivery/Courier:* Follow the same instructions as for Mail, above.

Please submit your comments using only one of these methods. Submissions through the CFTC Comments Portal are encouraged.

All comments must be submitted in English, or if not, accompanied by an English translation. Comments will be posted as received to https://comments.cftc.gov. You should submit only information that you wish to make available publicly. If you wish the Commission to consider information that you believe is exempt from disclosure under the Freedom of Information Act ("FOIA"), a petition for confidential treatment of the exempt information may be submitted according to the Commission's procedures established in 17 CFR 145.9.

The Commission reserves the right, but shall have no obligation, to review, pre-screen, filter, redact, refuse or remove any or all of your submission from *https://comments.cftc.gov* that it may deem to be inappropriate for publication, such as obscene language. All submissions that have been redacted or removed that contain comments on the merits of the rulemaking will be retained in the public comment file and will be considered as required under the Administrative Procedure Act and other applicable laws, and may be accessible under FOIA.

**FOR FURTHER INFORMATION CONTACT:** Grey Tanzi, Assistant Chief Counsel, (312) 596–0635, *gtanzi@cftc.gov,* Division of Market Oversight, Commodity Futures Trading Commission, 77 West Jackson Blvd., Suite 800, Chicago, Illinois 60604, Andrew Stein, Assistant Chief Counsel, (202) 418–6054, *astein@cftc.gov,* Lauren Bennett, Assistant Chief Counsel, (202) 418–5290, *lbennett@cftc.gov,* or Nora Flood, Chief Counsel, (202) 418–6059, *nflood@cftc.gov,* Three Lafayette Centre, 1151 21st Street NW, Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background
  A. Overview of Proposed Changes to § 40.11
  B. Commission History With Event Contracts
  C. Statutory Authority and Prior Commission Action
  1. CEA Section 5c(c)(5)(C)
  2. Commission Regulation § 40.11
  3. Commission Determinations Pursuant to § 40.11
II. Proposed Amendments to § 40.11
  A. Amendments to Further Align With Statutory Language
  1. Description of Excluded Commodities
  (a) Proposed Amendments
  (b) Illustrative Examples of Event Contracts Not Within Scope of CEA Section 5c(c)(5)(C) and § 40.11
  2. Contracts That "Involve" an Enumerated Activity
  B. The Enumerated Activities
  1. Gaming
  (a) Background
  (b) Proposed Gaming Definition
  (c) Illustrative Examples of Gaming
  2. The Other Enumerated Activities
  C. Public Interest Considerations
  1. Overview of Proposed Amendments
  2. Factors Considered by the Commission in Evaluating Whether a Contract, or Category of Contracts, Is Contrary to the Public Interest
  3. The Enumerated Activities
  (a) Terrorism, Assassination, and War
  (b) Activity That Is Unlawful Under Federal or State Law
  (c) Gaming
  D. The Commission's Authority To Identify Additional Similar Activities to the Enumerated Activities
  E. Technical Amendments
  1. Technical Amendments to § 40.11(a)
  2. Technical Amendments to § 40.11(c)
  F. Implementation Timeline
III. Related Matters
  A. Regulatory Flexibility Act
  B. Paperwork Reduction Act
  1. Submission of Updated Rules to the Commission
  2. Request for Comment
  C. Consideration of Costs and Benefits
  1. Introduction
  2. Proposed Amendments
  (a) Definition of Gaming—Proposed § 40.11(b)
  (1) Baseline and Proposed Amendments
  (2) Benefits
  (3) Costs
  (b) Amendments to Further Align With Statutory Language
  3. Section 15(a) Factors
  (a) Protection of Market Participants and the Public
  (b) Efficiency, Competitiveness and Financial Integrity
  (c) Price Discovery
  (d) Sound Risk Management Practices
  (e) Other Public Interest Considerations
  D. Antitrust Considerations

**I. Background**

*A. Overview of Proposed Changes to § 40.11*

On July 27, 2011, the Commission published in the **Federal Register** final rules under part 40 of the Commission's regulations, including new § 40.11.[1] Commission Regulation 40.11 was promulgated pursuant to authority granted under section 5c(c)(5)(C) of the CEA,[2] which was added by section 745(b) of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act").[3] CEA section 5c(c)(5)(C) authorizes the Commission to prohibit certain "event contracts" from being listed or made available for clearing or trading on or through a

---

[1] *Provisions Common to Registered Entities,* 76 FR 44776 (July 27, 2011). Commission Regulation 40.11 was adopted as part of broader changes made to part 40 of the Commission's regulations to implement section 745 of the Dodd-Frank Act, which amended section 5c of the CEA. Section 5c(c) of the CEA, in particular, sets forth requirements relating to the listing for trading or making available for clearing of derivative contracts, and the implementation of rules and rule amendments, by "registered entities." CEA section 1a(40), 7 U.S.C. 1a(40), defines the term "registered entity" to include any board of trade designated by the Commission as a contract market ("DCM"), and any derivatives clearing organization ("DCO"), swap execution facility ("SEF"), or swap data repository ("SDR") registered by the Commission.

[2] 7 U.S.C. 7a–2(c)(5)(C).

[3] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (July 21, 2010).

registered entity,[4] if such contracts involve an activity that is enumerated in CEA section 5c(c)(5)(C) or "other similar activity" as determined by the Commission by rule or regulation, and the Commission determines that such contracts are contrary to the public interest.

While the term "event contract" is not defined in the CEA or the CFTC's regulations, event contracts are generally understood to be a type of derivative contract, typically with a binary payoff structure, based on the outcome of an underlying occurrence or event.[5] A registered entity that seeks to list event contracts for trading, or make event contracts available for clearing, must comply with the substantive and procedural requirements that apply, more generally, to the listing for trading, or making available for clearing, of derivative contracts. For example, CFTC-registered exchanges—namely, DCMs and SEFs—are subject to statutory requirements to only list or permit trading in derivative contracts that are not readily susceptible to manipulation;[6] to enforce compliance with contract terms and conditions;[7] and to monitor trading on the exchange in order to prevent manipulation, price distortion, and disruption of the settlement process through market surveillance, compliance, and enforcement practices and procedures.[8] In addition to the more generally applicable requirements to which registered entities are subject when listing derivative contracts for trading or making such contracts available for clearing, CEA section 5c(c)(5)(C) grants the Commission the authority to prohibit registered entities from listing for trading or making available for clearing particular types of event contracts, if the Commission determines that such contracts are contrary to the public interest.

Since 2021, the Commission has observed a significant increase in the number of event contracts listed for trading by CFTC-registered exchanges,

as well as in the diversity of occurrences and events underlying such contracts.[9] The Commission has also observed recent applications for exchange registration, and expressions of interest regarding exchange registration, from entities that have indicated that they are interested primarily, or exclusively, in listing event contracts for trading.[10]

In light of these developments, the Commission proposes to amend § 40.11 to further specify types of event contracts that fall within the scope of CEA section 5c(c)(5)(C) and are contrary to the public interest. The Commission believes that these amendments would support efforts by registered entities to ensure compliance with the CEA by more clearly identifying the types of event contracts that may not be listed for trading or accepted for clearing. The Commission believes that these amendments would, correspondingly, assist registered entities, as well as applicants for registration, in making informed business decisions with respect to product design, which would help to support responsible market innovation.

The Commission believes that amending § 40.11 to further specify types of event contracts that may not be listed for trading or accepted for clearing would also benefit the Commission and its staff, by reducing the need to undertake individualized, resource-intensive contract reviews. As further discussed below, under § 40.11(c), the Commission may initiate a 90-day review to evaluate whether a particular event contract is of a type that may not be listed for trading or accepted

for clearing. Further specifying, in § 40.11, the types of event contracts that may not be listed for trading or accepted for clearing should provide registered entities with a better understanding regarding appropriate event contract parameters and should, in turn, reduce the likelihood that contract filings that raise potential public interest concerns are submitted to the Commission. From a resource allocation perspective, this will be of significant benefit to the Commission and its staff, since, in the Commission's experience, a single § 40.11(c) review is resource-intensive and consumes hundreds of hours of staff time.

Finally, the Commission proposes to make certain amendments to § 40.11 to further align the language of the regulation with the statutory text of CEA section 5c(c)(5)(C), and also proposes to make certain technical amendments to the regulation in order to enhance clarity and organization.

*B. Commission History With Event Contracts*

CFTC-registered exchanges have listed a variety of event contracts for trading for several decades.[11] On February 18, 2004, the Commission designated the first contract market dedicated to trading event contracts.[12] In 2008, the Commission published a concept release (the "2008 Concept Release"), requesting input from interested persons, and those with expertise, on the appropriate regulatory treatment of event contract markets.[13] The 2008 Concept Release was prompted by the Commission's receipt of a substantial number of requests for guidance related to application of the CEA to event contract markets.[14] The Commission sought both general input and responses to 24 enumerated questions. The Commission received 31 comments in response to the 2008

---

[4] *See* note 2, *supra.* CEA section 1a(40), 7 U.S.C. 1a(40), defines the term "registered entity" to include any DCM, and any DCO, SEF, or SDR registered by the Commission.

[5] Most event contracts that have traded or are currently trading on CFTC-registered exchanges are structured as binary options, which are generally understood as a type of option whose payout is either a fixed amount or zero.

[6] *See* Core Principle 3 for DCMs, CEA section 5(d)(3), 7 U.S.C. 7(d)(3), and Core Principle 3 for SEFs, CEA section 5h(f)(3), 7 U.S.C. 7b–3(f)(3).

[7] *See* Core Principle 2 for DCMs, CEA section 5(d)(2), 7 U.S.C. 7(d)(2), and Core Principle 2 for SEFs, CEA section 5h(f)(2), 7 U.S.C. 7b–3(f)(2).

[8] *See* Core Principle 4 for DCMs, CEA section 5(d)(4), 7 U.S.C. 7(d)(4), and Core Principle 4 for SEFs, CEA section 5h(f)(4), 7 U.S.C. 7b–3(f)(4).

[9] From 2006–2020, DCMs listed for trading an average of approximately five event contracts per year. In 2021, this number increased to 131, and the number of newly-listed event contracts per year has remained at a similar level in subsequent years. Since 2021, DCMs also have listed for trading a substantial number of event contracts not associated with traditional commodities, financial indices, or economic indicators. These have included event contracts based on the occurrence or non-occurrence of international events, natural disasters in specific U.S. cities, heating/cooling degree days and cumulative average temperature in specific cities, the timing of video game and album releases, Oscar award winners, COVID–19 case levels and restrictions, the outcome of cases pending before the Supreme Court of the United States, the passage of specific laws by the U.S. Congress, U.S. Presidential approval ratings, confirmation of U.S. executive branch officials, National Football League ("NFL") television ratings, the discovery of exoplanets, and the occurrence of a National Aeronautics and Space Administration moon landing before a certain date.

[10] As of February 12, 2024, Commission staff were reviewing several pending applications for contract market designation from entities with a stated interest in offering event contracts for trading. Commission staff have received multiple additional inquiries from other entities indicating an interest in applying for exchange registration in order to offer event contracts for trading.

[11] Since 1992, CFTC-registered exchanges have listed for trading event contracts involving interests such as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events. *See Concept Release on Appropriate Regulatory Treatment of Event Contracts,* 73 FR 25669, 25671 (May 7, 2008).

[12] *See* CFTC Order of Designation for HedgeStreet, Inc. ("HedgeStreet") (Feb. 20, 2004), *available at https://www.cftc.gov/sites/default/files/opa/press04/opa4894-04.htm* (last visited Mar. 7, 2024). HedgeStreet listed daily and weekly event contracts on various corporate mergers, weather events, and economic indicators. Effective June 21, 2009, HedgeStreet changed its name to North American Derivatives Exchange, Inc., or "Nadex." Nadex continues to list event contracts on foreign exchange, equity indices, commodity prices, and digital assets.

[13] 73 FR 25669.

[14] *Id.*

Concept Release,[15] but ultimately did not take further action at that time. In 2010, Congress addressed the Commission's regulatory authority with respect to certain event contracts in section 745(b) of the Dodd-Frank Act, which added section 5c(c)(5)(C) to the CEA. Thereafter, in 2011, the Commission adopted § 40.11, which implements CEA section 5c(c)(5)(C).

As discussed above, the Commission has observed applications for exchange registration, and expressions of interest regarding exchange registration, from entities that appear to be interested primarily, or exclusively, in listing event contracts for trading.[16] The Commission also has observed a significant increase in the number of event contracts listed for trading by registered entities, and in the diversity of occurrences and events underlying such contracts.

### C. Statutory Authority and Prior Commission Action

#### 1. CEA Section 5c(c)(5)(C)

As discussed above, a registered entity that seeks to list event contracts for trading, or accept such contracts for clearing, must comply with the substantive and procedural requirements that apply, more generally, to the listing for trading or acceptance for clearing of derivative contracts.[17]

Notably, for example, a DCM or SEF is required to ensure that the derivative contracts that it lists or permits for trading are not readily susceptible to manipulation; to ensure enforcement of the terms and conditions of those contracts; and to monitor trading in those contracts in order to prevent manipulation, price distortion, and disruption of the settlement process.[18] CEA section 5c(c)(5)(C) further grants the Commission the authority to prohibit registered entities from listing or making available for clearing or trading certain event contracts that involve particular activities, if the Commission determines that such contracts are contrary to the public interest.

Section 5c(c)(5)(C) was added to the CEA by section 745(b) of the Dodd-Frank Act, which amended, more generally, the contract and rule submission requirements set forth in CEA section 5c. In a short colloquy with the late Senator Diane Feinstein on the Senate floor regarding the proposed Dodd-Frank Act provision that ultimately was enacted as CEA section 5c(c)(5)(C) (the ''2010 Colloquy''), Senator Blanche Lincoln, then-Chair of the Senate Committee on Agriculture, Nutrition, and Forestry—who is identified in the 2010 Colloquy as one of the authors of CEA section 5c(c)(5)(C)—stated that the provision was intended to assure that the Commission ''has the power to prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events and also prevent gambling through futures markets.''[19]

CEA section 5c(c)(5)(C)(i) provides that in connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities[20] that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title),[21] by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.[22]

CEA section 5c(c)(5)(C)(ii) provides that no agreement, contract or transaction[23] determined by the Commission to be contrary to the public interest under section 5c(c)(5)(C)(i) may be listed or made available for clearing or trading on or through a registered entity.[24]

The Commission interprets CEA section 5c(c)(5)(C) to contemplate that the Commission engage in a two-step

---

[15] See Comment File for **Federal Register** Release 73 FR 25669, CFTC, https://www.cftc.gov/LawRegulation/PublicComments/08-004.html (last visited Mar. 7, 2024).

[16] The Commission's Division of Market Oversight (''DMO'') also has issued staff no-action positions to two academic institutions which provide that, subject to specified terms, DMO will not recommend to the Commission enforcement action against the academic institutions for operating, without registration as a DCM, SEF, or foreign board of trade (''FBOT''), small-scale, not-for-profit markets that offer trading in political and economic indicator event contracts for academic purposes. See CFTC Staff Letter No. 93–66 issued to the University of Iowa (June 18, 1993), available at https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf. This no-action position superseded the operative terms of a more limited no-action position issued in 1992. See also CFTC Staff Letter No. 14–130 issued to Victoria University of Wellington, New Zealand (Oct. 29, 2014), available at https://www.cftc.gov/csl/14-130/download. The terms of these staff no-action positions contemplate that each event market will be operated by the relevant academic institution for academic purposes and without compensation. The terms of the no-action positions also contemplate limitations on, among other things, the number of market participants and the number of contracts that each market participant may hold. In issuing each of the no-action positions, DMO explicitly noted that it was not rendering an opinion on the legality of the academic institutions' activities under state law.

[17] Registered entities seeking to list event contracts for trading, or accept such contracts for clearing, must abide by the CEA and Commission regulations, including applicable statutory core principles. See, e.g., CEA section 5(d), 7 U.S.C. 7(d)

(Core Principles for DCMs); CEA section 5b(c)(2), 7 U.S.C. 7a–1(c)(2) (Core Principles for DCOs); CEA section 5h(f), 7 U.S.C. 7b–3(f) (Core Principles for SEFs). In addition, registered entities seeking to list event contracts for trading, or accept such contracts for clearing, must comply with the submission requirements set forth in CEA section 5c(c), 7 U.S.C. 7a–2(c)(1), and part 40 of the Commission's regulations.

[18] See Core Principle 3 for DCMs, CEA section 5(d)(3), 7 U.S.C. 7(d)(3), and Core Principle 3 for SEFs, CEA section 5h(f)(3), 7 U.S.C. 7b–3(f)(3); Core Principle 2 for DCMs, CEA section 5(d)(2), 7 U.S.C. 7(d)(2), and Core Principle 2 for SEFs, CEA section 5h(f)(2), 7 U.S.C. 7–b3(f)(2); and Core Principle 4 for DCMs, CEA section 5(d)(4), 7 U.S.C. 7(d)(4), and Core Principle 4 for SEFs, CEA section 5h(f)(4), 7 U.S.C. 7b–3(f)(4). For the avoidance of doubt, regardless of whether or not a particular event contract falls within the scope of CEA section 5c(c)(5)(C) and § 40.11, the DCM or SEF seeking to list the event contract for trading has a statutory obligation to ensure that the event contract is not readily susceptible to manipulation.

[19] 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln), available at https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf (last visited Mar. 7, 2024).

[20] The term ''excluded commodity'' is defined in CEA section 1a(19), 7 U.S.C. 1a(19), as: (i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure; (ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—(I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or (II) based solely on one or more commodities that have no cash market; (iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or (iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence.

[21] There is no ''section 1a(2)(i)'' in the CEA. As discussed in section II.A.1.a., infra, the Commission believes that the reference in CEA section 5c(c)(5)(C)(i) to ''section 1a(2)(i)'' is a typographical or drafting error.

[22] CEA section 5c(c)(5)(C)(i); 7 U.S.C. 7a–2(c)(5)(C)(i).

[23] CEA section 5c(c)(5)(C)(i) applies in connection with the listing of agreements, contracts, transactions, or swaps by a DCM or SEF. 7 U.S.C. 7a–2(c)(5)(C)(i). The Commission notes that similar phrases both later in CEA section 5c(c)(5)(C)(i) and in CEA section 5c(c)(5)(C)(ii) refer only to ''agreements, contracts, or transactions . . . .'' The Commission interprets either phrase to encompass derivative contracts listed for trading on or through DCMs or SEFs, and for simplicity refers to ''agreements, contracts, transactions or swaps'' as ''contracts'' herein.

[24] CEA section 5c(c)(5)(C)(ii); 7 U.S.C. 7a–2(c)(5)(C)(ii).

inquiry. First, the Commission must assess whether a contract in a specified excluded commodity "involve[s]" an activity enumerated in CEA section 5c(c)(5)(C)(i)(I)–(V) (each, an "Enumerated Activity") or other similar activity as determined by the Commission by rule or regulation ("prescribed similar activity"). If the Commission determines that the contract involves such activity, the Commission must assess whether the contract is contrary to the public interest. The Commission interprets CEA section 5c(c)(5)(C) to provide that the contract may not be listed or made available for clearing or trading by a registered entity if the Commission finds both that (i) the contract involves an Enumerated Activity or prescribed similar activity, and (ii) the contract is contrary to the public interest.

2. Commission Regulation 40.11

In 2011, the Commission adopted § 40.11 to implement CEA section 5c(c)(5)(C) as part of broader changes to the Commission's part 40 regulations.[25] Commission Regulation 40.11(a)(1) provides that a registered entity shall not list for trading or accept for clearing on or through the registered entity an agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law.[26] Although they are not listed in precisely the same order, the activities enumerated in § 40.11(a)(1) are the same as the activities enumerated in CEA sections 5c(c)(5)(C)(i)(I)–(V) and are similarly referred to herein as the Enumerated Activities.

Consistent with CEA section 5c(c)(5)(C)(i)(VI), § 40.11(a)(2) provides

that a registered entity shall not list for trading or accept for clearing on or through the registered entity an agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11a(1), and that the Commission determines, by rule or regulation, to be contrary to the public interest.[27] To date, the Commission has not made any such determinations.

Pursuant to § 40.11(c), when a contract submitted to the Commission by a registered entity, pursuant to § 40.2 or § 40.3, may involve, relate to, or reference an activity enumerated in §§ 40.11a(1) or (2), the Commission is authorized to commence a 90-day review of the contract.[28] The Commission must issue an order approving or disapproving the contract by the end of the 90-day review period or, if applicable, at the conclusion of any extended period agreed to or requested by the registered entity.[29] Commission Regulation 40.11(c)(1) requires the Commission to request that the registered entity suspend the listing or trading of the contract during the 90-day review period.[30] The Commission also must post on its website a notification of the intent to carry out a 90-day review.[31]

The Commission did not, in § 40.11 or in the 2011 adopting release for the rule, define any of the Enumerated Activities. The Commission acknowledged, in the adopting release, a comment on the rule proposal that stated that the term "gaming," in particular, should be further defined in order to enhance clarity regarding the scope of the prohibition set forth in § 40.11a(1).[32] The Commission expressed agreement

with the interest to further define "gaming" for purposes of the prohibition,[33] and stated that the Commission might issue a future event contracts rulemaking that, among other things, addressed the appropriate treatment of event contracts involving gaming.[34] The Commission stated that, in the meantime, it had determined to adopt the prohibition set forth in § 40.11(a)(1) with respect to the Enumerated Activities, "and to consider individual product submissions on a case-by-case basis under § 40.2 or § 40.3."[35]

3. Commission Determinations Pursuant to § 40.11

To date, the Commission has issued two final determinations pursuant to § 40.11. On January 3, 2012, the Commission commenced a 90-day review, under § 40.11(c), of certain event contracts on election outcomes that had been self-certified by Nadex.[36] On April 2, 2012, the Commission issued an order (the "Nadex Order") prohibiting the contracts from being listed or made available for clearing or trading, finding that the contracts involved the Enumerated Activity of

---

[25] Part 40 of the Commission's regulations, more generally, implements the contract and rule submission requirements for registered entities set forth in CEA section 5c(c). For example, § 40.2 sets forth the general process by which a DCM or SEF may list a new derivative contract for trading by providing the Commission with a written certification—a "self-certification"—that the contract complies with the CEA, including the CFTC's regulations thereunder. *See also* CEA section 5c(c)(1), 7 U.S.C. 7a–2(c)(1). The Commission must receive the DCM's or SEF's self-certified submission at least one business day before the contract's listing. 17 CFR 40.2(a)(2). Commission Regulation 40.3 sets forth the general process by which a DCM or SEF may elect voluntarily to seek prior Commission approval of a derivative contract that the DCM or SEF seeks to list for trading. *See also* CEA sections 5c(c)(4)–(5), 7 U.S.C. 7a–2(c)(4)–(5). Amendments to an existing derivative contract also must be submitted to the Commission either by way of self-certification or for prior Commission approval. 17 CFR 40.5, 40.6.

[26] 17 CFR 40.11(a)(1).

[27] 17 CFR 40.11(a)(2). CEA section 5c(c)(5)(C) applies with respect to agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i)). There is no "section 1a(2)(i)" in the CEA, and the Commission believes the reference to this provision in CEA section 5c(c)(5)(C) is a typographical or drafting error. In adopting §§ 40.11(a)(1) and (2), as well as § 40.11(c), the Commission interpreted CEA section 5c(c)(5)(C) to apply with respect to the excluded commodities defined in CEA section 1a(19)(iv). *See* discussion in section II.A.1.a, *infra*.

[28] 17 CFR 40.11(c). Commission Regulation 40.11(c) states that the 90-day review period shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

[29] 17 CFR 40.11(c)(2).

[30] 17 CFR 40.11(c)(1).

[31] *Id.*

[32] Provisions Common to Registered Entities, 76 FR 44776, 44785 (July 27, 2011).

[33] *Id.*

[34] *Id.*

[35] *Id.* The Commission noted that a registered entity could receive a definitive resolution of any questions concerning the applicability of § 40.11(a)(1) by submitting a particular contract for Commission approval under § 40.3: if the submitted contract was approved by the Commission, the registered entity would have assurance that the Commission had reviewed and did not object to the submission based on the prohibitions in § 40.11(a). *Id.* at 44785–86. The Commission noted that, alternatively, a registered entity could self-certify a contract under § 40.2 and, if the Commission determined during its review of the contract "that the submission may violate the prohibitions in § 40.11(a)(1)–(2), the Commission may request that the registered entity suspend the trading or clearing of the contract pending the completion of a 90-day . . . review." *Id.* at 44786. The Commission stated that, upon completion of that review, the Commission would be required to issue an order finding either that the contract violated, or did not violate, the prohibitions in § 40.11(a)(1)–(2). *Id.*

[36] *See https://www.cftc.gov/PressRoom/PressReleases/6163-12.* Nadex self-certified cash-settled, binary contracts on whether there would be a Democratic majority in the U.S. House of Representatives ("House"); whether there would be a Republican majority in the House; whether there would be a Democratic majority in the U.S. Senate ("Senate"); and whether there would be a Republican majority in the Senate. The contracts settled based on whether the named party held the majority of seats in the identified chamber of Congress on the expiration date. Nadex also self-certified ten cash-settled, binary contracts on the upcoming Presidential election. Each contract was based on one of the leading candidates for President and paid according to whether that candidate won the Presidency.

**48972** **Federal Register** / Vol. 89, No. 112 / Monday, June 10, 2024 / Proposed Rules

gaming and were contrary to the public interest.[37]

On June 23, 2023, the Commission commenced a 90-day review, under § 40.11(c), of certain event contracts self-certified by KalshiEX LLC ("Kalshi") that were based on which political party controlled each chamber of Congress.[38] On September 22, 2023, the Commission issued an order (the "Kalshi Order") prohibiting the contracts from being listed or made available for clearing or trading, finding that the contracts involved the Enumerated Activities of gaming and activity that is unlawful under State law, and that the contracts were contrary to the public interest.[39] The Kalshi Order is currently under judicial review in the U.S. District Court for the District of Columbia.[40]

The Commission has exercised its authority to commence a 90-day review of event contracts, pursuant to § 40.11(c), on two additional occasions.[41] On December 23, 2020, the Commission commenced a 90-day review of certain event contracts that had been self-certified by Eris Exchange, LLC ("ErisX"), that were based on the moneyline, the point spread, and the total points for individual NFL games.[42] On August 26, 2022, the Commission commenced a 90-day review of certain Congressional control event contracts submitted for Commission approval by

Kalshi.[43] In both of these instances, the submitting parties withdrew their respective contracts from consideration before the Commission issued a final determination pursuant to § 40.11.

## II. Proposed Amendments to § 40.11

In light of (i) the significant increase that the Commission has observed in the number and diversity of event contracts listed for trading by Commission-registered exchanges, and (ii) the increased interest that the Commission has observed, among applicants and prospective applicants for exchange registration, in operating exchanges that would primarily or exclusively offer event contracts for trading, the Commission is proposing to amend § 40.11 to, among other things, further specify types of event contracts that fall within the scope of CEA section 5c(c)(5)(C) and are contrary to the public interest, such that they may not be listed for trading or accepted for clearing on or through a registered entity. As discussed above, the Commission believes that these proposed amendments would support efforts by registered entities to ensure compliance with the CEA, and would, correspondingly, assist registered entities, as well as applicants for registration, in making informed business decisions with respect to product design, thereby helping to support responsible market innovation. The Commission further believes that, by helping to delineate appropriate event contract parameters, the proposed amendments would reduce the frequency of event contract submissions to the Commission that raise potential public interest concerns, which would allow for more efficient use of Commission and staff resources by reducing the need to conduct individualized event contract reviews pursuant to § 40.11(c). It may also yield efficiencies for registered entities by helping to avoid situations where they expend resources to develop and submit a contract that the Commission subsequently determines, following a § 40.11(c) review, may not be listed for trading or accepted for clearing.

In addition, the Commission is proposing to make certain amendments to § 40.11 to further align the language of the regulation with the statutory text of CEA section 5c(c)(5)(C), and also is proposing to make certain technical amendments to the regulation to enhance clarity and organization.

## A. Amendments to Further Align With Statutory Language

### 1. Description of Excluded Commodities

#### (a) Proposed Amendments

CEA section 5c(c)(5)(C) applies with respect to agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i)).[44] There is no "section 1a(2)(i)" in the CEA, and the Commission believes the reference to this provision in CEA section 5c(c)(5)(C) is a typographical or drafting error.[45] In adopting § 40.11, the Commission interpreted the "excluded commodities" falling within the scope of CEA section 5c(c)(5)(C) to be those set forth in CEA section 1a(19)(iv), and accordingly referenced CEA section 1a(19)(iv) in §§ 40.11(a)(1)–(2) and § 40.11(c).[46]

With the aim of adhering as closely as possible to the statutory text—while, by necessity, having to account for the errant reference in CEA section 5c(c)(5)(C) to "section 1a(2)(i)," which is not a provision in the statute—the Commission is proposing to amend §§ 40.11(a)(1)–(2) and § 40.11(c) to refer to agreements, contracts, transactions, or swaps in excluded commodities based on the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(19)(i) of the Act). These proposed amendments would achieve two purposes. First, the proposed amendments would remove from the relevant rules the current reference to CEA section 1a(19)(iv) and would more precisely track the text of CEA section 5c(c)(5)(C). Second, the proposed amendments would clarify the Commission's interpretation that the

[37] See CFTC Release No. 6224–12 CFTC Issues Order Prohibiting North American Derivatives Exchange's Political Event Derivatives Contracts (Apr. 2, 2012), available at https://www.cftc.gov/PressRoom/PressReleases/6224-12.

[38] See CFTC Release No. 8728–23, CFTC Announces Review of Kalshi Congressional Control Contracts and Public Comment Period (June 23, 2023), available at https://www.cftc.gov/PressRoom/PressReleases/8728-23. The Kalshi contracts were cash-settled, binary contracts that settled based on the party affiliation of the leader of the identified chamber of Congress on the expiration date. The Kalshi contracts differed from the Nadex contracts that the Commission had previously disapproved, in that the Nadex contracts settled based on the number of seats in the House or Senate held by a given political party, while the Kalshi contracts settled based on the party affiliation of the leader of the House (the Speaker) or the leader of the Senate (the President Pro Tempore).

[39] See CFTC Release No. 8780–23, CFTC Disapproves KalshiEX LLC's Congressional Control Contracts (Sept. 22, 2023), available at https://www.cftc.gov/PressRoom/PressReleases/8780-23.

[40] KalshiEX LLC v. Commodity Futures Trading Commission, 1:23–cv–03257 (filed Nov. 1, 2023) (D.D.C.).

[41] In so doing, the Commission found, pursuant to § 40.11(c), that the subject contracts "may" involve an Enumerated Activity. 17 CFR 40.11(c).

[42] See CFTC Release No. 8345–20, CFTC Announces Review of RSBIX NFL Futures Contracts Proposed by Eris Exchange, LLC (Dec. 23, 2020), available at https://www.cftc.gov/PressRoom/PressReleases/8345-20.

[43] See CFTC Release No. 8578–22, CFTC Announces Review and Public Comment Period of KalshiEx Proposed Congressional Control Contracts Under CFTC Regulation 40.11, available at https://www.cftc.gov/PressRoom/PressReleases/8578-22.

[44] CEA section 5c(c)(5)(C)(i); 7 U.S.C. 7a–2(c)(5)(C)(i).

[45] CEA section 1a(2), 7 U.S.C. 1a(2), defines an "appropriate Federal banking agency," which is not relevant to the excluded commodity definition.

[46] While the adopting release did not discuss the basis for this interpretation, it is likely that the Commission assumed the statutory language of the "excluded commodity" definition set forth in CEA section 1a(19)(iv), since CEA section 5c(c)(5)(C) tracks the language of CEA section 1a(19)(iv) to a large extent. The "excluded commodity" definition set forth in CEA section 1a(19)(iv) is as follows: an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence. "[C]lause (i)" refers to CEA section 1a(19)(i).

reference to "section 1a(2)(i)" in CEA section 5c(c)(5)(C) was intended by Congress to refer to the excluded commodities described in CEA section 1a(19)(i), namely, an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure. This interpretation carves out from the scope of CEA section 5c(c)(5)(C) event contracts based on a change in the price, rate, value, or levels of these measures, indices, and instruments.

The measures, indices, and instruments described in CEA section 1a(19)(i) served as underlyings for a range of derivative contracts that were broadly traded on CFTC-registered exchanges at the time of enactment of CEA section 5c(c)(5)(C).[47] As such, the Commission believes that it is unlikely that Congress intended the heightened authority granted to the Commission in CEA section 5c(c)(5)(C) to apply with respect to event contracts based on changes in the price, rate, value or levels of these measures, indices, and instruments.[48] The Commission notes that it has not historically recognized these types of event contracts as falling within the scope of CEA section 5c(c)(5)(C) and, by extension, § 40.11.

(b) Illustrative Examples of Event Contracts Not Within the Scope of CEA Section 5c(c)(5)(C) and § 40.11

The Commission believes that registered entities and market participants would benefit from the Commission providing examples of the types of event contracts that, in the Commission's view, fall outside of the scope of CEA section 5c(c)(5)(C) and, by extension, § 40.11.[49] The Commission believes that, among other things, this will assist registered entities, as well as applicants for registration, in making informed business decisions with respect to product design, thereby supporting responsible innovation. The Commission believes that this also will support the more efficient use of CFTC staff resources in connection with the review of event contract submissions.

While the Commission cannot anticipate every contract design, the Commission believes that event contracts based on a change in the price, rate, value, or levels of the following would generally fall outside of the scope of CEA section 5c(c)(5)(C) and § 40.11:

• Economic indicators, including the CPI and other price indices; the U.S. trade deficit with another country; measures related to GDP, jobless claims, or the unemployment rate; and U.S. new home sales;

• Financial indicators, including the federal funds rate; total U.S. credit card debt; fixed-rate mortgage averages (e.g., the 30-year fixed-rate mortgage interest rate); and end of day, week, or month values for broad-based stock indexes; and

• Foreign exchange rates or currencies.

Request for Comment

The Commission requests comment on all aspects of its proposal to amend the language of §§ 40.11(a)(1)–(2) and 40.11(c) to more precisely track, in the description of "excluded commodities," the text of CEA section 5c(c)(5)(C). In particular, the Commission requests comment on its interpretation that the reference to "section 1a(2)(i)" in the parenthetical in CEA section 5c(c)(5)(C)(i) is a typographical or drafting error, and that the intention was to refer to the excluded commodities described in CEA section 1a(19)(i).

The Commission further requests comment on the examples provided of event contracts that the Commission believes would generally fall outside of the scope of CEA section 5c(c)(5)(C) and § 40.11. In particular, the Commission requests comment on the following questions:

• Are there additional types of event contracts that should be explicitly identified by the Commission in the non-exclusive list of contract types that would generally fall outside of the scope of CEA section 5c(c)(5)(C) and § 40.11?

• What indices or measures are "other macroeconomic index[es] or measure[s]" for purposes of CEA section 1a(19)(i)? Are tax rates (e.g., corporate and capital gains tax rates) among such macroeconomic measures?

2. Contracts That "Involve" an Enumerated Activity

CEA section 5c(c)(5)(C) applies with respect to event contracts in certain excluded commodities that "involve" one of the Enumerated Activities or a prescribed similar activity. In adopting § 40.11, the Commission described the types of event contracts that may not be listed for trading or accepted for clearing as contracts that involve, relate to, or reference one of the Enumerated Activities or a prescribed similar activity.[50] Commission Regulation 40.11(c) further provides that the Commission may engage in a 90-day review of an event contract if the contract may involve, relate to, or reference an Enumerated Activity or a prescribed similar activity.[51]

In order to further align the language of the regulation with the statutory text of CEA section 5c(c)(5)(C), the Commission proposes to amend § 40.11 to remove the terms "relate to" and "reference" wherever they appear and to simply refer to event contracts that "involve" an Enumerated Activity or prescribed similar activity. The proposed amendments would reaffirm the scope of the Commission's prohibition authority and the standard of review that applies with respect to an event contract pursuant to § 40.11. The proposed amendments would also be consistent with the determinations made by the Commission in the Nadex Order and the Kalshi Order, both of which focused on whether the event contracts in question "involved" an Enumerated Activity.[52] The proposed amendments are not intended to alter the scope of the Commission's prohibition authority or the nature of the Commission's analysis to determine whether a particular event contract falls within the ambit of CEA section 5c(c)(5)(C) and § 40.11.

The term "involve" is not defined in the CEA, so the Commission gives the term its ordinary meaning.[53] Definitions of "involve" include "to relate to or affect," "to relate closely," to "entail," or to "have as an essential feature or consequence." [54] In this regard, the

---

[47] These included derivative contracts based on changes in the Consumer Price Index ("CPI"), home price indices for various U.S. cities, U.S. Initial Jobless Claims, and Gross Domestic Product ("GDP").

[48] Consistent with the Commission's view that the reference to "section 1a(2)(i)" in CEA section 5c(c)(5)(C) was intended by Congress to refer to the excluded commodities described in CEA section 1a(19)(i), section 201(b) of the CFTC Reauthorization Act of 2019 included, as a technical correction to the CEA, the replacement of the reference to "section 1a(2)(i)" with a reference to "section 1a(19)(i)." CFTC Reauthorization Act of 2019, H.R. 6197, 116th Cong. (2d. Sess. 2020).

[49] For the avoidance of doubt, with respect to these types of event contracts, a registered entity still must comply with the substantive and procedural requirements that apply, more generally, to the listing for trading or acceptance for clearing of derivative contracts, including, for DCMs and SEFs, the statutory requirement to ensure that such contracts are not readily susceptible to manipulation.

[50] 17 CFR 40.11(a)(1) and (2). While there are no prescribed similar activities at this juncture, the Commission retains its authority under CEA section 5c(c)(5)(C)(i)(VI) and § 40.11(a)(2) to prescribe similar activities in future rules or regulations.

[51] 17 CFR 40.11(c).

[52] See Kalshi Order at 5–7; Nadex Order at 2.

[53] See Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187, 115 S.Ct. 788 (1995); see also Morrisette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240 (1952) (holding that undefined statutory words that are not terms of art are given their ordinary meanings, frequently derived from the dictionary).

[54] See "involve" definition, Merriam-Webster.com, available at https://www.merriam-webster.com/dictionary/involve (last visited Mar. 7, 2024); Random House College Dictionary 703

Continued

Commission reiterates that a contract may "involve" an Enumerated Activity, or prescribed similar activity, in circumstances where such activity is not, itself, the contract's underlying.[55] By its plain meaning, a contract "involves" its underlying, but it also involves other characteristics. Further, where the CEA specifies a contract's underlying, it uses the word "underlying,"[56] or, as syntax requires, it refers to what the contract is "based on"[57] or "based upon."[58]

Beyond the plain meaning of "involve," the full text of CEA section 5c(c)(5)(C)(i) demonstrates that a contract "involve[s]" more than just its underlying: the provision uses the terms "based upon" and "involve" in the same sentence and differentiates between the two. First, CEA section 5c(c)(5)(C)(i) states that the provision applies with respect to agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency.[59] In other words, the contract's underlying must be an event. Then, just a few words later, CEA section 5c(c)(5)(C)(i) states that "such agreements, contracts, or transactions" must "involve" an Enumerated Activity or prescribed similar activity. In context, "based upon" and "involve" must have different meanings, with "based upon" referring to the underlying, and requiring only that it be an event, and "involve" retaining its broader ordinary meaning and referring not just to the underlying, but to "such agreements, contracts, or transactions" as a whole.

In effect, Congress's choice of the broader term "involve" means that CEA section 5c(c)(5)(C) encompasses both event contracts whose underlying is an Enumerated Activity or prescribed similar activity, and event contracts with a different connection to an Enumerated Activity or prescribed similar activity, because, for example, they "relate closely" to, "entail," or "have as an essential feature or consequence" such activity.

The legislative history of CEA section 5c(c)(5)(C) supports the plain meaning of the statutory text in this regard. During the 2010 Colloquy, Senator

Lincoln stated that, among other things, CEA section 5c(c)(5)(C) was intended to "prevent gambling through futures markets" and to restrict derivatives exchanges from "construct[ing] an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament."[60] None of the Super Bowl, the Kentucky Derby, or the Masters Golf Tournament are, of themselves, "gaming."[61] Rather, the statement of Senator Lincoln—who, as noted above, is identified in the 2010 Colloquy as one of the authors of CEA section 5c(c)(5)(C)—focuses on the overall characteristics of the contract. As noted in the Nadex Order and the Kalshi Order, this legislative history supports the plain meaning of the term "involve," and indicates that the question for the Commission in evaluating whether a contract "involves" an Enumerated Activity or prescribed similar activity is whether the contract, considered as a whole, involves one of those activities.[62]

### Request for Comment

The Commission requests comment on all aspects of its proposal to amend § 40.11 to remove the terms "relate to" and "reference" wherever they appear, and to refer in the regulation only to event contracts that "involve" an Enumerated Activity or prescribed similar activity.

### B. The Enumerated Activities

#### 1. Gaming

##### (a) Background

Neither the CEA nor current § 40.11 define "gaming" or any of the other Enumerated Activities. While acknowledging, in the adopting release for § 40.11, the interest expressed by certain commenters to further define the term "gaming" for purposes of the regulation, the Commission deferred at the time from doing so, indicating that

it would instead "consider individual product submissions on a case-by-case basis under § 40.2 or § 40.3."[63]

Since the adoption of § 40.11 in 2011, as part of the agency's standard product review process, CFTC staff have evaluated whether event contracts in certain excluded commodities may implicate CEA section 5c(c)(5)(C) and § 40.11, and in four instances the Commission has commenced a review pursuant to § 40.11(c) to evaluate whether event contracts implicated one of the Enumerated Activities. In each of these four instances, a § 40.11(c) review was commenced, in part, to evaluate whether the event contracts in question implicated gaming.[64]

Based upon its experience administering CEA section 5c(c)(5)(C) pursuant to § 40.11, the Commission believes that defining the term "gaming" within § 40.11 will assist in establishing a common understanding and more uniform application of the term. It will thereby assist registered entities, and applicants for registration, in their product design efforts, and benefit market participants and the public by helping to ensure that event contracts listed for trading and accepted for clearing by registered entities are consistent with the requirements of the CEA and § 40.11. The Commission notes that there may continue to be instances where contract-specific reviews are commenced pursuant to § 40.11(c) in order to evaluate whether a contract involves "gaming," as proposed to be defined. However, the Commission expects that establishing a definition, and thereby a common understanding of the term, will help to reduce the frequency of these reviews.

##### (b) Proposed Gaming Definition

The Commission proposes to define "gaming" in new § 40.11(b)(1) as the staking or risking by any person of something of value upon: (i) the outcome of a contest of others; (ii) the outcome of a game involving skill or chance; (iii) the performance of one or more competitors in one or more contests or games; or (iv) any other occurrence or non-occurrence in connection with one or more contests or games.[65] This proposed definition is

---

(Revised ed. 1979); Riverside University Dictionary 645 (1983) 645; *see also* Roget's International Thesaurus 1040 (7th ed. 2010) (giving as synonyms "entail" and "relate to").

[55] *See* Kalshi Order at 5–7; Nadex Order at 2.

[56] *E.g.*, 7 U.S.C. 6c(d)(2)(A)(i), 20(e), 25(a)(1)(D)(ii).

[57] *E.g.*, 7 U.S.C. 2(a)(1)(C)(i)(I), 2(a)(1)(C)(iv), 6b(e).

[58] *E.g.*, 7 U.S.C. 2(a)(1)(C)(ii).

[59] 7 U.S.C. 7a–2(c)(5)(C).

[60] *See* 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln).

[61] As noted in the Kalshi Order, it is difficult to conceive of a contract whose underlying event, itself, is "gaming." If "involve" were to refer only to a contract's underlying, contracts based on sporting events such as horse races and football games would not qualify, because sports typically are not understood to be "gaming"—they are understood to be "games." In effect, if "involve" were to refer only to a contract's underlying, the scope of certain prongs of CEA section 5c(c)(5)(C) could effectively be limited to a null set of event contracts, which could not have been Congress's intent. Kalshi Order at 7, note 18.

[62] Nadex Order at 2; Kalshi Order at 7. For example, giving the term its ordinary meaning, a contract "involves" an Enumerated Activity or prescribed similar activity if trading in the contract amounts to such activity. *Id.* at 7, note 19.

[63] Provisions Common to Registered Entities, 76 FR 44776, 44785 (July 27, 2011).

[64] *See https://www.cftc.gov/PressRoom/ PressReleases/6163-12* (2011 Nadex contracts); *https://www.cftc.gov/PressRoom/PressReleases/ 8345-20* (2020 ErisX contracts); *https:// www.cftc.gov/PressRoom/PressReleases/8578-22* (2022 Kalshi contracts); *https://www.cftc.gov/ PressRoom/PressReleases/8728-23* (2023 Kalshi contracts).

[65] The Commission considers the term "contest" to have its ordinary meaning, and to encompass a

consistent with the Commission's interpretation of the term "gaming" in the Nadex Order and the Kalshi Order,[66] and draws upon the ordinary meaning of the term [67] and relevant state and federal statutory definitions, as discussed below. The Commission wishes to make it clear that its proposed definition of "gaming" would not have applicability beyond the CFTC's administration of CEA section 5c(c)(5)(C) and § 40.11.

The proposed definition recognizes—as the Commission did in the Nadex Order and the Kalshi Order [68]—that the terms "gaming" and "gambling" are used interchangeably in common usage and dictionary definitions.[69] The proposed definition further recognizes that, under a number of state statutes, "gambling," "betting," or "wagering" is recognized to include a person staking or risking something of value upon a game or contest, or the performance of competitors in a game or contest.[70] Further, a federal statute, the Unlawful internet Gambling Enforcement Act ("UIGEA"), defines the term "bet or wager" as the staking or risking by any person of something of value on the outcome of a contest of others, a sporting event, or a game subject to chance, upon an agreement or understanding that the person or another person will receive something

of value in the event of a certain outcome.[71]

Accordingly, the Commission believes that it is appropriate, for purposes of defining "gaming" within § 40.11, to focus on the staking or risking of something of value upon a contest of others or a game, including the outcome of such contest or game, the performance of competitors in such contest or game,[72] or other occurrences or non-occurrences in connection with such contest or game. As noted above, this proposed approach draws upon the approach taken in relevant state and federal statutes to defining the terms "gambling," "betting," and "wagering." In this regard, the proposed approach is consistent with indications of the intent of the drafters of CEA section 5c(c)(5)(C). In the 2010 Colloquy, Senator Lincoln stated that the provision was intended, in part, to assure that the Commission had the authority to "prevent gambling through futures markets."[73]

The Commission acknowledges that several state statutes recognize "gambling," "betting," or "wagering," to encompass, more broadly, a person staking or risking something of value upon the outcome of any contingent event not in the person's influence or control—and not just a game or a contest of others.[74] The Commission is

not proposing to define "gaming" in this manner. The Commission recognizes that this broader definition could encompass event contracts that were not intended by Congress to be subject to the Commission's heightened authority pursuant to CEA section 5c(c)(5)(C), including the types of event contracts described in section II.A.1.b, *supra.* To avoid going beyond what Congress may have intended with respect to the "gaming" category, the Commission is proposing to use the narrower definition discussed herein. The Commission is, however, proposing to define "gaming" to include the staking or risking of something of value on a contingent event in connection with a game or contest, which the Commission believes would be as much of a wager or bet on the game or contest as staking or risking something of value on the outcome of the game or contest would be.

(c) Illustrative Examples of Gaming

In order to provide additional guidance to registered entities and market participants, the Commission proposes to set forth in new § 40.11(b)(2) a non-exclusive list of examples of activities that constitute "gaming," as proposed to be defined. Proposed § 40.11(b)(2) states that "gaming" includes, but is not limited to, the staking or risking by any person of something of value upon: (i) the outcome of a political contest, including an election or elections; (ii) the outcome of an awards contest; (iii) the outcome of a game in which one or more athletes compete; or (iv) an occurrence or non-occurrence in connection with such a contest or game, regardless of whether it directly affects the outcome. The Commission emphasizes that the list of examples provided in proposed § 40.11(b)(2) is non-exclusive. To the extent that other activity falls within the definition of "gaming" set forth at proposed § 40.11(b)(1), such activity would also constitute "gaming."

The first three examples in the non-exclusive list reflect types of games or contests which, when something of value is staked or risked upon their outcome, have been recognized as

---

"competition.' *See, e.g., MERRIAM-WEBSTER.COM, available at https://www.merriam-webster.com/dictionary/contest* (last visited Mar. 7, 2024) (defining the noun "contest" as: "1) a struggle for superiority or victory; 2) a competition in which each contestant performs without direct contact with or interference from competitors").

[66] *See* Nadex Order at 2–3; Kalshi Order at 8–10.

[67] *See* note 70, *infra.*

[68] Nadex Order at 2–3; Kalshi Order at 8–9.

[69] For example, Dictionary.com defines "gaming" as, *e.g.,* "gambling." *See* "gaming" definition, *Dictionary.com, https://www.dictionary.com/browse/gaming* (last visited Feb. 2, 2024). Black's Law Dictionary also refers to "gambling" as "gaming" and cross-refers the definition of gaming to gambling. *See* "GAMING Definition & Legal Meaning," Black's Law Dictionary, 2nd Ed., *available at https://thelawdictionary.org/gaming/* (last visited Mar. 22, 2024). Further, many state agencies that regulate gambling are known as "gaming" commissions. *See, e.g.,* Nevada Gaming Commission and Nevada Gaming Control Board, *https://gaming.nv.gov/* (last visited Mar. 7, 2024); New York State Gaming Commission, *https://www.gaming.ny.gov/* (last visited Mar. 1, 2024); Illinois Gaming Board, *https://www.igb.illinois.gov/* (last visited Mar. 7, 2024).

[70] *See, e.g.,* Ga. Code Ann. section 16–12–21(a)(1) (West 2020) (A person commits the offense of gambling when he makes a bet upon the partial or final result of any game or contest or upon the performance of any participant in such game or contest.); Tex. Penal Code Ann. section 47.02(a) (West 2019) (A person commits an offense of gambling if he: (1) makes a bet on the partial or final result of a game or contest or on the performance of a participant in a game or contest"). *See also* note 75, *infra.*

[71] 31 U.S.C. 5362(1)(A). The UIGEA, 31 U.S.C. 5361–5367 (2006), prohibits gambling businesses from knowingly accepting payments in connection with the participation of another person in a bet or wager that involves the use of the internet and that is unlawful under any federal or state law. Unlike the Wire Act, 28 U.S.C. 1084 (1961), the UIGEA defines a "bet", but it criminalizes it only if it is connected with unlawful internet gambling that violates any federal or state law. *See* 31 U.S.C. 5362. The UIGEA does not alter the definitions in other federal and state laws and expressly excludes any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the CEA from the definition of "bet or wager." *See id.* at section 5362(1)(E).

[72] This would include the performance of one or more athletes in one or more games, as well as the performance of one or more competitors in one or more auto, drone, boat, horse, or similar competitions. In addition, this would include performance in any "fantasy" or simulated contest or league in which participants own or manage an imaginary or theoretical team and compete against other participants based on the performance of such teams or team members.

[73] *See* 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statement of Sen. Blanche Lincoln).

[74] *See, e.g.,* N.Y. Penal Law section 225.00(2) (McKinney 2015) (A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.); Mich. Comp. Laws section 750.301 (2023) (Any person or his or her agent or employee who, directly or indirectly, takes, receives, or accepts from any person any money or valuable thing with the agreement, understanding or

allegation that any money or valuable thing will be paid or delivered to any person where the payment or delivery is alleged to be or will be contingent upon the result of any race, contest, or game or upon the happening of any event not known by the parties to be certain.); Va. Code Ann. section 18.2–325(1) (West 2022) (Illegal gambling means the making, placing, or receipt of any bet or wager of money or other consideration or thing of value, made in exchange for a chance to win a prize, stake, or other consideration or thing of value, dependent upon the result of any game, contest, or any other event the outcome of which is uncertain or a matter of chance.).

gambling, betting, or wagering under relevant state and federal statutes, and would constitute "gaming" under the proposed definition in § 40.11(b)(1).[75] The first example reflects the Commission's prior determinations that "gaming" includes the staking of something of value upon the outcome of a political contest, including an election.[76] The Commission's prior determinations reflect, in turn, that several state statutes, on their face, link the terms "gaming" or "gambling" to betting or wagering on elections.[77]

For purposes of proposed § 40.11(b), the Commission would consider a political contest to include, but not be limited to, a federal, state, or municipal election or primary contest for any political office, as well as any political contest in a foreign jurisdiction,

including any political subdivision thereof, or in a supranational organization. For the avoidance of doubt, the Commission would consider an event contract to "involve" gaming if the contract is premised on the outcome of one or more political contests, or would otherwise amount to the staking or risking of something of value upon the outcome of one or more political contests.[78]

The inclusion of the staking or risking of something of value upon the outcome of a political contest as an example of "gaming" in proposed § 40.11(b)(2) highlights that the Commission's proposed definition is not limited to sporting events or other games. This reflects the similar approach taken in numerous state gambling statutes [79] as well as in the UIGEA, which defines a "bet or wager" to mean, in relevant part, the staking or risking by any person of something of value on the outcome of a contest of others, a sporting event, or a game subject to chance.[80] The separate "contest of others" category in the UIGEA definition demonstrates that "betting or wagering" (and, by extension, gaming) is recognized within a federal statutory framework as extending beyond sporting events and games of chance.

In this regard, in its non-exclusive list of examples of "gaming" at proposed § 40.11(b)(2), the Commission includes the staking or risking of something of value upon the outcome of an awards contest. This would encompass, among other things, the staking or risking of something of value upon the outcome of entertainment award contests such as the Emmys, the Oscars, or the Grammys; athletics award contests such as the Heisman Trophy; or achievement award contests such as the Nobel Prize or the Pulitzer Prize. The Commission further includes as an example of "gaming" in proposed § 40.11(b)(2) the staking or risking of something of value upon the outcome of a game in which one or more athletes participate. This would encompass, among other things, the staking or risking of something of value upon the outcome of a professional or amateur (including scholastic) sports game.

Finally, the Commission includes as an example of "gaming" in proposed

§ 40.11(b)(2) the staking or risking of something of value upon an occurrence or non-occurrence in connection with any of the previously described examples of contests or games— regardless of whether such occurrence or non-occurrence directly affects the outcome of such contest or game. As discussed above, the Commission is proposing to define "gaming" to mean— in addition to the staking or risking of something of value upon the outcome of a contest of others or a game of skill or chance, or the performance of one or more competitors in such contest or game—the staking or risking of something of value upon any other occurrence or non-occurrence in connection with a contest or game. The Commission makes clear, in proposed § 40.11(b)(2), that it is of no import whether or not such occurrence or non-occurrence directly affects the outcome of a contest or game. Such an occurrence or non-occurrence would encompass, for example: (i) whether a particular candidate enters or withdraws from a political contest, or polls above or below a certain threshold; (ii) whether a particular individual is nominated for an award or attends an award ceremony; and (iii) in the context of an athletic game, the score or individual player or team statistics at given intervals during the game, whether a particular player will participate in a game, and whether a particular individual will attend a game.

The Commission notes that a number of states prohibit betting or wagering on a variety of occurrences or non-occurrences associated with athletic games,[81] as well as non-sporting events.[82] This highlights that in some

[75] *See* section II.B.1.b, *supra.*

[76] In the Nadex Order, which addressed certain event contracts on election outcomes, the Commission found that state gambling definitions of "wager" and "bet" were analogous to the act of taking a position in the subject contracts. Additionally, the Commission cited to the UIGEA definition of the term "bet or wager," and found that taking a position in the subject contracts "fit[] the plain meaning" of a person staking something of value upon a contest of others, since the contracts were all premised—either directly or indirectly—on the outcome of a contest between electoral candidates. As in the Nadex Order, in the Kalshi Order, the Commission looked to definitions of the terms "gaming," "gambling," and "bet or wager," including state and federal statutory definitions, and found that the subject contracts involved gaming, since taking a position in the contracts would be staking something of value upon the outcome of a contest of others: the contracts were premised on the outcome of Congressional election contests. As discussed, *infra*, the Commission further found in the Kalshi Order that the subject contracts involved "activity that is unlawful under . . . State law" pursuant to CEA section 5c(c)(5)(C)(i)(I) and § 40.11(a)(1).

[77] *See, e.g.*, 720 Ill. Comp. Stat. Ann. section 5/28–1 (West 2011) (A person commits gambling when he makes a wager upon the result of any game, contest, or any political nomination, appointment or election"); Neb. Rev. Stat. section 28–1101(4) (2011) (A person engages in gambling if he or she bets something of value . . . upon the outcome of a game, contest, or election.); N.M. Stat. Ann. section 44–5–10 (1978) (Bets and wagers authorized by the constitution and laws of the United States, or by the laws of this state, are gaming within the meaning of this chapter.); N.D. Cent. Code. Ann. section 12.1–28–01 (West 2011) (Gambling means risking any money upon the happening or outcome of an event, including an election . . . over which the person taking the risk has no control.). *See also* Ga. Code. Ann. section 16–12–21(a)(2) (West 2011) (A person commits the offense of gambling when he makes a bet upon the result of any political nomination, appointment, or election.); Miss. Code Ann. section 97–33–1 (West 2011) (If any person shall wager or bet upon the result of any election he shall be fined in a sum not more than Five Hundred Dollars.); S.C. Code Ann. section 16–19–90 (2012) (Any person who shall make any bet or wager of money upon any election in this State shall be guilty of a misdemeanor.); Tex. Penal Code Ann. section 47.02(a)(2) (West 2011) (A person commits an offense if he makes a bet on the result of any political nomination, appointment, or election.).

[78] Consistent with its determination in the Kalshi Order, where taking a position in a contract would be staking or risking something of value upon the outcome of a political contest, including an election or elections, the Commission would consider the contract also to involve activity that is unlawful under state law, pursuant to CEA section 5c(c)(5)(C)(i)(I) and § 40.11(a)(1). *See* Kalshi Order at 12–14.

[79] *See, e.g.*, notes 71, 75, and 78, *supra.*

[80] 31 U.S.C. 5362(1)(a).

[81] *See, e.g.* Va. Code Ann. section 58.1–4039 (A)(2) (West) (No person shall place or accept a proposition bet on college sports.). Ohio and Maryland have recently followed suit and banned player-specific proposition bets on college sports. *See https://casinocontrol.ohio.gov/static/NCAA%20Request%20&%20Commission's%20Response/Response%20to%20the%20NCAA%20Regarding%20Proposition%20Wagers%20on%20Student%20Athletes%202022%2002%2023.pdf* (Feb. 23, 2024 letter from the Ohio Casino Control Commission approving a request from the National Collegiate Athletic Association ("NCAA") to prohibit player-specific proposition bets on intercollegiate athletics competitions); *https://sbcamericas.com/2024/03/04/maryland-bans-college-athlete-props/* (describing a directive by the Maryland Lottery and Gaming Control Agency to all sportsbook operators in Maryland to remove college player proposition wagers from their platforms as of Mar. 1, 2024). *See also* Massachusetts Gaming Commission Says No Super Bowl Prop Bets This Year, NewBostonPost (Feb. 9, 2024), *available at https://newbostonpost.com/2024/02/09/massachusetts-gaming-commission-says-no-super-bowl-prop-bets-this-year/.*

[82] For example, in Nevada, a sports book may not accept wagers on a non-sporting event unless

**Federal Register** / Vol. 89, No. 112 / Monday, June 10, 2024 / Proposed Rules

instances, event contracts that involve "gaming," as proposed to be defined, may also involve a second Enumerated Activity—"activity that is unlawful under . . . State law." For example, as discussed in section I.C.3, *supra*, the Commission found in the Kalshi Order that the subject contracts involved both gaming and activity that is unlawful under state law.[83] While the Commission does not provide a complete catalogue herein of the types of betting or wagering that is prohibited under state law, it warrants recognition that in certain instances, event contracts that involve "gaming," as proposed to be defined, may also involve activity that is unlawful under state law.[84]

As discussed above, the Commission recognizes that there may continue to be instances where contract-specific reviews will need to be commenced pursuant to § 40.11(c) in order to evaluate whether a particular contract involves "gaming," as proposed to be defined. However, it is anticipated that the proposed definition and non-exclusive list of examples will assist in demarcating for registered entities and market participants the types of event contracts that involve "gaming" for purposes of § 40.11(a)(1), and thereby reduce the frequency with which such reviews must be commenced.

Request for Comment

The Commission requests comment on all aspects of its proposed definition of the term "gaming." In particular, the Commission requests comment on the following questions:

• Are there examples of activities that would constitute "gaming" that may fall outside of the proposed definition?

• Are there other types of votes or elections that the Commission should specifically identify, for clarity, in the illustrative examples in proposed § 40.11(b)(2)? What types of other votes or elections should be identified, and why?

• Should the availability at gaming venues of bets or wagers on a particular

contingency, occurrence, or event be a relevant factor in the Commission's consideration of whether an event contract involving that contingency, occurrence, or event involves "gaming" for purposes of § 40.11?

• If, on judicial review, it is determined that staking something of value on the outcome of a political contest does not involve "gaming," the Commission may consider whether that activity is "similar to" gaming. Is staking something of value on the outcome of a political contest similar to gaming?

• The Commission may also consider whether it should enumerate contracts involving political contests or some subset thereof as contracts involving a "similar activity" to any one or more of "war," "terrorism," "assassination," or "activity that is unlawful under any Federal or State law" under CEA section 5c(c)(5)(C)(i)(VI) and determine that contracts involving this newly enumerated activity of political contests are contrary to the public interest. Are contracts involving political contests contracts involving a similar activity to any one or more of "war," "terrorism," "assassination," or "activity that is unlawful under any Federal or State law"? If so, should the Commission determine such contracts are contrary to the public interest?

2. The Other Enumerated Activities

The Commission does not believe that it is necessary to define "terrorism," "assassination," or "war" at this time.[85] With respect to "activity that is unlawful under any Federal or State law," the Commission notes that the § 40.11(c) review that it conducted in connection with its determination in the Kalshi Order evaluated whether the subject Congressional control contracts involved this Enumerated Activity. In the Kalshi Order, the Commission found that, in many states, betting or wagering on elections is prohibited by statute or common law, and the Commission cited to the statutory provisions and caselaw prohibiting such activity that it had identified through a survey of relevant state law.[86] The Commission found that, because taking a position in the subject contracts would be staking something of value upon the outcome of contests between electoral candidates—in effect, betting or wagering on the outcome of elections—and because in many states such conduct is illegal, the subject

contracts involved activity that was unlawful under state law.[87]

The Commission anticipates that that the agency would in the future follow a similar approach—including a survey of relevant law—in circumstances where there is a question regarding whether an event contract submitted to the Commission involves activity that is unlawful under any state, or federal, law for purposes of § 40.11(a)(1). The Commission acknowledges that many state codes include laws prohibiting certain activity that, while not repealed, are generally considered archaic and are not enforced. The Commission believes that it is unlikely that a registered entity would seek to list for trading or accept for clearing an event contract involving such a law. To the extent that a registered entity does make a submission to the Commission regarding a contract that may involve such a law, the Commission believes that it may be appropriate to commence a review of the contract pursuant to § 40.11(c) to evaluate whether, in light of the relevant facts and circumstances, it is appropriate to recognize the contract as involving "activity that is unlawful under any . . . State law" for purposes of § 40.11(a)(1).

The Commission notes further that a registered entity may receive a definitive resolution of any questions concerning the applicability of § 40.11(a)(1) by submitting a contract for Commission approval under § 40.3. CFTC staff also may, at its discretion and upon a request from a registered entity, review a draft contract

---

[83] Kalshi Order at 11–12.

[84] *See* note 88, *infra*. While the Commission has exclusive jurisdiction over futures and swaps contracts traded on a CFTC-registered exchange, preempting the application of state law with respect to such transactions—and meaning that transacting in such contracts on a CFTC-registered exchange cannot, of itself, constitute unlawful activity for state law purposes—this does not preclude a contract from involving "activity that is unlawful under . . . State law" for purposes of CEA section 5c(c)(5)(C).

[85] The Commission clarifies, however, that it believes that cyberattacks and other acts of cyberterrorism constitute terrorism, and in some cases war, and are also likely to constitute activity that is unlawful under state or federal law.

[86] Kalshi Order at 11–12.

[87] CEA section 2(a)(1) grants the Commission "exclusive jurisdiction" over futures and swap contracts traded on a CFTC-registered exchange, 7 U.S.C. 2(a)(1). This "preempts the application of state law," *Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), so transacting these contracts on a CFTC-registered exchange cannot, in and of itself, be an "activity that is unlawful under any . . . State law." However, such contracts may still "involve . . . activity" that is unlawful under a state law, in the sense, for example, that transactions in the contracts may "relate closely" to, "entail," or "have as an essential feature or consequence" an activity that violates state law. For example, in the Kalshi Order, the Commission found that state laws (which are not preempted by the CEA) prohibit wagering on elections. The Commission found that taking a position in the subject Congressional control contracts would be staking something of value on the outcome of contests between electoral candidates, such that wagering on elections was "an essential feature or consequence" of the contracts. Accordingly, the Commission found that while transactions in the contracts on a CFTC-registered exchange would not violate, for example, state bucket-shop laws, they nevertheless involved an activity that is unlawful in a number of states—wagering on elections. The Commission found that to permit such transactions on a CFTC-registered exchange would undermine important state interests expressed in statutes separate and apart from those applicable to trading on a CFTC-registered exchange. *Id.* at 13, note 28.

submission or proposal and provide guidance concerning the contract's compliance with the CEA and CFTC regulations, including § 40.11(a)(1).[88]

Request for Comment

The Commission requests comment as to whether commenters agree with the Commission's view that a registered entity is unlikely to seek to list for trading or accept for clearing a contract that involves a state law prohibiting certain activity that, while not repealed, is generally considered archaic and is not enforced.

*C. Public Interest Considerations*

1. Overview of Proposed Amendments

As discussed above, CEA section 5c(c)(5)(C) provides that a registered entity may not list, or make available for clearing or trading, contracts in certain excluded commodities that involve an Enumerated Activity or prescribed similar activity, and that have been determined by the Commission to be contrary to the public interest.[89] The Commission interprets CEA section 5c(c)(5)(C) to provide that a contract may not be listed or made available for clearing or trading if the Commission finds both that: (i) the contract involves an Enumerated Activity or prescribed similar activity, and (ii) the contract is contrary to the public interest.

While CEA section 5c(c)(5)(C) requires the Commission to determine that a contract that involves an Enumerated Activity or prescribed similar activity is contrary to the public interest, in order for the contract to be prohibited from being listed or made available for clearing or trading, the statute does not require this public interest determination to be made on a contract-specific basis. The Commission interprets CEA section 5c(c)(5)(C) to authorize categorical public interest determinations if the Commission determines that contracts involving an Enumerated Activity or prescribed similar activity are, as a category, contrary to the public interest.[90] The

Commission proposes to amend § 40.11(a)(1) to include a determination that event contracts involving each of the Enumerated Activities—including "gaming," as proposed to be defined—are, as a category, contrary to the public interest and therefore may not be listed for trading or accepted for clearing on or through a registered entity. The Commission notes that, to date, it has conducted a contract-specific public interest analysis in connection with each of the contract reviews that it has commenced pursuant to § 40.11(c).[91] If, as proposed, § 40.11(a)(1) is amended to include a categorical public interest determination with respect to contracts involving each of the Enumerated Activities, the Commission would not, going forward, undertake a contract-specific public interest analysis as part of a review commenced pursuant to § 40.11(c). Rather, the focus of any such review would be to evaluate whether the contract involves an Enumerated Activity, in which case, it may not be listed for trading or accepted for clearing on or through a registered entity. The Commission believes this would be appropriate to ensure the consistent treatment of categories of contracts that have been determined by the Commission to be contrary to the public interest. The Commission notes its expectation, as discussed above, that defining the term "gaming" for purposes of § 40.11(a)(1) will further assist registered entities in their product design and compliance efforts, and will reduce the instances in which contract-specific reviews need to be commenced pursuant to § 40.11(c).

2. Factors Considered by the Commission in Evaluating Whether a Contract, or Category of Contracts, Is Contrary to the Public Interest

The term "public interest" is not defined in CEA section 5c(c)(5)(C). As discussed more fully below, the Commission has evaluated whether a contract is contrary to the public interest with reference to the contract's commercial hedging or price-basing

utility. The Commission has also, however, regularly stated that other public interest factors may be considered.[92] In that historical context, the Commission observes that the event contract categories listed in CEA 5c(c)(5)(C)—for example, terrorism, war, assassination, and activity that is unlawful under any federal or state law—are indicative of additional public interest concerns for Congress, beyond a contract's hedging and price-basing utility, in establishing the heightened authority set forth in that provision.

The Commission reviewed the legislative history available to establish its own determination of what factors are relevant in a public interest evaluation under CEA section 5c(c)(5)(C). The legislative history of the provision is limited, but it does suggest an intent on the part of the drafters for the hedging and price-basing utility of a contract to be relevant factors for consideration in a public interest evaluation.[93] In the 2010 Colloquy, Senator Feinstein and Senator Lincoln discussed the Commission's authority, prior to the enactment of the Commodity Futures Modernization Act of 2000 ("CFMA"), to prevent trading that is contrary to the public interest.[94] Before its repeal by the CFMA, CEA section 5(g) made it a condition of initial and continuing contract market designation that transactions for future delivery not be contrary to the public interest.[95] The Commission interpreted this statutory public interest standard to include the concept of an "economic purpose" test. Pre-CFMA guidelines articulated the economic purpose test as an evaluation of whether a contract reasonably can be expected to be, or has been, used for hedging and/or pricing basing on more than an occasional basis.[96]

[88] The Commission notes, however, that staff's guidance concerning drafts and proposals is preliminary and non-binding. CFTC staff formally reviews contracts only at such time as a compliant submission is provided to the Commission pursuant to § 40.2 or § 40.3.

[89] 7 U.S.C. 7a–2(c)(5)(C).

[90] Further, the Commission's general rulemaking authority under CEA section 8a(5) provides the Commission with the authority to enact prophylactic regulations that, as proposed herein and for the reasons discussed below, the Commission has determined are reasonably necessary to prevent the listing for trading or acceptance for clearing of event contracts that will always violate the public interest, and to diminish the harms (such as inefficiency for market

participants) caused by regular use of post hoc evaluations of contracts that exchanges have already expended resources to develop. CEA section 8(a)(5), 7 U.S.C. 12(a)(5) (authorizing the Commission "to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of [the CEA]").

[91] In the Nadex Order and the Kalshi Order, the Commission first determined that the subject contracts involved an Enumerated Activity (or Enumerated Activities), and then separately determined that the contracts were contrary to the public interest and therefore prohibited from being listed or made available for clearing or trading. *See* Nadex Order at 3–4; Kalshi Order at 13–23.

[92] *See* note 103, *infra.*

[93] The Commission has recognized price basing to occur when producers, processors, merchants, or consumers of a commodity establish commercial transaction prices based on the futures price for that or a related commodity. *See, e.g.,* Kalshi Order at 18.

[94] *See* 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln).

[95] CEA section 5(g), 7 U.S.C. 7(g) (repealed).

[96] The Commission adopted "Guideline No. 1" to assist DCMs in preparing applications for product approval. *See* Guideline on Economic and Public Interest Requirements for Contract Market Designation, 40 FR 25849 (June 19, 1975). Guideline No. 1 stated that DCMs should make an affirmative showing that a proposed futures contract was "reasonably expected to serve, on more than occasional basis," as a price discovery or hedging tool for commercial users of the underlying commodity. Subsequently, the Commission revised Guideline No. 1, publishing it as appendix A to part 5 of chapter 17 of the Code of Federal Regulations. *See* 47 FR 49832 (Nov. 3, 1982). As revised in 1982,

In the 2010 Colloquy, Senator Feinstein and Senator Lincoln articulated the approach to evaluating a contract's hedging and price-basing utility differently from how the economic purpose test was applied under former CEA section 5(g). Senator Feinstein asked Senator Lincoln whether, with respect to CEA section 5c(c)(5)(C), the intent was to "define 'public interest' broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used predominantly by speculators or participants not having a commercial or hedging interest." [97] Senator Feinstein further asked whether the Commission would "have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use." [98] Senator Lincoln replied, "That is our intent." [99] Thus, while pre-CFMA Commission guidelines articulated the economic purpose test as an evaluation of "whether [a] contract reasonably can be expected to be, or has been, used for hedging and/or price basing on more than an occasional basis," Senator Lincoln and Senator Feinstein referred instead to whether a contract is used predominantly by speculators or market participants not having a commercial or hedging interest.

While the articulation of the approach to evaluating hedging and pricing-basing utility differs from the pre-CFMA articulation, the 2010 Colloquy does suggest an intent on the part of the

drafters of CEA section 5c(c)(5)(C) for the hedging and price-basing utility of a contract to be relevant considerations in a public interest review under that provision. As noted, this is not inconsistent with the approach taken in assessing whether a futures contract was contrary to the public interest under former CEA section 5(g), which contemplated application of the economic purpose test.

In this regard, the Commission notes further that the general "Findings and Purpose" provision of the CEA, at CEA section 3(a), states that the transactions subject to [the CEA] . . . are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair, and secure financial facilities.[100] Accordingly, the CEA recognizes hedging as a public interest, which certain transactions subject to the CEA—transactions providing a means for managing and assuming price risk—are intended to serve.

As such, the Commission recognizes the utility of a contract, or category contracts, for purposes of hedging and price-basing to be relevant factors for consideration in evaluating whether the contract, or category of contracts, is contrary to the public interest pursuant to CEA section 5c(c)(5)(C).[101] While the articulation of the approach to evaluating hedging and price-basing utility differs in the 2010 Colloquy and under the pre-CFMA economic purpose test, the Commission anticipates that a

contract, or category of contracts, that does not satisfy one such articulation also would likely not satisfy the other.

In this regard, the Commission reiterates that it has the discretion to consider other factors, in addition to hedging and price-basing utility, in its evaluation of whether a contract, or category of contracts, is contrary to the public interest for purposes of CEA section 5c(c)(5)(C).[102] This is consistent with the discretion of the Commission when evaluating whether a futures contract was contrary to the public interest under CEA section 5(g), prior to its repeal by the CFMA.[103] Accordingly, for the reasons discussed herein, and giving due consideration to the intentions reflected in the 2010 Colloquy, the Commission has determined that there are circumstances where other public interest considerations support prohibiting a contract, or category of contracts, from being listed for trading or accepted for clearing on or through a registered entity, even where such contract, or category of contracts, may have certain hedging or price-basing utility.[104]

With respect to other factors to be considered in a public interest review, the legislative history of CEA section 5c(c)(5)(C) supports consideration of whether the contract, or category of

Guideline No. 1 was updated to address proposed innovations in the trading of futures contracts, including futures contracts on financial instruments and on various indexes and cash-settled futures contracts. Guideline No. 1 was again revised in 1992. 57 FR 3518 (Jan. 30, 1992). The 1992 revisions eliminated redundant materials by stating that an application for designation as a contract market for a particular futures contract should include a cash-market description only when the proposed contract differed from a currently designated contract and that a DCM need justify only individual contract terms that were different from terms which previously had been approved by the Commission. 57 FR at 3521. In addition, the 1992 revisions eliminated the guideline that a DCM provide a further, separate justification that the proposed contract would be quoted and disseminated for price basing, or used as a means of hedging against possible loss through price fluctuation on more than an occasional basis, noting that "the economic purpose of a contract is often implicit, or encapsulated, in the exchange's demonstration that the terms and conditions of the proposed contract meet the criteria of the Guideline [No. 1]." 57 FR at 3521–22, note 9. Former CEA section 5(g) was deleted by the CFMA, and Guideline No. 1 was accordingly also withdrawn by the Commission.

[97] 156 Cong. Rec. S5906 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln).

[98] Id.

[99] Id.

[100] 7 U.S.C. 5(a).

[101] The Commission considered hedging and price-basing utility in its previous orders under CEA section 5c(c)(5)(C) and § 40.11. See Kalshi Order at 13–15; Nadex Order at 3. In the Kalshi Order the Commission found, among other things, that the event underlying the subject contracts—control of a chamber of Congress—did not, in and of itself, have "sufficiently direct, predictable, or quantifiable economic consequences" for the contracts to serve an effective hedging function. The Commission found that, since the economic effects of control of a chamber of Congress are "diffuse and unpredictable," the price of the subject contracts was not directly correlated to the price of any commodity, and so the price of the contracts could not predictably be used to establish commercial transaction prices. The Commission found that, even if some level of political risk may be embedded in the price of many commercial transactions, that did not, in itself, support a finding that the subject contracts served a price-basing function. Kalshi Order at 16–17. Similarly, in the Nadex Order the Commission found that "the unpredictability of the specific economic consequences of an election means that the [subject contracts] cannot reasonably be expected to be used for hedging purposes . . . ." Nadex Order at 3. The Commission found that there was no situation in which the subject contracts' prices could form the basis for the pricing of a commercial transaction, financial asset, or service, which demonstrated that the contracts did not have price-basing utility. Id.

[102] For example, in both the Nadex Order and the Kalshi Order, the Commission highlighted the public interest concerns that would be raised if registered entities were permitted to offer trading in event contracts involving the outcome of political elections. Nadex Order at 4; Kalshi Order at 19–20.

[103] In the Senate conference report for the Commodity Futures Trading Commission Act of 1974, the conferees adopted an amendment that required a board of trade to demonstrate that transactions on it would not be contrary to the public interest, and "note[d] that the broader language of the Senate provision would include the concept of the 'economic purpose' test provided in the House bill subject to the final test of the 'public interest.'" S. Rep. 1194, 93rd Cong. 2d Sess. 36 (1974). See also Economic and Public Interest Requirements for Contract Market Designation, 47 FR 49832, 49836 (Nov. 3, 1982) ("Congress made clear when it adopted the public interest test of Section 5(g) of the Act, that the public interest test is broader than, and includes, an economic purpose test" (citing the above-referenced Senate conference report). This public interest standard was not modified by the 1992 revisions to Guideline 1. See generally 57 FR 3518 (Jan. 30, 1992).

[104] In the 2010 Colloquy, Senator Feinstein asked Senator Lincoln whether she agreed that CEA section 5c(c)(5)(C) would "empower the Commission to prevent trading in contracts that may serve a limited commercial function but threaten the public good by allowing some to profit from events that threaten our national security." Senator Lincoln confirmed that she agreed, stating that while national security threats "pose a real commercial risk to many businesses in America," contracts that permitted people to hedge that risk "would also involve betting on the likelihood of events that threaten our national security. That would be contrary to the public interest." 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln).

contracts, may threaten the public good. In the 2010 Colloquy, Senator Feinstein recognized contracts that would "allow[] some to profit from events that threaten our national security" as a threat to the public good.[105] Senator Lincoln similarly recognized that event contracts that allowed for the hedging of the commercial risks of terrorist attacks, war, and hijacking would also "involve betting on the likelihood of events that threaten our national security. That would be contrary to the public interest."[106] The Commission believes this is plainly so given the terrible potential consequences of these activities. The Commission accordingly agrees with, and adopts, the view expressed in the 2010 Colloquy that national security and, more broadly, the public good, are relevant factors for consideration in an evaluation of whether a contract, or category of contracts, is contrary to the public interest for purposes of CEA section 5c(c)(5)(C).

The Commission will consider all relevant factors in evaluating whether a contract, or category of contracts, is contrary to the public interest, and there is no one factor that will be determinative in the Commission's evaluation. In addition to hedging utility, price-basing utility, and threats to national security or other threats to the public good, some of the factors that may be relevant when the Commission is evaluating whether a contract, or category of contracts, is contrary to the public interest include: (i) the extent to which the contract, or category of contracts, would draw the Commission into areas outside of its primary regulatory remit;[107] (ii) whether characteristics of the contract, or category of contacts, may increase the risk of manipulative activity relating to the trading or pricing of the contract;[108]

[105] *Id.*

[106] *Id.*

[107] *See, e.g.,* Kalshi Order at 22–23.

[108] *See, e.g., id.* at 21–22. The Commission notes that DCMs and SEFs have a statutory obligation to ensure that the contracts that they list for trading are not readily susceptible to manipulation. *See* Core Principle 3 for DCMs, CEA section 5(d), 7 U.S.C. 7(d)(3), and Core Principle 3 for SEFs, CEA section 5h(f)(3), 7 U.S.C. 7b-3(f)(3). The Commission distinguishes the type of review that would be undertaken to evaluate whether a contract submission to the Commission, pursuant to § 40.2 or § 40.3, demonstrates compliance with this statutory obligation, from the type of review that would be undertaken to evaluate whether increased risk of manipulative activity may raise public interest concerns regarding a contract, or category of contracts, for purposes of CEA section 5c(c)(5)(C). The Commission notes that a review for purposes of CEA section 5c(c)(5)(C) would be to determine whether a contract, or category of contracts, should be per se prohibited from being listed for trading

and (iii) whether the contract, or category of contracts, could result in market participants profiting from harm to any person or group of persons.[109]

The Commission notes that the factors that inform a public interest determination, and the weight given to each such factor, are likely to vary depending on the particular characteristics of the contract, or category of contracts, that are being evaluated.

*Request for Comment*

The Commission requests comment on all aspects of its discussion of the factors to be considered in evaluating whether a contract, or category of contracts, is contrary to the public interest for purposes of CEA section 5c(c)(5)(C). In particular, the Commission requests comment on the following questions:

• Should hedging and price-basing utility be considered as factors when evaluating whether a contract, or category of contracts, is contrary to the public interest? Why or why not?

• If hedging and price-basing utility should be considered as factors when evaluating whether a contract, or category of contracts, is contrary to the public interest, how should such utility be assessed?

• Are there factors, in addition to those described herein, that may be relevant when evaluating whether a contract, or category of contracts, is contrary to the public interest? Are there any factors the Commission should specifically not consider? Why or why not?

3. The Enumerated Activities

The Commission proposes to amend § 40.11(a)(1) to include a determination that any event contract that involves an Enumerated Activity—including "gaming," as proposed to be defined— is contrary to the public interest and therefore may not be listed for trading or accepted for clearing on or through a registered entity.

(a) Terrorism, Assassination, and War

The Commission recognizes the Enumerated Activities of terrorism, assassination, and war as activities that pose a threat to national and international security and entail

or accepted for clearing on or through a registered entity because it is contrary to the public interest.

[109] In the 2010 Colloquy, Senator Lincoln stated that CEA section 5c(c)(5)(C) was intended, in part, to ensure that the Commission had the power "to prevent the creation of futures and swaps markets that would allow citizens to profit from devastating events." *See* 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln).

violence and human suffering. The Commission believes that it would be contrary to the public interest to allow event contracts involving such activities to trade on CFTC-regulated markets. The Commission believes that allowing such contracts to trade would raise a real risk that the contracts, and markets for the contracts, could be used to "profit from devastating events."[110] Allowing trading in contracts involving terrorism, assassination, or war could incentivize certain market participants to take a speculative position on whether these devastating events will occur, or how wide-reaching their impact will be—a type of speculation that the Commission believes, at a base level, is offensive and has no place in CFTC-regulated markets. Allowing trading in such contracts might even increase the risk of a terrorist attack, assassination, or act of war by creating financial incentives for a potential perpetrator to take a position in such a contract and then profit by carrying out the heinous act that the contract involves. The national and international security concerns and threat to the public good raised by terrorism, assassination, and war are so significant that the Commission must consider very seriously even the slightest risk that CFTC-regulated markets could create a means or motive to profit from such activity.[111] Accordingly, in circumstances where an event contract involves terrorism, assassination, or war, the Commission believes that the public interest concerns that would be raised by allowing the contract to be traded as a financial instrument on CFTC-regulated markets, as described above, would

[110] *Id.*

[111] Similar concerns led to the shutdown in 2003 of the Futures Markets Applied to Prediction ("FutureMAP") program proposed by the Defense Advanced Research Projects Agency ("DARPA"), an office within the United States Department of Defense. The FutureMAP program would have permitted traders to take positions on questions such as whether a particular political leader would be assassinated or whether a bioterror attack would occur. Senators raised concerns that the market would permit the perpetrator of a terrorist attack to profit from that attack. Senator Tom Daschle raised concerns that the market could actually incentivize terrorist attacks ("How long would it be before you saw traders investing in a way that would bring about the desired result"), and Senators Byron Dorgan and Ron Wyden characterized the project as "morally repugnant," "offensive," and "grotesque." *See* "Threats and Responses and Criticisms; Pentagon Prepares a Futures Market on Terror Attacks," The New York Times, July 29, 2003, *available at https://www.nytimes.com/2003/07/29/us/threats-responses-plans-criticisms-pentagon-prepares-futures-market-terror.html;* "Pentagon Kills 'Terror Futures Market,' " NBC News, July 29, 2003, *available at https://www.nbcnews.com/id/wbna3072985;* 149 Cong. Rec. S10082–83 (daily ed. July 29, 2003), *available at https:// www.congress.gov/congressional-record/volume-149/issue-114/senate-section/article/S10082-1.*

supersede any potential price-basing or hedging utility of the contract.

The Commission therefore proposes to amend § 40.11(a)(1) to include determinations that any event contract that involves terrorism, assassination, or war is contrary to the public interest and may not be listed for trading or accepted for clearing on or through a registered entity.

### Request for Comment

The Commission requests comment on all aspects of its proposed public interest determinations with respect to contracts involving terrorism, assassination, and war. In particular, the Commission requests comment on whether there are contracts that may involve terrorism, assassination, or war that do not raise the above-described public interest concerns. Why, or why not?

### (b) Activity That is Unlawful Under Federal or State Law

The Commission similarly proposes to amend § 40.11(a)(1) to include a determination that any event contract that involves activity that is unlawful under federal or state law is contrary to the public interest and may not be listed for trading or accepted for clearing on or through a registered entity. As an independent agency of the federal government, the Commission exercises the authorities granted to it by Congress under the CEA to help ensure that U.S. derivatives markets operate with integrity. The Commission believes that it is contrary to the public interest to permit trading in the financial markets that the Commission is mandated by Congress to oversee, in any event contract that involves activity that Congress has determined to be illegal.

The Commission further believes that it is contrary to the public interest to permit trading in any event contract that involves activity that is illegal under state law. Legislative bodies are intended to serve the public good, and such bodies generally bar or prohibit activity that they recognize as causing, or posing, public harm. Judges and judicial bodies, applying statutes and developing common law, also establish the illegality of activity that is recognized as causing, or posing, public harm.[112] The Commission thus believes that permitting trading, on CFTC-regulated markets, in contracts that involve activity that is unlawful under state law—and potentially in some circumstances creating opportunities to

profit from illegal activity—would undermine important state interests, expressed in state statutes and common law, in protecting the public good.[113] This is also a matter of comity with states.

The Commission notes that there are variations across state law in the specific activities that are recognized as unlawful. The Commission believes that a determination that an event contract that involves activity that is unlawful under state law is contrary to the public interest—which turns the focus of the analysis to the questions of whether the activity, itself, is recognized as unlawful, and, if so, whether the contract "involves" such unlawful activity—eliminates the possibility that the Commission would have to serve, in its public interest analysis of a particular contract involving particular activity, as arbiter of a state's own public interest determination, as expressed in statute and/or common law, in recognizing specific activity as causing, or posing, public harm.

### Request for Comment

The Commission requests comment on all aspects of its proposed public interest determination with respect to contracts involving activity that is unlawful under federal or state law. In particular, the Commission requests comment on whether there are contracts that may involve such activity that do not raise the above-described public interest concerns. Why, or why not?

### (c) Gaming

As discussed above, the Commission is proposing to define the term "gaming," for purposes of § 40.11, as the staking or risking by any person of something of value upon: (i) the outcome of a contest of others; (ii) the outcome of a game involving skill or chance; (iii) the performance of one or more competitors in one or more contests or games; or (iv) any other occurrence or non-occurrence in connection with one or more contests or games. The proposed definition draws upon the approach taken, in relevant state and federal statutory definitions, to defining the terms "gambling," "betting," or "wagering," which, as discussed above, are generally used interchangeably with the term

"gaming." The Commission proposes to amend § 40.11(a)(1) to include a determination that any contract that involves "gaming," as proposed to be defined, is contrary to the public interest. Both economic utility and other public interest factors inform the Commission's preliminarily determination that event contracts involving gaming should not be permitted to trade on CFTC-regulated markets.

The Commission believes that by defining "gaming" in a manner that draws upon the approach taken, in relevant state and federal statutory definitions, to defining the terms "gambling," "betting," or "wagering," the Commission is in turn identifying, for purposes of § 40.11, contracts that "exist predominantly to enable gambling."[114] The Commission believes that the economic impact of an occurrence (or non-occurrence) in connection with a contest of others, or a game of skill or chance—including the outcome of such contest or game—generally is too diffuse and unpredictable to correlate to direct and quantifiable changes in the price of commodities or other financial assets or instruments, limiting the hedging and price-basing utility of an event contract involving such an occurrence. Generally speaking, the Commission believes that something of value is staked or risked upon an occurrence (or non-occurrence) in connection with a contest of others,

---

[112] The Commission noted such common law prohibitions, and related policy concerns, with respect to wagering on elections in the Kalshi Order. Kalshi Order at 11–12, note 27.

[113] While the Commission has exclusive jurisdiction over futures and swaps contracts traded on a CFTC-registered exchange, preempting the application of state law with respect to such transactions—and meaning that transacting in such contracts on a CFTC-registered exchange cannot, of itself, constitute unlawful activity for state law purposes—this does not preclude a contract from involving "activity that is unlawful under . . . State law" for purposes of CEA section 5c(c)(5)(C).

[114] In the 2010 Colloquy, when discussing the Dodd-Frank Act provision that was ultimately enacted as CEA section 5c(c)(5)(C), Senator Lincoln stated that "[t]he Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." *See* 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statements of Sen. Diane Feinstein and Sen. Blanche Lincoln). The Commission is aware that the legal landscape with respect to certain forms of gambling has changed since CEA section 5(c)(c)(5)(C) was adopted in 2010, and § 40.11 was adopted in 2011. Specifically, in 2018, the Supreme Court in *Murphy v. N.C.A.A.*, 584 U.S. 453, 138 S.Ct. 1461, struck down The Professional and Amateur Sports Protection Act ("PAPSA"). PAPSA had prohibited states from authorizing state-sponsored gambling on sporting events or permitting other persons to operate and promote such sports gambling schemes. Following this decision, many states have legalized various forms of sports gambling. The Commission highlights, however, the determination of Congress to identify "gaming" as an Enumerated Activity, separate and apart from activity that is unlawful under federal or state law. This indicates Congressional intent—supported by the 2010 Colloquy—to empower the Commission to prohibit event contracts that would effectively serve as a wagering vehicle, subject to a Commission determination that such contracts are contrary to the public interest. To this point, the Commission notes that there were forms of legalized gambling in the United States when CEA section 5c(c)(5)(C) was adopted (*e.g.*, casino sportsbooks in states such as Nevada and New Jersey).

or a game involving skill or chance, for entertainment purposes—in order wager on the occurrence. As such, the Commission believes that contracts involving such occurrences are likely to be traded predominantly "to enable gambling"[115] and "used predominantly by speculators or participants not having a commercial or hedging interest," and cannot reasonably expected to be "used for hedging and/ or price basing on more than an occasional basis."[116]

While there may be individuals or entities for whom a particular occurrence in connection with a contest or game have more direct and more predictable economic consequences, the Commission believes that any such segment of individuals or entities is likely to be narrow as compared to the broader universe of market participants, including retail market participants, who may be able to trade in an event contract listed on a CFTC-registered exchange—and who, the Commission believes, are most likely to trade such contract for entertainment purposes only.

Moreover, the Commission believes that an individual or entity for whom a particular occurrence in connection with a contest or game may have more direct and more predictable economic consequences may also be more likely to have access to information and/or influence that could be used to engage in activity that could artificially move the market in an event contract involving such occurrence, potentially raising heightened manipulation concerns. For example, a professional athlete or coach may be economically impacted by their team's wins or losses, but may also have access to information—for example, about a team member's health or a potential injury—that could be used to trade ahead of the market in an event contract involving the team's performance. Further, the athlete or coach would potentially have a platform—for example, access to media, combined with public perception as an authoritative source of information regarding the team—that could be used to disseminate misinformation that could artificially impact the market in the contract for additional financial gain.[117]

The Commission additionally notes that, in many instances, a particular individual or group of individuals may be able to influence an occurrence in connection with a contest or game.[118] If an event contract involving such an occurrence is permitted to trade on CFTC-registered markets, then even if the individual, or group of individuals, that can influence the outcome of the occurrence are prohibited, by the contract's terms, from trading in the contract, such individual or group of individuals may be vulnerable to pressure or persuasion by others who have taken a position in the contract and seek a particular outcome.[119]

The Commission further notes that most contracts falling within the proposed definition of "gaming" would have no underlying cash market with bona fide economic transactions to provide directly correlated price forming information. Rather, price forming information is either nonexistent, or driven by informational sources that are unregulated, have opaque underlying processes and procedures, and may not follow

in the event. *See, e.g.,* N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367 (McKinney). In the context of an event contract traded on CFTC-regulated markets, involving an occurrence (or non-occurrence) in connection with a contest of others or a game of skill or chance, the Commission notes that, even if individuals, or groups of individuals, who may influence the outcome of the occurrence are prohibited by the contract's terms from trading in the contract, this would not prevent such individual, or group of individuals, from engaging in other activity—for example, the spread of misinformation—that could artificially move the market in the event contract.

[118] This may particularly be the case for occurrences that do not directly affect the final outcome of a contest or game. The Commission believes that event contracts involving such occurrences would be akin to "novelty," "proposition," or "prop" bets. Many states that have legalized sports gambling prohibit various types of novelty or proposition bets due, in part, to manipulation concerns. *See, e.g., Massachusetts Gaming Commission Says No Super Bowl Prop Bets This Year,* NewBostonPost (Feb. 9, 2024), *available at https://newbostonpost.com/2024/02/09/ massachusetts-gaming-commission-says-no-super- bowl-prop-bets-this-year/. See also Suspicious betting leads to questions about Super Bowl Gatorade color odds,* New York Post (Feb. 13, 2024), *available at https://nypost.com/2024/02/13/ sports/suspicious-betting-raises-questions-about- super-bowl-gatorade-color-odds/.*

[119] Relevant to this concern, certain state gaming regulators have prohibited, or are seeking to prohibit, collegiate sports proposition bets due to concerns related to "bad actors [who] have engaged in unacceptable behavior by making threats against student-athletes[.]" *Could Ohio ban college sports prop bets? Mike DeWine, NCAA president Charlie Baker support,* The Columbus Dispatch (Feb. 2, 2024), *available at https://www.dispatch.com/story/ sports/college/big-10/2024/02/02/mike-dewine- ohio-college-sports-betting-ban-ncaa/72453967007/; see also* Va. Code Ann. section 58.1–4039 (A)(2) (West) (No person shall place or accept a proposition bet on college sports.).

scientifically reliable methodologies.[120] This differs from the informational sources used for pricing the vast majority of commodities underlying Commission-regulated derivatives contracts (*e.g.,* government issued crop forecasts, weather forecasts, federal government economic data, market- derived supply and demand metrics for commodities, market-based interest rate curves). The lack of price forming information for contracts involving "gaming," or the availability of only opaque and unregulated sources of price forming information, may increase the risk of manipulative activity relating to the trading and pricing of such contracts, while decreasing the ability of the offering exchange, or the Commission, to detect such activity.

Other public interest considerations also weigh against permitting the trading, on CFTC-regulated markets, of event contracts involving gaming, as proposed to be defined. The Commission believes that permitting such contracts to trade as financial instruments on financial markets could raise broad investor protection concerns by conflating gambling and financial instruments in a manner that could particularly create confusion and risk for retail market participants. Among other things, it could improperly signal to certain retail investors that these contracts are instruments to be used for investment purposes—and it could signal to others that derivative markets are appropriate venues for retail market participants to trade for entertainment purposes, which could minimize, for those investors, unique characteristics and risks of trading, more generally, in derivative markets.

Moreover, the Commission notes that in the United States, gambling is overseen by state regulators with particular expertise, and governed by state gaming laws aimed at addressing particular risks and concerns associated with gambling.[121] The Commission is

[120] Notably, the most useful source of price- forming information with respect to contracts involving "gaming," as proposed to be defined, would likely be prices of similar wagers in gambling and sport-betting facilities. The Commission believes that this fact further supports the Commission's view that trading in such "gaming" contracts would effectively amount to betting or wagering.

[121] *See, e.g.,* N.Y. Rac. Pari-Mut. Wag. & Breed. Law section 1367 (McKinney) (requiring casinos and mobile sports wagering licensees to promptly report to the New York State Gaming Commission information relating to, among other things, unusual wagering activity or patterns that may indicate concern with the integrity of a sporting event, any potential breach of the relevant sports governing body's internal rules and codes of conduct pertaining to sports wagering (as they have been provided by the sports governing body to the

---

[115] *Id.*

[116] *See* section II.C.2, *supra.*

[117] In this regard, the Commission notes that, in order to address concerns about the potential to undermine the integrity of a sporting event or wagering thereon, a number of states have established prohibitions on sports wagers for certain categories of individuals when they are involved in a particular sporting event, including athletes, coaches, referees, and staff of participants

not a gaming regulator. The CEA and Commission regulations are focused on regulating financial instruments and markets, and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling.[122] Permitting event contracts involving gaming, as proposed to be defined, to trade on CFTC-regulated markets would in effect permit instruments commonly understood as bets or wagers on contests or games to avoid these legal regimes and protections. Gambling is a rapidly evolving field, and the Commission does not believe that it has the statutory mandate nor specialized experience appropriate to oversee it, or that Congress intended for the Commission to exercise its jurisdiction or expend its resources in this manner.[123]

The Commission notes that the non-exclusive list of examples of "gaming" set forth in proposed § 40.11(b)(2) includes staking or risking something of value upon the outcome of a political contest, including an election or elections, or upon an occurrence or non-occurrence in connection with such a contest. Consistent with its

determinations in the Nadex Order and the Kalshi Order, the Commission believes that permitting trading, on CFTC-regulated markets, in this particular sub-set of gaming contracts would raise unique additional public interest concerns relating to election integrity and the perception of election integrity, and the appropriate role of the Commission in this area.[124] For example, permitting trading in these types of contracts could create monetary incentives to vote for particular candidates even when such votes may be contrary to a voter's (or organized groups of voters') political views. It would also raise concerns that conduct designed to artificially affect the electoral process could be used to manipulate the markets in such contracts, or conversely, that the markets in such contracts could be manipulated to influence elections or electoral perceptions. For example, false reporting or other misinformation—such as inaccurate polling or voter surveys or false news reporting—could be used to distort the information underlying price formation in such contracts.[125]

The Commission notes, further, that it is not tasked with the protection of election integrity or enforcement of campaign finance laws. However, if trading was permitted on CFTC-registered exchanges in event contracts that involve the staking or risking of something of value on a political contest, then the Commission could find itself investigating the outcome of an election itself.[126] Again, the Commission does not have the specialized experience appropriate for this role, and believes that it is unlikely that Congress intended for the Commission to exercise its jurisdiction or expend its resources this way.

The unique additional public interest concerns that would be raised by permitting the trading, on a CFTC-registered exchange, of an event contract that involves the staking or risking of something of value on the outcome of a political contest, or upon an occurrence or non-occurrence in connection with such a contest, inform the Commission's proposal to amend § 40.11(a)(1) to include a determination that any such contract is contrary to the public interest.[127]

casino or mobile sports wagering operator), and suspicious or illegal wagering activities, including using agents to place wagers, using confidential non-public information, or using false identification); Colo. Rev. Stat. Ann. section 44–30–1506 (West) (requiring a sports betting operator promptly to report to the Colorado Division of Gaming any abnormal betting activity or discernible patterns that may indicate a concern about the integrity of a sports event or events; any other conduct with the potential to corrupt a betting outcome of a sports event for purposes of financial gain, including match fixing or the use of material, nonpublic information to place bets or facilitate another person's sports betting activity; and suspicious or illegal wagering activities).

[122] For example, a number of states have developed self-exclusion programs for individuals who experience problem gambling, which enable such individuals to self-report to be excluded from in-person and/or online gambling sites for a set amount of years (or, in some cases, indefinitely). *See, e.g.,* Del. Code Ann. tit. 29, § 4834 (West); La. Stat. Ann. section 27:27.1; Ariz. Rev. Stat. Ann. section 5–1320; Iowa Gaming Association, *Responsible Gaming,* available at *https:// www.iowagaming.org/responsible-gaming/.* A number of states mandate the on-site posting of problem gambling assistance notices, and some states also mandate employee training to identify individuals who may be struggling with problem gambling. *See, e.g.,* 4 Pa. Stat. and Cons. Stat. Ann. section 3706 (West); 230 Ill. Comp. Stat. Ann. 10/13.1; Ohio Rev. Code Ann. section 3772.18 (West). In addition, a number of states require gambling advertisements to include customer protection disclosures, such as resources for problem gambling assistance. *See, e.g.,* N.Y. Rac. Pari-Mut. Wag. & Breed. Law sections 1362, 1363 (McKinney); Tenn. Code Ann. section 4–49–205 (West); Ark. Code Ann. section 20–27–2601 (West); Conn. Gen. Stat. Ann. section 12–863 (West).

[123] *See* note 82, *supra,* for examples of certain evolving risks related to certain bets or wagers on contests or games.

[124] The Commission believes that permitting trading in contracts involving political contests in a foreign jurisdiction, or concerning a supranational organization, also would raise these public interest concerns, just as permitting trading in contracts involving political contest in the United States would.

[125] Certain commenters on the contracts subject to the Kalshi Order asserted that event contracts involving occurrences in connection with political election contests could serve as a check on misinformation and inaccurate polling, stating that market-based alternatives tend to be more accurate than polling or other methods of predicting election outcomes. *See* Kalshi Order at 22. The Commission notes that there is also research suggesting that election markets may incentivize the creation of "fake" or unreliable information in the interest of moving the market; a number of commenters on the contracts subject to the Kalshi Order also raised this concern. *Id. See also* Yeargain, Tyler, "Fake Polls, Real Consequences: The Rise of Fake Polls and the Case for Criminal Liability," Missouri Law Review, Volume 85, Issue 1 (Winter 2020) citing Enten, Harry, "Fake Polls are a Real Problem," FiveThirtyEight (Aug. 22, 2017), *available at https://fivethirtyeight.com/features/fake-polls-are-a-real-problem/* (noting how a seemingly false or unreliable poll caused significant movement on an event contract market and suggesting that such poll could have been, or at least could be, created to cause such market movement; further arguing that such false polls can have a real and detrimental effect on elections). The Commission notes, further, that there is no underlying cash market for political event contracts, with bona fide economic transactions to provide directly correlated price forming information. Rather, price forming information is driven in large measure by polling and other informational sources that are unregulated, frequently have opaque underlying processes and procedures, and may not follow scientifically reliable methodologies. The opaque and unregulated sources of price forming information for such contracts may increase the risk of manipulative activity relating to the trading and pricing of the contracts, while decreasing the ability of the listing registered entity and the Commission to detect such activity.

[126] While certain commodities outside the Commission's direct remit do underlie derivatives without giving rise to significant problems, due to the special role of elections in our society, the Commission believes that the oversight function in this area is best reserved for other expert bodies. Of course, governmental bodies are tasked with that function, but the Commission has both the authority and responsibility to address fraud, false reporting, and manipulation in markets for derivatives that trade on CFTC-registered exchanges. *See, e.g.,* CEA section 6(c), 7 U.S.C. 9(c); 17 CFR 180. As such, if trading were permitted in event contracts that involve the staking or risking of something of value on the outcome of a political contest, or upon an occurrence or non-occurrence in connection with such a contest, the Commission would have a statutory responsibility to exercise its surveillance, investigation, and enforcement authority to ensure the integrity of the markets in such contracts. Conversely, attempts at manipulation of such markets could have broader electoral implications, similarly drawing the Commission into investigations of election-related activities. Indeed, accusations of fraud have been leveled *at* government bodies tasked with administering elections. Such scenarios underscore for the Commission that it has no appropriate role in this area.

[127] Many state courts have also found that wagering on elections is contrary to sound public policy. *E.g.,* Alabama, *White* v. *Yarbrough,* 16 Ala. 109, 110 (1849) ("A wager on an election is void as against public policy"); Arkansas, *Williams* v. *Kagy,* 3 SW2d 332, 333–34, 176 Ark. 484, 3 (1928) ("Even before the passage of the statute quoted, this court ruled . . . that wagers upon elections then pending are calculated to endanger the peace and harmony of society and have a corrupting influence upon the morals and are contrary to sound policy"); Colorado, *Maher* v. *Van Horn,* 60 P. 949, 17–18 (Colo. 1900) ("[W]ager contracts on the result of elections are contrary to public policy and void and will not be enforced by the courts"); Georgia, *McLennan* v. *Whidon,* 48 SE 201, 202–03, 120 Ga. 666 (1904), quoting *Leverett* v. *Stegal,* 23 Ga. 259
Continued

Request for Comment

The Commission requests comment on all aspects of its proposed public interest determination with respect to contracts involving gaming. In particular, the Commission requests comment on whether there are contracts that may involve gaming that do not raise the above-described public interest concerns. Why, or why not?

*D. The Commission's Authority To Identify Additional Similar Activities to the Enumerated Activities*

CEA section 5c(c)(5)(C)(i)(VI) provides that the Commission may determine, by rule or regulation, that event contracts in certain excluded commodities are contrary to the public interest if the contracts involve "other similar activity" to the Enumerated Activities.[128] CEA section 5c(c)(5)(C)(ii),

---

[128] 7 U.S.C. 7a–2(c)(5)(C)(i)(VI).

in turn, provides that such contracts shall not be listed or made available for clearing or trading on or through a registered entity. These statutory provisions are implemented through § 40.11(a)(2), which provides that a registered entity shall not list for trading or accept for clearing an event contract "which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part"—namely, an Enumerated Activity—and that the Commission determines, by rule or regulation, to be contrary to the public interest.[129] CEA sections 5c(c)(5)(C)(i)–(ii), as implemented through § 40.11(a)(2), thus empower the Commission to identify, by rule or regulation, additional, similar activities to the Enumerated Activities, and to prohibit registered entities from listing for trading or accepting for clearing event contracts involving those activities where the Commission finds that such contracts are contrary to the public interest. To date, the Commission has not exercised this authority.

While the Commission is not proposing to exercise this authority at this juncture, the Commission reiterates that it retains the authority under CEA section 5c(c)(5)(C)(VI) to determine, in the future, that other activities are similar to the Enumerated Activities, and that event contracts involving such similar activities are contrary to the public interest and may not be listed for trading or accepted for clearing on or through a registered entity. This authority will continue to be reflected in the regulatory text of § 40.11(a)(2). As part of any final rule resulting from this Notice of Proposed Rulemaking, the Commission intends to include an Appendix E to Part 40 containing guidance in the form of factors the Commission may consider, in addition to other factors the Commission deems appropriate in light of individual facts and circumstances, when making a determination under § 40.11(a)(2) that such event contracts are contrary to the public interest, consistent with the public interest analysis set forth above.

*E. Technical Amendments*

The Commission proposes to make certain technical amendments to § 40.11. These proposed amendments are intended to clarify and more logically organize the regulation, and are not intended to change the regulation's substantive meaning or effect. As a threshold matter, the Commission proposes to remove the words "Review of" from the title of § 40.11, because the regulation does not

---

[129] 17 CFR 40.11(a)(2).

only address contract reviews. The Commission believes that the regulation would be more clearly and accurately titled "Event contracts based upon certain excluded commodities."

1. Technical Amendments to § 40.11(a)

The Commission proposes to make certain technical amendments to § 40.11(a). First, the Commission proposes to list the Enumerated Activities, as currently set forth in § 40.11(a)(1), in separate sub-paragraphs and to reorder the list of the Enumerated Activities to match the order in which they appear in CEA section 5c(c)(5)(C)(i). The Enumerated Activities would be listed in new sub-paragraphs (i) through (v) of § 40.11(a)(1).

The Commission further proposes to replace "which" with "that" in § 40.11(a)(2). This is not intended to change the meaning of the current language. Rather, the Commission proposes this change to make the language of § 40.11(a)(2) consistent with the language of § 40.11(a)(1).

The Commission additionally proposes to state in § 40.11(a)(2) that a contract may not be listed for trading or accepted for clearing if the contract involves activity that is similar to an activity enumerated in proposed sub-paragraphs (i) through (v) of § 40.11(a)(1)—in effect, if the contract involves activity that is similar to one of the statutory Enumerated Activities. This would be substantively consistent with existing § 40.11(a)(2) and would reflect the statutory text of CEA section 5c(c)(5)(C)(i)(VI), which states that the Commission may make a public interest determination with respect to contracts involving other activity that is similar to the Enumerated Activities set forth in CEA sections 5c(c)(5)(C)(i)(I)–(V). The Commission contemplates that, in the event that it identifies activities that are similar to the Enumerated Activities in a future rule or regulation pursuant to its authority under CEA section 5c(c)(5)(C)(i)(VI) and § 40.11(a)(2), such activities would be numbered sequentially after proposed sub-paragraphs (i) through (v) of § 40.11(a)(1).

2. Technical Amendments to § 40.11(c)

The Commission proposes to make certain technical amendments to § 40.11(c). These proposed amendments are not intended to alter the regulation's substantive meaning or its practical implementation, including the timing or procedural requirements of the § 40.11(c) review process. The proposed technical amendments are simply intended to clarify § 40.11(c) and improve its organization.

---

[127] (finding that all gambling contracts are illegal but noting that "If there be any class of gambling contracts which should be frowned upon more than another it is bets on elections. They strike at the foundations of popular institutions, corrupt the ballot box, or, what is tantamount to it, interfere with the freedom and purity of elections"); Indiana, *Worthington* v. *Black*, 13 Ind. 344, 344–345 (1859) ("It has been often decided that wagers upon the result of an election are against the principles of sound policy, and consequently illegal . . ."); Iowa, *David* v. *Ransom*, 1 Greene 383, 383–85 (1848) ("A wager or bet made between parties on the result of an election is void. If the wager is made before an election, illegal votes are often secured, and others induced, contrary to the better judgment of the voter; or if made after an election, the parties interested might be led to exert a corrupt influence upon the canvassing, and returns of the votes"); Kansas, *Reynolds* v. *McKinney*, 4 Kan. 94, 101 (1866) ("[A bet] involving an inquiry into the validity of the election of a public officer. . . . was therefore, illegal and void on principles of public policy"); Massachusetts, *Ball* v. *Gilbert*, 53 Mass. 397, 400–02 (1847) (a wager upon the event of an election for a public office—at the federal, state, or local level—is illegal and void on numerous public policy grounds); Missouri, *Hickerson* v. *Benson*, 8 Mo. 8 (1843) (wagers on the result of public elections and collateral matters are "clearly" against public policy and "sound morality" and consequently illegal and void at common law); Nebraska, *Specht* v. *Beindorf*, 56 Neb. 553, 76 NW 1059 (1898) (promissory note premised on the election of a public official is a wager on the result of an election and void on grounds of public policy); North Carolina, *Bettis* v. *Reynolds*, 34 N.C. 344, 345–48 (1851) ("the practice of betting on elections has a direct tendency to cause undue influence[,]" and even where neither party was a voter, a wager on the result of a Presidential election void as against public policy); Oregon, *Willis* v. *Hoover*, 9 Or. 418, 419–20 (1881) (wagers on the result of public elections are illegal and void upon grounds of public policy); Rhode Island, *Stoddard* v. *Martin*, 1 R.I. 1, 1 (1828) (all wagers on elections and judicial decisions "are of immoral tendency, against sound policy," and therefore void); Texas, *Thompson* v. *Harrison*, 1842 WL 3625, at *1 (1842) (wagers on the result of public elections are "contrary to good morals" and void on grounds of public policy); Wisconsin, *Murdock* v. *Kilbourn*, 6 Wis. 468, 470–71 (1857) (wager upon the event of a public election is contrary to public policy, illegal, and void).

First, the Commission proposes removing the phrase "and approval of certain event contracts" from the title of § 40.11(c), because the paragraph does not only address contract approval. The Commission believes the paragraph would be more clearly and accurately titled "90-day review."

Next, the Commission proposes to number the introductory paragraph to § 40.11(c) as § 40.11(c)(1), and to reorganize existing §§ 40.11(c)(1) and (2) into three new paragraphs, numbered §§ 40.11(c)(2) through § 40.11(c)(4). In renumbered § 40.11(c)(1), the Commission proposes adding the modifying phrase "made by a registered entity" to clarify that submissions pursuant to §§ 40.2 and 40.3 are made by registered entities. The Commission further proposes replacing the word "which" with "that" in order to make the language consistent throughout § 40.11, and proposes replacing the word "be" with "is" simply for grammatical structure.[130]

The proposed reorganization of existing §§ 40.11(c)(1) and (2) into three new paragraphs, numbered §§ 40.11(c)(2) through § 40.11(c)(4), and the proposed language changes to those provisions, are intended to improve the clarity of § 40.11(c) by, among other things, grouping related information together. As amended, § 40.11(c)(2) would address the commencement of a 90-day review period, including notification of such commencement. As amended, § 40.11(c)(2) would include language explicitly stating that a registered entity must be notified of the commencement of a 90-day review, and would group this language together with a clarified version of existing language providing that notice of the commencement of a 90-day review will be posted on the Commission's website. To further enhance clarity, proposed § 40.11(c)(2) would provide that the 90-day review period commences "on the date the Commission notifies the registered entity of its determination to conduct a 90-day review," amending the current language, which states that the 90-day review period commences from the date the Commission notifies a registered entity of a potential violation of § 40.11(a). The Commission proposes to clarify the current language to avoid potential uncertainty as to the specific start date of the 90-day review period.

Proposed new § 40.11(c)(3) would address the existing requirement that the Commission request that a registered entity suspend the listing or trading of a contract during the pendency of the 90-day review period. To enhance clarity, minor technical changes would be made to the existing regulatory language, including removal of excess wording describing the types of contracts that may be subject to a 90-day review.

With the exception of a sub-heading for consistency, proposed new § 40.11(c)(4) would include existing regulatory language addressing Commission action at the end of the 90-day review period.

Request for Comment

The Commission requests comment on all aspects of its proposed technical amendments to § 40.11.

*F. Implementation Timeline*

The Commission proposes making the final rule amendments effective 30 days after publication in the **Federal Register**. The Commission believes that this 30-day period should provide registered entities with sufficient time to account for the rule amendments in their product design and compliance procedures. However, the Commission also proposes an implementation period that would run for an additional 30 days after the effective date of the final rule amendments—for a total of 60 days from the date of publication of the final rule amendments in the **Federal Register**—solely for event contracts that are listed for trading as of the date of publication of the final rule amendments, and that are impacted by the amendments.

The Commission believes that a 60-day implementation period for these contracts will minimize any market disruption that might be caused by the rule amendments. In this regard, the Commission notes that event contracts are generally based upon a discrete occurrence or event, and Commission staff's anecdotal experience indicates that many event contracts settle within relatively short time horizons. This, coupled with the fact that, as discussed further in section III.C, *infra*, contracts that involve "gaming," as proposed to be defined, currently comprise a small portion of the overall event contracts market, suggests that few event contracts impacted by the proposed rule amendments, if finalized, would need to be wound down before their existing settlement dates.[131] To the extent that a particular event contract that is impacted by the rule amendments has a

settlement date that extends beyond the implementation period, the Commission believes that 60 days would provide sufficient time for the registered entity to ensure the orderly cessation of trading in the contract.

For the avoidance of doubt, the proposed extended 60-day implementation period would apply only to contracts that are listed and available for trading as of the date of publication of the final rule amendments in the **Federal Register**. The extended implementation period would not apply to contracts that have been self-certified under § 40.2, or approved by the Commission under § 40.3, but are not listed and available for trading as of the date of publication of the final rule amendments in the **Federal Register**. The interest in minimizing market disruption that informs the proposed extended implementation period does not apply to such contracts.

All registered entities are expected to make good-faith efforts that will result in conformance with the final rule amendments by no later than the effective date of the final amendments (or the 60-day implementation period, as applicable). These good-faith efforts should take the final rule amendments into account in all compliance, contract design, and listing, trading, or clearing decisions, as well as in decisions leading to the orderly and timely windown of any contracts with settlement dates beyond the 60-day implementation period.

Request for Comment

The Commission requests comment on all aspects of the proposed implementation timeline. In particular, the Commission requests comment on the following questions:

• Would an effective date that is 30 days after publication of the final rule amendments in the **Federal Register** provide registered entities with sufficient opportunity to comply with the amendments?

• Would the proposed 60-day implementation period provide sufficient time for the expiration of, or orderly cessation of trading in, listed event contracts that are impacted by the proposed rule amendments?

**III. Related Matters**

*A. Regulatory Flexibility Act*

The Regulatory Flexibility Act ("RFA") requires federal agencies to consider whether the rules they propose will have a significant economic impact on a substantial number of small entities and, if so, to provide a regulatory

---

[130] As discussed above, the Commission also is proposing to remove from § 40.11(c)(1), as proposed to be renumbered, the words "relate to, or reference", and to refer only to contracts that "may involve" an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), in order to more closely align with the statutory language of CEA section 5c(c)(5)(C).

[131] *See also* note 171, *infra.*

**48986**    **Federal Register** / Vol. 89, No. 112 / Monday, June 10, 2024 / Proposed Rules

flexibility analysis respecting the impact.[132] Whenever an agency publishes a general notice of proposed rulemaking for any rule, pursuant to the notice-and-comment provisions of the Administrative Procedure Act,[133] a regulatory flexibility analysis or certification is typically required.[134]

The rule amendments proposed herein will affect DCMs, SEFs, and DCOs. The Commission has previously established certain definitions of "small entities" to be used by the Commission in evaluating the impact of its rules on small entities in accordance with the RFA.[135] The Commission previously determined that DCMs are not small entities for purposes of the RFA.[136] Similarly, the Commission previously determined that SEFs [137] and DCOs [138] are not small entities for purposes of the RFA.[139]

Accordingly, the Chairman, on behalf of the Commission, hereby certifies pursuant to 5 U.S.C. § 605(b) that the proposed amendments will not have a significant economic impact on a substantial number of small entities.

*B. Paperwork Reduction Act*

The Paperwork Reduction Act of 1995 ("PRA") [140] imposes certain requirements on federal agencies, including the Commission, in connection with conducting or sponsoring any "collection of information," as defined by the PRA. Under the PRA, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid control number from the Office of Management and Budget ("OMB").[141] The PRA is intended, in part, to minimize the paperwork burden created for individuals, businesses, and other persons as a result of the collection of information by federal agencies, and to ensure the greatest possible benefit and utility of information created, collected, maintained, used, shared, and disseminated by or for the federal

government.[142] The PRA applies to all information, regardless of form or format, whenever the federal government is obtaining, causing to be obtained, or soliciting information, and includes required disclosure to third parties or the public, of facts or opinions, when the information collection calls for answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons.[143]

The rule amendments proposed herein, if adopted, would result in a collection of information within the meaning of the PRA, as discussed below. The Commission therefore is submitting this proposal to the OMB for its review in accordance with the PRA.[144] Responses to this collection of information would be mandatory. The Commission will protect any proprietary information according to the Freedom of Information Act and part 145 of the Commission's regulations.[145] In addition, section 8(a)(1) of the CEA strictly prohibits the Commission, unless specifically authorized by the CEA, from making public any "data and information that would separately disclose the business transactions or market positions of any person and trade secrets or names of customers." [146] Finally, the Commission is also required to protect certain information contained in a government system of records according to the Privacy Act of 1974.[147]

1. Submission of Updated Rules to the Commission

This proposed rulemaking affects a collection of information for which the Commission has previously received a control number from OMB. The title for this collection of information is OMB Control No. 3038–0093, Part 40, Provisions Common to Registered Entities ("OMB Collection 3038–0093").

Section 40.6 of the Commission's regulations [148] requires registered entities to make rule submissions to the Commission when they adopt a new or revised rule or rule amendments, including changes to product terms and conditions. The Commission anticipates that, if the rule amendments proposed herein are adopted, registered entities whose product offerings include contracts involving "gaming," as proposed to be defined, will take certain steps with respect to those contracts in

order to comply with the rules. The Commission anticipates that, for certain exchanges, one step will be filing § 40.6 self-certification submissions to permanently delist the contracts and remove reference to them from their exchange rules.[149] These § 40.6 filings are additional burdens under the PRA and would increase the reporting burden associated with OMB Collection 3038–0093.[150]

The Commission estimates that approximately 30 § 40.6 filings would need to be submitted for contracts to be delisted if the proposed rule amendments are adopted, taking an average of two hours per submission. Currently, there are six DCMs that list event contracts for trading.[151] As an average, the new burden would be an estimated 5 additional § 40.6 filings per DCM. Accordingly, the Commission estimates the additional PRA burden as follows:

• *§ 40.6 submissions related to delisting contracts*

  *Estimated Number of Respondents:* 6.
  *One-Time Responses by each Respondent:* 5.
  *Estimated Hours per Response:* 2.
  *Estimated Total Hours:* 60.

As discussed in the analysis of cost benefit considerations in section III.C, *infra,* registered entities may incur other costs to review and implement the new definition of "gaming," if the proposed rules are adopted. This may include costs to update any product design and compliance procedures that a registered entity maintains in the regular course of business. These activities do not constitute "information collections," however, because the PRA excludes the maintenance of records required to be kept in the usual and customary order of business from the definition of a "collection of information." [152]

---

[132] 5 U.S.C. 601 *et seq.*

[133] 5 U.S.C. 553.

[134] *See* 5 U.S.C. 601(2), 603, 604, and 605.

[135] *See* Policy Statement and Establishment of Definitions of "Small Entities" for Purposes of the Regulatory Flexibility Act, 47 FR 18618 (Apr. 30, 1982).

[136] *Id.* at 18618–19.

[137] *See* Core Principles and Other Requirements for SEFs, 78 FR 33476, 33548 (June 4, 2013).

[138] *See* New Regulatory Framework for Clearing Organizations, 66 FR 45604, 45609 (Aug. 29, 2001).

[139] The determination about impact on small entities in this section is limited to the RFA analysis. Additional analysis on the impact of the regulation is set out in the analysis of cost-benefit considerations in section III.C.

[140] 5 U.S.C. 601, *et seq.*

[141] *See* 44 U.S.C. 3507(a)(3); 5 CFR 1320.5(a)(3).

[142] *See* 44 U.S.C. 3501.

[143] *See* 44 U.S.C. 3502(3).

[144] *See* 44 U.S.C. 3507(d); 5 CFR 1320.11.

[145] *See* 5 U.S.C. 552; *see also* 17 CFR part 145 (Commission Records and Information).

[146] 7 U.S.C. 12(a)(1).

[147] 5 U.S.C. 552a.

[148] 17 CFR 40.6.

[149] In this context, "delisting" refers to the process of submitting rule amendments to the Commission in order to withdraw self-certified or approved contracts (meaning they can no longer be listed for trading on the exchange), regardless of whether such contracts are currently available to market participants for trading.

[150] Additional costs associated with delisting are laid out in the analysis of cost-benefit considerations, but are not PRA burdens because they do not require a registered entity to submit reports or create records for the Commission beyond the registered entity's existing obligations.

[151] As discussed below in section III.C.2(a)(3), note 175, only one DCM currently offers the types of event contracts that would be prohibited and require § 40.6 filings as a result of the proposed rule amendments, if adopted. However, for the purposes of the PRA, the Commission is estimating the potential burden for all six DCMs that currently offer event contracts.

[152] 5 CFR 1320.3(b)(3). The following OMB collections address the general reporting and recordkeeping compliance obligations for DCMs, SEFs, and DCOs, for compliance with relevant CEA

Moreover, updates to these types of business records would not require registered entities to provide responses to a series of identical questions.[153] The Commission expects that the content and nature of any revisions to update product design or compliance procedures would vary considerably among registered entities and registered entities retain flexibility in deciding how to structure those procedures and what content to include.

There are no additional capital and start-up or operations and maintenance costs associated with this collection.

2. Request for Comment

The Commission invites the public and other federal agencies to comment on any aspect of the proposed information collection requirements discussed above. The Commission will consider public comments on this proposed collection of information in:

(1) Evaluating whether the proposed collection of information is necessary for the proper performance of the functions of the Commission, including whether the information will have a practical use;

(2) Evaluating the accuracy of the estimated burden of the proposed collection of information, including the degree to which the methodology and the assumptions that the Commission employed were valid;

(3) Enhancing the quality, utility, and clarity of the information proposed to be collected; and

(4) Minimizing the burden of the proposed information collection requirements on registered entities, including through the use of appropriate automated, electronic, mechanical, or other technological information collection techniques, *e.g.,* permitting electronic submission of responses.

Copies of the submission from the Commission to OMB are available from the CFTC Clearance Officer, 1155 21st Street NW, Washington, DC 20581, (202) 418–5174 or from *http://RegInfo.gov.* Organizations and individuals desiring to submit comments on the proposed

information collection requirements should send those comments to:

• The Office of Information and Regulatory Affairs, Office of Management and Budget, Room 10235, New Executive Office Building, Washington, DC 20503, Attn: Desk Officer of the Commodity Futures Trading Commission;

• (202) 395–6566 (fax); or

• *OIRAsubmissions@omb.eop.gov* (email).

Please provide the Commission with a copy of submitted comments so that all comments can be summarized and addressed in the final rulemaking, and please refer to the **ADDRESSES** section of this rule proposal for instructions on submitting comments to the Commission. OMB is required to make a decision concerning the proposed information collection requirements between 30 and 60 days after publication of this release in the **Federal Register**. Therefore, a comment to OMB is best assured of receiving full consideration if OMB receives it within 30 calendar days of publication of this release. Nothing in the foregoing affects the deadline enumerated above for public comment to the Commission on the proposed rule amendments.

*C. Consideration of Costs and Benefits*

1. Introduction

Section 15(a) of the CEA requires the Commission to consider the costs and benefits of its actions before promulgating a regulation under the CEA or issuing certain orders.[154] Section 15(a) further specifies that the costs and benefits shall be evaluated in light of five broad areas of market and public concern: (i) protection of market participants and the public; (ii) efficiency, competitiveness, and financial integrity of futures markets; (iii) price discovery; (iv) sound risk management practices; and (v) other public interest considerations. The Commission considers the costs and benefits resulting from its discretionary determinations with respect to the section 15(a) factors.

While, as discussed previously and further below, the Commission believes the amendments proposed herein—measured relative to the baseline of status quo conditions—would create meaningful benefits for market participants and the public, it also recognizes that they likely would result in some incremental costs. The Commission has endeavored to enumerate material costs and benefits and, when reasonably feasible, assign a

quantitative value to them. Where it is not reasonably feasible to quantify costs and benefits of the proposed amendments, those costs and benefits are discussed qualitatively.[155]

The Commission identifies and considers the benefits and costs of the proposed amendments relative to a baseline standard of those generated by the current statutory and regulatory framework applicable to event contracts, *i.e.,* the status quo. This framework includes the provisions involving event contracts in CEA section 5c(c)(5)(C) and current § 40.11 and Commission orders that have been issued pursuant to § 40.11(c)(2), which address relevant terms such as "gaming." The specific elements of the baseline that would be impacted by the proposed amendments are discussed in more detail below.

2. Proposed Amendments

(a) Definition of Gaming—Proposed § 40.11(b)

(1) Baseline and Proposed Amendments

Pursuant to current § 40.11(a)(1), a registered entity shall not list for trading or accept for clearing on or through the registered entity an event contract in certain excluded commodities that "involves, relates to, or references" gaming. The term "gaming" is not defined in the CEA or Commission regulations. The Commission has issued two orders pursuant to § 40.11(c)(2)—the Nadex Order [156] and the Kalshi Order [157]—both of which have included discussions of the term. The orders have provided some insight regarding the Commission's understanding of what "gaming" means for purposes of CEA section 5c(c)(5)(C) and § 40.11. For example, the orders set forth the Commission's recognition that: (i) relevant state and federal statutes define the terms "gambling," "betting," and "wagering"—which are generally used

---

core principles and Commission regulations: OMB Control No. 3038–0052, Core Principles and Other Requirements for DCMs ("OMB Collection 3038–0052"); OMB Control No. 3038–0074, Core Principles and Other Requirements for Swap Execution Facilities ("OMB Collection 3038–0074"); and OMB Control No. 3038–0076, Requirements for Derivative Clearing Organizations ("OMB Collection 3038–0076"). The Commission does not anticipate that the proposed rule amendments will affect the information collection burden associated with these collections.

[153] 44 U.S.C. 3502(3)(A) (providing that a "collection of information" occurs when ten or more persons are asked to report, provide, disclose, or record information in response to "identical questions").

[154] 7 U.S.C. 19(a).

[155] The Commission notes that this cost benefit consideration is based on its understanding that the derivatives market regulated by the Commission functions internationally with: (1) transactions that involve U.S. persons occurring across different international jurisdictions; (2) some persons organized outside of the United States that are registered with the Commission; and (3) some persons that typically operate both within and outside the United States and that follow substantially similar business practices wherever located. Where the Commission does not specifically refer to matters of location, the discussion of costs and benefits below refers to the effects of the proposed rule amendments on all relevant derivatives activity, whether based on their actual occurrence in the United States or on their connection with activities in, or effect on, U.S. commerce.

[156] *See https://www.cftc.gov/PressRoom/ PressReleases/6224-12.*

[157] *See https://www.cftc.gov/PressRoom/ PressReleases/8780-23.*

interchangeably with the term "gaming"—to include staking something of value upon a game or contest of others; [158] (ii) the event contracts subject to each respective order involved "gaming," because they involved staking something of value upon the outcome of a contest of others; [159] and (iii) an event contract can involve "gaming," for purposes of CEA section 5c(c)(5)(C) and § 40.11, in circumstances where the contract's underlying, itself, is gaming, and in circumstances where the contract has a different connection to gaming, for example because the contract "relates closely" to, "entails," or "has as an essential feature or consequence" gaming.[160]

The Commission's understanding of the term "gaming," as set forth in the orders that it has issued pursuant to § 40.11(c)(2), is reflected in its proposed definition of the term—and, more generally, in the other amendments proposed herein. However, the Commission recognizes that in the absence, to date, of a formal statutory or regulatory definition, registered entities may have taken somewhat different approaches to interpreting the scope of the term, and in some respects may have interpreted the scope to be narrower than the definition of "gaming" that the Commission is now proposing. Conversely, certain registered entities may have interpreted the term more broadly than the Commission's proposed definition.

The Commission is proposing to define "gaming," in new § 40.11(b)(1), to mean the staking or risking by any person of something of value upon: (i) the outcome of a contest of others; (ii) the outcome of a game involving skill or chance; (iii) the performance of one or more competitors in one or more contests or games; or (iv) any other occurrence or non-occurrence in connection with one or more contests or games. The Commission is proposing to provide in new § 40.11(b)(2) that "gaming" includes, but is not limited to, the staking or risking of something of value upon the outcome of a political contest, including an election or elections, an awards contest, or a game in which one or more athletes compete; or an occurrence or non-occurrence in

connection with such a contest or game, regardless of whether it directly affects the outcome. In establishing the proposed "gaming" definition, the Commission, as noted above, considered its discussion of "gaming" in the Nadex Order and Kalshi Order, and drew upon the ordinary meaning of the term, as well as relevant state and federal statutory definitions.[161]

**(2) Benefits**

By providing additional specificity to determine whether a particular event contract falls within the scope of CEA section 5c(c)(5)(C) and is contrary to the public interest because it involves "gaming," the Commission believes its proposed definition would reduce the likelihood that a registered entity would list for trading an event contract that is contrary to the public interest.

The Commission believes that, by establishing a common understanding and more uniform application of the term "gaming," the proposed definition also would assist registered entities in their product design and compliance efforts and help avoid situations in which registered entities expend resources to develop and submit a contract that the Commission subsequently determines may not be listed for trading or made available for clearing, pursuant to CEA section 5c(c)(5)(C) and § 40.11(a)(1). As discussed above, the Commission has observed a significant increase in the overall number and diversity of event contracts being listed for trading.[162] While the Commission does not have access to data or any other information to enable it to predict the specific types or quantities of event contracts that may be listed for trading in the future, the observed event contract trend causes the Commission to anticipate that going forward, absent these proposed rule amendments, the number of submitted contracts involving "gaming" could increase. Accordingly, by better delineating the types of prohibited event contracts that involve "gaming," the proposed definition should enhance registered entities' confidence with respect to product design and compliance, potentially yielding cost- and resource-saving benefits for them in the process. In addition, the proposed definition may help guard against market disruption that might otherwise be caused if an event contract is listed for trading and the Commission later determines, following an individualized review pursuant to (c), that the contract

is prohibited because it involves gaming and is contrary to the public interest.

The proposed definition also would support the Commission and its staff in the effective oversight of derivative markets—including by supporting the efficient and effective administration of the contract submission and review process, by helping to reduce the likelihood that contracts are submitted to the Commission that raise public interest concerns. In this regard, among other things, the proposed definition would promote the Commission's responsible stewardship and efficient use of the tax dollars appropriated to it by reducing the need for individualized contract reviews pursuant to § 40.11(c). In the Commission's experience, a review pursuant to § 40.11(c) is resource-intensive and consumes hundreds of hours of staff time. Based on prior experience, the Commission estimates that each review conducted pursuant to § 40.11(c) takes, on average, approximately 625 hours of Commission staff time, at a cost of approximately $220,012.[163]

---

[158] Kalshi Order at 8–9.

[159] Nadex Order at 3; Kalshi Order at 10.

[160] Kalshi Order at 7. *See also* Nadex Order at 2 ("[T]he legislative history of CEA Section 5c(c)(5)(C) indicates that the relevant question for the Commission in determining whether a contract involves one of the activities enumerated in CEA Section 5c(c)(5)(C)(i) is whether the contract, considered as a whole, involves one of those activities.")

[161] *See* note 54, *supra* (discussing that undefined statutory terms are given their ordinary meaning).

[162] *See* section I.A., *supra.*

[163] This figure is rounded to the nearest dollar and based on the annual mean wages for U.S. Bureau of Labor Statistics ("BLS") categories 19–3011, "Economists" and 23–1011, "Lawyers." BLS, Occupational Employment and Wages, May 2023 (hereinafter "BLS Data"), *available at https://www.bls.gov/oes/current/oes_nat.htm.* This estimate assumes that, of the approximately 625 hours expended for each review conducted pursuant to § 40.11(c), approximately 25% (or 156 hours) is expended by economists, and approximately 75% (or 469 hours) is expended by lawyers. The "Economist" category consists of professionals who "[c]onduct research, prepare reports, or formulate plans to address economic problems related to the production and distribution of goods and services or monetary and fiscal policy." BLS, Occupational Employment and Wages, May 2023: 19–3011, Economists, *available at https://www.bls.gov/oes/current/oes193011.htm.* According to BLS, the mean salary for this category in the context of Federal, State, and Local Government is $138,360. This number is divided by 1,800 work hours in a year to account for sick leave and vacations and multiplied by 4 to account for retirement, health, and other benefits or compensation, as well as for office space, computer equipment support, and human resources support. This number is further multiplied by 1.0272 to account for the 2.72% change in the CPI for Urban Wage-Earners and Clerical Workers between May 2023 and March 2024 (298.382 to 306.502). BLS, CPI for Urban Wage Earners and Clerical Workers (CPI–W), U.S. City Average, All Items—CWUR0000SA0, *available at https://www.bls.gov/data/#prices.* Together, these modifications yield an hourly rate of $316. The "Lawyer" category consists of professionals who "[r]epresent clients in criminal and civil litigation and other legal proceedings, draw up legal documents, or manage or advise clients on legal transactions." BLS, Occupational Employment and Wages, May 2023: 23–1011, Lawyers, *available at https://www.bls.gov/oes/current/oes231011.htm.* According to BLS, the mean salary for this category in the context of Federal, State, and Local Government is $159,280. This number is divided by 1,800 work hours in a year to account for sick leave and vacations and multiplied by 4 to account for retirement, health,

Federal Register / Vol. 89, No. 112 / Monday, June 10, 2024 / Proposed Rules **48989**

(3) Costs

The Commission expects that some registered entities may incur a one-time compliance cost to understand and implement the proposed "gaming" definition.[164] This may include costs to account for the definition in the registered entity's product design and compliance procedures. Costs associated with understanding and implementing the proposed "gaming" definition may vary depending on the size of the registered entity, available resources, and existing products, practices and policies. Nonetheless, the Commission preliminarily estimates that a registered entity typically would spend approximately 10 hours, or $2,660 (based on an hourly rate of $266),[165] to update its product design and compliance procedures to

implement the proposed "gaming" definition. The Commission estimates that this would result in an overall burden of 90 hours and an aggregated cost of $23,940 (nine registered entities [166] × $2,660).

As discussed more fully below, if the proposed rule amendments are adopted, the Commission anticipates that exchanges whose product offerings include contracts that involve "gaming," as proposed to be defined, will, in order to ensure compliance with the rules, file § 40.6 self-certification submissions to permanently delist the contracts and remove reference to the contracts in their exchange rules.[167] Exchanges may also need to take steps to effectuate the orderly wind-down of contracts involving "gaming" that are listed and available for trading as of the date of publication of final rule amendments in the **Federal Register**, and that have settlement dates beyond the 60-day implementation period proposed by the Commission.

The Commission preliminarily estimates that approximately 30 [168] § 40.6 delisting submissions would be filed for contracts involving "gaming," as proposed to be defined, taking approximately two hours per submission. This would result in an estimated burden of 60 hours and an estimated aggregated cost of $15,960 (based on an hourly rate of $266).[169]

As discussed above, to the extent the proposed rule amendments are finalized as proposed, and contracts that involve "gaming" are listed and available for trading as of the date of publication of final rule amendments in the **Federal Register** and have settlement dates beyond the 60-day implementation period, there may be costs to the listing exchanges, and market participants, associated with the wind-down of those contracts. The Commission notes that event contracts are generally based upon a discrete occurrence or event, and

Commission staff's anecdotal experience indicates that many event contracts settle within relatively short time horizons. This, coupled with the fact that, as discussed below, event contracts that involve "gaming," as proposed to be defined, currently comprise a small portion of the overall event contracts market, suggests that few event contracts involving "gaming" would likely need to be wound down before their existing settlement dates.[170]

With respect to the limited number of contracts that the Commission anticipates would have settlement dates beyond the proposed 60-day implementation period, the Commission expects that the costs to exchanges associated with orderly wind-down would include operational, compliance and technological costs. As further noted below, the costs to exchanges associated with the wind-down of these contracts may also include the inability to realize the full anticipated return on investment in the contracts. The Commission notes that the precise costs attributable to contract wind-down would be proprietary information of the listing exchange, to which the Commission does not have access. However, given the limited number of contracts that the Commission anticipates would need to be wound down before their existing settlement dates, the Commission believes that these costs to the exchange should be relatively modest.

The Commission further anticipates that certain market participants may incur losses depending on the nature of their positions in the contracts at, and leading up to, wind-down. Conversely, certain market participants may profit based on the nature of their positions at, and leading up to, wind-down.[171] The Commission notes that the future market losses or gains to a market participant are not predictable with any data and therefore, the Commission

---

[164] Currently, there are six CFTC-registered exchanges that offer event contracts for trading, and there are three CFTC-registered DCOs that accept event contracts for clearing. However, the Commission acknowledges that additional entities have sought, or may seek in the future, to register with the Commission in order to list or clear event contracts.

[165] This figure is rounded to the nearest dollar and based on the annual mean wage for BLS category 13–2061, "Financial Examiners." BLS Data, *available at https://www.bls.gov/oes/current/oes_nat.htm*. This category consists of professionals who "[e]nforce or ensure compliance with laws and regulations governing financial and securities institutions and financial and real estate transactions." BLS, Occupational Employment and Wages, May 2023: 13–2061 Financial Examiners, *available at https://www.bls.gov/oes/current/oes132061.htm*. According to BLS, the mean salary for this category in the context of Securities, Commodity Contracts, and Other Financial Investments and Related Activities is $116,520. This number is divided by 1,800 work hours in a year to account for sick leave and vacations and multiplied by 4 to account for retirement, health, and other benefits or compensation, as well as for office space, computer equipment support, and human resources support. This number is further multiplied by 1.0272 to account for the 2.72% change in the CPI for Urban Wage-Earners and Clerical Workers between May 2023 and March 2024 (298.382 to 306.502). BLS, CPI for Urban Wage Earners and Clerical Workers (CPI–W), U.S. City Average, All Items—CWUR0000SA0, *available at https://www.bls.gov/data/#prices*. Together, these modifications yield an hourly rate of $266. The rounding and modifications applied with respect to the estimated average burden hour cost for this occupational category have been applied with respect to each occupational category discussed as part of this analysis.

and office benefits or compensation, as well as for office space, computer equipment support, and human resources support. This number is further multiplied by 1.0272 to account for the 2.72% change in the CPI for Urban Wage-Earners and Clerical Workers between May 2023 and March 2024 (298.382 to 306.502). BLS, CPI for Urban Wage Earners and Clerical Workers (CPI–W), U.S. City Average, All Items—CWUR0000SA0, *available at https://www.bls.gov/data/#prices*. Together, these modifications yield an hourly rate of $364. The rounding and modifications applied with respect to the estimated average burden hour cost for this occupational category have been applied with respect to each occupational category discussed as part of this analysis.

[166] *See* note 165, *supra.*

[167] In this context, "delisting" refers to the process of submitting rule amendments to the Commission in order to withdraw self-certified or approved contracts (meaning they can no longer be listed for trading on the exchange), regardless of whether such contracts are currently available to market participants for trading.

[168] This estimate is based on Commission staff analysis of product submissions and trading data regarding event contracts submitted to the Commission by CFTC-registered exchanges. The estimate contemplates that self-certified or approved contracts involving "gaming," as proposed to be defined, would need to be delisted regardless of whether such contracts are available to market participants for trading at the time that final rule amendments are published in the **Federal Register**, or whether their settlement dates fall within the 60-day implementation period proposed by the Commission.

[169] *See* note 166, *supra.*

[170] The terms and conditions of event contracts listed for trading as of the issuance of these proposed rule amendments that the Commission believes would be impacted by such amendments, if finalized, generally establish that the subject contract will settle either on a date that is expected to be soon after the contract's underlying occurrence or event, or, as a backstop, on a date that is further in the future (typically the end of the calendar year). Based on CFTC staff's experience in connection with administering the agency's product review process, the Commission believes, notwithstanding backstop expiration dates, most event contracts settle close in time to the underlying occurrence or event.

[171] The Commission notes that the types of event contracts that would be impacted by this proposed rulemaking, if finalized, tend to be fully collateralized, which would have a bearing on the market risk to which market participants would be exposed in the event of the early wind-down of such a contract.

believes that it is not feasible to further quantify these costs associated with potential contract wind-downs.

The Commission recognizes that a further consequence, for certain registered entities, and applicants for registration, of establishing a common understanding and more uniform application of the term "gaming" may be to modify such registered entities', and applicants', understanding of the types of event contracts that they may seek to list for trading or accept for clearing in the future. This may entail certain modifications to a registered entity's, or applicant's, business model and projected revenue streams, and may impact a registered entity's, or applicant's, ability to realize the full anticipated return on investment with respect to certain aspects of its business model. For example, a registered entity or applicant for registration may have invested resources into various aspects of strategic planning (e.g., market research, technological implementation, and marketing) that are premised, at least in part, on event contracts that may be implicated by the proposed "gaming" definition.[172] Relatedly, establishing a common understanding and more uniform application of the term "gaming" may modify, in certain respects, the types of event contracts that are available to market participants for trading and clearing.

In this regard, the Commission notes that contracts that involve "gaming," as proposed to be defined, comprise a small portion of the overall event contracts market, suggesting that the above-described consequences of the proposed "gaming" definition would be relatively modest. Specifically, the Commission estimates that contracts involving "gaming," as proposed to be defined, comprised less than 1% of the total trading volume in event contracts in 2023.[173]

Based on historical trading data, the Commission recognizes that the above-described anticipated costs of compliance with the proposed "gaming" definition may have more of an impact for some registered entities—and consequently for their customers—than others.[174] The Commission expects, however, that a significant proportion of these registered entities' offerings would not be impacted by the proposed gaming definition, suggesting that the overall impact to these registered entities of the proposed definition would be relatively modest.[175]

Further, the Commission believes that providing specificity to determine whether a particular event contract involves "gaming" will support the ability of these and other registered

_____

"something of value upon a contest of others." Nadex Order at 3.

As previously discussed, the Commission notes that it has observed a significant increase in the number and diversity of event contracts listed for trading by CFTC-registered exchanges, as well as increased interest among applicants and prospective applicants for exchange registration in operating exchanges that would primarily or exclusively offer event contracts for trading. This upward trend—if it continues, as the Commission anticipates is possible (if not probable)—potentially could extend, absent the proposed rule amendments, to include additional event contracts involving "gaming," as proposed to be defined. An extension of this type would mean that a registered entity or applicant for registration currently may have plans to seek to list for trading or accept for clearing, and may have invested in, event contracts that involve "gaming," as proposed to be defined. Beyond this general observation that registered entities or applicants for registration potentially could have plans to list in the future, and could have invested in event contracts involving "gaming," as proposed to be defined, the Commission lacks access to the entity-specific proprietary data necessary to quantify what, if any, additional costs should be attributed to such yet-to-be-listed, planned-for contracts.

To the extent that registered entities or applicants for registration currently could have plans to list in the future event contracts involving "gaming," as proposed to be defined, in the Commission's view this also supports the benefits, as discussed infra, that defining the term would provide. Among other things, the definition would enhance confidence regarding product compliance that can inform product design efforts, and would help to ensure that contracts that are contrary to the public interest are not traded on CFTC-regulated markets.

[174] In 2023, only one CFTC-registered exchange listed event contracts that involved "gaming," as proposed to be defined. In 2023, only one CFTC-registered DCO cleared event contracts that involved "gaming," as proposed to be defined.

[175] For example, the Commission estimates that, in 2023, event contracts involving "gaming," as proposed to be defined, comprised approximately 1% of the trading volume of the CFTC-registered exchange that offered such contracts for trading. The Commission further estimates that event contracts that involve "gaming," as proposed to be defined, comprised approximately 9% of the total number of event contracts listed by this exchange in 2023. To make these estimates, Commission staff reviewed aggregated event contracts trading data that was reported to the Commission for the period of January 1, 2023 through December 31, 2023.

entities to develop and list new products with enhanced confidence regarding such products' compliance with the CEA and CFTC regulations. The Commission believes that this should assist registered entities, as well as applicants for registration, in making informed business decisions with respect to product design, which should have long-term business benefits. As discussed above, it may also yield business efficiencies for registered entities by helping to avoid situations where they expend resources to develop and submit a contract that the Commission subsequently determines, following a § 40.11(c) review, may not be listed for trading or accepted for clearing. To that end, the Commission believes that defining the term "gaming" will have broader public benefits by helping to ensure that contracts that are contrary to the public interest—namely, certain contracts that "exist predominantly to enable gambling"—are not traded, including by retail market participants, as financial instruments on CFTC-regulated markets.

(b) Amendments To Further Align With Statutory Language

The proposed rule amendments include certain changes to improve regulatory and statutory textual alignment that are not expected to render material costs or benefits.[176] First, when describing the contracts to which § 40.11 applies, the Commission is proposing to remove the terms "relate to" and "reference" wherever they appear, and to refer only to contracts that "involve" (or, as applicable, that "may" involve) an Enumerated Activity or prescribed similar activity,[177] in order to further align with the statutory text of CEA section 5c(c)(5)(C)(i). The Commission also is proposing to remove from § 40.11 the reference to CEA section 1a(19)(iv), and to more precisely track the statutory language of CEA section 5c(c)(5)(C)(i) when describing the contracts to which § 40.11 applies—while accounting for the errant reference to "section 1a(2)(i)," which is not a provision in the statute—by stating that the regulation applies with respect to contracts "in excluded commodities based on the occurrence, extent of an

_____

[172] The Commission notes that the value of any such lost return would be proprietary information of the listing registered entity to which the Commission does not have access, and therefore, the Commission believes that it is not feasible to further quantify this cost associated with the proposed "gaming" definition.

[173] To make this estimate, Commission staff reviewed aggregated event contracts trading data that was reported to the Commission by CFTC-registered exchanges for the period of January 1, 2023 through December 31, 2023. Based on this review, the Commission further estimates that event contracts that involve "gaming," as proposed to be defined, comprised approximately 6% of the total number of event contracts listed for trading in 2023. These event contracts were primarily comprised of contracts based on the outcome of various entertainment awards contests. In 2012, in the Nadex Order, the Commission recognized certain event contracts to involve "gaming" where taking a position in the contracts would be staking

[176] By further aligning the regulatory text of § 40.11 with the statutory text of CEA section 5c(c)(5)(C), the proposed amendments may be of some limited benefit to the extent any registered entity would unnecessarily expend resources to resolve confusion attributable to the existing textual variation.

[177] While there are no prescribed similar activities at this juncture, the Commission retains its authority under CEA section 5c(c)(5)(C)(i)(VI) and § 40.11(a)(2) to prescribe similar activities in future rules or regulations.

occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(19)(i) of the Act)[.]"

### 3. Section 15(a) Factors

The Commission has evaluated the costs and benefits of the proposed amendments to § 40.11 in light of the following five broad areas of market and public concern identified in section 15(a) of the CEA: protection of market participants and the public; efficiency, competitiveness, and financial integrity of the markets; price discovery; sound risk management practices; and other public interest considerations.

#### (a) Protection of Market Participants and the Public

The Commission believes that the proposed amendments to § 40.11 will help to protect the public by preventing the listing for trading or acceptance for clearing by registered entities of certain event contracts that are contrary to the public interest. The Commission further believes that permitting trading of contracts involving "gaming," as proposed to be defined, would conflate gambling and financial instruments in a manner that could particularly create confusion and risk for retail market participants, and that the proposed amendments would, accordingly, enhance protection of market participants.

#### (b) Efficiency, Competitiveness, and Financial Integrity of Markets

The Commission acknowledges that a consequence, for certain registered entities and applicants for registration, of the proposed amendments may be to modify such registered entities' and applicants' understanding of the types of event contracts that they may seek to list for trading or accept for clearing in the future. This may entail certain modifications to a registered entity's business model and projected revenue streams, and may impact a registered entity's, or applicant's, ability to realize the full anticipated return on certain aspects of its business model. Based on the types of event contracts that different registered entities currently list for trading or accept for clearing, the Commission anticipates that this consequence of the proposed amendments may impact some registered entities—and consequently their customers—more than others. However, for those registered entities that currently list for trading or accept for clearing contracts that involve "gaming," as proposed to be defined, the Commission estimates that a significant proportion of their offerings

would not be impacted by the proposed amendments, suggesting that the overall impact of the rule amendments should be relatively modest.[178]

Moreover, the Commission believes that, by further specifying types of event contracts that are contrary to the public interest and therefore may not be listed for trading or accepted for clearing, the proposed amendments also will support these and other registered entities' ability to develop and list new products with enhanced confidence regarding such products' compliance with the CEA and CFTC regulations. The Commission believes that this should assist registered entities, as well as applicants for registration, in making informed business decisions with respect to product design, which may enhance competitiveness and efficiency.

#### (c) Price Discovery

While the proposed amendments are not likely to have an impact on price discovery in CFTC-regulated markets, the Commission acknowledges that certain event contracts could have limited informational value in other contexts outside the scope of CFTC-regulated markets that may be lost if the proposed amendments are adopted.

#### (d) Sound Risk Management Practices

The Commission has not identified any effect of the proposed amendments on sound risk management practices.

#### (e) Other Public Interest Considerations

As discussed in detail above, the primary purpose of § 40.11 is to implement the Commission's statutory authority to determine that certain event contracts are contrary to the public interest and therefore may not be listed or made available for clearing or trading on or through a registered entity. The proposed amendments seek to support this objective by further specifying the types of event contracts that are contrary to the public interest and therefore may not be listed for trading or accepted for clearing.

#### Request for Comment

The Commission generally requests comments on all aspects of its consideration of costs and benefits, including the identification and assessment of any costs and benefits not discussed herein; data and any other information to assist or otherwise inform the Commission's ability to quantify or qualitatively describe the costs and benefits of the proposed amendments; and substantiating data, statistics, and any other information to

support positions posited by commenters with respect to the Commission's discussion. The Commission welcomes comment on such costs and benefits, particularly from registered entities that can provide quantitative cost and benefit data based on their respective experiences. The Commission also welcomes comments on alternatives to the proposed amendments that may be preferable on cost-benefit grounds, and why.

#### D. Antitrust Considerations

Section 15(b) of the CEA requires the Commission to "take into consideration the public interest to be protected by the antitrust laws and endeavor to take the least anticompetitive means of achieving" the purposes of the CEA, in issuing any order or adopting any Commission rule or regulation (including any exemption under section 4(c) or 4c(b)), or in requiring or approving any bylaw, rule, or regulation of a contract market established pursuant to section 17 of the CEA.[179]

The Commission believes that the public interest to be protected by the antitrust laws is generally to protect competition. The Commission requests comment on whether this proposed rulemaking implicates any other specific public interest to be protected by the antitrust laws.

The Commission has considered the Proposal to determine whether it is anticompetitive and has preliminarily identified no anticompetitive effects. The Commission requests comment on whether the Proposal is anticompetitive and, if it is, what the anticompetitive effects are.

Because the Commission has preliminarily determined that the Proposal is not anticompetitive and has no anticompetitive effects, the Commission has not identified any less anticompetitive means of achieving the purposes of the CEA. The Commission requests comment on whether there are less anticompetitive means of achieving the relevant purposes of the CEA that would otherwise be served by adopting this proposed rulemaking.

### List of Subjects in 17 CFR Part 40

Commodity futures, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, the Commodity Futures Trading Commission hereby proposes to amend 17 CFR chapter I as follows:

---

[178] See note 176, supra.

[179] 7 U.S.C. 19(b).

## PART 40—PROVISIONS COMMON TO REGISTERED ENTITIES

■ 1. The authority citation for part 40 continues to read as follows:

**Authority:** 7 U.S.C. 1a, 2, 5, 6, 7, 7a, 8 and 12, as amended by Titles VII and VIII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Pub. L. 111–203, 124 Stat. 1376 (2010).

■ 2. Revise § 40.11 to read as follows:

### § 40.11 Event contracts based upon certain excluded commodities.

(a) *Prohibition.* Agreements, contracts, transactions, or swaps described in paragraphs (a)(1) and (2) of this section are contrary to the public interest and shall not be listed for trading or accepted for clearing on or through a registered entity:

(1) Agreements, contracts, transactions, or swaps in excluded commodities based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(19)(i) of the Act) that involve:

(i) Activity that is unlawful under any Federal or State law;

(ii) Terrorism;

(iii) Assassination;

(iv) War; or

(v) Gaming.

(2) Agreements, contracts, transactions, or swaps in excluded commodities based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(19)(i) of the Act) that involve other activity that is similar to an activity enumerated in paragraphs (a)(1)(i) through (v) of this section, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) *Gaming.* (1) For purposes of paragraph (a)(1)(v) of this section, "gaming" means the staking or risking by any person of something of value upon:

(i) The outcome of a contest of others;

(ii) The outcome of a game involving skill or chance;

(iii) The performance of one or more competitors in one or more contests or games; or

(iv) Any other occurrence or non-occurrence in connection with one or more contests or games.

(2) For purposes of paragraph (a)(1)(v) of this section, "gaming" includes, but is not limited to, the staking or risking by any person of something of value upon the outcome of a political contest, including an election or elections, an awards contest, or a game in which one or more athletes compete, or an occurrence or non-occurrence in connection with such a contest or game, regardless of whether it directly affects the outcome.

(c) *90-day review.* (1) The Commission may determine, based upon a review of the terms or conditions of a submission made by a registered entity under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap as described in paragraph (a) of this section may involve-an activity enumerated in paragraphs (a)(1) or (2) of this section, and is subject to a 90-day review.

(2) The Commission shall notify the registered entity of its determination to conduct a 90-day review and post notice of the determination on its website. The 90-day review period shall commence on the date the Commission notifies the registered entity of its determination to conduct a 90-day review.

(3) The Commission shall request that the registered entity suspend the listing or trading of the agreement, contract, transaction, or swap subject to the 90-day review during the pendency of the review period.

(4) The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under this paragraph (c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

Issued in Washington, DC, on May 29, 2024, by the Commission.

**Robert Sidman,**

*Deputy Secretary of the Commission.*

**Note:** The following appendices will not appear in the Code of Federal Regulations.

## Appendices to Event Contracts—Voting Summary and Chairman's and Commissioners' Statements

### Appendix 1—Voting Summary

On this matter, Chairman Behnam and Commissioners Johnson, and Goldsmith Romero, voted in the affirmative. Commissioners Mersinger and Pham voted in the negative.

### Appendix 2—Statement of Chairman Rostin Behnam

I support the proposed amendments to the Commission's rules concerning event contracts. Before further discussion, I would like to acknowledge the tremendous work by many CFTC colleagues. I particularly would like to thank Vince McGonagle, Nora Flood, and Grey Tanzi for all of their thorough and thoughtful work on the proposal.

Starting in 2021, there has been a significant uptick in the number of event contracts listed for trading by CFTC-registered exchanges. To put that increase into perspective, more event contracts were listed for trading in 2021 than had been listed in the prior 15 years combined. And that has continued to be true each year since.

Given this exponential increase, the Commission today proposes to further specify the types of event contracts that fall within the scope of CEA section 5c(c)(5)(C) and are contrary to the public interest. The amendments will support efforts by registered entities to comply with the CEA by more clearly identifying the types of event contracts that may not be listed for trading or accepted for clearing. These changes will support responsible and efficient market innovation, by helping registered entities and new applicants to make informed decisions with respect to product design.

Specifically, the Commission is proposing to amend Commission Regulation 40.11 to, among other things, further specify types of event contracts that fall within the scope of CEA section 5c(c)(5)(C) and are contrary to the public interest, such that they may not be listed for trading or accepted for clearing on or through a registered entity. The proposal defines "gaming" and provides illustrative examples of gaming, including the outcome of a political contest, the outcome of an awards contest, the outcome of a game in which one or more athletes compete, or an occurrence or non-occurrence in connection with such a contest or game.

The proposal includes a determination that event contracts involving each of the Enumerated Activities in CEA section 5c(c)(5)(C) (gaming, war, terrorism, assassination, and activity that is unlawful under state law) are, as a category, contrary to the public interest and therefore may not be listed for trading or accepted for clearing through a registered entity. The illustrative examples of gaming that I just mentioned are therefore contrary to the public interest and cannot be listed for trading.

To be clear, that means that even contracts on the outcome of a political contest such as an election could not be listed for trading or accepted for clearing under the proposed rule. Such contracts not only fail to serve the economic purpose of the futures markets—they are illegal in several states and could potentially and impermissibly preempt State responsibilities for overseeing federal elections. This is not a new phenomenon for the CFTC. Over the course of the last 20 years, the CFTC has remained steadfast—through many administrations—that election or political contracts should not be allowed on the US futures and options markets.

Contracts involving political events ultimately commoditize and degrade the integrity of the uniquely American experience of participating in the democratic electoral process. Allowing these contracts would push the CFTC, a financial market regulator, into a position far beyond its Congressional mandate and expertise. To be blunt, such contracts would put the CFTC in the role of an election cop.

The CFTC's jurisdiction as mandated by Congress and solidified in our statute, the Commodity Exchange Act, recognizes our expertise in markets for goods, services,

rights, and interests—which can include events associated with financial, commercial, or economic consequences. We are tasked with upholding the public interest by ensuring that America's derivatives markets provide a means for managing and assuming price risks and providing for price discovery through liquid, fair, open, transparent, and financially secure trading facilities. Market integrity is featured so prominently within that mandate that the CFTC has civil enforcement authority when it comes to the potential for fraud, manipulation, and other abuses such as the dissemination of false information in the underlying or commodity cash markets. Political control contracts on CFTC-regulated exchanges would push the CFTC far beyond its historical expertise and jurisdiction, and potentially place the CFTC in the position of monitoring such markets for fraud and manipulation in elections themselves.

I thank the staff for their hard work in producing this important proposal.

## Appendix 3—Statement of Commissioner Summer K. Mersinger

I support the Commission [180] undertaking a rulemaking on event contracts, which is long overdue. During my tenure on the Commission, I have consistently called for a rulemaking process to establish a framework for the Commission to exercise the discretionary authority with respect to event contracts that Congress granted to the agency in our governing statute, the Commodity Exchange Act ("CEA").[181]

Unfortunately, though, I cannot support this particular proposed rulemaking (the "Proposal"). At first blush, it appears to be "much ado about nothing," [182] as it seems to do little more than rubber-stamp what the Commission has already said and done. Upon closer inspection, though, it is a "wolf in sheep's clothing" [183] because where the Proposal departs from our past practice, it lays the foundation to prohibit entire categories of potential exchange-traded event contracts whose terms and conditions the Commission has never even seen.

In planting the seeds of future bans of countless event contracts, sight unseen, the Proposal—
- Exceeds the legal authority that Congress granted the Commission in the CEA;

[180] This Statement will refer to the agency as the "Commission" or "CFTC." All web pages cited herein were last visited on May 9, 2024.

[181] See Dissenting Statement of Commissioner Summer K. Mersinger Regarding Order on Certified Derivatives Contracts with Respect to Political Control of the U.S. Senate and House of Representatives (September 22, 2023), available at *https://www.cftc.gov/PressRoom/Speeches Testimony/mersingerstatement092223* ("Kalshi Dissenting Statement"); and Dissenting Statement of Commissioner Summer K. Mersinger Regarding Commencement of 90-Day Review Regarding Certified Derivatives Contracts with Respect to Political Control of the U.S. Senate and House of Representatives (June 23, 2023), available at *https://www.cftc.gov/PressRoom/SpeechesTestimony/ mersingerstatement062323*.

[182] Shakespeare, William, 1564–1616, *Much Ado about Nothing*, London, New York (Penguin, 2005).

[183] Aesop's Fables, *The Wolf in Sheep's Clothing* (1867).

- Relies heavily on a brief snippet of legislative history consisting of a colloquy between two Senators—cherry-picking parts of the colloquy it likes, while ignoring other parts of the same colloquy;
- Resurrects an "economic purpose test" for evaluating the public interest that was based on a provision of the CEA that was repealed by Congress nearly a quarter-century ago;
- Fails to do the hard work of analyzing the unique nature of event contracts, which are different in kind from traditional derivatives contracts more familiar to the agency;
- Relies on unsupported conjecture, treats similar circumstances differently, and raises more questions than it answers; and
- Flies in the face of the CFTC's mandate to promote responsible innovation as Congress directed in the CEA.

My dissent should not be taken as an indication that I am a fan of all event contracts. But it is hard not to conclude from the multitude of defects in this Proposal that its significant overreach is motivated more by a seemingly visceral antipathy to event contracts than by reasoned analysis.

It does not matter whether we think event contracts are a good idea or a bad idea; the Commission must exercise its authority with respect to event contracts within the scope of the CFTC's legal authority, and must appropriately implement the authority that Congress has provided us. This Proposal fails both tests.

## I. Event Contracts in Brief

CEA Section 5c(c)(5)(C), which was added to the CEA in 2010 by the Dodd-Frank Act,[184] permits the Commission to prohibit an event contract from being listed for trading on an exchange [185] if: (1) the contract involves one of five enumerated activities (*i.e.*, activity that is unlawful under Federal or State law; terrorism; assassination; war; or gaming); and (2) the Commission determines that the contract is contrary to the public interest. CEA Section 5c(c)(5)(C) also provides that the Commission may determine, by rule or regulation, that an event contract involves "other similar activity" to the five enumerated activities, which would subject event contracts involving that similar activity to the "contrary to the public interest" standard.[186]

Congress in CEA Section 5c(c)(5)(C) did not decree that event contracts involving enumerated activities are contrary to the public interest *per se*. Rather, if an event contract involves an enumerated activity, the Commission "may" determine that it is

[184] Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111–203, 124 Stat. 1376 (2010) ("Dodd-Frank Act").

[185] CEA Section 5c(c)(5)(C) applies to event contracts listed for trading by two types of exchanges (designated contract markets ("DCMs") and swap execution facilities ("SEFs")), as well as the clearing of event contracts by derivatives clearing organizations ("DCOs"), all of which must register with, and are regulated by, the CFTC. For convenience, this Statement will refer simply to "exchange listing" of event contracts.

[186] CEA Section 5c(c)(5)(C)(i); 7 U.S.C. 7a–2(c)(5)(C)(i).

contrary to the public interest and prohibited from trading—which necessarily indicates that the Commission also has the discretion to determine that it is not.

A year after enactment of the Dodd-Frank Act, the Commission adopted CFTC Rule 40.11 [187] to implement the CEA's new event contract provisions.[188] It is Rule 40.11 that the Commission is now proposing to amend.

## II. The Proposed Definition of "Gaming" is Significantly Overbroad

Neither the CEA nor the Commission's rules define the term "gaming." In the Rule 40.11 Adopting Release implementing CEA Section 5c(c)(5)(C), the Commission acknowledged that "the term 'gaming' requires further clarification," and said that the Commission may issue a future rulemaking concerning event contracts that involve "gaming." [189]

I agree that, 13 years later, it is long past time for the Commission to do so. But, the Proposal's definition of "gaming" is much too broad.

### 1. The Proposal Sweeps in the Universe of Every "Occurrence or Non-Occurrence in Connection With" a Game

The proposed definition of "gaming" includes both the outcome of a game and the performance of one or more competitors in a game. So far, so good.

But it then tacks on an additional category of "any other occurrence or non-occurrence in connection with" a game. The all-encompassing nature of the phrase "any other occurrence or non-occurrence" is self-evident. And that universality is further reinforced by its attachment to the "in connection with" wording.

The motivation for this expansive wording in the Proposal is likely that, where the phrase "in connection with" appears in various enforcement provisions of the CEA, the Commission interprets it "broadly, not technically or restrictively." [190] And the Proposal gives no indication that it should be interpreted any differently here. In fact, the Proposal (section II.B.1.b) goes so far as to say that staking or risking something of value on a contingent event "in connection with" a game "would be as much of a wager or a bet on the game . . . as staking or risking something of value on the outcome of the game . . . would be."

Under this incredibly far-reaching formulation, there are countless "occurrence[s] or non-occurrence[s] in connection with" a game that the Proposal

[187] CFTC Rule 40.11, 17 CFR 40.11.

[188] *See* Provisions Common to Registered Entities, 76 FR 44776 (July 27, 2011) ("Rule 40.11 Adopting Release").

[189] *Id.* at 44785.

[190] *See* Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 FR 41398, 41405 (July 14, 2011) (citing the U.S. Supreme Court's decision in *SEC* v. *Zandford*, 535 U.S. 813 (2002), interpreting the "in connection with" language in SEC Rule 10b–5, 17 CFR 240.10b–5, as "particularly instructive"; in *Zandford*, the Supreme Court broadly equated the "in connection with" language with the word "coincide" and the phrase "not independent events," *id.* at 820–822).

would deem to be "gaming." Obvious examples include event contracts involving the attendance at a baseball or football game, or whether a particular nation will be selected to host a soccer World Cup. These would clearly be "in connection with" the underlying baseball, football, or soccer games—but there is no reason why staking something of value on those contingent events should be treated the same as staking something of value on the outcome of those games.

Indeed, there is no better illustration of the overbreadth of the "in connection with" aspect of the proposed "gaming" definition than the Proposal's own example (section II.B.1.c) of "whether a particular individual will attend a game." It is difficult to fathom why an event contract involving whether Taylor Swift will attend a Kansas City Chiefs football game should constitute "gaming"—and impossible to understand why the Proposal treats similar things differently, since whether she attends a Beyoncé concert would not constitute "gaming."

I acknowledge that it might be appropriate to extend the definition of "gaming" to include events that can affect the outcome of a game or the performance of a competitor in a game. Event contracts involving, say, whether an injury to Shohei Ohtani would prevent him from playing in the World Series, or involving the score of a football game at halftime, might be examples of this. But to broadly define as "gaming" every "occurrence or non-occurrences in connection with" a game—regardless of whether it has any bearing on the outcome of the game or the performance of a competitor in the game—is wholly unwarranted.

*2. Elections and Awards Are Not "Gaming"*

The Proposal rubber-stamps two prior Commission Orders that found that event contracts involving political control or elections are "gaming,"[191] essentially repeating the same discussion from those Orders—and then throwing awards into its "gaming" definition as well. Yet, this definition is inconsistent with the legislative history of CEA Section 5c(c)(5)(C)—legislative history on which, for other issues discussed below, the Proposal relies heavily.

That legislative history consists of a colloquy between Senators Blanche Lincoln and Dianne Feinstein. Senator Lincoln was then the Chair of the Senate Committee on Agriculture, Nutrition, and Forestry, which is the CFTC's authorizing committee.

In the colloquy, the Senators talked about "gaming" only in the limited context of sporting events. In responding to Senator Feinstein's question about the CFTC's authority under Section 5c(c)(5)(C) to determine that a contract is a "gaming"

contract, Senator Lincoln said that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament."[192] Thus, Senator Lincoln clearly associated "gaming" with sporting events, *i.e.*, games.[193]

But rather than remain true to the legislative history that equated "gaming" with only sporting events, the Proposal broadly sweeps all "contests" into its definition of "gaming." And it then concludes that elections and awards are "contests" and, therefore, "gaming"—even though neither Senator Lincoln nor Senator Feinstein ever mentioned elections or awards (or "contests," for that matter).

The Proposal attempts to squeeze elections and awards into the "gaming" category through the following tortured chain of reasoning:

- Gaming means gambling;
- Some State statutes link gambling to betting or wagering on contests; therefore,
- Contests (including elections and awards) constitute gaming.

Yet, one has to ask: If Congress had intended for elections and awards to be enumerated activities, is it more likely that Section 5c(c)(5)(C) would have:

- Included elections and awards in its list of enumerated activities; or
- Enumerated "gaming" and hoped the Commission would—
  - ○ Define "gaming" to include "contests;" and
  - ○ Consider "contests" to include elections and awards?

Congress easily could have included elections and awards as enumerated activities, but it did not. Confronted with this Congressional silence, I do not believe the Commission can simply decree that elections and awards are enumerated activities. And this is especially the case when Congress in CEA Section 5c(c)(5)(C) provided the Commission with a ready-made process for determining, through a rulemaking proceeding, whether contests, elections, and/or awards are similar to the enumerated activities, including "gaming."

I am baffled at why the Commission is tying itself into knots by trying to reason its way from "gaming" to "gambling" to "contests" to elections and awards, rather than simply do what Congress said it could do: consider whether elections and awards are similar to "gaming" (or another enumerated activity). This is not a matter of form over substance. Approach matters when it comes to exercising our authority under the

CEA, and I cannot support the Proposal's approach to stretch the statutory term "gaming" to include elections and awards.

**III. The Commission Lacks Legal Authority To Determine in Advance That Entire Categories of Event Contracts Are Contrary to the Public Interest**

The overbreadth of the Proposal's "gaming" definition would suffice for me to dissent. But the Proposal's most brazen overreach is its determination, in advance, that every event contract that involves an enumerated activity is automatically contrary to the public interest—regardless of the terms and conditions of that contract.

The Proposal would prohibit these contracts—sight unseen—through the shortcut of declaring entire categories of event contracts to be contrary to the public interest. But the Commission lacks legal authority under the CEA to make public interest determinations by category.

The Proposal's justification for its approach (in section II.C.1) is that "the statute does not require this public interest determination to be made on a contract-specific basis." This is backwards. The CFTC is a creature of statute, and has only the authorities granted to it by the CEA. There is no provision in CEA Section 5c(c)(5)(C) for public interest determinations regarding event contracts involving enumerated activities to be made by category. Accordingly, the Commission cannot claim that authority through the *ipse dixit* of "Congress didn't say we couldn't."

This is not a mere question of what procedure to follow. The Proposal would allow the Commission to make the substantive policy determination that entire categories of event contracts, regardless of their terms and conditions, are contrary to the public interest. And the consequences of such a determination are severe—a complete prohibition on exchanges' ability to list event contracts, and on market participants' ability to trade them. If Congress had intended for the Commission to wield this immense authority, surely it would have said so.

In fact, in another CEA provision similar to CEA Section 5c(c)(5)(C) that also was added by the Dodd-Frank Act, Congress did say so. CEA Section 2(h)(2)(A)(i) specifically states that the Commission shall review "each swap, or any group, *category*, type, or class of swaps to make a determination as to whether the swap or group, *category*, type, or class of swaps should be required to be cleared."[194]

---

[191] *See* Order Prohibiting North American Derivatives Exchange's Political Event Derivatives Contracts (April 2, 2012), available at *https://www.cftc.gov/PressRoom/PressReleases/6224-12*; and Order In the Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives (September 22, 2023), available at *https://www.cftc.gov/PressRoom/PressReleases/8780-23*.

[192] *See* 156 Cong. Rec. S5906–07 (daily ed. July 15, 2010) (statements of Senator Dianne Feinstein and Senator Blanche Lincoln), available at *https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf* ("Feinstein-Lincoln colloquy").

[193] The Senator's view is consistent with the natural interpretation of the word "gaming" as meaning the staking of money on the outcome of a game. For example, Cambridge Dictionary defines "gaming" in terms of games: "The risking of money in games of chance, especially at a casino; gaming machines/tables." *See* "gaming" definition, CAMBRIDGE DICTIONARY, available at *https://dictionary.cambridge.org/us/dictionary/english/gaming*.

[194] CEA Section 2(h)(2)(A)(i), 7 U.S.C. 2(h)(2)(A)(i) (emphasis added). For convenience, the text will refer only to CEA Section 2(h)(2)(A)(i), although the Dodd-Frank Act also used this same wording explicitly authorizing the Commission to make determinations by category in CEA Sections 2(h)(2)(B)(i), (ii), (iii)(II), and (E); 2(h)(3)(A), (B), (C)(i), (C)(ii), and (D); and 2(h)(4)(B), (B)(iii), (C)(i), and (C)(ii), and (C)(ii), 7 U.S.C. 2(h)(2)(B)(i), (ii), (iii)(II), and (E); 2(h)(3)(A), (B), (C)(i), (C)(ii), and (D); and 2(h)(4)(B), (B)(iii), (C)(i), and (C)(ii).

Of particular interest is CEA Section 2(h)(4)(B)(iii), 7 U.S.C. 2(h)(4)(B)(iii), which provides that to the extent the Commission finds that a particular swap or category (or group, type or class) of swaps should be subject to mandatory clearing but no DCO has listed the swap or category

Thus, when it enacted the Dodd-Frank Act, Congress knew how to tell the Commission that it could make a determination on either an individual or categorical basis when it wanted to do so.[195] In contrast, Congress did not say in CEA Section 5c(c)(5)(C) that the Commission could make public interest determinations for event contracts by category.

The Proposal's premise is that a grant of authority to make a determination about one thing necessarily includes authority to make a determination about a category of such things—*unless* Congress says otherwise. But if that were the case, then there was no need for Congress to tell the Commission in CEA Section 2(h)(2)(A)(i) that it could make mandatory swap clearing determinations either by individual swap or by category.[196] The Proposal's determination would render statutory text in CEA Section 2(h)(2)(A)(i) mere surplusage in violation of established canons of statutory construction.[197] It also would violate the canon of statutory construction that provisions enacted as part of the same statute (here, the Dodd-Frank Act) should be construed in a similar manner.[198]

In the absence of any statutory text in CEA Section 5c(c)(5)(C) like that in CEA Section

2(h)(2)(A)(i), I cannot accept that Congress silently authorized the CFTC to make life easier for itself through the shortcut of making impactful determinations that entire categories of event contracts are contrary to the public interest and thus are prohibited from trading on exchanges.

## IV. Even if There Is Legal Authority, the Proposal Fails To Justify Making Advance Public Interest Determinations by Category—for a Host of Reasons

Even if the Commission has legal authority to make public interest determinations for event contracts by category, the Proposal is wholly unpersuasive in its attempt to justify doing so. There are a multitude of failings.

### 1. There is No Basis To Resurrect the Repealed "Economic Purpose Test," Which Shouldn't be Applied to Event Contracts in Any Event

The Proposal would ban entire categories of event contracts as being contrary to the public interest based largely on the proposition that they fail the "economic purpose test." There are four significant problems with this approach.

*Congressional Intent:* First, the Proposal relies on a single, ambiguous, passage in the legislative history to conclude that Congress intended, for purposes of a public interest review of an event contract, to resurrect the "economic purpose test" that the Commission once used to determine whether a futures contract was contrary to the public interest—until Congress repealed that public interest requirement in 2000.[199]

The Proposal's resurrection of the "economic purpose test" is based entirely on this one passage in the colloquy between Senator Dianne Feinstein and Senator Blanche Lincoln:

Mrs. Feinstein: . . . Will the CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to hedging or economic use?

Mrs. Lincoln: That is our intent. The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed event contracts. It would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.[200]

To be clear, the Dodd-Frank Act did not codify the Commission's prior "economic purpose test." And I cannot accept the Proposal's assertion that this isolated colloquy between two Senators establishes an intent by the whole of Congress that the Commission conduct its public interest reviews of event contracts based on an "economic purpose test" that the Commission had withdrawn as a result of the repeal (by the whole of Congress) of the statutory provision it implemented a decade earlier.

After all, neither Senator Feinstein nor Senator Lincoln used the term "economic purpose test" or referred to the Commission's Guideline No. 1 that set out that test. As someone who spent over a decade working in Congress, and who was present on the Senate floor for countless colloquies, and even had a hand in preparing talking points for similar floor discussions, I am confident that if the Senators believed we should resurrect the "economic purpose test," they would have said just that.

*Difference in Kind:* Second, the "economic purpose test" was designed for traditional futures contracts that have been listed and traded on exchanges for decades.[201] These contracts differ in kind from event contracts, which typically are structured as binary (yes/no) options.

The two prongs of the "economic purpose test," which the Proposal adopts as a primary basis for prohibiting entire categories of event contracts as being contrary to the public interest, evaluate: (1) the contract's utility for price basing; and (2) whether the contract can be used for hedging purposes. Yet, the Commission itself has previously recognized the difference between event contracts and the traditional futures contracts for which the "economic purpose test" was developed. In a Concept Release issued in 2008, the Commission stated that "[i]n general, event contracts are neither dependent on, nor do they necessarily relate to, market prices or broad-based measures of economic or commercial activity," and elaborated as follows:

Since 2005, the Commission's staff has received a substantial number of requests for guidance on the propriety of offering and trading financial agreements that may primarily function as information aggregation

---

[195] Similarly, in another CEA provision added by the Dodd-Frank Act, Congress told the Commission that it could exempt swaps or other transactions from position limits either individually or by class. *See* CEA Section 4a(7), 7 U.S.C. 6a(7) ("The Commission . . . may exempt . . . any swap or class of swaps . . . or any transaction or class of transactions from any requirement it may establish . . . with respect to position limits").

[196] Nor can authority to make categorical determinations be found in the CEA's grant of general rulemaking authority in CEA Section 8a(5), 7 U.S.C. 12a(5), which provides that the Commission may adopt such rules as, "in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of" the CEA. Again, if that were the case, then there was no need for Congress to tell the Commission in CEA Section 2(h)(2)(A)(i) that it could make mandatory swap clearing determinations either by individual swap or by category, nor was there any need for Congress to tell the Commission in CEA Section 4a(7) that it could exempt swaps or other transactions from position limits requirements either by individual transaction or by class.

[197] *See, e.g., Dep't of Agric. Rural Dev. Rural Hous. Serv.* v. *Kirtz,* 601 U.S. 42, 53 (2024) (stating proper respect for Congress cautions courts against lightly assuming statutory terms are superfluous or void of significance); *City of Chicago, Illinois* v. *Fulton,* 592 U.S. 154, 159 (2021) (specifying the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme).

[198] *See Turkiye Halk Bankasi A.S.* v. *United States,* 598 U.S. 264, 275 (2023) (The Court has a duty to construe statutes and not isolated provisions, and such construction must occur within the context of the entire statutory scheme.).

[199] Before 2000, CEA Section 5(g) required that futures contracts not be contrary to the public interest. The Commission interpreted this statutory public interest standard to include the "economic purpose test." *See* Request for Comments Respecting Public Interest Test, Guideline on Economic and Public Interest Requirements for Contract Market Designations, 40 FR 25849 (June 19, 1975) ["Guideline No. 1"]. In 2000, Congress repealed Section 5(g) of the CEA and its public interest requirement in the Commodity Futures Modernization Act of 2000, Public Law 106–554, 114 Stat. 2763 (2000) ("CFMA"). As a result, the Commission withdrew Guideline No. 1.

[200] *See* Feinstein-Lincoln colloquy, n.13, *supra.*

[201] The CFTC's Guideline No. 1, including its "economic purpose test," applied to futures contracts. *See* Guideline No. 1, 40 FR at 25850 ("The Commission is inviting comment . . . to assist the Commission in determining whether the *futures contracts* of [certain exchanges] meet the public interest requirements for contract market designation . . . ."), and at 25851 (an exchange "should at this time affirm that *futures transactions* in the commodity for which designation is sought are not, or are not reasonably expected to be, contrary to the public interest") (emphasis added). And the Feinstein-Lincoln colloquy makes clear that CEA Section 5c(c)(5)(C) was drafted with futures contracts in mind. Senator Lincoln cited terrorist attacks, war and hijacking as examples of events that "pose a real commercial risk to many businesses in America," but stated that "*a futures contract* that allowed people to hedge that risk [of terrorist attacks, war, and hijacking] . . . would be contrary to the public interest" (emphasis added). Feinstein-Lincoln Colloquy, n.13, *supra* (emphasis added).

vehicles. These event contracts generally take the form of financial agreements linked to eventualities or measures that neither derive from, nor correlate with, market prices or broad economic or commercial measures.[202]

In other words, the Proposal would ban entire categories of event contracts largely on the basis of price basing and hedging requirements that event contracts (described in the Concept Release as "information aggregation vehicles") likely—because of their very structure—have little chance of satisfying.

This problem is compounded by the fact that under the Proposal, some event contracts that fail to satisfy the "economic purpose test" would be banned, while other contracts failing the test would not. For example, the Proposal's statement (in section II.C.3.c) that "most contracts falling within the proposed definition of 'gaming' would have no underlying cash market with bona fide economic transactions to provide directly correlated price forming information" is equally true of weather-related event contracts—but those contracts would not be banned.

Since the weather is not an enumerated activity, event contracts involving the weather can trade because they are not subject to a public interest review under CEA Section 5c(c)(5)(C). Thus, the Proposal's reliance on the "economic purpose test" means that exchanges can list for trading event contracts (such as those involving weather) that the Commission believes are contrary to the public interest—which I find untenable.

These are the inevitable results of imposing an "economic purpose test" on event contracts that was not designed for event contracts. Certainly, a rulemaking proceeding could be appropriate to fully explore the economic attributes of event contracts, and to consider how to incorporate such attributes into a public interest review that is tailored to the nature of event contracts. But, that is not this Proposal.

*Government paternalism:* Third, the Proposal asserts (in section II.C.3.c) that "the economic impact of an occurrence (or non-occurrence) in connection with a contest of others, or a game of skill or chance . . . generally is too diffuse and unpredictable to correlate to direct and quantifiable changes in the price of commodities or other financial assets or instruments, limiting the hedging

and price-basing utility of an event contract involving such an occurrence."

But to say that there are limits to the hedging utility of an event contract is simply a statement that the contract may not be a particularly good hedging vehicle. Market participants should be permitted to make their own choices about what financial products meet their hedging needs. It is not the CFTC's role to deny them that choice altogether because we feel a given product's hedging value is "limited."

*The "Economic Purpose Test" Was Not Applied to Categories of Contracts:* Fourth, even assuming that the "economic purpose test" is an appropriate part of a public interest analysis for event contracts, it does not support making public interest determinations for event contracts by category—because the Commission applied its "economic purpose test" to the terms and conditions of individual contracts. The Commission's Guideline No. 1 provided that "[i]ndividual contract terms and conditions must be justified" in order for an exchange to demonstrate that it met the "economic purpose test."[203]

The Commission took no shortcuts in applying its subsequently withdrawn "economic purpose test" to futures contracts. It did not group contracts into categories (such as all futures contracts on wheat, corn, gold, or silver) in evaluating the public interest through its "economic purpose test." Rather, the Commission looked at each contract's "individual contract terms and conditions" to make that determination. If the Proposal is going to (incorrectly) adopt that "economic purpose test" in determining whether an event contract is contrary to the public interest, then it should apply that test the same way.

*2. The Proposal's Application of Other Factors Falls Far Short of Justifying Its Prohibition of Entire Categories of Event Contracts*

Aside from the "economic purpose test," the Proposal points to a hodgepodge of other factors to try to justify prohibiting entire categories of event contracts, whose terms and conditions the Commission has never seen, from being traded on exchanges. But its discussion of these factors is conjectural and without evidentiary support, calls into question other contracts that are trading on regulated exchanges, and raises more questions than it answers. Taken as a whole, the Proposal falls far short of justifying the shortcut of prohibiting entire categories of event contracts (even assuming the Commission has the legal authority to do so).

Examples of these defects in the Proposal abound, but I will focus here on just a few:

*Hopelessly Impractical:* The category of activities illegal under State law demonstrates the type of problems inherent in determining that all event contracts in a category are contrary to the public interest. Some activities are illegal in some States, but not others. Yet, the Proposal does not provide any guidance on several obvious questions: Is

an event contract automatically contrary to the public interest if it involves an activity that is illegal in only a single State—and if so, why? Or, if not, then how many States have to declare an activity illegal before the automatic prohibition on event contracts involving that activity is triggered? More than half? States comprising a certain percentage of the country's population?[204]

The problem is exacerbated by the Proposal's suggestion that the prohibition of event contracts can hinge on decisions by judges. Is this reference limited to Supreme Courts of the States? Or would a ruling by a lower court of a State that a particular activity is illegal trigger an automatic determination that an event contract involving that activity is contrary to the public interest? What if that decision is appealed?

While I have focused here on the category of event contracts involving activities illegal under State law, these types of practical questions are a foreseeable and inevitable result of any determination that an entire category of event contracts is contrary to the public interest. I recognize that a contract-specific approach to making public interest determinations regarding event contracts may be difficult and resource-intensive for the CFTC. But aside from my view that a contract-specific approach is required by the CEA, it also is a better approach from a policy perspective precisely because it would permit the CFTC to consider these practical questions in the context of the specific circumstances applicable to a particular event contract. We do not get to override a requirement under the law because it will be hard or require more work for us.

*Absolutism Based on Conjecture:* Another defect in the Proposal is illustrated by the following (in section II.C.3.c): "*Generally speaking,* the Commission believes that something of value is staked or risked upon an occurrence (or non-occurrence) in connection with a contest of others, or a game or [sic] skill or chance, for entertainment purposes—in order wager [sic] on the occurrence. As such, the Commission believes that contracts involving such occurrences are *likely* to be traded predominantly 'to enable gambling' and 'used predominantly by speculators or participants not having a commercial or hedging interest' . . . ." (Emphasis added; footnote omitted).

These assertions are entirely conjectural, as the Proposal does not cite any support for these statements. One can readily envision an event contract involving whether a particular US city will be awarded the summer or winter Olympic games in a given year, which

---

[202] Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 FR 25669, 25669–25670 (May 7, 2008). More specifically, the Concept Release noted that: 1) event contracts based on environmental measures (such as the volatility of precipitation or temperature levels) or environmental events (such as a specific type of storm within an identifiable geographic region) will "not predictably correlate to commodity market prices or other measures of broad economic or commercial activity;" and 2) event contracts based on general measures (such as the number of hours that U.S. residents spend in traffic annually or the vote-share of a particular candidate) "do not quantify the rate, value, or level of any commercial or environmental activity," and that contracts on general events (such as whether a Constitutional amendment will be adopted) "do not reflect the occurrence of any commercial or environmental event." *Id.* at 25671.

[203] Guideline No. 1, 40 FR at 25850 (emphasis added). *See also id.* at 25851 ("The justification of *each contract term or condition* must be supported by appropriate economic data") (emphasis added).

[204] The Proposal justifies its category-based approach regarding activity that is illegal under State law (in section II.C.3.b) on the grounds that it "eliminates the possibility that the Commission would have to serve . . . as arbiter of a state's own public interest determination . . . in recognizing specific activity as causing, or posing, public harm." But unless the activity is illegal in all 50 States, then in determining that an event contract involving an activity illegal in some States is automatically contrary to the public interest, the Commission is inherently "serv[ing] as arbiter" of the determination by all the other States that the activity does not cause, or pose, public harm.

would be used by hotel and restaurant owners, as well as other businesses, that would make money if their city gets the Olympics but not if the Olympics are awarded elsewhere. Such an event contract would not necessarily be used predominantly for entertainment or speculative purposes.

Indeed, the quoted text itself uses wording like "[g]enerally speaking" and "likely," which is an acknowledgement that its conclusions are not universally true. A belief for which no evidence is cited, and that is acknowledged not to be true across-the-board, cannot justify an absolutist determination that all event contracts involving an activity are automatically contrary to the public interest, nor can it justify a prohibition on trading all event contracts in that category.

*Calling into Question Traditional Futures Contracts:* I agree that an event contract involving the outcome of a sporting event, and that allows players or coaches to in trade that contract, would be contrary to the public interest. But consistent with its overreach, the Proposal also concludes that even where the terms and conditions of such a contract prohibit such persons from trading, the contract is nonetheless contrary to the public interest. The Proposal's stated rationale (in section II.C.3.c) is that "the athlete or coach would potentially have a platform—for example, access to media, combined with public perception as an authoritative source of information regarding the team—that could be used to disseminate misinformation that could artificially impact the market in the contract for additional financial gain."

The same can be said of many traditional exchange-traded futures contracts. For example, oil companies (or companies in the agricultural or metals sectors, or other energy companies) also have "access to media, combined with public perception as an authoritative source of information regarding" the oil (or other) industry, "that could be used to disseminate misinformation that could artificially impact the market in the contract for additional financial gain." And yet, exchanges are permitted to list oil futures for trading (in fact, oil companies are permitted to trade them).

The Proposal offers no explanation for why a possible incentive to spread misinformation should render all event contracts involving sporting events (or occurrences or non-occurrences in connection with sporting events) contrary to the public interest when traditional futures contracts with the same incentive are not. A contract-specific public interest analysis, by contrast, could take into account the terms and conditions of a particular event contract—such as whether athletes and coaches can trade, or whether there are guardrails against the spread of misinformation—to determine whether the threat of misinformation in that contract is such that it is contrary to the public interest.

*Fallacies Concerning the CFTC's Regulatory and Enforcement Roles:* The Proposal raises in alarmist tones the red herring that sweeping public interest determinations are necessary so that the CFTC does not get drawn into a regulatory or enforcement role for which it is not well-equipped. For example, the Proposal says (in

section II.C.2) that one factor that may be relevant in evaluating whether event contracts are contrary to the public interest is the extent to which they "would draw the Commission into areas outside of its primary regulatory remit." [205] Other examples are: (1) the statements (in section II.C.3.c) relating to event contracts involving elections that the Commission "is not tasked with the protection of election integrity or enforcement of campaign finance laws;" and (2) the statement (in the first sentence of footnote no. 127) that "the oversight function in this area [regarding elections] is best reserved for other expert bodies."

To be clear: The CFTC does not administer, oversee, or regulate elections, sporting events, gambling, or any other activity or event discussed in the Proposal—and that will not change with respect to any event contract that is found not to be contrary to the public interest. Rather, the CFTC would exercise its exact same authorities under the CEA that it does with respect to all other derivatives contracts.

Nor would the CFTC become some type of "election cop." After all, the CFTC has anti-fraud and anti-manipulation enforcement authority with respect to futures contracts on broad-based security indices, but that does not mean the CFTC regulates the securities markets or that it is tasked with the protection of the integrity of the securities markets or enforcement of securities laws—the Securities and Exchange Commission ("SEC") does all that. The CFTC similarly has enforcement authority with respect to natural gas and electricity since there are futures contracts on those commodities, but that does not mean the CFTC regulates the transmission of natural gas or electricity or that it is tasked with the protection of the integrity of physical natural gas or power markets, or enforcement of the Natural Gas Act or the Federal Power Act—the Federal Energy Regulatory Commission ("FERC") does all that.

The same is true with respect to an event contract that is not contrary to the public interest and thus is permitted to trade on a regulated exchange. As the Supreme Court has stated: "This Court's cases have consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare. Rather, the words take meaning from the purposes of the regulatory legislation." [206] If a particular event contract

involving elections were found not to be contrary to the public interest and thus permitted to trade, the CFTC would have absolutely no authority to administer, oversee, or regulate the elections that are the subject of that contract, or to enforce any campaign finance laws. Its authority would extend only so far as is the case with respect to all commodities underlying derivatives contracts within our jurisdiction, as provided by Congress in the CEA.

*Why This is Important:* I can understand why some might ask: You have been pleading for an event contracts rulemaking for some time now, and here it is—so what is the problem? The problem is this: CFTC Rule 40.11(a)(1) already prohibits the listing and trading of any event contract involving an enumerated activity. As I explained in my Kalshi Dissenting Statement:

Rule 40.11 contradicts the statute. CEA Section 5c(c)(5)(C) grants the Commission discretion to determine *whether* [an exchange's] event contract that involves an enumerated activity is contrary to the public interest. CFTC Rule 40.11(a), by contrast, provides that [an exchange] "*shall not* list for trading" a contract that involves . . . an enumerated activity (emphasis added). Read literally, Rule 40.11(a) removes entirely the flexibility that Congress granted the Commission to evaluate [exchange] event contracts from a public interest perspective. [207]

Rather than fix this problem, though, the Proposal doubles down on it. By making categorical public interest determinations in advance, the Proposal would impermissibly transform the two-step analysis that Congress provided for event contracts into a single step. It would transmogrify the *discretion* that Congress gave the Commission to determine that an event contract involving an enumerated activity is contrary to the public interest into a *mandate* that it do so.

The Proposal actually is quite candid in acknowledging that it would re-write CEA Section 5c(c)(5)(C). It states (in section II.C.1): "If, as proposed, [Rule 40.11] is amended to include a categorical public interest determination with respect to contracts involving each of the Enumerated Activities, the Commission would not, going forward, undertake a contract-specific public interest analysis as part of a review . . . Rather, the focus of any such review would be to evaluate whether the contract involves an Enumerated Activity, in which case, it may not be listed for trading . . ."

If Congress had intended that every event contract involving an enumerated activity is automatically contrary to the public interest and prohibited from trading, it could have provided for such a single-step process in CEA Section 5c(c)(5)(C). But it did not do that, and instead provided that even if an event contract involves an enumerated activity, the Commission cannot prohibit the contract without exercising its discretion in a second step of determining that the contract is contrary to the public interest. The

---

[205] Since the CFTC has a narrow "regulatory remit" restricted to regulating derivatives markets, this factor presumably could support finding that virtually every event contract is contrary to the public interest.

[206] *NAACP* v. *Federal Power Commission,* 425 U.S. 662, 669 (1976). The Court went on to explain: "Congress in its earlier labor legislation unmistakably defined the national interest in free collective bargaining. Yet it could hardly be supposed that, in directing the Federal Power Commission to be guided by the 'public interest,' Congress thereby instructed it to take original jurisdiction over the processing of charges of unfair labor practices on the part of its regulatees." *Id.* at 671. Similarly, it could hardly be supposed that, in directing the CFTC to be guided by the "public interest" in evaluating event contracts, Congress thereby instructed it to take original jurisdiction

over the regulation or enforcement of laws relating to elections, sporting events, gambling, or any other activity or event.

[207] *See* Kalshi Dissenting Statement, n.2, *supra.*

Commission can't short-circuit the process that Congress established by determining that an event contract is contrary to the public interest—in advance and without knowing the contract's terms and conditions—simply because that makes things easier for the agency.

Granted, the Proposal makes categorical public interest determinations only for the activities enumerated in CEA Section 5c(c)(5)(C). I admit that I am not going to lose sleep over a determination that all event contracts involving terrorism, assassination, and war are contrary to the public interest.

But this is where the "wolf in sheep's clothing" arrives. While this Proposal only addresses event contracts involving enumerated activities, it sets the precedent for how the Commission can handle event contracts involving other activities that it determines are similar to enumerated activities, too.

If the Proposal is adopted as final, then at any time in the future, the Commission could determine that other activities are similar to enumerated activities—and could then determine that every event contract involving that activity is automatically contrary to the public interest (and therefore prohibited from trading) regardless of its particular terms and conditions. And given all the deficiencies in this Proposal's categorical public interest determinations discussed above, that appears to be a low bar to clear.

## V. Portions of the Proposal Are Inaccurate or Extremely Weak, or Make No Sense

The fact that certain portions of the Proposal are inaccurate, extremely weak, or simply make no sense suggests that it either was hastily prepared, or is motivated primarily by the sheer hatred that the Commission seems to bear towards event contracts. Here are a few examples:
• The Proposal says (in section II.C.2) that "the public good" is a relevant factor for consideration in an evaluation of whether an event contract is contrary to the public interest. It makes no sense that the Commission should consider "the public good" in evaluating whether a contract is contrary to "the public interest." This is tautological—"the public good" and "the public interest" mean the same thing.
• The Proposal's statement (in section II.C.2) that in the colloquy, Senators Feinstein and Lincoln "discussed the Commission's authority, prior to the enactment of the Commodity Futures Modernization Act of 2000 ('CFMA'), 'to prevent trading that is contrary to the public interest'" is incorrect. Senators Feinstein and Lincoln did not "discuss" the Commission's pre-CFMA authority. Senator Feinstein referenced it in asking a question, but Senator Lincoln (the Committee Chair) did not talk about it—in fact, she did not even mention the CFMA.
• Footnote no. 49 cites the CFTC Reauthorization Act of 2019 as support for the Proposal's view that an erroneous reference to a non-existent CEA Section 1a(2)(i) in CEA Section 5c(c)(5)(C) was intended by Congress to refer to CEA Section 1a(19)(i) instead, since the bill included a provision to replace the reference to Section

1a(2)(i) with a reference to Section 1a(19)(i). But an amendment in a bill introduced in a subsequent Congress (nine years later) sheds no light on what was intended by the Congress that enacted the statutory provision in question—especially when the referenced bill was not enacted and nothing has happened on it during the ensuing five years.

## VI. Certain Implementation Timeline Provisions in the Proposal Are Ill-Advised

As discussed above, I do not support the proposal to determine that all event contracts involving enumerated activities are contrary to the public interest. But if the Commission decides to do so, I oppose applying that determination to contracts that are already listed for trading as of the date of publication of final rule amendments in the **Federal Register**.

It is my hope that there would be few such contracts. But for any contracts that would be impacted, the Proposal is pollyanaish in its rosy view (in section II.F) that "a 60-day implementation period for these contracts will minimize any market disruption that might be caused by the rule amendments." For one thing, given the Proposal's repeated emphasis (in sections II.B.1.c and section II.C.3.c) that its examples of activities that constitute "gaming" under the proposed definition are non-exclusive, I am dubious that exchanges and traders necessarily will know exactly which existing event contracts the Commission believes are now suddenly prohibited.

Beyond that, this aspect of the Proposal is fundamentally unfair. At any time during the 13 years since its adoption of Rule 40.11, the Commission could have concluded that a given event contract involving an enumerated activity is contrary to the public interest. Exchanges and market participants that have listed and traded an event contract in good faith reliance on the fact that the Commission had not determined the contract to be contrary to the public interest should not pay the price (literally) for the Commission's inaction by having to halt trading in a fixed amount of time because the Commission has finally gotten around to it.

This would be the antithesis of "good government." Accordingly, I do not believe that any rule amendments finalized as part of this rulemaking should apply to an event contract that is listed and available for trading as of the date of their publication in the **Federal Register**.

## VII. Conclusion

Rather than undertake a rulemaking process to do the hard work of building a framework for evaluating event contracts pursuant to CEA Section 5c(c)(5)(C), the Commission squandered the 14 years since that provision was enacted as part of the Dodd-Frank Act. While the Commission is now proposing an event contract rulemaking, that hard work still has yet to be done. Instead, the Commission is skipping right over building a proper framework—and simply proposing to prohibit contracts outright.

This result seems preordained, given the hostility that the Commission has displayed toward event contracts since the enactment

of the Dodd-Frank Act. This Proposal rubber-stamps the Commission's two prior Orders finding proposed event contracts to be contrary to the public interest. In addition, it continues the "tradition" of stretching a solitary, cryptic colloquy to form the basis for evaluating whether event contracts are contrary to the public interest through the "economic purpose test" that: (1) is not mentioned in the statute; (2) had previously been withdrawn due to Congress' repeal of the CEA provision it implemented; (3) was not designed for this type of contract; and (4) many event contracts, due to their structure, likely will be unable to meet.

And now the Proposal goes even further, adopting an overly broad definition of "gaming" and declaring entire categories of event contracts to be contrary to the public interest, sight unseen. The Commission's legal authority to make such determinations by category is questionable, at best; that it is inappropriate from a policy perspective cannot reasonably be questioned.

The Proposal flatly contravenes Congress' direction in the CEA that the CFTC "promote responsible innovation."[208] The unmistakable take-away for exchanges is not to expend resources developing an innovative event contract because the Commission will go to great lengths to find that it is contrary to the public interest and prohibit it from trading.[209]

I want to be very clear: My dissent should not be taken as an endorsement of the wisdom of event contracts generally, or of any event contract in particular. Rather, it reflects my application of Congress' direction to the Commission in CEA Section 5c(c)(5)(C). Whatever we may think of event contracts, we cannot re-write the CEA to claim an authority that Congress did not give us because we have been derelict in applying the authority that Congress did give us. Nor should we be prohibiting an event contract without a proper showing that it involves an enumerated activity and is contrary to the public interest based on the application of well-defined factors to the particular terms and conditions of that particular contract.

Because this wolf in sheep's clothing fails on many levels for the foregoing reasons, I respectfully dissent.

## Appendix 4—Statement of Commissioner Caroline D. Pham

I respectfully dissent from the Event Contracts Proposal because it takes the CFTC's regulation of event contract markets backwards with its fundamental misunderstanding of how we regulate derivatives and the States regulate gaming. Instead of thoughtfully considering how to effectively regulate these markets while

---

[208] CEA Section 3(b), 7 U.S.C. 5(b). The Proposal claims (in section I.A, section II, and section II.A.1.b) that it would help to support responsible market innovation. I do not agree that prohibiting broad categories of innovative event contracts supports responsible market innovation.

[209] In this regard, the Proposal even undermines the CFTC's commitment to its own stated Core Value of being "Forward-Thinking" (i.e., challenging ourselves to stay ahead of the curve). CFTC Core Values, Forward-Thinking, available at *https://www.cftc.gov/About/AboutTheCommission.*

fostering innovation, the Event Contracts Proposal ties itself in knots over the bounds of gaming, which Congress has neither asked nor directed the Commission to regulate. I am simply disappointed in this wasted opportunity to regulate retail binary options, sidestepping our responsibility, and concerned about its legal impact.

The United States is built on a foundation of federalism. Federalism reflects the Founders' understanding that a one-size-fits-all approach would not work for this country, and allows for States to govern in ways that best suit their residents.[1] The simple language of the Tenth Amendment to the Constitution ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people") emphasizes that the Federal government is a government of limited and enumerated powers.[2] The Tenth Amendment, importantly, protects the American people from Federal encroachment.

State regulation of gaming, ranging from betting to lotteries, is long-established in the U.S., and is clearly a power reserved to the States.[3] No one understands their local cultures, economies, and values better than the States,[4] which leads to State laws that have been crafted to reflect the needs of their residents. This approach has allowed some States to embrace gaming and leverage it as a source of revenue and tourism, while others take a more conservative approach.[5]

When it comes to event contracts related to gaming, I have been clear that the CFTC should exercise caution, primarily because I believe the Commission fundamentally misunderstands the law in this area and

Congressional intent.[6] That fear has proven well-founded with the Event Contracts Proposal.

The CFTC has a role in regulating event contracts as a market regulator, but it is essential that the CFTC does not encroach upon the prerogatives of States. An appropriate Event Contracts Proposal would have struck a balance between Federal oversight and State autonomy by focusing on the CFTC's core mandate of promoting market stability and protecting market participants from fraud and abusive practices.[7] In doing so, the CFTC could have maintained the integrity of event contracts without undermining the authority of State governments.

Instead, as I will explain below, the Event Contracts Proposal bigfoots into State regulation of gaming by drawing unintelligible lines in the sand that will either at best result in confusion for State gaming authorities, or at worst push event contracts into illegal, unregulated offshore markets.

**The Event Contracts Proposal Ignores the Supreme Court's Preemption Doctrine**

The Constitution's Supremacy Clause provides that "the Laws of the United States . . . shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[8] This language is the basis for the doctrine of Federal preemption, according to which Federal law supersedes conflicting State laws.[9]

The Supreme Court has identified two general ways in which Federal law can preempt State law: expressly, when a Federal statute or regulation contains explicit preemptive language; and impliedly when its structure and purpose implicitly reflect Congress's preemptive intent.[10] But the Federal government cannot preempt traditional State powers that are the exclusive domain of States to regulate,

recognizing the right to self-determination by the people.

The Event Contracts Proposal uniquely ignores the fact that the limits Congress placed on the Commission's regulation of event contracts *save* the Commission from becoming a gaming regulator. In other words, the Commission could have relied on implied preemption to regulate event contracts as derivatives in our markets separate and apart from State gaming regulation. Instead, the Commission *creates* preemption concerns by proposing a gaming definition that incomprehensibly relies so heavily on State law that I don't know how any exchange could understand where the Commission's rules begin and end for these contracts.

Together, under CEA Section 5c(c)(5)(C), Rule 40.11, and the preamble to the final rulemaking for Rule 40.11, whether an event contract is prohibited by Rule 40.11 depends on the underlying activity that the contract is based upon. When the Commission reviewed an exchange's political control contracts, I raised that the underlying activity was political control, which was neither terrorism, assassination, war, gaming, nor unlawful under any Federal or State law.[11] Therefore, Rule 40.11(a)(1) did not apply. Yet in disapproving the contracts, the Commission argued that "*taking a position* in the Congressional Control Contracts" (emphasis added) amounted to gaming.[12]

When taking a position in a derivatives contract is gaming, the Commission starts to look like a gaming regulator. Congress may not compel a State to enact or enforce a regulatory regime,[13] and indeed, Congress has not here. Yet in doubling down on its logic in the Event Contracts Proposal, when the act of entering into a derivatives contract that meets the Proposal's overbroad definition of gaming, drawn from dozens of State laws, is now gaming under the Commission's jurisdiction, we begin encroaching on State gaming oversight. State-regulated sportsbooks, in trying to comprehend where the Commission's gaming derivatives begin and traditional bets end, will be captured in this confusion and question the need to register with the Commission as exchanges. I certainly don't want the Commission to be registering Las Vegas sportsbooks and other betting venues.

**The Commodity Exchange Act Is Clear That the Commission Regulates Event Contracts**

Congress has been clear in its direction for the CFTC.

First, in relevant part, the purpose of the Commodity Exchange Act is to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions; to

[1] *See* Bernard Dobski, Ph.D., America Is a Republic, Not a Democracy, The Heritage Foundation (June 19, 2020) (examining whether current egalitarian efforts threaten, among other things, the diverse interests the Founders sought to protect from factionalism), *https://www.heritage.org/american-founders/report/america-republic-not-democracy*. Interestingly, the Event Contracts Proposal repeatedly claims to be motivated by the increase in volume and "diversity of event contracts listed for trading by Commission-registered exchanges." However, the Proposal admits only one CFTC registered exchange currently offers the types of event contracts covered by the Proposal, out of the six CFTC registered exchanges that are authorized to offer event contracts. I question the motivations of any rulemaking that seeks to quash unique products offered by one exchange because their products are "diverse."

[2] *See* Gary Lawson and Robert Schapiro, Common Interpretation: The Tenth Amendment, National Constitution Center, *https://constitutioncenter.org/the-constitution/amendments/amendment-x/interpretations/129#:~:text=by%20Gary%20Lawson,-Phillip%20S.&text=The%20Tenth%20Amendment%20formally%20changed,Tenth%20Amendment%20is%20unconstitutional%20afterwards*.

[3] *See* Tim Lynch, Gambling Regulation Belongs to the States, Cato Institute (July 23, 1998), *https://www.cato.org/commentary/gambling-regulation-belongs-states*.

[4] *See* America Is a Republic, Not a Democracy.

[5] *See* LexisNexis Legal Insights, States Embracing New Form of Gambling: iGaming (Mar. 3, 2024), *https://www.lexisnexis.com/community/insights/legal/capitol-journal/b/state-net/posts/states-embracing-new-form-of-gambling-igaming*.

[6] Dissenting Statement of Commissioner Caroline D. Pham Regarding the Review and Stay of KalshiEX LLC's Political Event Contracts (Aug. 26, 2022), *https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement082622*.

[7] Commodity Exchange Act (CEA) Section 3(a), 7 U.S.C. 5.

[8] U.S. Const. art. VI, cl. 2.

[9] Congressional Research Service, Federal Preemption: A Legal Primer, 1 (Jul. 23, 2019) (citing *Gade* v. *Nat'l Solid Wastes Mgmt. Assn.*, 505 U.S. 88, 108 (1992)), *https://crsreports.congress.gov/product/pdf/R/R45625/1*.

[10] *See id.* at 2 (citing *Gade*, 505 U.S. 88, 98). The Court has identified two subcategories of implied preemption: "field preemption" and "conflict preemption." Field preemption occurs when a pervasive scheme of federal regulation implicitly precludes supplementary state regulation, or when states attempt to regulate a field where there is clearly a dominant federal interest. *Id.* In contrast, conflict preemption occurs when compliance with both federal and state regulations is a physical impossibility (impossibility preemption), or when state law poses an "obstacle" to the accomplishment of the "full purposes and objectives" of Congress (obstacle preemption). *Id.* at 2 (citing *Fla. Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132, 142–43 (1963) and *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941)).

[11] Dissenting Statement of Commissioner Caroline D. Pham Regarding the Review and Stay of KalshiEX LLC's Political Event Contracts.

[12] *See* CFTC Order, In the Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives (Sept. 22, 2023), *https://www.cftc.gov/PressRoom/PressReleases/8780-23*.

[13] *See New York* v. *United States*, 505 U.S. 144 (1992).

protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants.[14]

Second, the Commission is authorized to review event contracts if the underlying activity that the contract is based upon is terrorism, assassination, war, gaming, or unlawful under any Federal or State law.[15]

Read together, Congress intended that the Commission regulate event contracts within the bounds of the section 5(c) prohibitions. Instead of telling market participants how we will regulate the innovative contracts and exchanges that have appeared in recent years, the Commission has decided to "identif[y] the types of event contracts that may *not* be listed for trading or accepted for clearing" (emphasis added), seemingly primarily to avoid the work. If the number of contract reviews has increased, then the Commission should increase its resources and capacity—not to prohibit public activity.

As referenced above, the Commission then embarks on a survey of state gaming definitions to insert the concept into the Commission's rules. The Commission even notes the approach "reflects the similar approach taken in numerous state gambling statutes," and mentions 35 States. The word "state" appears in the 95 page release 133 times. The Event Contracts Proposal reads as a defense against becoming a gaming regulator while inserting State gaming into our rules, which is not only confusing but unnecessary because Congress has clearly defined our role with respect to the States.

To make matters worse, the Commission then leaps from the overbroad, vague definition of gaming to provide examples of the types of event contracts that the Commission believes fall outside of the scope of CEA section 5c(c)(5)(C) and, by extension, Regulation 40.11. Given the fact that the Event Contracts Proposal repeatedly states

that the broad range and volume of new contracts motivated this rulemaking, I find it stunning that the outer bounds provided are limited to contracts based on: (1) economic indicators, (2) financial indicators, and (3) foreign exchange rates or currencies.

Instead of creating a framework, the Commission is creating a vast gray area for exchanges. Where gaming begins and the scope of Regulation 40.11 ends is anyone's guess now, and I fear State gaming authorities will be left to figure it out on their own.

**Specific Areas for Public Comment**

In addition to my concerns raised above, I highlight the following specific areas for public comment to aid in review of the Proposal:

*Missing Comment Letters*

The Event Contracts Proposal completely omits any discussion of the comment letters the Commission recently received on the definition of gaming, as well as Rule 40.11 and event contracts more broadly. All told, the Commission has received around 200 comments in response to requests for public comment on an exchange's political control contracts.[16] These comments came from exchanges, academics, former CFTC officials, and other industry participants, and were directly on point on the issues raised in today's Proposal.

The Commission cannot selectively decide to tell one side of the story. It strains credulity that the Commission has selective amnesia and makes no mention of these letters in the Event Contracts Proposal.

*Misplaced Election Integrity Concerns*

The Commission gets hung up on the fact that "it is not tasked with the protection of election integrity or enforcement of campaign finance laws" in justifying prohibiting event

contracts based on political contests. However, the Federal Election Commission polices campaigns. Congress has never asked, nor suggested, the CFTC should police elections, much like the Commission has not become the weather police for weather derivatives. I will highlight a couple categories of event contracts that have been permitted since 1992:

The Commission is not the crop yield police and hasn't displaced the role of the USDA. The Commission is not the police for changes to corporate officers or asset purchases and has not displaced the role of the SEC. The Commission is not the police for regional insured property losses, which is the domain of state insurance regulators. The Commission is not the bankruptcy police, which is the domain of the courts. The Commission is not the temperature police, and so on and so forth. I do believe that the 2008 concept release from which I drew these examples was very thoughtful, and I wanted to familiarize myself with the full administrative record.[17]

**Conclusion**

I would like to thank Grey Tanzi, Andrew Stein, Lauren Bennett, Nora Flood, and Vince McGonagle in the Division of Market Oversight for their work on the Proposal.

The contracts causing so much consternation for the Commission have not been, and are not, gaming. If the Commission could accept that and move on, we could have a healthy discussion over how to effectively regulate these markets as we do any other and protect against abusive trading in retail binary options contracts. Instead, we have muddled it and made a mess.

I look forward to the comments.

[FR Doc. 2024–12125 Filed 6–7–24; 8:45 am]

**BILLING CODE 6351–01–P**

---

[14] CEA Section 3(a), 7 U.S.C. 5.

[15] CEA section 5c(c)(5)(C), 7 U.S.C. 7a–2(c)(5)(C)(i)(I)–(VI).

[16] The CFTC maintains the public comment files at: *https://comments.cftc.gov/PublicComments/CommentList.aspx?id=7311*, and *https://comments.cftc.gov/PublicComments/CommentList.aspx?id=7394*.

[17] *See* Request for Public Comment, Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 FR 25,669 (May 7, 2008), *https://www.federalregister.gov/documents/2008/05/07/E8-9981/concept-release-on-the-appropriate-regulatory-treatment-of-event-contracts.*