# Exhibit J

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION


 4


 5   BLUE LAKE RANCHERIA, CHICKEN    )  C-25-06162 JSC
     RANCH RANCHERIA OF ME-WUK       )
 6   INDIANS, AND PICAYUNE RANCHERIA )  SAN FRANCISCO, CALIFORNIA
     OF THE CHUKCHANSI INDIANS,      )
 7                                   )  OCTOBER 23, 2025
                    PLAINTIFFS,      )
 8                                   )  PAGES 1-69
              VS.                    )
 9                                   )
     KALSHI INC., KALSHIEX LLC,      )
10   ROBINHOOD MARKETS, INC.,        )
     ROBINHOOD DERIVATIVES LLC, AND  )
11   DOES 1-20,                      )
                                     )
12                  DEFENDANTS.      )
     _____)
13


14


15            TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY
16            UNITED STATES DISTRICT JUDGE


17


18   A P P E A R A N C E S:

19   FOR THE PLAINTIFFS:   LAW OFFICES OF RAPPORT AND MARSTON
                           BY:  LESTER J. MARSTON
20                         405 WEST PERKINS STREET
                           UKIAH, CALIFORNIA  95482
21

22          APPEARANCES CONTINUED ON THE NEXT PAGE

23   REMOTE REPORTED BY:   LEE-ANNE SHORTRIDGE, CSR, CRR
                           CERTIFICATE NUMBER 9595
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1

 2        APPEARANCES (CONTINUED)

 3

 4        FOR THE KALSHI          MILBANK LLP
          DEFENDANTS:             BY:  GRANT R. MAINLAND
 5                                55 HUDSON YARDS
                                  NEW YORK, NEW YORK  10001
 6
                                  BY:  OLIVIA S. CHOE
 7                                1101 NEW YORK AVENUE, NW
                                  WASHINGTON, D.C.  20005
 8

 9        FOR THE ROBINHOOD       CRAVATH, SWAINE & MOORE LLP
          DEFENDANTS:             BY:  ANTONY L. RYAN
10                                TWO MANHATTAN WEST
                                  375 NINTH AVENUE
11                                NEW YORK, NEW YORK  10001

12                                CONRAD, METLITZKY, KANE LLP
                                  BY:  MARK R. CONRAD
13                                217 LEIDESDORFF STREET
                                  SAN FRANCISCO, CALIFORNIA  94111
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      SAN FRANCISCO, CALIFORNIA              OCTOBER 23, 2025

 2                      P R O C E E D I N G S

 3         (COURT CONVENED AT 10:48 A.M.)

 4             THE CLERK:  CALLING CIVIL ACTION C-25-6162, BLUE LAKE

 5      RANCHERIA ET AL. VERSUS KALSHI, INC., ET AL.

 6             MR. MARSTON:  GOOD MORNING, YOUR HONOR.

 7         LESTER MARSTON ON BEHALF OF THE PLAINTIFFS, BLUE LAKE

 8      RANCHERIA, CHICKEN RANCH RANCHERIA, AND THE PICAYUNE RANCHERIA.

 9             THE COURT:  GOOD MORNING.

10             MR. MARSTON:  GOOD MORNING.  IT'S A BEAUTIFUL DAY.

11             MR. MAINLAND:  GOOD MORNING, YOUR HONOR.

12         GRANT MAINLAND OF MILBANK LLP ON BEHALF OF THE KALSHI

13      DEFENDANTS.

14         YOUR HONOR, I'M GOING TO BE HANDLING THE IGRA PORTION OF

15      OUR ARGUMENT TODAY, AND MY PARTNER, OLIVIA CHOE, WILL BE

16      HANDLING THE LANHAM ACT AND INJUNCTION RELATED MATTER.

17             THE COURT:  ALL RIGHT.  LET'S ACTUALLY START WITH THE

18      LANHAM ACT BECAUSE I THINK IT'S SIMPLER.

19             MS. CHOE:  AND DO THE ROBINHOOD DEFENDANTS WANT TO --

20             THE COURT:  SORRY, GO AHEAD.

21             MR. RYAN:  GOOD MORNING, YOUR HONOR.

22         ANTONY RYAN AND MARK CONRAD ON BEHALF OF ROBINHOOD.

23             THE COURT:  THANK YOU.

24         ALL RIGHT.  MR. MARSTON, WITH RESPECT TO THE LANHAM ACT,

25      YOU CHALLENGE TWO STATEMENTS, RIGHT, ESSENTIALLY.  AND LET'S
```

1    START WITH THE SECOND STATEMENT, WHICH IS YOU SAY NECESSARILY

2    BY IMPLICATION KALSHI IS ENCOURAGING OR TELLING 18 YEAR OLDS TO

3    GAMBLE.  RIGHT?

4         BUT LET'S JUST SAY THEY ARE.  I DON'T KNOW THAT I AGREE

5    WITH THAT NECESSARILY, BUT LET'S JUST SAY THEY ARE.

6         THAT DOESN'T CAUSE THE TRIBES ANY HARM BECAUSE THEY CAN'T

7    GAMBLE.  THEY'RE NOT LOSING ANY BUSINESS.

8              MR. MARSTON:  WELL, THAT'S A DIFFICULT QUESTION.

9              THE COURT:  IT OCCURRED TO ME, THEY CAN SAY 5 YEAR

10   OLDS CAN GAMBLE.  OKAY, BUT YOU DON'T LOSE ANY BUSINESS FROM

11   THAT, RIGHT?

12             MR. MARSTON:  WHAT WE'RE SEEKING TO STOP IS ILLEGAL

13   GAMBLING ON OUR RESERVATIONS.  EVERY SINGLE DAY FAMILIES COME

14   TO OUR DESTINATION RESORTS TO GAME, INCLUDING MINORS.

15        SO THOSE MINORS ARE ON THE RESERVATION.  I MEAN, MY 14

16   YEAR OLD GRANDDAUGHTER HAS A CELL PHONE.  I MEAN, TODAY IT'S

17   COMMON KNOWLEDGE THAT MOST MINORS IN HIGH SCHOOL HAVE CELL

18   PHONES.  THEY ARE ALL ON FACEBOOK AND INSTAGRAM.

19        IF YOU PICK UP A CELL PHONE TODAY AND YOU'RE ON FACEBOOK

20   AND INSTAGRAM, YOU ARE INUNDATED WITH ADS FROM KALSHI REGARDING

21   THEIR ABILITY TO GAME LEGALLY IN ALL 50 STATES.

22        AND IF I'M ON AN APP AND I SEE THAT ADVERTISEMENT, IF I'M

23   ON FACEBOOK AND I SEE THAT ADVERTISEMENT, I COULD BE INDUCED

24   AND CONVINCED TO GET ON THE APP.

25             THE COURT:  HOW IS THAT COMPETITIVE HARM TO THE

```
1    TRIBES, WHICH IS WHAT YOU REQUIRE FOR STATUTORY STANDING UNDER

2    THE LANHAM ACT?  NOT WHETHER YOU CAN START ANOTHER ACTION

3    AGAINST THEM ON BEHALF OF THE MINORS.  THAT'S NOT THIS CASE.

4             MR. MARSTON:  WELL, IT'S -- IT'S DECEPTION IN

5    ADVERTISING.  WE HAVE AN OBLIGATION UNDER THE LAW TO ENSURE THE

6    INTEGRITY AND THE FAIRNESS OF THE PLAYING OF THE GAME.

7             THE COURT:  MR. MARSTON, THIS IS YOUR LANHAM ACT

8    CLAIM, YOUR MOTION FOR PRELIMINARY INJUNCTION.  YOU HAVE TO

9    SHOW A LIKELIHOOD OF SUCCESS.

10        IT'S OKAY -- IT'S ACTUALLY BETTER TO SAY, "OH, OKAY,

11   JUDGE, MAYBE NOT THAT ONE."  RIGHT?

12            MR. MARSTON:  OKAY.  SO DARE I SAY IT, I THINK YOU

13   TRUMPED ME, YOUR HONOR.

14            THE COURT:  OKAY.  ALL RIGHT.

15        SO NOW LET'S TURN TO THE OTHER ONE --

16            MR. MARSTON:  YES.

17            THE COURT:  -- THAT LEGAL IN ALL 50 STATES.

18            MR. MARSTON:  INCLUDING INDIAN RESERVATIONS WITHIN

19   THOSE 50 STATES.

20        THAT ONE --

21            THE COURT:  IT SAYS LEGAL IN ALL 50 STATES, WHICH

22   GENERALLY IS AN OPINION.  WHICH CASE ARE YOU RELYING ON THAT

23   SAYS IT'S NOT LEGAL IN ALL 50 STATES?

24            MR. MARSTON:  WELL, THERE ARE INDIAN RESERVATIONS IN

25   ALL 50 STATES.  SO WHAT THE STATEMENT IS SAYING IS THAT IT'S
```

1    LEGAL TO GAME, TO DO GAMING ON INDIAN RESERVATIONS.

2         THE COURT:  WHICH CASE ARE YOU RELYING ON THAT WOULD

3    SAY THAT'S FACIALLY FALSE?  THEY KNOW THAT -- KALSHI KNOWS

4    THAT'S FALSE BECAUSE X COURT TOLD THEM THAT'S FALSE?

5         MR. MARSTON:  I DON'T RELY ON THE CASE.  I RELY ON

6    THE REGULATION PROMULGATED BY THE NATIONAL INDIAN GAMING

7    COMMISSION, WHICH SPECIFICALLY DEFINES SPORTSBOOK AS CLASS III

8    GAMING, AND UNDER THE IGRA, CLASS III GAMING IS ONLY LEGAL ON

9    AN INDIAN RESERVATION IF STATE LAW PERMITS ANY PERSON,

10   ORGANIZATION, OR ENTITY --

11        THE COURT:  YOU THINK YOU'RE GOING TO HAVE TO SLOW

12   DOWN OR THE COURT REPORTER IS GOING TO HAVE A HEART ATTACK.

13        MR. MARSTON:  SO I DON'T RELY ON A CASE.

14        THE COURT:  OKAY.

15        MR. MARSTON:  I RELY ON THE INDIAN GAMING REGULATORY

16   ACT, THE REGULATIONS PROMULGATED BY THE NATIONAL INDIAN GAMING

17   COMMISSION, THE TRIBES' GAMING ORDINANCES, AND THE TRIBES'

18   GAMING COMMISSION REGULATIONS.

19        THE COURT:  OKAY.

20        MR. MARSTON:  SO IF YOU WANT TO ENGAGE IN GAMING ON

21   AN INDIAN RESERVATION, FIRST OF ALL, AS I SAID, THE STATE MUST

22   PERMIT ANY PERSON, ORGANIZATION, OR ENTITY TO PLAY THE GAME.

23        THE COURT:  OKAY.  I UNDERSTAND THAT.

24     DID YOU WANT TO SAY ANYTHING ABOUT THAT?

25        MS. CHOE:  I MEAN, YOUR HONOR, WE AGREE WITH YOU, IN

```
 1      ADDITION TO THE FACT THAT, YOU KNOW, 18 YEAR OLDS CAN'T

 2      ENGAGE --

 3               THE COURT:  NOT THAT ONE.  THAT ONE HE --

 4               MS. CHOE:  I GOT IT.

 5               THE COURT:  -- CONCEDES.

 6               MS. CHOE:  WE AGREE THAT IT'S AN OPINION.  WE AGREE

 7      THAT THERE'S NO BASIS ON WHICH PLAINTIFFS COULD ALLEGE THAT

 8      KALSHI DIDN'T HAVE THE GENUINELY HELD BELIEF THAT IT WAS LEGAL.

 9         THEY ARE OPERATING UNDER THE REGULATIONS OF THE CFTC AS A

10      NATIONWIDE --

11               THE COURT:  CAN I ASK YOU ALSO, BACK TO STATUTORY

12      STANDING WITH RESPECT TO THE COMPETITIVE HARM, SO YOU RELY ON

13      THE WEST --

14               MR. MARSTON:  WEST FLAGLER IS ONE OF THE CASES.

15               THE COURT:  BUT THAT WAS SORT OF THE OPPOSITE, RIGHT?

16      THAT WAS YOU HAD NON-TRIBE CASINOS, BRICK AND MORTAR CASINOS,

17      WHO WERE CHALLENGING A COMPACT THAT FLORIDA ENTERED INTO WITH

18      THE TRIBES THERE TO ALLOW THE TRIBES IN FLORIDA TO ENGAGE IN

19      INTERNET -- WAS IT SPORTS GAMBLING?

20               MR. MARSTON:  THAT'S CORRECT.

21         THE ISSUE -- THEY WERE ARGUING THAT GIVING THE TRIBES THE

22      EXCLUSIVE RIGHT TO ENGAGE IN SPORTSBOOK GAMING ACTUALLY

23      COMPETED WITH THEIR BRICK AND MORTAR CASINOS AND THAT CAUSED

24      THEM IRREPARABLE HARM.

25               THE COURT:  BECAUSE -- BECAUSE THE PEOPLE IN FLORIDA
```

1    THAT WANT TO GAME WOULD NOT DRIVE AND GO TO THE CASINOS BECAUSE

2    THEY COULD JUST SIT BACK IN THEIR LIVING ROOM AND ENGAGE ON

3    THEIR APP; RIGHT?

4         MR. MARSTON:  AND LET ME GO BACK TO THE MINORS FOR A

5    MOMENT, BECAUSE I HAVE TO BE HONEST WITH YOU, I NEVER THOUGHT

6    OF THAT.  THIS IS THE FIRST -- YOU RAISED -- YOU FOUND

7    SOMETHING THAT I DIDN'T THINK OF, AND I WANT TO COMPLIMENT THE

8    COURT ON THAT.

9         BUT THEIR ADVERTISING IS TARGETING GAMBLERS AND POTENTIAL

10   GAMBLERS, RIGHT?  THOSE MINORS WHO ARE IN HIGH SCHOOL THAT ARE

11   16 AND 17 YEARS OLD THAT ENJOY SPORTS, THAT PARTICIPATE IN

12   SPORTS, THEIR ADS ARE TARGETING THEM AS GAMBLERS, POTENTIAL

13   FUTURE GAMBLERS, AND THEY INFLUENCE THEM AND THEY'RE TRYING TO

14   INFLUENCE THEM SO THAT WHEN THEY DO TURN 18, THEY'LL GAMBLE ON

15   KALSHI'S APP.

16        AND AS WE KNOW, YOUNG TEENAGERS, THEY'RE ON THEIR PHONES

17   ALL THE TIME.

18        THE COURT:  MR. MARSTON, THAT DOESN'T SHOW THAT YOU

19   HAVE A COMPETITIVE INJURY NOW.  YOU WOULD HAVE TO -- AND I

20   DON'T KNOW HOW YOU WOULD EVER SHOW THIS, THAT SOMEHOW THAT'S

21   TAKING BUSINESS AWAY FROM THE TRIBES.

22        MR. MARSTON:  THEY'RE ALWAYS TRYING TO DEVELOP NEW

23   GAMERS FOR THE RESERVATION.

24        THE COURT:  YEAH, THAT --

25        MR. MARSTON:  OKAY.  I'LL LET IT GO.  I'LL CONCEDE

1    THAT.

2              THE COURT:  IT'S NOT CLOSE, I THINK, ON THAT ONE.

3              MR. MARSTON:  OKAY.

4              THE COURT:  BUT ON THE OTHER ONE, HERE'S WHAT I --

5    YOUR COMPLAINT IS THAT THE -- THAT KALSHI IS ALLOWING PEOPLE,

6    WHILE THEY'RE ON TRIBAL LANDS, WHILE THEY'RE IN THE CASINO, TO

7    ACTUALLY ENGAGE IN THE SPORTS BETTING.

8              MR. MARSTON:  THAT IS CORRECT.

9              THE COURT:  AND YOUR CLAIM IS THAT SOMEHOW THAT IS

10   HURTING THE TRIBES FINANCIALLY.

11             MR. MARSTON:  IT'S CAUSING THE TRIBE IRREPARABLE HARM

12   IN A NUMBER OF WAYS, YOUR HONOR.

13             THE COURT:  WELL, LET'S TALK ABOUT STATUTORY

14   STANDING, THE COMPETITIVE HARM.  I'M TALKING ABOUT THE LANHAM

15   ACT CLAIM, WHICH IS THE ALL 50 STATES.

16             MR. MARSTON:  CORRECT.

17             THE COURT:  I DON'T THINK THAT'S FALSE ANYWAY, BUT I

18   WAS INTERESTED IN THE STATUTORY STANDING CLAIM BECAUSE WHAT I

19   DON'T UNDERSTAND IS, ISN'T IT JUST AS PLAUSIBLE THAT BECAUSE --

20   THAT THE -- LIKE, YOU CAN'T DO ANYTHING ABOUT THE INTERNET

21   GAMING THAT'S OUTSIDE THE TRIBAL LANDS; RIGHT?

22             MR. MARSTON:  CORRECT.

23             THE COURT:  AND THAT'S WHAT THE CASE WAS IN WEST --

24   IN FLORIDA.  IT WAS THE CASINOS WERE GOING TO LOSE PATRONS

25   BECAUSE THEY WEREN'T GOING TO COME TO THE CASINO.

1       HERE THIS IS ABOUT PATRONS ARE AT THE CASINO, AND THEY CAN

2   BET ON THE APP.

3       BUT ISN'T THERE AN ARGUMENT THAT ACTUALLY IF THEY COULDN'T

4   COME TO THE TRIBE, THEY WOULD STAY HOME?  THAT'S WHAT THE

5   FLORIDA CASE WAS, BECAUSE -- AND JUST DO ALL THEIR BETTING AT

6   HOME.

7       BUT BECAUSE THEY CAN COME TO THE CASINO AND THEY CAN DO

8   BOTH THERE, MAYBE THERE'S NO INJURY.

9           MR. MARSTON:  WELL, YOU'VE GOT IT.  YOU'VE GOT THE

10  CONCEPT.

11          THE COURT:  RIGHT?

12          MR. MARSTON:  ABSOLUTELY.  AND WE DON'T HAVE TO

13  ACTUALLY SHOW A DIRECT COMPETITIVE INJURY.  IT'S ENOUGH THAT WE

14  FALL WITHIN THE ZONE OF INTEREST, RIGHT, WHICH IS A LITTLE BIT

15  OF A LESSER STANDARD.

16          THE COURT:  YOU HAVE TO SHOW SOMETHING, I GUESS.

17          MR. MARSTON:  WE DO.  WE DO HAVE TO SHOW SOMETHING.

18          THE COURT:  YEAH, BUT ALL YOU SHOW IS THAT PEOPLE USE

19  THE APP IN THE CASINO.  OKAY, FOR SURE.

20          MR. MARSTON:  WELL, IT'S JUST -- YOU KNOW, AND I

21  QUOTE, IN WEST FLAGLER, WHAT THEY SAID -- AND YOU'RE RIGHT,

22  IT'S THE FLIP SIDE OF THE COIN.

23      BUT THEY STILL SAID, AND I QUOTE, IT'S REASONABLE AND NOT

24  SPECULATIVE THAT ALLOWING THE TRIBES TO ENGAGE IN THAT CASE IN

25  SPORTSBOOK GAMING WOULD HAVE A DIRECT, AND I QUOTE, DIRECT

1   BUSINESS -- THAT IT WOULD DIRECTLY TAKE BUSINESS AWAY FROM THE

2   BRICKS AND MORTAR CASINOS.

3            THE COURT:  PEOPLE WOULDN'T GO TO THE CASINOS BECAUSE

4   THEY CAN STAY HOME AND ENGAGE IN INTERNET GAMBLING.

5            MR. MARSTON:  WE'VE BEEN DOING IT FOR DECADES NOW

6   SINCE THE PASSAGE IN 1980 OF THE INDIAN GAMING AND REGULATORY

7   ACT.

8        MARKETING STUDIES, WE DEFINE WHAT OUR MARKET IS SO WE CAN

9   ADVERTISE OURSELVES TO OUR MARKET.

10       IT'S A WELL KNOWN FACT.  THE VAST MAJORITY OF GAMERS, THEY

11   BUDGET A CERTAIN AMOUNT OF MONEY --

12            THE COURT:  AH, OKAY.  THAT ARGUMENT I UNDERSTAND.

13            MR. MARSTON:  AND THEY BUDGET THAT AMOUNT OF MONEY

14   BECAUSE THEY VIEW GAMING AS RECREATION.  THEY'LL TRAVEL -- YOU

15   KNOW, IF YOU'RE IN DOWNTOWN FRESNO, YOU'LL DRIVE THE 30 MINUTES

16   TO GET UP TO THE PICAYUNE RANCHERIA CASINO, YOU'LL GO INTO THE

17   CASINO AND YOU'LL MAYBE BOOK A ROOM IN THE HOTEL AND YOU'LL

18   SPEND THAT WEEKEND SPENDING THAT MONEY.

19       RIGHT NOW, YOU KNOW, IT'S SATURDAY, WHEN I NORMALLY HEAD

20   UP TO PICAYUNE AND I TURN ON THE TV AND THE NEBRASKA CORN

21   HUSKERS -- AND I WAS BORN IN NEBRASKA, MY FAVORITE TEAM IS

22   PLAYING -- AND I'VE GOT A BUDDY WHOSE FAVORITE TEAM IS PLAYING

23   NEBRASKA, IT'S EASY AND CONVENIENT FOR ME JUST TO GET ON MY

24   PHONE, SIT ON THE COUCH IN MY LIVING ROOM, AND I SPEND THAT

25   DISPOSABLE INCOME.

```
1          THE COURT:  WHERE IS YOUR LIVING ROOM?

2          MR. MARSTON:  MY LIVING ROOM, IN MY EXAMPLE THERE, IS

3     IN THE CITY OF FRESNO 30 MILES AWAY FROM THE CASINO.

4          THE COURT:  SO THEN THAT'S NOT SOMETHING THE TRIBES

5     THEN HAVE ANY STANDING TO CONTEST, BECAUSE AS WE STARTED AT THE

6     OUTSET, YOU CAN'T CHALLENGE THE GAMING THAT OCCURS OUTSIDE THE

7     TRIBAL LANDS.

8          MR. MARSTON:  I'M NOT CHALLENGING THE GAMING THAT

9     OCCURS OUTSIDE THE RESERVATION.

10     I'M -- I'M CHALLENGING THE COMPETITION THAT IS PARADED BY

11     THAT GAMING THAT TAKES GAMING REVENUE THAT NORMALLY WOULD BE

12     SPENT IN MY CASINO IS NOT BEING SPENT IN MY CASINO BECAUSE THEY

13     CAN GAME, ILLEGALLY GAME OFF OF THE RESERVATION.

14          THE COURT:  OFF THE RESERVATION?

15          MR. MARSTON:  OFF THE RESERVATION.

16          THE COURT:  I DON'T KNOW HOW YOU HAVE STANDING TO

17     CHALLENGE OFF THE RESERVATION.

18          MR. MARSTON:  WELL --

19          THE COURT:  DOESN'T -- FOR YOUR LANHAM ACT CLAIM,

20     DOESN'T IT HAVE TO BE -- OH, YOU'RE SAYING, I SEE, THE --

21          MR. MARSTON:  IT'S DECEIVING THE PUBLIC, AND AS A

22     RESULT OF THE DECEPTION, THEY'RE NOT COMING TO THE RESERVATION.

23     THEY'RE SPENDING THE MONEY OFF OF THE RESERVATION --

24          THE COURT:  BECAUSE THE --

25          MR. MARSTON:  -- MONEY THAT THEY WOULD NORMALLY SPEND
```

```
 1        ON THE RESERVATION.
 2               THE COURT:  BECAUSE THEY THINK IT'S LEGAL IN ALL 50
 3        STATES?
 4               MR. MARSTON:  BECAUSE THEY THINK IT'S LEGAL.
 5               THE COURT:  BUT IT'S ACTUALLY ILLEGAL IN CALIFORNIA?
 6               MR. MARSTON:  IN MY OPINION, IT'S ILLEGAL BOTH
 7        UNDER THE --
 8               THE COURT:  WHY DOES YOUR OPINION MATTER, AS OPPOSED
 9        TO THE STATE OF CALIFORNIA'S OPINION?
10               MR. MARSTON:  I'M SORRY, YOUR HONOR?
11               THE COURT:  WHY DOES YOUR OPINION MATTER, AS OPPOSED
12        TO THE STATE OF CALIFORNIA'S OPINION?
13               MR. MARSTON:  MY OPINION DOESN'T MATTER.
14           CONGRESS'S OPINION IS WHAT MATTERS AS EMBODIED IN THE
15        INDIAN GAMBLING REGULATORY ACT WHERE THEY SAID, FIRST OF ALL,
16        INDIAN TRIBES --
17               THE COURT:  I UNDERSTAND THAT.
18           DO YOU HAVE ANYTHING ELSE ON THE STATUTORY STANDING WITH
19        RESPECT TO THE ALL 50 STATES?
20               MS. CHOE:  YEAH.  YES.  YES, YOUR HONOR.
21           COUNSEL, I THINK, SAID SOMETHING ALONG THE LINES OF HE
22        DOESN'T NEED TO SHOW COMPETITIVE INJURY, HE JUST NEEDS TO FALL
23        WITHIN THE ZONE OF INTEREST.
24           BUT UNDER LEXMARK, THAT MEANS SHOWING INJURY, WHICH
25        PLAINTIFFS HAVE COME NOWHERE CLOSE TO DOING.
```

```
1            THE CASINO PATRON EXAMPLE YOU MENTIONED I THINK SHOWS THAT
2    BUSINESS, IF ANYTHING, IS NOT BEING DRAWN AWAY BY PEOPLE USING
3    THE APP.  IF ANYTHING, THEY ARE STILL PATRONIZING THE CASINO,
4    KEEPING THEIR BUSINESS THERE WHILE POSSIBLY ALSO USING THE
5    KALSHI APP.
6            THE COURT:  BUT I THINK I WAS CONFLATING THE TWO
7    CLAIMS.  THE LANHAM ACT CLAIM -- I THINK HE'S RIGHT -- IS THAT
8    IF THE FALSE STATEMENT DRAWS PEOPLE TO THE APP AND USES THEIR
9    LIMITED GAMBLING MONEY, THAT LEAVES LESS MONEY TO GAMBLE AT THE
10   CASINO AND THERE WOULD BE COMPETITIVE HARM.
11        I DON'T KNOW THAT THAT'S THERE, BUT THAT CERTAINLY MAKES
12   SENSE.
13            MS. CHOE:  THE ISSUE I THINK, YOUR HONOR, IS THAT ON
14   A PRELIMINARY INJUNCTION MOTION WHERE THERE NEEDS TO BE A CLEAR
15   SHOWING MADE FOR WHAT PLAINTIFFS CONCEDE IS EXTRAORDINARY
16   RELIEF, THERE IS REALLY NOTHING BEFORE THIS COURT SHOWING THAT
17   BUSINESS IS BEING DRAWN AWAY, THAT THERE'S A LIMITED POOL OF
18   DOLLARS THAT ARE BEING SPENT ON ANY OF THIS ACTIVITY, THAT
19   KALSHI WITH ITS CUSTOMERS WHO USE AN APP ARE THE SAME AS THE
20   CUSTOMERS WHO PATRONIZE PLAINTIFFS' CASINOS.
21        SO I THINK, YOUR HONOR, YOU'RE EXACTLY RIGHT.  THEY'VE
22   MADE NO SHOWING OF THE COMMERCIAL INJURY OR THE PROXIMATE
23   CAUSE, IF THEY COULD EVEN SHOW AN INJURY, THAT THEY WOULD NEED
24   TO TO ESTABLISH STANDING IN THE FIRST PLACE.
25            AND AS YOUR HONOR NOTED AT THE OUTSET, THESE ARE
```

```
1    STATEMENTS OF OPINION.  THEY'RE NOT ACTIONABLE UNDER THE LANHAM

2    ACT.

3              THE COURT:  OKAY.

4              MR. MARSTON:  YOUR HONOR, CAN I JUST QUICKLY RESPOND?

5              THE COURT:  YES.

6              MR. MARSTON:  WITH ALL DUE RESPECT, SHE'S JUST WRONG,

7    RIGHT?

8              THE COURT:  ABOUT WHAT?

9              MR. MARSTON:  ABOUT A NUMBER OF THINGS.

10       FIRST OF ALL, ON A MOTION FOR PRELIMINARY INJUNCTION, IN

11   ORDER TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS, THE

12   COURTS HAVE MADE IT VERY CLEAR THAT THE STANDARD IS A FAIR

13   CHANCE OF SUCCESS, OR WE'VE RAISED A SERIOUS QUESTION REGARDING

14   THE LAW.

15       SO IT -- THAT'S THE STANDARD.

16       WE HAVE DONE THAT.  WE SUBMITTED THE DECLARATION OF

17   JASON RAMOS, WHO -- AND CHAIRMAN RAMOS HAPPENS TO BE IN THE

18   COURTROOM, YOUR HONOR.

19              THE COURT:  WELCOME.

20              MR. MARSTON:  CHAIRMAN RAMOS, UNDER PENALTY OF

21   PERJURY, HAS SPECIFICALLY STATED THAT GAMERS ARE NOT COMING TO

22   THE -- TO HIS BRICK AND MORTAR CASINO BECAUSE THEY'RE GAMING ON

23   THE APP.

24       NOW, OPPOSING COUNSEL HAS SAID, WELL, THAT'S HEARSAY.  BUT

25   YOU CAN -- YOU'RE ALLOWED, ON A MOTION FOR PRELIMINARY
```

1    INJUNCTION, TO CONSIDER HEARSAY.  IT GOES TO THE WEIGHT.

2           THE COURT:  WELL, IF IT WOULD BE ADMISSIBLE AT TRIAL,

3    IF IT COULD BE PRESENTED IN AN ADMISSIBLE FORM AT TRIAL.

4           MR. MARSTON:  NO, I THINK THE STANDARD IS THAT YOU

5    CAN CONSIDER HEARSAY.  YOU JUST -- IT'S -- IT GOES TO THE --

6    IT'S IN YOUR SOUND DISCRETION, GIVEN THE REASONABLENESS OF THE

7    STATEMENTS, HOW MUCH WEIGHT YOU'RE GOING TO GIVE TO THE

8    STATEMENTS.

9           CHAIRMAN RAMOS HAS, YOU KNOW, HE WAS A GAMING -- THE

10   CHAIRMAN OF THE GAMING COMMISSION FOR 30 YEARS.  HE LIVES RIGHT

11   NEXT TO THE CASINO.  HE'S IN THE CASINO EVERY SINGLE DAY.  HE'S

12   BEEN INVOLVED IN NUMEROUS MARKET STUDIES FOR HIS CASINO.  HE

13   INTERACTS WITH HIS PATRONS EVERY SINGLE DAY.  HE'S TALKS TO

14   THEM ABOUT THE KALSHI APP.

15       HE KNOWS HIS GAMERS BETTER THAN ANYBODY ELSE.  I COULD

16   CALL HIM AND PUT HIM ON THE WITNESS STAND RIGHT NOW AND HE CAN

17   TELL YOU THAT IT'S A FACT THAT HIS GAMERS AREN'T COMING TO THE

18   CASINO BECAUSE OF THE KALSHI APP.

19           THE COURT:  ALL RIGHT.  LET'S MOVE ON TO THE IGRA.

20   IS THAT --

21           MR. MARSTON:  SOME PEOPLE ARE IG-RA, I'M AN I-GRA

22   PERSON.

23           THE COURT:  ALL RIGHT.  WE'LL USE IGRA.

24           MR. MARSTON:  THANK YOU, YOUR HONOR.

25           THE COURT:  OKAY.  SO, FIRST, CAN YOU JUST DEFINE ME

1    THE CLASS, OR JUST DESCRIBE THE CLAIM.  IT'S THAT KALSHI IS

2    VIOLATING -- IN VIOLATION OF IGRA BECAUSE WHAT?

3            MR. MARSTON:  BECAUSE, FIRST OF ALL, CONGRESS HAS SO

4    TOTALLY TAKEN THE REGULATION OF GAMING ON INDIAN RESERVATIONS

5    IN HAND, THEY HAVE LEFT NO ROOM FOR ANY OTHER REGULATION.

6        CONGRESS HAS ESTABLISHED THE NATIONAL INDIAN GAMING

7    COMMISSION, A FEDERAL AGENCY, THAT, ALONG WITH THE TRIBES,

8    THROUGH TO THE PROMULGATION OF FEDERAL REGULATIONS,

9    COMPREHENSIVELY REGULATES CLASS II GAMING AND ESTABLISHES ALSO

10   MINIMUM INTERNAL CONTROL STANDARDS FOR THE PLAYING OF THE

11   GAMES.

12       CONGRESS HAS GIVEN AUTHORITY TO THE SECRETARY OF THE

13   INTERIOR TO PROMULGATE PROCEDURES IN THOSE SITUATIONS WHERE A

14   TRIBE HAS GONE INTO FEDERAL COURT AND PROVEN THAT THE STATE HAS

15   ENGAGED IN BAD FAITH NEGOTIATIONS, WON'T ACCEPT THE MEDIATOR'S

16   CHOSEN COMPACT, AND OFFERED IT TO THE STATE TO FORM A COMPACT,

17   THE TRIBES GO TO THE SECRETARY OF THE INTERIOR TO PROMULGATE

18   PROCEDURES.

19       THE SECRETARY OF THE INTERIOR IS ALSO GIVEN THE AUTHORITY

20   TO APPROVE WHAT ARE CALLED REVENUE ALLOCATION PLANS.  TRIBES

21   DON'T GET TO SPEND THEIR GAMING REVENUE ON WHATEVER THEY WANT.

22   CONGRESS SPECIFICALLY SPECIFIES THE FIVE AREAS WHERE THEY CAN

23   SPEND THEIR REVENUE.

24       AND THE TWO PRIMARY AREAS WHERE THEY HAVE TO SPEND THEIR

25   REVENUE, AND WHERE THE TRIBES DO SPEND THEIR REVENUE, IS TO

1    FUND ESSENTIAL GOVERNMENTAL PROGRAMS ON THE RESERVATIONS.

2         TRIBAL GOVERNMENTS AREN'T GOVERNMENTS UNLESS THEY HAVE THE

3    REVENUE TO PAY, TO PAY JUDGES IN THEIR TRIBAL COURTS, OR TO

4    PAVE THEIR ROADS, OR TO OFFER THEIR SENIORS MEALS, RIGHT?

5         THE COURT:  WE COULD USE HELP PAYING THE FEDERAL

6    JUDGE SYSTEM RIGHT NOW.

7         MR. MARSTON:  THE POINT I'M TRYING TO MAKE IS WE'RE

8    NOT LIKE KALSHI.  WE'RE NOT A PRIVATE BUSINESS THAT'S IN THE

9    BUSINESS JUST TO RAISE A BUNCH OF MONEY TO PUT IT IN THE

10   POCKETS OF OUR STOCKHOLDERS, RIGHT?

11        EVERY DOLLAR OF OUR MONEY GOES TO FUND THE GOVERNMENT.

12   THAT'S WHAT IT DOES.  THIS IS TRIBAL GOVERNMENTAL GAMING.

13        CONGRESS AND THE IGRA HAS SPECIFICALLY AUTHORIZED TRIBES

14   TO ENACT ORDINANCES TO REGULATE GAMING.

15        SO WHEN THE TRIBES ARE, AS THEY ARE HERE TODAY, SEEKING TO

16   REENFORCE THEIR TRIBAL GAMING ORDINANCE, THEY'RE EXERCISING THE

17   POWER OF CONGRESS.  THEY'RE EXERCISING CONGRESSIONALLY

18   DELEGATED AUTHORITY.

19        THE COURT:  OKAY.  SO POINT TO ME -- I'M GOING TO GO

20   BACK TO IGRA.  I UNDERSTAND THE HISTORY AND ALL THAT.

21        THE CAUSE OF ACTION IS THAT KALSHI IS VIOLATING WHAT?

22   WHAT --

23        MR. MARSTON:  THE IGRA PROHIBITS ALL FORMS OF GAMING

24   ON AN INDIAN RESERVATION.

25        THE COURT:  THAT THE IGRA PROHIBITS, OKAY.  WHAT

```
 1        PROVISION ARE YOU LOOKING AT WHEN YOU SAY THAT?

 2              MR. MARSTON:  THE -- I -- I KNOW THE SECTION.  I'M

 3        FORGETTING THE SECTION NUMBER, YOUR HONOR.  IT'S 25 U.S.C.,

 4        SECTION, I THINK IT'S -- I THINK IT'S 2710.

 5              THE COURT:  2710 IS THE TRIBAL GAMING ORDINANCES,

 6        YES.

 7              MR. MARSTON:  WHAT THE IGRA SAYS IS THE ONLY ENTITY

 8        THAT CAN ENGAGE IN GAMING ON AN INDIAN RESERVATION IS AN INDIAN

 9        TRIBE.

10              THE COURT:  OKAY.  WHERE DOES IT SAY THAT?

11              MR. MARSTON:  I HAD THE IGRA IN FRONT OF ME.

12           OFF THE TOP OF MY HEAD, I CAN'T REMEMBER THIS -- I SHOULD

13        KNOW.  I'VE BEEN DEALING WITH IGRA CASES ALL MY LIFE JUST

14        ABOUT.

15           I'M GOING TO REQUEST MY CO-COUNSEL --

16              THE COURT:  ABSOLUTELY.

17              MR. MARSTON:  -- TO COME UP AND HE'LL GIVE IT TO ME.

18              THE COURT:  HE CAN ALSO SPEAK, TOO.  MORE THAN ONE

19        PERSON CAN SPEAK.

20              MR. MARSTON:  THE STATUTORY CITE SAYS -- OKAY, THERE

21        IT IS.

22           SO IT'S 2710, YOUR HONOR, SUBSECTION (D)(1).

23              THE COURT:  (D)(1).

24              MR. MARSTON:  YES.  CLASS III GAMING ACTIVITIES SHALL

25        BE LAWFUL ON INDIAN LANDS ONLY IF SUCH ACTIVITIES ARE:
```

1    AUTHORIZED BY AN ORDINANCE OR RESOLUTION THAT IS ADOPTED BY THE

2    GOVERNING BODY OF AN INDIAN TRIBE; MEETS THE REQUIREMENTS OF

3    SUBSECTION (B); AND IS APPROVED BY THE CHAIRMAN.

4         SO, FIRST OF ALL, THERE HAS TO BE A TRIBAL ORDINANCE.  IT

5    HAS TO BE LOCATED IN A STATE THAT PERMITS ANY PERSON,

6    ORGANIZATION, OR ENTITY TO PLAY GAME, RIGHT?

7         AND, OF COURSE, HERE IN THE STATE OF CALIFORNIA,

8    SPORTSBOOK GAMING IS ABSOLUTELY PROHIBITED BY PENAL CODE

9    SECTION 337.

10              THE COURT:  WHY AREN'T YOU THEN ASKING THE ATTORNEY

11   GENERAL?

12              MR. MARSTON:  I HAVE.

13              THE COURT:  WELL, MAYBE THAT'S THE SOLUTION, THOUGH,

14   RIGHT?

15              MR. MARSTON:  NO.

16              THE COURT:  BECAUSE MY UNDERSTANDING, WHAT IT IS IS

17   THE JOHNSON ACT, RIGHT?

18              MR. MARSTON:  1160, YES.

19              THE COURT:  YES, IT SAID CLASS III GAMING IS

20   ILLEGAL --

21              MR. MARSTON:  UNLESS IT'S DONE PURSUANT TO A COMPACT.

22              THE COURT:  WELL, IT'S ILLEGAL EVERYWHERE IF IT'S

23   ILLEGAL IN THE STATE --

24              MR. MARSTON:  UNDER STATE LAW.

25              THE COURT:  RIGHT?

```
 1                MR. MARSTON:  CORRECT.

 2                THE COURT:  EVERYWHERE UNDER STATE LAW.

 3           AND THEN IN 1988, CONGRESS SAID, WE'RE GOING TO MAKE IT

 4      LEGAL, UNDER CERTAIN CIRCUMSTANCES, ON INDIAN TRIBES FOR ALL

 5      THOSE VERY GOOD REASONS THAT YOU SAID.

 6                MR. MARSTON:  CORRECT.

 7                THE COURT:  RIGHT?

 8           SO WHAT WE START WITH, IT'S ILLEGAL SOMEWHERE ELSE.  IT'S

 9      ILLEGAL SOMEWHERE ELSE.  IT'S NOT THAT THE TRIBES MADE IT

10      ILLEGAL.  IT'S THAT THE STATE MADE IT ILLEGAL, AND THEN YOU GET

11      THE COMPACT, OR WITH RESPECT TO TWO OF --

12                MR. MARSTON:  NO, THE TRIBES HAVE MADE IT ILLEGAL AS

13      WELL.

14                THE COURT:  WHERE?

15                MR. MARSTON:  IN THEIR GAMING ORDINANCE, IN THEIR

16      GAMING REGULATIONS, AND IN THEIR MINIMUM INTERNAL CONTROL

17      STANDARDS.

18           WE DO NOT, UNDER TRIBAL LAW, EXERCISING OUR CONGRESSIONAL

19      DELEGATED AUTHORITY AND OUR INHERENT SOVEREIGN AUTHORITY TO

20      GOVERN OURSELVES ON OUR RESERVATIONS, WE HAVE MADE SPORTSBOOK

21      GAMING ILLEGAL.

22           IN ADDITION TO THAT, CONGRESS, UNDER IGRA, HAS MADE IT

23      ILLEGAL BECAUSE THE TRIBES CAN ENGAGE IN GAMING ON INDIAN LANDS

24      AND THE TRIBES, UNDER THE IGRA, CAN ONLY PLAY THOSE GAMES THAT

25      THE STATE PERMITS ANY PERSON, ORGANIZATION, OR ENTITY TO PLAY,
```

1    AND STATE LAW STRICTLY PROHIBITS IT; THEREFORE, AS A MATTER

2    UNDER FEDERAL LAW, IT'S PROHIBITED ON THE RESERVATION.

3         THE COURT:  SO THE IGRA GIVES THE COURTS JURISDICTION

4    TO HEAR CLAIMS BY THE TRIBES THAT ARE BROUGHT TO ENJOIN A

5    VIOLATION OF THE COMPACT, AND I UNDERSTAND THE ARGUMENT ABOUT

6    SECRETARIAL PROCEDURES ARE TANTAMOUNT TO COMPACTS UNDER THE

7    NINTH CIRCUIT LAW.

8         BUT NOT, NOT THEY -- IT DOESN'T GIVE JURISDICTION TO

9    ENJOIN FOR A VIOLATION OF IGRA.  IT'S FOR A VIOLATION OF THE

10   COMPACT, RIGHT?

11        MR. MARSTON:  WELL, JURISDICTION UNDER 1331 AND

12   JURISDICTION UNDER 1362.  YOU MAY HAVE JURISDICTION UNDER

13   25 U.S.C., SECTION 27(D)(1), THE SECTION YOU'RE RELYING ON.

14        THE UNITED STATES SUPREME COURT, IN NATIONAL FARMERS

15   INSURANCE COMPANY, SPECIFICALLY HELD THAT WHEN AN INDIAN TRIBE

16   SEEKS TO ENFORCE ITS LAWS OVER NON-INDIANS OR A NON-INDIAN

17   BUSINESS ENTITY, THAT IS A FEDERAL QUESTION UNDER 1331.

18        THE COURT:  OKAY.  BUT THIS IS THE CAUSE OF ACTION

19   THAT YOU'VE MOVED ON PRELIMINARY INJUNCTION, BECAUSE YOU HAVE

20   OTHER CLAIMS IN YOUR COMPLAINT, IS UNDER IGRA.

21        MR. MARSTON:  THE COMPLAINT UNDER IGRA, CONGRESS HAS

22   SPECIFICALLY DONE TWO THINGS UNDER 2710(D)(1).

23        ONE, IT SAYS THE DISTRICT COURTS SHALL HAVE JURISDICTION.

24   SO THEY'VE GIVEN YOU JURISDICTION.

25        NUMBER TWO, THEY'VE CREATED THE CAUSE OF ACTION.  THEY'VE

1   SAID SPECIFICALLY, EXPRESS AND EXPLICIT LANGUAGE, YOU HAVE

2   JURISDICTION OVER A CAUSE OF ACTION BROUGHT BY AN INDIAN

3   TRIBE -- WHICH PLAINTIFFS ARE ALL FEDERALLY RECOGNIZED INDIAN

4   TRIBES -- TO ENJOIN A CLASS III GAMING ACTIVITY -- AND THE

5   NATIONAL INDIAN GAMING COMMISSION, BY FEDERAL REGULATION, HAS

6   DEFINED SPORTSBOOK AS A CLASS III GAME -- TO ENJOIN A CLASS III

7   GAMING ACTIVITY THAT'S CONDUCTED IN VIOLATION OF A COMPACT.

8        OUR COMPACT AND OUR SECRETARIAL PROCEDURES, WHICH AS YOU

9   HAVE STATED IN STAND UP FOR CALIFORNIA IS THE FUNCTIONAL

10  EQUIVALENT OF A COMPACT, ONLY AUTHORIZES THE PLAYING OF SLOT

11  MACHINES, HOUSE-BANKED AND PERCENTAGE CARD GAMES, LOTTERIES,

12  AND THAT'S IT.  IT DOESN'T AUTHORIZE SPORTSBOOK.

13       AND THEREFORE, UNDER THE IGRA, BECAUSE THE STATE DOES NOT

14  PERMIT SPORTSBOOK AND THE TRIBE HASN'T BEEN AUTHORIZED UNDER

15  THEIR COMPACT TO PLAY SPORTSBOOK, SPORTSBOOK IS PROHIBITED AND

16  IT VIOLATES THE IGRA, THE COMPACT, THE GAMING ORDINANCE, THE

17  GAMING REGULATIONS.

18       THE COURT:  WELL, IT VIOLATES CALIFORNIA LAW.  I

19  UNDERSTAND THAT.

20       MR. MARSTON:  IT DOES THAT, TOO.

21       THE COURT:  AND IT DOESN'T FALL WITHIN THE

22  AUTHORIZATION THAT IGRA GAVE IT.  YOU SEE, THE --

23       MR. MARSTON:  IT'S PROHIBITED.  NOBODY CAN PLAY.

24       THE COURT:  YOU SAY -- WHAT YOU'RE SAYING IS IT'S

25  PROHIBITED BY STATE LAW.  IN THE FIRST INSTANCE, IT'S

```
1    PROHIBITED BY STATE LAW.

2              MR. MARSTON:  WELL, IF YOU -- DO YOU BELIEVE THERE'S

3    AN AMBIGUITY IN THE IGRA?

4              THE COURT:  IF THERE WAS AN AMBIGUITY, I WOULD HAVE

5    TO RESOLVE IT IN FAVOR OF THE TRIBES.  I UNDERSTAND THAT.

6              MR. MARSTON:  NINTH CIRCUIT COURT OF APPEAL ORDER

7    SAID NOT BECAUSE IT'S THE BEST INTERPRETATION, BECAUSE IT'S THE

8    INDIANS' INTERPRETATION.

9         AND WE INTERPRET THE IGRA -- AND I THINK THE LANGUAGE IS

10   CLEAR AND UNAMBIGUOUS -- BUT IF THERE'S ANY AMBIGUITIES, WE

11   INTERPRET IT AS ONLY THOSE GAMES, CLASS III GAMES, THAT ARE

12   AUTHORIZED UNDER OUR COMPACT ARE AUTHORIZED.

13        EVERYTHING ELSE IS PROHIBITED.  UNDER THE IGRA, THE TRIBES

14   CAN PLAY THE GAME.  KALSHI'S PLAYING THE GAME, THEY'RE OFFERING

15   IT ON OUR RESERVATION, AND ALLOWING ANY PERSON WHO HAS A CELL

16   PHONE -- AND RIGHT NOW, YOUR HONOR, YOU CAN GO RIGHT UP THE

17   101, GET ON THE BLUE LAKE RANCHERIA, GO IN THEIR CASINO -- I

18   WELCOME YOU TO DO IT.

19             THE COURT:  I DON'T GAMBLE.

20             MR. MARSTON:  TAKE OUT YOUR -- NEITHER DO I, YOUR

21   HONOR.

22        -- TAKE OUT YOUR CELL PHONE AND GET ON KALSHI'S APP AND

23   BET ON WHETHER THE 49ERS ARE GOING TO BEAT HOUSTON IN THE --

24             THE COURT:  I DON'T KNOW THAT I'D BET ON THE NINERS

25   THESE DAYS.  BUT ANYWAY.
```

1          MR. MARSTON:  WELL, YOU AND ME BOTH, RIGHT, EVER

2     SINCE Y.A. TITTLE WAS THROWING PASSES TO R.C. OWENS.

3          BUT I'D LIKE TO MAKE THIS ONE POINT.  I WANT TO GO BACK TO

4     THE FACT THAT CONGRESS HAS EXCLUSIVE JURISDICTION OVER INDIAN

5     AFFAIRS.  THE UNITED STATES SUPREME COURT HAS DESCRIBED THEIR

6     AUTHORITY AS PLENARY.  IT'S PLENARY.  IT'S EXCLUSIVE.

7          AND CONGRESS, IN THE EXERCISE OF THAT PLENARY AUTHORITY,

8     HAS ENACTED THIS COMPREHENSIVE FEDERAL REGULATORY SCHEME THAT

9     LITERALLY REGULATES EVERY ASPECT OF GAMING.  IT REGULATES THE

10    MONEY, RIGHT, THE BETS, HOW THE MONEY IS COUNTED AND ACCOUNTED

11    FOR.  IT REGULATES WHO CAN OFFER THE GAMES AND WHO CAN BE

12    INVOLVED IN THE GAMES, RIGHT?

13         WE GO THROUGH DETAILED LICENSING, CRIMINAL HISTORY

14    BACKGROUND CHECKS.  WE HAVE TO TAKE ALL OF OUR EQUIPMENT THAT'S

15    USED IN THE GAME AND SEND IT TO INDEPENDENT GAMING TEST

16    LABORATORIES TO HELP ASSIST US IN ESTABLISHING STANDARDS TO

17    MAKE SURE THAT THE GAMES ARE FAIR, RIGHT?  THERE'S ALL OF THIS

18    COMPREHENSIVE REGULATION.

19         THE PROBLEMS WITH WHAT KALSHI IS DOING HERE TODAY IS

20    THEY'RE INTERFERING WITH THAT REGULATION.

21          THE COURT:  CAN I ASK YOU, COULD THE TRIBES KEEP

22    FACEBOOK OFF INDIAN LAND?

23          MR. MARSTON:  NO.  IT'S NOT GAMING.

24          THE COURT:  OKAY.  SO --

25          MR. MARSTON:  WELL, IT'S --

1          THE COURT:  SO YOUR ARGUMENT ISN'T REALLY BASED ON

2    TRIBES AS SOVEREIGNS OVER THEIR INDIAN LANDS.  IT'S BASED THEN

3    ON IGRA AND THE REGULATION OF GAMING?

4          MR. MARSTON:  NO.  I FIRST -- I'M AN INDIAN, YOUR

5    HONOR.  I'VE BEEN DEFENDING INDIAN SOVEREIGNTY ALL MY LIFE.

6          THE CASE LAW IS CLEAR.  THE UNITED STATES SUPREME COURT,

7    FOR 150 YEARS, HAS SAID INDIANS ARE SOVEREIGN NATIONS.  WE

8    EXERCISE POWERS OF SELF-GOVERNMENT, EXCEPT FOR WHAT HAS BEEN

9    EXPRESSLY TAKEN AWAY FROM US BY AN ACT OF CONGRESS.

10          WE'RE IN A GOVERNMENT-TO-GOVERNMENT RELATIONSHIP WITH THE

11    UNITED STATES.  THE COURTS ARE TO CONSTRUE THAT RELATIONSHIP

12    THAT CONGRESS, IN ENACTING THE LEGISLATION, WOULD ONLY BE

13    ENACTING LEGISLATION THAT WOULD UPHOLD TRIBAL SOVEREIGNTY

14    UNLESS THEY EXPRESSLY AND EXPLICITLY TAKE THAT POWER AWAY.

15          SO MY FIRST RELIANCE ON OUR ABILITY TO REGULATE KALSHI, TO

16    STOP THEM FROM DOING WHAT THEY'RE DOING ON OUR RESERVATION, IS

17    WE HAVE THE INHERENT SOVEREIGN AUTHORITY TO DO THAT UNDER OUR

18    CONSTITUTION AND OUR TRIBAL LAWS.

19          THE COURT:  THAT'S WHY I ASKED, BECAUSE I THOUGHT

20    THAT'S EVEN SEPARATE, TOTALLY SEPARATE FROM THE --

21          MR. MARSTON:  AND SEPARATE AND APART FROM THAT,

22    THERE'S CONGRESS, AND CONGRESS HAS GIVEN US EXPRESSED DELEGATED

23    AUTHORITY.  THEY HAVE EXPRESSLY AUTHORIZED US TO ENACT GAMING

24    ORDINANCE.  THEY HAVE REQUIRED THAT THE SECRETARY -- I MEAN THE

25    CHAIRMAN OF THE NATIONAL INDIAN GAMING COMMISSION REVIEW THOSE

```
 1        ORDINANCES.  THEY SPECIFIED IN THE FEDERAL LAW WHAT HAS CERTAIN

 2        PROVISIONS THAT HAVE TO BE IN THOSE ORDINANCES.

 3             WHY?  TO ENSURE THE FAIRNESS OF THE PLAYING OF THE GAMES;

 4        TO MAKE SURE ORGANIZED CRIME IS NOT INVOLVED IN THE GAMES; TO

 5        MAKE SURE THAT MINORS AREN'T PLAYING THE GAMES, RIGHT; THAT THE

 6        GAMES ARE FAIR AND THEY'RE NOT RIGGED; AND THAT THE TRIBES ARE

 7        THE SOLE PROPRIETARY OWNERS OF THE GAMES -- NOT KALSHI PLAYING

 8        THE GAMES, WE ARE -- SO THAT THE REVENUE THAT'S GENERATED FROM

 9        THE PLAYING OF THE GAMES GOES TO US.

10             WHY?  SO WE CAN FEED OUR SENIORS, HOUSE OUR PEOPLE THAT

11        ARE HOMELESS.

12             THEY'RE COMING ON TO THE RESERVATION, THEY'RE ALLOWING

13        GAMERS TO PLACE BETS IN VIOLATION OF OUR TRIBAL LAW, IN

14        VIOLATION OF THE IGRA, AND THEY'RE TAKING THAT MONEY FROM THAT

15        GAMING THAT WE PROHIBIT AND PUT IT AND LINE IT IN THEIR

16        SHAREHOLDERS' POCKETS, AND IT'S A MINIMAL BURDEN TO REQUIRE

17        THEM TO CONDUCT A FENCE AROUND OUR RESERVATIONS.

18             THIS IS NOT ABOUT TRADING.  THIS IS NOT ABOUT COMMODITIES.

19        THIS IS NOT ABOUT DOING, AS FAR AS I'M CONCERNED, THE CEA.

20             THIS IS AN ISSUE OF TRIBAL SOVEREIGNTY.  IT'S AN ISSUE OF

21        GAMBLING.  THEY'RE ILLEGALLY GAMBLING ON OUR RESERVATIONS UNDER

22        THE COMMODITIES EXCHANGE ACT BECAUSE ALL YOU HAVE TO DO IS LOOK

23        AT THE ACT.

24             CONGRESS WRITING THE CONDITION TO EXCLUDE CERTAIN

25        CONTRACTS.  IN DODD-FRANK THEY AMENDED THE STATUTE AND
```

1    AUTHORIZED THE COMMISSION TO DO THAT, AND WHAT DID THE

2    COMMISSION DO?  I KNOW YOU KNOW.  THEY PROMULGATED 17 CFR 40.11

3    AND THE COMMISSION SAID GAMING CONTRACTS ARE NOT -- ARE

4    EXCLUDED CONTRACTS.

5         WHAT DID KALSHI DO?  I THINK THEY'VE GOT BRILLIANT

6    LAWYERS.  I MEAN, THEY FOUND A LOOPHOLE IN THE LAW AND THEY'RE

7    UTILIZING THE FEDERAL COURTS TO ALLOW THEM TO ENGAGE IN ILLEGAL

8    CONDUCT.

9         THE COURT:  WELL, YOU FILED THE LAWSUIT, SO I DON'T

10   KNOW THAT THEY'RE UTILIZING THE COURT.

11         MR. MARSTON:  RIGHT.  BUT WHAT THEY'RE DOING IS THEY

12   SELF-CERTIFY.

13         THE COURT:  THEY CAN DO THAT.

14         MR. MARSTON:  AND THAT ALLOWS THEM TO IMMEDIATELY

15   OFFER THE CONTRACTS ON THE INTERNET.

16         THE COURT:  THERE'S A GOOD ARGUMENT TO GO TO

17   CONGRESS, OR TO WHATEVER, AND CHANGE ALL THAT.

18       BUT THAT IS, THAT IS WHAT IT IS, RIGHT?

19         MR. MARSTON:  YOU HAVE TO LOOK AT WHY THE FEDERAL

20   COMMODITIES TRADE COMMISSION IS NOT ENFORCING THAT, YOUR HONOR.

21         THE COURT:  LIKE I SAID TO THE PREVIOUS ATTORNEY, I

22   UNDERSTAND THERE'S ALL THAT GOING ON.

23       I CAN'T GET INTO THAT, RIGHT?  I HAVE TO MAKE DECISIONS

24   JUST BASED ON THE LAW AS IT IS.  I'M JUST A TRIAL COURT.  I

25   HAVE TO FOLLOW WHAT'S THERE.

1           MR. MARSTON:  THEN FOLLOW CONGRESS'S LAW, FOLLOW THE

2     INDIAN GAMING REGULATORY ACT, BECAUSE I THINK IT'S PRETTY

3     CLEAR, UNDER MORTON VERSUS MANCARI, CONGRESS SAID -- THE

4     UNITED STATES SUPREME COURT SAYS WHERE YOU HAVE TWO FEDERAL

5     STATUTES, RIGHT, AND ONE IS MORE OF A GENERAL STATUTE AND ONE

6     IS MORE OF A SPECIFIC STATUTE, YOU HAVE TO -- YOU HAVE TO

7     FOLLOW THE SPECIFIC STATUTE, RIGHT, AND RESOLVE THE CONFLICTS

8     IN FAVOR OF THE SPECIFIC STATUTE.

9         THERE'S NOTHING MORE SPECIFIC THAN THE INDIAN GAMING

10    REGULATORY ACT.  IT'S REALLY CLEAR.

11          THE COURT:  BUT AT THE TIME IT WAS ENACTED, INTERNET

12    GAMING WASN'T THERE.

13          MR. MARSTON:  WELL, GAMING WAS.

14          THE COURT:  WELL, THEN CONGRESS DID ENACT AN ACT THAT

15    ADDRESSED INTERNET GAMING.

16          MR. MARSTON:  NO.  THE INDIAN GAMING REGULATORY ACT

17    TALKS ABOUT TECHNOLOGICAL -- THE USE OF TECHNOLOGICAL DEVICES

18    IN FURTHERANCE OF THE PLAYING OF THE GAMES.

19        WHEN THEY -- THEY SAW WHAT WAS ON THE HORIZON, RIGHT?  AND

20    I THINK THEY ADAPTED AN ACT THAT, YOU KNOW, WOULD TAKE INTO --

21    THAT TOOK INTO CONSIDERATION TECHNOLOGICAL ADVANTAGES.

22        IT DOESN'T REALLY MATTER WHETHER -- I MEAN, THEY'RE

23    PLAYING A CLASS III GAME, RIGHT?  IT'S STILL A GAME.  THERE'S

24    NO -- AND IT'S --

25          THE COURT:  I UNDERSTAND ALL THAT.

1          MR. MARSTON:  THAT MACHINE, THAT SLOT MACHINE IS A

2     DEVICE.  THEIR -- THE CELL PHONES TO ACCESS THE INTERNET, TO

3     ACCESS THEIR SERVERS -- THE SLOT MACHINE IS A GAME OF CHANCE.

4     THEY'RE PLAYING GAMES OF CHANCE.

5          THEY'RE BETTING -- THEY'RE ALLOWING PEOPLE TO PLACE A

6     WAGER OR A BET ON THE OUTCOME OF A SPORTS EVENT.

7          WHAT MAKES THIS CASE DIFFERENT IS THAT THEY'RE ENGAGING IN

8     SPORTSBOOK GAMBLING, DOING IT ON INDIAN RESERVATIONS, AND THE

9     SPORTSBOOK GAMBLING THAT THEY'RE ENGAGING IN DOESN'T PROVIDE AN

10    ECONOMIC BENEFIT TO ANYBODY OTHER THAN THEM.

11          THE COURT:  ALL RIGHT.

12     LET ME HEAR FROM THE DEFENSE.

13          MR. MAINLAND:  SURE.

14     YOUR HONOR, GOOD MORNING.  THERE WAS A LOT IN THERE, AND

15    IN PARTICULAR, MR. MARSTON HAD A LOT TO SAY ABOUT THE

16    COMPLEXITY OF IGRA, ABOUT THIS COMPREHENSIVE STATUTORY SCHEME

17    THAT THE STATUTE ESTABLISHES.

18          ALL OF THAT IS PERFECTLY FINE.

19          IT WAS NOT UNTIL YOUR HONOR NUDGED HIM A LITTLE BIT THAT

20    THE COMMODITY EXCHANGE ACT, ANOTHER STATUTE THAT CONFERS

21    EXCLUSIVE JURISDICTION IN A PARTICULAR AREA, WAS MENTIONED.  I

22    DON'T THINK UIGEA WAS REALLY ENGAGED WITH AT ALL.

23          SO THE PREMISE OF MR. MARSTON'S ANALYSIS HERE IS THAT YOU

24    LOOK AT IGRA AND YOU LOOK AT IGRA ALONE.  YOU PUT ON THE

25    BLINDERS AND YOU PRETEND THAT OTHER STATUTES DON'T EXIST.

1          BUT THAT'S CLEARLY NOT THE CASE.

2          AS WE SET OUT IN OUR BRIEF, WE HAVE A READING OF THREE

3     STATUTES THAT HARMONIZE THEM, AND I'D LIKE TO JUST WALK THROUGH

4     THAT BRIEFLY.

5              THE COURT:  BEFORE WE GET TO THAT, CAN I JUST -- THIS

6     IS A BIGGER OVERARCHING ISSUE.  MAYBE JUST TO KIND OF CUT TO

7     THE CHASE, EVEN APART FROM ALL THIS, WHAT MR. MARSTON SAID

8     ABOUT THE INDIAN SOVEREIGNTY, WHY SHOULDN'T THE TRIBES BE ABLE

9     TO SAY, "WE DON'T WANT, WHILE YOU'RE ON OUR RESERVATION, YOU TO

10    BE ABLE TO DO SPORTS GAMBLING"?  WHY SHOULDN'T THEY?

11          WHY IS KALSHI INSISTING THAT, OVER THEIR OBJECTION, YOU

12    CAN BE NOT -- IT'S NOT VERY MANY PEOPLE, OR NOT MUCH LAND,

13    ACTUALLY, IN THE UNITED STATES, AND ALL WE HAVE ARE THREE

14    TRIBES HERE.  THAT'S IT.

15          ALL THEY'RE SAYING IS -- AND YOU CAN BECAUSE THIS IS DONE

16    ALL THE TIME EVERYWHERE -- YOU COULD GEOFENCE IT AND HAVE IT

17    NOT BE AVAILABLE ON THE TRIBE LAND.

18          WHY -- AND MAYBE IT'S RHETORICAL AND YOU DON'T NEED TO

19    ANSWER, BUT I GUESS WHAT I'M SAYING, ALMOST EVEN AS A MORAL

20    QUESTION, LIKE, WHY IS KALSHI PUSHING THAT?  WHY?  JUST, LIKE,

21    WHY?  WHY SHOULD THEY -- AND IF YOU'RE GOING TO TELL ME BECAUSE

22    IT'S NOT ON INDIAN LANDS, I SAY, YOU ASK ANY PERSON SITTING

23    THERE, IF I'M SITTING RIGHT IN THE CASINO ON THE INDIAN LAND

24    AND I CAN DO IT, IT'S ON INDIAN LAND IN ANY COMMON SENSE.

25              SO I JUST -- AND YOU ACTUALLY DON'T HAVE TO ANSWER, BUT I

```
 1   DO THINK YOUR CLIENT SHOULD REALLY THINK ABOUT THAT.  WHY ARE

 2   THEY PUSHING IT?

 3             MR. MAINLAND:  WELL --

 4             THE COURT:  WHY ARE THEY PUSHING IT?  THEY'RE

 5   ACTUALLY NOT ASKING FOR VERY MUCH.  IT'S VERY LITTLE.  THEY'RE

 6   NOT TRYING TO, LIKE, NOT -- MAYBE -- I MEAN, SURE, THEY WOULD

 7   LOVE THAT KALSHI WASN'T IN BUSINESS ANYWHERE FOR ALL THE

 8   REASONS THEY SAID.

 9        BUT THEY RECOGNIZE THIS CASE ISN'T GOING TO DO THAT.  THAT

10   WOULD HAVE TO BE CALIFORNIA OR SOMETHING ELSE.

11        THEY'RE JUST SAYING, JUST -- IT'S NOT LIKE IT'S -- THIS IS

12   A TRIBE, AND INDIAN LAND IS A SEPARATE SOVEREIGN.

13        JUST LIKE I ASKED THEM ABOUT FACEBOOK.  I THINK THEY

14   SHOULD PROBABLY BE ALLOWED TO SAY, "I DON'T WANT FACEBOOK.  WE

15   THINK THESE THINGS ARE HARMFUL" FOR WHATEVER REASON.

16        WHY?

17        ANYWAY, THAT'S KIND OF A RHETORICAL --

18             MR. MAINLAND:  YOUR HONOR, I'M HAPPY TO ADDRESS IT.

19        THE STATES ARE SEPARATE SOVEREIGNS, TOO.  AND WHAT

20   CONGRESS DETERMINED WHEN IT PASSED THE CEA -- AND WHEN IT

21   PASSED IN PARTICULAR THE 1974 AMENDMENTS 14 YEARS BEFORE IGRA

22   EVEN EXISTED -- IT DETERMINED THAT THERE WOULD BE A UNIFORM

23   NATIONAL DERIVATIVES MARKET, A FUTURES MARKET AT THE TIME --

24             THE COURT:  THAT IS NOT ANSWERING MY QUESTION, SO I

25   THINK YOU PROBABLY SHOULDN'T ANSWER IT.
```

```
 1              MR. MAINLAND:  OKAY.

 2              THE COURT:  I'M NOT ASKING A LEGAL QUESTION.  I'M

 3   ACTUALLY ASKING A MORE MORAL QUESTION ACTUALLY.

 4              MR. MAINLAND:  OKAY.

 5              THE COURT:  I'M -- AND I DON'T EXPECT YOU -- YOU'RE

 6   REPRESENTING YOUR CLIENT.  I DON'T EXPECT YOU TO ACT LIKE A

 7   HUMAN BEING IN THE SENSE, OR EVEN YOUR CLIENT, TO DO SOMETHING.

 8        I'M JUST SAYING WHAT MR. MARSTON SAID -- AS YOU SAW VERY

 9   GENUINELY -- I'M ASKING YOU TO STEP BACK, AND YOUR CLIENT, WHO

10   I HOPE IS MAYBE HERE AND LISTENING, TO STEP BACK AND ACTUALLY

11   JUST PRETEND TO BE A HUMAN BEING AS OPPOSED TO JUST AN ENTITY

12   MAKING MONEY FOR A SECOND, NOT CONGRESS THIS OR THAT, AND SAY,

13   "THESE THREE TRIBES ARE SAYING, YOU KNOW, WE WANT TO GOVERN OUR

14   LAND, WE DON'T WANT THIS ON THERE."

15        YOU HEARD WHY.  THAT'S ALL I'M SAYING IS MAYBE JUST THINK

16   ABOUT, FINE, WE DON'T NEED THIS EXTRA LITTLE TINY BIT.

17              MR. MAINLAND:  WELL, ON THAT --

18              THE COURT:  WITHOUT GIVING UP ANY LEGAL ARGUMENTS, WE

19   THINK WE LEGALLY CAN.

20        BUT YOU DON'T HAVE TO RESPOND BECAUSE I DON'T WANT TO HEAR

21   THE LEGAL.  WE'LL GET TO THE LEGAL.

22              MR. MAINLAND:  OKAY.

23              THE COURT:  IT WAS JUST THE BIGGER PICTURE, BECAUSE

24   MAYBE YOUR CLIENT IS HERE, MAYBE THEY'RE WATCHING.  I WANT THEM

25   TO THINK ABOUT MAYBE THERE'S SOME OTHER RESOLUTION THAT THEY
```

1    DON'T HAVE TO GO INTO THIS FIGHT BECAUSE THERE'S BEEN ENOUGH

2    FIGHTS IN THE HISTORY OF THIS COUNTRY WITH THE INDIAN TRIBES

3    THAT WE PROBABLY DON'T NEED ANY MORE, AND THAT MAYBE, MAYBE

4    THERE'S JUST A WAY OF DOING SOMETHING THAT SATISFIES THEM AND

5    ALLOWS YOUR CLIENT TO CONTINUE TO MAKE A LOT OF MONEY, WHICH IS

6    WHAT IT'S ABOUT, RIGHT?

7         MR. MAINLAND:  I HEAR WHAT YOU'RE--

8         THE COURT:  GAMBLING, WE CAN'T REALLY ARGUE ABOUT

9    THIS IS, LIKE, FOR THE PUBLIC GOOD OR SOMETHING LIKE THAT,

10   WHICH IS FINE, THAT'S FINE.  THAT'S WHAT WE'RE BUILT UPON.

11        MR. MAINLAND:  WELL, I GUESS I WOULD TAKE ISSUE WITH

12   THAT, BECAUSE I THINK THE WAY IN WHICH THIS MARKET IS

13   DEVELOPING IN TERMS OF ITS PREDICTIVE POWER IN TERMS OF

14   INFORMATIONAL MARKETS, IT'S INCREDIBLY EXCITING AND IT CUTS

15   ACROSS A LOT OF DIFFERENT AREAS AND NOT JUST SPORTS.

16        SO OUR CLIENT IS INDEED VERY EXCITED ABOUT BEING ABLE TO

17   OPERATE IN AN UNINTERRUPTED WAY ACROSS THE COUNTRY.

18        THAT'S TRUE FOR SPORTS, BUT IT'S TRUE FOR A LOT OF OTHER

19   THINGS, ELECTIONS, POPULAR CULTURE, WEATHER, ALL SORTS OF

20   THINGS.

21        AND WHEN I HEAR -- I NEED TO TAKE A LITTLE BIT OF ISSUE

22   WITH THE IDEA THAT WE'RE JUST TRYING TO LINE OUR SHAREHOLDERS'

23   POCKETS.  OF COURSE WE'RE A BUSINESS.  OF COURSE WE'RE TRYING

24   TO SUCCEED.

25        BUT THIS IS VERY DIFFERENT FROM A SPORTSBOOK.  WHEN A

```
1    SPORTSBOOK IS TAKING A BET, IT WINS WHEN THE PATRON LOSES.

2    THAT'S THE NATURE OF THAT ARRANGEMENT THERE.

3        THAT IS NOT THE CASE WHEN KALSHI IS MAKING AVAILABLE EVENT

4    CONTRACTS ON ITS EXCHANGE.  THEY'RE INDIFFERENT TO THE OUTCOME

5    OF WHETHER SUCH AND SUCH TEAM IS GOING TO WIN THE SUPER BOWL.

6    THEY'RE INDIFFERENT TO THE OUTCOME OF A PARTICULAR ELECTION.

7        IT'S THE TRADERS THEMSELVES WHO ARE TRADING WITH EACH

8    OTHER THAT -- I MEAN, SPORTSBOOKS --

9            THE COURT:  YOUR CLIENT MAKES MONEY NO MATTER WHAT

10   THEN.

11           MR. MAINLAND:  WELL, I GET IT.

12       BUT IN TERMS OF THE MORALITY ON THIS, I MEAN, THE

13   SPORTS -- THE CASINOS ON THESE INDIAN TRIBES ARE TAKING MONEY

14   OUT OF THEIR PATRONS' POCKETS.

15           THE COURT:  YES, BUT YOU HEARD WHY.  RIGHT?  YOU

16   HEARD WHY.

17           MR. MAINLAND:  IN TERMS OF TAX REVENUE AND THAT SORT

18   OF THING.

19           THE COURT:  YES, TO SUPPORT THE TRIBES, RIGHT?  SO

20   DON'T ARGUE WITH ME ABOUT THAT.  I'M JUST SAYING, I UNDERSTAND

21   THAT.

22       BUT ALL I'M SAYING IS -- AND IT'S NOT AS A LEGAL QUESTION,

23   IT'S NOT ILLEGAL, IT'S NOT GOING TO GO INTO THAT -- BUT I CAN'T

24   SIT HERE AND HEAR THIS AND NOT THINK, "WOW, WHY IS KALSHI

25   PUSHING IT WHEN THE TRIBES SAY 'WE DON'T WANT YOU OPERATING ON
```

1    OUR LAND'?  WHY IS KALSHI INSISTING ON BRINGING AN ARMY OF

2    LAWYERS HERE INSISTING, 'I DON'T CARE, TRIBES.  I DON'T CARE.

3    WE THINK WE LEGALLY CAN, AND SO WE'RE GOING TO DO IT NO MATTER

4    WHAT, EVEN IF YOU DON'T WANT TO BECAUSE LEGALLY WE'RE RIGHT.'"

5         THAT'S ALL I'M SAILING IS MAYBE, MAYBE LEGALLY YOU'RE

6    RIGHT.  THAT DOESN'T ALWAYS MEAN YOU'RE RIGHT OR THAT YOU

7    SHOULD.

8         MR. MAINLAND:  WELL, AS A LAWYER, I CERTAINLY -- I

9    TAKE YOUR HONOR'S POINT.  I'M HEAR TO ARGUE THE LAW.  I'M HERE

10   TO REPRESENT MY CLIENT.

11        I DON'T THINK I CAN GET INTO A MORAL DEBATE.

12        THE COURT:  I DON'T --

13        MR. MAINLAND:  WHAT I WILL SAY, THOUGH, I THINK

14   YOU'VE AT LEAST HINTED IT'S JUST THREE PLAINTIFFS, IT'S JUST

15   THREE RESERVATIONS, WHAT'S THE BIG DEAL, KALSHI?

16        AND THE REALITY IS THERE ARE 584 FEDERALLY RECOGNIZED

17   TRIBES AROUND THE COUNTRY.  FULLY HALF OF THEM PROVIDE SOME

18   SORT OF GAMING OPERATION.

19        THE IDEA THAT WE WOULD BE, WHATEVER -- AND MY COLLEAGUE

20   CAN SPEAK TO THE DIFFICULTIES AROUND GEO FENCING.  WE SUBMITTED

21   AN AFFIDAVIT IN OPPOSING THE P.I. HERE.

22        BUT WHEN YOU LOOK AT A MAP OF EVERY RESERVATION AROUND THE

23   COUNTRY THAT IS CONDUCTING GAMING, ALL OF A SUDDEN WHAT'S THE

24   BIG DEAL BECOMES, WOW, THIS IS AN INCREDIBLY BIG DEAL.

25        THE COURT:  BECAUSE THEY WOULD MAKE LESS MONEY.

1        MR. MAINLAND:  WELL, I'M NOT GOING TO DENY THAT WE'RE

2   A BUSINESS TRYING TO SUCCEED IN AN INCREDIBLY COMPETITIVE

3   MARKET.

4        THE COURT:  OKAY.  THAT'S FINE.  I JUST THOUGHT I'D

5   PUT IT OUT THERE BECAUSE IT JUST OCCURRED TO ME, LISTENING TO

6   MR. MARSTON, THAT --

7        MR. MAINLAND:  AND I RESPECT IT AND I RESPECT THE

8   EMOTION WITH WHICH, YOU KNOW, HE FEELS THESE ARGUMENTS AND

9   THERE IS -- WE ARE NOT SEEKING TO UNDERMINE INDIAN SOVEREIGNTY.

10      WHAT WE'RE TRYING TO DO IS RUN A BUSINESS ON A NATIONAL

11   BASIS THAT CONGRESS HAS DETERMINED WE'RE ENTITLED TO OPERATE IN

12   THAT MANNER.

13      IF WE COULD GET TO THE LAW, YOUR HONOR WAS ASKING A NUMBER

14   OF QUESTIONS ABOUT, YOU KNOW, THIS DISTINCTION BETWEEN

15   AUTHORIZING CONDUCT AND VIOLATING A COMPACT.

16      I WANT TO JUST -- I THINK I CAN BE QUICK ON THIS, BUT,

17   YOUR HONOR, THE CLAIM THAT THEY'RE BRINGING -- AND I APPRECIATE

18   THAT YOU PRESSED COUNSEL ON EXACTLY WHAT ARE YOU ALLEGING A

19   VIOLATION OF -- AND I THINK HE CORRECTLY STATED IT'S

20   2710(D)(1).

21      THAT'S THE PROVISION OF IGRA THAT DETERMINES THE

22   CIRCUMSTANCES IN WHICH CLASS III GAMING WILL BE LAWFUL ON A

23   RESERVATION.  HE ACKNOWLEDGED THAT'S WHAT HE'S TRYING TO SUE

24   OVER HERE.

25      THAT IS NOT THE PRIVATE RIGHT OF ACTION, OR I SHOULD SAY

```
 1    THE TRIBAL RIGHT OF ACTION OR THE STATUTORY RIGHT OF ACTION

 2    THEY HAVE.  IT REQUIRES THAT THERE BE A VIOLATION OF A COMPACT.

 3          THERE IS NO VIOLATION OF A COMPACT HERE.  WITH RESPECT TO

 4    TWO OF THE THREE PLAINTIFFS, THERE IS NO COMPACT AT ALL.

 5             THE COURT:  WELL, I DON'T -- I DON'T -- I AGREE.

 6    BUT -- THERE IS NO COMPACT.

 7          BUT AS YOU -- IF YOU READ STAND UP FOR CALIFORNIA, THERE'S

 8    NO WAY I THINK I CAN SAY THAT COMPACT IN SIX -- TRIBAL STATE

 9    COMPACTS IN (D)(1)6 MEANS SOMETHING DIFFERENT IN (D)(1)(7).

10          MR. MAINLAND:  LET ME TAKE A SHOT AT IT.  I'M NOT

11    SUPER OPTIMISTIC I'M GOING TO PERSUADE YOU BECAUSE I CAN SEE

12    YOU'VE THOUGHT ABOUT IT.

13          BUT ON STAND UP, I DON'T THINK STAND UP CUTS AS FAR AS

14    THEY CLAIM IT DOES.  THE ISSUE IN STAND UP WAS AN EXEMPTION

15    FROM THE JOHNSON ACT.

16          SO WHAT THE COURT WAS DEALING WITH THERE IS, HOW CAN IT

17    BE, IF YOU'RE PERMITTED TO DO CLASS III GAMING ACTIVITY UNDER A

18    COMPACT, IF YOU DO IT UNDER SECRETARIAL PROCEDURES, YOU WOULD

19    BE IN VIOLATION, CRIMINALLY IN VIOLATION OF THE JOHNSON ACT.

20          THAT CANNOT BE WHAT CONGRESS INTENDED.  SO WHAT THAT WENT

21    TO WAS THE SCOPE OF THE SUBSTANTIVE RIGHT THAT THE TRIBE HAS TO

22    CONDUCT CLASS III GAMING ACTIVITY ON ITS LANDS.

23          THE SCOPE OF A SUBSTANTIVE RIGHT IS DIFFERENT FROM WHO HAS

24    THE ABILITY TO ENFORCE IT, AND WHAT I WOULD SAY IS UNDER THIS

25    STATUTE, THE TWO PROVISIONS ARE RIGHT NEXT TO EACH OTHER.
```

```
1       THERE'S THE ONE THAT AUTHORIZES TRIBES AND STATES TO SUE; AND

2       THERE'S THE ONE RIGHT UNDER IT, RIGHT NEXT TO IT, THAT EMPOWERS

3       THE SECRETARY OF THE INTERIOR TO ENFORCE SECRETARIAL

4       PROCEDURES.

5           A NUMBER OF COURTS, INCLUDING THE FLORIDA AGAINST SEMINAL

6       TRIBE CASE IN THE ELEVENTH CIRCUIT, GOES THROUGH THE LITANY OF

7       VARIOUS VERY SPECIFIC CAUSES OF ACTION THAT IGRA CREATES.

8       THEY'RE ALL OVER THE PLACE.  THE STATUTE IS HIGHLY PRESCRIPTIVE

9       AS TO WHO CAN SUE AND UNDER WHAT CIRCUMSTANCES.

10          SO I THINK THERE, I DON'T READ STAND UP GOING THAT FAR --

11              THE COURT:  STAND UP SAYS THERE'S A PRESUMPTION THAT

12      A GIVEN TERM IS USED TO MEAN THE SAME THING THROUGHOUT A

13      STATUTE.

14          AND YOU'RE SAYING THAT PRESUMPTION IS OVERCOME?

15              MR. MAINLAND:  I AM SAYING THAT.

16              THE COURT:  BECAUSE?

17              MR. MAINLAND:  BECAUSE OF THE WAY IN WHICH THE TWO

18      PROVISIONS ARE SITUATED NEXT TO EACH OTHER AND CONTRASTED WITH

19      EACH OTHER.

20              THE COURT:  BUT THERE'S NOTHING INCONSISTENT WITH

21      SAYING TRIBAL COMPACT IN IN 7A-2 INCLUDES THAT A TRIBE -- LIKE,

22      I THINK IT FITS RIGHT IN THERE, RIGHT?

23          A TRIBE COULDN'T GET THE STATE TO AGREE TO A COMPACT

24      BECAUSE THE STATE WAS ACTING IN BAD FAITH, THEREFORE, INSTEAD

25      THEY HAD TO GO TO THE SECRETARIAL PROCEDURES.
```

1    YOU'RE SAYING THAT CONGRESS INTENDED TO TREAT THOSE TWO

2    TRIBES DIFFERENTLY, THOSE WHERE THE STATE ACTED IN GOOD FAITH

3    AND THEN GOT A COMPACT, DIFFERENT FROM THOSE WHERE THEY ACTED

4    IN BAD FAITH, AND HAVE ONLY THE SECRETARY OF INTERIOR BE ABLE

5    TO ACT ON BEHALF OF THE TRIBE WHO HAD A BAD ACTOR STATE.

6    THAT DOESN'T MAKE ANY SENSE TO ME.

7    MR. MAINLAND:  OKAY.

8    THE COURT:  IT'S CONSISTENT TO SAY A TRIBE, EITHER

9    WAY, CAN ENFORCE WHATEVER THE COMPACT IS, THE SECRETARIAL

10   PROCEDURES, AND BY THE WAY, COURTS, THE SECRETARY OF INTERIOR

11   CAN AS WELL, AS OPPOSED TO TREATING THOSE TWO TRIBES

12   DIFFERENTLY.

13   ANYWAY, WHAT DIFFERENCE DOES IT MAKE REALLY, RIGHT,

14   BECAUSE AT LEAST YOU HAVE ONE TRIBE WITH A COMPACT?

15   MR. MAINLAND:  WELL, THERE'S THAT.

16   AND I WOULD ALSO SAY, EVEN IF YOU'RE GOING TO TREAT

17   SECRETARIAL PROCEDURES THE SAME AS A COMPACT, THERE IS NO

18   ALLEGATION AS TO HOW ANY SECRETARIAL PROCEDURES HAVE BEEN

19   VIOLATED HERE.

20   THE COURT:  IT'S THE SAME AS THE COMPACT.

21   MR. MAINLAND:  OKAY.  WELL --

22   THE COURT:  IT HAS THE SAME -- WE LOOKED.  IT HAS THE

23   SAME TERMS AS THE COMPACT, RIGHT?

24   MR. MAINLAND:  I AGREE WITH THAT.

25   WHAT I'M SAYING IS THE COMPLAINT DOESN'T TELL ME ANYTHING

1    ABOUT WHAT WE'VE DONE HERE THAT VIOLATES ANY LANGUAGE IN ANY

2    SECRETARIAL PROCEDURES.  IN FACT, THE ONLY LANGUAGE THEY SAY

3    FROM THE COMPACT THAT THEY HAVE WITH PICAYUNE, A PICAYUNE TRIBE

4    HAS, IS 4.1(C).  I IMAGINE YOUR HONOR HAS LOOKED AT IT.

5            THE COURT:  YES.

6            MR. MAINLAND:  AND YOU PROBABLY NOTICED THAT

7    SPECIFICALLY GOVERNS THE TRIBE, ONLY THE TRIBE.

8            THE COURT:  YES.

9            MR. MAINLAND:  AND THAT'S, THAT STANDS TO REASON.

10    THIS IS AN AGREEMENT BETWEEN THE STATE AND THE TRIBE.  IT

11    GOVERNS WHAT THEIR RESPECTIVE RIGHTS AND RESPONSIBILITIES ARE

12    VIS-À-VIS EACH OTHER.

13        THAT'S THE WHOLE -- THE CORE CONCEPT OF IGRA IS THAT THIS

14    WOULD ALL BE WORKED OUT BETWEEN THE STATE AND THE TRIBE TO WORK

15    OUT WHAT THEIR RIGHTS AND RESPONSIBILITIES ARE.

16        THE IDEA THAT A THIRD PARTY CAN COME IN AND VIOLATE THAT

17    PROVISION JUST DOESN'T SQUARE WITH ELEMENTAL CONTRACT LAW, AND

18    THE LAW IS CLEAR THAT A COMPACT IS JUST ANOTHER FORM OF A

19    CONTRACT.

20        SO --

21            THE COURT:  CAN YOU IDENTIFY FOR ME WHAT WOULD BE AN

22    ACTION THAT A TRIBE WOULD BRING UNDER THAT FOR VIOLATION OF A

23    COMPACT?

24            MR. MAINLAND:  IN OTHER WORDS, WHAT KIND OF CLASS III

25    GAMING ACTIVITY WOULD IT BE LOOKING TO ENJOIN?

1          THE COURT:  YES.

2          MR. MAINLAND:  SO ONE THING I DID NOTICE IN GOING

3     THROUGH IT IS THAT THERE ARE REFERENCES TO GAMING OPERATORS AND

4     POTENTIAL VIOLATIONS BY GAMING OPERATORS UNDER THE COMPACT

5     ITSELF.

6          SO THEY ARE ENTITLED TO LICENSE CERTAIN ACTIVITIES TO

7     THIRD PARTIES, AND IF THEY DO THAT, THEN THEY -- AND IT SAYS

8     VERY PRECISELY UNDER THE COMPACT THAT IF THOSE THIRD PARTIES

9     WOULD VIOLATE THE COMPACT ITSELF, THAT THEY HAVE CERTAIN

10    ENFORCEMENT RIGHTS WITH RESPECT TO THAT.  SO I CAN IMAGINE A

11    TRIBE COMING IN TO ENJOIN THAT KIND OF ACTIVITY.

12         THE OTHER THING I'LL NOTE, YOUR HONOR, AND I'M VERY

13    SKEPTICAL, I CAN'T PROVE THIS TO YOUR HONOR, BUT I'M SKEPTICAL

14    THAT THERE WAS EVER ANY INTENTION TO USE THIS PROVISION TO

15    PERMIT TRIBES TO SUE THIRD PARTIES, AS OPPOSED FOR THERE TO BE

16    LITIGATION BETWEEN TRIBES AND THE STATES THEMSELVES.

17         I'VE FOUND ONLY A SINGLE CASE -- AND I'VE HAD MY TEAM

18    LOOK, I CAN'T GUARANTEE WE DIDN'T OVERLOOK SOMETHING -- BUT

19    WE'VE LOOKED FOR CASES WHERE THEY USE THIS PROVISION, THIS

20    ENFORCEMENT MECHANISM AS THEY CALL IT, TO SUE THIRD PARTIES,

21    AND WE'VE ONLY FOUND A SINGLE ONE.  IT'S THE CAYUGA NATION CASE

22    IN THE NORTHERN DISTRICT OF NEW YORK WHERE THERE WAS A BUSINESS

23    THAT WAS ONE OF THE DEFENDANTS, IT WAS CALLED JACKPOT, AND

24    WITHIN MONTHS, THERE WAS AN UNDISCLOSED SETTLEMENT AND THEY

25    WERE DROPPED FROM THE CASE.

1      ALL OF THE CASE LAW IN THIS AREA ARE DISPUTES BETWEEN

2   TRIBES AND STATES, AND THAT STANDS TO REASON BECAUSE WE'RE

3   TALKING ABOUT VIOLATIONS OF A COMPACT BETWEEN TRIBES AND

4   STATES.

5      SO THAT IS THE RIGHT OF ACTION ISSUE.  I DON'T THINK

6   THEY'RE EMPOWERED TO SUE AT ALL.

7          THE COURT:  SO THEN WE DON'T EVEN GET TO THE INTERNET

8   GAMING ACT?

9          MR. MAINLAND:  I DON'T THINK YOU NEED TO.  I THINK

10   THERE'S A TON OF COMPLEXITY IN THIS STATUTE.  I FIND IT

11   EXTREMELY INTERESTING TO STUDY IT ALL.

12      BUT I THINK WE CAN CUT THIS ONE OFF AT THE PASS WITH

13   WHETHER THEY BELONG IN COURT ON THIS IGRA CLAIM AT ALL.

14      I DON'T THINK THEY WILL BE ABLE TO STATE A CLAIM.  THEY

15   ARE CERTAINLY NOT LIKELY TO SUCCEED ON IT.  WE'LL BE FLUSHING

16   THIS OUT FURTHER IN OUR MOTION TO DISMISS.

17      BUT I THINK THEY HAVE A REAL ISSUE WITH THEIR RIGHT OF

18   ACTION.

19          THE COURT:  SO YOU ONLY GET THEN TO THE -- I DON'T

20   KNOW HOW YOU SAY THAT ONE.  IT'S -- YOU'RE IGRA.  HOW ARE YOU

21   ON THE OTHER -- HOW DO YOU PRONOUNCE THE OTHER ONE?

22          MR. MAINLAND:  I'M BEEN CALLING IT U-GEA.

23          THE COURT:  U-GEA?

24          MR. MAINLAND:  YEAH, BUT --

25          THE COURT:  DO YOU AGREE WITH THAT, MR. MARSTON?

```
 1              MR. MARSTON:  HE CAN CALL IT WHATEVER HE WANTS, YOUR

 2     HONOR.

 3              MR. MAINLAND:  TO BE FAIR, I WAS CALLING IT IG-RA

 4     BEFORE TODAY, SO BUT --

 5              THE COURT:  UIGEA, THAT OTHER STATUTE.

 6              MR. MAINLAND:  THAT OTHER STATUTE.

 7              THE COURT:  THE ARGUMENT IS YOU ONLY GET TO THAT

 8     OTHER STATUTE IF THERE'S A CAUSE OF ACTION UNDER IGRA?

 9              MR. MAINLAND:  RIGHT.

10              THE COURT:  ALL RIGHT.  THEN EXPLAIN TO ME UIGEA.

11              MR. MAINLAND:  UIGEA.  UIGEA IS WHERE CONGRESS

12     ACTUALLY TURNED ITS ATTENTION TO THE ISSUE THAT'S PRESENTED

13     PRECISELY IN THIS CASE.

14         ONE THING I THINK WE CAN ALL AGREE ON -- MAYBE MR. MARSTON

15     WILL CONTEST THIS BECAUSE HE WAS REFERRING TO SOME FORMS OF

16     TECHNOLOGY -- BUT I THINK WE CAN ALL AGREE, AND THE NINTH

17     CIRCUIT CERTAINLY HAS AGREED, THAT WHEN IGRA ITSELF WAS PASSED

18     IN 1988, CONGRESS DID NOT HAVE THE INTERNET IN MIND.

19         THE INTERNET, AS THE NINTH CIRCUIT POINTED OUT IN THE

20     IIPAY NATION CASE, THE INTERNET WAS NOT PUBLICLY AVAILABLE.

21     MAYBE IT WAS BEING DEVELOPED IN THE HALLS OF DARPA SOMEWHERE,

22     BUT IT CERTAINLY WASN'T SOMETHING THAT WAS AVAILABLE --

23              THE COURT:  BY AL GORE.

24              MR. MAINLAND:  AL GORE, EXACTLY.  I HAD TO FIGHT THE

25     URGE TO MAKE THAT ONE.
```

1    BUT IN ANY EVENT, I THINK WE'RE CONFIDENT THAT CONGRESS

2    WASN'T THINKING ABOUT IT.  SO IN THAT LITERAL SENSE, CONGRESS

3    DID NOT HAVE ANY INTENTION ONE WAY OR THE OTHER WITH RESPECT TO

4    THIS.

5        SO I THINK IF YOU ONLY HAD IGRA, I CAN SEE THE ARGUMENT.

6    IF YOU HAVE ONLY HAD IGRA, AT LEAST IT WOULD BE DEBATABLE.  IS

7    GAMING HAPPENING WHERE THE TRADE --

8        THE COURT:  WHAT DO YOU MEAN BY THAT, THOUGH?  BUT

9    YOUR FIRST ARGUMENT IS, EVEN IF WE HAVE IGRA, IT DOESN'T --

10        MR. MAINLAND:  WELL, WHAT I'M SAYING IS I CAN SEE

11    SOMEONE -- NO, THAT'S CERTAINLY OUR POSITION, THAT EVEN IF ALL

12    YOU HAD IS IGRA, THIS CONDUCT IS NOT HAPPENING ON INDIAN LANDS.

13    AND I --

14        THE COURT:  SO THAT'S WHERE I'M TROUBLED.

15        MR. MAINLAND:  UM-HUM.

16        THE COURT:  THAT'S A DIFFERENT ARGUMENT, IT'S NOT

17    HAPPENING ON INDIAN LANDS, AS OPPOSED TO IGRA AUTHORIZES

18    OTHERWISE ILLEGAL CONDUCT TO OCCUR, RIGHT?

19        BECAUSE I DON'T BUY IT'S NOT HAPPENING ON INDIAN LANDS.

20    IT'S JUST COMMON SENSE.

21        MR. MAINLAND:  WELL, OKAY.  SO YOU CAN -- YOU CAN

22    MAKE THE ARGUMENT THAT IT DOESN'T -- IF YOU'RE NOT BUYING IT,

23    I'M NOT GOING TO BOTHER WITH IT, YOUR HONOR.

24        WHAT I WOULD JUST QUICKLY SAY ON IT IS THAT THE STATUTE

25    DOES SPEAK IN VERY SPECIFIC TERMS ABOUT GAMING BEING CONDUCTED

1    ON INDIAN LANDS, THAT IT'S LOCATED ON INDIAN LANDS.

2        ALL OF THESE THINGS ARE SORT OF NOT IN KEEPING WITH THE

3    IDEA THAT THERE'S SOME COMPANY OPERATING IN NEW YORK, AND

4    BECAUSE THERE'S THIS THING CALLED THE INTERNET THAT CAN BE

5    ACCESSED THERE, THAT THEY'VE ENTERED INDIAN LANDS.

6        BUT I HEAR YOUR HONOR --

7        THE COURT:  WE'VE GOT, LIKE -- WE'RE INUNDATED WITH

8    THESE PRIVACY CASES BASED ON THE CALIFORNIA WIRETAP STATUTE AND

9    THE LIKE.  WHEN THEY WERE ENACTED, THEY HAD NO IDEA OF WHAT WAS

10   GOING TO COME UP.

11       BUT WE HAVE TO APPLY IT.  WE DON'T JUST GET TO SAY IT

12   DOESN'T APPLY.

13       MR. MAINLAND:  OKAY.

14       THE COURT:  ALL I'M SAYING IS, SURE, AT THE TIME IT

15   WAS ENACTED, THEY DIDN'T HAVE THE INTERNET IN MIND.

16       BUT IT'S COMMON SENSE, IF YOU'RE SITTING ON THE LAND AND

17   YOU'RE DOING IT, I THINK YOU CAN SAY THAT -- IT CONFUSES ME, TO

18   BE HONEST, WHEN YOU KEEP SAYING THAT.

19       MR. MAINLAND:  OKAY.

20       THE COURT:  AS OPPOSED TO I THOUGHT THE ARGUMENT WAS,

21   THIS IS -- THE IGRA AUTHORIZES, IT DOESN'T PROHIBIT, AND THE

22   PROHIBITION HAS TO COME FROM, SAY, CALIFORNIA, BUT THAT'S UP TO

23   CALIFORNIA TO ENFORCE.  THE IGRA AUTHORIZES IT, AND SO THERE'S

24   JUST NO CAUSE OF ACTION THERE, EVEN APART FROM WHETHER IT'S ON

25   INDIAN LANDS.

1            MR. MAINLAND:  THAT'S TRUE, AND THAT GOES TO THE

2      CAUSE OF ACTION ISSUE.

3            I GUESS WHAT I'M SAYING IS EVEN IF THERE'S A CAUSE OF

4      ACTION, EVEN IF NOT BEING AUTHORIZED MEANS YOU'RE VIOLATING A

5      COMPACT, SO THEY CAN BRING A LAWSUIT.

6            AND THEY CAN BRING A LAWSUIT FOR -- AGAINST A COMPANY LIKE

7      KALSHI THAT'S OPERATING IN NEW YORK WHOSE CONTRACTS CAN BE

8      ACCESSED BY SOMEONE SITTING ON A RESERVATION IN CALIFORNIA.

9      LET'S JUST -- THAT IS THE FACT PATTERN THAT WE'RE DEALING WITH

10     HERE.  THAT'S THE LAWSUIT THEY'VE BROUGHT HERE.

11            I DON'T THINK THEY HAVE A CAUSE OF ACTION TO BRING IT, BUT

12     ASSUME THEY DO.

13            UIGEA IS WHERE CONGRESS ACTUALLY LOOKED AT THIS ISSUE.

14     THAT WAS -- AT THAT POINT, CONGRESS -- AND THE IIPAY NATION

15     CASE, THE NINTH CIRCUIT DECISION, IS VERY GOOD ABOUT EXPLAINING

16     THE CONTEXT.  YOU HAVE A PATCHWORK OF STATE REGULATION

17     GOVERNING GAMING, STATE AND TRIBAL REGULATION.  IN SOME PLACES

18     IT'S LEGAL, IN SOME PLACES IT'S NOT.  EVEN IN THE PLACES WHERE

19     IT IS LEGAL, IT'S LEGAL TO DIFFERENT DEGREES.

20            AND AT THE SAME TIME, YOU HAVE THIS THING CALLED THE

21     INTERNET WHERE PEOPLE CAN ACCESS IT ANYWHERE IN THE COUNTRY.

22            AND SO UIGEA PROVIDED A SOLUTION, AND IT MAKES IT

23     UNLAWFUL, AS A MATTER OF FEDERAL LAW, IF IT'S UNLAWFUL WHERE

24     THE TRADE IS INITIATED, RECEIVED, OR OTHERWISE MADE.  THAT

25     LANGUAGE IS IN UIGEA.  IT'S NOT IN IGRA.

```
1              AND IF THE STATUTE JUST STOPPED THERE, I WOULD CONCEDE

2     THAT THEY HAVE A PRETTY GOOD CASE HERE.

3              THE STATUTE DID NOT STOP THERE, AND I HAVEN'T HEARD ANY

4     ENGAGEMENT WITH THE FACT THAT THE STATUTE DIDN'T STOP THERE.

5              IT WENT ON TO CARVE OUT TRANSACTIONS CONDUCTED ON A

6     REGISTERED ENTITY UNDER THE COMMODITY EXCHANGE ACT.  THAT'S US.

7     IT'S UNDISPUTED THAT THAT'S US.

8              I CAN GET TO ALL THE CLAIMS THEY MAKE ABOUT HOW WE'RE NOT

9     IN COMPLIANCE WITH THE CEA.  I THINK THAT'S A COMPLETE

10    SIDESHOW.

11             BUT IT'S UNDISPUTED IN THIS CASE THAT WE ARE A REGISTERED

12    DCM.  WE'VE BEEN AUTHORIZED AS SUCH BY THE CFTC, WE'RE

13    REGULATED BY THE CFTC, AND SITTING HERE TODAY, PEOPLE CAN TRADE

14    KALSHI EVENT CONTRACTS ON OUR DCM.  SO WE ARE CLEARLY CARVED

15    OUT FROM THAT.

16             AND THEN, OF COURSE, THERE'S THE CEA ITSELF.  I DON'T

17    THINK YOUR HONOR NEEDS TO GET INTO THE CEA IN ANY PARTICULAR

18    DETAIL.  BUT IT IS IMPORTANT AS A WAY OF EXPLAINING, WELL, WHY

19    DOES THIS CARVEOUT EXIST?

20             AND THE REASON THE CARVEOUT EXISTS IS BECAUSE IF YOU JUST

21    APPLIED UIGEA ON ITS TERMS WITHOUT THE CARVEOUT, THE EXCLUSIVE

22    JURISDICTIONAL SCHEME, THE UNIFORM NATIONAL REGULATORY SCHEME

23    SET UP IN THE 1974 AMENDMENTS TO THE CEA, WOULD BE COMPLETELY

24    UNWORKABLE.  WE WOULD GO BACK TO THE VERY PATCHWORK OF

25    REGULATION AROUND THE COMPANY THAT -- AROUND THE COUNTRY THAT
```

1    CONGRESS SPECIFICALLY EXPUNGED BACK IN 1974, AND IT EXPANDED

2    THAT AGAIN IN 2000 WHEN IT BROUGHT EVENT CONTRACTS INTO THE

3    MIX, AND THEN IN 2010 WITH THE DODD-FRANK AMENDMENTS WHERE

4    SWAPS ON EVENT CONTRACTS ARE PART OF THE CFTC'S EXCLUSIVE

5    JURISDICTION.

6          SO THEY OFFER A VERY DIFFERENT READING OF THAT.  THEY

7    OFFER A READING OF THAT -- AND YOU HEARD IT HERE IN

8    MR. MARSTON'S PRESENTATION -- JUST LOOK AT IGRA.  JUST LOOK AT

9    THAT STATUTE.

10         AND EFFECTIVELY WHAT THAT RESULTS IN IS DELETING CERTAIN

11   PROVISIONS OF UIGEA AND THE CEA.  PLAINTIFFS ARE SAYING IT'S

12   ILLEGAL UNDER FEDERAL LAW, IRRESPECTIVE OF WHETHER THE

13   TRANSACTION IS ON A CFTC REGISTERED EXCHANGE.  THEY CONCEDE OUR

14   TRANSACTIONS ON SUCH AN EXCHANGE, AND THEY SAY IT'S UNLAWFUL

15   UNDER FEDERAL LAW ANYWAY.

16         I DON'T KNOW HOW YOU GET THERE WITHOUT RED PENCILLING,

17   WITHOUT CROSSING OUT THE CARVEOUT THAT WE HAVE IN UIGEA, AND OF

18   COURSE IN THE CEA, WHICH PROVIDES FOR EXCLUSIVE JURISDICTION

19   OVER TRANSACTIONS ON DCM'S.

20         I DON'T KNOW HOW YOU COULD GET TO THE RESULT THAT THEY'RE

21   ASKING FOR HERE WITHOUT COMPLETELY DISREGARDING THAT.

22         I DO WANT TO -- YOUR HONOR, IF YOU HAVE A QUESTION,

23   I'LL --

24              THE COURT:  I WAS GOING TO ASK MR.  MARSTON TO

25    ADDRESS THAT LATTER ARGUMENT ABOUT UIGEA.

1          MR. MARSTON:  WELL, FIRST OF ALL, IF YOU READ THE

2     STATUTE, IT ONLY APPLIES TO FINANCIAL INSTITUTIONS.  IT DOESN'T

3     APPLY TO THE TRIBE.

4          IN THE MATERIAL, THE STATUTE SPECIFICALLY CARVES OUT

5     TRIBES AS AN EXCEPTION.

6          THE COURT:  WELL, FOR INTERTRIBAL TRANSACTIONS,

7     RIGHT?  I MEAN, BET AND WAGER SPECIFICALLY, AS IN THE ACT,

8     COVERS WHAT HAPPENS HERE.

9          BUT THEN IT DOES EXCLUDE OR EXEMPT --

10         MR. MARSTON:  INDIAN TRIBES.

11         THE COURT:  WELL, IN A DIFFERENT POSITION, INDIAN

12    TRIBES, YES.

13         BUT ALSO WHAT KALSHI IS DOING, BECAUSE IT ALLOWS FOR

14    SELF-REGISTRATION.

15         MR. MARSTON:  THAT -- BUT THAT STATUTE DOESN'T REPEAL

16    OR MODIFY THE INDIAN GAMING REGULATORY ACT.

17         WHAT OPPOSING COUNSEL KEEPS FORGETTING IS WHAT IGRA DOES

18    IS THAT IT SETS UP A SCHEME SO THAT NO GAMING CAN BE CONDUCTED,

19    CLASS III GAMING, UNLESS IT'S CONDUCTED PURSUANT TO A TRIBAL

20    ORDINANCE AND A TRIBAL COMPACT.

21         THE COURT:  WELL, ACTUALLY, IF YOU HAD A STATE -- AND

22    I DON'T KNOW IF THERE ARE ANY -- IF YOU HAD A STATE WHERE ALL

23    GAMBLING WAS LEGAL --

24         MR. MARSTON:  NEVADA.

25         THE COURT:  IS IT LEGAL, ALL OF IT?

```
 1                  MR. MARSTON:  PRETTY MUCH.  YOU -- YOU NAME ME A GAME

 2      THAT'S ILLEGAL IN NEVADA.

 3                  MR. MAINLAND:  THE SCOPE OF THE REGULATORY --

 4                  MR. MARSTON:  AND THAT'S SUGGESTIVE --

 5                  THE COURT:  WAIT, WAIT, WAIT.  LET ME FINISH MY

 6      THOUGHT.

 7                  MR. MARSTON:  OKAY.

 8                  THE COURT:  IF YOU HAD A STATE WHERE ALL GAMBLING WAS

 9      LEGAL, THE TRIBES WOULDN'T NEED IGRA TO ENGAGE IN GAMBLING

10      ON --

11                  MR. MARSTON:  NO.  YES, THEY DO.  EVERY SINGLE TRIBE

12      IN NEVADA, INCLUDING THE LAS VEGAS PAIUTES THAT HAVE A

13      RESERVATION IN LAS VEGAS, NEVADA IN CLARK COUNTY, THEY CAN'T DO

14      GAMING ON THEIR RESERVATION WITHOUT A COMPACT, CLASS III

15      GAMING.  AND THEY CAN'T DO GAMING ON THEIR RESERVATION WITHOUT

16      A GAMING ORDINANCE BY THE SECRETARY OF THE INTERIOR.

17          AND THAT IS THE OFFICIAL POSITION --

18                  THE COURT:  BECAUSE IGRA PROHIBITS GAMING?

19                  MR. MARSTON:  BECAUSE IGRA ONLY ALLOWS, ON INDIAN

20      RESERVATIONS, INDIAN TRIBES TO OFFER THE GAMES.

21          AND IGRA SAYS THAT THE TRIBES CAN ONLY OFFER THE GAMES IF

22      THE STATE PERMITS THE GAME UNDER STATE LAW, THAT'S RUMSEY V.

23      WILSON, NINTH CIRCUIT OPINION; THE TRIBE HAS A GAMING ORDINANCE

24      THAT'S APPROVED BY THE SECRETARY OF THE INTERIOR, AND THE IGRA

25      SPECIFIES CERTAIN PROVISIONS THAT HAVE TO BE IN THE ORDINANCE;
```

```
1        AND, WITH REGARDS CLASS III GAMING, THE TRIBE HAS A COMPACT.

2            THAT'S WHAT EVERYBODY KEEPS MISSING, RIGHT?

3            AND SO CONGRESS DELEGATED AUTHORITY REALLY TO, TO THE

4    TRIBES TO ENACT THESE GAMING ORDINANCES FOR THE TRIBE AS A

5    MATTER OF TRIBAL LAW, PURSUANT TO THEIR INHERENT SOVEREIGN

6    AUTHORITY, TO PROSCRIBE -- AS LONG AS THE GAMES WERE PERMITTED

7    UNDER STATE LAW, RIGHT, AND AS LONG AS THEY WERE ABLE TO

8    NEGOTIATE THE COMPACT AND GET THE PROCEDURES FROM THE

9    SECRETARY -- LEFT IT UP TO THE TRIBES TO DEFINE THE GAMES, HOW

10   THEY WERE TO BE PLAYED, WHAT KIND OF ACTIVITY WOULD BE

11   PROHIBITED.

12       WE MOST CERTAINLY HAVE A PRIVATE CAUSE OF ACTION TO

13   ENFORCE OUR ORDINANCES.

14           THE COURT:  OKAY.  BUT THEN WHAT HAPPENED IS AT THE

15   TIME IT WAS ENACTED, THERE WASN'T ANY INTERNET GAMING, AND THEN

16   THE UIGEA --

17       WHAT YEAR WAS IT ENACTED?

18           MR. MAINLAND:  2006.

19           THE COURT:  -- IN 2006 WAS SPECIFICALLY ENACTED TO

20   REGULATE --

21           MR. MARSTON:  FINANCIAL INSTITUTIONS.

22           THE COURT:  -- GAMING --

23           MR. MARSTON:  NO.  IT WAS TO PROHIBIT BANKS FROM

24   BEING INVOLVED IN INTERNET GAMBLING, RIGHT?  TO MAKE SURE --

25           THE COURT:  I SAW YOU SAY THE PURPOSE.  BUT IT'S
```

1    BROADER THAN THAT, AND IT REFERENCES INDIAN LANDS.

2    MR. MARSTON:  SO YOU'VE GOT --

3    THE COURT:  IT REFERENCES INDIAN LANDS, SO IT'S NOT

4    AS IF WE CAN SAY CONGRESS WASN'T THINKING ABOUT THAT, RIGHT?

5    MR. MARSTON:  SO YOU'VE GOT THREE FEDERAL STATUTES,

6    RIGHT?  YOU'VE GOT THE COMMODITIES AND EXCHANGE ACT; YOU'VE GOT

7    THE, WHAT IS IT, UNLAWFUL ENFORCEMENT OF THE INTERNET GAMBLING

8    ACT, I THINK I GOT IT RIGHT; AND YOU'VE GOT THE IGRA.  OKAY?

9    SO THE FIRST THING THAT THE UNITED STATES SUPREME COURT

10   HAS DIRECTED YOU TO DO, YOUR HONOR, IS YOU'RE TO PRESUME THAT

11   WHEN CONGRESS ENACTED LEGISLATION, PARTICULARLY LEGISLATION

12   THAT TOUCHES UPON INDIAN TRIBES, LIKE THE UIGEA, RIGHT, BECAUSE

13   THEY NAME TRIBES, THAT CONGRESS'S TREATMENT OF TRIBES IN THEIR

14   GOVERNMENT-TO-GOVERNMENT RELATIONSHIP IS BENEVOLENT.

15   SO THEY HAVE DIRECTED THE LOWER FEDERAL COURTS, IN

16   CONSTRUING FEDERAL STATUTES PERTAINING TO INDIAN TRIBES, NOT TO

17   FIND THAT THE FEDERAL STATUTE WOULD DIMINISH ONE OF THE TRIBE'S

18   SOVEREIGN RIGHTS ABSENT THAT EXPRESS AND EXPLICIT LANGUAGE

19   SAYING SO.

20   SO WHEN YOU SEEK TO INTERPRET THE IGRA IN CONJUNCTION WITH

21   THE UIGEA, OR WHATEVER THE ACRONYM IS, YOU'VE GOT TO INTERPRET

22   IT IN SUCH A WAY THAT IT WILL UPHOLD THE TRIBE'S RIGHT TO BE

23   ABLE TO BRING A PRIVATE CAUSE OF ACTION, A GOVERNMENTAL CAUSE

24   OF ACTION, AGAINST KALSHI TO ENFORCE ITS GAMING ORDINANCE THAT

25   EXPRESSLY PROHIBITS SPORTSBOOK BEING PLAYED ON THEIR

1    RESERVATION.  SO THAT'S THE FIRST THING.

2         THE SECOND THING IS I DON'T REALLY SEE A CONFLICT BETWEEN

3    IGRA AND THE UIGEA, WHATEVER IT IS, AND THE CEA.

4         WHY?  BECAUSE THESE SPORTSBOOK CONTRACTS, UNDER THE CEA,

5    THEY'RE NOT SWAPS AND, THEREFORE, THE COURT DOESN'T -- THE

6    COMMISSION DOESN'T HAVE EXCLUSIVE JURISDICTION.  THEY'RE NOT

7    SWAPS BECAUSE THEY'RE PROHIBITED CONTRACTS UNDER 40.11.

8         AND THE FACT THAT THEY'VE SELF-CERTIFIED DOESN'T MAKE THEM

9    LEGAL.  THEY'RE STILL IN VIOLATION OF THE REGULATION.

10            THE COURT:  WHO GETS TO DECIDE THAT?

11            MR. MARSTON:  WELL, THE COMMISSION GETS TO DECIDE

12    WHETHER THEIR CONTRACT MEETS THE REQUIREMENTS OF THE CEA AND IS

13    OR IS NOT, IN, FACT, GAMING, AND IS OR IS NOT A PROHIBITED --

14    AGAINST THE PUBLIC INTEREST IN A PROHIBITED CONTRACT.

15         BUT WE GET TO DECIDE WHETHER THEIR CONDUCT VIOLATES OUR

16    GAMING ORDINANCE AND VIOLATES OUR COMPACT.  WE GET TO DEFINE

17    WHETHER THEIR CONDUCT CONSTITUTES SPORTSBOOK AS WE DEFINED IT

18    AND AS THE NATIONAL INDIAN GAMING DEFINES IT UNDER FEDERAL

19    REGULATION.

20         WHY?  BECAUSE THEY'RE DOING IT ON INDIAN LANDS AND BECAUSE

21    THE IGRA -- BECAUSE THE IGRA GIVES US THAT CONGRESSIONALLY

22    DELEGATED AUTHORITY TO DO SO.

23         THIS IS AN INTERPRETATION -- THIS IS A CASE OF STATUTORY

24    CONSTRUCTION, AND THE FEDERAL -- THE UNITED STATES SUPREME

25    COURT IN NATIONAL FARMER HAS SAID THIS POSES A FEDERAL

```
1     QUESTION, AND YOU GET TO DECIDE IT, YOUR HONOR.

2          YOU GET TO DECIDE -- IF THERE'S AMBIGUITY BETWEEN THE

3     STATUTES AND THERE'S CONFLICT BETWEEN THE STATUTES, YOU GET TO

4     RESOLVE THE CONFLICT AND YOU GET TO INTERPRET THE STATUTES.

5          BUT YOU'VE GOT TO INTERPRET THEM AS THE INDIANS UNDERSTAND

6     THEM, AND YOU'VE GOT TO PRESUME THAT CONGRESS WOULD NOT HAVE

7     TAKEN A RIGHT OF SELF-GOVERNMENT AWAY FROM THE TRIBES UNLESS

8     THEY EXPRESSLY AND EXPLICITLY SAY SO.

9          THERE IS NOTHING IN THE CEA, OR ITS LEGISLATIVE HISTORY,

10    THAT EVEN MENTIONS INDIAN TRIBES.

11         YOU KNOW, CONGRESS ENACTED THE IGRA BEFORE THEY DID THE

12    AMENDMENTS TO THE CEA BY DODD-FRANK.

13              THE COURT:  CAN I GO BACK TO SOMETHING COUNSEL SAID

14    EARLIER, WHICH WAS THAT UNDER IGRA, DO YOU HAVE A CASE IN WHICH

15    A TRIBE HAS SUED A THIRD PARTY?

16              MR. MARSTON:  NOT DIRECTLY.  BUT WE GO -- I GO INTO

17    COURT ALL THE TIME AND SUE THIRD PARTIES TO ENFORCE TRIBAL LAW.

18         WATER WHEEL, NINTH CIRCUIT COURT OF APPEAL --

19              THE COURT:  SO IGRA, WE'RE TALKING ABOUT GAMBLING,

20    CLASS III GAMBLING, WE'RE TALKING ABOUT IGRA AND THE STATUTE.

21              MR. MARSTON:  WELL, YOU KNOW, I'M THINKING THE

22    SIMULCAST SPORTSBOOK CASE, THE NINTH CIRCUIT'S DECISION WHERE

23    THE TRIBE SUED -- I'M TRYING TO REMEMBER.  I KNOW THE TRIBE

24    SUED THE STATE.  I THINK THEY ALSO SUED THE NON-INDIAN

25    SPORTS -- THE PEOPLE THAT WERE PROVIDING THE SIMULCAST SIGNAL.
```

1        I'LL HAVE TO GO BACK AND LOOK.  I'LL BE HONEST, YOUR

2    HONOR.

3            THE COURT:  OKAY.

4            MR. MARSTON:  BUT IT'S -- YOU KNOW, CABAZON VERSUS

5    CALIFORNIA, BUT NOT THE CALIFORNIA VERSUS CABAZON SUPREME COURT

6    CASE THAT INTERPRETED PUBLIC LAW 280.

7            BUT WE GO INTO COURT ALL THE TIME.  WATER WHEEL, LOOK AT

8    WATER WHEEL.  THERE --

9            THE COURT:  THAT'S AN IGRA CASE?

10            MR. MARSTON:  IT'S NOT AN IGRA CASE.

11            THE COURT:  THAT'S MY QUESTION, THOUGH.  I -- YOUR

12    CAUSE OF ACTION YOU'VE MOVED FOR PRELIMINARY INJUNCTION ON IS

13    UNDER IGRA.

14            MR. MARSTON:  BUT IT -- BUT, AGAIN --

15        OH, THAT'S RIGHT.

16        WELL, YOUR HONOR, I SUED --

17        WE GOT SUED?

18        YES, I WOULD CITE STOCKBRIDGE-MUNSEE VERSUS STATE OF

19    WISCONSIN.

20            THE COURT:  STOCKBRIDGE?

21            MR. MARSTON:  STOCKBRIDGE-MUNSEE VERSUS STATE OF

22    WISCONSIN.  THAT WAS A THIRD PARTY SUIT INVOLVING THE IGRA.

23    THAT WAS MY CASE, YOUR HONOR, SEVENTH CIRCUIT.  I FORGOT ABOUT

24    IT.

25            I HAVE 110 REPORTED DECISIONS.  I FORGET ABOUT THEM.

1           THE REPORTER:  I'M SORRY, COUNSEL.  I DIDN'T HEAR

2     THAT LAST PART.

3           MR. MARSTON:  BUT --

4           THE COURT:  HE SAID HE HAS 110 PUBLISHED DECISIONS.

5           MR. MARSTON:  YOU JUST THINK I'M YOUNG AND HANDSOME,

6     YOUR HONOR.  I'M OLD AND DECREPIT, ACTUALLY.  I'VE BEEN DOING

7     THIS FOR A LONG TIME.

8           THE COURT:  NO COMMENT.

9           MR. MARSTON:  THANK YOU, YOUR HONOR.

10        BUT WATER WHEEL IS INSTRUCTIVE.

11        WHY?  BECAUSE THE NINTH CIRCUIT SAID THAT THE INDIAN

12     TRIBE'S JURISDICTION TO ENFORCE A TRIBAL ORDINANCE, THERE IT

13     WAS AN EVICTION ORDINANCE, AGAINST A NON-INDIAN BUSINESS AND

14     NON-INDIAN INDIVIDUALS, BECAUSE THE ACTIVITY OF THE NON-INDIANS

15     WAS OCCURRING ON INDIAN TRUST LAND WITHIN THE BOUNDARIES OF THE

16     RESERVATION, WAS EXCLUSIVE.

17           THE COURT:  OKAY.  BUT THAT'S A DIFFERENT ARGUMENT

18     THAN YOU MADE IN YOUR PRELIMINARY INJUNCTION MOTION.  SO MAYBE

19     YOU COME UP -- THIS IS UNDER IGRA.

20           MR. MARSTON:  BUT YOU CAN'T -- THE POINT I'M TRYING

21     TO MAKE IS YOU CAN'T SEPARATE THE COMPACT IN THE TRIBE'S GAMING

22     ORDINANCE FROM THE ACTUAL WORDING OF THE FEDERAL STATUTE.

23        THE IGRA CREATES -- THE GAMING ORDINANCE AND THE COMPACT

24     ARE AUTHORIZED BY THE FEDERAL STATUTE, THEY'RE REQUIRED BY THE

25     FEDERAL STATUTE FOR THE TRIBES TO ENGAGE IN GAMING, AND THEY

1    HAVE TO BE READ PART AND PARCEL, IN PARI MATERIA, WITH THE

2    FEDERAL STATUTE.

3         THE COURT:  OKAY.  CAN I ASK YOU ANOTHER QUESTION,

4    AND THEN WE HAVE TO FINISH UP BECAUSE THE COURT REPORTER HAS

5    BEEN GOING FOR A COUPLE HOURS.

6         MR. MARSTON:  THANK YOU FOR DOING THAT.

7         THE COURT:  LET'S ASSUME FOR A SECOND THAT THERE WAS

8    A SERIOUS QUESTION.  WHAT IS THE IRREPARABLE INJURY, OTHER THAN

9    MONEY -- I MEAN, YOUR CLAIM IS THAT YOU'RE LOSING MONEY.

10        MR. MARSTON:  THERE'S THREE.  FIRST AND FOREMOST,

11   IT'S WHAT WE'VE BEEN TALKING ABOUT.

12        YOU KNOW, THERE'S THIS JUDGE CALLED NEIL GORSUCH, AND HE

13   SAT ON THE TENTH CIRCUIT COURT OF APPEALS FOR A LONG TIME, AND

14   HE WROTE THE OPINION IN THE UTE CASE AND HE CAME RIGHT OUT AND

15   HE SAID, WHEN YOU INTERFERE WITH THE ABILITY OF A TRIBE TO BE

16   ABLE TO ENACT ITS OWN LAWS, BE RULED BY THEM, AND ENFORCE THEIR

17   LAWS AGAINST PERSONS, ORGANIZATIONS, AND ENTITIES ON THE

18   RESERVATION, THAT'S AN IMPERMISSIBLE INTERFERENCE WITH TRIBAL

19   SELF-GOVERNMENT UNDER THE SUPREME COURT'S DECISION IN WILLIAMS

20   VERSUS LEE AND THE TRIBE SUFFERS IRREPARABLE HARM.  IT'S RIGHT

21   IN THE OPINION.

22        THE UNITED STATES SUPREME COURT, IN NEW MEXICO VERSUS

23   MESCALERO APACHE TRIBE, THERE HELD THAT WHERE A NON-INDIAN THAT

24   COMES ON TO THE RESERVATION AND IS CONFRONTED WITH HAVING TO

25   DECIDE WHETHER IT HAS TO ABIDE BY A STATE HUNTING AND FISHING

1    LAW OR A TRIBAL HUNTING AND FISHING LAW, AND CAN'T ABIDE BY

2    BOTH BECAUSE THEY CONFLICT WITH EACH OTHER, THAT CONSTITUTES AN

3    IMPERMISSIBLE INTERFERENCE WITH TRIBAL SELF-GOVERNMENT AND THE

4    TRIBE SUFFERS IRREPARABLE HARM.  THAT'S NUMBER ONE.

5              THE COURT:  OKAY.

6              MR. MARSTON:  NUMBER TWO IS WE HAVE A

7    RESPONSIBILITY -- YOU KNOW, OUR COMPACT, OUR COMPACT ACTUALLY

8    CONTAINS PROVISIONS -- I WANTED TO CITE TO THEM -- PICAYUNE'S

9    COMPACT, SECTION 8.1.1, WE'RE MANDATED BY THE COMPACT TO, AND I

10   QUOTE, ENFORCE ALL RELEVANT LAWS AND RULES.

11             SECTION 8.1.4, WE'RE MANDATED TO PREVENT, TO -- WE'RE

12   REQUIRED TO PREVENT ILLEGAL ACTIVITY FROM OCCURRING.

13             THEIR ACTIVITY PREVENTS US FROM ENSURING THE FAIRNESS OF

14   THE PLAYING OF THE GAME, PREVENTS US FROM BEING ABLE TO

15   DETERMINE WHETHER ORGANIZED CRIME IS ENGAGED IN THE PLAYING OF

16   THE GAME.

17             THE COURT:  WELL, I DON'T KNOW -- I DON'T KNOW ABOUT

18   THAT ONE.  THAT ONE IS A BIT OF A STRETCH.

19             MR. MARSTON:  NO, BECAUSE CLASS III -- UNDER OUR --

20   UNDER THE IGRA AND UNDER OUR COMPACT AND UNDER OUR ORDINANCE,

21   ANY CLASS III GAMING ACTIVITY THAT'S LAWFUL ON OUR RESERVATION,

22   WE HAVE TO ENSURE THE FAIRNESS OF THE PLAYING OF THE GAMES.  SO

23   WE DO CRIMINAL HISTORY BACKGROUND CHECKS, WE TEST THE EQUIPMENT

24   THAT'S USED TO PLAY THE GAMES TO ENSURE THAT THEY'RE NOT

25   RIGGED, RIGHT?

1        WE CAN'T -- WE CAN'T DO THAT WITH REGARDS TO KALSHI.  WE

2   HAVE NO IDEA -- AND THE PEOPLE COME ON TO OUR RESERVATION,

3   GAMERS COME ON TO OUR RESERVATION AND THEY PULL UP AN APP

4   BECAUSE THEY'VE BEEN BOMBARDED WITH ADVERTISEMENTS ON THEIR

5   INSTAGRAM AND FACEBOOK THAT THEY CAN PLAY THIS GAME AND IT'S

6   LEGAL IN ALL 50 STATES.  THEY IMMEDIATELY PRESUME IT'S LAWFUL

7   ON THE RESERVATION AND THEY'RE PLAYING THE GAME.

8        WHAT HAPPENS IF THE GAME THAT THEY THEN PLAY -- AND I

9   DON'T KNOW IF YOUR HONOR SAW CNN THIS MORNING --

10        THE COURT:  I DID NOT.

11        MR. MARSTON:  WELL, THE FBI JUST ANNOUNCED --

12        THE COURT:  OH, THE NBA -- I DIDN'T SEE CNN --

13        MR. MARSTON:  SPORTSBOOK GAMBLING, ORGANIZED CRIME

14   BEING INVOLVED IN SPORTSBOOK GAMBLING, THAT THE GAMES WERE

15   RIGGED, THEY'RE CHARGING PLAYERS AND THE PEOPLE THAT --

16        THE COURT:  YOU'RE GETTING A LITTLE FAR AFIELD HERE.

17        MR. MARSTON:  THE POINT I'M TRYING TO MAKE IS THEY'RE

18   INTERFERING WITH OUR ABILITY TO BE ABLE TO REGULATE THE GAMES

19   AS WELL AND TO GUARANTEE TO OUR PUBLIC THAT THE GAMES ARE FAIR

20   AND NOT RIGGED.  RIGHT?

21        THE COURT:  THEY'RE --

22        MR. MARSTON:  AND THEN FINALLY, IT'S OUR POSITION --

23   AND AGAIN I GO BACK TO THE RAMOS DECLARATION -- THAT THEY'RE

24   TARGETING GAMERS AND THEY'RE TRYING TO CONVINCE GAMERS TO PLAY

25   SPORTSBOOK ON THEIR PHONES, AND THE VAST MAJORITY OF THOSE

```
1      GAMERS ARE DOING IT, AS YOU STATED EARLIER, SITTING ON THE

2      COUCH WATCHING THE TELEVISION, AND THAT'S DIVERTING REVENUE

3      AWAY FROM THE TRIBES.

4           THE COURT:  RIGHT.  BUT THE -- OKAY.  ALL RIGHT.

5           MR. MARSTON:  AND THAT PREVENTS US FROM BEING ABLE TO

6      OFFER ESSENTIAL GOVERNMENTAL SERVICES, AND THAT IS CAUSING US

7      IRREPARABLE HARM.

8           MR. MAINLAND:  A FEW THINGS YOUR HONOR.

9           THE COURT:  OKAY.

10          MR. MAINLAND:  DO YOU WANT TO HEAR MORE ON --

11          THE COURT:  WHATEVER YOU WANT TO SAY, BECAUSE WE'RE

12     GOING TO STOP.

13          MR. MAINLAND:  I'LL BE VERY, VERY QUICK.

14          ON THIS ISSUE OF A CANON OF INTERPRETATION IN FAVOR OF

15     INDIAN TRIBES, THAT APPLIES WHERE THERE ARE DOUBTFUL

16     EXPRESSIONS OF LEGISLATIVE INTENT.

17          WE WOULD SUBMIT WHEN YOU LOOK AT UIGEA, WHEN YOU LOOK AT

18     WHAT IT WAS TRYING TO ACCOMPLISH THERE WITH RESPECT TO THE

19     INTERNET AND APPLICATION OF STATE AND TRIBAL LAW AROUND THE

20     COUNTRY, THAT THERE IS NO DOUBTFUL EXPRESSION OF LEGISLATIVE

21     INTENT.  IT'S VERY CLEAR WHAT CONGRESS INTENDED THERE.  IT

22     INTENDED TO EXEMPT DERIVATIVES TRADING FROM THAT OTHERWISE

23     APPLICABLE PROHIBITION.

24          THE OTHER ISSUE, JUST VERY QUICKLY, ON THIS POINT ABOUT

25     17 CFR 40.11 AND THESE AREN'T REALLY SWAPS, ALL OF THAT, I'LL
```

```
1    BE VERY BRIEF ON IT.

2         BUT THAT'S JUST DEMONSTRABLY WRONG.  THEY QUOTE 40.11(A),

3    BUT THEY COMPLETELY OMIT 40.11(C), WHICH PROVIDES FOR A PUBLIC

4    INTEREST REVIEW PROCESS BY THE CFTC WITH RESPECT TO CONTRACTS,

5    EVENT CONTRACTS THAT HAVE BEEN SELF-CERTIFIED BY THE DCM AND

6    FALL INTO THOSE ENUMERATED ACTIVITIES.

7         SO THE IDEA THAT IT WAS A BLANKET PROHIBITION IS REFUTED

8    BY THE TEXT OF THE RULE ITSELF.

9         IT'S ALSO CLEAR THAT THE CFTC DOESN'T THINK SO, BECAUSE

10   WHEN THERE WAS LITIGATION BETWEEN KALSHI AND THE CFTC, THEY

11   DIDN'T SAY, WHAT ARE YOU DOING LISTING THESE POLITICAL EVENT

12   CONTRACTS?  THEY'RE PROHIBITED.

13        THEY SAID, WE'RE GOING TO LOOK AT THIS AND DETERMINE

14   WHETHER THEY FALL INTO ONE OF THESE ENUMERATED CATEGORIES,

15   GAMING OR UNLAWFUL ACTIVITY; AND THEN, THEN AS A SECOND STEP,

16   WE'RE GOING TO DO A PUBLIC INTEREST REVIEW.

17        AND IN THE ORDER THAT WAS LITIGATED OVER THERE, THERE WERE

18   TEN PAGES OF PUBLIC INTEREST ANALYSIS AFTER THEY HAD DETERMINED

19   THAT THESE CONTRACTS FELL INTO ONE OF THE ENUMERATED

20   CATEGORIES.

21        SO THE IDEA THAT IT'S A BLANKET PROHIBITION IS TOTALLY

22   INCONSISTENT WITH THAT.

23        AND THE ADOPTING RELEASE FOR 40.11 MAKES CLEAR YOU CAN

24   ALWAYS CERTIFY PRODUCTS AND THEN THEY'LL -- THE CFTC MAY

25   CONDUCT A PUBLIC INTEREST REVIEW.
```

1          AND A PROPOSED RULE MAKING JUST FROM LAST YEAR -- IT

2    WASN'T ACTUALLY ADOPTED -- BUT A PROPOSED RULE MAKING BY THE

3    CFTC SAID THE COMMISSION INTERPRETS THE SPECIAL RULE TO

4    CONTEMPLATE THAT THE COMMISSION ENGAGE IN A TWO-STEP INQUIRY,

5    AND IT WALKED THROUGH.

6          THE FIRST IS WHETHER IT FALLS IN ONE OF THOSE CATEGORIES,

7    AND THE NEXT IS WHETHER IT IS CONTRARY TO THE PUBLIC INTEREST.

8          AND THE THIRD POINT, AND THEN I'LL JUST VERY BRIEFLY ON

9    IRREPARABLE HARM, THERE HAVE BEEN A LOT OF TALK ABOUT

10   ORDINANCES TODAY.

11         I'VE BEEN A LITTLE TROUBLED BY THAT JUST BECAUSE THEY'RE

12   NOT SEEKING A PRELIMINARY INJUNCTION ON THE BASIS OF THEIR

13   ORDINANCES CLAIM.  THAT'S A SEPARATE CLAIM.  IT'S NOWHERE TO BE

14   FOUND IN THEIR PRELIMINARY INJUNCTION MOTION.  THEY STILL HAVE

15   NOT IDENTIFIED FOR US WHAT THESE ORDINANCES ARE OR WHAT THEY

16   SAY, SO WE'LL BE RAISING THAT IN CONNECTION WITH OUR MOTION TO

17   DISMISS.

18         BUT THEIR P.I. MOTION IS TARGETED ON THE IGRA CLAIM AND

19   THE LANHAM ACT CLAIM, AND THAT'S IT.

20         SO WITH THAT, I WILL PASS IT TO MY COLLEAGUE.

21           MS. CHOE:  ON IRREPARABLE HARM, YOUR HONOR, WE WOULD,

22   YOU KNOW, LARGE RELY ON OUR PAPERS.

23         BUT WITH RESPECT TO THE CLAIMED INFRINGEMENT OF TRIBAL

24   SOVEREIGNTY, VIOLATING A SOVEREIGN'S LAWS, IF THAT IS WHAT, YOU

25   KNOW, THEY'RE SAYING KALSHI IS DOING, ISN'T INFRINGING ON THAT

1        SOVEREIGN'S SOVEREIGNTY.  THAT'S A MATTER BETWEEN SOVEREIGNS.

2            VIOLATING A SOVEREIGN'S LAWS MEANS YOU'RE VIOLATING THE

3        LAWS, RIGHT?  IT DOESN'T MEAN YOU'RE INFRINGING ON THEIR

4        SOVEREIGN AUTHORITY, FIRST OF ALL.

5            SECOND OF ALL, WE WOULD POINT THE COURT TO MONTANA,

6        CORNELL, AND OTHER CASES THAT, AGAIN, WE'LL MORE FULLY FLUSH

7        OUT IN OUR MOTION TO DISMISS WHICH WILL BE FILED END OF NEXT

8        WEEK, I BELIEVE.

9            THE TRIBES DO NOT HAVE SOVEREIGN AUTHORITY OVER

10       NON-MEMBERS LIKE KALSHI.  THIS IS NOT A CASE THAT FALLS INTO

11       EITHER OF THE TWO NARROW EXCEPTIONS IN MONTANA.

12           AND TO THE EXTENT THAT THEIR CLAIM THAT WE'RE HARMING THEM

13       BY INFRINGING ON THEIR SOVEREIGN AUTHORITY IS BASED ON

14       SOVEREIGN AUTHORITY OVER KALSHI, IT DOESN'T EXIST.

15           AND FINALLY, WITH RESPECT TO THE ARGUMENT THAT KALSHI IS

16       DIVERTING REVENUE, WE DISCUSSED THAT IN THE CONTEXT OF THE

17       LANHAM ACT CLAIM.  THERE IS NO SHOWING OF THAT.  THERE IS NO

18       SHOWING THAT THERE HAS BEEN OR WILL BE IMMINENT IRREPARABLE

19       HARM TO EITHER THEIR REVENUE STREAM, WHICH IS, OF COURSE, TRULY

20       ECONOMIC INJURY, OR TO THEIR TRIBAL GOVERNMENTAL OPERATIONS.

21           THEY HAVE LAID OUT A POTENTIAL SERIES OF HYPOTHETICALS,

22       BUT NO EVIDENCE FOR THE COURT TO SHOW THAT THOSE THINGS ARE

23       LIKELY TO HAPPEN.

24               THE COURT:  ALL RIGHT.  THANK YOU.

25               MR. MARSTON:  I -- JUST ONE MINUTE, AND IT'S MY

```
1        MOTION, I'D LIKE TO CLOSE.

2             SHE IS ABSOLUTELY, POSITIVELY WRONG ABOUT MONTANA AND THAT

3        WE DON'T HAVE JURISDICTION.  ALL THE COURT NEEDS TO DO IS READ

4        THE NINTH CIRCUIT'S COURT OF APPEALS DECISION IN WATER WHEEL

5        WHERE IT SPECIFICALLY STATES MONTANA ONLY APPLIES WITH REGARDS

6        TO A TRIBE SEEKING TO EXERCISE JURISDICTION OVER NON-INDIANS ON

7        NON-INDIAN OWNED FEE LAND WITHIN THE BOUNDARIES OF THE

8        RESERVATION.

9             IF THE TRIBE IS SEEKING TO EXERCISE JURISDICTION OVER

10       NON-INDIANS ON TRUST LAND WITHIN THE BOUNDARIES OF THE

11       RESERVATION, THEY HAVE, AS THE NINTH CIRCUIT SAID, ABSOLUTE

12       JURISDICTION.

13            THE SUPREME COURT IN MAZURIE, UNITED STATES VERSUS

14       MAZURIE, MADE IT ALSO VERY CLEAR THAT IT'S A TOTALLY DIFFERENT

15       SITUATION WHEN CONGRESS ENACTS A STATUTE GIVING TRIBES THE

16       AUTHORITY TO ENACT ORDINANCES REGULATING PARTICULAR CONDUCT

17       BECAUSE IN THOSE SITUATIONS, THEY'RE EXERCISING CONGRESSIONALLY

18       DELEGATED AUTHORITY.

19            AND I'LL CLOSE BY SAYING THIS:  FOR 150 YEARS, WE HAVE

20       BEEN DEFENDING OUR SOVEREIGNTY.  WE DON'T HAVE THE ABILITY TO

21       GO SEND POLICE AND ARREST THEM OUTSIDE OUR RESERVATION.  WE

22       DON'T HAVE THE ABILITY TO STOP THEM FROM DOING WHAT THEY'RE

23       DOING.  FOR 150 YEARS, WE'VE BEEN GOING, TRIBES HAVE BEEN GOING

24       TO THE FEDERAL COURTS SEEKING THE PROTECTION OF THE FEDERAL

25       COURTS.  WE'RE SEEKING YOUR PROTECTION NOW.
```

```
1            THANK YOU, YOUR HONOR.

2                 THE COURT:  THANK YOU, EVERYONE, FOR THE ARGUMENT.

3                 MS. CHOE:  THANK YOU, YOUR HONOR.

4                 THE COURT:  OH, FOR ROBINHOOD, DO YOU HAVE SOMETHING

5      DIFFERENT TO SAY?

6                 MR. RYAN:  I JUST WANTED TO ADDRESS BRIEFLY THE POINT

7      ABOUT TRIBAL SOVEREIGNTY, YOUR HONOR.

8                 THE COURT:  OKAY.

9                 MR. RYAN:  AND SO THEY ARE -- THEY ARE -- IT'S

10     OBVIOUSLY A VERY IMPORTANT PRINCIPLE, BUT ONE THAT HAS A

11     CAREFULLY DEFINED SCOPE, AND IT DOES NOT EXTEND TO ACTIVITIES

12     OFF A RESERVATION, EVEN IF THEY ARE RECEIVED OVER THE INTERNET

13     ON THE RESERVATION.

14         AND AN EXAMPLE OF THAT IS THE HORNELL BREWING CASE THAT WE

15     CITED IN OUR PAPERS WHERE ADVERTISEMENTS BY A NON-TRIBAL MEMBER

16     OFF RESERVATION COULD BE RECEIVED, AND WERE RECEIVED, OVER THE

17     INTERNET ON THE ROSEBUD SIOUX RESERVATION, AND THE COURT WAS

18     CLEAR THAT THAT DID NOT FALL WITHIN TRIBAL SOVEREIGNTY.

19                THE COURT:  DO YOU HAVE A CASE THAT SAYS NOT JUST

20     RECEIVED, BUT THEN ACTED UPON AND SENT, RIGHT?  IT'S NOT

21     JUST -- THEY'RE NOT SUING ON ADVERTISEMENTS.  THEY'RE SUING ON

22     CONTRACTS THAT ARE ACTUALLY ENTERED ON TRIBAL LAND.

23                MR. RYAN:  YES, YOUR HONOR.

24         AND SO IF YOU HAVE PEOPLE WHO ENTER ON TRIBAL LAND THAT'S

25     GOVERNED BY MONTANA AGAINST THE UNITED STATES, AND THERE ARE
```

1    TWO SPECIFIC EXCEPTIONS.  THE GENERAL RULE IS THAT THERE'S NO

2    INHERENT TRIBAL SOVEREIGNTY OVER THE ACTIVITIES OF NON-MEMBERS,

3    EVEN ON TRIBAL LAND, AND THAT IS MONTANA AGAINST UNITED STATES.

4    THAT IS ALSO IN THE NINTH CIRCUIT EVANS VERSUS

5    SHOSHONE-BANNOCK, 736 F.3D 1298.

6         AND THERE ARE TWO MONTANA EXCEPTIONS, ONE BEING IF THERE

7    ARE INTERACTIONS WITH THE TRIBES, SO AN EXAMPLE THAT HAS BEEN

8    CITED IN THE PAPERS IS THE LEXINGTON INSURANCE CASE WHERE A

9    NON-TRIBAL INSURANCE COMPANY VOLUNTARILY ENTERED INTO AN

10   INSURANCE COMPANY WITH THE TRIBE TO INSURE TRIBAL PROPERTY ON

11   TRIBAL LANDS THAT FIT WITHIN THE FIRST MONTANA EXCEPTION.

12        AND THE SECOND MONTANA EXCEPTION IS THAT IT WOULD IMPERIL

13   ASSISTANCE OR WELFARE OF THE TRIBE, AND FOR THAT IT IS

14   NECESSARY TO AVERT CATASTROPHIC CONSEQUENCES, THAT'S THE PLAINS

15   COMMERCE BANK AGAINST LONG FAMILY LAND AND CATTLE COMPANY FROM

16   U.S. SUPREME COURT IN 2008.

17        SO THERE ARE THESE VERY NARROW EXCEPTIONS WHERE A TRIBE

18   MAY EXERCISE INHERENT TRIBAL SOVEREIGNTY.

19        WE'LL SET FORTH IN OUR MOTION TO DISMISS PAPERS NEXT WEEK

20   WHY THOSE SHOULD LEAD TO DISMISSAL --

21             THE COURT:  OKAY, WE HAVE --

22             MR. RYAN:  -- OF THOSE TWO CAUSES OF ACTION.

23        BUT THOSE ALSO INFLUENCE WHAT IGRA MEANT BY ON INDIAN LAND

24   AND EXPLAIN WHY, WHY OFF-RESERVATION CONDUCT IS NOT COVERED BY

25   IGRA.

1          THE COURT:  BUT WHEN IGRA WAS ENACTED, THERE WASN'T

2    THE INTERNET THIS WAY, SO IT JUST DIDN'T CONTEMPLATE IT.  IT

3    JUST DIDN'T CONTEMPLATE IT, RIGHT?

4          MR. RYAN:  THAT'S RIGHT, YOUR HONOR.

5       UIGEA DOES --

6          THE COURT:  I UNDERSTAND THAT ARGUMENT.

7          MR. RYAN:  -- AND HAS A SPECIFIC CEA CARVEOUT FOR

8    DESIGNATED CONTRACT MARKETS LIKE KALSHI.

9          MR. MARSTON:  MONTANA DOESN'T APPLY.  READ THE

10   NINTH CIRCUIT'S DECISION IN WATER WHEEL.  THEY TELL YOU WHY

11   MONTANA DOESN'T APPLY.

12      AND ALL I WOULD SAY, YOUR HONOR, IT'S THE NATIONAL

13   POLICY -- IT'S THE OFFICIAL NATIONAL POLICY OF THE

14   UNITED STATES TO PROMOTE TRIBAL SELF-GOVERNMENT AND TO ALLOW

15   THE INDIANS TO GOVERN THEMSELVES ON THEIR RESERVATIONS UNDER

16   THEIR OWN TRIBAL LAWS.

17      WE HAVE A GAMING ORDINANCE.  WE'RE TRYING TO GOVERN

18   OURSELVES UNDER THAT GAMING ORDINANCE.  THEY'RE VIOLATING THAT

19   GAMING ORDINANCE.

20      THAT'S FRUSTRATING THE VERY PURPOSE FOR WHICH CONGRESS

21   ENACTED THE INDIAN GAMING REGULATORY ACT.

22          THE COURT:  ALL RIGHT.

23      THANK YOU, EVERYONE, FOR YOUR VERY HELPFUL ARGUMENTS.

24          MR. MARSTON:  THANK YOU, YOUR HONOR.  THANK YOU FOR

25   GIVING US THE TIME.

1              MR. MAINLAND:  THANK YOU, YOUR HONOR.

2         (THE PROCEEDINGS WERE CONCLUDED AT 12:16 P.M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7         I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    1301 CLAY STREET, OAKLAND, CALIFORNIA, DO HEREBY CERTIFY:

10        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

11   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

12   ABOVE-ENTITLED MATTER.

13

14

15

16         _____
           LEE-ANNE SHORTRIDGE, CSR, CRR
17         CERTIFICATE NUMBER 9595

18              DATED:  OCTOBER 27, 2025

19

20

21

22

23

24

25