1  LESTER J. MARSTON
   California State Bar No. 081030
2  LAW OFFICES OF RAPPORT AND MARSTON
   AN ASSOCIATION OF SOLE PRACTITIONERS
3  405 West Perkins Street
   Ukiah, California 95482
4  Telephone: 707-462-6846
   Facsimile: 707-462-4235
5  Email: ljmarston@rmlawoffice.net
6
7  *Attorney for Plaintiffs*

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10  BLUE LAKE RANCHERIA,                    Case No.:  25-cv-06162-JSC
    CHICKEN RANCH RANCHERIA OF
11  ME-WUK INDIANS, and PICAYUNE          **PLAINTIFFS' OPPOSITION TO**
    RANCHERIA OF THE                      **DEFENDANTS' MOTION TO DISMISS**
12  CHUKCHANSI INDIANS                    **PLAINTIFFS' COMPLAINT**

13                  Plaintiffs,            Date: March 19, 2026
                                          Time: 10:00 a.m.
14  v.                                    Courtroom: 8 (19th Floor)
                                          Judge: Hon. Jacqueline Scott Corley
15  KALSHI INC., KALSHIEX LLC,
    ROBINHOOD MARKETS, INC.,
16  ROBINHOOD DERIVATIVES LLC,
    and DOES 1-20,
17
                    Defendants.
18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

LEGAL STANDARDS ................................................................................................ 3

   1.   Legal Standard for Motions to Dismiss. ......................................................... 3

   2.   Legal Standard for Interpreting Tribal Statutory Rights. ................................ 4

I.   THE TRIBES ALLEGE SUFFICIENT FACTS TO STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER IGRA. .......................................................... 4

II.  THE TRIBES ALLEGE SUFFICIENT FACTS TO STATE A PLAUSIBLE CLAIM FOR RELIEF PURSUANT TO THE GAMING ORDINANCE. .................................... 20

III. THE TRIBES ALLEGE SUFFICIENT FACTS TO STATE A PLAUSIBLE CLAIM FOR DECLARATORY RELIEF FOR INFRINGEMENT OF TRIBAL SOVEREIGNTY. .................................................................................. 23

IV. THE TRIBES STATE A LANHAM ACT CLAIM BY ALLEGING THAT KALSHI FALSELY ADVERTISED THAT IT CONDUCTS LEGAL SPORTS BETTING IN ALL FIFTY STATES. ........................................................ 26

   A.  The Heightened Pleading Standard Does Not Apply to the Tribes' Lanham Act Claim. ............................................................................................. 26

   B.  The Tribes Have Alleged that Kalshi Injured the Tribes Through Kalshi's False Advertising. ............................................................................................. 28

   C.  The Tribes Have Alleged That Kalshi Made a False Statement of Fact About Kalshi's Service. ............................................................................................. 30

   D.  The Tribes Have Alleged That Kalshi's Statement Deceived and Has the Tendency to Deceive a Substantial Segment of its Audience and That the Tribes Have Been Injured. ............................................................................. 33

V.  THE TRIBES STATE A CLAIM FOR CIVIL RICO AGAINST ALL DEFENDANTS. ............................................................................................. 34

   A.  The Tribes Allege That Defendants Conducted the Affairs of an Association-in-Fact Enterprise. ............................................................................................. 35

   B.  The Tribes Allege Predicate Acts of Racketeering. ...................................... 37

      1.  The Tribe Alleges Wire Fraud. ................................................................ 37

      2.  The Tribes Allege Violations of the Wire Act or 18 U.S.C. § 1955. ........ 38

      3.  The Tribes Allege Proximate Causation and Cognizable Injury. ............. 41

VI. THE TRIBES ALLEGE FACTS SUFFICIENT TO MAINTAIN CLAIMS FOR RELIEF AGAINST DEFENDANT PARENT COMPANIES. ...................................... 42

CONCLUSION .......................................................................................................... 43

i

# TABLE OF AUTHORITIES

**Cases**

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)..................................................... 41, 42

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................ passim

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. 3, 7, 13

*Bibeau v. Pac. Nw. Rsch. Found. Inc.*, 188 F.3d 1105 (9th Cir. 1999) .......................................... 6

*Blue Lake Rancheria v. Kalshi Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) .................................................................................................. passim

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) ............................................................. 40

*Bobbleheads.com, LLC v. Wright Brothers, Inc.*, 259 F. Supp. 3d 1087 (S.D. Cal. 2017) .......... 27

*Boyle v. United States*, 556 U.S. 938 (2009) ............................................................................. 35

*Brosnan v. Tradeline Solutions*, 2009 U.S. Dist. LEXIS 147074 (N.D. Cal. Dec. 18, 2009) ...... 27

*Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050 (9th Cir. 1997) ................. 11, 12, 13

*Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651 (N.D.N.Y. 2025) 13, 22

*Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083 ............................................................................. 41

*Cherokee Nation v. Georgia*, 30 U.S. 1 (1831) ........................................................................... 4

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024 (9th Cir. 2022)6, 9, 12

*Child's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742 (9th Cir. 2024) ............................... 41

*Cleveland Bakers & Teamsters Health & Welfare Fund v. AMAG Pharms., Inc.*, 2025 WL 1024103 (D. Mass. Mar. 12, 2025) ....................................................................... 37

*Coastal Abstract Service, Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999)....... 31, 32

*Coeur D'Alene Tribe v. State of Idaho*, 51 F.3d 876 (9th Cir. 1995) ........................................... 6

*Coeur d'Alene Tribe v. State*, 842 F. Supp. 1268 (D. Idaho 1994)..................................... 6, 9, 13

*Corner Post, Inc. v. Bd. of Governors of Fed.Rsrv. Sys.*, 603 U.S. 799 (2024)........................... 40

*Crowley Maritime Corp. v. Boston Old Colony Ins. Co.*, 158 Cal. App. 4th 1061 (2008)............. 9

ii

*Edwards v. Marin Park, Inc.*, 356 F.3d 1058 (9th Cir. 2004)........................................................ 37

*EEOC v. Cherokee Nation*, 871 F.2d 937 (10th Cir.1989) ............................................................ 23

*Ely Holdings Ltd. v. O'Keeffe's, Inc.*, 2019 U.S. Dist. LEXIS 135805 (N.D. Cal. Aug. 12, 2019) ....................................................................................................................................................... 27

*Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665 (9th Cir. 2023) ..... 31, 32

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018)............................................................................. 39

*Express Cos. v. Mitel Techs., Inc.,* No. 12-CV-2818 W (MDD), 2013 U.S. Dist. LEXIS 141828 (S.D. Cal. Sep. 30, 2013) ............................................................................................................. 29

*Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010 U.S. Dist. LEXIS 106600 (N.D. Cal. Oct. 5, 2010) ............................................................................................................................... 27

*Fraser v. Team Health Holdings, Inc.*, 2022 U.S. Dist. LEXIS 60544 (N.D. Cal. Mar. 31, 2022) ....................................................................................................................................................... 35

*Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765 (5th Cir. 2023) .............................................. 25

*Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992)................................................................. 41

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813 (7th Cir. 1999) ............................................... 29

*KalshiEX LLC v. Commodity Futures Trading Comm' n,* No. 23-CV-03257-JMC, 2024 WL 4164694 (D.D.C., Jan. 25, 2024) ............................................................................................... 33

*KalshiEX LLC v. Flaherty,* No. 25-CV-02152-ESK-MJS, 2025 WL1218313 (D. N.J., Apr. 28, 2025) ..................................................................................................................................... 32, 33

*KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025)....................................... 19, 33, 39

*KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) ..................................................................................................................... 20, 32, 33, 39

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ...................... 28, 30

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................................. 18

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)........................................................................... 30

*Marbury v. Madison*, 5 U.S. 137 (1803)........................................................................................ 18

*Marmon v. Cty. of Del Norte*, No. C 07-01611 CRB, 2007 U.S. Dist. LEXIS 44684 (N.D. Cal. June 20, 2007) ........................................................................................................................ 4

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ............................ 19

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014) ................................................ passim

*Midwest Grinding Co. v. Spitz*, 976 F.2d 1016 (7th Cir. 1992) ................................................. 42

*Montana v. Blackfeet Tribe*, 471 U.S. 759 (1985) ................................................................. 4, 21

*Morton v. Mancari*, 417 U.S. 535 (1974) ..................................................................................... 23

*Murphy v. NCAA*, 584 U.S. 453 (2018) .............................................................................. 31, 40

*N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) ................................................................. 18, 20, 39

*Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) ................................................ 35

*Navajo Nation v. Dalley*, 896 F.3d 1196 (10th Cir. 2018) .................................................. 16, 17

*Nayab v. Capital One Bank*, 942 F.3d 480 (9th Cir. 2019) ....................................................... 21

*Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038 (9th Cir. 2008) ........................... 31

*Od's on Fin., LLC v. Mena*, 2025 U.S. Dist. LEXIS 138119 (N.D. Cal. July 18, 2025) .............. 28

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) ... 31

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ......................................................................... 36

*Rincon Band of Luiseno Mission Indians of Rincon Rsrv. v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010) .................................................................................................................. 12

*Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009) ................................................ 27

*S.E.C. v. McCarthy*, 322 F.3d 650 (9th Cir. 2003) ................................................................... 12

*Seminole Nation v. United States*, 316 U.S. 286 (1942) ........................................................... 4

*Shea v. Kerry*, 961 F. Supp. 2d 17 (D.D.C. 2013) ................................................................... 23

*Smith v. Simmons*, No. 1:05-CV-01187-OWW-GSA, 2008 U.S. Dist. LEXIS 21162 (E.D. Cal. Mar. 14, 2008) ..................................................................................................................... 3

*Smith v. United States*, 508 U.S. 223 (1993) ................................................................ 15

*Solis v. Matheson*, 563 F.3d 425 (9th Cir. 2009) ........................................................ 23

*South Carolina v. Catawba Indian Tribe*, 476 U.S. 498 (1986) .................................... 4

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997)...................... 34

*State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018).......... 14, 16, 17

*Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC,* 519 F. Supp. 3d 839 (D. Or. 2021)............. 29

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609 (9th Cir. 2016) ................... 32

*Thomas v. Home Depot USA Inc.*, 527 F. Supp. 2d 1003 (N.D. Cal. 2007) ................................. 3

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013) ................................................................ 35, 36

*United States v. Galecki*, 89 F.4th 713 (9th Cir. 2023)............................................................ 37

*United States v. McEligot*, No. 14-CV-05383-JST, 2015 WL 1535695 (N.D. Cal. Apr. 6, 2015) .................................................................................................... 23

*W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260 (D.D.C. 2021) ........................................ 30

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980).................................................... 4

*Wisconsin Cent. Ltd v. United States*, 585 U.S. 274 (2018) ........................................................ 15

*Wisconsin v. Ho-Chunk Nation*, 478 F. Supp. 2d 1093 (W.D. Wis. 2007)................................... 12

**Statutes**

17 C.F.R. § 40.2 ............................................................................................................... 20

18 U.S.C. § 1084 ............................................................................................................. 37

18 U.S.C. § 1343 ............................................................................................................. 37

18 U.S.C. § 1955 ......................................................................................................... passim

18 U.S.C. § 1964 ............................................................................................................. 42

25 U.S.C. § 2701 ......................................................................................................... passim

25 U.S.C. § 2702 ......................................................................................................... passim

v

25 U.S.C. § 2703 ..................................................................................................... passim

25 U.S.C. § 2710 ..................................................................................................... passim

28 U.S.C. § 1331 ............................................................................................................ 24

31 U.S.C. §§ 5361–5367, Unlawful Internet Gambling Enforcement Act of 2006 ............. passim

44 U.S.C. § 1507 .............................................................................................................. 6

7 U.S.C. § 1a ................................................................................................................... 20

7 U.S.C. § 2 ............................................................................................................... 18, 19

7 U.S.C. § 7a-2 ............................................................................................................... 19

**Other Authorities**

https://www.nigc.gov/office-of-general-counsel/gaming-ordinances/ ......................... 22

S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088 ........................................... passim

*The Dynamics of Casino Slot Revenue Tax Base Calculations*, 20 J. Tax'n F. Inst. 11, 14......... 15

**Rules**

Fed. R. Civ. P., Rule 12 ............................................................................................... 3, 4

Fed. R. Civ. P., Rule 8 ......................................................................................... 3, 21, 43

Fed. R. Civ. P., Rule 9 ................................................................................. 26, 27, 28, 37

**Regulations**

17 C.F.R. § 38.151 ........................................................................................................... 7

17 C.F.R. § 40.11 ..................................................................................................... passim

25 C.F.R. § 502.4 ..................................................................................................... 15, 21

1

## INTRODUCTION

2  The Plaintiffs, Blue Lake Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians, and

3  Picayune Rancheria of the Chukchansi Indians (collectively "Tribes") bring suit to stop

4  Defendants, Kalshi Inc., KalshiEx LLC, Robinhood Markets Inc., and Robinhood Derivatives

5  LLC, (collectively "Kalshi" or "Defendants") from conducting class III gaming on the Tribes'

6  Indian lands in violation of the Indian Gaming Regulatory Act ("IGRA"), the Tribes' Gaming

7  Ordinances, the Tribes' Class III Tribal-State Compact ("Compact") and IGRA Secretarial

8  Procedures ("Procedures"), and the Tribes' sovereign authority to regulate class III gaming in

9  accordance with federal law. In addition, the Tribes seek civil damages available to them under

10  RICO because Defendants have joined forces to illegally conduct class III gaming on the Tribes'

11  Indian lands through the internet. Finally, the Tribes bring a False Advertising Claim against

12  Kalshi because it falsely advertised its illegal conduct as legal sports betting in all 50 states.

13  The Defendants ask this Court to ignore the factual allegations in the Complaint and, in

14  Kalshi's case, its own advertisements, and instead find that they are a "derivatives exchange" or a

15  "derivatives trading business." Defendants cannot *both* make money off what Kalshi advertises as

16  sports betting *and* disclaim their conduct as "derivative trading" to avoid liability. And they

17  certainly cannot obtain dismissal of the Tribes' claims by disclaiming the facts that the Tribes

18  allege in their Complaint. Because the Tribes allege that Kalshi conducts class III gaming, in the

19  form of sports betting, on the Tribes' Indian lands, by selling event contracts that cannot meet the

20  legal definition of a swap, Kalshi cannot obtain dismissal by arguing that its sports events contracts

21  are swaps. Furthermore, Robinhood cannot succeed on its motion to dismiss[1] for the same reasons.

22  While Kalshi and Robinhood made separate motions to dismiss and filed separate briefs in support

23  of those motions, the substance of their arguments is the same. For this Court's convenience the

24  Tribes file a single opposition brief in response.

25  In ruling on the Tribes' Motion for a Preliminary Injunction, *Blue Lake Rancheria v. Kalshi*

26

27  [1] The Tribes only bring one claim, for civil RICO, against Robinhood. This Court need not consider
Robinhood's arguments seeking dismissal of any other claims because the Tribes have not brought

28  any other claims against it.

1    *Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025), this Court held that

2    the Tribes are unlikely to succeed on the merits of their IGRA claims for relief because (1) the

3    Tribes' Compact/Procedures do not prohibit Kalshi's sports betting conduct and are not binding

4    on Kalshi's gaming activity; and (2) the Unlawful Internet Gaming Enforcement Act ("UIGEA"),

5    not IGRA, applies to Kalshi's conduct, effectively holding, in contravention of the express

6    language of IGRA to the contrary, that a non-Indian entity, such as Kalshi, can offer class III sports

7    betting through online application to consumers on the Tribes' Indian lands. These holdings are

8    unsupported by the plain language of IGRA and UIGEA, and Kalshi's Motion to Dismiss must be

9    denied on this basis.

10          The Court also declined to evaluate the legality of Kalshi's sports betting pursuant to the

11    Commodity Exchange Act ("CEA") and the regulations promulgated by the Commodity Futures

12    Trading Commission ("CFTC"), on the grounds that the CFTC has exclusive jurisdiction to

13    determine the legality of Kalshi's sports betting (gaming) contracts. This finding conflicts with the

14    plain language of the CEA, the CFTC regulations, specifically 17 C.F.R. § 40.11(a), and marks a

15    split with courts addressing this issue both within and outside of the Ninth Circuit. As this Court

16    acknowledged during oral argument on the motion for an injunction, Kalshi is engaging in

17    gambling, yet the CEA and CFTC regulations prohibit Kalshi from engaging in gambling, and

18    Kalshi's Motion to Dismiss must be denied on this basis.

19          Finally, this Court held that the Tribes are unlikely to succeed on the merits of their Lanham

20    Act claims for relief because Kalshi's advertisements promoting their products as *sports betting,*

21    *legal in all 50 states on Kalshi*, constituted statements by laypersons that purport to interpret the

22    meaning of a statute or regulation, which amount to opinion statements, and not statements of fact.

23    Kalshi is a federally-licensed, Designated Contract Market ("DCM"), not a layperson, and their

24    factual statements conveying that sports betting is legal to the public consumer bear no sign of

25    opinion on the *meaning* of statutes or regulations. Kalshi's Motion to Dismiss must, therefore, be

26    denied on this basis.

27          In this Opposition Brief, the Tribes demonstrate that Kalshi has not met its burden to

28    establish that the Tribes' Complaint suffers from any fatal defect or articulate a basis for rejecting

1   the truth of the factual and legal allegations in the Complaint and the logical conclusions flowing

2   therefrom. Kalshi, rather, argues the substantive merits of the Tribes' claims, and asks the Court

3   to decide, at the pleading stage, complex, novel issues of statutory interpretation, based on disputed

4   facts about the manner in which Kalshi's sports betting is conducted, which requires the Court to

5   consider evidence and arguments well beyond the form of the Complaint. This opposition shows

6   that the Tribes' Complaint comports with the notice pleading standard and, to the extent the Court

7   considers Kalshi's arguments on the merits, those arguments conflict with the operative statutory,

8   regulatory, and common law, including recent decisions within the Ninth Circuit finding that

9   Kalshi's contracts are prohibited by the CEA.

## LEGAL STANDARDS

### 1.   Legal Standard for Motions to Dismiss.

Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted). The "pleading standard Rule 8 announces does not require '**detailed** factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (emphasis added). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, **accepted as true**, to 'state a claim to relief that is plausible on its face.'" *Id.* (emphasis added).

A motion to dismiss does not address the substantive merits of the claims being challenged. "Because the focus of a Rule 12(b)(6) motion is on the legal sufficiency, rather than the substantive merits of a claim, the Court ordinarily limits its review to the face of the complaint." *Thomas v. Home Depot USA Inc.*, 527 F. Supp. 2d 1003, 1006 (N.D. Cal. 2007); *see Smith v. Simmons*, No. 1:05-CV-01187-OWW-GSA, 2008 U.S. Dist. LEXIS 21162, at *11 (E.D. Cal. Mar. 14, 2008) ("The question before the court is not whether the plaintiff will ultimately prevail; rather, it is whether the plaintiff could prove any set of facts in support of his claim that would entitle him to relief."); *Marmon v. Cty. of Del Norte*, No. C 07-01611 CRB, 2007 U.S. Dist. LEXIS 44684, at

1    *4-5 (N.D. Cal. June 20, 2007) ("A Rule 12(b)(6) motion to dismiss for failure to state a claim

2    tests only the sufficiency of the complaint, not the merits of the underlying claim.").

### 2.    Legal Standard for Interpreting Tribal Statutory Rights.

It is well-established that the United States maintains a historical trust relationship with

Indian tribes. *E.g., Cherokee Nation v. Georgia*, 30 U.S. 1 (1831); *Seminole Nation v. United

States*, 316 U.S. 286, 296–97 (1942). Based upon the trust responsibility, courts presume when

Congress legislates in the area of Indian affairs its intent towards the tribes is benevolent and

federal statutes that arguably would abrogate or abridge tribal rights to self-government are

narrowly construed in favor of the tribes retaining those rights. *See, e.g., Montana v. Blackfeet

Tribe*, 471 U.S. 759, 766 (1985). The Supreme Court has also explained that this canon means that

"doubtful expressions of legislative intent must be resolved in favor of the Indians." *South

Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 506 (1986).

As the Supreme Court has held, "statutes are to be constructed construed liberally in favor

of the Indians, with ambiguous provisions interpreted to their benefit," and for the purpose of

"preserving their tribal sovereignty and self-governance." *Montana v. Blackfeet Tribe*, 471 U.S.

759, 766 (1985). Courts construe ambiguities in federal law "generously" in favor of tribes in order

to comport with "traditional notions of sovereignty and with the federal policy of encouraging

tribal independence." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143--44 (1980).

## I.    THE TRIBES ALLEGE SUFFICIENT FACTS TO STATE A PLAUSIBLE CLAIM FOR RELIEF UNDER IGRA.

Defendant Kalshi moves to dismiss based on the argument that the Tribes fail to allege a

violation of the Tribes' Tribal-State Class III Gaming Compact ("Compact") and Secretarial

Procedures ("Procedures") as a matter of fact and argues that Kalshi's sports betting activity does

not occur on Indian lands as a matter of law. Notice of Kalshi Defs.' Mot. to Dismiss Pls.' Compl.

and Mem. in Supp. at 5–8, Oct. 31, 2025, Dkt. No. 67 ("MTD"). Kalshi asks the Court to go

beyond the notice pleading standard for evaluating the sufficiency of the Tribes' Complaint by

requiring a "hypertechnical, code-pleading" standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). Kalshi improperly asks the Court to address the merits of the Tribes' claims at the pleading

---

4

OPPOSITION
[Case No.:  25-cv-06162-JSC]

stage, without the Court accepting the truth of the facts and allegations asserted in the Complaint as required, *Iqbal*, 556 U.S. at 678, and by relying upon evidence beyond the four-corners of the Complaint.

The Tribes have alleged sufficient facts to support, at the pleading stage, the claim that Kalshi is conducting class III gaming (sports betting), that Kalshi's gaming activity is occurring on the Tribes' Indian lands, and that Kalshi is conducting its sports betting on the Tribes' lands without federally-mandated authorization under the Tribes' Compact/Procedures, which violates the Tribes' Compact/Procedures. The Tribes, therefore, have alleged sufficient facts to support their claim seeking an order enjoining Kalshi's class III gaming conducted in violation of the Tribes' Compact/Procedures.

IGRA establishes a tribal claim for relief under 25 U.S.C. § 2710(d)(7)(A)(ii) "to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." The purpose of Section 2710 (d)(7)(A)(ii) was to grant "United States district courts jurisdiction over actions by . . . a tribe or state to enjoin **illegal** gaming on Indian lands . . . ." S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088 (emphasis added) ("S. REP. 100-446"). Kalshi asserts that "the right of action created by the statute extends only to violations of state-tribal compacts, which the Complaint does not allege." MTD, at 5. In so arguing, Kalshi ignores the allegations in the Complaint as well as the regulatory nature of the Tribes' Compact/Procedures as the tribal-state law authorizing and governing any and all class III gaming activity on the Tribes' lands.

In passing IGRA, Congress unequivocally laid out the *only* manner in which class III gaming could be lawful on Indian lands. 25 U.S.C. § 2710 (d)(1). Congress declared that class III gaming activities shall be lawful on Indian lands "**only if** such activities" are:

(A) **authorized** by an ordinance or resolution that—

　(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands . . .

(B) located in a State that permits such gaming for any purpose by any person, organization or entity, and

(C) **conducted in conformance** with a Tribal-State compact entered into by the Indian Tribe and the state . . . .

1    25 U.S.C. § 2710 (d)(1) (emphasis added); s*ee Coeur d'Alene Tribe v. State*, 842 F. Supp. 1268,

2    1282 (D. Idaho 1994), *aff'd sub nom. Coeur D'Alene Tribe v. State of Idaho*, 51 F.3d 876 (9th Cir.

3    1995). Subparts (A)–(C) of § 2710(d)(1) are elemental and exhaustive—any class III gaming

4    conducted without meeting all the requirements of § 2710 (d)(1) is unlawful and prohibited by

5    IGRA. *See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1034–35

6    (9th Cir. 2022) (holding a similar provision, 25 U.S.C. § 2710(d)(3)(C), is exhaustive to the

7    exclusion of other subjects of compact negotiation).

8         "After lengthy hearings, negotiations and discussions, [Congress] concluded that the use

9    of compacts between tribes and states is the **best mechanism** to assure that the interests of both

10    sovereign entities are met with respect to the **regulation of complex gaming enterprises** . . . ." S.

11    REP. 100-446, at 13 (emphasis added); *Chicken Ranch Rancheria of Me-Wuk Indians v.*

12    *California*, 42 F.4th 1024, 1053 n.17 (9th Cir. 2022). The Tribes' Compact/Procedures[2] thus

13    establish the applicable regulatory law at the tribal-state level, approved by the federal government

14    and published in the Federal Register, to be implemented on the Tribes' Indian lands directly

15    through the Tribes' Gaming Ordinances.[3] *See* 25 U.S.C. § 2701(5) (Congressional finding that

16    "Indian tribes have the exclusive right to regulate gaming activity on Indian lands . . . ."); 25 U.S.C.

17    2710(d)(3)(B) (compacts are effective upon  "approval by the Secretary [when] published by the

18    Secretary in the Federal Register."). Thus, the Tribes' Compact/Procedures are direct extensions

19    of IGRA, implementing IGRA's regulatory scheme at the tribal-state level with a force akin to

20    federal regulatory law. Any class III gaming activity conducted on the Tribes' Indian lands, such

21    ───────────────

22    [2] *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202, at *5 (N.D.
      Cal. Nov. 10, 2025) (finding that "the Court must presume compacts are equivalent to secretarial

23    procedures").

24    [3] Tribal–state compacts, secretarial procedures, and tribal gaming ordinances are published in the
      Federal Register, *see* 25 U.S.C. §§ 2710(d)(2)(B), 2710(d)(3)(B), 2710(d)(8)(D), are available to

25    the public on the Bureau of Indian Affairs and the NIGC websites, and are a matter of public
      record. *See* 44 U.S.C. § 1507. Once approved and published in the Federal Register as required by

26    IGRA, tribal–state compacts, secretarial procedures, and tribal gaming ordinances provide
      constructive notice to all persons subject to or affected by them under 44 U.S.C. § 1507, and

27    Defendants are presumed to be "aware of the obligations the law imposes on them." *See Bibeau v.*
      *Pac. Nw. Rsch. Found. Inc.*, 188 F.3d 1105, 1110 (9th Cir. 1999), *opinion amended on denial of*

28    *reh'g*, 208 F.3d 831 (9th Cir. 2000).

as Kalshi's sports betting, that does not comply with the Tribes' Compact/Procedures regulating class III activity on the Tribes' lands constitutes a violation of the Compact/Procedures.

The Tribes' Complaint clearly alleges facts sufficient to state a plausible claim for relief from Kalshi's violation of the Compact. Paragraphs 17–43 allege the factual, historical, and legal bases supporting the claim that Compacts/Procedures function as congressionally-delegated tribal-state regulatory law governing the only conditions under which class III gaming activity is lawful on Indian lands. Compl. for Decl. and Inj. Relief at ¶¶ 17–43, Jul. 22, 2025, Dkt. No. 1 ("Complaint"). Specifically, the Picayune Tribe alleges that it duly entered into a class III gaming Compact with the State of California in 1999, which is in effect, and Blue Lake Rancheria and Chicken Ranch Rancheria conduct class III gaming pursuant to Secretarial Procedures issued by the Department of the Interior on January 31, 2024. Complaint, at ¶ 39. The Complaint alleges that the Tribes are the primary beneficiary of class III gaming enterprises on the Tribes' land, consistent with the federal mandate that tribes be the primary beneficiaries of all class III gaming occurring on Indian lands in IGRA, 25 U.S.C. § 2702(2). Complaint, at ¶¶ 25, 37. The Tribes identify the facts and law that support its claim that Kalshi's sports betting contracts constitute class III gaming activity. Complaint, at ¶¶ 31–33, 42–43. And the Tribes allege that Kalshi has placed its sports betting contracts in the stream of interstate commerce making them available for purchase throughout the nation on Indian lands and, specifically, the Tribes' Indian lands, Complaint, at ¶¶ 43, 68–70, a fact Kalshi does not challenge: "One of [the] core principles requires every DCM to offer market participants 'impartial access' to its exchange." MTD, at 3 (citing 17 C.F.R. § 38.151(b)). These facts are sufficient to give Kalshi fair notice of what the claim is and the grounds upon which it rests, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and to allow the Court to draw the reasonable inference that Kalshi is liable for the misconduct alleged by the Tribes. *E.g.*, *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Additionally, the Tribes' Complaint alleges that Kalshi's sports betting contracts do not comply with the CEA, which further supports the Tribes' claim that Kalshi's sports betting activity is unlawful and violates the Tribes' Compact/Procedures. Complaint, at ¶¶ 48–92. Specifically, the Tribes' Complaint sets forth the legal requirements for lawful event contracts under the

Commodity Exchange Act ("CEA") and the Commodity Futures Trading Commission ("CFTC") regulations prohibiting a Designated Contract Market ("DCM") from listing contracts that involve, reference, or relate to gaming, Complaint, at ¶¶ 48–56, and alleges facts to support the reasonable conclusion that the CEA does not, therefore, provide a lawful, alternative basis for offering Kalshi's sports betting contracts on the Tribes' Indian lands. Complaint, at ¶¶ 48–70. These factual and legal allegations, as a whole, are sufficiently detailed and surpass mere legal conclusions or threadbare recitals of the elements of a cause of action. *E.g.*, *Iqbal*, 556 U.S. at 678.

Kalshi fails to point to any specific defect or insufficiency that renders approximately twenty pages of detailed allegations conclusory or allows the Court to reject the truth of those allegations at the pleading stage. MTD, at 5–6. Kalshi merely asserts, without demonstrating, that the Tribes' Complaint is "full of conclusory assertions." *Id.*, at 8. Kalshi confuses conclusions logically inferred from the facts and law alleged with conclusory assertions.

At the pleading stage, the Tribes merely need to plausibly allege that Kalshi's conduct constitutes class III gaming on the Tribes' Indian lands in violation of the Tribes' Compact/Procedures. Kalshi, instead, demands that the Court adopt a narrow construction of 25 U.S.C. § 2710(d)(7)(A)(ii) that is unsupported by the text and structure of IGRA, demands that the Court resolve complex legal disputes about the statutory scope of the CEA and IGRA at the pleading stage, and rejects, without foundation, the Tribes' legal theory concerning the location of class III gaming activity, which is a complex factual and legal issue. Kalshi's argument, thus, requires the Court to go beyond the form of the Complaint and address the substance of the merits of the claim.

To the extent that the Court is willing to consider Kalshi's arguments on the merits of the Tribes' IGRA claims, those arguments fail. Kalshi contends that it cannot violate the Compact/ Procedures—as a tribal-state regulatory regime—because Kalshi is not a party to the Compact/Procedures. "It 'goes without saying that a contract cannot bind a nonparty.'" MTD, at 7–8 (quoting *Crowley Maritime Corp. v. Boston Old Colony Ins. Co.*, 158 Cal. App. 4th 1061,

1069 (2008)).[4] As will be explained in detail below, Kalshi does not have to be a party to the Compact/Procedures in order to conduct class III gaming on Indian lands in violation of the Compact/Procedures, because of the regulatory nature of compacts and procedures. 25 U.S.C. § 2710(d)(7)(A)(ii), moreover, does not require the Tribes to point to a specific provision of the Compact/Procedures that has been violated by Kalshi, and Kalshi cannot point to any provision of IGRA that explicitly requires specific terms and conditions of a compact/procedures be breached.[5] Instead, the claim requires that the Tribes establish that "a class III gaming activity located on Indian lands [is] **conducted in violation** of [a] Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii), that is, conducted in violation of the tribal-state regulatory law that authorizes the Tribes to conduct class III gaming to the exclusion of all other non-tribal entities. *See Coeur d'Alene*, 842 F. Supp. at 1282–83.

The clearest evidence that compacts are primarily regulatory rather than contractual in nature is Congress's creation of secretarial procedures. Secretarial Procedures are not a contract; there are no "parties" to the Procedures. The Secretary of the Interior prescribes, similar to the promulgation of regulations, procedures "which are consistent with the proposed compact selected" in the IGRA compact negotiation remedial process, "under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction." 25

---

[4] Kalshi fails to explain how a compact could include activity that is patently prohibited by IGRA, 25 U.S.C. § 2710(d)(1), and not included within the narrow scope of the jurisdictional and regulatory exchange of rights and obligations between two sovereigns set forth in 25 U.S.C. § 2710(d)(3)(C); *Chicken Ranch*, 42 F.4th at 1034. Kalshi demands a legal impossibility as a condition precedent to enforcing the exclusive federal right tribes have to conduct class III gaming on their Indian lands.

[5] Shown in detail below, the distinction between "breach of contract" and "violation of any compact" is crucial to understanding the dual roles a compact plays as (1) a highly restricted contract between sovereigns *establishing* a framework for tribal-state regulation of class III gaming, 25 U.S.C. §§ 2710(d)(3)(A)–(C), and, once established (2) a mechanism for co-regulation of class III gaming within a specific tribe's jurisdiction at the tribal-state level, *id*. §§ 2710 (d)(1)(B)–(C). While the Tribes' Compact/Procedures do prohibit sports betting, they need not do so explicitly, because recognition of restrictions on types of class III gaming under state law is elemental to lawful class III conduct on Indian lands. 25 U.S.C. § 2710(d)(1)(B). Under the express terms of IGRA, 25 U.S.C. § 2710(d)(1), a compact/procedures must conform to the laws of the state, therefore, any class III gaming that does not conform with the laws of the state does not, and cannot, conform with the compact/procedures and, thus, violates the compact/procedures.

OPPOSITION
[Case No.: 25-cv-06162-JSC]

U.S.C. § 2710(d)(7)(B)(vii). Procedures are derivative of compacts offered in the remedial phase of IGRA. 25 U.S.C. § 2710(d)(7)(B)(iii)–(vi); *Blue Lake*, 2025 WL 3141202, at *5. Significantly, the Court has previously held, "the Court must presume compacts are equivalent to secretarial procedures." Kalshi fails to explain how, if procedures are not contracts, but, rather, regulations for class III gaming issued by the Secretary of the Interior, the Tribes' Compact/Procedures can be treated as binding only the parties to the Procedures, when Procedures are not contracts. If the "compacts are equivalent to secretarial procedures," the Court cannot find that compacts are binding only on the sovereign parties or that they do not prohibit unlawful class III gaming as a matter of regulatory law. *See Blue Lake*, 2025 WL 3141202, at *5. Procedures are regulatory law and compacts, therefore, must be "equivalent." *Id*. The plain language of IGRA supports this interpretation.

Further support for this conclusion can be found in the text and structure of IGRA, which draws a clear distinction between "compact" and "contract." *Compare* 25 U.S.C. § 2710(d)(7)(A)(ii) ("[A]ny cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in **violation of any Tribal-State compact** . . . ." (emphasis added)), *with id.* § 2710(d)(3)(C)(v) ("Any Tribal-State compact . . . may **include** provisions relating to . . . remedies for **breach of contract** . . . ." (emphasis added)); *cf. Bay Mills*, 572 U.S. at 785 ("A compact typically . . . provides remedies for breach of the agreement's terms."). As a contract between two sovereigns reconciling competing jurisdictional and regulatory interests, IGRA provides discrete remedies for disputes governing compact/contract *formation* and disputes arising among the parties after a compact is *concluded*. 25 U.S.C. § 2710(d)(7)(A)(i) creates a right of action by tribes "arising from the failure of a State to enter into negotiations with the Indian tribe . . . or to conduct such negotiations in good faith . . . ." IGRA authorizes states and tribes to negotiate, in the formation of a compact, "remedies for breach of contract." 25 U.S.C. § 2710(d)(3)(C)(v). In establishing "remedies for breach of contract," compacts almost universally include dispute resolution mechanisms within the compact, which bind the parties.

For example, Picayune's Compact, Section 9.0, imposes mandatory dispute resolution procedures. If a dispute between Picayune and the State arises: "In recognition of the government-

to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that occur under this Gaming Compact by good faith negotiations whenever possible." Picayune Compact, at 27. The parties "establish[ed] a threshold requirement that disputes between the Tribe and the State first be subjected to a process of meeting and conferring in good faith in order to foster a spirit of cooperation and efficiency in the administration and monitoring of performance and compliance by each other with the terms, provisions, and conditions of this Gaming Compact . . . ." *Id.* "If the dispute is not resolved to the satisfaction of the parties within 30 calendar days after the first meeting, then [the dispute] may be resolved in the United States District Court where the Tribe's Gaming Facility is located, or is to be located, and the Ninth Circuit Court of Appeals (or, if those federal courts lack jurisdiction, in any state court of competent jurisdiction and its related courts of appeal) [subject to certain limitations]." *Id.* at 28.

Under Picayune's compact, neither the Tribe nor the State could maintain suit under 25 U.S.C. § 2710(d)(7)(A)(ii) without first exhausting their compact remedies for *breach of contract*. Thus, 25 U.S.C. § 2710(d)(7)(A)(ii) would rarely apply to disputes between the parties for breach of the terms of the Compact, because such disputes are subject to the dispute resolution provisions of the Compact, which include, but are not limited to, the lawful scope of class III gaming.[6] While Kalshi urges the Court that "it is doubtful that Congress intended to empower tribes or states to sue third parties—rather than each other—under [Section 2710(d)(7)(A)(ii)]," MTD, at 8, it is clear that a compact, once concluded, renders § 2710(d)(7)(A)(ii) largely irrelevant concerning disputes between the parties to a compact. *See, e.g., Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1059 (9th Cir. 1997) ("The State, however, **has no jurisdiction** over gaming activities that are not the subject of a Tribal–State compact. IGRA **limits the state's regulatory authority** to that expressly agreed upon in a compact. Outside the express provisions of a compact, the enforcement of IGRA's prohibitions on class III gaming remains the exclusive province of the

---

[6] 25 U.S.C. § 2710(d)(7)(A)(ii) does not apply where compact/contract *formation* gives rise to a dispute, because § 2710(d)(7)(A)(i) applies to compact negotiation disputes.

1   federal government [not the states].").

2       If Congress intended 25 U.S.C. § 2710(d)(7)(A)(ii) to only apply to parties to a compact,

3   there would be little reason to provide that compacts "may include provisions relating to—

4   remedies for breach of contract," under 25 U.S.C. § 2710(d)(3)(C)(v). If the Court applies the

5   "presumption that a given term is used to mean the same thing throughout a statute, " *Blue Lake*,

6   2025 WL 3141202, at *5, and the corollary principle that it "is a well-established canon of statutory

7   interpretation that the use of different words or terms within a statute demonstrates that Congress

8   intended to convey a different meaning for those words," *S.E.C. v. McCarthy*, 322 F.3d 650, 656

9   (9th Cir. 2003), the Court must distinguish between circumstances where compacts may be

10  *violated* as a matter of federal regulatory law from circumstances where compacts may be

11  *breached* by one of the sovereign parties.

12      In support of its argument, Kalshi points to *Michigan v. Bay Mills Indian Cmty.*, 572 U.S.

13  782 (2014) and *Wisconsin v. Ho-Chunk Nation*, 478 F. Supp. 2d 1093, 1098 (W.D. Wis. 2007).

14  Those decisions are easily distinguished from the instant litigation. Like *Cabazon*, 124 F.3d at

15  1059, they pertain to compact disputes between the sovereign parties concerning the scope of

16  jurisdiction to enforce the compact. MTD, at 8–9.

17      The foregoing demonstrates that the only context in which a class III gaming compact can

18  be treated like a private contract pertains to the sovereign entities negotiating the compact and

19  enforcing the terms of the compact. Even in that narrow context, compacts are different from

20  private contracts, because the permissible terms and conditions of a compact are narrowly

21  restricted by Congress. *See Chicken Ranch*, 42 F.4th at 1034 ("IGRA, we made clear, 'does not

22  permit the State and the tribe to negotiate over any subjects they desire; rather, IGRA anticipates

23  a very specific exchange of rights and obligations.'" (quoting *Rincon Band of Luiseno Mission*

24  *Indians of Rincon Rsrv. v. Schwarzenegger*, 602 F.3d 1019, 1039 (9th Cir. 2010)); 2710(d)(3)(C)

25  (enumerating specific permitted subjects of negotiation); 25 U.S.C. §§ 2710(d)(3)(A) ("the State

26  shall negotiate with the Indian tribe in good faith . . . ."). This is because compacting was the

27  procedural "mechanism" chosen by Congress to reconcile competing tribal-state jurisdictional and

28  regulatory interests and to create a tribal-state regulatory framework governing all class III gaming

on Indian lands. S. REP. 100-446, at 5–6, 13; *Cabazon*, 124 F.3d at 1060.

With respect to Kalshi, any class III gaming that does not conform with the Tribes' Compact/Procedures violates the tribal-state regulatory framework applicable to class III gaming on the Tribes' Indian lands. *See Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 666 (N.D.N.Y. 2025) (finding 25 U.S.C. § 2710(d)(1) "unambiguous," stating: "The text of the statute refers to '[c]lass III gaming activities' 'on Indian lands,' and does not differentiate between who is conducting the gaming. [citation omitted] The definition of class III gaming, . . . defined as 'all forms of gaming that are not class I gaming or class II gaming,' also does not restrict its meaning to only encompass Indian gaming."); *Coeur d'Alene*, 842 F. Supp. at 1282; *see also* 25 U.S.C. §§ 2710(d)(2)(A), 2710(d)(9). A plain reading of IGRA compels the conclusion that Kalshi's conduct violates the Tribes' Compact/Procedures because Kalshi's activity is not "conducted in conformance with" the Tribes' Compact/Procedures, 25 U.S.C. § 2710(d)(1)(C). Kalshi's sports betting is, therefore, "conducted in violation of" the Tribes' Compact/Procedures. 25 U.S.C. § 2710(d)(7)(A)(ii).

Thus, even if Kalshi were permitted to argue the merits of the Tribes' IGRA based claims on a motion to dismiss, which it is not, Kalshi's arguments are rebutted by a plain reading of IGRA.

Kalshi employs the same strategy in challenging the Tribes' allegation that Kalshi offers sports betting on its Indian lands. "Even if Plaintiffs had a statutory right of action, the . . . question presented by Plaintiffs' IGRA claim is whether a company operating an internet gaming platform that can be accessed in a place where it is unlawful [on Indian lands] is liable under IGRA for conducting class III gaming activity on Indian lands." MTD, at 9. Again, the notice pleading standard and *Twombly/Iqbal* do not require a hypertechnical explanation of legal arguments on the merits of the claims alleged in the complaint at the pleading stage. Shown above, Kalshi does not dispute the fact that Kalshi offers its sports betting contracts throughout the U.S., including on the Tribes' Indian lands; rather, they assert that their Core Principles compel them to offer their contracts on the Tribes' Indian lands. MTD, at 3. Kalshi then insists that the Court go beyond the allegations of the Complaint and address complex factual and legal issues on the merits concerning whether offering its sports betting contracts for purchase on the Tribes' lands in an online format

1  constitutes class III gaming activity on Indian lands. This is improper on a motion to dismiss. To

2  the extent that the Court decides to consider Kalshi's arguments on the merits on this issue, those

3  arguments fail here, as well.

4        Kalshi's argues that the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C.

5  §§ 5361–5367 ("UIGEA") effectuates an implied repeal of IGRA. This is patently false. In

6  enacting UIGEA, Congress explicitly established: "No provision of this subchapter shall be

7  construed as altering, limiting, or extending any Federal or State law **or Tribal-State compact**

8  **prohibiting, permitting, or regulating gambling** within the United States." 31 U.S.C. § 5361(b)

9  (emphasis added). Concerning civil remedies, Congress further provided: "Rule of construction.—

10  No provision of this section shall be construed as altering, superseding, or otherwise affecting the

11  application of the Indian Gaming Regulatory Act." 31 U.S.C. § 5365(b)(3)(B). These rules of

12  construction are not discretionary. Congress explicitly instructs "the district courts of the United

13  States" in interpreting the intersection of UIGEA and IGRA. 31 U.S.C. § 5365(a). Unsurprisingly,

14  Kalshi omits this language from its argument.

15        Kalshi's reliance on UIGEA is predicated on the legally and factually incorrect assertion

16  that "Congress did not contemplate this scenario [internet gaming] when it passed IGRA in 1988

17  . . . ." MTD, at 9; *see State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 964 n.6

18  (9th Cir. 2018). On the contrary, Congress was aware of emergent forms of electronic gaming,

19  evident from IGRA's statutory definitions of the classes of gaming. *See* S. REP. 100-446, at 13

20  ("The Committee notes the strong concerns of states that . . . regulations relating to **sophisticated**

21  **forms of class III gaming** be respected on Indian lands where, with few exceptions, such laws

22  and regulations do not now apply." (emphasis added)).

23        "The term 'class II gaming' means— the game of chance commonly known as bingo

24  (**whether or not electronic, computer, or other technologic aids are used in connection**

25  **therewith**) . . . in which the holder of the card covers such numbers or designations when objects,

26  similarly numbered or designated, are drawn or **electronically determined** . . . ." 25 U.S.C. §

27  2703(7)(A)(i). "The term 'class II gaming' does not include—**electronic or electromechanical**

28  **facsimiles of any game of chance** or slot machines **of any kind**." *Id*. § 2703(7)(B). "The term

'class III gaming' means **all forms of gaming** that are not class I gaming or class II gaming." *Id*. § 2703(8).[7] This universal language is a feature of IGRA, not a flaw. IGRA's definitions anticipate advancements in electronic gaming and speak broadly to include forthcoming electronic technology. Online gaming easily fits within the forms of gaming defined in IGRA.

Given these definitions and considering that internet technology has been around since the 1970s in forms such as ARPANET and NSFNET, and area-wide progressive slot machines using electronic networking technology have been available through International Game Technology ("IGT") since 1986,[8] two years prior to enactment of IGRA, there is no legal or factual basis for concluding that Congress did not intend that IGRA extend to gaming conducted on Indian lands through the internet. Even assuming Congress could not have anticipated modern online gaming, the Supreme Court has repeatedly held that statutes are written in general terms and apply to new technologies when the conduct fits the statutory category, even if the technology was unknown. *See, e.g., Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018) ("While every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." (original emphasis)); *Smith v. United States*, 508 U.S. 223, 229 (1993) ("Had Congress intended the narrow construction petitioner urges, it could have so indicated. It did not, and we decline to introduce that additional requirement on our own.").

The Tribes maintain that UIGEA is inapplicable to the instant litigation for at least three reasons. First, IGRA sufficiently addresses class III gaming offered in electronic formats, online

---

[7] The federal regulations implementing IGRA are similarly universal. Gaming activity is defined simply as: "the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward." 25 C.F.R. § 293.2(d). While the NIGC defines class III gaming with greater specificity to include "sports betting," it does so universally, irrespective of particular format or technology. 25 C.F.R. § 502.4(c).

[8] *See The Dynamics of Casino Slot Revenue Tax Base Calculations*, 20 J. Tax'n F. Inst. 11, 14 ("As state lotteries spread and as their payoffs went into the millions of dollars, the gaming industry realized that it also needed to provide larger jackpots. This came in the form of progressive jackpots. Progressive jackpots represented a series of slot machines where the major jackpot grew based on the amount of coins played. Initially, these jackpots were based on a series of linked slot machines in one casino. International Game Technology (IGT) developed a system in 1986 that allowed the slot machines to be located in a series of casinos, all linked [electronically] to a common progressive jackpot.").

or otherwise. 25 U.S.C. § 2703. Second, UIGEA expressly does not alter, disrupt, or "supersede" existing gambling laws, specifically IGRA. 31 U.S.C. §§ 5361(b), 5365(b)(3)(B). "Unlike IGRA or other gambling regulations, the UIGEA does not make gambling legal or illegal directly. Instead, the UIGEA makes it illegal for a 'person engaged in the business of betting or wagering' knowingly to accept certain financial payments from an individual who is engaged in 'unlawful Internet gambling.'" *Iipay*, 898 F.3d at 964–65. Third, assuming *arguendo* that Kalshi's sports betting activity comports with the CEA—which it does not—at best, UIGEA preserves and enhances IGRA and exempts both tribal gaming operations and CEA transactions from enforcement of UIGEA, and does not touch upon the dispositive issue here, whether Kalshi, by offering gaming contracts in the form of sports betting in contravention of 17 C.F.R. § 40.11(a) on Indian lands, subjects Kalshi to regulation pursuant to IGRA. IGRA and the common law interpreting the situs of gaming activity, *e.g.*, *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 792 (2014) and *Navajo Nation v. Dalley*, 896 F.3d 1196, 1207 (10th Cir. 2018), are sufficient to support the conclusion that sports betting contracts offered on the Tribes' Indian lands constitute class III gaming activity subject to the requirements of IGRA, which must be conducted in conformance with a compact or procedures. 25 U.S.C. § 2710(d)(1); *see also id*. §§ 2701, 2702, 2703.

Even if the Court were to harmonize IGRA and UIGEA and arrive at the conclusion that "the UIGEA should be interpreted to apply to cover interstate (or state-to-Indian-lands and vice versa) gaming transactions via the internet, whereas IGRA should be interpreted to cover Class III gaming activities that take place exclusively within Tribal lands," such a finding is limited to the scope of enforcement of UIGEA, not IGRA. *See Blue Lake*, 2025 WL 3141202, at *6. Nothing in the text of IGRA draws a distinction between gaming conducted wholly on Indian lands and gaming conducted partially on Indian lands. *See* 25 U.S.C. §2703(4) (defining "Indian lands"). Such a finding would also conflict with Ninth Circuit precedent and the plain language of UIGEA. *See Iipay*, 898 F.3d at 965 (holding "UIGEA does create a system in which a 'bet or wager' must be legal both where it is 'initiated' and where it is 'received.'").

In *Iipay Nation*, the Iipay tribe argued that the locale of the gaming activity it was

1  conducting was where the Iipay Nation received the bet (on its Indian lands), not where the bets

2  were initiated (off the reservation).[9] The Ninth Circuit harmonized IGRA and UIGEA, *Iipay*, 898

3  F.3d at 968, and concluded:

> [A]s the Government argues, the patrons are engaging in "gaming activity" by
> initiating a bet or a wager in California and off Indian lands. Consistent with the
> Supreme Court's holding in *Bay Mills*, the act of placing a bet or wager is the
> "gambling in the poker hall," not "off-site licensing or operation of the games."
> [citation]. As a result, it seems clear that at least some of the "gaming activity"
> associated with [Iipay's gaming] does not occur on Indian lands and is thus not
> subject to Iipay's jurisdiction under IGRA.

8  *Id*. at 967; *accord*, *Navajo Nation v. Dalley*, 896 F.3d 1196, 1207 (10th Cir. 2018) ("Class III

9  gaming activity relates only to activities actually involved in the playing of the game. . . ."").

10 Extending the Ninth Circuit's rationale in *Iipay* to the underlying litigation, "it seems clear that at

11 least some of the 'gaming activity' associated with [Kalshi] does [] occur on Indian lands and is

12 thus [] subject to [the Tribes'] jurisdiction under IGRA." *See id*. at 968.

13      Kalshi allows consumers to place bets (or buy sports events contracts) on the Tribes' Indian

14 lands. As a result, "it seems clear that at least some of the 'gaming activity' associated" with betting

15 on sports events occurs on Indian lands and is thus subject to the Tribes' regulatory jurisdiction

16 under the IGRA. *Id*. Part of Kalshi's sports betting occurs off of the Tribes' Indian lands, but a key

17 part[10] occurs on the Tribes' Indian lands—the placing of the bets. Kalshi has pointed to no

18 language in UIGEA that explicitly or implicitly repeals any provision of IGRA or the Tribes'

19 exclusive right to regulate gaming on its lands, 25 U.S.C. § 2701(5), nor can they. UIGEA's

20 exemptions only apply to UIGEA, not IGRA, and nothing in UIGEA suggests otherwise. Because

21 UIGEA either does not apply or, alternatively, is not dispositive of whether Kalshi's sports betting

22 contracts offered on the Tribes' Indian lands must be conducted in conformance with a compact

23 or procedures, in accordance with federal law, Kalshi's argument should be rejected. Moreover,

---

[9] In essence, this is the same argument offered by Defendants.

[10] In enacting UIGEA, Congress recognized that a substantial portion of gambling/gaming activity
occurs where the bettor initiates a bet or wager, thus requiring gaming activity to be legal both
where the bet is initiated and where it is received. *Iipay*, 898 F.3d at 968; 31 U.S.C. § 5362(10).
Congress's insight concerning the operative actions involved in gambling/gaming activity are
relevant here, even if UIGEA is irrelevant.

1    Kalshi asks the Court to resolve complex, disputed, factual and legal questions about location of

2    betting activity versus server location by rewriting the Tribes' IGRA claims in the Complaint,

3    which is improper on a motion to dismiss.

4            Kalshi's reliance on the exemptions in UIGEA, 31 U.S.C. § 5362(1)(E), also undermines

5    Kalshi's contention that allegations of non-compliance with the CEA are irrelevant. MTD, at 11–

6    12. "If Kalshi has failed to comply with the CEA or CFTC regulations, that is a matter between

7    Kalshi and its regulator, not a reason to turn to IGRA." MTD, at 12. This ignores the fact that

8    Kalshi's sports betting (gaming) contracts are offered on Indian lands in contravention of 17 C.F.R.

9    § 40.11(a), 25 U.S.C. § 2710(d)(1) and, the Tribes' Compact/Procedures. If Kalshi's sports betting

10   contracts violate the CEA, then Kalshi's online transactions are not exempted by UIGEA and

11   Kalshi is just conducting online gambling, where wagers are placed and rewards are received by

12   consumers physically located on the Tribes' Indian lands. As a result, Kalshi's UIGEA argument

13   collapses, leaving only the CEA and IGRA to resolve the dispute.[11] Kalshi's reliance on UIGEA

14   as shielding Kalshi from the application of IGRA compels the Court to evaluate whether Kalshi's

15   sports betting (gaming) contracts comply with the CEA. They do not.

16           Nothing in the CEA precludes federal courts from evaluating whether commodity contracts

17   offered on a DCM comply with federal law. Rather, the plain language of the CEA confirms that

18   federal courts have that authority. "It is emphatically the province and duty of the judicial

19   department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *accord N. Am.*

20   *Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025

21   WL 2916151, at *6 (D. Nev. Oct. 14, 2025) ("*Crypto*"); *see also Loper Bright Enters. v. Raimondo*,

22   603 U.S. 369, 374 (2024) ("it does not follow that Congress has taken the power to authoritatively

23   interpret [a] statute from the courts and given it to the agency. Congress expects courts to handle

24   technical statutory questions . . . .").

25           While 7 U.S.C. § 2(a)(1)(A) states: "The Commission shall have exclusive jurisdiction," it

26

27   _____

     [11] Crucially, if Kalshi's sports betting contracts violate the CEA, Kalshi's reliance on CEA as
     shielding Kalshi from the application of IGRA also collapses, leaving IGRA as the only applicable
28   law.

also provides: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*; *see Blue Lake*, 2025 WL 3141202, at *7. The CEA "Special Rule" implies that interpretations of federal law by courts play a critical role in the CFTC's evaluation of contracts. 7 U.S.C. § 7a-2(c)(5)(C)(i)(I) provides: "the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—activity that is unlawful under any Federal or State law . . . ." Courts are the proper arbiter of whether an activity is unlawful under any federal or state law, especially when, as here, such determination presents a novel legal issue of statutory interpretation.

Significantly, the United States District Court for the District of Maryland, in *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), explained that the CFTC's "exclusivity" only excludes competing federal agencies, such as the SEC. "Congress's clearest intent in conferring 'exclusive jurisdiction' on the CFTC with regard to commodities futures . . . was to make clear that as among *federal agencies*, the CFTC would have exclusive authority, rather than the SEC." *Martin*, 793 F. Supp. 3d 667, 678 (original emphasis); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 387 (1982) ("the exclusive-jurisdiction provision . . . was intended only to consolidate federal regulation of commodity futures trading in the Commission . . . ."). The *Martin* court's insight follows from the whole-text of 7 U.S.C. § 2 which frames the jurisdiction of the CFTC in contradistinction to the jurisdiction of the SEC. *See, e.g.*, 7 U.S.C. § 2(a)(1)(D).

Moreover, interpreting IGRA is beyond the scope of the CFTC's authority. Although the CFTC may be uniquely situated to evaluate the narrow issue of whether a commodity contract constitutes "gaming," the CFTC cannot, as an issue of first impression, determine whether the same contract constitutes "activity that is unlawful under" IGRA. That issue is left for the federal courts to decide. Even among federal agencies, the Department of the Interior, Bureau of Indian Affairs, and the NIGC are the federal agencies with the authority to interpret IGRA.

The CEA and CFTC regulations categorically prohibit listing of gaming contracts. 7 U.S.C. §§ 7a-2(c)(5)(C)(i), 7a-2(c)(5)(C)(i)(V), 7a-2(c)(5)(C)(ii), 7a-2(c)(5)(B); 17 C.F.R. § 40.11(a).

A registered entity shall not list for trading or accept for clearing on or through the

> registered entity any of the following: . . . [a]n agreement, contract, transaction, or
> swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the
> Act, that involves, relates to, or references terrorism, assassination, war, gaming, or
> an activity that is unlawful under any State or Federal law . . . .

17 C.F.R. § 40.11(a). While Kalshi makes no mention of its obligation to not list gaming contracts

pursuant to § 40.11(a), the United States District Court for the District of Nevada has interpreted

§ 40.11(a) as a "blanket" prohibition, "which prohibits DCMs from listing a swap based on an

excluded commodity that "involves, relates to, or references . . . gaming," as contrary to the public

interest under the CEA. *Crypto*, 2025 WL 2916151, at *10. The Nevada court further held that

Kalshi's sports betting contracts are not "swaps" as defined by the CEA, 7 U.S.C. § 1a(47)(A)(ii).

*KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *6–8 (D.

Nev. Nov. 24, 2025); *Crypto*, 2025 WL 2916151, at *7–10. Kalshi's reliance on 17 C.F.R. § 40.2

and 17 C.F.R. § 40.11(c) are inapposite, as the burden to refrain from listing rests with the

registered entity, Kalshi, not with the CFTC. 17 C.F.R. § 40.11(a); *see Hendrick*, 2025 WL

3286282, at *13 n.13. Even Kalshi has admitted that their sports betting contracts constitute

gaming and "Contracts that involve games are probably not the type of contracts that we want to

be listed on an exchange, because they don't have any real economic value to them." *Hendrick*,

2025 WL 3286282, at *7 n.3.

      Thus, determining whether Kalshi's sports betting contracts are outside the lawful scope

of the CEA is crucial to evaluating Kalshi's contention that Kalshi's sports betting contracts are

exempt from UIGEA, let alone IGRA.

      Thus, the Court must deny Kalshi's motion to dismiss the Tribes' IGRA-based claim.

## II.    THE TRIBES ALLEGE SUFFICIENT FACTS TO STATE A PLAUSIBLE CLAIM FOR RELIEF PURSUANT TO THE GAMING ORDINANCE.

      At the outset, Defendant Kalshi abandons even the pretense of challenging the sufficiency

of the Tribes' Complaint concerning the Tribes' second claim for relief, violation of the Tribes'

Gaming Ordinances.[12] Instead, Kalshi argues, as a matter of law: (1) the CEA preempts application of the Tribes' Gaming Ordinances, MTD, at 16–17; and (2) as a nonmember, Kalshi's contacts with the Tribes are too attenuated to be subject to the Tribes' class III regulatory jurisdiction under a *Montana* framework for evaluating tribal regulatory jurisdiction. MTD, at 13–16. Kalshi is wrong because: (1) the Tribes' Gaming Ordinances are derived from and federally mandated by IGRA, 25 U.S.C. § 2710, pursuant to congressionally-delegated authority to regulate class III gaming on the Tribes' Indian lands, 25 U.S.C. §§ 2701(5), 2702(2); and (2) because Congress explicitly delegated the "exclusive right to regulate gaming activity on Indian lands" through gaming ordinances, the *Montana* framework for evaluating tribal regulatory jurisdiction is inapplicable. Congress has already determined that the Tribes have regulatory jurisdiction over class III gaming activity on the Tribes' Indian lands. 25 U.S.C. § 2701(5).

As discussed above, 25 U.S.C. § 2710(d)(1)(A) provides that class III gaming "shall be lawful on Indian lands only if . . . authorized by an ordinance . . . adopted by the governing body of the Indian tribe having jurisdiction over such lands . . . ." "If any Indian tribe proposes to engage in, **or to authorize any person or entity to engage in**, **a class III gaming activity on Indian lands of the Indian tribe**, the governing body of the Indian tribe shall adopt and submit to the Chairman an ordinance or resolution that meets the requirements of subsection (b)," for approval and publication by the Chairman of the NIGC. *Id*. §§ 2710(d)(2)(A)–(B) (emphasis added); *id*. § 2710(e); *see also* S. REP. 100-446, at 18 ("(2)(A) Requires that any tribe proposing to engage in **or authorize any entity to engage in class III gaming activity** must first present an ordinance to the Chairman that meets the requirements of subsection (b).").

Kalshi offers sports betting, a class III gaming activity under 25 C.F.R. § 502.4, on the Tribes' Indian lands without authorization from the Tribes through a duly enacted gaming ordinance, approved by the NIGC. IGRA unequivocally establishes that class III gaming—

---

[12] Ironically, Kalshi's claim that the Tribes' allegations "do not satisfy the requirement under Federal Rule of Civil Procedure 8 that Plaintiffs 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" MTD, at 13 (quoting *Nayab v. Capital One Bank*, 942 F.3d 480, 496 (9th Cir. 2019)), is a "threadbare" recitation of the law, devoid of textual support, as Kalshi fails to point to even one specific deficiency in the Complaint.

meaning *all* class III gaming—is lawful *only if* authorized by a gaming ordinance. 25 U.S.C. §
2710(d)(1)(A). "This language is unambiguous. The text of the statute refers to '[c]lass III gaming
activities' 'on Indian lands,' and does not differentiate between who is conducting the gaming."
*Cayuga Nation*, 775 F. Supp. 3d at 666. "The definition of class III gaming, which, as stated above,
is defined as 'all forms of gaming that are not class I gaming or class II gaming,' also does not
restrict its meaning to only encompass Indian gaming." *Id*. (quoting 25 U.S.C. § 2703(8)).

Like the Compact/Procedures, Kalshi's failure to comply with the Tribes' Gaming
Ordinances while offering class III gaming (sports betting) on the Tribes' lands is a per se violation
of the Tribes' Gaming Ordinances—and IGRA—and does not require that a specific provision of
the Gaming Ordinances be identified to establish the violation. Nevertheless, Picayune's Gaming
Ordinance is clear: "The Tribe shall have sole proprietary interest in and responsibility for the
conduct of any gaming operation authorized by this Ordinance, except as expressly provided in
this Ordinance." Picayune Gaming Ordinance, Section 2.[13] Chicken Ranch's Gaming Ordinance
similarly provides that the Tribe shall have proprietary interest in class III gaming operations,
Section 2, adding: "All Gaming Activities on the Rancheria (whether Class I, II or III) are
prohibited except as expressly authorized under this Ordinance," Section 5(A), and "all revenues
generated from any Class II or Class III Gaming Activities are the property of the Tribe." Section
6(B). This is because the "Tribe desires to own all gaming on tribal trust lands within the
Rancheria, and to manage and regulate such gaming in a manner that will adequately address such
special interests and needs of the Tribe." Section 1(C). Blue Lake's Gaming Ordinance has
language that mirrors the above provisions in Sections 1(2)–(3), Section 2, Section 5.01, and
Section 6.01. Because the Tribes' Gaming Ordinances, like the Tribes' Compact/Procedures, are
uniquely a creature of IGRA and therefore federal law, principles of federal preemption are
inapplicable to the issue of whether IGRA applies to Kalshi's conduct on the Tribes' Indian lands
that is allegedly authorized by the CEA.

---

[13]   Tribal Gaming Ordinances may be accessed through the NIGC website at:
https://www.nigc.gov/office-of-general-counsel/gaming-ordinances/.

1    Kalshi contends that federal statutes of general applicability, "like the CEA," apply to

2  Indian tribes, even when silent on the issue of applicability to Indian tribes. MTD, at 17 (quoting

3  *Solis v. Matheson*, 563 F.3d 425, 429 (9th Cir. 2009)). That is incorrect. A statute of general

4  applicability does not override a specific statute directly tied to tribal sovereignty and tribal self-

5  government. *See Morton v. Mancari*, 417 U.S. 535, 550 (1974); *see also* 25 U.S.C. §§ 2701, 2702.

6  "Although Congress has plenary authority over tribes, courts will not lightly assume that Congress

7  in fact intends to undermine Indian self-government." *Bay Mills*, 572 U.S. at 790. Lest there be

8  any confusion about the effect of the CEA's silence as to Indian tribes, the Indian canons of

9  construction apply to federal statutes where application implicates matters of tribal sovereignty.

10  *See EEOC v. Cherokee Nation*, 871 F.2d 937, 939 (10th Cir.1989) (construing the Age

11  Discrimination in Employment Act silence with respect to Indians as inapplicable absent clear

12  Congressional intent to abrogate sovereignty).

13    Critically, there is no conflict between the CEA and IGRA, because the CEA and CFTC

14  regulations do not authorize Kalshi to offer gaming contracts that constitute sports betting, let

15  alone conduct sports betting on the Tribes' Indian lands in contravention of federal law, IGRA,

16  and the federal mechanisms expressly chosen by Congress to implement IGRA, the Tribes'

17  Compact/Procedures and the Tribes' Gaming Ordinances. If any ambiguity persists about whether

18  the CEA can be read to abrogate aspects of IGRA, federally mandated tribal Gaming Ordinances,

19  and tribal self-government in the regulation of federally sanctioned tribal governmental gaming,

20  applying the omitted-case canon resolves any remaining ambiguity. *Shea v. Kerry*, 961 F. Supp.

21  2d 17, 29 (D.D.C. 2013), *aff'd*, 796 F.3d 42 (D.C. Cir. 2015) ("explaining semantic canon that

22  '[n]othing is to be added to what the text states or reasonably implies (*casus omissus pro omisso*

23  *habendus est*).'"); *United States v. McEligot*, No. 14-CV-05383-JST, 2015 WL 1535695, at *4

24  (N.D. Cal. Apr. 6, 2015).

25 **III.    THE TRIBES ALLEGE SUFFICIENT FACTS TO STATE A PLAUSIBLE
          CLAIM FOR DECLARATORY RELIEF FOR INFRINGEMENT OF TRIBAL
26        SOVEREIGNTY.**

27    Kalshi challenges the Tribes' claim that Kalshi's sports betting contracts infringe upon the

28  Tribes' sovereign authority to regulate gaming, asserting that the Tribes lack Article III standing,

1  because they lack the authority to regulate Kalshi's sports betting conduct on the Tribes' Indian

2  lands. This is patently false.

3      "The general federal-question statute, 28 U.S.C. § 1331, gives a district court subject matter

4  jurisdiction to decide any claim alleging a violation of IGRA. Nothing in § 2710(d)(7)(A)(ii) or

5  any other provision of IGRA limits that grant of jurisdiction . . . ." *Bay Mills*, 572 U.S. at 788 n.2;

6  *see* Complaint, at ¶ 7. Kalshi admits that a sovereign interest serves as a basis for a cognizable

7  injury, for the purpose of establishing federal standing, if the defendant invades the government's

8  sovereign right, resulting in tangible interference with the sovereign's authority to regulate or

9  enforce its laws. MTD, at 18. Shown above, that is precisely the case here, with the caveat that,

10  here, the Tribes' right to regulate class III gaming through its Compact/Procedures and Gaming

11  Ordinances and enforce its rights under IGRA, are created by federal law and are enforced as a

12  matter of federal law. *See*, *e.g.*, 25 U.S.C. §§ 2701, 2702, 2710(d).

13      The Tribes' Gaming Ordinances are federal regulatory instruments mandated by IGRA for

14  the governance and regulation of class III gaming on the Tribes' Indian lands. Congress explicitly

15  stated, as a matter of federal policy, that IGRA was enacted "to promote tribal economic

16  development, tribal self-sufficiency, and strong tribal government." 25 U.S.C. § 2701(4); S. REP.

17  100-446, at 5 ("the Committee has attempted to balance the need for sound enforcement of gaming

18  laws and regulations, with the strong Federal interest in **preserving the sovereign rights of tribal**

19  **governments to regulate activities and enforce laws on Indian land**." (emphasis added)).

20      The Gaming Ordinances are, therefore, simultaneously an expression of federal law and

21  tribal sovereignty concerning the regulation of class III gaming and not subject to federal

22  preemption, as the Gaming Ordinances implement regulatory authority that is congressionally-

23  delegated through IGRA. "The **Committee recognizes and affirms** the principle that by virtue of

24  their **original tribal sovereignty**, **tribes reserved certain rights when entering into treaties**

25  **with the United States, and that today, tribal governments retain all rights that were not**

26  **expressly relinquished**." S. REP. 100-446, at 5 (emphasis added). IGRA, the Tribes'

27  Compact/Procedures, and the Tribes' Gaming Ordinances require that the Tribes be the primary

28  beneficiary of any class III gaming conducted on the Tribes' Indian lands, for the express purpose

of generating tribal governmental revenue, and that the Tribes have the exclusive right to regulate gaming activity on Indian lands. 25 U.S.C. §§ 2701, 2702, 2710(d); Complaint, at ¶¶ 25(2), 40, 160–163, 215–219.

As stated in the Tribes' Complaint: "An actual controversy exists between the Tribes and Kalshi, in that the Tribes contend that they have the authority to enforce their Ordinances against Kalshi and prohibit it from engaging in sports gambling on their Reservations, while Kalshi asserts that the Tribes have no such authority." Complaint, at ¶ 217. Kalshi urges a distinction between "violating" the law and hindering tribal self-government: "Violating the law is different from hindering its enforcement." MTD, at 18 (quoting *Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 772 (5th Cir. 2023)). Yet, Kalshi admits to hindering rather than violating enforcement of the tribal Gaming Ordinances by claiming that "Plaintiffs do not have sovereign authority . . . to enforce the Ordinances against nonmembers . . . ." MTD, at 18. Kalshi is not merely "violating" the ordinances, rather they claim to be immune from enforcement altogether, in other words, hindering enforcement of federally mandated regulatory law predicated on their status as a federally licensed DCM.

Moreover, IGRA unequivocally requires that the Tribes be the primary beneficiary of class III gaming conducted on its Indian lands. Whether the Tribes can offer sports betting as a matter of federal and state law, 25 U.S.C. § 2710(d)(1)(B), does not alter this requirement. Kalshi's contention that, "[u]nder Plaintiffs' logic, any conduct that draws business away from Plaintiffs' casinos—the building of a professional sports stadium or concert venue nearby, rezoning of neighboring areas making housing more or less attractive, the relocation of a major employer— would interfere with Plaintiff's right to self-governance," is disingenuous in the extreme. MTD, at 19.

Kalshi is not building sports stadiums or concert venues near the Tribes' Indian lands. Kalshi is conducting sports betting—class III gaming—**on** the Tribes' Indian lands in direct violation of IGRA, Congress's explicit delegation of regulatory authority to tribes, and the Tribes' sovereign right to regulate class III gaming through its Gaming Ordinances as a means of self-government and self-determination. *See* 25 U.S.C. § 2703(5) ("The term 'Indian tribe' means any

Indian tribe, band, nation, or other organized group or community of Indians which . . . is recognized as possessing powers of self-government."); 25 U.S.C. § 2701(4); 25 U.S.C. § 2702(1) ("The purpose of this chapter is . . . to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments . . . ."). Under Defendants' logic, if Kalshi built a "professional sports stadium or concert venue" on the Tribes' Indian lands, in whole or in part, nobody could reasonably suggest that the Tribes' zoning ordinance or building code would not apply to Kalshi's activities. Kalshi is not conducting class III gaming activity "nearby," but, rather, on the Tribes' Indian lands.

Kalshi's disruption of the Tribes' regulatory authority over class III gaming on the Tribes' lands, arising from IGRA and codified in the Tribes' Gaming Ordinances, is an impermissible interference with tribal self-government. The Tribes have sufficiently alleged that an actual case or controversy exists and this Court has jurisdiction to declare that the Tribes have the authority to enforce their Gaming Ordinances and prohibit Kalshi from conducting class III gaming activity through sports betting contracts on the Tribes' Indian lands in contravention of the Tribes' sovereignty, their Gaming Ordinances, and IGRA.

## IV. THE TRIBES STATE A LANHAM ACT CLAIM BY ALLEGING THAT KALSHI FALSELY ADVERTISED THAT IT CONDUCTS LEGAL SPORTS BETTING IN ALL FIFTY STATES.

Kalshi asks this Court to dismiss the Tribes' false advertising claim by setting up a straw man and knocking it down. But this Court does not consider strawmen on a motion to dismiss. Rather, this Court considers the allegations in the complaint to determine whether the Tribes have stated a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Here the Court should deny Kalshi's motion to dismiss the Tribes' false advertising claim because even applying a heightened pleading standard, the Tribes allege Kalshi's advertisements are false or misleading and that the advertisements are material to consumers, and that the Tribes are harmed by Kalshi's advertising.

### A. The Heightened Pleading Standard Does Not Apply to the Tribes' Lanham Act Claim.

As a preliminary matter, the Tribes need not plead their §43(a) false advertising claim under the heightened standard of Rule 9(b). Although the Ninth Circuit has not definitively

1  resolved whether Rule 9(b) governs false advertising claims under the Lanham Act, district courts

2  in the Circuit have applied the heightened standard where a plaintiff alleges claims that "are

3  grounded in fraud," and where the plaintiff alleges a "unified course of fraudulent conduct" and

4  relies on that conduct as "the basis of [the] claim." *Bobbleheads.com, LLC v. Wright Brothers,*

5  *Inc.*, 259 F. Supp. 3d 1087, 1095 (S.D. Cal. 2017); *Brosnan v. Tradeline Solutions*, 2009 U.S. Dist.

6  LEXIS 147074, at *8 (N.D. Cal. Dec. 18, 2009); *see also Ely Holdings Ltd. v. O'Keeffe's, Inc.*,

7  2019 U.S. Dist. LEXIS 135805, at *13 (N.D. Cal. Aug. 12, 2019).

8      Despite making a passing reference to the heightened standard, Kalshi does not explain

9  how the Tribes' Section 43(a) claim sounds in fraud. It cannot. Courts apply Rule 9(b) to Lanham

10  Act claims where the plaintiff alleges "knowing" and "intentional conduct" as part of a unified

11  scheme. *Brosnan*, 2009 U.S. Dist. LEXIS 147074, at *9. The Tribes do not rely on fraud as the

12  basis for their false advertising claim; indeed, the Complaint uses the term "fraud" only four times,

13  none of which relate to the Section 43(a) claim. *See* Compl., ¶¶ 82, 153, 168; *see also Ferrington*

14  *v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010 U.S. Dist. LEXIS 106600, at *12–13 (N.D. Cal.

15  Oct. 5, 2010) ("To ascertain whether a complaint sounds in fraud, a court must determine . . .

16  whether the complaint alleges a unified course of fraudulent conduct and relies entirely on that

17  course of conduct as the basis of the claim" (internal quotation marks omitted) (quoting *Rubke v.*

18  *Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009)).

19      Even if this Court finds that the heightened standard applies, the Tribes' complaint satisfies

20  Rule 9(b). To meet that standard, the Tribes must allege "the who, what, when, where, and how of

21  the alleged misconduct." *Brosnan v. Tradeline Solutions*, 2009 U.S. Dist. LEXIS 147074, at *8.

22  Here, the Tribes have done so. The complaint identified Kalshi numerous times as "the party

23  responsible" for the various false advertisements—the "who." *See, e.g.,* Compl., ¶¶ 94–99. The

24  Tribes allege that Kalshi's false advertisements are at issue—the "what." *See, e.g.,* Compl., ¶¶ 104,

25  222-224. The Tribes allege the specific dates that Kalshi published the advertisements and when

26  Kalshi entered the sports betting space marking the impetus of the advertisements at issue—the

27  "when." *See, e.g.,* Compl., ¶¶ 83–86, 95–98, 102. The Tribes' pleading described Kalshi's

28  advertisements and included multiple photos depicting Kalshi's advertisements appearing in

1  various forums and online platforms, which included "billboard signs, out-of-home advertising

2  bus stops, on trucks, and the sides of buildings" and on "Tik Tok, Instagram, X.com, and

3  YouTube"—the "where." *See, e.g.,* Compl., ¶¶ 4, 93, 99. Finally, the Tribes allege that Kalshi's

4  advertisements are false because Kalshi stated that it offers "Sports Betting Legal in all 50 States

5  on Kalshi" and that Kalshi allows users to bet on sports—the "how." *See* Compl., ¶¶ 94–98.

6  Courts in this District have found that providing specific social media posts to demonstrate

7  instances of false advertising satisfies the heightened Rule 9(b) pleading standard. *See Od's on*

8  *Fin., LLC v. Mena*, 2025 U.S. Dist. LEXIS 138119, at *6–7 (N.D. Cal. July 18, 2025) ("*Mena*")

9  (finding that the plaintiff met the heightened standard by alleging that defendant "made the posts,

10  the dates he made the posts, the exact statements, and alleges why the statements are false or

11  misleading, and for six of the seven statements, the [plaintiff] includes screenshots of the

12  statements."). Like the plaintiff in *Mena*, the Tribes have alleged the who, what, when, where, and

13  how of Kalshi's false advertisements, and therefore their allegations satisfy the pleading

14  requirements even under the heightened standard.

### B.    The Tribes Have Alleged that Kalshi Injured the Tribes Through Kalshi's False Advertising.

17  The Tribes allege that Kalshi injured their sales and reputation through false advertising.

18  These allegations are sufficient to confer standing under § 43(a) because the Tribes pleaded both

19  (1) "an injury to a commercial interest in reputation or sales," and (2) that their "economic or

20  reputational injur[ies] flow directly from the deception wrought by the defendant's advertising."

21  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132–33 (2014).

22  The Tribes allege that the market in which Kalshi competes with them is not limited to

23  sports betting but includes class III gaming. Compl., ¶¶ 9–13, 28, 31-33. Moreover, the Tribes

24  allege that Kalshi's advertisements injure both the Tribes' sales and reputation. Said injuries are

25  viable and logical when a defendant's deception or false claims cause consumers to withhold or

26  redirect trade away from the plaintiff. *Lexmark*, 572 U.S. at 133. Here, the Tribes allege that:

27  [B]y illegally offering its sports wagering contracts to persons
located both on and off of the Reservations in California, *Kalshi
draws business away from the Tribes' casinos* by allowing patrons
to participate in class III gaming from their homes. Loss of revenue

> has a direct impact on tribal governmental functions and *has a tangible effect on the services and programs the tribal governments provide* to their members and all persons who live, work, and visit the Reservations.

Compl., ¶ 69 (emphasis added). Accepting the Tribes' allegations as true, the Tribe have alleged sufficient details regarding the reputational and financial harm caused by Kalshi's false or misleading advertisements.

Regarding reputation, the Tribes allege facts support the "impact" of the lost revenue from Kalshi's conduct—including its false or misleading advertising. *Id.* In particular, the Tribes have alleged the lost revenue associated with consumers who will use Kalshi over the Tribes' gaming services will lead to the Tribes being unable to provide services and support to its members. *Id.* This weakening of the Tribes as a whole not only harms the Tribes' members, it also harms the reputation and goodwill the Tribes created by historically offering their services and support to their members. Compl., ¶¶ 9-11, 41, 43. While Kalshi's advertisements may not refer to the Tribes, there is no requirement for them to do so to have standing under § 43(a) to allege injury to reputation. *See Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC,* 519 F. Supp. 3d 839, 851 (D. Or. 2021); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999).

Regarding sales, the Tribes' allegation that Kalshi's advertisements draw business away from the Tribes and inhibit tribal functions is hardly "conclusory" based on the totality of the Tribes' allegations. MTD, at 20; *See Express Cos. v. Mitel Techs., Inc.,* No. 12-CV-2818 W (MDD), 2013 U.S. Dist. LEXIS 141828, at *12 (S.D. Cal. Sep. 30, 2013) (finding that a court can consider the "totality" of the allegations in the complaint on a motion to dismiss). The Tribes allege that IGRA gives the Tribes the exclusive right to regulate class III gaming within the State of California. Compl., ¶¶ 26, 212. Further, the Tribes allege that "[c]lass III gaming can be the most lucrative form of gaming." Compl., ¶ 30. In total, the Tribes thoroughly allege Kalshi conducts class III gaming through its sale of sports event contracts. Compl., ¶¶ 48, 50. The Tribes therefore allege Kalshi is in direct competition with the Tribes for the same pool of consumers' spending allocated to both gaming and to sports books.

The Tribes sufficiently allege that their "economic or reputational injury flow[s] directly

from the deception wrought by the defendant's advertising." *Lexmark*, 572 U.S. at 133. The Tribes allege that Kalshi engaged and continues to engage in a broad marketing strategy across numerous platforms designed to attract sports gamblers and divert business from the Tribes' highly regulated gaming facilities. Compl., ¶ 93–98. Further, the Tribes allege that Kalshi's false advertisements have succeeded in reaching a broad consumer base—as shown in the numerous platforms and forums the advertisements are alleged to be featured—which necessarily impacts brick-and-mortar sports betting facilities like the Tribes' Casinos. Compl., ¶ 93–98; *see W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 268 (D.D.C. 2021), *reversed on other grounds*, 71 F.4th 1059 (Fed. Cir. 2023) ("*West Flagler*") (noting that plaintiff's prediction that online sports wagering would "divert business that would have been spent at [their facilities] and cause it to be spent on online sports gaming" was "reasonable and hardly speculative." (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992))).

Defendants contend that *West Flagler*, which the Tribes introduced at the preliminary injunction stage, is inapplicable, but its reasoning regarding the plausibility of diverted consumer spending applies directly here, and the appellate court reversed on other grounds. *W. Flagler Assocs., Ltd. v. Haaland,* 71 F.4th 1059, 1062 (D.C. Cir. 2023). Similarly, the Tribes have alleged that Kalshi's advertisements diverted consumer spending from the Tribes' Class III gaming operations and that, in California, only federally recognized tribes may lawfully conduct Class III gaming on their reservations. These allegations provide a factual basis for understanding how Kalshi's unlawful conduct could plausibly affect the Tribes' revenue and their ability to provide governmental services.

### C.    The Tribes Have Alleged That Kalshi Made a False Statement of Fact About Kalshi's Service.

Kalshi ignores the plain language of the Complaint in its attempt to dismiss the Tribes' § 43(a) claim. The Tribes allege that Kalshi is making two false statements of fact about its business: 1) that it conducts "legal" sports betting and 2) that it conducts sports betting. *See* Compl., ¶¶ 94–95, 98. The Tribes allege that the statement that Kalshi offers "Sports Betting Legal in all 50 States" is false. Compl., ¶¶ 94, 222. The validity of Kalshi's statements is not up for

debate at this stage. To survive a motion to dismiss, the Tribes must merely plausibly allege that Kalshi made a false or misleading representation in a commercial advertisement, as recognized by the Ninth Circuit in *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665, 672 (9th Cir. 2023), where the court held that allegations of objectively verifiable false or misleading statements were sufficient to proceed under the Lanham Act at the pleading stage. *See also Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1052–53 (9th Cir. 2008). As shown below, the Tribes have gone far beyond these minimum pleading requirements.

Kalshi is wrong to argue that the alleged statements are inactionable opinions. MTD, at 21-22. Courts in the Ninth Circuit have not adopted a categorical rule that all assertions touching on legality are opinions. *See Coastal Abstract Service, Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999). Instead, the Ninth Circuit's inquiry focuses on whether the challenged statement makes a "specific and measurable claim" that is "capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Id.* at 731; *accord*, *Enigma*, 69 F.4th at 671.

The complaint alleges that California has not authorized and expressly prohibits betting on the outcome of sporting events, other than pari-mutuel wagering on horse racing, and that no tribe in California offers sports betting on its lands. Compl., ¶ 44. These allegations alone support the reasonable inference that Kalshi's statements advertising "sports betting" as legal in all 50 states are false. As a matter of law, *Murphy v. NCAA*, 584 U.S. 453 (2018), confirms that, absent federal regulation, states remain free to permit or prohibit sports gambling. In *Murphy*, the Supreme Court did not suggest that any federal statute, including the Commodity Exchange Act, independently authorizes sports betting notwithstanding state law, reinforcing that Kalshi's representation cannot be true nationwide. *See Id.* at 486.

Additionally, Kalshi never begins any of its advertisements by suggesting that it is merely opining about the legality of its platform. *See generally Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). Instead, as the Tribes repeatedly have alleged, Kalshi uses its reference to "legal" as a statement of fact. Kalshi even presents this statement as one of historical fact; for example, the Tribes allege that Kalshi advertised itself as:

"The First Nationwide Legal Sports Betting Platform." Compl., ¶¶ 4, 94. Kalshi tells consumers that betting on Kalshi is legal and that it is legal in all 50 states. *See, e.g.*, Compl., ¶¶ 94-95, 98. Taken together, these allegations plausibly demonstrate that Kalshi's statements about the legality of its platform are objectively verifiable claims— "more a statement of objective fact than a non-actionable opinion." *Enigma*, 69 F.4th at 671-72. With this, the Tribes allege that Kalshi made these statements as a licensed DCM under CFTC oversight, rather than merely as a layperson. *See* Compl., ¶ 4; *Coastal Abstract Serv. v. First Am. Title Ins. Co.,* 173 F.3d 725, 731 (9th Cir. 1999).

The Tribes also allege that Kalshi "lack[ed] a good faith belief in the truth of [its] statement." *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 615 (9th Cir. 2016). Specifically, the Tribes allege:

> On information and belief, Kalshi has been prolific in offering sports event contracts *with the knowledge that the legality of their sports event contracts is highly questionable* and widely criticized as an impermissible form of sports gaming or gambling, at a time when power in the CFTC is being consolidated in one commissioner, Quintenz, a Kalshi board member, with the knowledge that the CFTC is understaffed and lacks the resources to adequately review and regulate Kalshi's self-certified contracts to ensure compliance with the CEA.

Compl., ¶ 91 (emphasis added). Consistent with this allegation, the Tribes allege that Kalshi told the D.C. Federal Courts that contracts that involve gaming could not be sold on derivative markets. Compl., ¶¶ 76, 91. The Tribes' allegations are sufficient at the motion to dismiss stage to establish that the lack of good faith exception applies.

Moreover, *Hendrick* and *Flaherty* do not hold that "sports betting" is legal in all fifty states, nor did they validate Kalshi's use of the term "betting" in its advertising. Rather, both cases addressed only whether state officials were preempted from regulating Kalshi's event contracts under the Commodity Exchange Act. The procedural posture of *Hendrick* further limits its relevance here: the court later dissolved the preliminary injunction restricting state enforcement of gaming laws and declined to grant Kalshi a stay pending appeal before the Ninth Circuit. *Hendrick*, 2025 U.S. Dist. LEXIS 234246, at *8; *Hendrick*, 2025 U.S. Dist. LEXIS 265127, at *5-6 (D. Nev. Dec. 16, 2025). Similarly, *Flaherty* addressed only whether Kalshi had demonstrated a reasonable likelihood of success on its claim that federal law displaced state regulation of "sports-related event

1  contracts," not sports betting or gambling. *Flaherty*, 2025 U.S. Dist. LEXIS 79893, at *16.

2  Accordingly, Kalshi's reliance on those decisions does not negate the Tribes' well-pleaded

3  allegations that Kalshi lacked a good-faith belief in the truth of its advertising at the time the

4  statements were made.

5      Kalshi repeatedly tells courts, including this Court, that it is legally selling ***event contracts***

6  under the Commodity Exchange Act and is fully compliant with the CFTC. MTD, at 21; *see also*

7  *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, No.

8  2:25-CV-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025); *KalshiEX LLC v.*

9  *Flaherty,* No. 25-CV-02152-ESK-MJS, 2025 WL1218313 (D. N.J., Apr. 28, 2025). Kalshi itself

10  stated the Commodity Exchange Act does not permit Kalshi to conduct betting or gaming with its

11  platform. *See* Compl., ¶ 76. In particular, to prevent the CFTC from prohibiting Kalshi from selling

12  event contracts based on elections, Kalshi argued, "that contracts on 'sporting events such as the

13  Super Bowl, the Kentucky Derby, and Masters Golf Tournament' were *precisely* what Congress

14  had in mind as 'gaming' contracts." *Id.*; Plaintiff's Memorandum in Support of Motion for

15  Summary Judgment, at Section I.B.2., *KalshiEX LLC v. Commodity Futures Trading Comm' n*,

16  No. 23-CV-03257-JMC, 2024 WL 4164694 (D.D.C., Jan. 25, 2024).

17      As Kalshi admits, sports betting is neither regulated by the CFTC nor allowed under the

18  Commodity Exchange Act. And yet, Kalshi's advertisements repeatedly advertise that they are

19  offering "sports betting" or "sports gaming." Compl., ¶¶ 94, 96. Whether these statements are

20  legally false or misleading is up to the ultimate trier of fact and their validity is not rightfully at

21  issue during the motion to dismiss stage. Rather, the Tribes were required to allege that Kalshi

22  made false statements in its advertisements—which they did. Compl., ¶¶ 94-98, 222.

23      Instead of addressing the numerous issues noted above, Kalshi chooses to take issue with

24  the Tribes pleading in the alternative but provides no authority that the Tribes cannot do so. MTD,

25  at 22-23. Rather, at the motion to dismiss stage the Tribe is required to put Kalshi on notice of its

26  allegations, including any theories posed in the alternative. *See* FRCP 8(e)(2) (allowing pleading

27  in the alternative).

28      **D.    The Tribes Have Alleged That Kalshi's Statement Deceived and Has the**

**Tendency to Deceive a Substantial Segment of its Audience and That the Tribes Have Been Injured.**

The Tribes have alleged that Kalshi's false statements "have deceived, and are still likely to deceive, consumers into believing that Kalshi was associated with or created a gambling platform affirmatively endorsed by the federal government." Compl., ¶ 225; *see Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). The Tribes allege that Kalshi is deceiving consumers as Kalshi's false advertisements are "likely to cause consumers to purchase Kalshi's sports event contracts, believing its products were universally compliant and that Kalshi was a legally compliant sports betting platform." Compl., ¶ 226. The Tribes further allege that Kalshi is deceiving consumers because, as set forth above, Kalshi's sports betting platform is not legally compliant. *Id.* Indeed, Kalshi's advertisements entice and deceive or, at bare minimum, confuse consumers as to the legality or propriety of Kalshi's platform:

- "Kalshi is dangerous. Sports betting should not be okay for under 21 let alone in all 50 states"
- "'I traded that I'd be…' dawg that's called betting. You gambled."
- "Betting culture is crazzyyy"
- "I just wanted to confirm before using Kalshi. Washington state has strict 'gambling' laws in place and I know Kalshi is a trading app for contracts. Is there a guarantee I will not get into any legal trouble for using there [sic] app in the state?"

Compl., ¶¶ 100-102; Ex. D, E. Therefore, the Tribes adequately allege that Kalshi's statements deceived and continue to deceive consumers. The Tribes further allege that consumers rely on Kalshi's statements to engage or interact with Kalshi's platform. Compl., ¶¶ 100-107, 225-226. Finally, for the reasons stated above, the Tribes thoroughly allege Kalshi's advertisements have caused, and will cause, injury to the Tribes. *See supra* Section IV, B.

## V.    THE TRIBES STATE A CLAIM FOR CIVIL RICO AGAINST ALL DEFENDANTS.

Defendants seek dismissal of the Tribes' civil RICO claim by arguing that, in their version of the facts, their conduct is not illegal class III gaming on the Tribes' Indian lands, but they cannot succeed on a motion to dismiss by offering a different version of the facts, disputing the legality of their conduct as alleged, or invoking regulatory inaction as a shield where the Complaint plausibly alleges an unlawful racketeering scheme. This Court should deny the motion to dismiss

the Tribes' civil RICO claim for three reasons: 1) the Tribes allege that Kalshi and Robinhood formed an association-in-fact enterprise to offer class III gaming which is not legal on the Tribes' Indian lands; (2) the Tribes allege that, in doing so, Defendants committed wire fraud in violation of the Wire Act and 18 U.S.C. § 1955; and (3) the Tribes allege an injury is a direct, concrete loss resulting from the Defendants' unlawful encroachment on the Tribes exclusive market.

In their complaint, the Tribes are clear about their desire to uphold IGRA which Congress passed to, among other things, provide tribes, "adequate basis to shield [them] from organized crime and other corrupting influences." Compl., ¶ 17-47, 66-68; 25 U.S.C. § 2702(2). Kalshi, ironically, reminds this Court that "RICO was enacted to eliminate 'the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." MTD, at 24. Here, by offering unregulated class III gaming on the Tribes' Indian lands, in violation of IGRA and shortly after telling a federal court they could not do so under the Commodity Exchange Act, Defendants are the corrupting influence Congress was warning about.

## A.   The Tribes Allege That Defendants Conducted the Affairs of an Association-in-Fact Enterprise.

As Defendants note, to plead conduct of an association-in-fact enterprise, courts require something that "indicate[s] how the cooperation" between businesses "exceed[s] that inherent in every commercial transaction." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013). However, the Supreme Court has held on multiple occasions that the definition of association-in-fact is to be interpreted broadly. *Id.* at 853 (*citing Boyle v. United States*, 556 U.S. 938, 944 (2009); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257 (1994)). While the 9th Circuit maintains "there has been remarkable uniformity in [the] conclusion that RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client," the activities of the Defendants cannot be understood to be "routine business activities." *Fraser v. Team Health Holdings, Inc.*, 2022 U.S. Dist. LEXIS 60544, at *27-28 (N.D. Cal. Mar. 31, 2022).

Here, the Tribes were specific in how the conduct of Defendants working together exceeded those that are inherent in every commercial transaction. Defendants worked together to

1   offer online class III gaming on the Tribes' Indian lands, in violation of IGRA and California law.

2   Defendants are wrong to pretend that such conduct was a regular business transaction. Nor can

3   they hang their hats on Kalshi's status as a DCM because the CFTC has prohibited DCM's from

4   listing contracts that involve gaming and Kalshi cannot deny that these contracts involve gaming.

5   Compl., ¶ 119-120.

6       Nothing about Defendants' conduct is routine here. Defendants rely on *Reves v. Ernst &*

7   *Young*, 507 U.S. 170 (1993), and related authorities for the proposition that routine activity by

8   each defendant is insufficient to constitute "conduct[ing] or participat[ing] in the conduct of the

9   '*enterprise's* affairs,'" as opposed to "their *own* affairs." *Reves*, 507 U.S. at 185. In *Walgreen,* for

10  example, the defendants had a longstanding and ordinary business practice of cooperation "in order

11  for drugs to reach consumers." *Walgreen*, 719 F.3d at 856. Over and over again, however, the

12  Tribes explained how Defendants activities at issue were not consistent with contractual

13  obligations or other routine business practices.

14      Defendants here, for the first time, began conducting class III gaming in early 2025 when

15  they offered and widely disseminated these specific and controversial gaming event contracts.

16  Compl., ¶ 127. Defendants acknowledge that they were doing something new and different in their

17  advertisements, that Defendants operate "The **First** Nationwide Legal Sports Betting Platform"

18  and that "Robinhood [will] Offer Super Bowl Betting via Kalshi." Compl., ¶¶ 94, 96. The Tribes

19  highlight that the "Gaming Racket" launched sports betting products "strategically timed with the

20  March Madness NCAA men's and women's basketball tournaments," leading to a reported trading

21  volume of over $500 million across all 50 states through Robinhood. Compl., ¶ 132. And, the

22  Tribes allege that the Gaming Racket uses a different arrangement than Robinhood typically uses

23  with its third-party partnerships. Compl., ¶ 123. The Tribes allege that instead of receiving

24  "payment for order flow," the Gaming Racket used "a direct revenue-sharing model." Compl., ¶¶

25  123-124.

26      Nor can Defendants succeed on a motion to dismiss by disputing the Tribes' factual

27  allegations that they are conducting class III gaming in violation of IGRA and 17 C.F.R. § 40.11(a).

28  Defendants argue that they are "complying with federal regulations" which they say "is not the

conduct of a RICO enterprise." MTD, at 26. The Tribes allege that Defendants used self-certification as a vehicle to disguise prohibited betting products. Compl., ¶ 152. And, the Tribes allege that Defendants knew their conduct was unlawful because Kalshi previously represented to the federal courts in the District of Columbia that it could not lawfully engage in this conduct. Compl., ¶¶ 76, 119-120. Similarly, Robinhood recommended to the CFTC that it "focus on prohibiting single sporting events or contests." Compl., ¶ 121. The Tribes did not allege that Defendants did what the CFTC required, the Tribes allege that Defendants knew they were unlawfully conducting class III gaming and were prohibited by the CFTC from listing such contracts. *Compare Cleveland Bakers & Teamsters Health & Welfare Fund v. AMAG Pharms., Inc.*, 2025 WL 1024103 (D. Mass. Mar. 12, 2025) (dismissing a civil RICO claim against a drug manufacturer based on the drug label used when the FDA required the drug manufacturer to use the label).

### B.    The Tribes Allege Predicate Acts of Racketeering.

The Tribes allege predicate acts of racketeering activity, encompassing wire fraud (18 U.S.C. § 1343), the transmission of wagering information (18 U.S.C. § 1084), and the operation of an illegal gambling business (18 U.S.C. § 1955).

### 1.    The Tribe Alleges Wire Fraud.

The Tribes allege that Defendants used the internet to conduct its illegal class III gaming enterprise and did so knowing that their conduct was illegal.

To plead wire fraud, a plaintiff must allege three elements with the specificity: (1) a scheme to defraud; (2) use of the wires to further the fraudulent scheme; and (3) specific intent to defraud. *United States v. Galecki*, 89 F.4th 713, 737 (9th Cir. 2023). Civil RICO claims premised on alleged wire fraud are subject to Federal Rule of Civil Procedure 9(b)'s requirement that the circumstances constituting fraud or mistake be stated with particularity. *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004).

The Tribes meet this standard. As the Tribes explain, Defendants fraudulently collect money, over the wires, for class III gaming and—at least in their briefing, although not in their advertisements—claim that, rather than conducting class III gaming, they are selling federally

1    regulated derivatives contracts. The Tribes allege that the fraudulent instruments consist of binary

2    event contracts that pose some variation of the questions, "Will <team> win <title>", Compl., ¶

3    81, and "Will <team> win <event>?" Compl., ¶ 83. Defendants offer these "contracts" as legal

4    exchange-traded products, though they are actually conducting class III gaming, conduct Kalshi

5    has told the courts involve prohibited gaming. Compl., ¶ 76, 81, 120. The Tribes allege Defendants

6    began this scheme when, during the March Madness NCAA men's and women's basketball

7    tournaments, the Gaming Racket conducted class III gaming, on the internet, nationwide, making

8    money off of consumers betting on sports. Compl., ¶ 132.

9         The Tribes allege Defendants intended to defraud because they knew they could not list

10   event contracts that involve gaming—Kalshi repeatedly told the federal courts in the District of

11   Columbia that it could not do so and Robinhood argued for the CFTC to take a narrow approach

12   to defining gaming. Compl., ¶ 120-121. Defendants now argue the opposite and claim—despite

13   their prior arguments that such conduct would not be legal—they have a "good-faith belief" in

14   legality. Defendants provide no legal support for their contention that they could have a good faith

15   belief in the legality of their actions when, a few months prior, Kalsi told federal courts that such

16   actions would not be legal.

17        **2.    The Tribes Allege Violations of the Wire Act or 18 U.S.C. § 1955.**

18        The Wire Act prohibits knowingly using interstate wires to transmit bets or wagers on

19   sporting events. 18 U.S.C. § 1084(a). The Tribes allege that the Gaming Racket offers contracts

20   whose sole purpose is to allow participants to wager on sporting outcomes, and that Robinhood

21   promotes and facilitates access to those wagers as a futures commission merchant. Compl., ¶¶ 122-

22   133. The Tribes allege that the contracts are tied directly to sporting outcomes, involve

23   consideration, chance, and the opportunity for payout based solely on those outcomes, and are

24   marketed as a way to bet on sports. Compl., ¶¶ 94, 95, 122-133. With these allegations, the Tribes

25   plausibly describe "bets or wagers" under the Wire Act.

26        Defendants cannot fall back on legal exceptions that cannot apply here to claim that the

27   Tribes have not alleged violations of the Wire Act. As a preliminary matter, the Tribes allege that

28   it is illegal for the Gaming Racket to conduct class III gaming on their Indian lands, and Defendants

38

OPPOSITION
[Case No.:  25-cv-06162-JSC]

provide no factual support from the allegations in the Complaint—which must be taken as true in deciding a motion to dismiss—for their assertion that they are selling contracts related to securities or other commodities. Nor can they do so, as the Tribes do not allege that these contracts involve commodities; just the opposite, the Tribes allege facts showing that these contracts could not be swaps. Compl., ¶¶ 61–63. And, every court that has considered whether a sports events contract could constitute a "swap" under the Commodity Exchange Act has found that these contracts cannot be swaps. *See KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 at *11 (D. Nev. Nov. 24, 2025); *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *4-5 (D. Nev. Oct. 14, 2025) ("*Crypto*").

Similarly, Defendants cannot avoid liability here by falling back on federal pre-emption. Courts across the country have rejected this argument. *See Hendrick*, 2025 WL 3286282, at *17; *Crypto.com*, 2025 WL 2916151, at *14–15; *Martin*, 793 F. Supp. 3d at 678. Defendants instead rely on the lone decision still adopting their pre-emption argument. But where, as here, the Tribes allege a violation of a federal law, IGRA, Defendants cannot invoke federal pre-emption. Nor can they suggest that Congress silently repealed IGRA through the 2010 amendments to the Commodity Exchange Act, as Congress does not repeal by implication. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

Additionally, Defendants cannot obtain dismissal by arguing that a different law controls here because, to do so, they have to ask this Court to ignore the Tribes' factual allegations. Rather than accept the Tribes' factual allegations as true, Defendants ask this Court to assume a different set of facts to conclude the Tribes have not alleged a violation of the Wire Act or 18 U.S.C. § 1955. Defendants would have this Court conclude that, despite the Tribes' allegations and Kalshi's own advertisements, they are not conducting sports betting on the Tribes' lands. They ask this Court to adopt that assumption so that they can then argue that IGRA does not apply and that, instead, UIGEA applies. But even if this Court were willing to ignore the allegations of the complaint, Defendants could not succeed. After all, in passing UIGEA, Congress stated, that "[n]o provision . . . [of UIGEA] shall be construed as altering, limiting, or extending any Federal or State law or

39

Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b). By its own words, UIGEA cannot alter California law. The Tribes allege that the Gaming Racket is conducting Class III gaming on the Tribes' lands in violation of IGRA, tribal law, state law and federal gaming restrictions. Compl., ¶¶ 202, 205-212. The Gaming Racket cannot have these claims dismissed by arguing that, contrary to the allegations in the complaint, they do not conduct class III gaming on the Tribes' Indian lands.

Defendants cannot also hang their hats on hoping to apply UIGEA's definitions to the Wire Act or rely upon *Bob Jones Univ. v. United States*, 461 U.S. 574, 588 n.10 (1983), and *Corner Post, Inc. v. Bd. of Governors of Fed.Rsrv. Sys.*, 603 U.S. 799, 818 (2024), for support of use of UIGEA's definitions within the context of the Wire Act. Congress did not amend the Wire Act when it passed UIGEA and expressly disclaimed any intent to modify existing gambling prohibitions. 31 U.S.C. § 5361(b). *Bob Jones* and *Corner Post* are inappropriate because these cases did not involve the importation of definitions from a later-enacted statute that Congress expressly stated would not alter existing gambling laws. Any confusion here can be resolved by considering the Supreme Court's decision in *Murphy v. NCAA,* decided after the Wire Act, IGRA, UIGEA, and the 2010 amendments to the Commodity Exchange Act were passed. 584 U.S. 453, 479 (2018). There, the Supreme Court noted that "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* In so noting, the Supreme Court cut off any hope the Gaming Racket had of arguing that amendment to the Commodity Exchange Act passed eight years earlier created a whole new system for regulating sports betting.

For the same reasons, the Tribes have alleged 18 U.S.C. § 1955 liability. Section 1955 requires operation of an illegal gambling business under state or federal law. The Tribes allege that Kalshi's contracts constitute unlawful wagers under § 945.03, that the business involves multiple participants in managerial and operational roles, and that it operates continuously at substantial volume. Compl., ¶¶ 114-130. Defendants cannot avoid these allegations by relying on on § 945.01(1)(a)(1) or CEA preemption, as the Tribes allege that these contracts are not swaps and could not be listed by a registered entity and there is no basis for the suggestion that these transactions are commodities. Compl., ¶¶ 48-50, 63, 127.

### 3.    The Tribes Allege Proximate Causation and Cognizable Injury.

The Tribes have alleged a direct and legally cognizable injury under their civil RICO claim. A RICO plaintiff "must show that his injury was proximately caused by the prohibited conduct." *Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1086." "[A] claim is cognizable under [RICO] only if the defendant's alleged violation proximately caused the plaintiff's injury." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006).

Under IGRA, the Tribes have the exclusive right to conduct class III gaming on their Indian lands. 25 U.S.C. § 2710(d)(1). The Tribes allege that the Gaming Racket intentionally circumvented federal and state law to offer nationwide online sports betting, including self-certified sports event contracts explicitly prohibited by the CFTC and state regulators. Compl., ¶¶ 108–130. In doing so, the Gaming Racket directly encroached upon and usurped the Tribes' exclusive markets, diverting revenue that belongs to the Tribes. Compl., ¶ 212. The Tribes have exclusivity regarding class III gaming, and by offering their own, the Gaming Racket directly violated the Tribes' legally protected exclusive rights on their Indian lands, making the injury concrete and foreseeable as a matter of law.

Because the Tribes have a legal monopoly on this revenue-generating activity, none of the cases Defendants cite to argue that the Tribes' alleged injuries are too attenuated apply. Defendants rely on cases finding that individual consumers' choices between competitors cannot be the basis for the direct harm necessary to prove an injury from a competitor's conduct. *See, e.g., Child's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742 (9th Cir. 2024) and *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992) (rejecting RICO claims because the alleged injury depended on independent third-party decisions, creating a highly attenuated causal chain). Defendants have failed to cite even one case in which an entity with a legal monopoly alleged harm because of the illegal encroachment on that monopoly.

The Tribes do not allege an injury that could be contingent on consumer choice. Under § 2710(d)(1), consumers do not have lawful alternatives to gamble on the Tribes' Indian lands outside the Tribes' compacted rights. By unlawfully offering contracts in competition with a market only the Tribes may lawfully serve, the Gaming Racket has caused the Tribes' injury that

is the immediate and intended consequence of the Gaming Racket's unlawful conduct. No third-party decisions break the causal chain because the defendants' scheme itself produces the direct injury.

Additionally, Robinhood's argument that consumers are the correct plaintiffs mischaracterizes the nature of the alleged injury. While consumers may participate in the unlawful gaming contracts, they are incidental, not intended victims. The harm RICO seeks to redress is not ordinary market losses and does not arise from a garden-variety business dispute; RICO instead seeks to redress a direct injury to the *business or property* like that suffered by the Tribes. 18 U.S.C. § 1964(c); *see Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992); *see also Anza*, 547 U.S. at 458-60. Here, the Tribes specifically allege that the Gaming Racket offered illegal sports-related event contracts in direct competition with the Tribes' Class III gaming operations, in violation of the Tribes' exclusive rights under their Tribal-State Compact and Procedures. Compl., ¶¶ 48–50, 64–66. Under 25 U.S.C. § 2702, the Indian tribe is the primary beneficiary of its gaming operations, and the Tribes' allegations show that revenue that otherwise would flow to the Tribe was directly diverted, harming the Tribes' statutory monopoly and affecting tribal governmental functions and services. Compl., ¶¶69-70. With these allegations, the Tribes demonstrate that they, and not the individual consumer, are the proper and direct victims under RICO.

## VI.     THE TRIBES ALLEGE FACTS SUFFICIENT TO MAINTAIN CLAIMS FOR RELIEF AGAINST DEFENDANT PARENT COMPANIES.

Contrary to the arguments of Robinhood, the Tribes allege facts sufficient to state a claim against Robinhood Markets, Inc. Robinhood Def.'s Notice of Mot. and Mot. to Dismiss Pls.' Compl. and Mem. in Supp. at 25, Oct. 31, 2025, Dkt. No. 68 ("MTD, Dkt. 68"). The Tribes sufficiently allege claims against both of Robinhood's companies. Compl., ¶ 3. For example, the Tribes allege that consumers are placing "illegal bets using defendants Kalshi Inc. and KalshiEX LLC, ("Kalshi"), and Robinhood Markets, Inc. and Robinhood Derivatives LLC ("Robinhood")." *Id*. The Tribes also allege: "The above-named defendants are collectively referred to as "Defendants," making it clear that the allegations and claims, where they are not explicitly stated

1    against a specific defendant, apply to all of the defendants, along with unknown DOE Defendants.

2    Compl., ¶ 12–16.

3        Defendants submit nothing to support the argument that dismissal of the parent corporate

4    entities is appropriate, as a matter of law, at the pleading stage. Instead, defendants again demand

5    a pleading standard akin to a hypertechnical, code-pleading standard. *Cf. Iqbal*, 556 U.S. at 678

6    ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime

7    of a prior era . . . ."). Evidence required to support Robinhood's assertion that the Tribes have not

8    established the requisite business relationship is beyond the scope of the Complaint and, therefore,

9    improper on a motion to dismiss. Paragraphs 12–16 of the Tribes' Complaint, if accepted as true,

10   *Iqbal*, 556 U.S. at 663, are sufficient to establish the requisite business relationship at the pleading

11   stage.

12       Defendants may present evidence to the contrary through discovery, but that is beyond the

13   purview of a motion to dismiss, which is limited to testing the sufficiency of the Complaint.

14   Defendants may then move for dismissal of the parent corporations at the proper procedural stage,

15   on a motion for summary judgment.

16                    **CONCLUSION**

17       For the foregoing reasons, the Tribes respectfully request that this Court deny Defendants'

18   Motions to Dismiss.

19   DATED: January 9, 2026                Respectfully Submitted,

20                                         RAPPORT AND MARSTON

21                                         By:    */s/ Lester J. Marston*
22                                                LESTER J. MARSTON,
                                                  Attorney for Plaintiffs
23

24

25

26

27

28

OPPOSITION
[Case No.:  25-cv-06162-JSC]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I am employed in the County of Mendocino, State of California. I am over the age of 18 years and not a party to the within action; my business address is that of Rapport & Marston, 405 West Perkins Street, Ukiah, California 95482.

I hereby certify that I electronically filed the foregoing document with the Clerk of the United States District Court for the Northern District of California by using the CM/ECF system on January 9, 2026, which generated and transmitted a notice of electronic filing to CM/ECF registrants.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct; executed on January 9, 2026, at Ukiah, California.

*/s/ Ericka Duncan*
ERICKA DUNCAN

OPPOSITION
[Case No.:  25-cv-06162-JSC]