# EXHIBIT K



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

JAN 3 1 2024

The Honorable Claudia Brundin
Chairperson, Blue Lake Rancheria
P.O. Box 428
Blue Lake, California 95525

Dear Chairperson Brundin:

On April 25, 2023, the Department of the Interior (Department) received a memorandum dated April 10, 2023, from the court-appointed mediator (Mediator) in *Chicken Ranch Rancheria of Me-Wuk Indians v. California,* 42 F.4th 1024 (9ᵗʰ Cir. 2022) notifying and transmitting to the Secretary of the Interior (Secretary) the class III gaming Compact selected by the Mediator (Mediator's Selected Compact) in accordance with the Indian Gaming Regulatory Act (IGRA). 25 U.S.C. § 2701 *et seq.* The Mediator's notice initiated the process for the Department to issue class III gaming procedures consistent with IGRA. 25 U.S.C. § 2710(d)(7)(B)(vii).

On March 31, 2021, the District Court issued an order in *Chicken Ranch Rancheria of Me-Wuk Indians, et al. v. Gavin Newsom, Governor of California, et al.*, 530 F. Supp. 3d 970 (E.D. Cal. 2021) ("District Court Order"), holding that the State of California (State) did not negotiate in good faith by demanding that the class III gaming compacts include provisions that were not proper subjects of negotiation under IGRA.

The State appealed the District Court's Order to the United States Court of Appeals for the Ninth Circuit (Ninth Circuit). On July 28, 2022, the Ninth Circuit issued a decision in *Chicken Ranch Rancheria of Me-Wuk Indians v. California,* 42 F.4th 1024 (9th Cir. 2022) (Court of Appeals Decision) affirming the District Court Order. The Ninth Circuit directed the State and Tribes to proceed with IGRA's remedial process under the District Court's continued supervision.

On February 1, 2023, the Mediator selected the Tribes' last best offer class III gaming compact as the one which best comported with IGRA and other Federal law as required by the remedial process. On April 3, 2023, the State notified the Mediator that it would not consent to the terms of the Mediator's Selected Compact (Compact). The remedial process then requires the Mediator to transmit their selected Compact to the Department.[1]

After consulting with the Tribe, I am issuing the attached Secretarial Procedures (these Procedures) as required by IGRA under which the Blue Lake Rancheria, California (Tribe) may conduct Class III gaming.

---

[1] *Chicken Ranch Rancheria of Me-Wuk Indians v. California,* 42 F.4th 1024 (9ᵗʰ Cir. 2022)

We note that the Compact contemplated that, in addition to the Tribal Gaming Commission's role as a regulator of the Tribe's gaming activities, the State could also have regulatory responsibilities largely consistent with the State's regulatory role in Class III gaming under numerous existing compacts with other Tribes in the State. The State refused to consent to the Compact and indicated it could not consent to fulfill such regulatory responsibilities under the terms of the Compact.[2]

The Secretary of the Interior cannot unilaterally obligate the State to carry out the regulatory responsibilities contemplated in the Compact. However, the National Indian Gaming Commission (NIGC) already exercises regulatory authority over the Tribe's gaming through requirements of the Tribe's gaming ordinance and IGRA. Therefore, the NIGC has agreed to perform many of the regulatory responsibilities included in the Compact. The Tribe will memorialize this arrangement in a Memorandum of Understanding with the NIGC. Accordingly, Section 6.1(a) of these Procedures requires the Tribe to incorporate these Procedures into the Tribe's gaming ordinance, and Section 8.2(c) requires the Tribe to enter into a Memorandum of Understanding with the NIGC.

The IGRA requires the Secretary to prescribe procedures, in consultation with the Tribe, that are consistent with IGRA, relevant provisions of state law, and with terms that are consistent with, but not identical to, the class III gaming compact selected by the mediator.[3] I find that these Procedures meet those requirements. By this letter and as required by IGRA, I am providing you with notification that I have proscribed these Procedures, which are now in effect, for the conduct of class III gaming on the Tribe's Indian lands.

Sincerely,

Bryan Newland
Assistant Secretary – Indian Affairs

Enclosure

---

[2] Letter from Nathan Voegeli, Senior Advisor for Tribal Negotiations, Office of the Governor, California to the Honorable Raul A. Ramirez, Judge (Ret.) dated April 3, 2023, declining to consent to the Mediator's selected compact. *See also* Letter form Timothy M. Muscat, Deputy Attorney General, on behalf of Rob Bonta, Attorney General for the State of California, to the Honorable Deb Haaland, Secretary of the Interior, dated April 17, 2023. Additionally, on December 29, 2023, the Office of Indian Gaming confirmed the Attorney General's letter was the State's formal position. Conference call December 29, 2023 between Office of Indian Gaming Director Paula L. Hart, Deputy Director Philip Bristol, and Nathan Voegeli, Senior Advisor for Tribal Negotiations, Office of the Governor, California.
[3] 25 U.S.C. § 2710 (d)(7)(B)(vii).

**CLASS III GAMING**

**SECRETARIAL PROCEDURES FOR**

**THE BLUE LAKE RANCHERIA, CALIFORNIA**

**TABLE OF CONTENTS**

PREAMBLE ................................................................................................................ 6

SECTION 1.0.    PURPOSES AND OBJECTIVES. .................................................... 9

SECTION 2.0.    DEFINITIONS. ............................................................................... 10

SECTION 3.0.    SCOPE OF CLASS III GAMING AUTHORIZED. ........................ 13

SECTION 4.0.    AUTHORIZED LOCATION OF GAMING FACILITY, NUMBER OF
GAMING DEVICES, COST REIMBURSEMENT, AND MITIGATION. ................. 14

     Sec. 4.1.    Authorized Number of Gaming Devices. ........................................ 14

     Sec. 4.2.    Authorized Gaming Facilities. ........................................................ 14

     Sec. 4.3.    RESERVED ...................................................................................... 14

     Sec. 4.4.    RESERVED ...................................................................................... 14

     Sec. 4.5.    Effective Date of Revenue Contribution Provisions. ..................... 14

     Sec. 4.6.    Quarterly RSTF Payments and Quarterly Contribution Report. ..... 14

     Sec. 4.7.    Exclusivity ..................................................................................... 15

SECTION 5.0.    REVENUE SHARING WITH NON-GAMING TRIBES. ............... 16

     Sec. 5.1.    Distributions from Revenue Sharing Trust Fund .......................... 16

SECTION 6.0.    LICENSING ................................................................................... 16

     Sec. 6.1.    Gaming Ordinance and Regulations. ............................................. 16

     Sec. 6.2.    Tribal Ownership, Management, and Control of Gaming Operation. ....... 17

     Sec. 6.3.    Prohibitions Regarding Minors ...................................................... 17

     Sec. 6.4.    Licensing Requirements and Procedures. ....................................... 17

     Sec. 6.4.1.    Summary of Licensing Principles ................................................ 17

Sec. 6.4.2.     Gaming Facility. ................................................................ 17

Sec. 6.4.3.     Gaming Employees. ............................................................ 20

Sec. 6.4.4.     Gaming Resource Suppliers ................................................. 20

Sec. 6.4.5.      Financial Sources. ............................................................. 21

Sec. 6.4.6.     Processing Tribal Gaming License Applications. ...................... 23

Sec. 6.4.7.     Suitability Standard Regarding Gaming Licenses. ..................... 24

Sec. 6.4.8.     Background Investigations of Applicants. ............................... 24

Sec. 6.4.9.     Temporary Licensing. ......................................................... 25

Sec. 6.5.       Tribal Gaming License Issuance. ........................................... 25

Sec. 6.5.1.     Denial, Suspension, or Revocation of Licenses ....................... 25

Sec. 6.5.2.     Renewal of Licenses; Extensions; Further Investigation. ........... 26

Sec. 6.5.3.     Identification Cards. ........................................................... 26

Sec. 6.5.4.     Fees for Tribal Gaming License. ........................................... 26

Sec. 6.5.5.     Summary Suspension of Tribal Gaming License. ...................... 26

SECTION 7.0.      APPROVAL AND TESTING OF GAMING DEVICES ................. 27

Sec. 7.1.       Gaming Device Approval. .................................................... 27

Sec. 7.2.       Gaming Test Laboratory Selection ........................................ 27

Sec. 7.3.       Maintenance of Records of Testing Compliance. ..................... 28

Sec. 7.4.       [RESERVED]. .................................................................... 28

Sec. 7.5.       Technical Standards. .......................................................... 28

Sec. 7.6.       Transportation of Gaming Devices. ...................................... 28

SECTION 8.0.     INSPECTIONS. ............................................................................. 29

    Sec. 8.1.     On-Site Regulation. ......................................................... 29

    Sec. 8.1.1.     Investigation and Sanctions. ......................................... 29

    Sec. 8.2.     Memorandum of Understanding with the National Indian Gaming
    Commission. ........................................................................................... 30

    Sec. 8.3     [RESERVED] ........................................................................ 30

    Sec. 8.4     [RESERVED] ........................................................................ 30

    Sec. 8.5     Cooperation with Tribal Gaming Agency ....................................... 30

SECTION 9.0.     RULES AND REGULATIONS FOR THE OPERATION AND
MANAGEMENT OF THE GAMING OPERATION AND FACILITY ..................................... 31

    Sec. 9.1.     Adoption of Regulations for Operation and Management; Minimum
    Standards. ........................................................................................... 31

    Sec. 9.2.     Manner in Which Incidents Are Reported. ..................................... 32

    Sec. 9.3.     Minimum Internal Control Standards. ............................................ 33

    Sec. 9.4.     Program to Mitigate Problem Gambling. ........................................ 34

    Sec. 9.5.     Enforcement of Regulations. ........................................................ 35

    Sec. 9.6.     State Civil and Criminal Jurisdiction. .............................................. 35

    Sec. 9.7.     Tribal Gaming Agency Members. ................................................... 35

SECTION 10.0.     PATRON DISPUTES. .................................................................. 35

SECTION 11.0.     PUBLIC AND WORKPLACE HEALTH, SAFETY, AND LIABILITY ....
.............................................................................................................. 37

    Sec. 11.1.     General Requirements. ................................................................ 37

    Sec. 11.2.     Health and Safety Standards. ....................................................... 37

    Sec. 11.3.     Tribal Gaming Facility Standards Ordinance. ................................. 39

Sec. 11.4.     Insurance Coverage and Claims. .................................................. 39

Sec. 11.5.     Participation in State Programs Related to Employment. .............................. 40

Sec. 11.6.     Emergency Services Accessibility. .................................................. 41

Sec. 11.7.     Alcoholic Beverage Service. ....................................................... 41

Sec. 11.8.     Possession of Firearms. ........................................................... 41

Sec. 11.9.     Labor Relations. .................................................................. 41

SECTION 12.0.     [RESERVED] ...................................................................... 41

SECTION 13.0.     EFFECTIVE DATE AND TERM. ........................................................ 41

Sec. 13.1.     Effective Date. ..................................................................... 41

Sec. 13.2.     Term; Extension. .................................................................... 41

SECTION 14.0.     AMENDMENTS. ..................................................................... 42

Sec. 14.1.     Amendment of These Secretarial Procedures. ......................................... 42

Sec. 14.2.     [RESERVED] ......................................................................... 42

Sec. 14.3.     [RESERVED] ......................................................................... 42

Sec. 14.4.     Most Favored Nation. ............................................................... 42

SECTION 15.0.     NOTICES. ........................................................................ 42

SECTION 16.0.     CHANGES TO IGRA. ................................................................ 43

SECTION 17.0.     MISCELLANEOUS. .................................................................. 43

Sec. 17.1.     Third-Party Beneficiaries. .......................................................... 43

Sec. 17.2.     Effect of Procedures. ............................................................... 43

Sec. 17.3.     Construction and Interpretation of Procedures. ...................................... 43

|  | Successor Provisions. | 44 |
| Sec. 17.5. | Ordinances and Regulations. | 44 |
| Sec. 17.6. | Calculation of Time. | 44 |
| Sec. 17.7. | Force Majeure. | 44 |
| Sec. 17.8. | Severability. | 44 |
| Sec. 17.9. | Compliance with Mediator's Choice of Last Best Offer Compact. | 45 |
| Sec. 17.10 | Class III Gaming Compact with the State. | 45 |
| Sec. 17.11 Procedures. | References to the State and the State Gaming Agency in These Secretarial | 46 |
| Sec. 17.12 | No Waiver of Sovereign Immunity | 46 |

Appendix A: Map of Tribe's Reservation .................................................... 48

Appendix B: Tribal Labor Relations Ordinance ........................................ 49

## CLASS III GAMING SECRETARIAL PROCEDURES

### PREAMBLE

**WHEREAS**, in 1999, the Tribe and the State of California entered into a Tribal-State Compact ("1999 Compact"), by which the Tribe was authorized to operate up to two Gaming Facilities and up to 2,000 Gaming Devices, banking and percentage card games, and games and devices permitted by California law to the State Lottery, and, in consideration for meaningful concessions of unique value, the Tribe made numerous concessions sought by the State, including on matters that were not directly related to the regulation or operation of class III Gaming Activities, and that have enabled the Tribe, through revenues generated by its class III Gaming Activities, to improve the environment, education, health, safety, and general welfare of its citizens, to promote a strong tribal government and self- sufficiency, and to provide essential government services to its citizens and all persons who live on, work at, or visit the Tribe's Indian lands; and

**WHEREAS**, in March, 2000, the voters of California, by approving Proposition 1A, added Article IV, Section 19(f) to the California Constitution, thereby authorizing the Governor to negotiate and the Legislature to ratify compacts between the State and federally-recognized Indian tribes exercising governmental authority over Indian lands in California pursuant to which such tribes, and only such tribes, would be permitted to conduct some of what the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq.* ("IGRA"), defines as "class III gaming," to wit: operation of Gaming Devices, banking and percentage card games, and games and devices permitted by state law to the California State Lottery; and

**WHEREAS**, the Tribe's 1999 Compact was approved by the Secretary of the Interior ("Secretary") and notice of such approval was published in the Federal Register; and

**WHEREAS**, pursuant to Section 11.2.1, subsection (a) of the 1999 Compact, the Compact was set to expire on December 31, 2020, however, the Tribe's 1999 Compact provided for an automatic extension of the term of the Compact through June 30, 2022, if the Tribe was in negotiations with the State to extend or replace its existing 1999 Compact; and

**WHEREAS**, in 2014, the Tribe joined various other Indian tribes with existing 1999 compacts to form the Compact Tribes Steering Committee ("CTSC") which entered into negotiations with the State to extend or replace the Parties' 1999 Compacts; and

**WHEREAS**, between 2015 and 2019, the State and the Tribe, as part of the CTSC, engaged in negotiations to extend or replace the 1999 Compacts; and

**WHEREAS**, pursuant to Section 11.2.1, subsection (a) of the 1999 Compact, the 1999 Compact term was automatically extended to June 30, 2022; and

**WHEREAS**, at the end of 2019, and after nearly five years of formal negotiations with the State, the Tribe, along with four other CTSC tribes ("Plaintiff Tribes"), filed suit against the

6

Governor and the State ("State Defendants") in the United States District Court for the Eastern District of California, alleging that the State violated the IGRA by failing to negotiate with the Plaintiff Tribes in good faith; and

**WHEREAS**, on March 31, 2021, the District Court issued an order in *Chicken Ranch Rancheria of Me-Wuk Indians, et al. v. Gavin Newsom, Governor of California, et al.*, 530 F. Supp. 3d 970 (E.D. Cal. 2021) ("District Court Order"), holding that the State Defendants did not negotiate with the Plaintiff Tribes in good faith by demanding that the Plaintiff Tribes include in their compacts provisions that were not proper subjects of negotiation under the IGRA; and

**WHEREAS**, the State Defendants appealed the District Court's Order to the Ninth Circuit Court of Appeals ("Court of Appeals"); and

**WHEREAS**, on or about April 21, 2022, the Plaintiff Tribes agreed to extend the term of their respective 1999 Compacts to December 31, 2023, to, among other things, await the Court of Appeals Decision; and

**WHEREAS**, on July 28, 2022, the Court of Appeals for the Ninth Circuit issued a decision in *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024 (9th Cir. 2022) ("Court of Appeals Decision" or "Decision") affirming the District Court Order finding that the State Defendants had failed to negotiate with the Plaintiff Tribes in good faith by demanding that the Tribes include in their new compacts provisions that were not directly related to the operation of class III gaming activities, in violation of the IGRA; and

**WHEREAS**, the Court of Appeals Decision held that IGRA does not authorize inclusion in compacts provisions concerning family law, State environmental law, and State tort law, because such provisions are not directly related to the operation of class III gaming activities; and

**WHEREAS**, the Court of Appeals Decision directed the State Defendants and Plaintiff Tribes to proceed to IGRA's remedial framework under the District Court's continued supervision; and

**WHEREAS**, the District Court issued an order appointing a mediator and ordering the State Defendants and each Plaintiff Tribe to submit to the mediator their last best offer compacts; and

**WHEREAS**, under the IGRA, the mediator is required to select the compact that best comports with of IGRA, any other applicable Federal law, and that is consistent with the Court of Appeals Decision; and

**WHEREAS**, on February 1, 2023, the mediator selected the last best offer compact submitted by the Plaintiff Tribes as the compact that best comported with the terms of the IGRA, any other applicable Federal law, and with the Court of Appeals Decision, and submitted the Plaintiff Tribes' last best offer compact to the State Defendants and the Plaintiff Tribes; and

**WHEREAS**, under the IGRA, 25 U.S.C. § 2710(d)(7)(B)(vi), if the State "consents to a

proposed compact during the 60-day period beginning on the date on which the proposed compact is submitted by the mediator to the State under clause (v), the proposed compact shall be treated as a Tribal-State compact…."; and

**WHEREAS**, under the IGRA, 25 U.S.C. § 2710(d)(7)(B)(vii), if the State "does not consent during the 60-day period described in clause (vi) to a proposed compact submitted by a mediator under clause (v), the mediator shall notify the Secretary and the Secretary shall prescribe, in consultation with the Indian tribe, procedures— (I) which are consistent with the proposed compact selected by the mediator under clause (iv), the provisions of [IGRA], and the relevant provisions of the laws of the State, and (II) under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction"; and

**WHEREAS**, on April 3, 2023, the State Defendants notified the mediator that the State Defendants would not consent to regulate the Plaintiff Tribes' class III gaming activities pursuant to the terms of the last best offer compact selected by the mediator; and

**WHEREAS**, on April 25, 2023, the Office of Indian Gaming received on behalf of the Secretary a memorandum dated April 10, 2023, from the court appointed mediator notifying and transmitting to the Secretary the compact selected by the mediator in accordance with IGRA, 25 U.S.C. § 2710(d)(7)(B)(vii).

**WHEREAS**, on April 17, 2023, the State Defendants sent a letter to the Secretary identifying provisions in the last best offer compact selected by the mediator the State viewed as conflicting with State law, and therefore effectively precluded the State from consenting to the mediators selected compact. The State further stated that "…the State is not a party to the procedures…"; and

**WHEREAS**, the Secretary cannot unilaterally obligate the State Defendants to carry out the regulatory responsibilities assigned to the State Defendants in the last best offer compact selected by the mediator; and

**WHEREAS**, the Tribe shall have jurisdiction, subject to any concurrent jurisdiction of the United States and the National Indian Gaming Commission, to regulate the class III gaming conducted under these Secretarial Procedures on its Indian lands; and

**WHEREAS**, 25 U.S.C. § 2710(d)(7)(B)(vii) states that the Secretary "shall" prescribe secretarial procedures once the other conditions set forth in 25 U.S.C. § 2710(d)(7)(B) have been satisfied, the Secretary has no discretion on the question of whether to prescribe secretarial procedures for the Tribe and the Secretary has a mandatory duty to prescribe these secretarial procedures ("Secretarial Procedures") for the Tribe; and

**WHEREAS**, the Secretary, since being notified of the court-appointed mediator's selection, has consulted with the Tribe regarding the prescription of these Secretarial Procedures; and

**WHEREAS**, the Secretarial Procedures set forth below are consistent with the compact

8

selected by the court-appointed mediator, the provisions of the IGRA, and the relevant provisions of the laws of the State, 25 U.S.C. § 2710(d)(7)(B)(vii)(I) with modifications only to the extent necessary to make these Secretarial Procedures consistent with the selected compact; and

**WHEREAS**, the Secretary has an interest in ensuring that tribal Gaming Activities are free from criminal and other undesirable elements; and

**WHEREAS**, these Secretarial Procedures will afford the Tribe primary responsibility for the regulation of its Gaming Facilities and Gaming Activities to ensure the fairness of the playing of the class III games, shield the games from criminal activity, ensure that the Tribe is the primary beneficiary of the Gaming Activities, and promote tribal economic development and self-sufficiency; and

**WHEREAS**, these Secretarial Procedures protect the interests of the Tribe and its members, as well as the interests of patrons of the Tribe's gaming facilities.

**NOW THEREFORE**, based on the foregoing findings, the Secretary, as requested by the mediator appointed by the United States District Court for the Eastern District of California in *Chicken Ranch Rancheria of Me-Wuk Indians et al. v. Newsom*, No. 1:19-CV-0024-AWI-SKO (E.D. Cal. Filed Jan. 4, 2019), and as mandated by IGRA, 25 U.S.C. § 2710 (d)(7)(B)(vii), and in consultation with the Tribe, hereby promulgates these class III Gaming Secretarial Procedures for the Tribe.

## SECTION 1.0.    PURPOSES AND OBJECTIVES.

The terms of these Secretarial Procedures are designed and intended to:

(a)  Regulate Class III Gaming, and only Class III gaming, on the Tribe's Indian lands to ensure its fair and honest operation in accordance with IGRA, and through that regulated Class III gaming, enable the Tribe to develop self-sufficiency, promote tribal economic development, and create jobs and generate revenues to support the Tribe's government and its governmental services and programs.

(b)  Promote ethical practices in conjunction with Class III gaming, through the licensing and control of persons and entities employed in, or providing goods and services to, the Gaming Operation, protect against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal government gaming, and protect the patrons and employees of the Gaming Operation and Gaming Facility.

(c)  Ensure that the provisions of these Secretarial Procedures do not violate: (1) any provision of the IGRA; (2) any other applicable provision of federal law; (3) the trust obligations of the United States owed to Indians and Indian tribes; and (4) the Court of Appeals Decision.

**SECTION 2.0.          DEFINITIONS.**

As used in these Secretarial Procedures, the following words shall have the following meanings:

Sec. 2.1.  "AICPA Guide" means the current edition of the American Institute of Certified Public Accountants' "Casino Audit Guide," and as said Guide may be revised from time to time.

Sec. 2.2.  "Applicable Codes" means the uniform fire, plumbing, electrical, mechanical, building, and related codes as adopted from time-to-time by the Western Fire Chiefs Association, the International Code Council, the International Association of Plumbing and Mechanical Officials, and the National Fire Protection Association, as approved by the American National Standards Institute, but excluding provisions not directly involving structural integrity or life safety.

Sec. 2.3. "Applicant" means an individual or entity that applies for a tribal gaming license.

Sec. 2.4.       "Association" means an association of California tribal and State gaming regulators, the membership of which comprises up to two (2) representatives from each tribal gaming agency of those tribes with whom the State has a Class III gaming compact under IGRA, and up to two (2) delegates from the California Department of Justice, Bureau of Gambling Control, and the California Gambling Control Commission.

Sec. 2.5.  "Class III gaming" means the forms of class III gaming defined in 25 U.S.C. § 2703(8) and by the regulations of the National Indian Gaming Commission.

Sec.2.6.  "Commission" means the California Gambling Control Commission, or any successor agency of the State.

Sec. 2.7.  "Compact" means a class III tribal state gaming compact between the State and a tribe.

Sec. 2.8.  "Compact Tribe" or "Compacting Tribe" means a federally recognized Indian tribe in California that is engaged in Class III Gaming Activities pursuant to a gaming compact entered with the State.

Sec. 2.9.      "Financial Source" means any person or entity who, directly or indirectly, extends financing in connection with the Tribe's Gaming Facility or Gaming Activities.

Sec. 2.10. "Gaming Activity" or "Gaming Activities" means the following activities necessary for the playing of a class III game: (1) the actual playing of a class III game; (2) the use, storage, transportation, and counting of cash, coin, chips, or their equivalents; (3) the use, storage, and maintenance of any books, records, receipts, accounting software, or electronic accounting

data pertaining to any class III game; (4) the use, storage, maintenance, or repair of any Gaming Resources or components thereof; (5) the use, storage, maintenance, and repair of any security or surveillance equipment necessary to safeguard the playing of a class III game; and (6) gaming employees or patrons engaging in activities 1 through 5 above. Gaming Activity or Activities do not include any activity directly related to the playing of a class I or II game.

Sec. 2.11. "Gaming Device" means any Gaming Device within the meaning of Article IV, section 19, subdivision (f) of the California State Constitution.

Sec. 2.12. "Gaming Employee" means any natural person who is an employee of the Gaming Operation and (i) conducts, operates, maintains, repairs, accounts for, or assists in the actual conduct of any Gaming Activities, or is in any way responsible for supervising such Gaming Activities or persons who conduct, operate, maintain, repair, account for, assist, or supervise any such Gaming Activities, (ii) is in a category under federal or tribal gaming law requiring licensing, but excluding persons subject to licensure solely for class II gaming, or (iii) is a person whose employment duties require or authorize access to areas of the Gaming Facility in which any activities directly related to Gaming Activities are conducted but that are not open to the public. Notwithstanding the foregoing, the definition of Gaming Employee does not include (a) members or employees of the Tribal Gaming Agency or persons employed by the Gaming Operation who have no access to Gaming Operation cash or business records, or who have no involvement in the actual operation of Gaming Activities; (b) any person involved in the playing or operation of a class I or class II game; and (c) any person not included in subsection (a) engaged in any non-gaming activities within a Gaming Facility.

Sec. 2.13. "Gaming Facility" or "Facility" means any space within any building or structure where Gaming Activities occur.

Sec. 2.14. "Gaming Operation" means the business enterprise that offers and operates Gaming Activities exclusively in the Facility or Facilities but does not include any other governmental or other business activities owned or operated by the Tribe that are not directly connected to the playing of a class III game within the Gaming Facility.

Sec. 2.15. "Gaming Ordinance" means a tribal ordinance or resolution duly authorizing the conduct of Gaming Activities in the Gaming Facility or Facilities on the Tribe's Indian lands in California and approved under IGRA.

Sec. 2.16. "Gaming Resources" means any goods or services provided or used in connection with Gaming Activities, whether exclusively or otherwise, including, but not limited to, equipment, furniture, Gaming Devices, and ancillary equipment, implements of Gaming Activities such as playing cards, furniture designed primarily for Gaming Activities, maintenance or security equipment and services, and class III gaming management or consulting services. "Gaming Resources" does not include accounting or legal services.

Sec. 2.17. "Gaming Resource Supplier" means any person or entity who, directly or indirectly, does, or is deemed likely to, manufacture, distribute, supply, vend, lease, purvey, or otherwise provide to the Gaming Operation or Gaming Facility at least twenty-five thousand

dollars ($25,000) in Gaming Resources in any twelve (12) month period, or who, directly or indirectly, receives or is deemed likely to receive, in connection with the Gaming Operation or Gaming Facility, at least twenty-five thousand dollars ($25,000) in any consecutive twelve (12) month period, provided that the Tribal Gaming Agency may exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection with, Gaming Activities, if the purveyor is not otherwise a Gaming Resource Supplier as described under Section 6.4.4, the compensation received by the purveyor is not grossly disproportionate to the value of the goods or services provided, and the purveyor is not otherwise a person who exercises a significant influence over the Gaming Operation.

Sec. 2.18.  "Gaming Tribe" means a Tribe that operates 350 or more Gaming Devices pursuant to a Class III gaming compact or Class III procedures prescribed by the Secretary of the Interior in lieu of a compact ("Secretarial Procedures").

Sec. 2.19.  "Governor" means the governor or the governor's office of the State of California.

Sec. 2.20.  "Gross Gaming Revenue" means "gross gaming revenue" as defined by the American Institute of Certified Public Accountants.

Sec. 2.21.  "IGRA" means the Indian Gaming Regulatory Act of 1988 (P.L. 100-497, 18 U.S.C. Sec. 1166 et seq. and 25 U.S.C. Sec. 2701 et seq.) and any amendments thereto, as interpreted by all regulations, promulgated thereunder.

Sec. 2.22.  "Management Contractor" means any Gaming Resource Supplier with whom the Tribe has contracted for the management of any Gaming Activity or Gaming Facility, including, but not limited to, any person who would be regarded as a management contractor under IGRA.

Sec. 2.23.  "NIGC" means the National Indian Gaming Commission.

Sec. 2.24. "Non-Gaming Tribe" means a federally recognized tribe in California, with or without a tribal-state class III Gaming compact with the State or secretarial procedures, that is operating fewer than a combined total of three hundred fifty (350) class III Gaming Devices in all its Gaming Operations wherever located, during the immediately preceding three hundred sixty-five (365) days.

Sec. 2.25.  [RESERVED]

Sec. 2.26.  "Revenue Sharing Trust Fund" ("RSTF") means a fund created by the California Legislature and administered by the State, as trustee, with no duties or obligations except as set forth in compacts entered into prior to these Secretarial Procedures and substantially similar compacts, for the receipt, deposit, and distribution of monies paid by Gaming Tribes for the benefit of Non-Gaming Tribes. The State has no discretion with respect to the use or disbursement by recipient tribes of the RSTF monies. Under California law, Government Code § 12012.75, the RSTF is authorized to serve as a depository of the trust funds and to allocate and disburse them on

12

a quarterly basis to eligible Non-Gaming Tribes as specified by the California Legislature.

Sec. 2.27. "State" means the State of California or an authorized official or agency thereof.

Sec. 2.28.  [RESERVED]

Sec. 2.29. "State Gaming Agency" means the entities authorized to investigate, approve, regulate and license gaming pursuant to the Gambling Control Act (ch. 5 (commencing with section 19800) of div. 8 of the California Business and Professions Code), or any successor statutory scheme, and any entity or entities in which that authority may hereafter be vested.

Sec. 2.30. "Tribal Chair" or "Tribal Chairperson" means the person duly elected or selected under the Tribe's Constitution or governing documents, customs, or traditions to perform the duties specified therein, including serving as the Tribe's official representative.

Sec. 2.31. "Tribal Gaming Agency" means the person, agency, board, committee, commission, or council designated under tribal law, including, but not limited to, an intertribal gaming regulatory agency approved to fulfill those functions by the NIGC, primarily responsible for carrying out the Tribe's regulatory responsibilities under IGRA and the Tribe's Gaming Ordinance. No person employed in, or in connection with, the management, supervision, or conduct of any Gaming Activity may be a member or employee of the Tribal Gaming Agency.

**SECTION 3.0.        SCOPE OF CLASS III GAMING AUTHORIZED.**

(a)     The Tribe is hereby authorized to engage in Gaming Activities and is permitted to operate or play the following under the terms and conditions set forth in these Secretarial Procedures:

(1)     Gaming Devices, including any devices or games played on those Gaming Devices that are legally equivalent to devices and games the State has authorized any person, organization, or entity to play in California.

(2)     Any banking or percentage card class III game.

(3)     Any devices or games that are authorized under State law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet, unless any other person, organization, or entity in the State is permitted to do so under State and federal law.

(b)     Nothing herein shall be construed to preclude the Tribe from offering class I and II gaming or preclude the negotiation of a separate compact with the State governing the conduct of off-track wagering at the Tribe's Gaming Facility.

(c)     Nothing herein shall be construed to authorize or permit the operation of any class III gaming that the State lacks the power to authorize or permit article IV, section

13

19 of the California Constitution.

(d)     The Tribe shall not engage in class III gaming that is not expressly authorized in these Secretarial Procedures; *provided*, that if, at any time subsequent to the Effective Date of these Secretarial Procedures, the State authorizes any additional form(s) of class III gaming not already expressly authorized by these Secretarial Procedures, the Tribe shall be entitled to operate such form(s) of class III gaming by amending these Secretarial Procedures as set forth in Section 14.1, and under such regulations and minimum internal controls as agreed upon by the Tribe and the NIGC consistent with the Tribe's Gaming Ordinance and the Sec. 8.2 Memorandum of Understanding.

## SECTION 4.0.    AUTHORIZED LOCATION OF GAMING FACILITY, NUMBER OF GAMING DEVICES, COST REIMBURSEMENT, AND MITIGATION.

### Sec. 4.1.    Authorized Number of Gaming Devices.

As of the effective date of these Secretarial Procedures, the Tribe is entitled to operate on its Indian lands the number of Gaming Devices that the Tribe, in its sole discretion, determines are appropriate for its market conditions and economic needs, pursuant to the applicable conditions set forth in section 3.0 through section 5.0 of these Secretarial Procedures.

### Sec. 4.2.    Authorized Gaming Facilities.

The Tribe may establish and operate on its Indian lands the number of Gaming Facilities that the Tribe, in its sole discretion, determines are appropriate for its market conditions and economic needs, and may allocate its Gaming Devices among such Facilities in its sole discretion.

### Sec. 4.3.    RESERVED

### Sec. 4.4.    RESERVED

### Sec. 4.5.    Effective Date of Revenue Contribution Provisions.

The provisions of these Secretarial Procedures establishing or superseding existing revenue sharing obligations of the Tribe will take effect on the first day of the first month following the Effective Date of these Secretarial Procedures.

### Sec. 4.6.    Quarterly RSTF Payments and Quarterly Contribution Report.

(a)

(1)     The Tribe shall remit quarterly to the State Gaming Agency, for deposit into the Revenue Share Trust Fund (RSTF), the following amounts in accordance with the following schedule based upon the number of Gaming Devices in operation in the Tribe's Gaming Facility as calculated as follows:

14

Gross Gaming Revenue on 0 to 349 Gaming Devices, zero percent (0%) is paid; Gross Gaming Revenue on 350 to 999 Gaming Devices, one percent (1%) is paid; and Gross Gaming Revenue on 1000 or more Gaming Devices, two percent (2%) is paid so that the Tribe never pays any percentage of Gross Gaming Revenue on 349 Gaming Devices. The amount of Gross Gaming Revenue shall be calculated based upon the Tribe's financial books and records of account kept in accordance with the AICPA Guide.

(2)     If the Gaming Activities authorized by these Secretarial Procedures commence during a calendar quarter, the first payment shall be due on the thirtieth (30th) day following the end of the first full quarter of the Gaming Activities and shall cover the period from the commencement of the Gaming Activities to the end of the first full calendar quarter.

(b)     At the time each quarterly payment is due, regardless of whether any monies are owed, the chief financial officer of the Gaming Operation shall prepare a certification (the "Quarterly Contribution Report") that specifies the following:

(1)     calculation of the maximum number of Gaming Devices operated in the Gaming Facility for each day during the given quarter;

(2)     the amount due pursuant to section 4.6; and

(3)     the total amount of the quarterly payment paid to the State for deposit into the Revenue Share Trust Fund.

### Sec. 4.7.    Exclusivity.

(a)     In the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated by the enactment, amendment, or repeal of a State statute or constitutional provision or the conclusive and dispositive judicial construction of a statute or the State Constitution by a California appellate court after the effective date of these Secretarial Procedures, or if Gaming Devices or banked or percentage card games may lawfully be operated by another person, organization, or entity (other than an Indian tribe operating pursuant to a Class III gaming compact or Secretarial Procedures prescribed by the Secretary of the Interior pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii)) within California, the Tribe shall have the right to be relieved of its obligations to make payments into the Revenue Share Trust Fund.

(b)     Nothing in this section is intended to preclude the California State Lottery from offering any lottery games or devices that are currently or may hereafter be authorized by state law.

15

## SECTION 5.0. REVENUE SHARING WITH NON-GAMING TRIBES.

### Sec. 5.1. Distributions from Revenue Sharing Trust Fund.

(a)    The Tribe agrees with all other tribes that are parties to compacts or Secretarial Procedures that provide for the creation and disbursement of the RSTF, defined in section 2.26 hereof, that each Non-Gaming Tribe in the State shall receive the sum up to $1.1 million per year from the RSTF. In the event there are insufficient monies in the RSTF to pay $1.1 million per year to each Non-Gaming Tribe, any available monies in that Fund shall be distributed to Non-Gaming Tribes in equal shares.

(b)    The Tribe does not have to make any payments into the RSTF until it is a Gaming Tribe for one full quarter immediately prior to the date the first quarterly payment is due. In addition, the Tribe shall be relieved of making any payments into the RSTF during a force majeure event as defined in section 17.7.

## SECTION 6.0. LICENSING.

### Sec. 6.1. Gaming Ordinance and Regulations.

(a)    Incorporation of Secretarial Procedures. These Secretarial Procedures, including amendments, shall be incorporated into the Tribal Gaming Ordinance. In the event any inconsistencies arise between the Secretarial Procedures and any provision of the Tribal Gaming Ordinance, the Secretarial Procedures shall govern.

(b)    All Gaming Activities conducted under these Secretarial Procedures shall, at a minimum, comply (i) with a Gaming Ordinance duly adopted by the Tribe and approved in accordance with IGRA, (ii) with all applicable rules, regulations, procedures, specifications, and standards duly adopted by the NIGC, and the Tribal Gaming Agency, and (iii) with the provisions of these Secretarial Procedures.

(c)    The Tribal Gaming Agency shall make the following documents available to Gaming Operation patrons or their legal representatives, upon request, through electronic means or otherwise in its discretion: the Gaming Ordinance; the rules of each class III game operated by the Tribe, to the extent that such rules are not available for display on the Gaming Device or the table on which the class III game is played; rules governing promotions; rules governing points and the player's club program, including rules regarding confidentiality of the player information, if any; the ordinance establishing an administrative procedure for damages claims enacted pursuant to section 11.4(a); and the regulations promulgated by the Tribal Gaming Agency concerning patron disputes pursuant to section 10.0. To the extent that any of the foregoing are available to the public on a website maintained by the federal government, or by the Tribe or the Gaming Operation, the Tribal Gaming Agency may refer requesters to such website(s) for the requested information.

### Sec. 6.2.    Tribal Ownership, Management, and Control of Gaming Operation.

The Gaming Operation authorized under these Secretarial Procedures shall be owned solely by the Tribe or an entity wholly owned or controlled by the Tribe.

### Sec. 6.3.    Prohibitions Regarding Minors.

(a)    The Tribe shall not permit persons under the age of eighteen (18) years to participate in Gaming Activities or to loiter in the vicinity of Gaming Activities, but they may pass through an area of the Gaming Facility in which Gaming Activities are being conducted while en- route to an area of the Gaming Facility in which no Gaming Activities are being conducted.

(b)    If the Tribe permits the consumption of alcoholic beverages in the Gaming Facility, the Tribe shall prohibit persons under the age of twenty-one (21) years from being present in any area in which alcoholic beverages may be consumed, except to the extent permitted by the Gaming Facility's Department of Alcoholic Beverage Control license.

### Sec. 6.4.    Licensing Requirements and Procedures.

### Sec. 6.4.1.    Summary of Licensing Principles.

All persons in any way connected with the Gaming Operation or Gaming Facility who are required to be licensed or to submit to a background investigation under IGRA, and any others required to be licensed under these Secretarial Procedures, including, without limitation, all Gaming Employees, Gaming Resource Suppliers, Financial Sources not otherwise exempt from licensing requirements, and any other person having a significant influence over the Gaming Operation, must be licensed by the Tribal Gaming Agency and, except as otherwise provided in the Tribes Gaming Ordinance, cannot have had any determination of suitability denied or revoked by the California Gambling Control Commission.

### Sec. 6.4.2.    Gaming Facility.

(a)    Each Gaming Facility authorized by these Secretarial Procedures shall be licensed by the Tribal Gaming Agency in conformity with the requirements of these Secretarial Procedures, the Gaming Ordinance, IGRA, and any applicable regulations adopted by the NIGC. The license shall be reviewed and renewed every two (2) years thereafter. The Tribal Gaming Agency's certification that the Gaming Facility is being operated in conformity with these requirements shall be posted in a conspicuous and public place in the Gaming Facility at all times.

(b)    To assure the protection of the health and safety of all Gaming Facility patrons, guests, and employees, the Tribe shall adopt, or has already adopted, and shall

17

maintain throughout the term of these Secretarial Procedures, an ordinance that requires any Gaming Facility construction to meet or exceed the standards in the Applicable Codes. The Gaming Facility and construction, expansion, improvement, modification, or renovation of the Gaming Facility will also comply with Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. Notwithstanding the foregoing, the Tribe need not comply with any standard that specifically applies in name or in fact only to tribal facilities. For purposes of this section, the terms "building official" and "code enforcement agency" as used in in the Applicable Codes mean the Tribal Gaming Agency or such other tribal government agency or official as may be designated by the Tribe's law. The "building official" and "code enforcement agency" designated by the Tribe's law may exercise authority granted to such individuals and entities as specified within the Applicable Codes with regard to the Gaming Facility.

(c)     To assure compliance with the Applicable Codes, the Tribe shall require inspections and, in connection therewith, employ for any Gaming Facility construction, qualified plan checkers or review firms. To be qualified as a plan checker or review firm for purposes of these Secretarial Procedures, plan checkers or review firms must be either state-licensed architects, engineers, or International Code Council (ICC) certified building inspectors with relevant experience, or state-licensed architects, engineers or ICC-certified building inspectors, or a building inspector licensed and authorized by the county in which the Gaming Facility is located. The Tribe shall also employ qualified project inspectors. To be qualified as a project inspector for purposes of these Secretarial Procedures, project inspectors must possess the same qualifications and certifications as project inspectors utilized by the County in which the Gaming Facility is located. The same persons or firms may serve as both plan checkers/reviewers and project inspectors. The plan checkers, review firms, and project inspectors shall hereinafter be referred to as "Inspector(s)." The Tribe shall require the Inspectors to report to the Tribal Gaming Agency, in writing and within thirty (30) days after the discovery thereof, any failure to comply with the Applicable Codes. The Tribal Gaming Agency shall forward those reports along with the proposed remedies to the NIGC within 30 days of receiving the report. The Tribe agrees to correct any Gaming Facility condition noted in the inspections that does not meet the Applicable Codes (hereinafter "deficiency").

(d)     The Tribe shall cause the design and construction calculations, and plans and specifications that form the basis for the Gaming Facility construction (the "Design and Building Plans") to be available to the NIGC upon request.

(e)     In the event that material changes to a structural detail of the Design and Building Plans will result from contract change orders or any other changes in the Design and Building Plans, such changes shall be reviewed by the qualified plan checker or review firm and field verified by the Inspectors for compliance with the Applicable Codes.

(f)     The Tribe shall maintain the Design and Building Plans depicting the as-built Gaming Facility, unless and until superseded by subsequent as-built Design and Building Plans upon which the superseding construction was based for the duration of these Secretarial Procedures.

(g)     Any failure to remedy within a reasonable period of time any material and timely raised deficiency shall be deemed a violation of these Secretarial Procedures. The Tribe shall not allow occupancy of any portion of the Gaming Facility that is constructed or maintained in a manner that endangers the health or safety of the occupants.

(h)     The Tribe shall also take all necessary steps to reasonably ensure the ongoing availability of sufficient and qualified fire suppression services to the Gaming Facility, and to reasonably ensure that the Gaming Facility satisfies all requirements of the Applicable Codes as set forth below:

    (1)     Within thirty (30) days after the effective date of  these Secretarial Procedures, and not less than biennially thereafter, the Gaming Facility shall be inspected, at the Tribe's expense, by an independent fire inspector certified by the ICC or the National Fire Protection Association for purposes of certifying that the Gaming Facility meets a reasonable standard of fire safety and life safety; *provided*, that if a qualified fire inspector has certified within twelve (12) months prior to the effective date of these Secretarial Procedures that the Gaming Facility meets a reasonable standard of fire and life safety, that shall satisfy this requirement and the Tribe shall thereafter have the Gaming Facility inspected biennially in accordance with this subdivision.

    (2)     The independent fire inspector shall issue to the Tribal Gaming Agency a report on the inspection within 15 days after its completion, or within 30 days after commencement of the inspection, whichever first occurs, identifying any deficiency in fire safety or life safety at the Gaming Facility or in the ability of the Tribe to meet reasonably expected fire suppression needs of the Gaming Facility. Within 21 days of receiving the report the Tribal Gaming Agency shall forward a copy of the report along with a plan to fix the noted deficiencies to the NIGC.

    (3)     Within twenty-one (21) days after the issuance of the report, the independent fire inspector shall also require and approve a specific plan for correcting deficiencies, whether in fire safety or life safety, at the Gaming Facility or in the Tribe's ability to meet the reasonably expected fire suppression needs of the Gaming Facility. A copy of the report and plan of correction shall be delivered to the Tribal Gaming Agency.

19

(4)    Immediately upon correction of all deficiencies identified in the report and plan of correction, the independent fire inspector shall certify in writing to the Tribal Gaming Agency that all deficiencies have been corrected. This report shall also be sent to the NIGC.

(5)    Any failure to correct all deficiencies identified in the report and plan of correction within a reasonable period of time shall be a violation of these Secretarial Procedures.

(6)    Consistent with its obligation to ensure the safety of those within the Gaming Facility, the Tribe shall promptly notify the NIGC of circumstances that it reasonably believes pose a serious or significant risk to the health or safety of any occupants and take prompt action to correct such circumstances. Any failure to remedy within a reasonable period of time any serious or significant risk to health or safety shall be deemed a violation of these procedures.

(i)    Notwithstanding anything in this section 6.4.2 or elsewhere in these Secretarial Procedures, any construction of any project that has taken place or has commenced prior to the effective date of these Secretarial Procedures shall be subject to the Gaming Facility license rules in effect at the time such construction was commenced.

### Sec. 6.4.3.    Gaming Employees.

Every Gaming Employee shall obtain, and thereafter maintain current, a valid tribal gaming license, which license and determination may be subject to biennial renewal consistent with the Tribe's gaming ordinance; provided that in accordance with section 6.4.9, those persons may be employed on a temporary or conditional basis pending completion of the licensing process.

### Sec. 6.4.4.    Gaming Resource Suppliers.

(a)    Every Gaming Resource Supplier shall be licensed by the Tribal Gaming Agency prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any Gaming Resources to or in connection with the Tribe's Gaming Operation or Facility.

(b)    Any agreement between the Tribe and a Gaming Resource Supplier shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide payment of all outstanding sums (exclusive of interest) owed as of, or payment for services or materials received up to, the date of termination, upon revocation or nonrenewal of the Gaming Resource Supplier's license by the Tribal Gaming Agency.

(c)    Notwithstanding subsection (a), the Tribal Gaming Agency may license a

Management Contractor for a period of no more than seven (7) years; provided, however, that nothing in this subdivision shall be construed to bar the Tribal Gaming Agency from issuing additional new licenses to the same Management Contractor following the expiration of a seven (7)-year license.

(d)    The Tribe may choose to contract with the State to assist with any portions of background investigations the Tribe deems necessary to help determine the suitability of any gaming resource supplier.

### Sec. 6.4.5.    Financial Sources.

(a)    Subject to subsection (h) of this section, each Financial Source shall be licensed by the Tribal Gaming Agency prior to the Financial Source extending financing in connection with the Tribe's Gaming Facility or Gaming Operation.

(b)    [RESERVED]

(c)    A license issued under this section shall be reviewed at least every two (2) years for continuing compliance. In connection with that review, the Tribal Gaming Agency shall require the Financial Source to update all information provided in the Financial Source's previous application. For the purposes of this section, that review shall be deemed to constitute an application for renewal.

(d)    Any agreement between the Tribe and a Financial Source shall include and shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of the date of termination upon revocation or non-renewal of the Financial Source's license by the Tribal Gaming Agency.

(e)    A Gaming Resource Supplier who provides financing exclusively in connection with the provision, sale, or lease of Gaming Resources obtained from that Gaming Resource Supplier may be licensed solely in accordance with the licensing procedures applicable, if at all, to Gaming Resource Suppliers, and need not be separately licensed as a Financial Source under this section.

(f)    The Tribe may choose to contract with the State to assist with any portions of background investigations the Tribe deems necessary to help determine the suitability of any financial supplier.

(g)    The Tribal Gaming Agency may, at its discretion, exclude from the licensing requirements of this section the following Financial Sources under the circumstances stated:

(A)    Any federally regulated or state regulated bank, savings and loan association, or other federally- or state-regulated lending institution

21

and any fund or other investment vehicle, including, without limitation, a bond indenture or syndicated loan, which is administrated or managed by any such entity.

(B)    An entity identified by the California Gambling Control Commission's Uniform Statewide Tribal Gaming Regulation CGCC-2, subsection (f) (as in effect on the date that notice of the issuance of these Secretarial Procedures is published in the Federal Register), when that entity is a Financial Source solely by reason of being (i) a purchaser or a holder of debt securities or other forms of indebtedness issued directly or indirectly by the Tribe for a Gaming Facility or for the Gaming Operation or (ii) the owner of a participation interest in any amount of indebtedness for which a Financial Source described in subsection (h)(l)(A), or any fund or other investment vehicle which is administered or managed by any such Financial Source, is the creditor.

(C)    Any investor who, alone or together with any person(s) controlling, controlled by or under common control with such investor, holds less than ten percent (10%) of all outstanding debt securities or other forms of indebtedness issued directly or indirectly by the Tribe for a Gaming Facility or for the Gaming Operation.

(D)    Any agency of the federal government, or of a tribal, state or local government providing financing, together with any person purchasing any debt securities or other forms of indebtedness of the agency to provide such financing.

(E)    A real estate investment trust (as defined in 26 U.S.C. § 856(a)) which is publicly traded on a stock exchange, registered with the Securities and Exchange Commission, and subject to the regulatory oversight of the Securities and Exchange Commission.

(F)    An entity or category of entities the Tribal Gaming Agency determines can be excluded from the licensing requirements of this section without posing a threat to the public interest or the integrity of the Gaming Operation.

(2)    The following are not Financial Sources for purposes of this section:

(A)    An entity identified by the California Gambling Control Commission's Uniform Statewide Tribal Gaming Regulation CGCC-2, subsection (h) (as in effect on the effective date of these Secretarial Procedures).

22

(B)     A person or entity whose sole connection with a provision or extension of financing to the Tribe is to provide loan brokerage or debt servicing for a Financial Source at no cost to the Tribe or the Gaming Operation, provided that no portion of any financing provided is an extension of credit to the Tribe or the Gaming Operation by that person or entity.

**Sec. 6.4.6.    Processing Tribal Gaming License Applications.**

(a)    Each Applicant for a tribal gaming license shall submit the completed application along with the required information and an application fee, if required, to the Tribal Gaming Agency in accordance with the rules and regulations of that agency.

(b)    At a minimum, the Tribal Gaming Agency shall require submission and consideration of all information required under IGRA, including part 556.4 of title 25 of the Code of Federal Regulations, for licensing primary management officials and key employees.

(c)    For Applicants that are business entities, these licensing provisions shall apply to the entity as well as: (i) each of its officers, limited liability company members, and directors; (ii) each of its principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager; (iii) each of its owners or partners, if an unincorporated business; (iv) each of its shareholders who owns more than ten percent (10%) of the shares of the corporation, if a corporation, or who has a direct controlling interest in the Applicant; and (v) each person or entity (other than a Financial Source that the Tribal Gaming Agency has determined does not require a license under section 6.4.5) that, alone or in combination with others, has provided financing in connection with any Gaming Operation or class III Gaming authorized under these Secretarial Procedures, if that person or entity provided more than  ten percent (10%) of either the start-up capital or the operating capital, or of a combination thereof, over a twelve (12) month period. For purposes of this subdivision, where there is any commonality of the characteristics identified in this section 6.4.6, subsections (c)(i) through (c)(v), inclusive, between any two (2) or more entities, those entities may be deemed to be a single entity. For purposes of this subdivision, a direct controlling interest in the Applicant referred to in subsection (c)(iv) excludes any passive investor or anyone who has an indirect or only a financial interest and does not have ability to control, manage, or direct the management decisions of the Applicant.

(d)    Nothing herein precludes the Tribe or Tribal Gaming Agency from requiring more stringent licensing requirements.

**Sec. 6.4.7.    Suitability Standard Regarding Gaming Licenses.**

(a)    In reviewing an application for a tribal gaming license, and in addition to any standards set forth in the Gaming Ordinance, the Tribal Gaming Agency shall consider whether issuance of the license is inimical to public health, safety, or welfare, and whether issuance of the license will undermine public trust that the Gaming Operation is free from criminal and dishonest elements and would be conducted honestly.

(b)    A license may not be issued unless, based on all information and documents submitted, the Tribal Gaming Agency is satisfied that the Applicant, and in the case of an entity, each individual identified in section 6.4.6, subsection (c) meets all of the following requirements:

   (1)    The person is of good character, honesty, and integrity.

   (2)    The person's prior activities, criminal record (if any), reputation, habits, and associations do not pose a threat to the public interest or to the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of gaming, or in the carrying on of the business and financial arrangements incidental thereto.

   (3)    The person is in all other respects qualified to be licensed as provided, and meets the criteria established in these Secretarial Procedures, IGRA, NIGC regulations, the Gaming Ordinance, and any other criteria adopted by the Tribal Gaming Agency or the Tribe; provided, however, an Applicant shall not be found to be unsuitable solely on the ground that the Applicant was an employee of a tribal gaming operation in California that was conducted prior to May 16, 2000.

**Sec. 6.4.8.    Background Investigations of Applicants.**

(a)    The Tribal Gaming Agency shall conduct or cause to be conducted all necessary background investigations reasonably required to determine that the Applicant is qualified for a gaming license under the  standards set forth in section 6.4.7, and to fulfill all applicable requirements for licensing under IGRA, NIGC regulations, the Gaming Ordinance, and these Secretarial Procedures. The Tribal Gaming Agency shall not issue a gaming license, other than a temporary license pursuant to section 6.4.9, until a determination is made that those qualifications have been met.

(b)    The information received shall be used by the requesting agency  solely for the purpose for which it was requested and shall not be reproduced for secondary dissemination to any other employment or licensing agency.

24

### Sec. 6.4.9.    Temporary Licensing.

(a)    If the Applicant has completed a license application in a manner satisfactory to the Tribal Gaming Agency, and that agency has conducted a preliminary background investigation, and the investigation or other information held by that agency does not indicate that the Applicant has a criminal history or other information in his or her background that would either automatically disqualify the Applicant from obtaining a tribal gaming license or cause a reasonable person to investigate further before issuing a license, or that the Applicant is otherwise unsuitable for licensing, the Tribal Gaming Agency may issue a temporary tribal gaming license and may impose such specific conditions thereon pending completion of the Applicant's background investigation, as the Tribal Gaming Agency in its sole discretion shall determine.

(b)    Special fees may be required by the Tribal Gaming Agency to issue or maintain a temporary tribal gaming license.

(c)    A temporary tribal gaming license shall remain in effect until suspended or revoked, or a final determination by the Tribal Gaming Agency is made on the application, or for a period for up to one (1) year, whichever comes first. However, an individual who meets the definition of a Key Employee or Primary Management Official consistent 25 C.F.R. § 502.14 or 25 C.F.R. § 502.19 may not be permitted to perform the duties, functions, and/or responsibilities of those positions if they are not licensed within 90 days.

(d)    At any time after issuance of a temporary tribal gaming license, the Tribal Gaming Agency shall or may, as the case may be, suspend or revoke it in accordance with the provisions of sections 6.5.1 or 6.5.5.

(e)    Nothing herein shall be construed to relieve the Tribe of any obligation under part 558 of title 25 of the Code of Federal Regulations.

### Sec. 6.5.    Tribal Gaming License Issuance.

Upon completion of the necessary background investigation, the Tribal Gaming Agency may issue a tribal gaming license on a conditional or unconditional basis. Nothing herein shall create a property or other right of an Applicant in an opportunity to be licensed, or in a tribal gaming license itself, both of which shall be considered to be privileges granted to the Applicant in the sole discretion of the Tribal Gaming Agency.

### Sec. 6.5.1.    Denial, Suspension, or Revocation of Licenses.

(a)    Any Applicant's application for a tribal gaming license may be denied, and any license issued may be revoked, if the Tribal Gaming Agency determines that the application is incomplete or deficient, or if the Applicant is determined to be

unsuitable or otherwise unqualified for a tribal gaming license.

(b)    Pending consideration of revocation, the Tribal Gaming Agency may suspend a tribal gaming license in accordance with section 6.5.5.

(c)    All rights to notice and hearing shall be governed by tribal law. The Applicant shall be notified in writing of any hearing and given notice of any intent to suspend or revoke the tribal gaming license.

### Sec. 6.5.2.    Renewal of Licenses; Extensions; Further Investigation.

Except as provided in section 6.4.4, subsection (c), the term of a tribal gaming license shall not exceed two (2) years, and application for renewal of a license must be made prior to its expiration.  Applicants for renewal of a license shall provide updated material as requested,  on the appropriate renewal forms, but, at the discretion of the Tribal Gaming Agency, may not be required to resubmit historical data previously submitted or that is otherwise available to the Tribal Gaming Agency. At the discretion of the Tribal Gaming Agency, an additional background investigation may be required at any time if the Tribal Gaming Agency determines the need for further information concerning the Applicant's continuing suitability or eligibility for a license.

### Sec. 6.5.3.    Identification Cards.

(a)    The Tribal Gaming Agency shall require that all persons who are required to be licensed wear, in plain view at all times while in the Gaming Facility, identification badges issued by the Tribal Gaming Agency. The Tribal Gaming Agency may allow temporary exceptions to this provision for the purposes of authorizing investigators who are actively investigating a matter within the Gaming Facility to monitor Gaming Activities.

(b)    Identification badges must display information including, but not limited to, a photograph and an identification number that is adequate to enable agents of the Tribal Gaming Agency to readily identify the person and determine the validity and date of expiration of his or her license.

### Sec. 6.5.4.    Fees for Tribal Gaming License.

The fees for all tribal gaming licenses shall be set by the Tribal Gaming Agency.

### Sec. 6.5.5.    Summary Suspension of Tribal Gaming License.

The Tribal Gaming Agency may summarily suspend the tribal gaming license of any licensee if the Tribal Gaming Agency determines that the continued licensing of the person could constitute a threat to the public health or safety or may violate the Tribal Gaming Agency's licensing, the Tribal Gaming Ordinance and regulations, applicable federal law, or other applicable standards.  The Tribal Gaming Agency shall notify the NIGC within 7 days of any such

determination.  Any right to notice or hearing in regard thereto shall be governed by tribal law.

**SECTION 7.0.         APPROVAL AND TESTING OF GAMING DEVICES.**

> ### Sec. 7.1.         Gaming Device Approval.

(a)     No Gaming Device may be offered for play unless all of the following occurs:

> (1)     The manufacturer or distributor that sells, leases, or distributes such Gaming Device has been licensed by the Tribal Gaming Agency;

> (2)     The software for each class III game authorized for play on the Gaming Device has been tested, approved and certified by an independent gaming test laboratory or state or national governmental gaming test laboratory ("Gaming Test Laboratory") as operating in accordance with technical standards that meet or exceed industry standards;

> (3)     The software for the games authorized for play on the Gaming Device is tested by the Tribal Gaming Agency to ensure each class III game authorized for play on the Gaming Device has the correct electronic signature prior to insertion into the Gaming Device, or if the software is to be installed on a server to which one or more Gaming Devices will be connected, prior to the connection of Gaming Devices to the server.

> (4)     The hardware and associated equipment for each type of Gaming Device has been tested by the Gaming Test Laboratory prior to operation by the public to ensure operation in accordance with the standards established by the Tribal Gaming Agency that meet or exceed industry standards; and

> (5)     The hardware and associated equipment for the Gaming Device has been tested by the Tribal Gaming Agency to confirm operation in accordance with the manufacturer's specifications and the Tribe's regulations for technical standards applicable to Gaming Devices.

> ### Sec. 7.2.         Gaming Test Laboratory Selection.

The Gaming Test Laboratory shall be an independent commercial gaming test laboratory that is (i) recognized in the gaming industry as competent and qualified to conduct scientific tests and evaluations of Gaming Devices, (ii) licensed or approved by any state or tribal government within the jurisdiction of which the operation of Gaming Devices is authorized, and (iii) does not at the time of testing have a suspended license with any state gaming agency.

### Sec. 7.3.    Maintenance of Records of Testing Compliance.

The Tribal Gaming Agency shall prepare and maintain records of its compliance with section 7.1 while any Gaming Device is on the gaming floor and for a period of one (1) year after the Gaming Device is removed from the gaming floor.

### Sec. 7.4.    [RESERVED].

### Sec. 7.5.    Technical Standards.

The Tribal Gaming Agency shall provide to the NIGC copies of its regulations for technical standards applicable to the Tribe's Gaming Devices at least thirty (30) days before the commencement of the Gaming Operation or within thirty (30) days after the effective date of these Secretarial Procedures, whichever is later, and thereafter at least thirty (30) days before the effective date of any revisions to the regulations, unless exigent circumstances require that any revisions to the regulations take effect sooner in order to ensure Class III game integrity or otherwise to protect the public or the Gaming Operation, in which event the revisions to the regulations shall be provided to the NIGC as soon as reasonably practicable. In no event shall these the standards be less stringent than the Guidance Class III Minimum Internal Control Standards published by the NIGC in August of 2018, or as updated by the NIGC at any later date and adopted by the Tribe in the Gaming Ordinance.

### Sec. 7.6.    Transportation of Gaming Devices.

(a)    Subject to the provisions of subsection (b), the Tribal Gaming Agency shall not permit any Gaming Device to be transported to or from the Tribe's Indian lands except in accordance with applicable law and at least ten (10) days' notice to the Sheriff's Department for the County in which the land is located.

(b)    Transportation of a Gaming Device from a Gaming Facility within California is permissible only if:

(1)    The final destination of the Gaming Device is a gaming facility of any tribe in California that has a class III Gaming compact with the State or Secretarial Procedures that makes lawful the operation of Gaming Devices;

(2)    The final destination of the Gaming Device is any other state in which possession of the Gaming Device is made lawful by that state's law, tribal-state compact, or Secretarial Procedures;

(3)    The final destination of the Gaming Device is another country, or any state or province of another country, wherein possession of Gaming Devices is lawful; or

(4)    The final destination is a location within California for testing, repair,

maintenance, or storage by a person or entity that has been licensed by the Tribal Gaming Agency.

**SECTION 8.0.          INSPECTIONS.**

### Sec. 8.1.          On-Site Regulation.

These Secretarial Procedures recognize and respect the primary role of the Tribal Gaming Agency to perform on-site regulation and to protect the integrity of the Gaming Activities, the reputation of the Tribe and the Gaming Operation for honesty and fairness, and to maintain the confidence of patrons that tribal governmental gaming in California meets the highest standards of regulation and internal controls. These procedures also acknowledge and afford the NIGC, through the MOU required by Section 8., with the authority and responsibility to ensure the Tribe complies with all terms of the Procedures and that the gaming is conducted with integrity and in a manner that protects the health, safety, and other interests of the people of California.

### Sec. 8.1.1.          Investigation and Sanctions.

(a)     The Tribal Gaming Agency shall investigate any reported violation of these Secretarial Procedures and shall require the Gaming Operation to correct the violation upon such terms and conditions as the Tribal Gaming Agency determines are necessary.

(b)     The Tribal Gaming Agency shall be empowered by the Gaming Ordinance to impose fines or other sanctions within the jurisdiction of the Tribe against gaming licensees who interfere with or violate the Tribe's gaming regulatory requirements and obligations under IGRA, the Gaming Ordinance, or these Secretarial Procedures. Any right to notice or hearing in regard thereto shall be governed by tribal law. Nothing in these Secretarial Procedures expand, modify, or impair the jurisdiction of the Tribal Gaming Agency under IGRA, the Tribal Gaming Ordinance or other applicable tribal law.

(c)     The Tribal Gaming Agency shall report individual or continuing violations of these Procedures that pose a significant threat to gaming integrity or public health and safety, and any failures to comply with the Tribal Gaming Agency's orders, to the NIGC within fourteen (14) days of discovery.

**Sec. 8.2.    Memorandum of Understanding with the National Indian Gaming Commission.**

(a)    As set forth in the preamble of these Secretarial Procedures, the mediator's selected compact provided the State with authority to regulate the Tribe's class III Gaming Activities in the event that the State consented to the mediator's selected compact pursuant to 25 U.S.C. § 2710(d)(7)(B)(vi). The State, however, did not consent to regulate the Tribe's class III Gaming Activities under the mediator's selected compact the Secretary cannot unilaterally obligate the State to carry out any regulatory responsibilities under these Secretarial Procedures.

(b)    Accordingly, the Tribe is responsible for ensuring compliance with these procedures and the Tribal Gaming Agency shall perform the primary regulatory responsibilities set forth in these Secretarial Procedures.

(c)    The Tribe shall enter into a Memorandum of Understanding ("MOU") with the Chairman of the NIGC documenting the agreed-upon responsibilities and functions of the NIGC with respect to the Secretarial Procedures and the Tribe's class III Gaming Activities authorized by the Gaming Ordinance and governed by these Secretarial Procedures.

(d)    The Tribe shall not operate any class III Gaming Activities under these Secretarial Procedures in a manner that is inconsistent with any federal regulations such as but not limited to NIGC Minimum Internal Control Standards or subsequently any other provision or standard agreed to in the MOU entered into with the Chairman of the NIGC.

**Sec. 8.3    [RESERVED].**

**Sec. 8.4    [RESERVED].**

**Sec. 8.5    Cooperation with Tribal Gaming Agency**

The NIGC shall meet no less than yearly with the Tribal Gaming Agency and cooperate in all matters relating to the enforcement of the provisions of these Procedures.

## SECTION 9.0.    RULES AND REGULATIONS FOR THE OPERATION AND MANAGEMENT OF THE GAMING OPERATION AND FACILITY.

### Sec. 9.1.    Adoption of Regulations for Operation and Management; Minimum Standards.

It is the responsibility of the Tribal Gaming Agency to conduct on-site gaming regulation and control in order to enforce the terms of these Secretarial Procedures, the IGRA, the NIGC gaming regulations, and the Gaming Ordinance to protect the integrity of the Gaming Activities, the reputation of the Tribe and the Gaming Operation for honesty and fairness, and to maintain the confidence of patrons that tribal governmental gaming in California meets the highest standards of fairness and internal controls. To meet those responsibilities, the Tribal Gaming Agency shall be vested with the authority to promulgate, and shall promulgate and enforce, rules and regulations governing, at a minimum, the following subjects pursuant to the standards and conditions set forth therein:

(a)    The enforcement of all applicable laws and rules with respect to the Gaming Activities, Gaming Operation and Gaming Facility, and the conduct of investigations and hearings with respect thereto and any other subject within its jurisdiction.

(b)    The physical safety of Gaming Facility patrons, employees and any other person while in the Gaming Facility. Except as provided in section 11.1, nothing herein shall be construed, however, to make applicable to the Tribe any state laws, regulations, or standards governing the use of tobacco.

(c)    The physical safeguarding of assets transported to, within, and from the Gaming Facility.

(d)    The prevention of illegal activity within the Gaming Facility or with regard to the Gaming Operation or Gaming Activities, including, but not limited to, the maintenance of employee procedures and a surveillance system as provided in subsection (e).

(e)    Maintenance of a closed-circuit television surveillance system consistent with industry standards for gaming facilities of the type and scale operated by the Tribe, which system shall be approved by, and may not be modified without the approval of, the Tribal Gaming Agency. The Tribal Gaming Agency shall have current copies of the Gaming Facility floor plan and closed-circuit television surveillance system at all times, and any modifications thereof shall first be approved by the Tribal Gaming Agency.

(f)    The establishment of employee procedures designed to permit detection of any irregularities, theft, cheating, fraud, or the like, consistent with industry practice.

(g)     Maintenance of a list of persons permanently excluded from the Gaming Facility who, because of their past behavior, criminal history, or association with persons or organizations, pose a threat to the integrity of the Gaming Activities or to the integrity of regulated gambling within California.

(h)     The auditing of the Gaming Operation, not less than annually, by an independent certified public accountant, in accordance with the AICPA Guide. Audits shall include both Audited Financial Statements and Agreed Upon Procedures Reports that both must be submitted to the NIGC within 120 days of the Gaming Operations Financial Year End.

(i)      Submission to, and prior approval by, the Tribal Gaming Agency of the rules and regulations of each class III game to be operated by the Tribe, and of any changes in those rules and regulations. No class III game may be offered for play that has not received Tribal Gaming Agency approval.

(j)      The obligation of the Gaming Facility and the Gaming Operation to maintain a copy of the rules, regulations, and procedures for each class III game as played, including, but not limited to, the method of play and the odds and method of determining amounts paid to winners.

(k)     Specifications and standards to ensure that information regarding the method of play, odds, and payoff determinations is visibly displayed or available to patrons in written form in the Gaming Facility and to ensure that betting limits applicable to any gaming station shall be displayed at that gaming station.

(l)      Maintenance of a cashier's cage in accordance with the Tribal internal control standards that meet or exceed industry standards for such facilities.

(m)     Specification of minimum staff and supervisory requirements for each Gaming Activity to be conducted.

(n)     Technical standards and specifications in conformity with the requirements of these Secretarial Procedures for the operation of Gaming Devices and other games authorized herein.

### Sec. 9.2.      Manner in Which Incidents Are Reported.

The Tribal Gaming Agency shall require the recording of any occurrences within the Gaming Facility that deviate from normal operating policies and procedures (hereinafter "incidents"). The procedure for recording incidents pursuant to this section 9.2 shall also do the following:

(a)     Specify that security personnel shall keep a written record of all incidents regardless of an employee's determination that the incident may be immaterial.

32

(b)    Require the assignment of a sequential number to each incident report.

(c)    Provide for permanent reporting in indelible ink in a bound notebook from which pages cannot be removed and in which entries are made on each side of each page and/or in electronic form, provided the information is recorded in a manner so that once the information is entered, it cannot be deleted or altered.

(d)    Require that each report include, at a minimum, all of the following:

  (1)    The record number.

  (2)    The date.

  (3)    The time.

  (4)    The location of the incident.

  (5)    A detailed description of the incident.

  (6)    The persons involved in the incident.

  (7)    The security department employee assigned to the incident.

**Sec. 9.3.    Minimum Internal Control Standards.**

(a)    The Tribe shall conduct its Gaming Activities pursuant to an internal control system that implements minimum internal control standards for class III gaming that are no less stringent than those contained in (1) the Minimum Internal Control Standards of the NIGC (25 C.F.R. § 542), as they existed on the date of issuance of these Secretarial Procedures, and as they have been or may be amended from time to time, without regard to the NIGC's authority to promulgate, enforce, or audit the standards or (2) any subsequent NIGC regulation or NIGC guidance that is at least as stringent as the Minimum Internal Control Standards of the NIGC, including the August 14, 2018 NIGC Guidance on the class III Minimum Internal Control Standards. These standards are posted on the NIGC website(s) and are referred to herein as the "Compact MICS." This requirement is met through compliance with the provisions set forth in this section and sections 9.1 and 9.2. In the event that a new game is approved by the Secretary in accordance with the requirements of section 14.1 and controls specific to that game have not been promulgated by the NIGC the Tribal Gaming Agency will consult with other regulatory jurisdictions and implement controls no less stringent than existing industry standards for that game.

(b)    In the event the NIGC withdraws its regulations at 25 C.F.R. § 542, the Compact MICS, as they may be amended from time to time, shall continue to serve as the minimum internal control standards for the purposes of these Secretarial Procedures.

(c)    The minimum internal control standards set forth in the Compact MICS shall apply to all Gaming Activities, Gaming Facilities, and the Gaming Operation; however, the Compact MICS are not applicable to any class II gaming activities. Should the terms in the Compact MICS be inconsistent with these Secretarial Procedures, the terms in these Secretarial Procedures shall prevail.

### Sec. 9.4.    Program to Mitigate Problem Gambling.

The Gaming Operation shall establish a program, approved by the Tribal Gaming Agency, to mitigate pathological and problem gambling by implementing the following measures:

(a)    It shall train Gaming Facility supervisors and gaming floor employees on responsible gaming and to identify and manage problem gambling.

(b)    It shall make available to patrons at conspicuous locations and ATMs in the Gaming Facility educational and informational materials that aim at the prevention of problem gambling and that specify where to find assistance and shall display at conspicuous locations and at ATMs within the Gaming Facility signage bearing a toll-free help-line number where patrons may obtain assistance for gambling problems.

(c)    It shall establish self-exclusion measures whereby a self-identified problem gambler may request the halt of promotional mailings, the revocation of privileges for casino services, the denial or restraint on the issuance of credit and check cashing services, and exclusion from the Gaming Facility.

(d)    It shall establish involuntary exclusion measures that allow the Gaming Operation to halt promotional mailings, deny or restrain the issuance of credit and check-cashing services, and deny access to the Gaming Facility to patrons who have exhibited signs of problem gambling. No person involuntarily excluded under such measures shall be entitled to assert any claim whatsoever against the Tribe, the Gaming Operation or any official, employee or agent of the Tribe or the Gaming Operation as the result of such exclusion.

(e)    It shall make diligent efforts to prevent underage individuals from loitering in the area of the Gaming Facility where the Gaming Activities take place.

(f)    It shall ensure that a responsible gambling message and a toll-free help-line number for problem gamblers are made available at the Gaming Facility, where practical, and that they make no false or misleading claims.

Any deficiency in the effectiveness of these measures or standards, as opposed to compliance with the program and measures specified above, does not constitute a material breach of these Secretarial Procedures.

Nothing herein is intended to grant any third party the right to sue based upon any alleged deficiency or violation of these measures.

### Sec. 9.5.    Enforcement of Regulations.

The Tribal Gaming Agency shall ensure the enforcement of the rules, regulations, and specifications promulgated under these Secretarial Procedures.

### Sec. 9.6.    State Civil and Criminal Jurisdiction.

Nothing in these Secretarial Procedures affect the civil or criminal jurisdiction of the State under Public Law 280 (18 U.S.C. Sec. 1162; 28 U.S.C. Sec. 1360) or IGRA, to the extent applicable.

### Sec. 9.7.    Tribal Gaming Agency Members.

(a)     The Tribe shall take all reasonable steps to ensure that members of the Tribal Gaming Agency are free from corruption, undue influence, compromise, and conflicting interests in the conduct of their duties under these Secretarial Procedures; shall adopt a conflict-of-interest code to that end; and shall ensure the prompt removal of any member of the Tribal Gaming Agency who is found to have acted in a corrupt or compromised manner or is found to have violated the conflict-of-interest code.

(b)     The Tribe or as authorized by tribal law, the Tribal Gaming Agency shall conduct a background investigation on each prospective member of the Tribal Gaming Agency; provided that if such member is elected through a tribal election process, that member may not participate in any Tribal Gaming Agency matters under these Secretarial Procedures unless a background investigation has been concluded and the member has been found to be suitable.

(c)     The Tribal Gaming Agency shall conduct a background investigation on each prospective employee of the Tribal Gaming Agency to ensure he or she satisfies the suitability requirements of section 6.4.7.

## SECTION 10.0.    PATRON DISPUTES.

The Tribal Gaming Agency shall promulgate regulations consistent with fairness and prevailing industry standards governing patron disputes over the play or operation of any class III game, including any refusal to pay to a patron any alleged winnings from any Gaming Activities.

The regulations shall meet the following minimum standards:

(a)  If a patron makes an oral or written complaint to personnel of the Gaming Operation over the play or operation of any class III game within forty-eight (48) hours of the play or operation at issue and the Gaming Operation does not informally resolve the complaint to the patron's satisfaction within seven (7) business days from the date the patron makes the complaint, the Gaming Operation shall provide the patron with a form on which the patron may submit within fifteen (15) days of receipt of the form his/her complaint in writing to the Tribal Gaming Agency for resolution by the Tribal Gaming Agency. If the patron's complaint submitted to the Tribal Gaming Agency involves an amount less than the winnings reportable by the Gaming Operation on an Internal Revenue Service ("IRS") Form W-2G, or on any successor form adopted by the IRS (the "Amount'), the Tribal Gaming Agency's decision shall be final and not subject to any further review. If the patron's complaint filed with the Tribal Gaming Agency involves an amount exceeding the Amount, the patron will have the right to seek review of the Tribal Gaming Agency's decision in the Tribe's tribal court system ("Tribal Court"), pursuant to the terms and provisions in subsection (c). If the patron is not provided with the aforesaid form and notification within thirty (30) days of the date upon which the patron timely submitted his/her complaint, the patron shall have 180 days from the date the claim arose in which to file the claim directly with the Tribal Court, and if the Tribe does not have a tribal court, then the patron shall file the claim with the Tribal Council of the Tribe pursuant to the Tribe's claims ordinance. In that event, the decision of the Tribal Council shall be final and non- appealable.

(b)  Upon receipt of the patron's written request for a resolution of the patron's complaint pursuant to subsection (a), the Tribal Gaming Agency shall conduct an appropriate investigation, shall provide to the patron a copy of its regulations concerning patron complaints, and shall render a decision in accordance with industry practice. The decision shall be issued within sixty (60) days of the patron's request, shall be in writing, shall be based on the facts surrounding the dispute, and shall set forth the reasons for the decision.

(c)     If the patron is dissatisfied with the decision of the Tribal Gaming Agency issued pursuant to subsection (b) on a complaint involving a disputed amount more than the Amount, or if the Tribal Gaming Agency fails to issue a decision within the sixty (60)-day period, regardless of the amount in dispute, the patron may request that the dispute be resolved in the Tribe's Tribal Court. The Tribal Court must afford the patron with a dispute resolution process that incorporates the essential elements of fairness and due process. No member of the Tribal Court may be employed by the Gaming Facility or Gaming Operation. Resolution of the dispute before the Tribal Court shall be at no cost to the claimant (excluding claimant's own attorney's fees and expenses and expert witness fees). Consistent with industry practice, if any alleged winnings are found to be a result of a mechanical, electronic, or electromechanical failure and not due to the intentional acts or gross negligence of the Tribe or its agents, the patron's claim for the winnings shall be denied but the patron shall be awarded reimbursement of the amounts wagered by the patron that were lost as a result of any mechanical, electronic or electromechanical failure. The judgment of the Tribal Court shall be final and not subject to further review, and the Gaming Operation shall be obligated as a matter of compliance with these Secretarial Procedures to comply with the judgment of the Tribal Court.

(d)     To effectuate its consent to review by the Tribal Court, the Tribe shall, in the exercise of its sovereignty, conditionally waive its right to assert sovereign immunity in connection with the jurisdiction of the Tribal Court in any action to (i) enforce an obligation provided in this section 10.0 or to (ii) enforce or execute a judgment based upon the award. However, such a waiver shall not apply to claims made against individual tribal officials or employees or for amounts in excess of five million dollars ($5,000,000.00).

## SECTION 11.0.     PUBLIC AND WORKPLACE <u>HEALTH, SAFETY,</u> AND LIABILITY.
### Sec. 11.1.     General Requirements.

The Tribe shall not conduct class III gaming in a manner that endangers the public health, safety, or welfare, provided, however, that nothing herein shall be construed to make applicable to the Tribe any state laws or regulations governing the use of tobacco.

### Sec. 11.2.     Health and Safety Standards.

To protect the health and safety of patrons and employees who directly engage in the operation or play of gaming activities within the Gaming Facility, the Tribe shall, for the Gaming Facility:

(a)     Adopt and comply with standards no less stringent than California public health standards for food and beverage handling. The Tribal Gaming Agency shall ensure that annual inspections are completed by qualified personnel or alternatively annual inspections may be completed by members of a United States Public Health Service. Any violations noted during the inspections that are not remedied within

37

14 days shall be sent to the NIGC with a plan of action designed to cure the violations within a reasonable period of time. Nothing herein shall be construed as submission of the Tribe to the jurisdiction of any state or county health inspectors.

(b)     Adopt and comply with standards no less stringent than federal water quality and safe drinking water standards applicable in California. The Gaming Operation will cause inspections and testing of water quality by qualified inspectors, as applicable, during normal hours of operation, to assess compliance with these standards unless inspections and testing are made by an agency of the United States pursuant to, or by the Tribe under express authorization of, federal law, to ensure compliance with federal water quality and safe drinking water standards. Any alleged violations of the standards shall be treated as alleged violations of this these procedures if the Tribe does not within 14 days of the written notification of the violation cure the violation(s), undertake steps that will cure the violation(s) within a reasonable period of time. The Tribe shall forward the suspected violation and a plan of action to the NIGC if it has not been cured within 14 days of notification of the violation. Nothing herein shall be construed as submission of the Tribe to the jurisdiction of any state or county health inspectors.

(c)     Comply with the building and safety standards set forth in section 6.4.2.

(d)     Adopt and comply with federal workplace and occupational health and safety standards.

(e)     Adopt and comply with tribal codes to the extent consistent with the provisions of these Secretarial Procedures and other applicable federal law regarding public health and safety.

(f)     Adopt and comply with standards no less stringent than federal laws forbidding employers generally from discriminating in the employment of persons who work for the Gaming Operation or in the Gaming Facility based on race, color, religion, national origin, gender, sexual orientation, age, or disability; provided that nothing herein shall preclude the Tribe from giving a preference in employment to Indians, pursuant to a duly adopted Tribal ordinance.

(g)     Comply with provisions of the Bank Secrecy Act, 31 U.S.C. §§ 5311- 5314, as amended, and all reporting requirements of the Internal Revenue Service, insofar as such provisions and reporting requirements are applicable to gambling establishments.

(h)     Adopt and comply with the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., and the United States Department of Labor regulations implementing the Fair Labor Standards Act, 29 C.F.R. § 500 et seq. and the federal minimum wage.

### Sec. 11.3.    Tribal Gaming Facility Standards Ordinance.

The Tribe shall adopt in the form of an ordinance, or ordinances, the standards and obligations described in section 11.2 to which the Gaming Operation and Gaming Facility are held. In the absence of a promulgated tribal standard with respect to a matter identified in section 11.2 or the express adoption of an applicable federal statute or regulation, as the case may be, with respect to any such matter, the otherwise applicable federal statute or regulation shall be deemed to have been adopted by the Tribe as the applicable standard.

### Sec. 11.4.    Insurance Coverage and Claims.

(a)    The Tribe shall adopt and have in effect during the term of these Secretarial Procedures an ordinance establishing an administrative procedure allowing any person who, while directly involved in Gaming Activities and is injured in the Gaming Facility, to file a claim for damages with the Tribe to compensate the claimant for any personal injuries or property damage proximately caused by the negligent conduct of a tribal official, agent or employee. The ordinance may provide that the Tribe shall not be liable for any punitive damages. The ordinance may further provide that the payment of any claim approved by the Tribe under the claims ordinance shall also be limited to the amount of the liability insurance limits set forth in subsection (b) below.

(b)    The Tribe shall obtain and maintain commercial general liability insurance consistent with industry standards for non-tribal casinos in the United States underwritten by an insurer with an A.M. Best rating of A or higher that provides coverage of no less than five million dollars ($5,000,000) per occurrence for bodily injury, personal injury, and property damage directly arising out of, connected with, or relating to the operation of Gaming Activities (Policy). To effectuate the insurance coverage, the Tribe expressly waives, and waives its right to assert, sovereign immunity up to the greater of five million dollars ($5,000,000) or the limits of the Policy, in accordance with the tribal ordinance referenced in subdivision (a) above, in connection with any claim for bodily injury, personal injury, or property damage, directly arising out of, connected with, or relating to the operation of Gaming Activities, provided, that such injury occurs at the Gaming Facility. Nothing herein requires the Tribe to agree to liability for punitive damages or attorney's fees or to waive its right to assert sovereign immunity in connection therewith. The Policy shall acknowledge in writing that the Tribe has expressly waived, and waived its right to assert, sovereign immunity for the purpose of adjudication of those claims up to the greater of five million dollars ($5,000,000) or the limits of the Policy and for the purpose of enforcement of any ensuing award or judgment and shall include an endorsement providing that the insurer shall not invoke tribal sovereign immunity up to the limits of the Policy; however, such endorsement or acknowledgement shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any portion of the claim that exceeds five million dollars ($5,000,000) or the Policy limits, whichever is greater.

39

(c)    Notwithstanding subsection (b) of this section, the Tribe may elect to self-insure in lieu of obtaining and maintaining a general commercial liability policy, provided that the Tribe maintains assets of at least $5 million from which any damages awarded under this section may be paid.

### Sec. 11.5.    Participation in State Programs Related to Employment.

(a)    The Tribe will advise the State of its election to participate in the statutory workers' compensation system as provided in subsection (a)(l) below or, alternatively, may forward to the State all relevant ordinances that have been adopted and all other documents establishing a tribal system and demonstrating that the system is fully operational and compliant with the comparability standards set forth in subsection (a)(2), including such waivers of the Tribe's sovereign immunity as are necessary to allow Gaming Employees to enforce the Tribe's workers' compensation system. Independent contractors doing business with the Tribe must comply with all state workers' compensation laws and obligations.

(1)    The Tribe may agree to participate in the State's workers' compensation program with respect to Gaming Employees. The workers' compensation program includes, but is not limited to, state laws relating to the securing of payment of compensation through one (1) or more insurers duly authorized to write workers' compensation insurance in this state or through self-insurance as permitted under the state's workers' compensation laws.

(2)    In lieu of participating in the State's statutory workers' compensation system and submission to the jurisdiction of the State Workers Compensation Appeals Board, the Tribe may create and maintain a system that provides redress for Gaming Employees' work-related injuries through requiring insurance or self-insurance. This system must include a scope of coverage, provision of up to ten thousand dollars ($10,000) in medical treatment for an alleged injury until the date that liability for the claim is accepted or rejected, employee choice of physician provisions comparable to those mandated for comparable employees under state law, quality and timely medical treatment provided comparable to the state's medical treatment utilization schedule, availability of an independent medical examination to resolve disagreements on appropriate treatment (by an independent medical review organization approved for external reviews through the Independent Medical Review program, a Qualified Medical Evaluator listed in the state-approved database, or an "Agreed Medical Examiner" upon mutual agreement of the employer and employee), the right to notice, hearings before an independent tribunal, a means of enforcement against the employer, and benefits (including, but not limited to, temporary and permanent disability, death, supplemental job displacement, and return to work supplement) comparable to those mandated for comparable employees under state law.

40

(b)    The Tribe may agree to participate in the State's program for providing unemployment compensation benefits and unemployment compensation disability benefits with respect to Gaming Employees, which participation shall include compliance with the provisions of the California Unemployment Insurance Code.

### Sec. 11.6.    Emergency Services Accessibility.

The Tribe shall make reasonable provisions for adequate emergency fire, medical, and related relief and disaster services for patrons and employees of the Gaming Facility.

### Sec. 11.7.    Alcoholic Beverage Service.

The Tribe's purchase, sale, and service of alcoholic beverages in the Gaming Facility shall be subject to applicable federal law.

### Sec. 11.8.    Possession of Firearms.

The possession of firearms by any person in the Gaming Facility is prohibited at all times, except for federal, state, tribal, or local law enforcement personnel, or tribal security personnel authorized by tribal, federal, or California law to possess firearms at the Gaming Facility.

### Sec. 11.9.    Labor Relations.

In the event that the National Labor Relations Board is determined by the final and unappealable judgment of a court of competent jurisdiction or an Act of Congress to lack jurisdiction over the Tribe's Gaming Operation, the Tribe shall comply with the Tribal Labor Relations Ordinance set forth in Appendix B to these Secretarial Procedures.

## SECTION 12.0.    [RESERVED]

## SECTION 13.0.    EFFECTIVE DATE AND TERM.

### Sec. 13.1.    Effective Date.

These Secretarial Procedures shall be effective immediately when signed by the Assistant Secretary–Indian Affairs.

### Sec. 13.2.    Term; Extension.

These Secretarial Procedures shall remain in effect unless one of the following events occurs:

(a)    These Secretarial Procedures are terminated by mutual consent of the Tribe and the Secretary; or

(b)    The Tribe duly adopts a resolution revoking tribal authority to conduct class III gaming upon the Tribe's Indian lands, as provided for in the IGRA.

**SECTION 14.0.    AMENDMENTS.**

**Sec. 14.1.    Amendment of These Secretarial Procedures.**

When the Tribe seeks to amend these Secretarial Procedures, it shall submit a request in writing to the Secretary pursuant to IGRA, provided that, except to amend Section 3.0(a) by triggering Section 14.4, no such request may be sought for 12 months following the effective date of these Secretarial Procedures. The Secretary, or her or his designee, shall meet and confer with the Tribe regarding modifying these Secretarial Procedures to incorporate the Tribe's requested amendment. The Secretary's agreement to amend these Secretarial Procedures shall not be unreasonably withheld or delayed.

**Sec. 14.2.    [RESERVED]**

**Sec. 14.3.    [RESERVED]**

**Sec. 14.4.    Most Favored Nation.**

Should the State and any other Compacting Tribe within California amend a current gaming compact or adopt a new gaming compact with a term or terms that the Tribe considers more favorable to the Compacting Tribe than the comparable term or terms of these Secretarial Procedures, at the Tribe's request, the Secretary, or her or his designee, shall meet and confer with the Tribe regarding modifying these Secretarial Procedures to add the more favorable terms. The Secretary's agreement to modify these Secretarial Procedures as provided in this section shall not be unreasonably withheld or delayed.

**SECTION 15.0.    NOTICES.**

Unless otherwise authorized by these Secretarial Procedures, all notices required or authorized to be served shall be served by first-class mail at the following addresses:

| **Secretary of the Interior** | **Chairman National Indian Gaming Commission** | **Tribal Chairperson** |
|---|---|---|
| C/O Director, | C/O Regional Director, | Blue Lake Rancheria, |
| Office of Indian Gaming | Sacramento Region Office | California |
| 1849 C. Street NW | 801 I Street | P.O. Box 428 |
| MS 3543 | Suite 489 | Blue Lake, California 95525 |
| Washington, D.C. 20240, | Sacramento, CA 95814 | |
| Or as listed in 25 C.F.R. Part 293. | | |

42

**SECTION 16.0.        CHANGES TO IGRA.**

These Secretarial Procedures are intended to meet the requirements of IGRA as it reads on the effective date of these Secretarial Procedures, and when reference is made to IGRA or to an implementing regulation thereof, the referenced provision is deemed to have been incorporated into these Secretarial Procedures as if set out in full. Subsequent changes to IGRA that diminish the rights of the Tribe may not be applied retroactively to alter the terms of these Secretarial Procedures, except to the extent that federal law validly mandates retroactive application without the Tribe's consent.

**SECTION 17.0.        MISCELLANEOUS.**

**Sec. 17.1.    Third-Party Beneficiaries.**

Notwithstanding any provision of law, these Secretarial Procedures are not intended to, and shall not be construed to, create any right on the part of a third party or third-party beneficiary.

**Sec. 17.2.    Effect of Procedures.**

These Secretarial Procedures, together with all appendices, set forth the full and complete authorization by the Secretary of the Interior for the Tribe to conduct class III Gaming Activities on its Indian lands pursuant to IGRA and supersedes, supplants, and extinguishes any prior agreements or understandings with respect to the subject matter hereof.

On the effective date of these Secretarial Procedures, any and all prior tribal-state class III gaming compacts entered into between the Tribe and the State shall be null and void and of no further force and effect.

**Sec. 17.3.    Construction and Interpretation of Procedures.**

Neither the presence in another tribal-state class III gaming compact of language that is not included in these Secretarial Procedures, nor the absence in another tribal-state class III gaming compact of language that is present in these Secretarial Procedures shall be a factor in construing the terms of these Secretarial Procedures.

The interpretation of these Secretarial Procedures and of federal statutes and regulations incorporated herein by reference shall comply with established canons of construction applicable to Indian tribes as a matter of federal law.

43

### Sec. 17.4.    Successor Provisions.

Wherever these Secretarial Procedures make reference to a specific statutory provision, regulation, or set of rules, it also applies to the provision or rules, as they may be amended from time to time, and any successor provision or set of rules.

### Sec. 17.5.    Ordinances and Regulations.

Whenever the Tribe adopts or materially amends any ordinance or regulations required to be adopted and/or maintained under these Secretarial Procedures, in addition to any other obligations to provide a copy to others, the Tribe shall provide a copy of such adopted or materially amended ordinance or regulations to the NIGC within fifteen (15) days of the adoption of such ordinance or regulations.

### Sec. 17.6.    Calculation of Time.

In computing any period of time prescribed by these Secretarial Procedures, the day of the event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday under the Tribe's laws, the State's law, or federal law. Unless otherwise specifically provided herein, the term "days" shall be construed as calendar days.

### Sec. 17.7.    Force Majeure.

In the event of a force majeure event, including but not limited to: an act of God; accident; fire; flood; earthquake; an epidemic or pandemic; or other natural disaster; strike or other labor dispute; riot or civil commotion; act of public enemy; enactment of any rule; order or act of a government or governmental instrumentality; effects of an extended restriction of energy use; and other causes of a similar nature beyond the Tribe's control that causes the Tribe's Gaming Operation or Facility to be inoperable or operate at significantly less than its full capacity, the Tribe shall be relieved of any obligations that it is prevented from performing under these Secretarial Procedures during the force majeure event. Within thirty (30) days of the Tribe declaring a force majeure event by giving written notice thereof to the NIGC, the Tribe and the NIGC agree to meet and confer for the purpose of discussing the event and appropriate actions, if any given the circumstances.

### Sec. 17.8.    Severability.

Any provision of these Secretarial Procedures held to be invalid, illegal, or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality, or unenforceability without affecting the validity, legality, and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

### Sec. 17.9.    Compliance with Mediator's Choice of Last Best Offer Compact.

These Secretarial Procedures are promulgated in compliance with the requirements of IGRA's remedial provisions, 25 U. S. C. § 2710(d)(7), and are consistent with: (1) the terms of the last best offer class III gaming compact selected by the mediator appointed by the court in *Chicken Ranch Rancheria of Me-Wuk Indians et al. v. Newsom*, No. 1:19-CV-0024-AWI-SKO (E.D. Cal. Filed Jan. 4, 2019); and (2) the State's position that it would not consent to regulate the Tribe's class III gaming under the mediator's selected compact. Under IGRA, these Secretarial Procedures are properly viewed as a full substitute for a class III gaming compact that would be in effect had a voluntary agreement been reached between the Tribe and the State, or if the State had consented to the court-appointed mediator's selection. Therefore, these Secretarial Procedures qualify for the exemption to the criminal prohibitions on gaming provided by Section 23 of IGRA.

### Sec. 17.10    Class III Gaming Compact with the State.

The terms and conditions of these Secretarial Procedures may be superseded at any time by a class III gaming compact entered into by the mutual and written agreement of the Tribe and the State that is in effect under IGRA. Any such class III gaming compact shall provide that these Secretarial Procedures be withdrawn and shall have no further force or effect upon publication of approval of the class III gaming compact in the Federal Register.

**Sec. 17.11    References to the State and the State Gaming Agency in These Secretarial Procedures.**

The State Gaming Agency and the State shall have no regulatory responsibilities or obligations to the Tribe, and the Tribe shall have no obligations to the State Gaming Agency and the State, including the payment of money to the State, except the Tribe's payments to the RSTF in accordance with Section 5.0, et seq.

**Sec. 17.12    No Waiver of Sovereign Immunity**

Nothing in these Secretarial Procedures shall be interpreted as a waiver of the Tribe's sovereign immunity, whether express or implied, as to the State or any third party.

IN WITNESS WHEREOF, the undersigned signed execute these Secretarial Procedures on behalf of the Department of the Interior.

Done this 31ˢᵗ day of January, 2024.

Bryan Newland, Assistant Secretary – Indian Affairs

46

APPENDICES

A.     The document creating the Tribe's Indian lands or a map of general location showing the location of those Indian lands. To the extent that there is a discrepancy between the legal description set forth in the document and the boundaries of the Indian lands as depicted on the map, the description in the document shall control. Without amending these Secretarial Procedures, the Tribe may update this document or map from time to time to reflect the then-current status of its Indian lands.

B.     Tribal Labor Relations Ordinance.

**Appendix A:**
**Map of Tribe's Reservation**

The Bureau of Indian Affairs is verifying the accuracy of the map and will include it at a later date.

**Appendix B:**
**Tribal Labor Relations Ordinance**

TRIBAL LABOR RELATIONS ORDINANCE

December 2, 2022

**Section 1: Threshold of applicability.**

(a) If a court of competent jurisdiction enters a final, non-appealable order declaring that federally-recognized Indian tribes are not subject to the provisions of the National Labor Relations Act and the Tribe employs 300 or more persons in a Gaming Facility, as defined in the Tribe's class III gaming compact with the State of California or as defined in procedures promulgated by the Secretary of the Interior pursuant to the Indian Gaming Regulatory Act, the Tribe shall adopt this Tribal Labor Relations Ordinance (TLRO or Ordinance).

(b) Upon the request of a labor union or organization which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, the Tribal Gaming Commission shall certify the number of employees in a Gaming Facility. Either party may dispute the certification of the Tribal Gaming Commission to the Tribal Labor Panel, which is defined in section 13.

**Section 2: Definition of Eligible Employees.**

(a) The provisions of this Ordinance shall apply to any person who is employed within a Gaming Facility (hereinafter "Eligible Employee") who has a direct connection to the playing of a class III game, except for any of the following:

(1) any employee who is a supervisor, defined as any individual having authority, in the interest of the Tribe and/or employer, to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment;

(2) any employee of the Tribal Gaming Commission;

(3) any employee of the security or surveillance department, other than those who are responsible for the technical repair and maintenance of equipment;

(4) any cash operations employee who is a "cage" employee or money counter; or

(5)    any dealer.

**Section 3: Non-interference with regulatory or security activities.**

Implementation and compliance with the terms of this Ordinance shall not interfere in any way with the duty of the Tribal Gaming Commission to regulate the gaming operation in accordance with the Tribe's National Indian Gaming Commission-approved gaming ordinance, the regulations promulgated by the Commission, minimum internal control standards approved by the Commission, and the Tribe's Compact or Secretarial Procedures or any other applicable law. Furthermore, the exercise of rights hereunder shall in no way interfere with the Gaming Facility's surveillance/security systems, or any auditing internal controls designed to protect the integrity of the Tribe's gaming operations. The Tribal Gaming Commission is specifically excluded from the definition of Tribe and its agents.

**Section 4: Eligible Employees free to engage in or refrain from concerted activity.**

Eligible Employees shall have the right to self-organization, to form, to join, or assist employee organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection and shall also have the right to refrain from any or all such activities.

**Section 5: Unfair Labor Practices for the Tribe.**

It shall be an unfair labor practice for the Tribe and/or employer or their agents:

(1) to interfere with, restrain, or coerce Eligible Employees in the exercise of the rights guaranteed herein;

(2)  to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it, but this does not restrict the Tribe and/or employer and a certified union from agreeing to union security or dues checkoff;

(3)  to discharge or otherwise discriminate against an Eligible Employee because s/he has filed charges or given testimony under this Ordinance; or

(4)  after certification of the labor organization pursuant to Section 10, to refuse to bargain collectively with the representatives of Eligible Employees.

**Section 6: Unfair Labor Practices for the union.**

It shall be an unfair labor practice for a labor organization or its agents:

51

(1) to interfere, restrain, or coerce Eligible Employees in the exercise of the rights guaranteed herein;

(2) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a primary or secondary boycott or a refusal in the course of his/her employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce or other terms and conditions of employment. This section does not apply to section 11;

(3) to force or require the Tribe and/or employer to recognize or bargain with a particular labor organization as the representative of Eligible Employees if another labor organization has been certified as the representative of such Eligible Employees under the provisions of this
TLRO;

(4) to refuse to bargain collectively with the Tribe and/or employer, provided it is the representative of Eligible Employees subject to the provisions herein; or

(5) to attempt to influence the outcome of a tribal governmental election, or otherwise interfere in the internal governmental affairs of the Tribe, provided, however, that this section does not apply to enrolled members of the Tribe.

**Section 7: Tribe and union right to free speech.**

The Tribe's and union's expression of any view, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of interference with, restraint, or coercion if such expression contains no threat of reprisal or force or promise of benefit.

**Section 8: Access to Eligible Employees.**

Access shall be granted to the union for the purposes of organizing Eligible Employees, provided that such organizing activity shall not interfere with patronage of the Gaming Facility or with the normal work routine of the Eligible Employees and shall be done on non-work time in non-work areas that are designated as employee break rooms or locker rooms that are not open to the public. The Tribe may require the union and or union organizers to be subject to the same licensing rules applied to individuals or entities with similar levels of access to the Gaming Facility, provided that such licensing shall not be unreasonable, discriminatory, or designed to impede access.

(a)    The Tribe, in its discretion, may also designate additional voluntary access to

52

the union in such areas as employee parking lots and non-Gaming Facility facilities located on tribal lands.

(b) In determining whether organizing activities potentially interfere with normal tribal work routines, the union's activities shall not be permitted if the Tribal Labor Panel determines that they compromise the operation of the Gaming Facility:

(1)     security and surveillance systems throughout the casino, and reservation;

(2)     access limitations designed to ensure security;

(3)     internal controls designed to ensure security;

(4)     other systems designed to protect the integrity of the Tribe's gaming operations, tribal property and/or safety of Gaming Facility personnel, patrons, employees or tribal members, residents, guests, or invitees; and

(5)     any rules, regulations, or minimum internal control standards adopted by the Gaming Commission pursuant to any authority granted to the Gaming Commission under the Tribe's Gaming Ordinance approved by the Chairman of the National Indian Gaming Commission.

(c) The Tribe shall provide to the union, upon a thirty percent (30%) showing of interest to the Tribal Labor Panel, an election eligibility list containing the full first and last name of the Eligible Employees within the sought-after bargaining unit and the Eligible Employees' last known address within ten (10) working days. Nothing herein shall preclude the Tribe from voluntarily providing an election eligibility list at an earlier point of a union organizing campaign.

(d)    The Tribe agrees to facilitate the dissemination of information from the union to Eligible Employees at the Gaming Facility by allowing posters, leaflets and other written materials to be posted in non-public employee break areas where the Tribe already posts announcements pertaining to Eligible Employees. Actual posting of such posters, notices, and other materials, shall be by employees desiring to post such materials.

(e)    The union shall not engage in any union activities on the Tribe's reservation outside of the areas expressly authorized under this Ordinance.

(f)    The Tribe shall, within thirty (30) days from the date that the union requests it in writing, provide the union with the names and addresses of all Eligible Employees. The Tribe shall not be required to provide to the union Eligible Employees' telephone

numbers, fax numbers, or any other information pertaining to the Eligible Employees except their names and addresses.

**Section 9: Indian preference explicitly permitted.**

Nothing herein shall preclude the Tribe from giving Indian preference in employment, promotion, seniority, lay-offs, or retention to members of any federally recognized Indian tribe or shall in any way affect the Tribe's right to follow tribal law, ordinances, personnel policies, or the Tribe's customs or traditions regarding Indian preference in employment, promotion, seniority, lay-offs, or retention. Moreover, in the event of a conflict between tribal law, tribal ordinance, or the Tribe's customs and traditions regarding Indian preference and this Ordinance, the tribal law, tribal ordinance, or the Tribe's customs and traditions shall govern.

**Section 10: Secret ballot elections required.**

(a) Dated and signed authorized cards from thirty percent (30%) or more of the Eligible Employees within the bargaining unit verified by the elections officer will result in a secret ballot election to be held within 30 days from presentation to the elections officer.

(b) The election shall be conducted by the election officer. The election officer shall be a member of the Tribal Labor Panel chosen pursuant to the dispute resolution provisions herein. All questions concerning representation of the tribe and/or Employer's Eligible Employees by a labor organization shall be resolved by the election officer. The election officer shall be chosen upon notification by the labor organization to the Tribe of its intention to present authorization cards, and the same election officer shall preside thereafter for all proceedings under the request for recognition; provided however that if the election officer resigns, dies, or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.

The election officer shall certify the labor organization as the exclusive collective bargaining representative of a unit of employees if the labor organization has received the support of a majority of the Eligible Employees voting in a secret ballot election that the election officer determines to have been conducted fairly. The numerical threshold for certification is fifty percent (50%) of the Eligible Employees plus one. If the election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or union, the election officer may order a re-run election. If the election officer determines that there was the commission of serious Unfair Labor Practices by the Tribe that interfere with the election process and preclude the holding of a fair election, and the labor organization is able to demonstrate that it had the support of a majority of the

54

employees in the unit at any point before or during the course of the Tribe's misconduct, the election officer shall certify the labor organization.

(c)    The Tribe or the union may appeal any decision rendered after the date of the election by the election officer within five (5) days to a three (3) member panel of the Tribal Labor Panel mutually chosen by both parties.

(d) A union which loses an election and has exhausted all dispute remedies related to the election may not invoke any provisions of this Ordinance until one year after the election was lost.

**Section 11: Collective bargaining impasse**

Upon recognition of the union as the Eligible Employees' representative, the Tribe and the union will negotiate in good faith for a collective bargaining agreement covering bargaining unit employees represented by the union. If collective bargaining negotiations result in impasse, and the matter has not been resolved by the tribal forum procedures set forth in Section 13(b) governing resolution of impasse within sixty (60) working days or such other time as mutually agreed to by the parties, the union shall have the right to strike. Strike-related picketing shall not be conducted on Indian lands as defined in 25 U.S.C. Sec. 2703(4).

**Section 12: Decertification of bargaining agent.**

(a)    The filing of a petition signed by thirty percent (30%) or more of the Eligible Employees in a bargaining unit seeking the decertification of a certified union will result in a secret ballot election. The election officer shall make a determination as to whether the required thirty percent (30%) showing has been made within one (1) working day after the submission of authorization cards. If the election officer determines the required thirty percent (30%) showing of interest has been made, the election officer shall issue a notice of election. The election shall be concluded within thirty (30) calendar days of the issuance of the notice of election.

(b) The election shall be conducted by an election officer. The election officer shall be a member of the Tribal Labor Panel chosen pursuant to the dispute resolution provisions herein. All questions concerning the decertification of the labor organization shall be resolved by an election officer. The election officer shall be chosen upon notification to the Tribe and the union of the intent of the employees to present a decertification petition, and the same election officer shall preside thereafter for all proceedings under the request for decertification; provided however that if the election officer resigns, dies, or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.

(c) The election officer shall order the labor organization decertified as the

exclusive collective bargaining representative if a majority of the employees voting in a secret ballot election that the election officer determines to have been conducted fairly vote to decertify the labor organization. If the election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or the union the election officer may order a re-run election or dismiss the decertification petition.

(d) A decertification proceeding may not begin until one (1) year after the certification of a labor union if there is no collective bargaining agreement. Where there is a collective bargaining agreement, a decertification petition may only be filed no more than 90 days and no less than 60 days prior to the expiration of a collective bargaining agreement. A decertification petition may be filed any time after the expiration of a collective bargaining agreement.

(e)    The Tribe or the union may appeal any decision rendered after the date of the election by the election officer to a three (3) member panel of the Tribal Labor Panel mutually chosen by both parties.

**Section 13: Binding dispute resolution mechanism**

(a)  All issues shall be resolved exclusively through the binding dispute resolution mechanisms herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution.

(b)    The first level of binding dispute resolution for all matters related to organizing, election procedures, alleged unfair labor practices, and discharge of Eligible Employees shall be an appeal to a designated tribal forum such as a Tribal Council, Business Committee, or Grievance Board. The parties agree to pursue in good faith the expeditious resolution of these matters within strict time limits. The time limits may not be extended without the agreement of both parties. In the absence of a mutually satisfactory resolution, either party may proceed to the independent binding dispute resolution set forth below. The agreed upon time limits are set forth as follows:

(1)    All matters related to organizing, election procedures, and alleged unfair labor practices prior to the union becoming certified as the collective bargaining representative of bargaining unit employees, shall be resolved by the designated tribal forum within thirty (30) working days.

(2)    All matters after the union has become certified as the collective bargaining representative and relate specifically to impasse during negotiations shall be resolved by the designated tribal forum within sixty (60) working days.

(c) The second level of binding dispute resolution shall be a resolution by the Tribal Labor Panel, consisting of ten (10) arbitrators appointed by mutual selection of the parties which panel shall serve all tribes that have adopted this ordinance. The Tribal Labor Panel shall have authority to hire staff and take other actions necessary to conduct elections,

determine units, determine scope of negotiations, hold hearings, subpoena witnesses, take testimony, and conduct all other activities needed to fulfill its obligations under this Tribal Labor Relations Ordinance.

      (1)    Each member of the Tribal Labor Panel shall have relevant experience in Gaming and Indian Gaming law, and federal labor law and/or federal Indian law with preference given to those with experience in all three. Names of individuals may be provided by such sources as, but not limited to, Indian Dispute Services, Federal Mediation and Conciliation Service, and the American Academy of Arbitrators.

      (2)    Unless either party objects, one arbitrator from the Tribal Labor Panel will render a binding decision on the dispute under the Ordinance. If either party objects, the dispute will be decided by a three- member panel of the Tribal Labor Panel, which will render a binding decision. In the event there is one arbitrator, five (5) Tribal Labor Panel names shall be submitted to the parties and each party may strike no more than two (2) names. In the event there is a three (3) member panel, seven (7) **Tribal** Labor Panel names shall be submitted to the parties and each party may strike no more than two (2) names. A coin toss shall determine which party may strike the first name. The arbitrator will generally follow the American Arbitration Association's procedural rules relating to labor dispute resolution. The arbitrator or panel must render a written, binding decision that complies in all respects with the provisions of this Ordinance.

  (d) Under the third level of binding dispute resolution, either party may seek a motion to compel arbitration or a motion to confirm an arbitration award in Tribal Court, which may be appealed to federal court. If the Tribal Court does not render its decision within 90 days, or in the event there is no Tribal Court, the matter may proceed directly to federal court. In the event the federal court declines jurisdiction, the Tribe agrees to a limited waiver of its sovereign immunity for the sole purpose of compelling arbitration or confirming an arbitration award issued pursuant to the Ordinance in the appropriate state superior court. The parties are free to put at issue whether or not the arbitration award exceeds the authority of the Tribal Labor Panel.