# EXHIBIT N

# The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance

## Remarks of Chairman Michael S. Selig at CFTC-SEC Event on Harmonization

Good afternoon. Thank you, Chairman Atkins, for your kind introduction. And, to our guests, welcome to the Commodity Futures Trading Commission. Before I begin, I must note that the views I share today are my own as Chairman and do not necessarily reflect those of the Commission.

I am pleased that my first public remarks as Chairman could be here at the CFTC, an institution with a rich and distinguished heritage of overseeing markets that facilitate price discovery, risk management, and reliable commodity prices for everyday Americans.

As these are my first public remarks, I would like to begin with a few words of thanks:

First, to President Trump, I am grateful for the trust and confidence you have placed in me to lead the Commission during this historic time.

Second, to Chairman Atkins, it was the honor of a lifetime to work with you and Commissioner Peirce at the SEC. You are a principled and inspiring leader. And I am thrilled to work with you in this new role to modernize and harmonize our agencies' regulatory frameworks.

Third, to the dedicated staff of the CFTC, thank you for the warm welcome. This agency's reputation is a direct reflection of your expertise, professionalism, and public service. I look forward to partnering with you as we carry that responsibility forward.

Today marks the beginning of a new chapter for the CFTC. One that builds on the Commission's legacy while sharpening its focus on regulatory clarity, inter-agency coordination, and permissionless innovation.

### From Open Outcry to Open Source: A Tradition of Market Innovation

For more than a century and a half, America's commodity futures markets have served a proving ground for innovation—not just in what is traded, but in how risk is managed, prices are discovered, and trust is established among market participants.

That tradition began in earnest in 1848, with the founding of the Chicago Board of Trade. What started as a physical meeting place for merchants trading grain and livestock quickly evolved into something more consequential: a system for standardizing contracts, aggregating dispersed information, and enabling producers and consumers to manage price risk over time.

As trading activity expanded in the late nineteenth century, new distribution technologies—telegraph lines, railroads, and printed quotations—dramatically broadened access to market prices. Alongside organized exchanges, informal venues known as "bucket shops" emerged—offering retail customers exposure to commodity prices without requiring physical delivery. While these operations often lacked quality and integrity, their popularity underscored a growing public appetite for participation in price discovery and risk-taking tied to real economic activity.

In response, organized exchanges moved to reinforce the distinction between transparent, rules-based markets and purely speculative imitation. Litigation over access to price quotations culminated in judicial recognition of the exchanges' role in safeguarding market integrity. In the end, the Board of Trade obtained a victory at the U.S Supreme Court[1] and trading in the future price of commodities migrated onto organized trading venues that came to be known as "pits" because of their unique physical design.

The economic dislocation of the Great Depression prompted Congress to formalize this framework. The Commodity Exchange Act required futures trading to occur on organized exchanges and obligated so-called "designated contract markets" (DCMs) to enforce rules to prevent fraud and manipulation. In 1974, the Commodity Futures Trading Commission was established to oversee these markets as they continued to evolve.

As American ingenuity progressed, innovation again reshaped market structure. Open trading floors gave way to electronic platforms. Without the restriction of limited real estate, the universe of futures contracts exploded as new exchanges proliferated, listing thousands of unique products. Congress responded not by freezing markets in place, but by modernizing market oversight. During this period of rapid transformation, Congress and the CFTC collaborated to craft the Commodity Futures Modernization Act, which embraced self-certification and principles-based regulation, recognizing that markets innovate faster than prescriptive rulebooks—and that regulatory frameworks must be durable and flexible.

Around this period, the CFTC and SEC were grappling with jurisdictional questions concerning new derivatives products, including single-stock and security index futures. The absence of clear statutory alignment created uncertainty for market participants and constrained domestic development. Over time, however, the agencies, working with Congress, came together to resolve these questions through the "Shad-Johnson Accord," restoring clarity and enabling these markets to thrive here in the U.S.

Today, commodity markets are once again experiencing a period of rapid transformation. Blockchains, crypto assets, and smart contracts are introducing new methods for trading, clearing, settling, margining, and collateralizing commodity price exposures. These innovations have the potential to reduce operational frictions by enhancing liquidity and streamlining post-trade processes. At the same time, new products such as prediction markets, "mini" contracts, and perpetual futures have experienced rapid adoption. We are witnessing the foundation of modern markets take shape.

As this transformation unfolds, the CFTC has an opportunity to build on its historic role as a forward-looking regulator. By applying clear rules, principles-based oversight, and harmonizing with fellow regulators, the Commission can help ensure that the next generation of commodity markets develop onshore—continuing a legacy that stretches from the grain pits of Chicago to the digital markets of the future.

**America at 250: The Crypto Capital of the World**

America is home to the most transparent and well-regulated financial markets in the world—markets that are grounded in market integrity and institutional trust. With thoughtful engagement and a commitment to principled innovation, the U.S. is uniquely positioned to extend its preeminence into the crypto era.

And thanks to the leadership of President Trump, "Operation Chokepoint 2.0" is history, regulation by enforcement is dead, the GENIUS Act is law, Congress is on the cusp of passing market structure legislation, and the U.S. is now the crypto capital of the world.

But we cannot assume this will always be the case. America's financial regulators must modernize and harmonize their approach to regulation to future-proof our markets for the innovations of tomorrow.

And, while market structure legislation will certainly advance these goals, we cannot and will not let this opportunity pass us by while Congress continues its work.

That is why I have already directed CFTC staff to make full use of the agency's existing authorities to begin upgrading our regulations for America's Golden Age. Whether incumbents or new entrants, the CFTC's doors are open to those looking to innovate.

**Project Crypto: Modernizing and Harmonizing Financial Regulation for the Golden Age**

Before I share some exciting news, I would like to thank former Commissioner Caroline Pham for her leadership as acting chairman. She took important steps to position the CFTC for the future by launching the Crypto Sprint initiative, which helped orient the agency at a critical moment towards the opportunities and challenges presented by crypto assets.

Today, we are building on that foundation. Rather than running a parallel initiative with the SEC, I am pleased to announce that the CFTC is partnering with the SEC on Project Crypto—bringing coordination, coherence, and a unified approach to the federal oversight of crypto asset markets.

Project Crypto recognizes that crypto markets span across our agencies' respective regulatory boundaries. Chairman Atkins and I view this moment as a generational opportunity for our agencies to collaborate on clear, durable, rules of the road for these markets.

Through this partnership, we will advance a clear crypto asset taxonomy, clarify jurisdictional lines, remove duplicative compliance requirements, and reduce regulatory fragmentation—ensuring that innovation takes root on American soil, under American law, and in service of American investors, customers, and businesses.

**New Accord: Delivering Clarity and Certainty to Crypto Asset Markets**

Earlier, I mentioned the historic Shad-Johnson Accord, which resolved one jurisdictional dispute between the CFTC and SEC and was later codified into statute. With a wide range of new crypto assets and on-chain financial markets, we're due for a new cross-agency agreement to govern these markets.

I agree with Chairman Atkins that "most crypto assets trading today are not securities."[2] But, for too long, crypto asset market participants have struggled to determine whether they are subject to regulation by the SEC, the CFTC, or both. Instead of leaving the industry trapped in uncertainty, as we witnessed under prior administrations, it is incumbent on us to draw a bright jurisdictional line for our nation's builders and innovators.

Chairman Atkins recently laid out a common-sense crypto asset taxonomy that would make clear that digital commodities, digital collectibles, and digital tools are not "securities"—even when they are sold as part of an investment contract.[3] I have directed Commission staff to work together with SEC staff to consider joint codification of this framework as an interim measure while Congress finalizes legislation.

**Liquid and Programmable: Expanding Eligible Tokenized Collateral**

With a clearer taxonomy in place, the next question becomes how blockchain technologies can be harnessed to strengthen market resilience and market functions.

In certain markets, 24/7 trading offers meaningful advantages, particularly where global participation is essential to market efficiency.

High-quality tokenized collateral that can move seamlessly across venues has the potential to make liquidity more dynamic and markets more resilient. As on-chain capabilities mature, they also create opportunities for new tools, including artificial intelligence-driven systems and autonomous software, to interact directly with tokenized collateral. These systems can programmatically monitor risk in real time and execute predefined strategies within established guardrails. In this way, tokenization and automation can begin to fulfill the original promise of blockchain technologies: a more open, transparent, and efficient market infrastructure.

To achieve this work, and to help unleash American innovation, I have directed CFTC staff to develop rules to enable the responsible deployment of additional forms of eligible tokenized collateral.

### Limitless: Onshoring True Perpetual Derivatives

The pace of innovation with crypto assets has also led to experimentation with novel types of derivatives.

Derivatives with no fixed maturity date, known as "perpetual contracts," have emerged as widely used tools for risk-management and price-discovery. Yet, despite clear market demand, the prior administration failed to create a pathway for these markets to exist onshore.

Reversing this misstep requires transparent and workable frameworks that allow true perpetual derivative products to be offered responsibly in the U.S. under common-sense regulations. And—under my leadership—the CFTC will use the tools at its disposal to onshore perpetual and other novel derivative products so that they can flourish across both centralized and decentralized markets, subject to appropriate safeguards.

### Safe Harbors for Software Developers and Users: Unleashing Permissionless Innovation

As our markets continue to evolve, digital wallets, decentralized finance protocols, layer-2 networks, and other on-chain software systems are now part of everyday finance. However, uncertainty persists regarding the appropriate regulatory treatment of these technologies under the CFTC's existing framework.

The Commission's existing rules were designed for—and assume—a centralized intermediary model. With the advent of on-chain financial markets, we must revisit these design choices and assumptions to facilitate permissionless innovation or risk ceding our global leadership to the many foreign nations that will welcome our builders with open arms—an unacceptable outcome.

On-chain systems exist on a spectrum of decentralization. In certain instances, there may exist non-custodial digital wallets or user interfaces that merely function as digital rails through which users can directly interact with programmatic, self-executing software code. In other instances, there may be more centralized touchpoints.

Under my leadership, the CFTC will explore ways in which the agency can encourage innovation in software development and support builders as they work toward product market fit, including by assessing whether an innovation exemption may be appropriate in certain circumstances.

At every step, our actions will reflect a commitment to establish clear and unambiguous safe harbors for software developers to ensure that the crypto innovations of today and tomorrow are Made in America.

### Leveraged Crypto Asset Trading: Enhancing Optionality for Market Participants

While I share the excitement around decentralized financial systems, intermediated trading will continue to play an important role in crypto markets. That includes trading conducted both on- and off-exchange with leverage, margin, or financing. In that spirit, we are already taking concrete steps to foster these trading activities.

First, I have directed CFTC staff to begin drafting rules clarifying when leveraged, margined, or financed retail commodity transactions in crypto may be offered off-exchange under an "actual delivery" exception.

Second, I have asked CFTC staff to begin drafting rules codifying requirements for DCMs that choose to offer these transactions on their current platforms. Codification will promote consistency, transparency, and a uniform application of core protections across venues—hallmarks of the CFTC's regulatory regime.

Finally, I have directed CFTC staff to explore the creation of a new category of DCM registration that is tailored specifically to retail leveraged, margined, or financed crypto asset trading. These venues would perform functions similar to traditional DCMs but operate under a purpose-fit regulatory framework.

**Harmonization: Facilitating Substituted Compliance and Super-Apps**

Now, our modernized approach will fall short unless it is paired with continued harmonization between the CFTC and the SEC.

Fragmented oversight imposes real economic costs—raising barriers to entry, reducing competition, increasing compliance expenses, and encouraging regulatory arbitrage rather than productive investment. Recognizing this, I intend for the CFTC to work closely with the SEC to identify opportunities to better align regulatory requirements across markets.

The objective is not to blur statutory boundaries, but to reduce unnecessary duplication that does not improve market integrity. As part of this harmonization effort, we will examine whether substituted compliance can achieve equivalent or better regulatory outcomes at lower costs for market participants. Within the bounds of the law and where appropriate, market participants should be able to offer multiple products through a single platform without navigating an inefficient patchwork of registrations and overlapping regulatory regimes.

**Prediction Markets: Forecasting the Future**

Last, but certainly not least, I would be remiss if I did not address prediction markets, or event contracts as we refer to them at the CFTC.

These markets are not new. They have operated within the CFTC's regulatory perimeter for more than two decades. But, despite their history, many view them as novel or unsettled. That uncertainty has not served our markets well, nor has it served the public interest.

It is time for clear rules and a clear understanding that the CFTC supports lawful innovation in these markets. Consistent with my commitment to fostering responsible innovation in crypto asset markets, I will continue to support the responsible development of event contract markets and the important role they play in the broader financial system. Here's how we will be moving forward.

First, I have directed CFTC staff to withdraw the 2024 event contracts rule proposal that would prohibit political and sports-related event contracts[4] and the 2025 staff advisory,[5] which cautioned registrants about offering access to sports-related event contracts due to ongoing litigation. While the

advisory was issued at the staff level with the intent of bringing awareness to the litigation, it has instead contributed to uncertainty in our markets.

Second, looking ahead, and in the spirit of markets that trade on expectations, I have directed CFTC staff to move forward with drafting an event contracts rulemaking. For too long, the CFTC's existing framework has proven difficult to apply and has failed our market participants. That is something I intend to fix by establishing clear standards for event contracts that provide certainty to market participants.

Third, I have directed CFTC staff to reassess the Commission's participation in matters currently pending before the federal district and circuit courts. Where jurisdictional questions are at issue, the Commission has the expertise and responsibility to defend its exclusive jurisdiction over commodity derivatives.

Finally, I have directed CFTC staff to work with our counterparts at the SEC to develop a joint interpretation on Title VII definitions. This effort would draw clearer lines between certain commodity and security options, CFTC-regulated swaps, and SEC-regulated security-based swaps. Clear, coordinated guidance will allow firms to scale products responsibly and reduce the number of innovations that fall into what Chairman Atkins has aptly described as "the no man's land"[6] between our two agencies.

\*\*\*

As the new frontier of finance descends upon us, regulators must relentlessly modernize, harmonize, and future-proof their approach to regulation. But we must not abandon our age-old principles, like investor protection, anti-fraud and anti-manipulation, and market integrity, which remain our north star.

I am honored to partner with Chairman Atkins on Project Crypto and lead the CFTC into this new era —for our financial markets, and for the new frontier of finance.

Thank you very much for your time today. I look forward to the fireside chat to follow.

[1] *Board of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905).

[2] Chairman Paul S. Atkins, *The SEC's Approach to Digital Assets: Inside "Project Crypto"* (Nov. 12, 2025), available at: https://www.sec.gov/newsroom/speeches-statements/atkins-111225-secs-approach-digital-assets-inside-project-crypto.

[3] *Id.*

[4] 89 Fed. Reg. 48968 (June 10, 2024).

[5] CFTC Staff Advisory 25-36 (Sept. 30, 2025).

[6] Chairman Paul S. Atkins, Acting Chairman Caroline D. Pham, *Joint Statement from the Chairman of the SEC and Acting Chairman of the CFTC*, (Sept. 5, 2025), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/phamatkinsstatement090525.