LESTER J. MARSTON
California State Bar No. 081030
THE LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA OF ME-WUK INDIANS, and BUENA VISTA RANCHERIA OF ME-WUK INDIANS<br><br>Plaintiffs,<br>v.<br><br>KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, and DOES 1-20,<br><br>Defendants. | Case No.: 25-cv-06162-JSC<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONEY DAMAGES**<br><br>**[25 U.S.C. § 2710(d)(7)(A)(ii); 15 U.S.C. § 1125(a)(1)(B)]**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. This is an action brought by three (3) federally recognized Indian Tribes, the Blue Lake Rancheria, the Chicken Ranch Rancheria of Me-Wuk Indians, and the Buena Vista Rancheria of Me-Wuk Indians (collectively, the "Tribes"), seeking: (1) a declaration from the Court that the defendants are engaging in illegal sports gambling on the Tribes' reservations; and (2) a preliminary and permanent

injunction against the defendants to prevent them from engaging in illegal sports gambling on the Tribes' respective reservations in violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), the Tribes' Tribal-State Gaming Compacts ("Compacts") with the State of California ("State") entered into pursuant to the IGRA, Secretarial Procedures ("Procedures") issued by the Secretary pursuant to the IGRA, the Tribes' Gaming Ordinances ("Ordinances") approved by the Chairman of the National Indian Gaming Commission pursuant to the IGRA, and the respective Tribal Gaming Commissions' regulations adopted pursuant to the Tribes' federally approved Ordinances and Compacts, all of which prohibit sports gambling on the Tribes' reservations or "Indian Lands" ("Reservations"), as defined by the IGRA.

2. For the majority of this Country's history, gambling on sports has been illegal under federal law and the laws of most states for both moral reasons and to ensure that sporting events are fair and free from gambling-related corruption. In 1992, Congress enacted the Professional and Amateur Sports Protection Act, 28 U.S. Code § 3701 *et seq*., which purported to bar the States (other than Nevada and New Jersey) from authorizing sports betting. In 2018, however, the Supreme Court struck down that Act, recognizing that "Americans have never been of one mind about gambling[,]" and holding that Congress could not lawfully impose such a barrier on state lawmakers. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Since then, most states have legalized sports gambling through licensing and registration regimes that generate much needed tax dollars for states and, typically, require bettors to be 21 years old to place sports bets. Indian tribes, too, have begun to offer sports gambling on their reservations in those states where, consistent with the IGRA, the state permits such gambling under state law.

3. In 2025, the gaming industry shifted significantly. Currently, 18 year old high school students across the United States—including some that are located on Indian reservations—are on their phones placing bets on the outcome of virtually

every sporting event occurring across the globe, without any regulation of that betting by states or Indian tribes or the protective measures related to corruption and problem gambling imbedded in such regulatory schemes, in contravention of federal, state, and tribal law. And they are placing those illegal bets using defendants Kalshi Inc. and KalshiEX LLC, ("Kalshi"), and Robinhood Markets, Inc. and Robinhood Derivatives LLC ("Robinhood").

4. Kalshi claims that it is not offering sports gambling. Kalshi will tell the Court that it is a Designated Contract Market, regulated exclusively by the Commodity Futures Trading Commission ("CFTC"), and is merely operating a "prediction market" that permits the buying and selling of "commodities contracts," or swaps on sporting events. While masquerading as novel commodities and futures products, these event contracts are, substantively, nothing more than illegal, unregulated wagers on the outcomes of sporting events:










5. In 2025, Robinhood partnered with Kalshi to embed Kalshi's prediction markets event contracts directly into the Robinhood internet app. This allowed Robinhood users to place bets or wagers on the outcome of sporting events without leaving Robinhood's brokerage interface, including utilizing the Robinhood app to place a bet or wager on the outcome of physical contests or sporting contests while on the Tribes' Indian lands as defined by the IGRA.

6. As a result, Robinhood substantially contributed to Kalshi's volume of sports gambling, including sports gambling on the Tribes' Indian lands, while

routing order flow to Kalshi's clearinghouse and splitting fees or generated fee revenue per bet or wager made on the Tribes' Indian lands.

7. Contrary to Kalshi's and Robinhood's assertions, Kalshi and Robinhood are engaging in sports gambling as defined by the IGRA and the Tribes' Compacts, Procedures, and Ordinances on the Tribes' Indian lands. Therefore, the Tribes seek an order declaring that Kalshi and Robinhood are engaging in illegal sports gambling on the Tribes' Indian lands and an order from the Court enjoining Kalshi and Robinhood from conducting their illegal sports gambling operation.

8. In addition, the Tribes seek a permanent injunction enjoining Kalshi's and Robinhood's illegal gambling on Indian lands because such gaming is currently unregulated, violates the State's Constitution and penal code provisions, constitutes a crime under 18 U.S.C. § 1166 and directly interferes with the ability of the Tribes to govern themselves under their own laws on their Reservations—land owned by the United States of America in trust for the Tribes.

## JURISDICTION

9. This Court's jurisdiction over the Tribes' claims is based upon the following:

(a) 28 U.S.C. § 1331, in that this action arises under the Constitution and laws of the United States, specifically, the IGRA, 25 U.S.C. § 2710(d)(7)(A)(ii), the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the federal common law;

(b) 28 U.S.C. § 1362, in that the district courts have original jurisdiction of all civil actions brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior ("Secretary"), wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States;

(c) 25 U.S.C. § 2710(d)(7)(A)(ii), in that this is an action initiated by federally recognized Indian tribes to enjoin a class III gaming activity located on Indian lands and conducted in violation of Tribal-State compacts and secretarial

procedures that are in effect;

(d) 15 U.S.C. § 1125(a)(1)(B), in that this action seeks to redress false and misleading statements of fact made in commercial advertising or promotion that misrepresent the nature, characteristics, or qualities of defendant Kalshi's activities.

## VENUE

10. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, in that:

(a) The defendants conduct business within this District;

(b) A substantial part of the events or omissions giving rise to the Tribes' claims occurred in this District; and

(c) Defendants maintain corporate offices within this District.

## PARTIES

11. Plaintiff Blue Lake Rancheria ("Blue Lake") is a federally recognized Indian tribe, organized under the provisions of the Indian Reorganization Act, 25 U.S.C. § 476, under a written Constitution, which has been approved by the Secretary and which designates the Blue Lake Business Council as the governing body of Blue Lake. Blue Lake is the beneficial owner of the Blue Lake Rancheria ("Blue Lake Reservation"), which consists of approximately 26 acres of trust and fee lands located within the exterior boundaries of the Blue Lake Reservation and approximately 5 acres of trust lands that are contiguous with the boundaries of the Reservation in Humboldt County, California. Blue Lake conducts class-III gaming on its Blue Lake Rancheria pursuant to the IGRA, its Secretarial Procedures, and its Gaming Ordinance.

12. Plaintiff Chicken Ranch Rancheria of Me-Wuk Indians ("Chicken Ranch") is a federally recognized Indian tribe organized under a written Constitution, which designates the Chicken Ranch Tribal Council as the governing body of Chicken Ranch. Chicken Ranch is the beneficial owner of the Chicken Ranch Rancheria or reservation ("Chicken Ranch Rancheria"), which consists of

approximately 40 acres of trust and fee lands located within the exterior boundaries of the Rancheria in Tuolumne County, California and approximately 40 acres of trust land that is contiguous with the boundaries of the Reservation. Chicken Ranch conducts class-III gaming on its Chicken Ranch Rancheria pursuant to the IGRA, its Secretarial Procedures, and its Gaming Ordinance.

13. Plaintiff Buena Vista Rancheria of Me-Wuk Indians ("Buena Vista Rancheria") is a federally recognized Indian tribe, organized under a written Constitution, which designates the Buena Vista Rancheria Tribal Council as the governing body of the Tribe. The Tribe is the beneficial owner of the Buena Vista Rancheria ("Buena Vista Reservation"), which is located in Amador County, California. Buena Vista conducts class-III gaming on its Buena Vista Reservation pursuant to the IGRA, its Compact, and its Gaming Ordinance.

14. Defendant Kalshi Inc. is a Delaware corporation headquartered at 594 Broadway, Rm 407, New York City, New York 10012. Plaintiffs are informed and believe, and on that basis allege, that Defendant Kalshi Inc. is the parent company of all other Kalshi entities.

15. Defendant KalshiEX LLC is a limited liability company headquartered at 594 Broadway Rm 407, New York City, New York 10012. Plaintiffs are informed and believe, and on that basis allege, that Defendant KalshiEX LLC is a wholly owned subsidiary of Kalshi Inc. that operates as a commodities exchange.

16. Defendant Robinhood Markets, Inc. is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. Plaintiffs are informed and believe, and on that basis allege, that Defendant Robinhood Markets, Inc. is the parent company of all other Robinhood entities. Robinhood is an investment platform that permits trading on stocks, Exchanged Traded Funds ("ETFs"), and other commodities. As relevant here, Robinhood has partnered with Kalshi to open—on the Robinhood investment platform—a prediction market hub, allowing persons located both on and off the Tribes' respective Reservations to place

illegal, unregulated sports book wagers on the outcome of sporting events, in the form of "event contracts."

17. Defendant Robinhood Derivatives LLC is a limited liability company headquartered at 85 Willow Road, Menlo Park, California 94025. Plaintiffs are informed and believe, and on that basis allege, that Defendant Robinhood Derivatives LLC is a wholly owned subsidiary of Robinhood Markets, Inc. It is a futures commission merchant and provides options on futures trading. As relevant here, it is the subsidiary of Robinhood that has partnered with Kalshi to offer a prediction market hub that allows persons to engage in illegal sports gambling by placing illegal, unregulated wagers on the outcome of sporting events in the form of event contracts on the Tribes' Reservations.

18. The above-named Defendants are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 20, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiffs will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

## GAMING ON INDIAN LANDS PURSUANT TO THE INDIAN GAMING REGULATORY ACT

19. Courts have long recognized that Congress has "exclusive authority" over Indian affairs. *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 788-90 (2014). This exclusive authority is rooted in the Indian Commerce Clause (art. I, § 8, cl. 3) and the Supremacy Clause (art. VI, cl. 2) of the Constitution, which gives Congress "the exclusive and absolute power to regulate commerce with the Indian tribes, — a power as broad and as free from restrictions as that to regulate commerce with foreign nations." *United States v. Forty-Three Gallons of Whiskey,* 93 U.S. 188,

194 (1876); *Worcester v. Georgia* 31 U.S. 515, 551-57, 558–60 (1832); *Seminole Tribe v. Fla.,* 517 U.S. 44, 62 (1996).

20. The Indian Commerce Clause authorizes Congress "[t]o regulate Commerce . . . with the Indian Tribes." Art. I, §8, cl. 3. The United States Supreme Court has interpreted the Indian Commerce Clause to reach not only trade, but certain "Indian affairs," as well. *Cotton Petroleum Corp. v. New Mexico*, 490 U. S. 163, 192 (1989).

21. The Supreme Court does not treat the Indian Commerce Clause as interchangeable with the Interstate Commerce Clause. *Id.* Unlike the Interstate Commerce Clause, where States retain "some authority" over trade, the Supreme Court has ruled that "virtually all authority over Indian commerce and Indian tribes" lies with the Federal Government. *Seminole Tribe of Fla.*, 517 U. S. at 62.

22. From this exclusive authority the Supreme Court has held that there arises and exists a trust relationship between the United States and the Indian tribes that informs and restrains the Congressional exercise of legislative power. *United States v. Mitchell*, 463 U. S. 206, 225-226 (1983). Pursuant to this trust relationship, the Federal Government has "'charged itself with moral obligations of the highest responsibility and trust'" toward Indian tribes. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 296-297 (1942)).

23. Based upon the trust responsibility owed to tribes by the United States, courts presume that when Congress legislates on Indian affairs, its intent towards the tribes is benevolent and federal statutes that arguably would abrogate or abridge tribal rights to self-government are narrowly construed in favor of the tribes retaining them. *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985).

24. For this reason, the Supreme Court has adhered to "the general rules that statutes passed for the benefit of the dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Id.*

25. Applying these canons of statutory construction, the Supreme Court in *California v. Cabazon Band of Indians*, 480 U.S. 202 (1987) ("*Cabazon*"), held that California had no authority to enforce its gambling laws against Indian tribes on their Indian lands. *Cabazon*, 480 U.S. at 221-222.

26. In response to the *Cabazon* decision, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, to create a framework for Indian tribes, states, and the federal government to exclusively and comprehensively regulate tribal gaming on "Indian lands."

27. The purpose of IGRA, set forth in 25 U.S.C. § 2702, is:

> (1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;
>
> (2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and
>
> (3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

28. Under the IGRA, if the gaming activity is not specifically prohibited by Federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity: (1) Indian tribes and the National Indian Gaming Commission ("NIGC") have the **exclusive** right to regulate class II gaming on Indian lands; and (2) the Indian tribes and the states, pursuant to a compact, have the **exclusive** right to regulate class III gaming on Indian lands. 25 U.S.C. § 2701(5) (emphasis added).

29. IGRA defines "Indian lands" as "all lands within the limits of any Indian reservation"; and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual Indian or held by any Indian tribe or individual subject to a restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. §§ 2703(4)(A)-(B).

30. IGRA established a statutory framework for the regulation of Indian gaming, which "expressly pre-empts the field of governance of gaming activities on Indian lands." *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1289 (D.N.M. 1996) (quoting S. REP. No. 100-446 at 6); *Gaming Corporation v. Dorsey & Whitney*, 88 F. 3d 536 (8th Cir. 1996).

31. IGRA divides Indian gaming into three classes, with different regulatory requirements for each class. Class I gaming consists of traditional tribal games for prizes of minimal value connected with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive regulatory jurisdiction of the tribes. Class II gaming consists of bingo, "whether or not electronic, computer, or other technological aids are used in connection therewith," including "pull tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. § 2703(7)(A)(i). Also included in class II gaming are non-banked card games either explicitly authorized by state law or not prohibited by state law and played in conformity with state regulations regarding hours of play and limits on wagers and pot sizes. 25 U.S.C. § 2703(7)(A)(i)-(ii) and (7)(B). Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming," 25 U.S.C. § 2703(8), which includes sports gambling.

32. Class III gaming can be the most lucrative form of gaming. It includes the games played in a typical casino in Las Vegas, such as slot machines, craps, roulette, and house banked and percentage card games, like blackjack (21).

33. The federal regulations adopted by the NIGC, which implement IGRA, specifically state that class III gaming includes "[a]ny sports betting and pari-mutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4(c).

34. While federal regulations define class III gaming as including all house banked games, 25 C.F.R. § 502.4(a), the regulations separately state that sports betting constitutes class III gaming without reference to whether the wagering is house banked. 25 C.F.R. § 502.4(c).

35. Thus, sports betting constitutes a class III gaming activity regardless of whether the wager is made against the house or against other bettors.

36. Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the tribe must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chairman of the NIGC (the federal regulatory agency created under IGRA); (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

37. In order to go into effect, a tribal-state class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by operation of law, 25 U.S.C. § 2710(d)(8)(C), and notice of approval must be published in the Federal Register, 25 U.S.C. § 2710(d)(3)(B).

38. Gaming conducted by any person or entity on Indian lands that is not authorized by a tribal-state class III gaming compact violates IGRA and federal and state criminal law. *See* 18 U.S.C. §1166 (applying "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions" to Indian country). *See also Coeur D'Alene Tribe v. State*, 842 F. Supp. 1268, 1282 (D. Idaho 1994) ("Accordingly, the court finds that in the

absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity . . . may conduct Class III gaming on the reservation.”).

39. Any class II or class III gaming conducted by a third party management company on Indian lands on behalf of a tribe with a compact must meet the strict requirements of IGRA, 25 U.S.C. § 2710(d)(9) and 25 U.S.C. § 2711, in order to conduct that gaming. Further, any contract authorizing a third party management company to conduct gaming on Indian lands on behalf of a tribe must be approved by the Chairman of the NIGC. *Id. See also* 25 C.F.R. § 533.

40. IGRA provides tribes an enforcement mechanism to prevent gaming from being conducted on Indian lands that is not authorized by a tribal-state compact. “The United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under [IGRA] that is in effect . . . .” 25 U.S.C. § 2710(d)(7)(A)(ii).

41. In addition, tribes and states, as part of the compact negotiation process, can agree to transfer the United States’ “exclusive” criminal jurisdiction to enforce the provisions of the Tribes’ Compacts to the State, allowing the states who are parties to the compact to bring criminal charges against any person, organization or entity, that conducts any class III gaming on a tribe’s Indian lands in violation of the state gambling laws. 18 U.S.C. § 1166(d).

## <u>THE TRIBES’ COMPREHENSIVE REGULATION OF GAMING</u>

### A. The Tribes’ Regulation of Gaming Under Their Compacts.

42. Each of the plaintiff Tribes conducts class III gaming on their respective Reservations. The Blue Lake Rancheria and Chicken Ranch Rancheria conduct their gaming pursuant to Secretarial Procedures issued by the Department of the Interior on January 31, 2024. The Buena Vista Rancheria conducts its gaming pursuant to a class-III gaming compact. Buena Vista entered into its Compact with the State in 2000, which has been subsequently extended twice.

43. The Procedures and Compact incorporate the Tribes' gaming ordinances into the compact/procedures to afford the Tribes primary responsibility for the regulation of their gaming facilities and activities to ensure the fairness of the playing of the class III games, to shield the games from criminal activity, to ensure that the Tribes are the primary beneficiaries of the gaming activities, and to promote tribal economic development and self-sufficiency. To achieve these objectives, the Procedures and Compacts promote ethical practices in conjunction with class III gaming through the licensing and control of persons and entities employed in, or providing goods and services to, the tribal gaming operations, protect against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal governmental gaming, and protect the patrons and employees of their gaming facilities.

44. The Procedures and Compacts thus regulate class III gaming on the Tribes' Indian lands to ensure compliance with IGRA, tribal Gaming Ordinances, and the NIGC and Tribal Gaming Commissions' regulations and minimum internal control standards. Through that regulated class III gaming, the procedures and compact enable the Tribes to develop self-sufficiency, promote tribal economic development, and create jobs and generate revenues to support the Tribes' governments and their governmental services and programs. Relevant to the Tribes, tribal governmental gaming is the primary source of revenue funding the Tribes' governments and their governmental services and programs.

45. Under their Procedures and Compacts, the Tribes are authorized to operate slot machines, lottery games, and banked and percentage card games at their casinos. However, because California has not specifically authorized and affirmatively prohibits betting on the outcome of physical contests or sporting events (other than pari-mutuel wagering on horse racing) the State consistently has refused to negotiate the inclusion of sports betting in Tribal-State compacts and, as a result,

no Indian tribe in California, including the Plaintiff Tribes, offer sports betting on their Indian lands, and betting on the outcome of sporting events would constitute a violation of the Tribes' Compacts and Procedures, the civil regulatory provisions of IGRA, and 18 U.S.C. § 1166.

46. By making its sports wagering contracts available on the Tribes' Indian lands, and offering for play to the general public the class III game of sports betting, the Defendants are violating the Tribes' Compacts and Procedures, Gaming Ordinances, and Gaming Commissions' regulations, and directly interfering with and impairing the Tribes' sovereign right to regulate gaming on their Reservations.

**B. The Tribes' Regulation Of Gaming Under their Gaming Ordinances.**

47. Pursuant to the IGRA and the Tribes' own inherent sovereign authority, each of the Tribes have enacted Gaming Ordinances, that have been approved by the Secretary, comprehensively regulating gaming activities on the Tribes' Reservations.

48. Each Ordinance establishes a Tribal Gaming Commission ("TGC") with the authority to adopt and enforce regulations that establish comprehensive minimum internal control standards for the playing of all games conducted on the Reservations, including but not limited to the rules for the playing of the games and approval and testing of the equipment used in the playing of the games.

49. In addition, each Ordinance requires every person, organization, and entity involved in gaming activities on the Tribe's Indian lands to go through detailed criminal history and background check and obtain gaming licenses issued by the TGC verifying that the licensee is not involved in or associated with any criminal activity.

50. Finally, each Ordinance and the Tribes' TGC regulations specify what games can be played on the Tribes' Reservations and prohibit the playing of any

class III game, including sports gambling, that is not expressly authorized by the Tribes' Compacts, Procedures, or Ordinances.

**KALSHI'S ILLEGAL SPORTS GAMBLING ON THE TRIBES' RESERVATIONS**

51. The Defendants are engaging in illegal sports gambling on the Tribes' Reservations disguised as event contracts that allow people to speculate on the outcome of a sporting event. Event contracts usually pose a binary, yes-or-no question as to whether the underlying event will happen. Event contracts are governed by the Commodities Exchange Act, 7 U.S.C. 1, et. seq. ("CEA").

52. Under the CEA, event contracts are a subset of futures contracts, which are derivatives contracts for the sale and purchase of a specified asset or basket of assets, including event contracts, at a specified price on a specified future date.

53. A derivative is a financial instrument or contract whose price is directly dependent upon (i.e., derived from) the value of one or more underlying assets — for example, commodities (like corn and wheat), securities, or debt instruments. Derivatives take many forms, including futures, options, and swaps. Derivatives allow the purchaser to take on exposure to an underlying asset without actually requiring a direct investment in the asset.

54. Simply put, futures contracts are agreements to buy or sell a specific commodity or asset at a predetermined price at a predetermined date. U.S. law defines "commodity" broadly to include physical goods (agricultural products, metals, energy, etc.) as well as broad categories of intangibles (services, rights, and interests in which futures contracts are traded). 7 U.S.C. § 1a(9).

55. In 2000, Congress passed the Commodity Futures Modernization Act ("CFMA"), which amended the CEA and introduced new legal categories of commodities: *excluded commodities* and *exempt commodities*. An "excluded commodity" was defined to include various financial indices and, importantly,

occurrences or contingencies beyond the control of the contracting parties that are associated with financial or economic consequences. 7 U.S.C. §§ 1a(19)–(20).

56. In effect, 7 U.S.C. § 1a(19) brought certain event-based phenomena, such as weather events or other contingencies, into the fold of regulated derivatives, classifying them as commodities on which futures or swaps could be based.

57. In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Dodd-Frank § 745(b) expanded the CEA to add Section 5c(c)(5)(C), sometimes called the "special rule for event contracts." *See* Brian Quintenz, *Any Given Sunday*, Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts (March 25, 2021) ("Quintenz Statement").[1]

58. This provision expressly empowered the CFTC, an independent federal agency created by Congress in 1974 under "The Commodity Futures Trading Commission Act," 7 U.S.C. § 4, to regulate financial derivative markets in accordance with the CEA, 7 U.S.C. § 1 *et seq*. and 17 C.F.R. § 1 *et seq*., and authorized the CFTC to prohibit certain types of derivatives contracts if it finds them "contrary to the public interest," specifically naming certain categories. *See* 7 U.S.C. § 7a-2(c)(5)(C).

59. Pursuant to this authority, in 2011, the CFTC promulgated Regulation 17 C.F.R. § 40.11, titled *"Review of event contracts based upon certain excluded commodities*," which formalized the review process for event contracts. Regulation 40.11 mirrored the substance of the statutory language and set out the procedure for the Commission to block an event contract. Subsection (a)(1) of Regulation 40.11 establishes a clear prohibition: "*A registered entity shall not list for trading or accept for clearing*" any contract "based upon an excluded commodity, as defined in [the CEA], that involves, relates to, or references terrorism, assassination, war, **gaming**, or an activity that is unlawful under any State or Federal law." *Id.* (emphasis added).

---

[1] https://www.cftc.gov/PressRoom/SpeechesTestimony/quintenzstatement032521

Any event contract that falls into one of those sensitive categories is thus *per se* barred from being listed by a registered entity.

60. Consistent with the findings and purpose of the CEA, the CFTC promulgated regulations that allow registered entities to self-certify event contracts through 17 C.F.R. § 40.2 and where self-certified products or contracts present compliance issues, the self-certifying registered entity must provide a "concise explanation and analysis that is complete" concerning "the underlying commodity, and the [contract's] compliance with applicable provisions of the [CEA], including core principles, and the [CFTC] regulations thereunder." 17 C.F.R. § 40.2(a)(3)(v).

61. 17 C.F.R. § 40.11(c) established a 90-day review process: if an exchange, like Kalshi, self-certifies a new event contract that may violate Regulation 40.11(a), the Commission can stay the listing for up to 90 days while it evaluates the contract and then issue an order approving or disapproving it. *Id*.

62. Thus, by 2011, the regulatory structure was in place to address the rise of event contracts, which previously fell into a gray area between regulated futures and mere wagers.

63. Until recently, the CFTC's consistent stance has been to prohibit contracts that it views as "gaming" or betting-type events, while permitting other event-based contracts.

64. At bottom, the purchase or sale of a "true" futures contract on an exchange is motivated by two economic purposes: (1) the opportunity to make a profit or (2) to minimize the risk of loss from a change in the market price or the happening of an event.

65. Thus, "true" futures contracts, and the purposes for which they are traded, "serve[] legitimate hedging and price discovery functions, thereby facilitating production of the underlying commodity." *Bd. of Trade v. SEC*, 677 F.2d 1137, 1151 (7th Cir. 1982). "Indeed, one basic justification for a futures market is that futures trading in a central location performs a 'price discovery' function for the

underlying commodity, thereby furnishing producers and users a reference point for their pricing on the cash market." *Id*. at 1173 n.15.

66. This is, ultimately, what differentiates "true" commodities futures contracts from gambling on a sporting event. While gambling *via* an event contract on next year's rainfall measures allows a wheat farmer to hedge against the risk of a low production year in the event of a lack of rain, betting on whether the 49ers will win the Super Bowl serves no hedging or other economic purpose. Nor does it perform any price discovery function on an underlying commodity because there is no underlying commodity and therefore no derivative market. It is simply gambling on sports. And it is offered, unabashedly, by the Defendants, to the public, as such, even within states and Indian reservations that strictly prohibit sports betting.

67. In resorting to this legal fiction, the Defendants seek to blur the distinction between careful minimization and allocation of market risk and what, in reality, amounts to unregulated sports gambling, to such an extent that the preexisting regulatory regime that distinguishes futures from off-exchange betting cannot restrict their business.

68. Such a result runs directly contrary to Congress's intent in enacting the 2010 amendments to the CEA to specifically give the CFTC the authority to prohibit sports wagering contracts, which — categorically — do not fulfill the economic purposes for which "true" futures contracts are permitted, but regulated:

> Mrs. FEINSTEIN. I am glad the Senator is restoring this authority to the CFTC. I hope it was the Senator's intent, as the author of this provision, to define "public interest" broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used predominantly by speculators or participants not having a commercial or hedging interest. Will CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use?
>
> Mrs. LINCOLN. That is our intent. The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. **These types of**

> **contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.**

156 Cong. Rec. S5906-07, (daily ed. July 15, 2010)(emphasis added).

69. The Defendants' operations quite clearly "construct an 'event contract' around sporting events such as the Super Bowl" and, therefore, serve no real commercial purpose. Rather, they are used solely for gambling, in direct violation of the CEA and its implementing regulations and as shown above the IGRA, and the Tribes' Procedures, Compacts, Ordinances and TGC's regulations.

70. Because the Defendants' contracts are not futures contracts but instead simply gambling on sports, as defined by the Tribes' Compacts, Procedures, Ordinances and state law, which does not "permit" any entity within the State, to offer for play within the State sports betting, Defendants offering of the contracts to the general public for play on the Tribes' Indian lands violates the IGRA.

71. By making its sports wagering contracts available on the Tribes' Indian lands, and offering sports betting to the general public, the Defendants are not only violating each of the Tribes' Procedures, Compacts, Ordinances, and TGC regulations, but they are also directly interfering with and impairing the Tribes' sovereign right to regulate gaming on their Indian lands.

72. Furthermore, by illegally offering its sports wagering contracts to persons located both on and off of the Tribes' Indian lands in California, the Defendants draw business away from the Tribes' casinos by allowing patrons to participate in class III gaming from their homes. Loss of revenue has a direct impact on tribal governmental functions and has a tangible effect on the services and programs the tribal governments provide to their members and all persons who live, work, and visit the Tribes' Indian lands.

73. Each of the Tribes' Gaming Commissions have conducted investigations on the Tribes' Indian lands to verify whether the Defendants are engaging in sports gambling on the Tribes' Indian lands. The Gaming Commissions'

investigators have repeatedly accessed the Defendants' "Kalshi App" and placed bets on the Tribes' Indian lands. Based upon these investigations, the Tribes' Gaming Commissions have been able to verify that the Defendants have offered and continue to offer their sports event contracts to consumers on the Tribes' Indian lands with the knowledge that their sports event contracts undercut tribal class III gaming markets, in violation of IGRA, the Tribes' Compact and Procedures, and their Gaming Ordinances over which Congress, the federal, state, and tribal governments exercise exclusive regulatory jurisdiction.

## KALSHI'S EVASION OF CFTC REGULATION

74. In 2020, the CFTC authorized Kalshi to list event contracts for public trading as a DCM. *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *4.

75. On June 12, 2023, Kalshi filed a self-certification to trade congressional control contracts, which allowed buyers to predict which political party will control the U.S. House of Representatives or Senate on a specific, future date, and took the form of a binary, "yes/no" event contract that posed the question: "Will <chamber of Congress> be controlled by <party> for <term>?" *KalshiEX LLC*, 2024 WL 4164694, at *4.

76. On June 23, 2023, the CFTC sent a letter to Kalshi representing that it had exercised its authority to initiate a 90-day review of Kalshi's self-certified submission because it determined that the contracts "may involve, relate to, or reference an activity enumerated" in the CEA and applicable regulations. *KalshiEX LLC*, 2024 WL 4164694, at *4; Notification of 90-day Review (June 23, 2023)[2]; Release Number 8728-23, *CFTC Announces Review of Kalshi Congressional Control Contracts and Public Comment Period* (June 23, 2023).[3]

77. On September 22, 2023, at the conclusion of the 90-day review period, the CFTC issued an order prohibiting Kalshi from listing its congressional control

[2] https://www.cftc.gov/sites/default/files/filings/ptc/23/06/ptc0623230001.pdf.
[3] https://www.cftc.gov/PressRoom/PressReleases/8728-23.

contracts for trading pursuant to 17 C.F.R. § 40.11, consistent with 7 U.S.C. § 7a-2(c)(5)(C). *KalshiEX LLC*, 2024 WL 4164694, at *5. In its order the CFTC determined that Kalshi's congressional control contracts involve two activities enumerated in the special rule: gaming and unlawful activity. *KalshiEX LLC*, 2024 WL 4164694, at *5. As a result, the CFTC found that Kalshi's congressional control contracts were contrary to the public interest. *KalshiEX LLC*, 2024 WL 4164694, at *6; CFTC Order (September 22, 2023)[4]; Release Number 8780-23, *CFTC Disapproves KalshiEX LLC's Congressional Control Contracts* (September 22, 2023).[5]

78. On November 1, 2023, Kalshi initiated litigation against the CFTC, challenging the CFTC determination, *inter alia*, that Kalshi's congressional control contracts were contrary to the public interest because the contracts involve gaming.

79. In this litigation, Kalshi identified "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" as "precisely what Congress had in mind as 'gaming' contracts." Pl.'s Mem. of Law in Supp. of Pl.'s Mot. Summ. J. at 23, *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 1:23-cv-3257 (JMC) (D.D.C.), Dkt. No. 17.

80. Additionally, in the *KalshiEX LLC* litigation, the Court acknowledged the potential application of the IGRA in supplying a definition of "gaming" as codified in, but not defined by, the CEA and implementing regulations. *KalshiEX LLC*, 2024 WL 4164694, at *9 ("And while the CFTC's order also considered and pulled definitions from a federal statute, it did not look to the only one that the Court is aware actually uses the term 'gaming'—the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701.").

81. June 10, 2024, the CFTC proposed rule-amendments to 17 C.F.R. Part 40, to "specify types of event contracts that fall within the scope of CEA section

[4] https://www.cftc.gov/sites/default/files/filings/documents/2023/orgkexkalshiordersig230922.pdf.
[5] https://www.cftc.gov/PressRoom/PressReleases/8780-23.

5c(c)(5)(C) and are contrary to the public interest." Event Contracts, 89 Fed. Reg. 48968-01, *48969. The proposed rule-amendments repeatedly acknowledge the CFTC's limited resources. "From a resource allocation perspective, this [rule-amendment] will be of significant benefit to the Commission and its staff, since, in the Commission's experience, a single § 40.11(c) review is resource-intensive and consumes hundreds of hours of staff time." *Id*. The rule-amendments were never finalized.

82. On January 7, 2025, CFTC Chairman, Rostin Behnam, announced that he would step down from the position of Chairman on January 20, 2025, and that Benham's last day at the Commission would be February 7, 2025. Public Statements & Remarks, *Chairman Rostin Behnam Announces Departure from CFTC* (January 7, 2025).[6]

83. On January 13, 2025, Donald Trump, Jr. announced that he was joining Kalshi as a strategic adviser. Brett Samuels, *Trump Jr. joins betting market Kalshi as adviser* (January 13, 2025).[7]

84. On January 22, 2025, Kalshi filed a self-certification to trade sports event contracts, which allowed buyers to predict the winner of a sport event title related to American sports leagues, and took the form of a binary, "yes/no" event contract that posed the question: "Will <team> win <title>?" The self-certification does not mention the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) or that, as a registered entity, Kalshi is prohibited from listing contracts that involve gaming pursuant to 17 C.F.R. § 40.11. The self-certification merely states that it is CEA compliant. Kalshi Notification Regarding the Initial Listing (January 22, 2025).[8]

85. On February 5, 2025, the CFTC announced its intent to hold a public roundtable related to sports-related event contracts. The purpose of the roundtable

[6] https://www.cftc.gov/PressRoom/SpeechesTestimony/behnamstatement010725.
[7] https://thehill.com/business/5082357-trump-jr-joins-kalshi-prediction-market/.
[8] https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf.

was to "establish a holistic regulatory framework that will both foster thriving prediction markets and protect retail customers from binary options fraud such as deceptive and abusive marketing and sales practices."[9] The roundtable was to include topics such as: "CFTC-registered entities' legal arguments in court that event contracts based on games or sports contests or sporting events constitute 'gaming' and are therefore prohibited under the Commodity Exchange Act," as well as "other issues including but not limited to Constitutional questions such as the Commerce Clause, States' rights and State regulatory schemes, Federalism, Federal preemption doctrines, and Tribal sovereignty as well as other federal laws applicable to sports betting." Release Number 9046-25, CFTC Announces Prediction Markets Roundtable (February 5, 2025).[10] The roundtable was then subsequently cancelled without explanation. Dustin Gouker, *News: CFTC Cancels Prediction Markets Roundtable*, Event Horizon (April 24, 2025).[11]

86. On February 7, 2025,[12] Kalshi filed a self-certification to trade sports event contracts, which allowed buyers to predict the winner of a sport event title related to American sports leagues, and took the form of a binary, "yes/no" event contract that posed the question: "Will <team> win <event>?" The self-certification does not mention the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) or that, as a registered entity, Kalshi is prohibited from listing contracts that involve gaming pursuant to 17 C.F.R. § 40.11. The self-certification merely states that it is CEA compliant. Kalshi Notification Regarding the Initial Listing (February 7, 2025).[13]

87. On February 11, 2025, President Donald Trump nominated Brian Quintenz, a Kalshi Board Member, to replace Rostin Behnam as the Chairman of the CFTC. Quintenz, in a statement concerning the CFTC's review of ErisX futures

[9] https://www.cftc.gov/PressRoom/PressReleases/9046-25
[10] https://www.cftc.gov/PressRoom/PressReleases/9046-25.
[11] https://nexteventhorizon.substack.com/p/news-cftc-cancels-prediction-markets.
[12] This is the same day former Chairman Behnam exited the CFTC.
[13] https://www.cftc.gov/sites/default/files/filings/ptc/25/02/ptc02072514957.pdf.

contracts involving NFL football games on March 25, 2021, asserted that the CEA "special rule," 7 U.S.C. § 7a-2(c)(5)(C), is unconstitutional, that the CFTC regulation, 17 C.F.R. § 40.11 is invalid, that the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) and 17 C.F.R. § 40.11 are not, in fact, prohibited and that "the Commission is not a moral arbiter. It is not expert [sic] in determining what the [sic] is in the public's interest, and it is certainly not equipped to tell the public what its interest *should* be." Quintenz Statement, *supra*.

88. Quintenz also stated: "Interestingly, the statute also does not require the Commission to make any determinations on these contracts at all. It is completely up to the Commission to decide whether and when to review an enumerated event contract or set of contracts for a public interest determination. If the Commission made no public interest determinations pursuant to this statutory section, it would nonetheless be following the law." Quintenz Statement, *supra*.

89. On March 7, 2025, the Major League Baseball ("MLB") wrote a letter to the CFTC expressing concerns about sports event contracts. The MLB stated: "As the resemblance between sports event contracts and traditional sports betting markets continues to grow, so too does the need to replicate the integrity and consumer protections that exist at the state level. Currently, those protections are lacking."[14]

90. On March 17, 2025, Robinhood and Kalshi announced their expanded partnership and launched an in-app sports gambling market hub to offer March Madness sports event contracts. Kalshi's CEO, Tarek Mansour stated: "[we] couldn't ask for a better partner in Robinhood to bring our vision to every American." Tom Nightingale, *Robinhood launches Kalshi-powered sports markets, starting with March Madness*, SBC Americas (March 17, 2025).[15]

91. On May 16, 2025, interim Chairman of the CFTC, Caroline Pham

---

[14] https://www.cftc.gov/media/11941/MLB030725/download (last visited June 24, 2025).
[15] https://sbcamericas.com/2025/03/17/robinhood-kalshi-sports-event-contracts/.

signaled her intent to leave the CFTC once Quintenz is confirmed to the appointment of the CFTC Chairman, leaving only Quintenz and commissioner Kristin Johnson on the Commission. Jesse Hamilton, *CFTC's Pham Said to Plot Exit, Agency May Be Left Without a Party Majority*, Coin Desk (May 16, 2025).[16]

92. On May 21, 2025, Quintenz submitted an ethics statement to the CFTC, confirming that Quintenz was employed by Kalshi and held stock and unvested stock options in Kalshi. Brian Quintenz, Ethics Statement to CFTC at 2 (May 21, 2025).[17]

93. On May 28, 2025, CFTC Commissioner Kristin Johnson signaled her intent to leave the CFTC "later this year," leaving Quintenz as the sole commissioner. Julia Shapero, *CFTC leaders exit as Trump pick prepares to take helm*, The Hill (May 28, 2025).[18]

94. On information and belief, Kalshi has been prolific in offering sports event contracts with the knowledge that the legality of their sports event contracts is highly questionable and widely criticized as an impermissible form of sports gaming or gambling, at a time when power in the CFTC is being consolidated in one commissioner, Quintenz, a Kalshi board member, with the knowledge that the CFTC is understaffed and lacks the resources to adequately review and regulate Kalshi's self-certified contracts to ensure compliance with the CEA.

95. As a direct result of these events, the Defendants have been able to avoid regulation of their sport gambling activities by the CFTC.

## <u>KALSHI'S FALSE AND MISLEADING ADVERTISING</u>

96. On March 30, 2026, Kalshi disseminated on X an advertisement stating: "We aren't the house. Kalshi is a federally regulated exchange where you trade against other users. We make money on transaction fees, not market settlements."

---

[16] https://www.coindesk.com/policy/2025/05/14/cftc-s-pham-said-to-plot-exit-agency-may-be-left-without-a-party-majority.

[17] https://extapps2.oge.gov/201/Presiden.nsf/PAS+Index/009D247776338CD385258C95002C929F/$FILE/Quintenz%2C%20Brian%20D.%20%20finalEA.pdf.

[18] https://thehill.com/newsletters/technology/5322818-cftc-leaders-exit-as-trump-pick-prepares-to-take-helm/.

(the "House Advertisement"). Exhibit A. As of November 3, 2026, the House Advertisement remains publicly accessible.

97. In gambling, "the house" refers to a casino or sportsbook operator, or a person aligned with it, that takes the opposite side of a customer's wager and profits when the customer loses. By stating "We aren't the house," Kalshi represented to consumers that no one aligned with Kalshi takes the opposite side of their wagers, that their counterparties are other users like themselves, and that Kalshi does not profit when they lose.

98. The House Advertisement described Kalshi in the language of financial markets ("a federally regulated exchange," "trade," "users," "transaction fees") and contrasted it with the language of gambling ("the house"). In doing so, it conveyed to consumers that what they do on Kalshi is trading on a financial exchange rather than gambling, and that the absence of a house is what makes the difference.

99. Whether or not a house is involved, Kalshi's customers do what gamblers do: they stake money on the outcome of a sporting event for the chance of a payout. Wagering against other bettors rather than a house is still gambling. In pari-mutuel wagering on horse racing, for example, bettors wager against one another, their stakes are pooled, winners are paid from the pool, and the operator takes a commission. Federal regulations likewise classify "[a]ny sports betting and parimutuel wagering" as class III gaming and define gaming activity by the elements of "chance, consideration, and prize or reward." 25 C.F.R. §§ 502.4(c), 293.2(d).

100. Kalshi's sports event contracts contain each element of gambling. A customer pays to take a position (consideration) on the outcome of a sporting event (chance) and receives a payout if that outcome occurs (prize). The Ninth Circuit has concluded that the substance of Kalshi's sports event contracts is sports gambling, and that they are likely class III gaming when entered on Indian lands. *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846 (9th Cir. August 28, 2026), and that

they are likely class III gaming when entered on Indian lands, *Blue Lake Rancheria v. Kalshi, Inc.*, No. 25-7504, 2026 WL 2728466 (9th Cir. September 16, 2026).

101. Setting aside whether wagering on Kalshi is gambling, the House Advertisement's assurance that customers "trade against other users" raises a further question: who actually stands on the other side of a Kalshi customer's trade. That question would be difficult for anyone to answer, including someone familiar with financial markets. The answer depends on Kalshi's market-maker designations and incentive programs, its affiliated clearinghouse, its affiliated trading company, and, for Combos, a separate request-for-quote process. Understanding how those pieces fit together requires working through technical rules on derivatives clearing and market making. Even then, a customer could not tell who is on the other side of any particular trade, because trading on Kalshi's order book "is conducted on a fully anonymous basis." KalshiEX LLC Rulebook, Rule 5.7(a) (Version 1.29) (accessed November 4, 2026) ("Kalshi Rulebook"). The House Advertisement replaced that complexity with a simple answer: "other users."

102. Kalshi chooses, obligates, and rewards the market makers that take the other side of its customers' trades. Under Kalshi's rulebook, Kalshi has "sole discretion" to decide who becomes a Market Maker, and may end that status "at any time and for any reason." Kalshi Rulebook, Rules 4.1(b), (e). Market Makers must maintain "two-sided markets within a defined spread and with a minimum depth." Rule 4.4(b). In return, they may receive "financial benefits, reduced fees, differing Position Limits and Position Accountability Levels, and enhanced access." Rule 4.3.

103. Kalshi's website lists the markets in which its market makers trade. They include markets on NFL games, the Super Bowl, and which players will score touchdowns; NBA, NHL, and MLB games and championships; college basketball games and the NCAA tournament; the Men's World Cup; Premier League, Champions League, and other European soccer matches; professional tennis, golf, NASCAR, and UFC. For each, Kalshi lists a market-maker "Availability" of "98%

of each 1h increment." Kalshi, How to Become a Market Maker on Kalshi, Kalshi Help Center (April 28, 2026) (accessed November 4, 2026). As a result, in Kalshi's sports markets, a market maker Kalshi has chosen and rewards is positioned to take the other side of customers' trades nearly all the time.

104. Beyond its market makers, Kalshi pays participants to supply the orders its customers trade against. Kalshi's rulebook authorizes it to run incentive programs that reward participants for trading on its exchange. Kalshi Rulebook, 3.13(f). Under Kalshi's Liquidity Provider Program, members who have signed a Market Maker Agreement may be designated as "Designated Liquidity Providers" for markets Kalshi selects, and receive rewards set through an auction. Kalshi also runs a Liquidity Incentive Program, which rewards participants for posting orders across Kalshi's markets.

105. The market makers Kalshi recruits include some of the largest trading firms in the world. On April 3, 2024, Kalshi announced that Susquehanna Government Products, LLLP, a member of Susquehanna International Group, would serve as its first dedicated institutional market maker. On information and belief, based on public reporting, Jump Trading also makes markets on Kalshi's exchange and has agreed to acquire an equity stake in Kalshi in connection with its market-making arrangement. Yet Kalshi's help center tells customers that its market makers are "primarily individuals and small institutions." Kalshi, "Who are you trading with?" Kalshi Help Center (accessed November 4, 2026).

106. Kalshi's own companies also stand on the opposite side of its customers' trades. KalshiEX LLC writes the terms of Kalshi's sports event contracts, lists them for trading, markets them, and runs the platform on which they trade. Kalshi Klear LLC, a KalshiEX affiliate registered with the CFTC as a derivatives clearing organization, clears those trades. It holds the money customers deposit to cover their positions, and at settlement pays the holders of winning positions from those funds. Kalshi Rulebook, Rules 5.3(c), 6.1(a), 6.3(d), 8.1(a);

Klear Rules, Rule 6.2(C). Under Kalshi's rules, once orders are matched, each trader's contract runs to Kalshi Klear rather than to the other trader. Kalshi Rulebook, Rules 6.1(c), (e); Klear Rules, Rule 6.1(E). Kalshi Klear's rules acknowledge that its employees "also work for the Kalshi Exchange," and that this affiliation "may present conflicts of interest." Klear Rules, Rule 2.13(D). Kalshi's rulebook also permits Kalshi to charge fees on the settlement of contracts. Kalshi Rulebook, Rules 3.13(c), 6.2.

107. Kalshi also has its own trading company, Kalshi Trading LLC, which trades on Kalshi's exchange. Under Kalshi's rulebook, Kalshi Trading is funded by the same holding company that owns the exchange, trades on "either (or both) sides of a market," and has "profitability" as its "business purpose." Kalshi Rulebook, Rule 2.12(e)(a); *see* Klear Rules, Rule 2.18. On information and belief, that holding company is Defendant Kalshi Inc. Most of the trading on Kalshi's exchange is in sports event contracts. On information and belief, Kalshi Trading has taken the opposite side of customers' trades in sports event contracts, including while Kalshi disseminated the House Advertisement. Each time Kalshi Trading's position prevailed, the customer on the other side lost, and Kalshi Trading gained what that customer lost.

108. Kalshi also offers parlays on sporting events, which it calls "Combos." A Combo combines multiple outcomes, including outcomes across different sporting events, into a single contract that pays only if every outcome resolves in the customer's favor. Kalshi began offering Combos on September 30, 2025. Combos are not traded on Kalshi's central order book. Instead, a customer's Combo is priced through a "request for quote" process, and the participant whose quote is accepted takes the opposite side of the customer's position. On information and belief, the participants who quote Combos are principally Kalshi's market makers.

109. As a result, the participants Kalshi chooses and rewards gain when Kalshi's customers lose. When a customer's sports event contract expires worthless,

the customer's stake funds the payout to the participant on the other side. Kalshi Rulebook, Rule 6.3(a), (d). In Kalshi's sports markets, where its market makers must quote prices nearly all the time, that participant is frequently one of Kalshi's market makers or Kalshi's own trading company. Kalshi rewards its market makers with reduced fees and other benefits, and pays incentives, for supplying the orders its customers trade against.

110. Kalshi has also disseminated, including to consumers in California, advertisements stating "Sports Betting Legal in all 50 States on Kalshi." Exhibit B.

111. On September 7, 2025, the first Sunday of the National Football League regular season, Kalshi shared on its official Instagram account, @Kalshi_official, a post stating: "Breaking News: Sports Betting in California is Now Legal" (the "California Advertisement"). Exhibit C. The California Advertisement did not disclose that sports betting remains illegal in California, or that the legality of Kalshi's sports contracts was then being challenged by state regulators and by the Tribes in this action.

112. Betting on sports events is illegal in California. California Penal Code § 337a prohibits pool selling, bookmaking, and recording, registering, receiving, or holding wagers on the result of any contest. In November 2022, California voters rejected Propositions 26 and 27, which would have authorized sports betting.

113. On July 3, 2025, the California Attorney General issued Opinion No. 23-1001, concluding that wagering on sporting events by persons physically located in California violates Penal Code § 337a, regardless of where the operator and its technology are located, and that the Unlawful Internet Gambling Enforcement Act does not alter that prohibition.

114. In proceedings challenging the legality of its sports event contracts, Kalshi has contended that its product is not sports betting, but swaps subject to the exclusive jurisdiction of the CFTC, and that state laws prohibiting sports betting are preempted as applied to them. On information and belief, Kalshi has never

contended in any court or before any agency that sports betting is legal in California or in all 50 States.

115. Before Kalshi listed its first sports event contract, it represented to federal courts that a contract on the outcome of a sporting event is "[t]he classic example" of a contract involving gaming, and that Congress "did not want sports betting to be conducted on derivatives markets." Appellee's Brief at 41, *KalshiEX*, No. 24-5205. Kalshi's counsel made similar statements at oral argument before the D.C. Circuit on January 17, 2025, five days before Kalshi self-certified its first sports event contract on January 22, 2025. *See* ¶ 109. Oral Argument at 50:22–50:40, *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 24-5205 (D.C. Cir. January 17, 2025).

116. Before Kalshi disseminated the California Advertisement, it received notice that its sports event contracts were alleged to be illegal sports betting. Gaming regulators in several States had sent Kalshi cease-and-desist letters asserting that its sports contracts violated gambling laws. The California Attorney General had issued the opinion described in ¶ 112. On July 22, 2025, the Tribes filed this action. Kalshi then disseminated the California Advertisement.

117. Social media users have understood Kalshi's description of its sports products as "trading" to mean that those products are not gambling and are therefore legal. In a thread on r/Kalshi, a Reddit forum devoted to Kalshi, titled "I'm in California. How is this legal?", a user asked: "Isn't this sports betting?" One user responded: "I think they do it as 'trades' not 'bets.' So same reason why California can have day traders. . . . [T]hat's when I downloaded the app." Another wrote: "It is not sports betting that is why it is legal."[19]

118. In the same thread, a user who identified as "a resident of CA" asked whether he could "bet on sports outcome on Kalshi," and later reported: "Yes already

[19] https://www.reddit.com/r/Kalshi/comments/1i86txe/im_in_california_how_is_this_legal/

using it." *Id.* In another thread on the same forum, a user wrote: "I know Kalshi is a trading app for contracts. Is there a guarantee I will not get into any legal trouble for using there [sic] app in the state?"[20]

119. Social media users have also adopted Kalshi's message that, because there is no house, Kalshi is a trading platform rather than a gambling operation. In an r/Kalshi thread posted in or about August 2026, after Kalshi disseminated the House Advertisement, users wrote that "Kalshi makes money on fees, not when John Gamble loses"; that Kalshi is "sum zero, they only make fees"; that although "half the sub acts like kalshi is a bookie," it is "just a platform that takes a tiny cut every time you click buy"; and that the absence of a house is "exactly what separates prediction markets from sportsbooks, which ARE directionally on the other side [of] trades their own customers take and specifically profit when their customers lose."[21]

120. Each Tribe operates a class III gaming facility in California. The revenue from those facilities fund each Tribe's government and the services it provides its members. Kalshi's sports event contracts are class III gaming. Kalshi and the Tribes therefore compete in the same market: the gaming expenditures of consumers in California. Because sports betting is not otherwise available in California, consumers who want to wager on sporting events choose between Kalshi and other forms of gaming, including the gaming the Tribes offer. A consumer's money spent wagering on Kalshi is money not spent at the Tribes' facilities.

121. The Tribes' patrons are adults in California who spend money on gaming, the same consumers Kalshi's advertisements target. Until at least September 24, 2026, Kalshi's sports contracts were available to those patrons anywhere, including on the Tribes' gaming floors, where the Tribes' gaming commission investigators placed wagers through Kalshi's application. Since Kalshi began

---

[20] https://www.reddit.com/r/Kalshi/comments/1m0c3da/legality_behind_kalshi/

[21] https://www.reddit.com/r/Kalshi/comments/1vdq8d6/comment/p1b1d71/

offering sports contracts in January 2025, consumers persuaded by Kalshi's advertisements that wagering on Kalshi is lawful trading rather than gambling have spent money on Kalshi's sports contracts that they would otherwise have spent at the Tribes' facilities. As a result, the Tribes have lost substantial gaming revenue, in an amount to be proven at trial.

## FIRST CAUSE OF ACTION

**(Violation of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721)**

122. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 121 above and by this reference incorporate each allegation as if set forth herein in full.

123. Gambling in Indian country is criminally prohibited by federal statute, except gaming conducted by a federally recognized Indian tribe in accordance with the IGRA. 18 U.S.C. §1166.

124. IGRA established a statutory framework for the regulation of Indian gaming that expressly preempts the field of governance of gaming activities on Indian lands. *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 543–44 (8th Cir. 1996).

125. Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the tribe must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chairman of the National Indian Gaming Commission ("NIGC"), a federal regulatory agency created under IGRA; (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

126. In order to go into effect, a tribal-state class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by

operation of law, 25 U.S.C. § 2710(d)(8)(C), and notice of approval must be published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B).

127. Federal regulations that implement IGRA define "gaming activity" or "gaming activities" as "the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward." 25 C.F.R. § 293.2(d).

128. Federal regulations that implement IGRA state that class III gaming includes "[a]ny sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4(c).

129. Kalshi and Robinhood are not federally-recognized Indian tribes conducting class III gaming activity pursuant to a Tribal-State Compact, 25 U.S.C. §§ 2710(d)(1)–(2), or Secretarial Procedures. 25 U.S.C. § 2710(d)(7)(B)(vii).

130. Through self-regulation, Kalshi and Robinhood have offered sports event contracts that are explicitly prohibited under 17 C.F.R. § 40.11(a)(1), and Kalshi has admitted that the subject matter of those contracts constitutes gaming.

131. Kalshi's self-certifications of its sports event contracts, pursuant to 17 C.F.R. § 40.2, are defective because the submissions fail to adequately address CEA compliance issues and establish that the prohibited contracts are nevertheless CEA compliant and are, therefore, not contrary to the public interest.

132. Kalshi has an adequate, available remedy for explicit CFTC approval under 17 C.F.R. § 40.3, but has chosen not to avail itself of CFTC approval.

133. Kalshi's and Robinhood's contracts fall outside the permissible scope of the CEA and, therefore, constitute unlawful gambling, a crime in Indian country under 18 U.S.C. § 1166, because the Kalshi app may currently be accessed for the purpose of staking something of value (consideration), on a sports event involving the element of chance, for the purposes of receiving a reward based on the outcome of the event, consistent with the definition of class III gaming activity in 25 C.F.R. § 293.2(d), from locations in Indian country, as defined by IGRA, 25 U.S.C. §§ 2703(4)(A)-(B).

134. As a result, any person over the age of eighteen with a cell phone, tablet, or computer can access the Kalshi app and engage in unlawful gambling on Indian lands.

135. From January 22, 2025, until at least September 24, 2026, Kalshi and Robinhood implemented no geolocation or geofencing measures to prevent sports betting through the Kalshi or Robinhood applications on the Tribes' Indian lands.

136. IGRA establishes a right of action by an "Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact [or Secretarial Procedures] entered into . . . that is in effect," over which the "United States district courts shall have jurisdiction . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii).

137. An actual case or controversy exists between the Tribes and the Defendants, in that the Tribes assert that the Defendants are conducting class III gaming on the Tribes' Indian lands and such conduct violates the Tribes' tribal-state class III gaming Compact/Procedures, and federal, state, and tribal law, while the Defendants contend that its activities do not constitute gaming and, therefore, do not violate IGRA.

WHEREFORE, the Tribes pray as hereinafter set forth below.

## SECOND CAUSE OF ACTION

### (Violation of the Tribes Gaming Ordinances)

138. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 137 above and by this reference incorporate each allegation as if set forth herein in full.

139. The Tribes are sovereign governmental entities that exercise inherent powers of self-government with the jurisdiction and authority to enact their own laws and enforce those laws against both Indians and non-Indians engaging in activities on their Reservations. *United States v. Wheeler*, 435 U.S. 313, 323 (1978); *Water Wheel v. LaRance*, 642 F. 3d 802 (9th Cir. 2011).

140. In enacting the IGRA, Congress expressly granted Indian tribes the right to regulate gaming activities on their respective Reservations through the enactment of tribal gaming Ordinances that would become effective upon the approval of those Ordinances by the Chairman of the NIGC. 25 U.S.C. § 2710(b) and § 2710(d).

141. Pursuant to the IGRA and their inherent sovereign authority, each of the Tribes have enacted gaming Ordinances comprehensively regulating all gaming activities on their Reservations. The enactment of the gaming Ordinances was not only an exercise of the Tribes' own inherent sovereign authority but also an exercise of Congressionally delegated authority granted to the Tribes by Congress with the enactment of the IGRA. *United States v. Mazuire*, 419 U.S. 544 (1975).

142. As such, the Tribes' gaming Ordinances preempt the field of conduct that the Tribes define as gaming in their Ordinances, including any other federal or state law that conflicts with the express provisions of the Ordinances authorized by the IGRA and which also conflicts with the provisions of the CEA. *Fisher v. District Court*, 424 U.S. 383 (1976).

143. Under the Ordinances, the Defendants' sports gambling activities meet the definition of gaming and a class III game that is strictly prohibited under the Ordinances. Pursuant to the Tribes' inherent sovereign authority and congressionally-delegated authority granted to the Tribes by IGRA, the Tribes have jurisdiction to enforce the provisions of their Ordinances against the Defendants, including prohibiting the Defendants from engaging sports betting on their respective Reservation by offering future event contracts.

WHEREFORE, the Tribes pray as hereinafter set forth below.

## **<u>THIRD CAUSE OF ACTION</u>**

### **(Infringement of the Tribes' Sovereignty and Interference with Tribal Self-Governance)**

144. The Tribes reallege each of the allegations set forth in Paragraphs 1

through 142 above and by this reference incorporate each allegation as if set forth herein in full.

145. Kalshi's and Robinhood's sports gambling activities are being conducted in direct violation of the Tribes' duly enacted gaming Ordinances which are incorporated into their gaming compact and procedures and which prohibit sports gambling on their Reservations.

146. By engaging in illegal sports gambling in violation of the Tribes' Ordinances, Kalshi and Robinhood are interfering with and will continue to interfere with the Tribes' ability to govern themselves, their members, and all persons who work, live, and visit their respective Reservations by preventing the Tribes from determining to what extent and under what conditions, if any, persons, organizations, and entities can engage in class III gaming on their Reservations under their laws.

147. In addition, the Tribes are engaged in Tribal governmental gaming. Under the IGRA, expenditure of gaming revenue is comprehensively regulated and the Tribes can only spend their gaming revenue to: (1) fund tribal governmental operations or program; (2) provide for the general welfare of the Tribes' members; (3) promote economic development on their Indian lands; (4) donate to charitable organizations; and (5) help fund the operations of local governments. 25 U.S.C. § 2710(b)(2)(B). All of the Tribes' gaming revenue is used to provide essential governmental services to its members, promote economic development on their Reservations, and help fund local governmental programs that benefit their Reservations.

148. By engaging in their illegal sports gambling activities both on-and-off of the Tribes' reservations, the Defendants have diverted revenue away from the Reservations and reduced the Tribes' governmental revenue forcing the Tribes to begin reducing the level of services and purposes that benefit their members thereby directly interfering in the ability of the Tribes to govern themselves and their members on their reservations.

149. An actual controversy exists between the Tribes and Kalshi and Robinhood, in that the Tribes contend they have the authority to enforce their Ordinances against Kalshi and Robinhood and prohibit them from engaging in sports gambling on their Reservations, while Kalshi and Robinhood assert that the Tribes have no such authority.

150. Kalshi's and Robinhood's past and future actions of violating the Tribes' Ordinances by engaging in sports gambling on the Tribes' Reservations impermissibly interferes with the ability of the Tribes to govern themselves on their Reservations under their own laws. *Williams v. Lee*, 358 U.S. 217 (1959).

151. The Tribes have been irreparably injured by Kalshi's and Robinhood's unlawful sports gambling on their Reservations and unless Kalshi and Robinhood are provisionally and permanently restrained and enjoined from engaging in such illegal gambling the Tribes will be prevented from governing themselves on their Reservations under their own Tribal laws, causing severe and irreparable injury for which the Tribes have no plain, speedy, or adequate remedy at law.

WHEREFORE, the Tribes pray as hereinafter set forth below.

## FOURTH CAUSE OF ACTION

### (False Advertising – Lanham Act, 15 U.S.C. § 1125(a)(1)(B))

152. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 151 above and by this reference incorporate each allegation as if set forth herein in full.

153. The following five elements must be established by a plaintiff in order to make out a claim for false or deceptive advertising on the part of a defendant: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to

be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Servs., Inc.,* 911 F.2d 242, 244 (9th Cir. 1990).

154. The House Advertisement is false or misleading on two independent grounds.

155. First, the House Advertisement conveyed that because there is no house, Kalshi's customers are trading on a financial exchange, not gambling. That message is false. Staking money on the outcome of a sporting event for the chance of a payout is gambling, whether the wager is placed against a house or against other bettors. Kalshi's sports event contracts contain every element of gambling: consideration, chance, and prize.

156. Second, the House Advertisement's statements that Kalshi "[isn't] the house," that customers "trade against other users," and that Kalshi makes money "on transaction fees, not market settlements" are false or misleading. Each customer's contract is with Kalshi Klear, the clearinghouse and a Kalshi company. Kalshi chooses, obligates, and pays the market makers who take the other side of its customers' trades, including in its sports markets. And Kalshi permits it to charge fees on the settlement of contracts.

157. Kalshi also stated in its advertisements that sports betting is legal in California and in all 50 States. In making those statements, Kalshi represented to consumers that it believed them to be true. Kalshi had no good-faith basis for that belief. In every forum, Kalshi has contended that its product is not sports betting, and that state laws prohibiting sports betting would otherwise apply. Before listing its first sports contract, Kalshi told federal courts that a contract on a sporting event is "[t]he classic example" of gaming. And Kalshi disseminated the California Advertisement, which announced as "Breaking News" that "Sports Betting in California is Now Legal," after receiving cease-and-desist letters from state

regulators, after the California Attorney General issued an opinion concluding that sports wagering in California violates state law, and after the Tribes filed this action. No change in California law preceded that announcement. Kalshi's representation that it believed its statements was therefore false.

158. Each of these statements were made in commercial advertising or promotion, disseminated in interstate commerce over the Internet and other media, including to consumers in California, to induce consumers to purchase Kalshi's sports event contracts.

159. Kalshi's advertisements actually deceived, or have the tendency to deceive, a substantial segment of their audience. Social media users have repeated Kalshi's message that its sports products are trading rather than gambling and are therefore legal.

160. The deception is material. Whether an activity is gambling and whether it is legal are each likely to influence a consumer's decision to wager. In a State where sports betting is otherwise unavailable, the claimed legality of sports betting on Kalshi is central to that decision.

161. Kalshi and the Tribes compete for the gaming expenditures of the same consumers in California. Kalshi's sports event contracts are class III gaming and they are available to those consumers throughout California. Until at least September 24, 2026, they were available even on the Tribes' gaming floors. Because sports betting is not otherwise available in California, consumers who want to wager on sporting events choose between Kalshi and other forms of gaming, including the gaming the Tribes offer.

162. As a direct and proximate result of Kalshi's false and misleading advertisements, the Tribes have lost sales and profits at their class III gaming facilities. By persuading consumers that wagering on Kalshi is trading rather than gambling, that no house profits from their losses, and that it is legal in California, Kalshi's advertisements induced consumers to spend money on Kalshi's sports event

contracts that they would otherwise have spent at the Tribes' facilities.

163. The Tribes have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law. Kalshi's geolocation measures restrict wagering on the Reservations, but they do not stop Kalshi's advertisements, which remain publicly accessible or the diversion of California consumers' gaming expenditures from the Tribes' facilities to Kalshi. Lost patronage and the diversion of gaming revenue that funds the Tribes' governments and the services they provide their members cannot be fully measured or remedied by damages. The Tribes are entitled to injunctive relief under 15 U.S.C. § 1116(a). Under 15 U.S.C. § 1117(a), the Tribes are further entitled to recover Kalshi's profits attributable to its false advertising, the Tribes' damages, and the costs of the action.

164. An actual case or controversy exists between the Tribes and Kalshi, in that the Tribes assert that the Kalshi has made false statements of fact in advertisements distributed in interstate commerce in violation of 15 U.S.C. § 1125(a)(1)(B), while Kalshi contends that its advertisements are accurate and comply with 15 U.S.C. § 1125(a)(1)(B).

WHEREFORE, the Tribes pray as hereinafter set forth below.

## **PRAYER FOR RELIEF**

Pursuant to their claims and causes of action alleged herein, the Tribes pray as follows:

1. That the Court declare Kalshi's sports event contracts to be outside the permissible scope of the CEA as self-certified contracts that involve, relate to, or reference gaming in contravention of the prohibition in 17 C.F.R. § 40.11(a)(1) and, therefore, Kalshi's contracts constitute illegal class III gaming activity in violation of 18 U.S.C. § 1166 and 25 U.S.C. §§ 2701-2721;

2. That the Court declare that Kalshi's and Robinhood's conduct is unlawful class III gaming activity in violation of IGRA and, therefore, subject to injunctive relief under 25 U.S.C. § 2710(d)(7)(A)(ii);

3. That the Court declare that Kalshi, as a self-certifying registered entity, self-regulating the products offered on its DCM, is impermissibly regulating an area of Indian commerce, within the field of class III gaming activity in Indian country, outside the permissible scope of the CEA, where IGRA occupies the field of regulation and grants Tribes the exclusive right to regulate class III gaming activity on Indian lands;

4. That the Court declare that the Defendants' gambling activities on the Tribes' Reservations violates the Tribes' Gaming Ordinances, compacts, procedures and constitutes an impermissible interference with the ability of the Tribes to govern themselves on their Reservations under their own laws;

5. That the Court preliminarily and permanently enjoin Kalshi and Robinhood from offering sports events contracts on the Tribes' Indian lands;

6. That the Court order injunctive relief as permitted by 15 U.S.C. § 1116(a), and award damages, including disgorgement of ill-gotten gains, lost profits, costs, and attorneys' fees, as permitted by 15 U.S.C. § 1117(a); and

7. That the Court grants such other and further relief as may be deemed appropriate.

Respectfully Submitted,

DATED: November 4, 2026 RAPPORT AND MARSTON

By: /s/ *Lester J. Marston*

LESTER J. MARSTON, Attorney for the Blue Lake Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians, and the Buena Vista Rancheria of Me-Wuk Indians

# Exhibit A

Kalshi @Kalshi · Mar 30

Rule #3: We aren't the house.

Kalshi is a federally regulated exchange where you trade against other users.

We make money on transaction fees, not market settlements.




13 17 175 43K

# Exhibit B


kalshi_official
Sponsored
Sports Betting Legal in all 50 States on Kalshi
By Jackson Smith, Sports News
4 minute read · Updated 08:17 AM EDT, Thu Jan 23, 2025
2 comments
Kalshi
Install now
92
3
kalshi_official Breaking News: You can now bet on sports in all 50 states with Kalshi

# Exhibit C


Kalshi
kalshi_official
BREAKING NEWS: SPORTS BETTING IN CALIFORNIA IS NOW LEGAL
New York-headquartered prediction market Kalshi has legalized sports betting in all 50 states.
Jeffrey Roger
09/07/25
Kalshi
Install now
Not interested
Interested