LESTER J. MARSTON
California State Bar No. 081030
THE LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA OF ME-WUK INDIANS, and ~~PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS~~BUENA VISTA RANCHERIA OF ME-WUK INDIANS<br><br>Plaintiffs,<br>v.<br><br>KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC., ROBINHOOD DERIVATIVES LLC, and DOES 1-20,<br><br>Defendants. | Case No.:- 25-cv-06162-JSC<br><br>**SECOND~~FIRST~~ AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONEY DAMAGES**<br><br>**[25 U.S.C. § 2710(d)(7)(A)(ii); 15~~8~~ U.S.C. § 1125(a)(1)(B)~~1964~~]**<br><br>**DEMAND FOR JURY TRIAL** |

Formatted: Font: 14 pt

## INTRODUCTION

1. This is an action brought by three (3) federally recognized Indian Tribes, the Blue Lake Rancheria, the Chicken Ranch Rancheria of Me-Wuk Indians, and the ~~Picayune Rancheria of the Chukchansi Indians~~Buena Vista Rancheria of Me-Wuk Indians (collectively, the "Tribes"), seeking ~~a~~: (1) a declaration from the Court

that the defendants are engaging in illegal sports gambling on the Tribes' reservations; and (2) a preliminary and permanent injunction against the defendants to prevent them from engaging in illegal sports gambling on the Tribes' respective reservations in ~~direct~~ violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), the Tribes' Tribal-State Gaming Compacts ("Compacts") with the State of California ("State") entered into pursuant to the IGRA, Secretarial Procedures ("Procedures") issued by the Secretary pursuant to the IGRA, the Tribes' Gaming Ordinances ("Ordinances") approved by the Chairman of the National Indian Gaming Commission pursuant to the IGRA, and the respective Tribal Gaming Commissions' regulations adopted pursuant to the Tribes' federally approved Ordinances and Compacts, all of which prohibit sports gambling on the Tribes' reservations or "Indian Lands" ("Reservations"), as defined by the IGRA.

2. ~~By way of background, f~~For the majority of this Country's history, gambling on sports has been illegal under federal law and the laws of most states for both moral reasons and to ensure that sporting events are fair and free from gambling-related corruption. In 1992, Congress enacted the Professional and Amateur Sports Protection Act, 28 U.S. Code § 3701 *et seq*., which purported to bar the States (other than Nevada and New Jersey) from authorizing sports betting. In 2018, however, the Supreme Court struck down that Act, recognizing that "Americans have never been of one mind about gambling[,]" and holding that Congress could not lawfully impose such a barrier on state lawmakers. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Since then, most states have legalized sports gambling throughh~~orough~~ licensing and registration regimes that generate much needed tax dollars for states and, typically, require bettors to be 21 years old to place sports bets. Indian tribes, too, have begun to offer sports gambling on their reservations in those states where, consistent with the IGRA, the state permits such gambling under state law.

3. In 2025, the gaming industry shifted significantly. Currently, 18 year old high school students across the United States—including some that are located on Indian reservations—are on their phones placing bets on the outcome of virtually every sporting event occurring across the globe, without any regulation of that betting by states or Indian tribes ~~and~~ or the protective measures related to corruption and problem gambling imbedded in such regulatory schemes, in contravention of federal, state, and tribal law. And they are placing those illegal bets using defendants Kalshi Inc. and KalshiEX LLC, (“Kalshi”), and Robinhood Markets, Inc. and Robinhood Derivatives LLC (“Robinhood”).

4. Kalshi ~~will~~ claims that it is not offering sports gambling. Kalshi will tell the Court that it is a Designated Contract Market, regulated exclusively by the Commodity~~ies~~ Futures Trading Commission (“CFTC”), and is merely operating a “prediction market” that permits the buying and selling of “commodities contracts,” or swaps on sporting events. While masquerading as novel commodities and futures products, these event contracts are, substantively, nothing more than illegal, unregulated wagers on the outcomes of sporting events:








5. In 2025, Robinhood partnered with Kalshi to embed Kalshi’s prediction markets event contracts directly into the Robinhood internet app. This allowed Robinhood users to place bets or wagers on the outcome of sporting events without leaving Robinhood’s brokerage interface, including utilizing the Robinhood app to place a bet or wager on the outcome of physical contests or sporting contests while on the Tribes’ Indian lands as defined by the IGRA.

6. As a result, Robinhood substantially contributed tobecame a massive driver of Kalshi's volume of sports gambling, including sports gambling on the Tribes' Indian lands, while routing order flow to Kalshi's clearinghouse and splitting fees or generated fee revenue per bet or wager made on the Tribes' Indian lands.

Formatted: Indent: First line: 0.5"

7. Contrary to Kalshi's and Robinhood's assertions, Kalshi is and Robinhood are engaging in sports gambling as defined by the IGRA and the Tribes' Compacts, Procedures, and Ordinances on the Tribes' Indian lands. Therefore, the Tribes seek an order declaring that Kalshi and Robinhood are engaging in illegal sports gambling on the Tribes' Indian lands and an order from the Court enjoining Kalshi and Robinhood from conducting its their illegal sports gambling operation.

86. In addition, the Tribes seek a permanent injunction enjoining Kalshi's and Robinhood's illegal gambling on Indian lands because such gaming is currently unregulated, violates the State's Constitution and penal code provisions, constitutes a crime under 18 U.S.C. § 1166 and directly interferes with the ability of the Tribes to govern themselves under their own laws on their Reservations—land owned by the United States of America in trust for the Tribes.

///

## JURISDICTION

97. This Court's jurisdiction over the Tribes' claims is based upon the following:

(a) 28 U.S.C. § 1331, in that this action arises under the Constitution and laws of the United States, specifically, the IGRA, 25 U.S.C. at § 2710(d)(7)(A)(ii), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the federal common law;

(b) 28 U.S.C. § 1362, in that the district courts have original jurisdiction of all civil actions brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior ("Secretary"), wherein the

matter in controversy arises under the Constitution, laws, or treaties of the United States;

(c) 25 U.S.C. § 2710(d)(7)(A)(ii), in that this is an action initiated by federally recognized Indian tribes to enjoin a class III gaming activity located on Indian lands and conducted in violation of Tribal-State compacts and secretarial procedures that are in effect;

Formatted: No widow/orphan control

~~(d) 18 U.S.C. § 1964(c), in that this is an action initiated by the Tribes for injuries to their business caused by defendants' violation of the Racketeer Influenced and Corrupt Organizations Act through a pattern of racketeering activity; and~~

(de) 15 U.S.C. § 1125(a)(1)(B), in that this action seeks to redress false and misleading statements of fact made in commercial advertising or promotion that misrepresent the nature, characteristics, or qualities of defendant Kalshi's activities.

**VENUE**

108. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, in that:

(a) The defendants conduct business within this District;

(b) A substantial part of the events or omissions giving rise to the Tribes' claims occurred in this District; and

(c) Defendants maintain corporate offices within this District.

**PARTIES**

119. Plaintiff Blue Lake Rancheria ("Blue Lake") is a federally recognized Indian tribe, organized under the provisions of the Indian Reorganization Act, 25 U.S.C. § 476, under a written Constitution, which has been approved by the Secretary and which designates the Blue Lake Business Council as the governing body of Blue Lake. Blue Lake is the beneficial owner of the Blue Lake Rancheria ("Blue Lake Reservation"), which consists of approximately 26 acres of trust and fee lands located within the exterior boundaries of the Blue Lake Reservation and

Formatted: No widow/orphan control

approximately 5 acres of trust lands that are contiguous with the boundaries of the Reservation in Humboldt County, California. Blue Lake conducts class-III gaming on its Blue Lake Rancheria pursuant to the IGRA, its Secretarial Procedures, and its Gaming Ordinance.

120. Plaintiff Chicken Ranch Rancheria of Me-Wuk Indians ("Chicken Ranch") is a federally recognized Indian tribe organized under a written Constitution, which designates the Chicken Ranch Tribal Council as the governing body of Chicken Ranch. Chicken Ranch is the beneficial owner of the Chicken Ranch Rancheria or reservation ("Chicken Ranch Rancheria"), which consists of approximately 40 acres of trust and fee lands located within the exterior boundaries of the Rancheria in Tuolumne County, California and approximately 40 acres of trust land that is contiguous with the boundaries of the Reservation. Chicken Ranch conducts class-III gaming on its Chicken Ranch Rancheria pursuant to the IGRA, its Secretarial Procedures, and its Gaming Ordinance.

131. Plaintiff Buena Vista Rancheria of Me-Wuk Indians Picayune Rancheria of Chukchansi Indians ("Buena VistaPicayune Rancheria") is a federally recognized Indian tribe, organized under a written Constitution, which designates the Buena VistaPicayune Rancheria Tribal Council as the governing body of the Tribe. The Tribe is the beneficial owner of the Buena VistaPicayune Rancheria ("Buena VistaPicayune Reservation"), which is located in AmadorMadera County, California. Picayune Buena Vista conducts class-III gaming on its Picayune Buena Vista Reservation pursuant to the IGRA, its Compact, and its Gaming Ordinance.

142. Defendant Kalshi Inc. is a Delaware corporation headquartered at 594 Broadway, Rm 407, New York City, New York 10012. Plaintiffs are informed and believe, and on that basis allege, that Defendant Kalshi Inc. is the parent company of all other Kalshi entities.

153. Defendant KalshiEX LLC is a Delaware corporationlimited liability company headquartered at 594 Broadway Rm 407, New York City, New York

10012. Plaintiffs are informed and believe, and on that basis allege, that Defendant KalshiEX LLC is a wholly owned subsidiary of Kalshi Inc. that operates as a commodities exchange.

164. Defendant Robinhood Markets, Inc. is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. Plaintiffs are informed and believe, and on that basis allege, that Defendant Robinhood Markets, Inc. is the parent company of all other Robinhood entities. Robinhood is an investment platform that permits trading on stocks, Exchanged Traded Funds (""ETFs"), and other commodities. As relevant here, Robinhood has partnered with Kalshi to open—on the Robinhood investment platform—a prediction market hub, allowing persons located both on and off the Tribes' respective Reservations to place illegal, unregulated sports book wagers on the outcome of sporting events, in the form of "event contracts."

175. Defendant Robinhood Derivatives LLC is a Delaware corporationlimited liability company headquartered at 85 Willow Road, Menlo Park, California 94025. Plaintiffs are informed and believe, and on that basis allege, that Defendant Robinhood Derivatives LLC is a wholly owned subsidiary of Robinhood Markets, Inc. It is a futures commission merchant and provides options on futures trading. As relevant here, it is the division subsidiary of Robinhood that has partnered with Kalshi to offer a prediction market hub that allows persons to engage in illegal sports gambling by placing illegal, unregulated wagers on the outcome of sporting events in the form of event contracts on the Tribes' Reservations.

186. The above-named Defendants are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 20, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged

herein. Plaintiffs will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

**GAMING ON INDIAN LANDS PURSUANT TO THE INDIAN GAMING REGULATORY ACT**

197. Courts have long recognized that Congress has "exclusive authority" over Indian affairs. *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 788-90 (2014). This exclusive authority is rooted in the Indian Commerce Clause (art. I, § 8, cl. 3) and the Supremacy Clause (art. VI, cl. 2) of the Constitution, which gives Congress "the exclusive and absolute power to regulate commerce with the Indian tribes, — a power as broad and as free from restrictions as that to regulate commerce with foreign nations." *United States v. Forty-Three Gallons of Whiskey,* 93 U.S. 188, 194 (1876); *Worcester v. Georgia* 31 U.S. 515, 551-57, 558–60 (1832); *Seminole Tribe v. Fla.,* 517 U.S. 44, 62 (1996).

2018. The Indian Commerce Clause authorizes Congress "[t]o regulate Commerce . . . with the Indian Tribes." Art. I, §8, cl. 3. The United States Supreme Court has interpreted the Indian Commerce Clause to reach not only trade, but certain "Indian affairs," as well. *Cotton Petroleum Corp. v. New Mexico*, 490 U. S. 163, 192 (1989).

2119. The Supreme Court does not treat the Indian Commerce Clause as interchangeable with the Interstate Commerce Clause. *Id.* Unlike the Interstate Commerce Clause, where States retain "some authority" over trade, the Supreme Court has ruled that "virtually all authority over Indian commerce and Indian tribes" lies with the Federal Government. *Seminole Tribe of Fla.*, 517 U. S. at 62.

220. From this exclusive authority the Supreme Court has held that there arises and exists a trust relationship between the United States and the Indian tribes that informs and restrains the Congressional exercise of legislative power. *United States v. Mitchell*, 463 U. S. 206, 225-226 (1983). Pursuant to this trust relationship, the Federal Government has "'charged itself with moral obligations of the highest

responsibility and trust'" toward Indian tribes. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011), (quoting *Seminole Nation v. United States*, 316 U.S. 286, 296-297 (1942)).

Formatted: Font: Not Italic

231. Based upon the trust responsibility owed to tribes by the United States, courts presume that when Congress legislates on Indian affairs, its intent towards the tribes is benevolent and federal statutes that arguably would abrogate or abridge tribal rights to self-government are narrowly construed in favor of the tribes retaining them. *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985).

242. For this reason, the Supreme Court has adhered to "the general rules that statutes passed for the benefit of the dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Id.*

253. Applying these canons of statutory construction, the Supreme Court in *California v. Cabazon Band of Indians*, 480 U.S. 202 (1987) ("*Cabazon*"), held that California had no authority to enforce its gambling laws against Indian tribes on their Indian lands. *Cabazon*, 480 U.S. at 221-222.

264. In response to the *Cabazon* decision, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, to create a framework for Indian tribes, states, and the federal government to exclusively and comprehensively regulate tribal gaming on "Indian lands."

275. The purpose of IGRA, set forth in 25 U.S.C. § 2702, is:

> (1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;
>
> (2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

> (3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

2~~8~~6. Under the IGRA, if the gaming activity is not specifically prohibited by Federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity: (1) Indian tribes and the National Indian Gaming Commission ("NIGC") have the **exclusive** right to regulate class II gaming on Indian lands; and (2) the Indian tribes and the states, pursuant to a compact, have the **exclusive** right to regulate class III gaming on Indian lands. 25 U.S.C. § 2701(5) (emphasis added).

2987. IGRA defines "Indian lands" as "all lands within the limits of any Indian reservation"; and "any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual Indian or held by any Indian tribe or individual subject to a restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. §§ 2703(4)(A)-(B).

30298. IGRA established a statutory framework for the regulation of Indian gaming, which "expressly pre-empts the field of governance of gaming activities on Indian lands." *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1289 (D.N.M. 1996) (quoting S. REP. No. 100-446 at 6); *Gaming Corporation v. Dorsey & Whitney*, 88 F. 3d 536 (8th Cir. 1996).

31029. IGRA divides Indian gaming into three classes, with different regulatory requirements for each class. Class I gaming consists of traditional tribal games for prizes of minimal value connected with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive regulatory jurisdiction of the tribes. Class II gaming consists of bingo, "whether or not electronic, computer,

Formatted: No widow/orphan control

or other technological aids are used in connection therewith," including "pull tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. § 2703(7)(A)(i). Also included in class II gaming are non-banked card games either explicitly authorized by state law or not prohibited by state law and played in conformity with state regulations regarding hours of play and limits on wagers and pot sizes. 25 U.S.C. § 2703(7)(A)(i)-(ii) and (7)(B). Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming," 25 U.S.C. § 2703(8), which includes sports gambling.

3210. Class III gaming can be the most lucrative form of gaming. It includes the games played in a typical casino in Las Vegas, such as slot machines, craps, roulette, and house banked and percentage card games, like blackjack (21).

3321. The federal regulations adopted by the NIGC, which implement IGRA, specifically state that class III gaming includes "[a]ny sports betting and pari-mutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4 (c).

3432. While federal regulations define class III gaming as including all house banked games, 25 C.F.R. § 502.4 (a), the regulations separately state that sports betting constitutes class III gaming without reference to whether the wagering is house banked. 25 C.F.R. § 502.4 (c).

3543. Thus, sports betting constitutes a class III gaming activity regardless of whether the wager is made against the house or against other bettors.

3654. Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the tribe must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chairman of the NIGC (the federal regulatory agency created under IGRA); (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be

conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

3765. In order to go into effect, a tribal-state class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by operation of law, 25 U.S.C. § 2710(d)(8)(C), and notice of approval must be published in the Federal Register, 25 U.S.C. § 2710(d)(3)(B).

3876. Gaming conducted by any person or entity on Indian lands that is not authorized by a tribal-state class III gaming compact violates IGRA and federal and state criminal law. *See* 1825 U.S.C. §1166 (applying "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions" to Indian country). *See also Coeur D'Alene Tribe v. State*, 842 F. Supp. 1268, 1282 (D. Idaho 1994) ("Accordingly, the court finds that in the absence of a tribal gaming ordinance and a compact, neither the Tribe nor any non-tribal entity …. . . may conduct Class III gaming on the reservation.").

3987. Any class II or class III gaming conducted by a third party management company on Indian lands on behalf of a tribe with a compact must meet the strict requirements of IGRA, 25 U.S.C. § 2710(d)(9) and 25 U.S.C. § 2711, in order to conduct that gaming. Further, any contract authorizing a third party management company to conduct gaming on Indian lands on behalf of a tribe must be approved by the Chairman of the NIGC. *Id*. *See also* 25 C.F.R. § 533.

40398. IGRA provides tribes an enforcement mechanism to prevent gaming from being conducted on Indian lands that is not authorized by a tribal-state compact. "The United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under [IGRA] that is in effect . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii).

4140. In addition, tribes and states, as part of the compact negotiation process, can agree to transfer the United States' "exclusive" criminal jurisdiction to enforce

the provisions of the Tribes' Compacts to the State, allowing the states who are parties to the compact to bring criminal charges against any person, organization or entity, that conducts any class III gaming on a tribe's Indian lands in violation of the state gambling laws. 18 U.S.C. § 1166(db).

## THE TRIBES' COMPREHENSIVE REGULATION OF GAMING

### A. The Tribes' Regulation of Gaming Under Their Compacts.

42139. Each of the plaintiff Tribes conducts class III gaming on their respective Reservations. The Blue Lake Rancheria and Chicken Ranch Rancheria conduct their gaming pursuant to Secretarial Procedures issued by the Department of the Interior on January 31, 2024. The Buena VistaPicayune Rancheria conducts its gaming pursuant to a class-III gaming compact. Buena VistaPicayune entered into its Compact with the State in 20001999, which has been subsequently extended twicefour times.

4320. The Procedures and Compacts incorporate the Tribes' gaming ordinances into the compact/procedures to afford the Tribes primary responsibility for the regulation of their gaming facilities and activities to ensure the fairness of the playing of the class III games, to shield the games from criminal activity, to ensure that the Tribes are the primary beneficiaries of the gaming activities, and to promote tribal economic development and self-sufficiency. To achieve these objectives, the Procedures and Compacts promote ethical practices in conjunction with class III gaming through the licensing and control of persons and entities employed in, or providing goods and services to, the tribal gaming operations, protect against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal governmental gaming, and protect the patrons and employees of their gaming facilities.

4431. The Procedures and Compacts thus regulate class III gaming on the Tribes' Reservations Indian lands to ensure compliance with IGRA, tribal Gaming

Ordinances, and the NIGC and Tribal Gaming Commissions' regulations and minimum internal control standards. Through that regulated class III gaming, the procedures and compact enable the Tribes to develop self-sufficiency, promote tribal economic development, and create jobs and generate revenues to support the Tribes' governments and their governmental services and programs. Relevant to the Tribes, tribal governmental gaming is the primary source of revenue funding the Tribes' governments and their governmental services and programs.

4542. Under their Procedures and Compacts, the Tribes are authorized to operate slot machines, lottery games, and banked and percentage card games at their casinos. However, because California has not specifically authorized and affirmatively prohibits betting on the outcome of physical contests or sporting events (other than pari-mutuel wagering on horse racing) the State consistently has refused to negotiate the inclusion of sports betting in Tribal-State compacts and, as a result, no Indian tribe in California, including the Plaintiff Tribes, offer sports betting on their Indian lands, and betting on the outcome of sporting events would constitute a violation of the Tribes' Compacts and Procedures, the civil regulatory provisions of the IGRA, and 18 U.S.C. § 1166.

4653. By making its sports wagering contracts available on the Tribes' ReservationsIndian lands, and offering for play to the general public the class III game of sports betting, Kalshi the Defendants are violatinges the Tribes' Compacts and Procedures, Gaming Ordinances, and Gaming Commissions' regulations, and directly interferinges with and impairsing the Tribes' sovereign right to regulate gaming on their Reservations.

**B. The Tribes' Regulation Of Gaming Under their Gaming Ordinances.**

4764. Pursuant to the IGRA and the Tribes' own inherent sovereign authority, each of the Tribes have enacted Ggaming Ordinances, that have been approved by

the Secretary, comprehensively regulating gaming activities on the Tribes' Reservations.

4875. Each Ordinance establishes a Tribal Gaming Commission ("TGC") with the authority to adopt and enforce regulations that establish comprehensive minimum internal control standards for the playing of all games conducted on the Reservations, including but not limited to the rules for the playing of the games and approval and testing of the equipment used in the playing of the games.

4986. In addition, each Ordinance requires every person, organization, and entity involved in gaming activities on the Ttribe's Indian lands Reservation to go through detailed criminal history and background check and obtain gaming licenses issued by the TGC verifying that the licensee is not involved in or associated with any criminal activity.

50497. Finally, each Ordinance and the Tribes' TGC regulations specify what games can be played on the Tribes' Reservations and prohibit the playing of any class III game, including sports gambling, that is not expressly authorized by the Tribes' Compacts, Procedures, or Ordinances.

**KALSHI'S ILLEGAL SPORTS GAMBLING ON THE TRIBES' RESERVATIONS**

51048. Kalshi isThe Defendants are engaging in illegal sports gambling on the Tribes' Reservations disguised as event contracts that allow people to speculate on the outcome of a sporting event. Event contracts usually pose a binary, yes-or-no question as to whether the underlying event will happen. Events contracts are governed by the Commodities Exchange Act, 7 U.S.C. 1, et. seq. ("CEA").

52149. Under the CEA, event contracts are a subset of futures contracts, which are derivatives contracts for the sale and purchase of a specified asset or basket of assets, including event contracts, at a specified price on a specified future date.

5320. A derivative is a financial instrument or contract whose price is directly dependent upon (i.e., derived from) the value of one or more underlying assets — for example, commodities (like corn and wheat), securities, or debt instruments. Derivatives take many forms, including futures, options, and swaps. Derivatives allow the purchaser to take on exposure to an underlying asset without actually requiring a direct investment in the asset.

5431. Simply put, futures contracts are agreements to buy or sell a specific commodity or asset at a predetermined price at a predetermined date. U.S. law defines "commodity" broadly to include physical goods (agricultural products, metals, energy, etc.) as well as broad categories of intangibles (services, rights, and interests in which futures contracts are traded). 7 U.S.C. § 1a(9).

5542. In 2000, Congress passed the Commodity Futures Modernization Act ("CFMA"), which amended the CEA and introduced new legal categories of commodities: *excluded commodities* and *exempt commodities*. An "excluded commodity" was defined to include various financial indices and, importantly, occurrences or contingencies beyond the control of the contracting parties that are associated with financial or economic consequences. 7 U.S.C. §§ 1a(19)–(20).

5653. In effect, 7 U.S.C. § 1a(19) brought certain event-based phenomena, such as weather events or other contingencies, into the fold of regulated derivatives, classifying them as commodities on which futures or swaps could be based.

5764. In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. Dodd-Frank § 745(b) expanded the CEA to add Section 5c(c)(5)(C), sometimes called the "special rule for event contracts." *See* Brian Quintenz, *Any Given Sunday*, Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts (March 25, 2021) ("Quintenz Statement").[1]

[1] https://www.cftc.gov/PressRoom/SpeechesTestimony/quintenzstatement032521

5875. This provision expressly empowered the CFTC, an independent federal agency created by Congress in 1974 under ~~the~~ "The Commodity Futures Trading Commission Act,"~~;~~ 7 U.S.C. § 4, to regulate financial derivative markets in accordance with the CEA, 7 U.S.C. § 1 *et seq.* and~~;~~ 17 C.F.R. § 1 *et seq.*, and authorized the CFTC to prohibit certain types of derivatives contracts if it finds them "contrary to the public interest," specifically naming certain ~~specific~~ categories. *See* 7 U.S.C. § 7a-2(c)(5)(C).

5986. Pursuant to this authority, in 2011, the CFTC promulgated Regulation 17 C.F.R. § 40.11, titled *"Review of event contracts based upon certain excluded commodities*," which formalized the review process for event contracts. Regulation 40.11 mirrored the substance of the statutory language and set out the procedure for the Commission to block an event contract. Subsection (a)(1) of Regulation 40.11 establishes a clear prohibition: "*A registered entity shall not list for trading or accept for clearing*" any contract "based upon an excluded commodity, as defined in [the CEA], that involves, relates to, or references terrorism, assassination, war, **gaming**, or an activity that is unlawful under any State or Federal law." *Id.* (emphasis added). Any event contract that falls into one of those sensitive categories is thus *per se* barred from being listed by a registered entity.

60597. Consistent with the findings and purpose of the CEA, the CFTC promulgated regulations that allow registered entities to self-certify event contracts through 17 C.F.R. § 40.2 and where self-certified products or contracts present compliance issues, the self-certifying registered entity must provide a "concise explanation and analysis that is complete" concerning "the underlying commodity, and the [contract's] compliance with applicable provisions of the [CEA], including core principles, and the [CFTC] regulations thereunder." 17 C.F.R. § 40.2(a)(3)(v).

61058. 17 C.F.R. § 40.11(c) established a 90-day review process: if an exchange, like Kalshi, self-certifies a new event contract that may violate Regulation

40.11(a), the Commission can stay the listing for up to 90 days while it evaluates the contract and then issue an order approving or disapproving it. *Id*.

62~~59~~. Thus, by 2011, the regulatory structure was in place to address the rise of event contracts, which previously fell into a gray area between regulated futures and mere wagers.

6~~0~~3. Until recently, the CFTC's consistent stance has been to prohibit contracts that it views as "gaming" or betting-type events, while permitting other event-based contracts.

6~~1~~4. At bottom, the purchase or sale of a "true" futures contract on an exchange is motivated by two economic purposes: — (1) the opportunity to make a profit or (2) to minimize the risk of loss from a change in the market price or the happening of an event.

6~~2~~5. Thus, "true" futures contracts, and the purposes for which they are traded, "serve[] legitimate hedging and price discovery functions, thereby facilitating production of the underlying commodity." *Bd. of Trade v. SEC*, 677 F.2d 1137, 1151 (7th Cir. 1982). "Indeed, one basic justification for a futures market is that futures trading in a central location performs a 'price discovery' function for the underlying commodity, thereby furnishing producers and users a reference point for their pricing on the cash market." *Id*. at 1173 n.15.

6~~3~~6. This is, ultimately, what differentiates "true" commodities futures contracts from gambling on a sporting event. While gambling *via* an event contract on next year's rainfall measures allows a wheat farmer to hedge against the risk of a low production year in the event of a lack of rain, betting on whether the 49ers will win the Super Bowl serves no hedging or other economic purpose. Nor does it perform any price discovery function on an underlying commodity because there is no underlying commodity and therefore no derivative market. It is simply gambling on sports. And it is offered, unabashedly, by ~~Kalshi~~the Defendants, to the public, as such, even within states and Indian reservations that strictly prohibit sports betting.

6764. In resorting to this legal fiction, Kalshi the Defendants seeks to blur the distinction between careful minimization and allocation of market risk and what, in reality, amounts to unregulated sports gambling, to such an extent that the preexisting regulatory regime that distinguishes futures from off-exchange betting cannot restrict their business.

6875. Such a result runs directly contrary to Congress's intent in enacting the 2010 amendments to the CEA to specifically give the CFTC the authority to prohibit sports wagering contracts, which — categorically — do not fulfill the economic purposes for which "true" futures contracts are permitted, but regulated:

> Mrs. FEINSTEIN. I am glad the Senator is restoring this authority to the CFTC. I hope it was the Senator's intent, as the author of this provision, to define "public interest" broadly so that the CFTC may consider the extent to which a proposed derivative contract would be used predominantly by speculators or participants not having a commercial or hedging interest. Will CFTC have the power to determine that a contract is a gaming contract if the predominant use of the contract is speculative as opposed to a hedging or economic use?
>
> Mrs. LINCOLN. That is our intent. The Commission needs the power to, and should, prevent derivatives contracts that are contrary to the public interest because they exist predominantly to enable gambling through supposed "event contracts." It would be quite easy to construct an "event contract" around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. **These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.**

156 Cong. Rec. S5906-07, (daily ed. July 15, 2010)(emphasis added).

6986. Kalshi's The Defendants' operations quite clearly "construct an 'event contract' around sporting events such as the Super Bowl" and, therefore, serve no real commercial purpose. Rather, they are used solely for gambling, in direct violation of the CEA and its implementing regulations and as shown above the IGRA, and the Tribes' Procedures, Compacts, Ordinances and TGC's regulations.

70697. Because Kalshi's the Defendants' contracts are not futures contracts but instead simply gambling on sports, as defined by the Tribes' Compacts, Procedures, Ordinances and state law, which does not "permit" any entity within the

State, to offer for play within the State sports betting, ~~Kalshi's~~ Defendants offering of the contracts to the general public for play on the Tribes' ~~Reservations~~ Indian lands violates the IGRA.

71~~068~~. By making its sports wagering contracts available on the Tribes' ~~Reservations~~Indian lands, and offering sports betting ~~for play~~ to the general public ~~the game of sports betting~~, ~~Kalshi~~ the Defendants are not only violating~~es~~ each of the Tribes' Procedures, Compacts, Ordinances, and TGC regulations, but ~~it~~ they are also directly interfering~~es~~ with and impairing~~s~~ the Tribes' sovereign right to regulate gaming on their ~~Reservations~~Indian lands.

72~~169~~. Furthermore, by illegally offering its sports wagering contracts to persons located both on and off of the Tribes' ~~the Reservations~~Indian lands in California, ~~Kalshi~~ the Defendants draw~~s~~ business away from the Tribes' casinos by allowing patrons to participate in class III gaming from their homes. Loss of revenue has a direct impact on tribal governmental functions and has a tangible effect on the services and programs the tribal governments provide to their members and all persons who live, work, and visit the ~~Reservations~~Tribes' Indian lands.

73~~20~~. ~~On information and belief, Kalshi has~~Each of the Tribes' Gaming Commissions have conducted investigations on the Tribes' Indian lands to verify whether the Defendants are engaging in sports gambling on the Tribes' Indian lands. The Gaming Commissions' investigators have repeatedly accessed the Defendants'~~Repeatedly, over a period of time ___, the Gaming Commissions's investigators have accessed the Defendants'~~ "Kalshi App" and placed bets on the Tribes' Indian lands. Based upon these investigations, the Tribes' Gaming Commissions have been able to verify that the Defendants have offered and continue~~s~~ to offer ~~its~~ their sports event contracts to consumers on the ~~Reservations~~ Tribes' Indian lands with the knowledge that ~~its~~ their sports event contracts undercut tribal class III gaming markets, in violation of IGRA, the Tribes' Compact and

/Procedures, and their Gaming Ordinances over which Congress, the federal, state, and tribal governments exercise exclusive regulatory jurisdiction.

Formatted: Font: Not Bold

Formatted: Centered

**KALSHI'S EVASION OF CFTC REGULATION**

7431. In 2020, as stated above, the CFTC authorized Kalshi to list event contracts for public trading as a DCM. *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *4.

7542. On June 12, 2023, Kalshi filed a self-certification to trade congressional control contracts, which allowed buyers to predict which political party will control the U.S. House of Representatives or Senate on a specific, future date, and took the form of a binary, "yes/no" event contract that posed the question: "Will <chamber of Congress> be controlled by <party> for <term>?" *KalshiEX LLC*, 2024 WL 4164694, at *4.

7653. On June 23, 2023, the CFTC sent a letter to Kalshi representing that it had exercised its authority to initiate a 90-day review of Kalshi's self-certified submission because it determined that the contracts "may involve, relate to, or reference an activity enumerated" in the CEA and applicable regulations. *KalshiEX LLC*, 2024 WL 4164694, at *4; Notification of 90-day Review (June 23, 2023)[2]; Release Number 8728-23, *CFTC Announces Review of Kalshi Congressional Control Contracts and Public Comment Period* (June 23, 2023).[3]

7764. On September 22, 2023, at the conclusion of the 90-day review period, the CFTC issued an order prohibiting Kalshi from listing its congressional control contracts for trading pursuant to 17 C.F.R. § 40.11, consistent with 7 U.S.C. § 7a-2(c)(5)(C). *KalshiEX LLC*, 2024 WL 4164694, at *5. In its order the CFTC determined that Kalshi's congressional control contracts involve two activities enumerated in the special rule: gaming and unlawful activity. *KalshiEX LLC*, 2024 WL 4164694, at *5. As a result, the CFTC found that Kalshi's congressional control

[2] https://www.cftc.gov/sites/default/files/filings/ptc/23/06/ptc0623230001.pdf.
[3] https://www.cftc.gov/PressRoom/PressReleases/8728-23.

contracts were contrary to the public interest. *KalshiEX LLC*, 2024 WL 4164694, at *6; CFTC Order (September 22, 2023)[4]; Release Number 8780-23, *CFTC Disapproves KalshiEX LLC's Congressional Control Contracts* (September 22, 2023).[5]

7875. On November 1, 2023, Kalshi initiated litigation against the CFTC, challenging the CFTC determination, *inter alia*, that Kalshi's congressional control contracts were contrary to the public interest because the contracts involve gaming.

7986. In this litigation, Kalshi identified "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" as "precisely what Congress had in mind as 'gaming' contracts." Pl.'s Mem. of Law in Supp. of Pl.'s Mot. Summ. J. at 23, *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 1:23-cv-3257 (JMC) (D.D.C.), Dkt. No. 17.In the *KalshiEX LLC* litigation, Kalshi argued its election contracts do not involve gaming because an event contract involves gaming "if it is contingent on a game or game-related event" such as "the Kentucky Derby, Super Bowl, or Masters golf tournament."

Formatted: Font color: Black

80797. Additionally, iIn the *KalshiEX LLC* litigation, the Court acknowledged the potential application of the IGRA in supplying a definition of "gaming" as codified in, but not defined by, the CEA and implementing regulations. *KalshiEX LLC*, 2024 WL 4164694, at *9 ("And while the CFTC's order also considered and pulled definitions from a federal statute, it did not look to the only one that the Court is aware actually uses the term 'gaming'—the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701.").

81078. June 10, 2024, the CFTC proposed rule-amendments to 17 C.F.R. Part 40, to "specify types of event contracts that fall within the scope of CEA section 5c(c)(5)(C) and are contrary to the public interest." Event Contracts, 89 Fed. Reg. 48968-01, *48969. The proposed rule-amendments repeatedly acknowledge

Formatted: No widow/orphan control

[4] https://www.cftc.gov/sites/default/files/filings/documents/2023/orgkexkalshiordersig230922.pdf.
[5] https://www.cftc.gov/PressRoom/PressReleases/8780-23.

the CFTC's limited resources. "From a resource allocation perspective, this [rule-amendment] will be of significant benefit to the Commission and its staff, since, in the Commission's experience, a single § 40.11(c) review is resource-intensive and consumes hundreds of hours of staff time." *Id.* The rule-amendments were never finalized.

82179. On January 7, 2025, CFTC Chairman, Rostin Behnam, announced that he would step down from the position of Chairman on January 20, 2025, and that Benham's last day at the Commission would be February 7, 2025. Public Statements & Remarks, *Chairman Rostin Behnam Announces Departure from CFTC* (January 7, 2025).[6]

8320. On January 13, 2025, Donald Trump, Jr. announced that he was joining Kalshi as a strategic adviser. Brett Samuels, *Trump Jr. joins betting market Kalshi as adviser* (January 13, 2025).[7]

8431. On January 22, 2025, Kalshi filed a self-certification to trade sports event contracts, which allowed buyers to predict the winner of a sport event title related to American sports leagues, and took the form of a binary, "yes/no" event contract that posed the question: "Will <team> win <title>?" The self-certification does not mention the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) or that, as a registered entity, Kalshi is prohibited from listing contracts that involve gaming pursuant to 17 C.F.R. § 40.11. The self-certification merely states that it is CEA compliant. Kalshi Notification Regarding the Initial Listing (January 22, 2025).[8]

8542. On February 5, 2025, the CFTCTFC announced its intent to hold a public roundtable related to sports-related event contracts. The purpose of the roundtable was to "establish a holistic regulatory framework that will both foster thriving prediction markets and protect retail customers from binary options fraud

**Formatted:** No widow/orphan control

[6] https://www.cftc.gov/PressRoom/SpeechesTestimony/behnamstatement010725.
[7] https://thehill.com/business/5082357-trump-jr-joins-kalshi-prediction-market/.
[8] https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf.

such as deceptive and abusive marketing and sales practices."[9] The roundtable was to include topics such as: "CFTC-registered entities' legal arguments in court that event contracts based on games or sports contests or sporting events constitute 'gaming' and are therefore prohibited under the Commodity Exchange Act," as well as "other issues including but not limited to Constitutional questions such as the Commerce Clause, States' rights and State regulatory schemes, Federalism, Federal preemption doctrines, and Tribal sovereignty as well as other federal laws applicable to sports betting." Release Number 9046-25, CFTC Announces Prediction Markets Roundtable (February 5, 2025).[10] The roundtable was then subsequently cancelled without explanation. Dustin Gouker, *News: CFTC Cancels Prediction Markets Roundtable*, Event Horizon (April 24, 2025).[11]

865~~3~~. On February 7, 2025,[12] Kalshi filed a self-certification to trade sports event contracts, which allowed buyers to predict the winner of a sport event title related to American sports leagues, and took the form of a binary, "yes/no" event contract that posed the question: "Will <team> win <event>?" The self-certification does not mention the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) or that, as a registered entity, Kalshi is prohibited from listing contracts that involve gaming pursuant to 17 C.F.R. § 40.11. The self-certification merely states that it is CEA compliant. Kalshi Notification Regarding the Initial Listing (February 7, 2025).[13]

876~~4~~. On February 11, 2025, President Donald Trump nominated Brian Quintenz, a Kalshi Board Member, to replace Rostin Behnam as the Chairman of the CFTC. Quintenz, in a statement concerning the CFTC's review of ErisX futures contracts involving NFL football games on March 25, 2021, asserted that the CEA "special rule," 7 U.S.C. § 7a-2(c)(5)(C), is unconstitutional, that the CFTC

[9] https://www.cftc.gov/PressRoom/PressReleases/9046-25
[10] https://www.cftc.gov/PressRoom/PressReleases/9046-25.
[11] https://nexteventhorizon.substack.com/p/news-cftc-cancels-prediction-markets.
[12] This is the same day former Chairman Behnam exited the CFTC.
[13] https://www.cftc.gov/sites/default/files/filings/ptc/25/02/ptc02072514957.pdf.

regulation, 17 C.F.R. § 40.11 is invalid, that the prohibited contracts enumerated in 7 U.S.C. § 7a-2(c)(5)(C) and 17 C.F.R. § 40.11 are not, in fact, prohibited and that "the Commission is not a moral arbiter. It is not expert [sic] in determining what the [sic] is in the public's interest, and it is certainly not equipped to tell the public what its interest *should* be." Quintenz Statement, *supra*.

8875. Quintenz also stated: "Interestingly, the statute also does not require the Commission to make any determinations on these contracts at all. It is completely up to the Commission to decide whether and when to review an enumerated event contract or set of contracts for a public interest determination. If the Commission made no public interest determinations pursuant to this statutory section, it would nonetheless be following the law." Quintenz Statement, *supra*.

8986. On March 7, 2025, the Major League Baseball ("MLB") wrote a letter to the CFTC expressing concerns about sports event contracts. The MLB stated: "As the resemblance between sports event contracts and traditional sports betting markets continues to grow, so too does the need to replicate the integrity and consumer protections that exist at the state level. Currently, those protections are lacking."[14]

90897. On March 17, 2025, Robinhood announced that it partnered with Kalshiand Kalshi announced their expanded partnership and launched theiran in-app sports gambling market hub to offer March Madness sports event contracts. Kalshi's CEO, Tarek Mansour stated: "[we] couldn't ask for a better partner in Robinhood to bring our vision to every American." Tom Nightingale, *Robinhood launches Kalshi-powered sports markets, starting with March Madness*, SBC Americas (March 17, 2025).[15]

91088. On May 16, 2025, interim Chairman of the CFTC, Caroline Pham signaled her intent to leave the CFTC once Quintenz is confirmed to the

Formatted: No widow/orphan control

[14] https://www.cftc.gov/media/11941/MLB030725/download (last visited June 24, 2025).
[15] https://sbcamericas.com/2025/03/17/robinhood-kalshi-sports-event-contracts/.

appointment of the CFTC Chairman, leaving only Quintenz and commissioner Kristin Johnson on the Commission. Jesse Hamilton, *CFTC's Pham Said to Plot Exit, Agency May Be Left Without a Party Majority*, Coin Desk (May 16, 2025).[16]

92189. On May 21, 2025, Quintenz submitted an ethics statement to the CFTC, confirming that Quintenz was employed by Kalshi and held stock and unvested stock options in Kalshi. Brian Quintenz, Ethics Statement to CFTC at 2 (May 21, 2025).[17]

9320. On May 28, 2025, CFTC Commissioner Kristin Johnson signaled her intent to leave the CFTC "later this year," leaving Quintenz as the sole commissioner. Julia Shapero, *CFTC leaders exit as Trump pick prepares to take helm*, The Hill (May 28, 2025).[18]

9431. On information and belief, Kalshi has been prolific in offering sports event contracts with the knowledge that the legality of their sports event contracts is highly questionable and widely criticized as an impermissible form of sports gaming or gambling, at a time when power in the CFTC is being consolidated in one commissioner, Quintenz, a Kalshi board member, with the knowledge that the CFTC is understaffed and lacks the resources to adequately review and regulate Kalshi's self-certified contracts to ensure compliance with the CEA.

9542. As a direct results of these events, Kalshi the Defendants has have been able to avoid regulation of theirits sport gambling activities by the CFTC.

**KALSHI'S KALSHI'S FALSE AND MISLEADING ADVERTISING**

953. Kalshi actively promotes its products, including its sports event contracts, across major social media platforms such as TikTok, Instagram, X.com, and YouTube.

Formatted: No widow/orphan control

[16] https://www.coindesk.com/policy/2025/05/14/cftc-s-pham-said-to-plot-exit-agency-may-be-left-without-a-party-majority.

[17] https://extapps2.oge.gov/201/Presiden.nsf/PAS+Index/009D247776338CD385258C95002C929F/$FILE/Quintenz%2C%20Brian%20D.%20%20finalEA.pdf.

[18] https://thehill.com/newsletters/technology/5322818-cftc-leaders-exit-as-trump-pick-prepares-to-take-helm/.

964. On its Instagram account, @kalshi_official, Kalshi, as shown in Exhibit A, has published advertisements asserting itself as "The First Nationwide Legal Sports Betting Platform" and that its customers can engage in "Sports Betting Legal in all 50 States on Kalshi" (Exhibit A).

975. Kalshi's Instagram account includes a post, dated January 23, 2025, stating in the caption post: "Legal sports markets, accessible to Americans in all 50 states." The post remains accessible on Kalshi's Instagram (Exhibit B).

986. Kalshi's Instagram account also includes a post, dated February 3, 2025, containing a screenshot of an article from Front Office Sports stating "Robinhood to Offer Super Bowl Betting via Kalshi." The post remains accessible on Kalshi's Instagram (Exhibit C).

997. On June 11, 2025, Kalshi posted an artificial intelligence ("AI") generated video advertisement to its Instagram account. Kalshi has also posted this video on other platforms such as TikTok. The advertisement contains depictions of people exclaiming "I'm all in on OKC" and "Indiana got that dog in them." The advertisement further contains a depiction of a shirtless man exclaiming, "Kalshi lets you legally trade on anything, anywhere in the U.S."

10098. On July 19th, 2025, Kalshi sponsored a TikTok video where a man explains to viewers, in response to questions by a woman asking about the legality of Kalshi's contracts, in the video that Kalshi is "totally [legal] … in all 50 states, even California" (Exhibit C).

10199. As part of its widespread promotional strategy, Kalshi has posted on its TikTok a video where Kalshi describes its platform as a place for placing "live bets" in various promotional materials including billboard signs, out-of-home advertising on bus stops, on trucks, and the sides of buildings, in various locations including New York City, Los Angeles, Miami, and Dallas.

1020. Social media users have raised questions about the legality of Kalshi's products, with specific comments expressing confusion, such as; "Is this app legit?"

Formatted: No widow/orphan control

Users have also raised concerns regarding their own legal liability for using Kalshi. On Reddit page r/Kalshi, one user stated: "I just wanted to confirm before using Kalshi. Washington state has strict 'gambling' laws in place and I know Kalshi is a trading app for contracts. Is there a guarantee I will not get into any legal trouble for using there [sic] app in the state?"[19]

1031. Social media users have expressed concern regarding these products, stating: "Kalshi is dangerous. Sports betting should not be okay for under 21 let alone in all 50 states" ( Exhibit D).

1042. On one of Kalshi's promotional TikTok posts added to the site on July 18, 2025, various TikTok users commented: "This shouldn't be legal"; "Betting culture is crazzyyy"; "Didn't Enron do the exact same thing?"; "Enron is back baby!"; "Betting on the weather is insane"; "Predatory marketing"; "Calling it a trading app is crazy"; "I 'traded' it all on black and now im by the wendy's dumpster if anybody wants service for a $5"; "Addiction type beat"; "1-800-GAMBLER"; "'Trading'"; "'Trade' ima buy $15 that it's sunny tomorrow. Yea that's a trade alright"; "As a meteorologist would this be insider trading?"; "Holy addiction"; "'I traded that I'd be…' dawg that's called betting. You gambled."; "This is literal distopia. Please don't do this." (Exhibit E).

1053. Kalshi's promotional materials frequently utilize the term "odds" in its advertisements. Kalshi even sells merchandise, including hats that say "What are the odds" (Exhibit F).

1064. Kalshi's deceptive promotional materials also pre-date its push into the sports gambling market. For instance, in close proximity to its advertisements of sports event contracts on various social media platforms, Kalshi marketed its platform as a betting app during the 2024 U.S. Presidential election. In one video posted on October 17, 2024, which remains available on Kalshi's Tiktok page, an interviewer is seen pulling a number of voters aside who are going to the polls to

[19] https://www.reddit.com/r/Kalshi/comments/1m0c3da/legality_behind_kalshi/

vote and asking "How much money would you bet on Trump winning the election?"

1075. On October 15, 2024, Kalshi posted a TikTok video on its official account, which remains available to users on its page, where its CEO and Co-founder, Tarek Masour, explains in response to the question "Hey my man, what do you do for a living", that "I'm the founder of Kalshi […] its an app and website where you can bet on anything." In the video, the man then asks, "anything?" and Tarek Mansour replies, "Anything. [...] We are the first platform that legalized betting on the U.S. election. Now, Americans can actually bet on whose going to win, Trump versus Kamala. You can bet on the weather tomorrow. You can bet on inflation. You can bet on whether Eric Adams is gonna get fired. Or when he's gonna get fired."

1086. Additionally, on October 17, 2024, Kalshi posted a TikTok video on its official account, which remains available to users on its page, where its CEO and Co-founder, Tarek Masour, explains that "I wanted to see our Billboard. So, these are live trades, live bets, of people actually betting on the exchange as we speak… If you bet on Kalshi right now, you're gonna get streamed on this billboard."

1097. Likewise, a TikTok post on Kalshi's page from October 19, 2024, states: "For the first time in 100 years, you can legally bet on U.S. elections." The post interviews different individuals, including one person who says, "If I could mortgage my house to bet on Trump, I would."

**KALSHI'S AND ROBINHOOD'S ILLEGAL RACKETEERING**

9511008. Kalshi, as a Designated Contract Market ("DCM"), operates an online exchange on which customers buy and sell "event contracts." Since January 22, 2025, Kalshi has offered event contracts on the outcome of sporting events. *See* ¶ 81. A customer buys a "yes" or "no" position on whether a particular outcome will occur, such as which team will win a game or a championship, at a price between one cent and ninety-nine cents. If the outcome occurs, the customer receives a fixed payout, typically one dollar per contract; if not, the customer loses what he paid. as

Formatted: Justified

Formatted: Indent: First line: 0", Add space between paragraphs of the same style, Widow/Orphan control, Tab stops: Not at 1"

a federally regulated exchange where users can trade event contracts based on the outcome of future events. This means individuals can buy and sell contracts, essentially betting "yes" or "no" on whether a specific event will occur. These events include economic indicators (e.g., GDP, inflation, unemployment rates), company performance (e.g., earnings releases), and weather outcomes (e.g., temperature, rainfall). The price of a contract reflects the market's perceived probability, and correct predictions lead to a predetermined payout. *See How are prices determined*, Kalshi.com (Accessed: 18 April 2025).[20]

96. Kalshi also offers parlays on sporting events, which it calls "Combos." A Combo combines multiple outcomes, including outcomes across different sporting events, into a single contract that pays only if every outcome resolves in the customer's favor.

9711109. Kalshi provides liquidity on its exchange through market makers it chooses, obligates, and pays, including's platform ensures liquidity through a partnership with Susquehanna Government Products, LLLP, a member of Susquehanna International Group, LLP ("Susquehanna"). Kalshi also has its own affliatedaffiliated trading company, Kalshi Trading LLC, which trades on Kalshi's exchange. And Kalshi's affiliate, Kalshi Klear LLC, serves as the clearinghouse for trades on Kalshi's exchange.Susquehanna provides liquidity by consistently taking the opposite side of trades, thereby ensuring there are always buyers and sellers available. In effect, Susquehanna acts as Kalshi's "house," facilitating the continuous and smooth execution of these event contracts, which function as wagers.

98. Robinhood Markets, Inc. operates a brokerage platform serving more than 25 million accounts. Its wholly owned subsidiary, Robinhood Derivatives, LLC, based in Chicago, Illinois, is registered with the CFTC as a futures commission merchant ("FCM").'s financial services operate through distinct subsidiaries,

[20] https://help.kalshi.com/markets/markets-101/how-are-prices-determined

Formatted: Add space between paragraphs of the same style, Widow/Orphan control

forming a comprehensive brokerage system that serves over 25 million-plus accounts.

99. Robinhood Derivatives integrates tightly into Robinhood's brokerage platform; a user cannot open an account with Robinhood Derivatives without an active Robinhood brokerage account.

100. Robinhood Derivatives is one of the FCMs through which Kalshi offers its contracts to the public. Under Kalshi's rules, an FCM does not merely refer customers to Kalshi. It is a member of Kalshi's exchange, bound by Kalshi's rules, with defined responsibilities in executing, collateralizing, clearing, and settling its customers' trades.

Formatted: Indent: First line: 0"

101. To become an FCM member, Robinhood Derivatives was required to sign Kalshi's FCM Member Agreement; to guarantee to Kalshi's clearinghouse its own transactions and those of its customers; to authorize Kalshi to direct the clearinghouse to debit its accounts; and to become a clearing member of Kalshi's clearinghouse.

102. Robinhood Derivatives takes its customers' orders and places them on Kalshi's exchange. Under Kalshi's rules, a customer who enters an order with an FCM "is considered to have entered an Order on the Platform." KalshiEX LLC Rulebook, Rule 5.5(a) (Version 1.29) (accessed November 4, 2026) ("Kalshi Rulebook"). Before submitting an order, the FCM must confirm that the customer has deposited enough money to cover the full potential loss, and it transmits the order to Kalshi together with the customer's unique account identifier and the FCM's own. *Id.*, Rules 5.5(b), (d). When the contract settles, the customer's winnings are paid into the FCM's customer account, and the FCM is obligated to Kalshi's clearinghouse on its customers' contracts. *Id.*, Rule 6.3(d); Kalshi Klear LLC Rules, Rule 6.1(E)(3) (DCO Version 1.4) (accessed November 4, 2026) ("Klear Rules"). On information and belief, the provisions of the Kalshi Rulebook and Klear Rules cited in this Complaint were in effect in materially the same form throughout the

period relevant to this action. On information and belief, Robinhood Derivatives has performed each of these functions for the sports wagers its customers have placed on Kalshi's contracts.

103. Kalshi and Robinhood each know who is placing every wager. Under Kalshi's rules, Robinhood Derivatives must verify each customer's identity, assign each customer a unique identifier, and transmit that identifier to Kalshi with every order. Robinhood must provide Kalshi with any customer's identifying information on request, and must report the identities of customers whose positions exceed the levels Kalshi sets.

104. Kalshi's Privacy Policy, which applies to Kalshi Inc. and its subsidiaries and affiliates, states that Kalshi collects personal information when a user interacts with its services, such as signing up, registering for Membership, requesting a transaction, or communicating with Kalshi. Kalshi Privacy Policy § I.A (Effective Date: October 30, 2026). On information and belief, Kalshi's privacy policy has contained materially the same provisions throughout the period relevant to this action. *See* Kalshi Privacy Policy (Effective Date: December 20, 2023).

Formatted: Indent: First line: 0", Right: 0"

105. Kalshi also collects certain information automatically, including location data and device data. Kalshi's Privacy Policy states that the company collects "current and historical information concerning a user's geographic location, GPS location, transaction location, and IP addresses." *Id.* § I.B.1(a) (Effective Date: October 30, 2026). Kalshi obtains location information "through GPS, Wi-Fi, wireless network triangulation, or other methods." *Id.* § I.B.1(b). Through tracking technologies, Kalshi also collects device information, including each user's IP address, device type, operating system, and a unique identifier. *Id.* § I.B.2(a).

106. Kalshi's Privacy Policy states that Kalshi uses this information to "fulfill [its] legal and regulatory obligations such as obligations that apply to being a U.S. Commodity Futures Trading Commission (CFTC) designated contract market." *Id.* § II.A.

107. Kalshi and Robinhood each can determine where wagers are placed. Kalshi collects the GPS location and transaction location of its users. Robinhood can restrict its customers' access to Kalshi's contracts by location, and has done so.

1120. Kalshi's Privacy Policy states that Kalshi collects personal information when a user interacts with its services, such as signing up, registering for Membership, requesting a transaction, or communicating with Kalshi. Kalshi Privacy Policy (Effective Date: December 20, 2023).[21]

1131. Certain information, like Location Data, Device Data, and Usage, is collected automatically through tracking technologies. Kalshi's Privacy Policy specifically states the company collects location data, including current and past geographic spot, GPS location, transaction locations, and the IP address of the device used. *Id.*

1142. Kalshi also gathers information automatically whenever a user visits its site, uses services, opens emails, or otherwise interacts with the company, utilizing various tracking technologies such as cookies, web beacons, and embedded scripts. Kalshi explicitly mentions collecting device details like IP address, browser type, Internet Service Provider, platform type, device type, operating system, date and time stamps, and a unique ID for identification. *Id.* at p. 2.

1153. Kalshi's Privacy Policy states that this collected information is used to comply with applicable laws and regulatory obligations for a DCM. *Id.* at p. 3.

1164. Robinhood's financial services operate through distinct subsidiaries, forming a comprehensive brokerage system that serves over 25 million-plus accounts.

1175. Robinhood's ecosystem includes Robinhood Derivatives, LLC. This wholly owned subsidiary, based in Chicago, Illinois, was acquired on January 3, 2024, from Marex Group plc (formerly Marex North America LLC).

[21] https://kalshi.com/docs/kalshi-privacy-policy.pdf

Formatted: Add space between paragraphs of the same style, Widow/Orphan control

Formatted: Add space between paragraphs of the same style

Formatted: Add space between paragraphs of the same style, Widow/Orphan control

Formatted: Add space between paragraphs of the same style

Formatted: Add space between paragraphs of the same style, Widow/Orphan control

Formatted: Add space between paragraphs of the same style

1186. Robinhood Derivatives, LLC operates as a Futures Commission Merchant ("FCM"), soliciting orders for futures or options contracts and accepting customer assets to support such orders. It enables users to trade futures, options contracts, and cleared swaps.

1197. 17 C.F.R. § 166.3 applies to FCMs and requires that "Each Commission registrant, except an associated person who has no supervisory duties, must diligently supervise the handling by its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) of all commodity interest accounts carried, operated, advised or introduced by the registrant and all other activities of its partners, officers, employees and agents (or persons occupying a similar status or performing a similar function) relating to its business as a Commission registrant."

Formatted: Indent: First line: 0", Add space between paragraphs of the same style

12018. For regulatory purposes, Robinhood Derivatives, LLC operates as a distinct entity, yet it integrates tightly into Robinhood's existing brokerage platform; a user cannot open an account with Robinhood Derivatives without an active Robinhood brokerage account.

Formatted: Add space between paragraphs of the same style

1082119. Prior to the initial listing of its sports event contracts, Throughout its litigation with the CFTC, Kalshi has repeatedly discussed gaming within the context of sportstold federal courts that contracts on sporting events are gambling. In *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024), dismissed, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025), Kalshi has stated:

a. "An event contract thus involves 'gaming' if it is contingent on a game or a game-related event. . . . The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." Appellee's Brief, at 41.

b. "Evidently, Congress sought to prevent exchanges from facilitating casino-style or sports gambling. . . . On a policy level, that makes some sense: The basic

purpose of Designated Contract Markets is to allow 'hedging' of economic risk. . . . Contracts that 'serve[] no commercial purpose at all' may therefore not deserve to be traded on a regulated exchange. . . . And, at least in general, contracts relating to *games* – again, activities conducted for diversion or amusement – are unlikely to serve any 'commercial or hedging interest.'" Appellee's Brief, at 45.

c. "[T]he word 'gaming' on its face – and in accord with its legislative history – is concerned with casino gambling and sports, not the premise of the entire derivatives market. As Justice Holmes put it, the 'proposition that the dealings which give its character to the great market for future sales in this country are to be regarded as mere wagers' is 'extraordinary and unlikely.'" Appellee's Brief, at 50.

d. "The legislative history is exclusively about sports when it talks about 'gaming'. So, I think there is a reason to believe that Congress was particularly concerned at the time it enacted this statute about sports betting and that was probably what they were getting at with the word 'gaming.'" Oral Argument, Jan. 17, 2025, at 50:22-50:40.

109220. Kalshi has made the following statements in *KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024):

Formatted: Add space between paragraphs of the same style

a. "The 'gaming' category reaches contracts contingent on *games* – for example, whether someone will win the Powerball lottery by a certain date, or whether a certain team will win the Super Bowl. It thus functions as a check on attempts to launder casino-style or sports gambling through the derivatives markets." Pl.'s Mem. of Law in Supp. of Pl.''s Mot. Summ. J., Dkt. No. 17, at p. 16.

b. "The only relevant legislative history, moreover, confirms that contracts on "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" were *precisely* what Congress had in mind as "gaming" contracts. 156 Cong. Rec. S5907 (daily ed. July 15, 2010)." Pl.'s Mem., Dkt. No. 17, at p. 23.

c. Arguing that the statutory term 'gaming' [as used in 7 U.S.C. § 7a-2(c)(5)(C)(i)] "on its face – and based on its legislative history – appears to be

concerned with casinos and sports, not with the premise of the entire industry. Statutory context thus forecloses the Commission's overbroad approach to "gaming." Giving the term its ordinary meaning – betting on *games* – avoids all of those pitfalls." Pl.'s Mem., Dkt. No. 17, at p. 27-28.

d. "Football, horseracing and golf. They're all games. . . . It's something that has no inherent economic significance. It's something that is done for amusement. It may be done for sport. It may be done purely to facilitate the betting itself, right, for its own sake." Oral Arg. on Mots. for Summ. J., Dkt. No. 40, at p. 15.

e. "So I think it makes sense for Congress to have thought about that category. Contacts that involve games are probably not the type of contracts that we want to be listed on an exchange, because they don't have any real economic value to them. But, again, what's tying that together is the existence of the game because the game is the thing that doesn't have intrinsic economic significance." Oral Arg., Dkt. No. 40, at p. 15.

1102331. Robinhood took the same view. Additionally, onOn August 8, 2024, JB Mackenzie of Robinhood Derivatives, through its General Counsel, Lucas Moskowitz, submitted a comment letter to the CFTC regarding CFTC Proposed Rule on Event Contracts. JB Mackenzie, Comment 74488 on Notice of Filing of Proposed Amendments to CFTC Regulation Section 40.11 (August 8, 2024) ("Mackenzie Comment").[22] In this letter, Robinhood Derivatives stated that the CFTC's definitions of "gaming" were "overly broad and ambiguous" and recommended that the CFTC "focus on prohibiting single sporting events or contests." Mackenzie Comment, *supra* 30:19–30:21, at 1, 7. The letter referenced 156 Cong. Rec. S5906-07, (daily ed. July 15, 2010), and stated that "[t]o the extent this discussion on the floor of the Senate represents Congressional intent, it focused on a comparison of gambling related to the results of *single* sporting events." *Id.* at 3.

[22] https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=74488&SearchText=Robinhood.



Formatted: Indent: First line: 0", Add space between paragraphs of the same style

1242. Beginning in October 2024, Robinhood announced its intention to allow trading on the outcome of the U.S. presidential election. This announcement followed Kalshi's favorable ruling against the CFTC, which allowed Kalshi to list its election contracts. Robinhood's shares spiked 4% after this announcement, despite the event contracts being rolled out to a limited number of U.S. citizen users.

111253. Robinhood does not independently offer event contracts; instead, users must access Kalshi's third-party services directly through the Robinhood platform. Robinhood began offering access to Kalshi's event contracts around October 28, 2024, initially focusing on political events like the 2024 U.S. presidential election. This arrangement deviates from Robinhood's typical third-party partnerships, where it facilitates all trades and earns revenue through payment for order flow.

112264. In contrast, Robinhood's partnership with Kalshi involves a direct revenue-sharing model, with Robinhood earning a $0.01 commission per contract traded . *Robinhood event contracts* (accessed July 1, 2025).[23] Robinhood's ability to offer event contracts is entirely reliant on Kalshi, as Robinhood itself is not a CFTC-designated contract market. Unlike its equities, options, or crypto offerings, where it does not co-brand with market makers (like Citadel Securities, Virtu, Wintermute, or B2C2), Robinhood Derivatives has notably co-brandeds with Kalshi. i, an exchange, and does not coordinate with a market maker to connect users to Kalshi's event contracts.

113275. Robinhood has incorporated Kalshi's foundational and regulatory documents into its platform. These documents specifically include: (1) KalshiEX LLC's Rulebook (Version 1.15) (January 17, 2025);[24] (2) a link to Appendix B of the January 22, 2025, self-certification Re: KalshiEX LLC — CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <team> win

[23] https://robinhood.com/us/en/support/articles/robinhood-event-contracts/
[24] https://cdn.robinhood.com/assets/robinhood/legal/KalshiEX_LLC_Rulebook.pdf



**Formatted:** Add space between paragraphs of the same style, Widow/Orphan control

**Formatted:** Add space between paragraphs of the same style

**Formatted:** Indent: First line: 0", Add space between paragraphs of the same style, Tab stops: Not at 0.5"

<title>?"Contract;[25] and (3) a Robinhood Event Contracts Risk Disclosure with a link to KalshiEx's Risk Disclosure.[26]

114286. Robinhood users access and trade Kalshi's event contracts directly within a dedicated "prediction markets hub" in the Robinhood application's native interface. This integration leverages Robinhood's existing user account and wallet infrastructure.

115. Each wager placed through Robinhood is transmitted by wire. When a Robinhood customer places a wager on a sporting event, Robinhood transmits the order electronically to Kalshi's exchange, as Kalshi's rules require, and Kalshi transmits confirmation and settlement information back. Kalshi Rulebook, Rules 5.5(a) (b), 5.10(b), 6.3(g). Those transmissions cross state lines: Kalshi operates from New York, and Robinhood Derivatives from Illinois.

1297. Kalshi expanded its offerings to include sports event contracts, which it began self-certifying on January 22, 2025. Through the CFTC's self-certification process under 17 C.F.R. § 40.2, Kalshi notified the Commission of its intent, asserting compliance with the CEA and CFTC regulations. Initial examples included questions such as "Will <team> win <title>?" for major sports championships, including the Super Bowl.

13028. The self-certification states it is CEA compliant but does not mention prohibited contracts under 7 U.S.C. § 7a-2(c)(5)(C) or the prohibition against listing contracts involving gaming pursuant to 17 C.F.R. § 40.11. *See* Kalshi Notification Regarding the Initial Listing (January 22, 2025).[27]

1163129. On February 3rd, 2025, Robinhood announced its intention to offer event contracts for Super Bowl LIX using Kalshi's services. *Robinhood Pauses Super Bowl Betting Contracts After Regulator Pushback* (February 5, 2025).[28]

[25] https://newsroom.aboutrobinhood.com/robinhood-prediction-markets-hub/
[26] https://cdn.robinhood.com/assets/robinhood/legal/Event_Contracts_Risk_Disclosure.pdf
[27] https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf.
[28] https://esportsinsider.com/2025/02/robinhood-pauses-super-bowl-betting-contracts-after-regulators-pushback



Formatted: Indent: First line: 0", Add space between paragraphs of the same style, Widow/Orphan control, Tab stops: Not at 1"

Formatted: Add space between paragraphs of the same style

Robinhood noted these contracts would be limited to roughly 1% of its users. *Robinhood Receives Formal Request from the CFTC to Roll Back the Pro Football Championship Market* (February 4, 2025).[29]

1320. In response to Robinhood's and Kalshi's partnership for Super Bowl sports event contracts, the CFTC formally requested Robinhood to cease offering them. On February 4, 2025, Robinhood announced it was rolling back the event contracts, halting bets on the Super Bowl result just one day after launch. *Id.*

117. Six weeks later, on March 17, 2025, Robinhood began offering Kalshi's sports contracts again, starting with the men's and women's college basketball tournaments. Robinhood announced the relaunch in a blog post stating that its new "prediction markets hub" would allow customers to "trade on the outcomes of some of the world's biggest events." Robinhood Launches Prediction Markets Hub (March 17, 2025). The post contained a direct link to Appendix B of Kalshi's January 22, 2025 sports self-certification. *Id.* During the 2025 college basketball tournaments, Kalshi reportedly facilitated around $500 million in trading on tournament contracts, in all 50 States and widely through Robinhood.

118. From the start, state regulators told Kalshi and Robinhood that their sports contracts were illegal sports wagering. The Nevada Gaming Control Board sent Kalshi a cease-and-desist letter on March 4, 2025. The New Jersey Division of Gaming Enforcement sent cease-and-desist letters to both Kalshi and Robinhood on March 27, 2025, demanding that they void wagers already placed. Kalshi and Robinhood have since been engaged in extensive litigation with States across the nation over its sports contracts.

119. Kalshi and Robinhood each can stop any customer from wagering. Kalshi's rules authorize it to direct Robinhood to place a customer's account on hold or to restrict it to closing existing positions, and require Robinhood to carry out that

[29] https://newsroom.aboutrobinhood.com/robinhood-receives-formal-request-from-the-cftc-to-roll-back-the-pro-football-championship-market/

direction. Kalshi Rulebook, Rule 5.5(e). Kalshi may also restrict trading by any participant in specific contracts or categories of contracts. *Id.*, Rules 3.11(a), (e). Despite that information and authority, Kalshi and Robinhood accepted sports wagers from customers located on the Tribes' Reservations.

120. Each Tribe's gaming commission has investigated whether Kalshi's sports event contracts could be purchased on that Tribe's Reservation. Each found that they could. **(info)**

121. On information and belief, members of the public, including the Tribes' own patrons and members, purchased Kalshi's sports event contracts while located on the Reservations during the same period. The Reservations have cellular and wireless internet, including on the Tribes' gaming floors. Kalshi's sports contracts were available to any adult in California with a smartphone. On information and belief, Kalshi's records of its users' GPS and transaction locations identify each wager placed on the Reservations.

122. For twenty months, Kalshi's sports event contracts were available on the Reservations. From January 22, 2025, when Kalshi listed its first sports event contract until at least September 24, 2026, anyone on the Reservations with a smartphone could wager on sporting events through Kalshi's application or Robinhood's. That period spanned every major professional and college sports season, including two Super Bowls, two college basketball tournaments, and a World Cup. Throughout it, Kalshi and Robinhood knew who was placing each wager and where, and had the authority to stop them. They did not restrict access on the Reservations.

123. On August 28, 2026, the Ninth Circuit held that Kalshi is unlikely to succeed on its claim that its sports event contracts are swaps subject to the CFTC's exclusive jurisdiction, and that Nevada may enforce its gaming laws against Kalshi. *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846 (9th Cir. August 28, 2026).

Formatted: Indent: First line: 0"

124. On September 16, 2026, in this action, the Ninth Circuit held that Blue Lake and Chicken Ranch are likely to succeed on their claims that Kalshi's sports event contracts, when entered on Indian lands, are class III gaming conducted in violation of IGRA, the Tribes' Secretarial Procedures, and their gaming ordinances, and that neither the Commodity Exchange Act nor UIGEA displaces IGRA. *Blue Lake Rancheria v. Kalshi, Inc.*, No. 25-7504, 2026 WL 2728466 (9th Cir. September 16, 2026). The mandate issued on October 8, 2026.

125. Eight days after the Ninth Circuit's decision in this action, on September 24, 2026, Kalshi, through its counsel, informed the Tribes and represented to this Court that it was taking steps to implement geolocation measures to block purchases of its sports event contracts on the Reservations. Those measures confirm that the technology to identify the Reservations' boundaries and restrict access within them was available to Kalshi throughout the period described in ¶ 122.

1331. In Nevada, the Nevada Gaming Control Board ("NGCB") issued a cease-and-desist letter to Kalshi on March 4, 2025, stating that its sports and election outcome contracts were unlawful without state approval. Nevada Gaming Control Board, Nevada Gaming Control Board Issues Cease and Desist Order to Company Engaged in Unlawful Gaming (March 4, 2025).[30]

1342. Only a month after pausing its sports event contracts related to Super Bowl LIX, pursuant to the CFTC's requests, Robinhood announced its renewed partnership with Kalshi to offer these contracts again on March 17, 2025. *Robinhood Pauses Super Bowl Betting Contracts After Regulator Pushback* (February 5, 2025).[31] During the 2025 March Madness tournaments, Kalshi reportedly facilitated a trading volume of around $500 million, specifically on tournament-related

[30] https://gaming.nv.gov/uploadedFiles/gamingnvgov/content/about/press-release/NGCB%20-%20News%20Release%20-%20KalshiEX%20Cease%20and%20Desist%20Order%20(3-4-2025).pdf

[31] https://esportsinsider.com/2025/02/robinhood-pauses-super-bowl-betting-contracts-after-regulators-pushback

markets. These trades took place in all 50 states and were widely available on Robinhood.

1353. Robinhood's March 17, 2025, announcement of the launch of its "Prediction Markets Hub" occurred via a blog post titled "Robinhood Launches Prediction Markets Hub." *Robinhood Launches Prediction Markets Hub* (March 17, 2025).[32] The blog post stated that this new hub would allow customers to "trade on the outcomes of some of the world's biggest events." *Id.* It specified initial contract offerings, including those related to the upper bound of the target Fed funds rate in May and the upcoming men's and women's College Basketball Tournaments. The post quoted JB Mackenzie, Robinhood's Vice President and General Manager of Futures and International, as identified in this post, regarding the company's view on prediction markets. *Id.* Furthermore, it contained a direct link to "Appendix B" from Kalshi's self-certified contract, which had been submitted to the CFTC on January 22, 2025. *Id.*

1364. The March 17, 2025, blog post contained a standard forward-looking statement disclaimer:

This blog post contains forward-looking statements regarding Robinhood's expectations, beliefs, plans, and projections about its business, regulatory environment, and product offerings. These statements are based on current assumptions and subject to risks and uncertainties that could cause actual results to differ materially from those anticipated. Such risks include, but are not limited to, regulatory developments, market demand, legal challenges, technological changes, and economic conditions. Robinhood undertakes no obligation to update any forward-looking statements after the date of this communication, except as required by law.

*Robinhood Launches Prediction Markets Hub* (March 17, 2025).[33]

Formatted: Indent: First line: 0", Widow/Orphan control, Font Alignment: Auto

Formatted: Indent: Left: 0", Right: 0", Space Before: 0 pt, After: 0 pt, Don't add space between paragraphs of the same style, Line spacing: Exactly 24 pt, Widow/Orphan control, Tab stops: Not at 1.06"

---

[32] https://newsroom.aboutrobinhood.com/robinhood-prediction-markets-hub/.
[33] https://newsroom.aboutrobinhood.com/robinhood-prediction-markets-hub/.

1375. In response to the offering of sports event contracts, particularly those related to the March Madness tournament, state gaming regulators took actions to assert that these contracts constituted unlicensed sports wagering in violation of their respective state laws.

1386. On March 27, 2025, the New Jersey Division of Gaming Enforcement issued cease-and-desist letters to both Kalshi and Robinhood, accusing them of unlawfully offering sports wagering in the state and demanding the voiding of placed wagers. Letter from Mary Jo Flaherty, Interim Director, New Jersey Division of Gaming Enforcement, to Tarek Mansour, CEO, Kalshi (March 27, 2025).[34] In immediate response, Robinhood promptly ceased allowing New Jersey customers to open new positions on March Madness event contracts and implemented geofencing to restrict access in other states raising similar concerns.

1397. Similarly, the Maryland Lottery and Gaming Control Agency issued a cease-and-desist letter to Kalshi on April 7, 2025, asserting that Kalshi's sports-event contracts constituted illegal sports wagering under Maryland law. Letter from John A. Martin, Secretary, Maryland Lottery and Gaming Control Commission, to Legal Counsel, Kalshi (April 7, 2025).[35]

14038. Kalshi responded to the Nevada Gaming Control Board's cease-and-desist by filing a lawsuit in the U.S. District Court for Nevada on March 28, 2025, seeking a temporary restraining order and preliminary injunction to continue its operations. On April 8, 2025, the Nevada court granted Kalshi a temporary restraining order against the NGCB.

14139. Despite initially pursuing the appeal in *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024), dismissed, No. 24-5205 (D.C. Cir. May 7, 2025), the CFTC later moved to voluntarily dismiss its case against Kalshi on May 7, 2025. This

[34] https://www.nj.gov/oag/ge/docs/EmergencyOrders/Kalshi2025.pdf
[35] https://www.mdgaming.com/wp-content/uploads/2025/04/Kalshi-4-7-25.pdf

action ended its legal challenge to the validity of election-based event contracts on public policy concerns.

1420. Kalshi continues to maintain that it is regulated by federal law under the CFTC and, therefore, state gambling laws are preempted concerning their sports event contracts.

1431. In addition to New Jersey, Maryland, and Nevada, other states that have issued cease-and-desist letters to Kalshi or its partners include Illinois, Ohio, Montana, and Arizona. The litigation in Maryland against the Maryland Lottery and Gaming Control Commission is ongoing, and the court has notably questioned Kalshi's inconsistent legal positions regarding the "economic consequence" of sports outcomes, given its differing arguments in the separate CFTC litigation over political event contracts.

144. On August 28, 2026, the United States Court of Appeals in *KalshiEx, LLC. Assad*, United States Court of Appeals, Ninth Circuit, Case No. 25-7516 unanimously held that the sports event contracts offered by Kalshi on prediction markets were not "swaps" under the Commodity Exchange Act, that Kalshi's sports events contracts did fall under the exclusive regulatory jurisdiction of the Commodity Futures Trading Commission and that the State of Nevada could enforce its state gaming laws against Kalshi.

145. From August 28, 2026, until the filing of this Second Amended Complaint, Kalshi and Robinhood have continued to offer and make available their sports event app for use by the general public and accepted sport event contracts or "bets" from the general public throughout the State of California.

146. On September 16, 2026, the United States Court of Appeals in *Blue Lake Rancheria and the Chicken Ranch Rancheria of the Me-Wuk Indians v. Kalshi,* United States Court of Appeals, Ninth Circuit, Case No. 25-7504 unanimously held that Kalshi's sports event contracts which paid a wager based on the winner of a sports event was unauthorized class III gaming when offered on Indian lands without

a valid Tribal-State Compact in violation of the IGRA. The Court also held that the District Court had jurisdiction to enjoin the illegal activity pursuant to 25 U.S.C. § 2710(d)(7)(A)(ii) of the IGRA.

147. Since September 16, 2026, to the filing of the Tribes' Second Amended Complaint, Kalshi and Robinhood have continued to offer the Kashi app on the Tribes' Indian lands and accept "bets" or wagers from the general public on the out-come of sporting events in violation of the Ninth Circuit Court of Appeals in this case.

148. Since January 1, 2025, until the filing of this Second Amended Complaint Kalshi has placed ads on internet social media, Television, sporting event pylon digital LED signs and print media advertising its app as being legal to use and place "Bets" on the outcome of sporting events within the State of California, including on the Tribes' Indian lands.

1492. These acts by Kalshi show a pattern and practice through their enterprises of racketeering activity in violation of RICO and false advertising in direct violation of the Lanham Act.**KALSHI'S FALSE AND MISLEADING ADVERTISING**

965126. On March 30, 2026, Kalshi disseminated on X an advertisement stating: "We aren't the house. Kalshi is a federally regulated exchange where you trade against other users. We make money on transaction fees, not market settlements." (the "House Advertisement"). Exhibit A(___). As of November 3, 2026, the House Advertisement remains publicly accessible.

9761278. In gambling, "the house" refers to a casino or sportsbook operator, or a person aligned with it, that takes the opposite side of a customer's wager and profits when the customer loses. By stating "We aren't the house," Kalshi represented to consumers that no one aligned with Kalshi takes the opposite side of their wagers, that their counterparties are other users like themselves, and that Kalshi does not profit when they lose.

987129. The House Advertisement described Kalshi in the language of financial markets ("a federally regulated exchange," "trade," "users," "transaction fees") and contrasted it with the language of gambling ("the house"). In doing so, it conveyed to consumers that what they do on Kalshi is trading on a financial exchange rather than gambling, and that the absence of a house is what makes the difference.

998130. Whether or not a house is involved, Kalshi's customers do what gamblers do: they stake money on the outcome of a sporting event for the chance of a payout. Wagering against other bettors rather than a house is still gambling. In pari-mutuel wagering on horse racing, for example, bettors wager against one another, their stakes are pooled, winners are paid from the pool, and the operator takes a commission. Federal regulations likewise classify "[a]ny sports betting and parimutuel wagering" as class III gaming and define gaming activity by the elements of "chance, consideration, and prize or reward." 25 C.F.R. §§ 502.4(c), 293.2(d).

10099131. Kalshi's sports event contracts contain each element of gambling. A customer pays to take a position (consideration) on the outcome of a sporting event (chance) and receives a payout if that outcome occurs (prize). The Ninth Circuit has concluded that the substance of Kalshi's sports event contracts is sports gambling, and that they are likely class III gaming when entered on Indian lands. *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846 (9th Cir. August 28, 2026), and that they are likely class III gaming when entered on Indian lands, *Blue Lake Rancheria v. Kalshi, Inc.*, No. 25-7504, 2026 WL 2728466 (9th Cir. September 16, 2026).*See* ¶¶ 123–124.

Formatted: Font color: Auto

101032. Setting aside whether wagering on Kalshi is gambling, the House's Advertisement's assurance that customers "trade against other users" raises a further question: who actually stands on the other side of a Kalshi customer's trade. That question would be difficult for anyone to answer, including someone familiar with financial markets. The answer depends on Kalshi's market-maker designations

Formatted: Widow/Orphan control

and incentive programs, its affiliated clearinghouse, its affiliated trading company, and, for Combos, a separate request-for-quote process. Understanding how those pieces fit together requires working through technical rules on derivatives clearing and market making. Even then, a customer could not tell who is on the other side of any particular trade, because trading on Kalshi's order book "is conducted on a fully anonymous basis." KalshiEX LLC Rulebook, Rule 5.7(a) (Version 1.29) (accessed November 4, 2026) ("Kalshi Rulebook"). KalshiEX Rule 5.7(a). The House Advertisement replaced that complexity with a simple answer: "other users."

102133. Kalshi chooses, obligates, and rewards the market makers that take the other side of its customers' trades. Under Kalshi's rulebook, Kalshi has "sole discretion" to decide who becomes a Market Maker, and may end that status "at any time and for any reason." Kalshi Rulebook, Rules 4.1(b), (e). Market Makers must maintain "two-sided markets within a defined spread and with a minimum depth." Rule 4.4(b). In return, they may receive "financial benefits, reduced fees, differing Position Limits and Position Accountability Levels, and enhanced access." Rule 4.3.

103234. Kalshi's website lists the markets in which its market makers trade. They include markets on NFL games, the Super Bowl, and which players will score touchdowns; NBA, NHL, and MLB games and championships; college basketball games and the NCAA tournament; the Men's World Cup; Premier League, Champions League, and other European soccer matches; professional tennis, golf, NASCAR, and UFC. For each, Kalshi lists a market-maker "Availability" of "98% of each 1h increment." Kalshi, How to Become a Market Maker on Kalshi, Kalshi Help Center (April 28, 2026) (accessed November 4, 2026). As a result, in Kalshi's sports markets, a market maker Kalshi has chosen and rewards is positioned to take the other side of customers' trades nearly all the time.

104335. Beyond its market makers, Kalshi pays participants to supply the orders its customers trade against. Kalshi's rulebook authorizes it to run

incentive programs that reward participants for trading on its exchange. Kalshi Rulebook, 3.13(f). Under Kalshi's Liquidity Provider Program, members who have signed a Market Maker Agreement may be designated as "Designated Liquidity Providers" for markets Kalshi selects, and receive rewards set through an auction. Kalshi also runs a Liquidity Incentive Program, which rewards participants for posting orders across Kalshi's markets.

105436. The market makers Kalshi recruits include some of the largest trading firms in the world. On April 3, 2024, Kalshi announced that Susquehanna Government Products, LLLP, a member of Susquehanna International Group, would serve as its first dedicated institutional market maker. On information and belief, based on public reporting, Jump Trading also makes markets on Kalshi's exchange and has agreed to acquire an equity stake in Kalshi in connection with its market-making arrangement. Yet Kalshi's help center tells customers that its market makers are "primarily individuals and small institutions." Kalshi, Kalshi Help Center, "Who are you trading with?" Kalshi Help Center (accessed November 4, 2026).

106537. Kalshi's own companies also stand on the opposite side of its customers' trades. KalshiEX LLC writes the terms of Kalshi's sports event contracts, lists them for trading, markets them, and runs the platform on which they trade. *See* ¶ 81. Kalshi Klear LLC, a KalshiEX affiliate registered with the CFTC as a derivatives clearing organization, clears those trades. It holds the money customers deposit to cover their positions, and at settlement pays the holders of winning positions from those funds. Kalshi Rulebook, Rules 5.3(c), 6.1(a), 6.3(d), 8.1(a); Klear Rules, Rule 6.2(C). Under Kalshi's rules, once orders are matched, each trader's contract runs to Kalshi Klear rather than to the other trader. Kalshi Rulebook, Rules 6.1(c), (e); Klear Rules, Rule 6.1(E). Kalshi Klear's rules acknowledge that its employees "also work for the Kalshi Exchange," and that this affiliation "may present conflicts of interest."

Klear Rules, Rule 2.13(D). Kalshi's rulebook also permits Kalshi to charge fees on the settlement of contracts. Kalshi Rulebook, Rules 3.13(c), 6.2.

107638. Kalshi also has its own trading company, Kalshi Trading LLC, which trades on Kalshi's exchange. Under Kalshi's rulebook, Kalshi Trading is funded by the same holding company that owns the exchange, trades on "either (or both) sides of a market," and has "profitability" as its "business purpose." Kalshi Rulebook, Rule 2.12(e)(a); *see* Klear Rules, Rule 2.18. On information and belief, that holding company is Defendant Kalshi Inc. *See* ¶ 12. Most of the trading on Kalshi's exchange is in sports event contracts. *See* ¶ 95. On information and belief, Kalshi Trading has taken the opposite side of customers' trades in sports event contracts, including while Kalshi disseminated the House Advertisement. Each time Kalshi Trading's position prevailed, the customer on the other side lost, and Kalshi Trading gained what that customer lost.

108739. Kalshi also offers parlays on sporting events, which it calls "Combos." A Combo combines multiple outcomes, including outcomes across different sporting events, into a single contract that pays only if every outcome resolves in the customer's favor. Kalshi began offering Combos on September 30, 2025. Combos are not traded on Kalshi's central order book. Instead, a customer's Combo is priced through a "request for quote" process, and the participant whose quote is accepted takes the opposite side of the customer's position. On information and belief, the participants who quote Combos are principally Kalshi's market makers.

109840. As a result, the participants Kalshi chooses and rewards gain when Kalshi's customers lose. When a customer's sports event contract expires worthless, the customer's stake funds the payout to the participant on the other side. Kalshi Rulebook, Rule 6.3(a), (d). In Kalshi's sports markets, where its market makers must quote prices nearly all the time, that participant is frequently one of

Kalshi's market makers or Kalshi's own trading company. Kalshi rewards its market makers with reduced fees and other benefits, and pays incentives, for supplying the orders its customers trade against.

110~~0941~~. Kalshi has also disseminated, including to consumers in California, advertisements ~~describing itself as "The First Nationwide Legal Sports Betting Platform" and~~ stating "Sports Betting Legal in all 50 States on Kalshi." Exhibit B~~A~~.

111~~042~~. On September 7, 2025, the first Sunday of the National Football League regular season, Kalshi shared on its official Instagram account, @Kalshi_official, a post stating: "Breaking News: Sports Betting in California is Now Legal" (the "California Advertisement"). Exhibit C~~B~~. The California Advertisement did not disclose that sports betting remains illegal in California, or that the legality of Kalshi's sports contracts was then being challenged by state regulators and by the Tribes in this action.

112~~143~~. Betting on sports events is illegal in California. California Penal Code § 337a prohibits pool selling, bookmaking, and recording, registering, receiving, or holding wagers on the result of any contest. In November 2022, California voters rejected Propositions 26 and 27, which would have authorized sports betting~~it~~.

113~~244~~. On July 3, 2025, the California Attorney General issued Opinion No. 23-1001, concluding that wagering on sporting events by persons physically located in California violates Penal Code § 337a, regardless of where the operator and its technology are located, and that the Unlawful Internet Gambling Enforcement Act does not alter that prohibition.

114~~345~~. In proceedings challenging the legality of its sports event contracts, Kalshi has contended that its product is not sports betting, but swaps subject to the exclusive jurisdiction of the CFTC, and that state laws prohibiting sports betting are preempted as applied to them. On information and belief, Kalshi

has never contended in any court or before any agency that sports betting is legal in California or in all 50 States.

115446. Before Kalshi listed its first sports event contract, it represented to federal courts that a contract on the outcome of a sporting event is "[t]he classic example" of a contract involving gaming, and that Congress "did not want sports betting to be conducted on derivatives markets." Appellee's Brief at 41, *KalshiEX*, No. 24-5205. ; *see* ¶ 78. *See* ¶ 108. Kalshi's counsel made similar statements at oral argument before the D.C. Circuit on January 17, 2025, five days before Kalshi self-certified its first sports event contract on January 22, 2025. *See* ¶ 109. Oral Argument at 50:22–50:40, *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 24-5205 (D.C. Cir. January 17, 2025).; *see* ¶ 83.

Formatted: Pattern: Clear

116547. Before Kalshi disseminated the California Advertisement, it received notice that its sports event contracts were alleged to be illegal sports betting. Gaming regulators in several States had sent Kalshi cease-and-desist letters asserting that its sports contracts violated gambling laws. That notice included the cease-and-desist letters described in ¶ 118, and the California Attorney General had issued the's opinion described in ¶ 11243. On July 22, 2025, the Tribes filed this action. Kalshi then disseminated the California Advertisement.

117648. Social media users have understood Kalshi's description of its sports products as "trading" to mean that those products are not gambling and are therefore legal. In a thread on r/Kalshi, a Reddit forum devoted to Kalshi, titled "I'm in California. How is this legal?", a user asked: "Isn't this sports betting?" One user responded: "I think they do it as 'trades' not 'bets.' So same reason why California can have day traders. . . . [T]hat's when I downloaded the app." Another wrote: "It is not sports betting that is why it is legal."[36]

[36] https://www.reddit.com/r/Kalshi/comments/1i86txe/im_in_california_how_is_this_legal/Add URL

118749. In the same thread, a user who identified as "a resident of CA" asked whether he could "bet on sports outcome on Kalshi," and later reported: "Yes already using it." *Id.* In another thread on the same forum, a user wrote: "I know Kalshi is a trading app for contracts. Is there a guarantee I will not get into any legal trouble for using there [sic] app in the state?"[37]

119850. Social media users have also adopted Kalshi's message that, because there is no house, Kalshi is a trading platform rather than a gambling operation. In an r/Kalshi thread posted in or about August 2026, after Kalshi disseminated the House Advertisement, users wrote that "Kalshi makes money on fees, not when John Gamble loses"; that Kalshi is "sum zero, they only make fees"; that although "half the sub acts like kalshi is a bookie," it is "just a platform that takes a tiny cut every time you click buy"; and that the absence of a house is "exactly what separates prediction markets from sportsbooks, which ARE directionally on the other side [of] trades their own customers take and specifically profit when their customers lose."[38]

1201951. Each Tribe operates a class III gaming facility in California. *See* ¶¶ 9–11, 39. The revenue from those facilities funds each Tribe's government and the services it provides its members. *See* ¶ 41. Kalshi's sports event contracts are class III gaming. *See* ¶ 124. Kalshi and the Tribes therefore compete in the same market: the gaming expenditures of consumers in California. Because sports betting is not otherwise available in California, consumers who want to wager on sporting events choose between Kalshi and other forms of gaming, including the gaming the Tribes offer. A consumer's money spent wagering on Kalshi is money not spent at the Tribes' facilities.

---

[37] https://www.reddit.com/r/Kalshi/comments/1m0c3da/legality_behind_kalshi/Add URL

[38] https://www.reddit.com/r/Kalshi/comments/1vdq8d6/comment/p1b1d71/

1210. The Tribes' patrons are adults in California who spend money on gaming, the same consumers Kalshi's advertisements target. Until at least September 24, 2026, Kalshi's sports contracts were available to those patrons anywhere, including on the Tribes' gaming floors, where the Tribes' gaming commission investigators placed wagers through Kalshi's application. *See* ¶ 72. Since Kalshi began offering sports contracts in January 2025, consumers persuaded by Kalshi's advertisements that wagering on Kalshi is lawful trading rather than gambling have spent money on Kalshi's sports contracts that they would otherwise have spent at the Tribes' facilities. As a result, the Tribes have lost substantial gaming revenue, in an amount to be proven at trial.

152. Since Kalshi's activity has proximately caused gamers to not travel to the reservation . As a direct and proximate result (Add facts showing overlap with Kalshi's customers).

Formatted: Indent: First line: 0.5"

Formatted: Indent: First line: 0.5"

96. On its Instagram account, @kalshi_official, Kalshi, as shown in Exhibit A, has published advertisements asserting itself as "The First Nationwide Legal Sports Betting Platform" and that its customers can engage in "Sports Betting Legal in all 50 States on Kalshi" (Exhibit A).

97. Kalshi's Instagram account includes a post, dated January 23, 2025, stating in the caption post: "Legal sports markets, accessible to Americans in all 50 states." The post remains accessible on Kalshi's Instagram (Exhibit B).

98. Kalshi's Instagram account also includes a post, dated February 3, 2025, containing a screenshot of an article from Front Office Sports stating "Robinhood to Offer Super Bowl Betting via Kalshi." The post remains accessible on Kalshi's Instagram (Exhibit C).

99. On June 11, 2025, Kalshi posted an artificial intelligence ("AI") generated video advertisement to its Instagram account. Kalshi has also posted this video on other platforms such as TikTok. The advertisement contains depictions of people exclaiming "I'm all in on OKC" and "Indiana got that dog in them." The advertisement further contains a depiction of a shirtless man exclaiming, "Kalshi lets you legally trade on anything, anywhere in the U.S."

100. On July 19th, 2025, Kalshi sponsored a TikTok video where a man explains to viewers, in response to questions by a woman asking about the legality of Kalshi's contracts, in the video that Kalshi is "totally [legal] … in all 50 states, even California" (Exhibit C).

101. As part of its widespread promotional strategy, Kalshi has posted on its TikTok a video where Kalshi describes its platform as a place for placing "live bets" in various promotional materials including billboard signs, out-of-home advertising on bus stops, on trucks, and the sides of buildings, in various locations including New York City, Los Angeles, Miami, and Dallas.

102. Social media users have raised questions about the legality of Kalshi's products, with specific comments expressing confusion, such as; "Is this app legit?" Users have also raised concerns regarding their own legal liability for using Kalshi. On Reddit page r/Kalshi, one user stated: "I just wanted to confirm before using Kalshi. Washington state has strict 'gambling' laws in place and I know Kalshi is a trading app for contracts. Is there a guarantee I will not get into any legal trouble for

using there [sic] app in the state?"[39]

103. Social media users have expressed concern regarding these products, stating: "Kalshi is dangerous. Sports betting should not be okay for under 21 let alone in all 50 states" ( Exhibit D).

104. On one of Kalshi's promotional TikTok posts added to the site on July 18, 2025, various TikTok users commented: "This shouldn't be legal"; "Betting culture is crazzyyy"; "Didn't Enron do the exact same thing?"; "Enron is back baby!"; "Betting on the weather is insane"; "Predatory marketing"; "Calling it a trading app is crazy"; "I 'traded' it all on black and now im by the wendy's dumpster if anybody wants service for a $5"; "Addiction type beat"; "1-800-GAMBLER"; "'Trading'"; "'Trade' ima buy $15 that it's sunny tomorrow. Yea that's a trade alright"; "As a meteorologist would this be insider trading?"; "Holy addiction"; "'I traded that I'd be…' dawg that's called betting. You gambled."; "This is literal distopia. Please don't do this." (Exhibit E).

105. Kalshi's promotional materials frequently utilize the term "odds" in its advertisements. Kalshi even sells merchandise, including hats that say "What are the odds" (Exhibit F).

106. Kalshi's deceptive promotional materials also pre-date its push into the sports gambling market. For instance, in close proximity to its advertisements of sports event contracts on various social media platforms, Kalshi marketed its platform as a betting app during the 2024 U.S. Presidential election. In one video posted on October 17, 2024, which remains available on Kalshi's Tiktok page, an interviewer is seen pulling a number of voters aside who are going to the polls to vote and asking "How much money would you bet on Trump winning the election?"

107. On October 15, 2024, Kalshi posted a TikTok video on its official account, which remains available to users on its page, where its CEO and Co-founder, Tarek Masour, explains in response to the question "Hey my man, what do

[39] https://www.reddit.com/r/Kalshi/comments/1m0c3da/legality_behind_kalshi/

you do for a living", that "I'm the founder of Kalshi […] its an app and website where you can bet on anything." In the video, the man then asks, "anything?" and Tarek Mansour replies, "Anything. [...] We are the first platform that legalized betting on the U.S. election. Now, Americans can actually bet on whose going to win, Trump versus Kamala. You can bet on the weather tomorrow. You can bet on inflation. You can bet on whether Eric Adams is gonna get fired. Or when he's gonna get fired."

108. Additionally, on October 17, 2024, Kalshi posted a TikTok video on its official account, which remains available to users on its page, where its CEO and Co-founder, Tarek Masour, explains that "I wanted to see our Billboard. So, these are live trades, live bets, of people actually betting on the exchange as we speak… If you bet on Kalshi right now, you're gonna get streamed on this billboard."

109. Likewise, a TikTok post on Kalshi's page from October 19, 2024, states: "For the first time in 100 years, you can legally bet on U.S. elections." The post interviews different individuals, including one person who says, "If I could mortgage my house to bet on Trump, I would."

Formatted: Indent: First line: 0.5"

## FIRST CAUSE OF ACTION

**(Violation of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721)**

12215043. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 1241092 above and by this reference incorporate each allegation as if set forth herein in full.

12325144. Gambling in Indian country is criminally prohibited by federal statute, except gaming conducted by a federally recognized Indian tribe in accordance with the IGRA. 18 U.S.C. §1166.

12435245. IGRA established a statutory framework for the regulation of Indian gaming that expressly pre-empts the field of governance of gaming activities

on Indian lands. *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 543–44 (8th Cir. 1996).

12545346. Under IGRA, in order for class III gaming to be conducted on Indian lands: (1) the tribe must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chairman of the National Indian Gaming Commission ("NIGC"), a federal regulatory agency created under IGRA; (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state, pursuant to IGRA. 25 U.S.C. § 2710(d)(1).

12655447. In order to go into effect, a tribal-state class III gaming compact must be approved by the Secretary, 25 U.S.C. § 2710(d)(8)(A), or deemed approved by operation of law, 25 U.S.C. § 2710(d)(8)(C), and notice of approval must be published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B).

12765548. Federal regulations that implement IGRA define "gaming activity" or "gaming activities" as "the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward." 25 C.F.R. § 293.2(d).

12875649. Federal regulations that implement IGRA state that class III gaming includes "[a]ny sports betting and parimutuel wagering including but not limited to wagering on horse racing, dog racing or jai alai." 25 C.F.R. § 502.4(c).

Formatted: No widow/orphan control

1298570. Kalshi and Robinhood are not federally-recognized Indian tribes conducting class III gaming activity pursuant to a Tribal-State Compact, 25 U.S.C. §§ 2710(d)(1)–(2), or Secretarial Procedures. 25 U.S.C. § 2710(d)(7)(B)(vii).

13029581. Through self-regulation, Kalshi and Robinhood havves offered sports event contracts that are explicitly prohibited under 17 C.F.R. § 40.11(a)(1), and Kalshi has admitted that the subject matter of those contracts constitutes gaming.

13105952. Kalshi's self-certifications of its sports event contracts, pursuant to 17 C.F.R. § 40.2, are defective because the submissions fail to adequately address CEA compliance issues and establish that the prohibited contracts are nevertheless CEA compliant and are, therefore, not contrary to the public interest.

13216053. Kalshi has an adequate, available remedy for explicit CFTC approval under 17 C.F.R. § 40.3, but has chosen not to avail itself of CFTC approval.

13326154. Kalshi's and Robinhood's contracts fall outside the permissible scope of the CEA and, therefore, constitute unlawful gambling, a crime in Indian country under 18 U.S.C. § 1166, because the Kalshi app may currently be accessed for the purpose of staking something of value (consideration), on a sports event involving the element of chance, for the purposes of receiving a reward based on the outcome of the event, consistent with the definition of class III gaming activity in 25 C.F.R. § 293.2(d), from locations in Indian country, as defined by IGRA, 25 U.S.C. §§ 2703(4)(A)-(B).

13436255. As a result, any person over the age of eighteen with a cell phone, tablet, or computer can access the Kalshi app and engage in unlawful gambling on Indian lands.

13546356. From January 22, 2025, until at least September 24, 2026, Kalshi and Robinhood implemented no geolocation or geofencing measures to prevent sports betting through the Kalshi or Robinhood applications on the Tribes' Indian lands. Kalshi and Robinhood has have not implemented any effective mechanism, such as geo-location and geo-fencing, that would prevent any person or entity from engaging in sports betting using the Kalshi app on the Tribes' Indian lands.

Formatted: Font color: Black

13656457. IGRA establishes a right of action by an "Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact [or Secretarial Procedures] entered into . . . that is in effect," over which the "United States district courts shall have jurisdiction . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii).

13766558. An actual case or controversy exists between the Tribes and the Defendants Kalshi, in that the Tribes assert that Kalshi the Defendants is are conducting class III gaming on the Tribes' Indian lands and such conduct violates the Tribes' tribal- state class III gaming Ccompact/Procedures, s and federal, and state, and tribal law, while Kalshi the Defendants contends that its activities do not constitute gaming and, therefore, do not violate IGRA.

WHEREFORE, the Tribes pray as hereinafter set forth below.

**SECOND CAUSE OF ACTION**

**(Violation of the Tribes Gaming Ordinances)**

13876659. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 13766558 above and by this reference incorporate each allegation as if set forth herein in full.

1398670. The Tribes are sovereign governmental entities that exercise inherent powers of self-government with the jurisdiction and authority to enact their own laws and enforce those laws against both Indians and non-Indians engaging in activities on their Reservations. *United States v. Wheeler*, 435 U.S. 313, 323 (1978); *Water Wheel v. LaRance*, 642 F. 3d 802 (9th Cir. 2011).

14039681. In enacting the IGRA, Congress expressly granted Indian tribes the right to regulate gaming activities on their respective Reservations through the enactment of tribal gaming Ordinances that would become effective upon the approval of those Ordinances by the Chairman of the NIGC. 25 U.S.C. § 2710(b) and § 2710(d).

1410692. Pursuant to the IGRA and their inherent sovereign authority, each of the Tribes have enacted gaming Ordinances comprehensively regulating all gaming activities on their Reservations. The enactment of the gaming Ordinances was not only an exercise of the Tribes' own inherent sovereign authority but also an exercise of Congressionally delegated authority granted to the Tribes by Congress with the enactment of the IGRA. *United States v. Mazuire*, 419 U.S. 544 (1975).

14217063. As such, the Tribes' gaming Ordinances preempt the field of conduct that the Tribes define as gaming in their Ordinances, including any other federal or state law that conflicts with the express provisions of the Ordinances authorized by the IGRA and which also conflicts with the provisions of the CEA. *Fisher v. District Court*, 424 U.S. 383 (1976).

14327164. Under the Ordinances, Kalshi's the Defendants' sports gambling activities meet the definition of gaming and a class III game that is strictly prohibited under the Ordinances. Pursuant to the Tribes' inherent sovereign authority and congressionally-delegated authority granted to the Tribes by IGRA, the Tribes have jurisdiction to enforce the provisions of their Ordinances against Kalshithe Defendants, including prohibiting Kalshi the Defendants from engaging sports betting on their respective Reservation by offering future event contracts.

WHEREFORE, the Tribes pray as hereinafter set forth below.

**THIRD CAUSE OF ACTION**

**(Infringement of the Tribes' Sovereignty and Interference with Tribal Self-Governance)**

1443222. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 142221 above and by this reference incorporate each allegation as if set forth herein in full.

1454223. Kalshi's and Robinhood's sports gambling activities are being conducted in direct violation of the Tribes' duly enacted gaming Ordinances which are incorporated into their gaming compact and procedures and which prohibit sports gambling on their Reservations.

1465224. By engaging in illegal sports gambling in violation of the Tribes' Ordinances, Kalshi and Robinhood areis interfering with and will continue to interfere with the Tribes' ability to govern themselves, their members, and all persons who work, live, and visit their respective Reservations by preventing the Tribes from determining to what extent and under what conditions, if any, persons, organizations,

and entities can engage in class III gaming on their Reservations under their laws.

147~~6225~~. In addition, the Tribes are engaged in Tribal governmental gaming. Under the IGRA, expenditure of gaming revenue is comprehensively regulated and the Tribes can only spend their gaming revenue to: (1) fund tribal governmental operations or program; (2) provide for the general welfare of the Tribes' members; (3) promote economic development on their Indian lands; (4) donate to charitable organizations; and (5) help fund the operations of local governments. 25 U.S.C. § 2710(b)(2)(B). All of the Tribes' gaming revenue is used to provide essential governmental services to its members, promote economic development on their Reservations, and help fund local governmental programs that benefit their Reservations.

148~~7226~~. By engaging in their illegal ~~criminal~~ sports gambling activities both on-and-off of the Tribes' reservations, the Defendants have diverted revenue away from the Reservations and reduced the Tribes' governmental revenue forcing the Tribes to begin reducing the level of services and purposes that benefit their members thereby directly interfering in the ability of the Tribes to govern themselves and their members on their reservations.

149~~8227~~. An actual controversy exists between the Tribes and Kalshi and Robinhood, in that the Tribes contend they have the authority to enforce their Ordinances against Kalshi and Robinhood and prohibit ~~it~~them from engaging in sports gambling on their Reservations, while Kalshi and Robinhood assert~~s~~ that the Tribes have no such authority.

150~~49228~~. Kalshi's and Robinhood's past and future actions of violating the Tribes' Ordinances by engaging in sports gambling on the Tribes' Reservations impermissibly interferes with the ability of the Tribes to govern themselves on their Reservations under their own laws. *Williams v. Lee*, 358 U.S. 217 (1959).

151~~0229~~. The Tribes ~~has~~have been irreparably injured by Kalshi's and Robinhood's unlawful sports gambling on their Reservations and unless Kalshi and

Robinhood isare provisionally and permanently restrained and enjoined from engaging in such illegal gambling the Tribes will be prevented from governing themselves on their Reservations under their own Tribal laws, causing severe and irreparable injury for which the Tribes have no plain, speedy, or adequate remedy at law.

WHEREFORE, the Tribes pray as hereinafter set forth below.

Formatted: Font: Not Bold, No underline

Formatted: Justified, Indent: First line: 0.5", Right: -0.06", No widow/orphan control

**(Civil RICO, 18 U.S.C. § 1962(c))**

17265. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 17164 above and by this reference incorporate each allegation as if set forth herein in full.

17366. 18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Thus, a *prima facie* RICO case requires that a plaintiff show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-97 (1985).

17467. Kalshi and Robinhood violated 18 U.S.C. § 1962(c) by engaging in the acts described in the paragraphs below. At all relevant times, Defendants Kalshi and Robinhood and other individuals and entities named herein are "persons" within the meaning of 18 U.S.C. § 1961(3).

17568. At all relevant times, Kalshi was associated with an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). This Enterprise (the "Gaming Racket") is an "association-in-fact" consisting of Kalshi, Robinhood, and various individual officers, directors, agents, and/or employees of these entities who knowingly participated in the Gaming Racket's affairs.

17669. An association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009). Such a group need not have a hierarchical structure or a "chain of command" and decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. *Id.* at 948. Members of the group need not have fixed roles; different members may perform different roles at different times. *Id.* The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. *Id.*

1770. This Gaming Racket was formed and functions with a common purpose: to design, market, distribute, and widely disseminate event contracts based on sports outcomes ("gaming contracts"), all the while consciously disregarding or actively circumventing prior regulatory concerns and even their own prior stated positions that such contracts constituted prohibited "gaming." and knowing full well that such activity was a crime in violation of California Penal Code § 337a and 18 U.S.C. § 1166. The decision by both Kalshi and Robinhood to jointly enter and aggressively expand the market for gaming contracts was made with a mutual awareness and intentional knowledge of the ongoing regulatory scrutiny requirements and criminal violations surrounding such products, resulting in shared liability and operational interdependence for this specific venture.

1781. The introduction of this product category represents a new venture for the Defendants, which distinguishes this Gaming Racket from their prior business operations.

1792. Prior to this venture, Kalshi's the Defendants' contract offerings primarily focused on more conventional event types, such as those tied to economic data releases (e.g., inflation rates, unemployment figures), general political outcomes (e.g., election results), or other verifiable, non-sporting events.

18073. Kalshi self-certified its first sports event contract via the CFTC Portal on January 22, 2025. This offering of event contracts on sports outcomes to the general public, particularly through a mass-market retail platform like Robinhood, involved a significant and deliberate expansion into a product category from its previous contract types.

18174. Robinhood's integration with Kalshi allows users to access Kalshi's event contracts directly within the Robinhood app. This constitutes a marked departure from Robinhood's traditional, federally regulated brokerage services, which include commission-free trading of stocks, exchange-traded funds, options, and cryptocurrency. Robinhood has additionally noted the novelty of these gaming contracts in its March 17, 2025, blog post standard forward-looking statement disclaimer. See *supra* ¶ 134.

18275. Robinhood's departure from its normal business to offer products solely dependent on Kalshi's specific self-certification is also evident in its inclusion in its March 17, 2025, blog post of a direct link to Appendix B from Kalshi's January 22, 2025, self-certification, which had taken place only weeks prior.

18376. The coordinated nature of this venture extends to its financial structure, as Kalshi and Robinhoodthe Defendants engage in revenue sharing on the gaming contracts offered through the Robinhood platform. This arrangement demonstrates a shared financial interest in the success and widespread dissemination of these gaming contracts, directly serving the Gaming Racket's common purpose to design, market, distribute, and widely disseminate these contracts based on sports outcomes.

18477. The Gaming Racket functions as a continuing unit with ongoing relationships and a discernible structure, where the actions undertaken are on behalf of the enterprise's joint interests, not merely the individual capacities of Kalshi and Robinhood.

18578. The operational design of the Gaming Racket ensures a seamless user experience, with Robinhood users accessing and trading Kalshi's event contracts directly within a dedicated "prediction markets hub" in the Robinhood application's native interface. This leverages Robinhood's existing user account and wallet infrastructure. This technical integration, requiring dedicated resources from Robinhood for development and ongoing maintenance, demonstrates a specific, shared, and continuous investment in the functional operability and success of this new venture.

18679. Robinhood's arrangement here differs from its typical third-party partnerships, where it facilitates all trades and earns revenue through payment for order flow by routing orders to market makers. In contrast, Robinhood's partnership with Kalshi involves a direct revenue-sharing model where Robinhood earns a $0.01 commission per contract traded. This further establishes Robinhood's financial stake in facilitating an ongoing criminal relationship with Kalshi.

1870. Evidencing a continuous structure, Robinhood has incorporated Kalshi's foundational and regulatory documents into its platform, demonstrating operational and regulatory integration. This indicates direct inter-company involvement and shared responsibility for the Gaming Racket's criminal products and compliance framework, moving beyond standard commercial dealings. See *supra* ¶ 125.

1881. The Gaming Racket's current shared legal exposure additionally reinforces its continuous criminal structure. This shared legal burden necessitates a unified defense strategy, compelling ongoing collaboration between the two entities and reinforcing their commitment to the Gaming Racket's criminal objectives despite external challenges.

1892. This shared legal challenge reveals a coordinated, albeit differentiated, strategic response by the Gaming Racket that underscores its continuity and lack of Robinhood's disengagement from the enterprise. In several instances where state

authorities issued cease and desist orders or declared gaming contracts illegal, Robinhood and Kalshi, functioning in its their operational capacity for the enterprise, implemented geofencing technology in states such as New Jersey. This operational measure served to restrict access to the criminal gaming contracts for users within those specified jurisdictions, while crucially continuing to offer these same criminal gaming contracts to users in other states through Kalshi, which also collects geolocation data, thereby demonstrating the Gaming Racket's ongoing commitment and its criminal operation across varied regulatory landscapes.

19083. Concurrently, and as a complementary component of the Gaming Racket's overall strategy, Kalshi, in its capacity as the DCM, elected to directly confront these cease-and-desist letters through legal proceedings rather than cease their criminal conduct or initiate geofencing. This included initiating lawsuits against state regulators to assert federal preemption or challenge the legality of state actions. This distinct legal posture by Kalshi, while Robinhood managed operational access, demonstrates a willful, intentional deliberate division of labor within the enterprise to commit a state and federal crime in California.

19184. These differing, yet congruent, responses underscore a unified strategic commitment by the Gaming Racket to ensure the widespread dissemination of gaming contracts while addressing specific legal impediments. The deployment of operational restrictions by one member and direct legal challenges by another illustrates the adaptability and concerted efforts and conspiracy of the Gaming Racket to overcome obstacles to its common purpose, with Robinhood maintaining its integral role in the venture rather than disengaging from the enterprise. All in furtherance of the Defendants on-going criminal activity.

19285. The longevity of the Gaming Racket is evidenced by its persistent and adaptive efforts to establish and expand the offering of these new, controversial criminal gaming contracts despite recurring regulatory challenges, indicating a sustained commitment to its common purpose. The strategic actions by

Kalshi regarding self-certification and the subsequent strategic reengagement and March relaunch, indicate that the Gaming Racket adapted and continued its pursuit of its objective for this illegal product line.

19386. A "pattern" of racketeering activity requires proof of "at least two [predicate] acts of racketeering activity" within ten years of each other. See 18 U.S.C. § 1961(5). Racketeering activity consists of the commission of a predicate act, as defined in 18 U.S.C. § 1961(1). *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985).

19487. Through this Gaming Racket, Defendants Kalshi and Robinhood directly and indirectly conducted and engaged in the enterprise's criminal activities through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1). Specifically, the Gaming Racket has: (1) engaged in wire fraud as prohibited by 18 U.S.C. § 1343, (2) transmitted wagering information as prohibited by 18 U.S.C. § 1084, (3) engaged in criminal sports gambling in violation of California Penal Code § 337a; (4) engaged in criminal sports gambling in violation of 18 U.S.C. § 1166; and (5) operated an illegal criminal gambling business as prohibited by 18 U.S.C. § 1955.

19588. 18 U.S.C. § 1343 requires proof of: (1) a scheme to defraud; (2) the use of interstate wire communications in furtherance of the scheme; and (3) that the defendants acted with the specific intent to deceive or defraud. *United States v. Bonallo*, 858 F.2d 1427, 1433 (9th Cir. 1988). Specific intent to defraud may be established by circumstantial evidence and by inferences drawn from the scheme itself, particularly if the scheme was reasonably calculated to deceive. *Manta v. Chertoff*, 518 F.3d 1134, 1142 (9th Cir. 2008).

19689. A scheme to defraud by false representations may be accomplished by making patently false statements or statements with a reckless indifference as to their truth or falsity, and deceitful concealment of material facts may constitute actual fraud. *Gusow v. United States*, 347 F.2d 755, 756 (10th Cir.

1965). "Even though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations." *United States v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997).

19790. The Defendants scheme to defraud have involved the systematic misrepresentation of unlawful gaming contracts as legitimate commodity contracts tradable on a CFTC-regulated exchange, in direct conflict with the CEA and CFTC regulations thereunder, particularly the explicit prohibition against transactions that involve "gaming." *See* 7 U.S.C. § 7a-2(c)(5)(C); 17 C.F.R. § 40.11, and engaging in illegal sports gambling in violation of Penal Code § 337a and 18 U.S.C. § 1166 both on-an-off of the Tribes' Indian lands..

1981. Beginning in February 2025, the Gaming Racket (through Robinhood's platform and its integrated payment systems) has continuously used interstate wire communications to electronically collect deposits from users, process orders for gaming contracts, facilitate trades, and manage withdrawals of funds. Each such instance of financial transfer has been conducted under the false pretense that it relates to legitimate commodity transactions stemming from valid self-certifications, rather than unlawful criminal gaming contracts that violate the CEA (specifically 7 U.S.C. § 7a-2(c)(5)(C) prohibiting "gaming"); and CFTC Regulations (including 17 C.F.R. § 40.11 prohibiting contracts involving "gaming,", and in contravention of the requirements of 17 C.F.R. § 40.2 regarding proper self-certification and violations of Penal Code § 337a and 18 U.S.C. § 1166.).

1992. Kalshi's 17 C.F.R. § 40.2 self-certification presented these gaming contracts as CEA-compliant, despite a demonstrable insufficiency in establishing compliance with the CEA's provisions against gaming, specifically 7 U.S.C. § 7a-2(c)(5)(C) and 17 C.F.R. § 40.11. This assertion of compliance for contracts tied directly to sports outcomes, coupled with the lack of detailed analysis and supporting documentation explicitly required by 17 C.F.R. § 40.2, indicates a disregard for relevant facts and applicable CFTC regulations. This position stands in stark contrast

to Kalshi's own prior statements, which previously suggested or acknowledged that such "sports events" contracts fall within the definition of "gaming" under 17 C.F.R. § 40.11, thereby being subject to prohibition under Section 40.11(a)(1).

200193. Kalshi notably self-certified the January 22, 2025, contract within a week of stating that similar sports events contracts constituted gaming, representing a rapid and contradictory shift in its compliance posture without apparent new legal justification.

201194. As a key act in furtherance of this scheme, in its March 17, 2025, press release, Robinhood included a link to Kalshi's January 22, 2025, self-certification filing with the CFTC and specifically directed users to Appendix B of that filing on its website. By directly disseminating Kalshi's insufficient compliance justification, Robinhood actively facilitated the widespread rollout of these mischaracterized contracts to its extensive user base.

202195. Defendant Robinhood Derivatives, as an FCM and a "Commission registrant" under 17 CFR § 166.3, was statutorily obligated to diligently supervise the activities of its partners, officers, employees, and agents in relation to the legitimacy and regulatory compliance of the products it makes available to its customers. Robinhood's actions indicate an understanding, or a disregard of readily available information, that Kalshi's 17 C.F.R. § 40.2 self-certification for its gaming contracts was insufficient to establish its compliance with the CEA's prohibition on unlawful gaming.

196203. Robinhood's own prior internal actions (e.g., its decision to pull specific sports-related contracts from its platform, such as those related to the Super Bowl or NCAA March Madness, in certain jurisdictions due to regulatory concerns) and documented external communications or internal analyses previously acknowledging the regulatory conflicts or the "gaming" nature of such contracts, further illustrate its awareness of the regulatory conflicts under the CEA and CFTC rules. By permitting its partners, officers, employees, and agents to promote and

facilitate trading in these contracts, Robinhood's conduct indicates an intention to present these impermissible contracts as legitimate commodity interests, leading to investor engagement based on a fundamental mischaracterization that generated profits for Robinhood.

197204. 18 U.S.C. §1084(a) states that whoever: engages in the business of betting or wagering and knowingly uses a wire communication in interstate or foreign commerce to transmit bets, wagers, or information assisting in placing bets or wagers "shall be fined under this title or imprisoned not more than two years, or both."

198205. 18 U.S.C. §1084(b), as an exception to Part (a), states:

> Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal.

206199. Defendants, by and through the Gaming Racket described herein, have knowingly used a wire communication facility for the transmission in interstate and foreign commerce of bets or wagers, or information assisting in the placing of bets or wagers, on sporting events or contests, or for the transmission of money or credits in connection therewith, in violation of 18 U.S.C. § 1084.

2070. The sports gaming contracts designed, marketed, and widely disseminated by the Gaming Racket constitute "bets or wagers" within the meaning of 18 U.S.C. § 1084. These contracts offer binary choices tied to the outcome of sporting contests such as the Super Bowl and NCAA March Madness tournaments. Customers buy "Yes" or "No" positions, with a fixed payout of $1 (minus fees) for a correct prediction and expiration at $0 for an incorrect one, aligning with the characteristics of a wager.

2081. The Gaming Racket, through its operation of the "prediction markets hub" within the Robinhood mobile application and web platform, knowingly utilizes

wire communication facilities. These platforms serve as the primary means by which users interact with and place positions on the gaming contracts. The transmissions occur in "interstate commerce" due to Robinhood's nationwide reach and the fact that users in various states access and engage with the prediction markets hub and associated contracts. Robinhood's mobile application and web platform are employed to transmit:

a. bets or wagers, by facilitating the placing of orders for "Yes" or "No" positions on gaming contracts.

b. information assisting in the placing of bets or wagers, including real-time pricing and probability information for these contracts, and marketing and promotional materials for gaming contracts to users across state lines. These transmissions explicitly concern "sporting events or contests," including but not limited to the Super Bowl and NCAA March Madness tournaments, as explicitly marketed and offered by the Defendants.

c. money or credits in connection therewith, by processing the transmission of funds related to the funding of accounts for these contracts and the distribution of payouts upon resolution.

d. direct communication channels for users to monitor the status and outcomes of their sports-related positions.

2092. In California, sports betting is not legal. Its prohibition is established by California Penal Code § 337a, which criminalizes various forms of bookmaking and wagering. Therefore, 18 U.S.C. §1084(b) is inapplicable.

21003. Under 18 U.S.C. § 1955(a), whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business can be held liable for violating this section. Section 1955(b)(4) establishes a non-exclusive and broad list of what qualifies as "gambling."

21104. An "illegal gambling business" under Section 1955(b)(1) qualifies as a business which: (1) violates state or local law; (2) involves five or more people who conduct, finance, manage, supervise, direct, or own all or part of the business; and (3) has been or remains in substantially continuous operation for more than 30 days or had a gross revenue of $2,000 in any single day.

21205. Defendants, by and through the Gaming Racket described herein, have knowingly conducted, financed, managed, supervised, directed, or owned all

or part of an illegal gambling business, as defined by 18 U.S.C. § 1955, that violates California Penal Code § 337a, which prohibits various forms of bookmaking and wagering including sportsbook.

21306. The following constitute relevant offenses under California Penal Code § 337a:

a. Pool selling or bookmaking, with or without writing, at any time or place. Cal. Penal Code § 337a(1).

b. Whether for gain, hire, reward, or gratuitously, or otherwise, keeps or occupies, for any period of time whatsoever, any room, shed, tenement, tent, booth, building, float, vessel, place, stand or enclosure, of any kind, or any part thereof, with a book or books, paper or papers, apparatus, device or paraphernalia, for the purpose of recording or registering any bet or bets, any purported bet or bets, wager or wagers, any purported wager or wagers, selling pools, or purported pools, upon the result, or purported result, of any trial, purported trial, contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever. Cal. Penal Code § 337a(2).

c. Whether for gain, hire, reward, or gratuitously, or otherwise, receives, holds, or forwards, or purports or pretends to receive, hold, or forward, in any manner whatsoever, any money, thing or consideration of value, or the equivalent or memorandum thereof, staked, pledged, bet or wagered, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever. Cal. Penal Code § 337a(3).

21407. The Gaming Racket designs, markets, and distributes these gaming contracts. In doing so, the Gaming Racket engages in pool selling and bookmaking as identified in Cal. Penal Code § 337a(1). Bookmaking, at its core, involves the business of receiving, recording, and accepting bets on the outcome of a contest. The "Yes" or "No" positions offered by the Gaming Racket on sports

events function as direct wagers on specific outcomes. The Gaming Racket acts as a central party in facilitating these wagers, accepting funds from participants, and distributing payout based on the result of the sports event. Additionally, the collection of funds from participants creates a pool of money that is then redistributed based on the event's outcome, which is characteristic of illegal pool selling. These activities are precisely the type of wagers or bets that the statute aims to prohibit, irrespective of any purported "market" or "exchange" framing.

21508. The Gaming Racket, through the operation of Robinhood's platform, keeps or occupies a "place" for the purpose of recording, registering, and otherwise facilitating these unlawful wagers, in contravention of Cal. Penal Code § 337a(2). Kalshi and Robinhood's digital interfaces, accessible by users in California, including on Indian reservations, serves as the virtual device where bets on the results of contests involving of "skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus" are continuously processed and managed.

21609. The Gaming Racket receives, holds, and forwards monies staked or wagered on the results of these sporting events in violation of Cal. Penal Code § 337a(3). Users deposit funds with Kalshi and Robinhood for the express purpose of purchasing these gaming contracts, which relate to contests of "skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus." These funds are then held and managed by the Gaming Racket. The fees charged on these transactions further align with the "for gain" language within Cal. Penal Code § 337a(3).

21710. The Gaming Racket involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business. These persons include, but are not limited to, Kalshi and Robinhood, their respective executives, officers, and employees responsible for the development, self-certification,

marketing, platform integration, and financial operations of the "prediction markets hub" and the gaming contracts.

2181. The illegal gambling business has been and remains in substantially continuous operation for a period in excess of 30 days, and/or has a gross revenue of $2,000 in any single day. The substantial volume of trades generating direct, shared revenue for the Gaming Racket through transaction fees on an ongoing basis since at least February 2025 demonstrates both a substantially continuous operation and daily gross revenues far exceeding the statutory threshold.

2192. As Federally recognized Indian Tribes holding the exclusive right to conduct Class III gaming within the State of California, the Tribes have suffered direct and substantial injury to their business by reason of Defendants' violations of 18 U.S.C. § 1962(c). The Gaming Racket's systematic engagement in a pattern of racketeering activity, encompassing wire fraud (18 U.S.C. § 1343), the transmission of wagering information (18 U.S.C. § 1084), and the operation of an illegal gambling business (18 U.S.C. § 1955) encroaches upon and usurps the Tribes' exclusive market. By conducting these unlawful activities, Defendants have impermissibly diverted revenue that, by law and compact, belongs exclusively to the Plaintiffs. This direct competition from the Gaming Racket, enabled and sustained by these prohibited racketeering acts, has caused the Tribes to suffer concrete and quantifiable injuries in the form of significant lost profits and diminished market share to their established and legally protected businesses.

220. Pursuant to the IGRA, specifically 18 U.S.C. § 1166, it is a federal crime to violate any state gambling laws with the Tribes Indian lands. Pursuant to 18 U.S.C. § 1166 all state laws concerning the licensing, regulation, or prohibition of gambling, including criminal penalties apply in Indian country, as defined by 18 U.S.C. § 1151, just as they do elsewhere in the state. In California sports gambling is a crime prohibited by Penal Code § 337a. The offering of the Defendants sports app within the Tribes Indian lands as described above constitutes sports gambling

and a violation of Penal Code § 337a. By engaging in illegal sports gambling on the Tribes Indian lands the Defendants have violated Penal Code § 337a, 18 U.S.C. § 1166 and impermissibly diverted revenue that, by law, compact and procedures belongs exclusively to the Tribes. This direct competition from these Gaming Racket criminal racketeering acts, has caused the Tribes to suffer concrete and quantifiable injuries in the form of significant lost profits in the millions of dollars and diminished the Tribes ' market share to their established and legally protected and sanctioned businesses.

22113. An actual case or controversy exists between the Tribes, Kalshi, and Robinhood, in that the Tribes assert that Kalshi and Robinhood have engaged in a coordinated and systematic pattern of criminal gaming racketeering activity under RICO, while Kalshi and Robinhood contend that their coordinated activities comply with the CEA and, therefore, do not violate RICO, 18 U.S.C. § 1962(c).

WHEREFORE, the Tribes pray as hereinafter set forth below.

## FOURTH CAUSE OF ACTIONN

**(Infringement of the Tribes' Sovereignty and Interference with Tribal Self-Governance)**

22214. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 22113 above and by this reference incorporate each allegation as if set forth herein in full.

22315. Kalshi's sports gambling activities are being conducted in direct violation of the Tribes' duly enacted gaming Ordinances which are incorporated into their gaming compact and procedures and, which prohibit sports gambling on their Reservations.

22416. By engaging in illegal sports gambling in violation of the Tribes' Ordinances, Kalshi is interfering with and will continue to interfere with the Tribes' ability to govern themselves, their members, and all persons who work, live, and visit their respective Reservations by preventing the Tribes from determining to what

Formatted: Indent: First line: 0"

extent and under what conditions, if any, persons, organizations, and entities can engage in class III gaming on their Reservations under their laws.

225. In addition, the Tribes are engaged in Tribal governmental gaming. Under the IGRA the Tribes can only spend their gaming revenue to: (1) fund tribal governmental operations or program; (2) provide for the general welfare of the Tribes' members; (3) promote economic development on their Indian lands; (4) donate to charitable organizations; and (5) help fund the operations of local governments. 25 U.S.C. § 2710(b)(2)(B). All of the Tribes' gaming revenue is used to provide essential governmental services to its members, promote economic development on their Reservations, and help fund local governmental programs that benefit their Reservations.

226. By engaging in their illegal criminal sports gambling activities both on-and-off of the Tribes' reservations, the Defendants have diverted revenue away from the Reservations and reduced the Tribes' governmental revenue forcing the Tribes to begin reducing the level of services and purposes that benefit their members thereby directly interfering in the ability of the Tribes to govern themselves and their members on their reservations.

2217. An actual controversy exists between the Tribes and Kalshi, in that the Tribes contend they have the authority to enforce their Ordinances against Kalshi and prohibit it from engaging in sports gambling on their Reservations, while Kalshi asserts that the Tribes have no such authority.

22818. Kalshi's past and future actions of violating the Tribes' Ordinances by engaging in sports gambling on the Tribes' Reservations impermissibly interferes with the ability of the Tribes to govern themselves on their Reservations under their own laws. *Williams v. Lee*, 358 U.S. 217 (1959).

2219. The Tribes has been irreparably injured by Kalshi's unlawful sports gambling on their Reservations and unless Kalshi is provisionally and permanently restrained and enjoined from engaging in such illegal gambling the Tribes will be prevented

from governing themselves on their Reservations under their own Tribal laws, causing severe and irreparable injury for which the Tribes have no plain, speedy, or adequate remedy at law.

WHEREFORE, the Tribes pray as hereinafter set forth below.

**(Civil RICO, 18 U.S.C. § 1962(c))**

172. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 171 above and by this reference incorporate each allegation as if set forth herein in full.

173. 18 U.S.C. § 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. A claim under § 1962(c) requires: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-97 (1985).

174. Kalshi Inc., KalshiEX LLC, Robinhood Markets, Inc., and Robinhood Derivatives, LLC are each a "person" within the meaning of 18 U.S.C. § 1961(3).

175. Kalshi Inc., KalshiEX LLC, Robinhood Markets, Inc., and Robinhood Derivatives, LLC together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Gaming Racket"). The Gaming Racket is engaged in, and its activities affect, interstate commerce. An association-in-fact enterprise requires a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit them to pursue the enterprise's purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009).

176. The Gaming Racket's members share a common purpose: offering wagers on the outcome of sporting events to the public through Robinhood's application, including to customers located on the Tribes' Reservations, and profiting from every wager placed. Kalshi supplies the contracts, the exchange, and,

Formatted: Centered, Indent: First line: 0", Right: 0", Widow/Orphan control

Formatted: Indent: First line: 0"

Formatted: Don't add space between paragraphs of the same style

through its affiliated clearinghouse, the means to hold stakes and pay winners. Robinhood supplies the customers, takes and funds their wagers, and guarantees them to Kalshi's clearinghouse. *See* ¶¶ 95–103, 114–115.

177. The members divide the functions of a single sports wagering business. Kalshi designs, lists, and prices the contracts, runs the exchange, and, through its affiliated clearinghouse, holds the stakes and pays the winners. Robinhood presents the contracts to its customers in its own application, takes their wagers, confirms and holds the money to cover them, places them on Kalshi's exchange, guarantees them to Kalshi's clearinghouse, receives the winnings, and shares in the revenue on every contract. *See* ¶¶ 100–103, 112–115.

178. The relationship between Kalshi and Robinhood is not an ordinary brokerage arrangement. Robinhood does not earn payment for order flow on Kalshi's contracts, as it does for the securities it offers; it shares in the revenue on every contract traded. Robinhood co-brands its prediction markets with Kalshi, and has incorporated Kalshi's rulebook and contract filings into its own platform. Under Kalshi's rules, Robinhood has guaranteed its customers' wagers to Kalshi's clearinghouse, and agreed to carry out Kalshi's directions concerning its customers' accounts. *See* ¶¶ 101, 111–113, 119.

179. The Gaming Racket has operated as a continuing unit since at least October 2024. Before Kalshi listed its first sports contract, Robinhood urged the CFTC to narrow the gaming prohibition to single sporting events, consistent with the position Kalshi was taking in its own litigation. In February 2025, Kalshi and Robinhood launched Super Bowl contracts together on Robinhood's platform. After the CFTC objected and Robinhood paused, they relaunched sports contracts together in March 2025, and have offered them together since. *See* ¶¶ 108–111, 116–118, 122.

180. Each Defendant conducted or participated, directly or indirectly, in the operation or management of the enterprise's affairs:

Formatted: Indent: First line: 0", Don't add space between paragraphs of the same style

(a) KalshiEX LLC designed and listed the sports event contracts, operated the exchange on which they were traded, and, through its affiliated clearinghouse, held the stakes and paid the winners. *See* ¶¶ 95–97, 136.

(b) Kalshi Inc. owns KalshiEX LLC and its affiliates and, on information and belief, directs their operations and funds the affiliated trading company that trades on Kalshi's exchange. *See* ¶¶ 12–13, 137.

(c) Robinhood Derivatives, LLC took its customers' wagers, confirmed and held the funds to cover them, placed them on Kalshi's exchange, guaranteed them to Kalshi's clearinghouse, received the winnings, and carried out Kalshi's directions concerning its customers' accounts. *See* ¶¶ 100–103, 119.

(d) Robinhood Markets, Inc. operates the application and prediction markets hub through which Robinhood's customers placed their wagers, and shares in the revenue on every contract traded. *See* ¶¶ 98–99, 112–114.

181. The Gaming Racket's affairs were conducted through a pattern of racketeering activity consisting of (1) the operation of an illegal gambling business, in violation of 18 U.S.C. § 1955, and (2) the transmission of bets, wagers, and information assisting in the placing of bets or wagers, in violation of 18 U.S.C. § 1084. Each is "racketeering activity" under 18 U.S.C. § 1961(1)(B).

182. The wagers the Gaming Racket accepted from customers located on the Tribes' Reservations were unlawful. California Penal Code § 337a prohibits pool selling and bookmaking, and the recording, registering, receiving, holding, or forwarding of wagers on the result of any contest of skill, speed, or power of endurance. Cal. Penal Code § 337a(a)(1)–(3). Under 18 U.S.C. § 1166, California's gambling laws, including § 337a, apply in Indian country in the same manner and to the same extent as elsewhere in the State. And the Ninth Circuit has held that Kalshi's sports event contracts, when entered on Indian lands, are likely class III gaming conducted in violation of IGRA, the Tribes' Secretarial Procedures, and their

Formatted: Normal, Left, Indent: First line: 0", Don't add space between paragraphs of the same style

Formatted: Indent: Left: 0", Don't add space between paragraphs of the same style

gaming ordinances, and that neither the Commodity Exchange Act nor UIGEA displaces IGRA. *See* ¶ 124.

183. Under 18 U.S.C. § 1955, it is a crime to conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business, meaning a gambling business that (1) violates the law of the State in which it is conducted; (2) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of it; and (3) has been in substantially continuous operation for more than thirty days, or has had gross revenue of $2,000 in any single day. 18 U.S.C. § 1955(b)(1).

Formatted: Normal, Left, Indent: First line: 0", Don't add space between paragraphs of the same style

184. The Gaming Racket's sports wagering business on the Reservations was an illegal gambling business:

Formatted: Indent: First line: 0", Don't add space between paragraphs of the same style

(a) It violated California Penal Code § 337a, as applied on the Reservations by 18 U.S.C. § 1166. *See* ¶ 183. KalshiEX LLC and its clearinghouse recorded and registered each wager, received and held the money staked, and paid the winners from it. Robinhood received its customers' wagers and the money to cover them, and forwarded both to Kalshi's exchange. *See* ¶¶ 95, 102, 136.

(b) It involved five or more persons who conducted, financed, managed, supervised, directed, or owned all or part of it, including KalshiEX LLC, Kalshi Klear LLC, Kalshi Trading LLC, Kalshi Inc., Robinhood Markets, Inc., and Robinhood Derivatives, LLC, and the officers and employees of each who directed their operations. *See* ¶¶ 97–103, 136–137.

(c) It has been in substantially continuous operation since January 22, 2025, far more than thirty days, and has had gross revenue far exceeding $2,000 on single days. *See* ¶¶ 95, 117, 122.

185. Each Defendant conducted, financed, managed, supervised, directed, or owned all or part of that business. *See* ¶ 181. Each wager accepted from a customer located on a Reservation was a separate violation of 18 U.S.C. § 1955.

186. 18 U.S.C. § 1084(a) prohibits anyone "engaged in the business of betting or wagering" from knowingly using a wire communication facility for the transmission

in interstate commerce of bets or wagers, or information assisting in the placing of bets or wagers, on any sporting event or contest, or of a wire communication entitling the recipient to receive money or credit as a result of bets or wagers.

187. Kalshi and Robinhood are engaged in the business of betting or wagering. Kalshi lists sports event contracts, accepts wagers on them, holds the stakes through its clearinghouse, pays the winners, and charges fees on each transaction. Robinhood takes its customers' wagers, places them on Kalshi's exchange, and earns revenue on every contract traded. *See* ¶¶ 95, 102, 112, 136.

188. Kalshi and Robinhood knowingly used wire communication facilities to transmit, in interstate commerce, bets and wagers on sporting events placed by customers located on the Reservations; information assisting in the placing of those bets and wagers, including contract prices; and communications entitling customers to receive money as a result of them. Each wager placed by a customer on a Reservation in California was transmitted over the internet to Kalshi's exchange in New York, directly or through Robinhood Derivatives in Illinois, and Kalshi transmitted confirmation and settlement information back. *See* ¶ 115.

189. The exception in 18 U.S.C. § 1084(b) does not apply. It covers only the transmission of information assisting in the placing of bets "from a State . . . where betting on that sporting event or contest is legal into a State . . . in which such betting is legal." Betting on these sporting events was not legal on the Reservations. *See* ¶ 183.

190. Kalshi and Robinhood acted knowingly. They knew they were accepting wagers on sporting events: Kalshi had told federal courts that contracts on sporting events are "[t]he classic example" of gaming, and Robinhood had urged the CFTC to treat single sporting events as gaming. *See* ¶¶ 108–110. They knew who placed each wager and where. *See*¶¶ 103–107. And they had the authority to stop any customer from wagering, but did not restrict access on the Reservations until after the Ninth Circuit's decision in this action. *See* ¶¶ 119, 122, 125.

~~191. Each wager accepted from a customer located on a Reservation, and each interstate transmission of such a wager, was a separate predicate act. The acts are related: they shared the same purpose, participants, victims, and methods of commission. And they are continuous: they occurred repeatedly over twenty months, from January 22, 2025, until at least September 24, 2026, as part of the Gaming Racket's regular way of doing business. *See* ¶ 122.~~

~~192. Each Tribe's business is the operation of class III gaming on its Reservation. Under IGRA, the Tribes' Secretarial Procedures and Compact, and their gaming ordinances, class III gaming on each Reservation may be conducted only as the Tribe authorizes. No other person may lawfully conduct class III gaming there. *See* ¶¶ 34, 36, 39–47.~~

~~193. By reason of Defendants' violations of 18 U.S.C. § 1962(c), the Tribes have been injured in their business and property, in an amount to be proven at trial. Under 18 U.S.C. § 1964(c), the Tribes are entitled to recover threefold their damages and the cost of the suit, including a reasonable attorney's fee.~~

~~194. An actual case or controversy exists between the Tribes, Kalshi, and Robinhood, in that the Tribes assert that Kalshi and Robinhood have engaged in a coordinated and systematic pattern of criminal gaming racketeering activity under RICO, while Kalshi and Robinhood contend that their coordinated activities comply with the CEA and, therefore, do not violate RICO, 18 U.S.C. § 1962(c).~~

~~WHEREFORE, the Tribes pray as hereinafter set forth below.~~

**Formatted:** Indent: First line: 0", Right: 0", Don't add space between paragraphs of the same style, Widow/Orphan control

**Formatted:** Font: Bold, Underline

**~~FIFTH CAUSE OF ACTION~~**

**(False Advertising – Lanham Act, 15 U.S.C. § 1125(a)(1)(B))**

15212320. The Tribes reallege each of the allegations set forth in Paragraphs 1 through 15102219 above and by this reference incorporate each allegation as if set forth herein in full.

15322321. The following five elements must be established by a plaintiff in

order to make out a claim for false or deceptive advertising on the part of a defendant: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Servs., Inc.,* 911 F.2d 242, 244 (9th Cir. 1990).

1543232. The House Advertisement is false or misleading on two independent grounds.

1554233. First, the House Advertisement conveyed that because there is no house, Kalshi's customers are trading on a financial exchange, not gambling. That message is false. Staking money on the outcome of a sporting event for the chance of a payout is gambling, whether the wager is placed against a house or against other bettors. Kalshi's sports event contracts contain every element of gambling: consideration, chance, and prize.

1565234. Second, the House Advertisement's statements that Kalshi "[isn't] the house," that customers "trade against other users," and that Kalshi makes money "on transaction fees, not market settlements" are false or misleading. Each customer's contract is with Kalshi Klear, the clearinghouse and a Kalshi company. Kalshi chooses, obligates, and pays the market makers who take the other side of its customers' trades, including in its sports markets. And Kalshi permits it to charge fees on the settlement of contracts.

1576235. Kalshi also stated in its advertisements that sports betting is legal in California and in all 50 States. *See* ¶¶ 140–141. In making those statements, Kalshi represented to consumers that it believed them to be true. Kalshi had no good-

faith basis for that belief. In every forum, Kalshi has contended that its product is not sports betting, and that state laws prohibiting sports betting would otherwise apply. *See* ¶ 144. Before listing its first sports contract, Kalshi told federal courts that a contract on a sporting event is "[t]he classic example" of gaming. *See* ¶ 145. And Kalshi disseminated the California Advertisement, which announced as "Breaking News" that "Sports Betting in California is Now Legal," after receiving cease-and-desist letters from state regulators, after the California Attorney General issued an opinion concluding that sports wagering in California violates state law, and after the Tribes filed this action. *See* ¶¶ 141, 146. No change in California law preceded that announcement. Kalshi's representation that it believed its statements was therefore false.

1587236. Each of these statements were made in commercial advertising or promotion, disseminated in interstate commerce over the Internet and other media, including to consumers in California, to induce consumers to purchase Kalshi's sports event contracts.

1598237. Kalshi's advertisements actually deceived, or have the tendency to deceive, a substantial segment of their audience. Social media users have repeated Kalshi's message that its sports products are trading rather than gambling and are therefore legal. *See* ____.

16059238. The deception is material. Whether an activity is gambling and, whether it is legal , and whether the operator or those it pays profit from a customer's losses are each likely to influence a consumer's decision to wager. In a State where sports betting is otherwise unavailable, the claimed legality of sports betting on Kalshi is central to that decision.

1610239. Kalshi and the Tribes compete for the gaming expenditures of the same consumers in California. Kalshi's sports event contracts are class III gaming , *see* ¶ 124, and they are available to those consumers throughout California. Until at least September 24, 2026, they were available even on the Tribes' gaming

floors. See ¶¶ 120–122, 125, 150–151. Because sports betting is not otherwise available in California, consumers who want to wager on sporting events choose between Kalshi and other forms of gaming, including the gaming the Tribes offer.

1621240. As a direct and proximate result of Kalshi's false and misleading advertisements, the Tribes have lost sales and profits at their class III gaming facilities. By persuading consumers that wagering on Kalshi is trading rather than gambling, that no house profits from their losses, and that it is legal in California, Kalshi's advertisements induced consumers to spend money on Kalshi's sports event contracts that they would otherwise have spent at the Tribes' facilities. See ¶¶ 150–152.

1632241. The Tribes have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law. Kalshi's geolocation measures restrict wagering on the Reservations, see ¶ 125, but they do not stop Kalshi's advertisements, which remain publicly accessible, see ¶ 126, or the diversion of California consumers' gaming expenditures from the Tribes' facilities to Kalshi. Lost patronage and the diversion of gaming revenue that funds the Tribes' governments and the services they provide their members cannot be fully measured or remedied by damages. See ¶ 150. The Tribes are entitled to injunctive relief under 15 U.S.C. § 1116(a). Under 15 U.S.C. § 1117(a), the Tribes are further entitled to recover Kalshi's profits attributable to its false advertising, the Tribes' damages, and the costs of the action.

2322. Kalshi has made and Robinhood has assisted in Kalshi making multiple false and misleading statements of fact concerning the legality and nature of its sports event contracts. These include statements to consumers that Kalshi's sports events contracts are fully legal and accessible nationwide despite the defectiveness of these contracts under 17 C.F.R. 40.2. Kalshi also repeatedly referred to its sports events contracts as "betting." This includes statements that Kalshi is "The First

Nationwide Legal Sports Betting Platform" and offers "Sports Betting Legal in all 50 States on Kalshi." *See supra* ¶ 94.

2323. Kalshi and Robinhood knew, or should have known, that its advertising was false, misleading, and deceptive, as numerous online users have expressed concern regarding the legality of these contracts. *See supra* ¶ 100. Kalshi has also continued to keep advertisement posts on its social media platforms that refer to these contracts as betting.

2324. Each of these false or misleading statements was made in the context of a commercial advertisement or promotion, including Instagram advertisement posts and Reels, TikTok video product promotions, TV commercials, YouTube videos, X.com posts, and Kalshi's own websites, distributed across the Internet and designed to promote purchasing of Kalshi's sports event contracts to consumers nationwide.

2325. Statements made in these advertisements have deceived, and are still likely to deceive, consumers into believing that Kalshi was associated with or created as a gambling platform affirmatively endorsed by the federal government. Currently, on its social media platforms, Kalshi's advertisements for sports event contracts are in close proximity to political events advertisements that use the terms "bet" and "betting." *See supra* ¶ 104. And in fact, Internet comments indicate that consumers were actively deceived on this point. Defendants' false and misleading statements have caused harm to the public and, unless restrained, will further damage the public.

2326. This deception is also material, as it is likely to cause a consumer to purchase Kalshi's the Defendants sports event contracts, believing its their products were universally compliant and that Kalshi the Defendants' app was a legally compliant sports betting platform.

2327. As a result of Kalshi's the Defendants' false and misleading statements, the Tribes have suffered damages through lost sales and lost profits of their Class III

Formatted: No widow/orphan control

businesses, as well as continuing damage to the Tribes' business, goodwill, and reputation. The Tribes have suffered and continue to suffer immediate and irreparable injury for which there is no adequate remedy at law. The Tribes are entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a). Furthermore, under 15 U.S.C. § 1117(a), the Tribes are entitled to recover Kalshi's the Defendants' profits on its sports event contracts in addition to any damages sustained and the costs of the action, ensuring that Kalshi doesthe Defendants do not benefit from its their unlawful conduct.

1643242328. An actual case or controversy exists between the Tribes and KalshiKalshithe Defendants, in that the Tribes assert that Kalshi the KalshiDefendants hassves made false statements of fact in advertisements distributed in interstate commerce in violation of 15 U.S.C. § 1125(a)(1)(B), while Kalshi Kalshithe Defendants contendss that its advertisements are accurate and comply with 15 U.S.C. § 1125(a)(1)(B).

WHEREFORE, the Tribes pray as hereinafter set forth below.

///

Formatted: Indent: First line: 0.5"

## PRAYER FOR RELIEF

Pursuant to their claims and causes of action alleged herein, the Tribes pray as follows:

1. That the Court declare Kalshi's sports event contracts to be outside the permissible scope of the CEA as self-certified contracts that involve, relate to, or reference gaming in contravention of the prohibition in 17 C.F.R. § 40.11(a)(1) and, therefore, Kalshi's contracts constitute illegal class III gaming activity in violation of 18 U.S.C. § 1166 and 25 U.S.C. §§ 2701-2721 IGRA;

2. That the Court declare that Kalshi's and Robinhood's conduct is unlawful class III gaming activity in violation of IGRA18 U.S.C. § 1166 and, therefore, subject to injunctive relief under IGRA, 25 U.S.C. § 2710(d)(7)(A)(ii);

3. That the Court declare that Kalshi, as a self-certifying registered entity, self-regulating the products offered on its DCM, is impermissibly regulating an area of Indian commerce, within the field of class III gaming activity in Indian country, outside the permissible scope of the CEA, where IGRA occupies the field of regulation and grants Tribes the exclusive right to regulate class III gaming activity on Indian lands;

4. That the Court declare that Kalshi's the Defendants' gambling activities on the Tribes' Reservations violates the Tribes' Gaming Ordinances, compacts, procedures and constitutes an impermissible interference with the ability of the Tribes to govern themselves on their Reservations under their own laws;

5. That the Court preliminarily and permanently enjoin Kalshi and Robinhood from offering sports events contracts on the Tribes' Indian lands;

6. That the Court declare that Kalshi's and Robinhood's joint conduct demonstrates systematic engagement in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c);

7. That the Tribes be awarded treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1962(c) and the Tribes' own attorney fee ordinances; and

68. That the Court order injunctive relief as permitted by 15 U.S.C. § 1116(a), and award damages, including disgorgement of ill-gotten gains, lost profits, costs, and attorneys' fees, as permitted by 15 U.S.C. § 1117(a); and

79. That the Court grants such other and further relief as may be deemed appropriate.

Formatted: Line spacing: Exactly 24 pt

Respectfully Submitted,

DATED: August 14November 43July 22, 20265 RAPPORT AND MARSTON

By: /s/ *Lester J. Marston*

LESTER J. MARSTON, Attorney for the Blue Lake Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians, and the Buena Vista Rancheria of Me-Wuk IndiansPicayune Rancheria of Chukchansi Indians